Jennifer A. Lenze, Esq., CA Bar No. 246858
**LENZE LAWYERS, PLC**
999 Corporate Drive, Suite 100
Ladera Ranch, CA 91765
T: (310) 322-8800
F: (310) 322-8811
jlenze@lenzelawyers.com

Brooke Cohen, Esq., TX Bar No. 24007019 (phv pending)
Andrea Hirsch, Esq. GA Bar No. 666557 (phv pending)
**COHEN HIRSCH, LP**
5256 Peachtree Road, Suite 195-E
Atlanta, GA 30341
T: (678) 268-4683
brooke@cohenhirsch.com
andrea@cohenhirsch.com
*Attorneys for PLAINTIFF*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANYA ROBERTS**, | ) **CASE NO. 2:23-cv-10492** |
| Plaintiff, | ) **COMPLAINT FOR DAMAGES FOR:** |
| v. | ) |
| **EXP REALTY, LLC, EXP WORLD HOLDINGS, INC., MICHAEL L. BJORKMAN; DAVID S. GOLDEN; BRENT GOVE, EMILY KEENAN, GLENN SANFORD; MICHAEL SHERRARD, and DOES 1-10,** | ) 1) **Violation of 18 U.S.C. § 1591** <br> 2) **Violation of 18 U.S.C. § 1591** <br> 3) **Violation of 18 U.S.C. § 1595** <br> 4) **Sexual Battery** <br> 5) **Civil Battery** <br> 6) **Intentional Infliction of Emotional Distress** <br> 7) **Negligent Hiring, Retention, and Supervision** |
| Defendants. | ) |
| _____ | ) **DEMAND FOR JURY TRIAL** |

PLAINTIFF ANYA ROBERTS, complaining of DEFENDANTS eXp REALTY, LLC; eXp WORLD HOLDINGS, INC., hereinafter referred to collectively as "eXp" or "eXp REALTY"; MICHAEL L. BJORKMAN; DAVID S. GOLDEN; GLENN SANFORD; BRENT GOVE; EMILY KEENAN, MICHAEL SHERRARD; and DOES 1-10, (hereinafter referred to as "Defendants") by her attorneys Cohen Hirsch, LP, and Lenze Lawyers, PLC, respectfully sets forth and alleges the following, upon information and belief:

## PRELIMINARY STATEMENT

1.      This is a case of drugging and sexual assault, "bad actors", and a company, eXp,[1] who at *worst* knew of, encouraged, and permitted abhorrent behavior or at the *least* recklessly disregarded and willfully turned a blind eye to the actions of its top agent influencers for the benefit of its bottom line.

2.      The detestable actions that are the subject of this complaint (the drugging and sexual assault) were rampant within eXp, during eXp events, agent sponsored events, as well as events where eXp was in attendance, permeating the company's culture.

3.      In April 2022, an eXp Realty Board Member addressed eXp Realty's failure to take any action to curb the sexual assault incidents that were occurring at eXp Realty. On par with eXp's treatment of complaints related to sexual harassment, sexual assault,

---

[1]Self-proclaimed to be "one of the world's fastest-growing real estate brokerages" with a cloud-based model and agents around the world benefiting financially through both agent attraction, *i.e.,* recruitment of agents to grow a "pyramid" type structure (multi-level marketing "MLM"), and secondarily, the sale of real estate.

drug use and the like, DEFENDANT eXp REALTY not only ignored this request to take action, but also DEFENDANT eXp CEO, GLENN SANFORD, expressed to this same board member that this was not their problem and would be simply a three to five day newspaper phenomenon and then would disappear.

4.   In kind, after having actual knowledge of the drugging and assault of Ms. Roberts, DEFENDANT eXp REALTY never reached out to Ms. Roberts to conduct any interview or investigation. In complete contrast to DEFENDANT SANFORD's belief about the incidents' lack of impact for eXp, Ms. Roberts will be impacted forever by the events described in this complaint.

## **JURISDICTION**

5.   This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1591.

6.   This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, which provides that district courts of the United States have jurisdiction over cases between a citizen of a state and a subject of a foreign state if the amount in controversy exceeds $75,000.

7.   This Court also has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the related federal claims over which this Court has original jurisdiction.

8.      This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. §1595.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as DEFENDANT MICHAEL L. BJORKMAN resided in this district and division at all times complained of herein.

## **THE PARTIES**

10.      PLAINTIFF ANYA ROBERTS is a citizen of Florida and is a licensed real estate agent with DEFENDANT eXp REALTY.

11.      DEFENDANT eXp WORLD HOLDINGS, INC. is a corporation duly organized and existing under and by virtue of the State of Delaware and has its principal place of business at 2219 Rimland Drive, Suite 301, Bellingham, Washington 98226.

12.      DEFENDANT eXp REALTY, LLC is a corporation duly organized and existing under and by virtue of the State of Washington has its principal place of business at 2219 Rimland Drive, Suite 301, Bellingham, Washington 98226.

13.      DEFENDANT MICHAEL BJORKMAN is a citizen of the State of California and resides in Ventura County, CA; he was a former real estate agent with DEFENDANT eXp REALTY, as well as an "Influencer" (defined *infra*) at DEFENDANT eXp REALTY, and upon information and belief, is a current Revenue Share Participant (defined *infra*) with DEFENDANT eXp REALTY.  DEFENDANT GOLDEN is DEFENDANT BJORKMAN's sponsor agent.

14.     DEFENDANT DAVID S. GOLDEN is a citizen of the State of Nevada and a former real estate agent with DEFENDANT eXp REALTY; he is also an "Influencer" (defined infra) at DEFENDANT eXp REALTY and on information and belief is still a current Revenue Share Participant (defined *infra*) with DEFENDANT eXp REALTY.

15.     DEFENDANT GLENN SANFORD is a citizen of the State of Washington, the Founder of eXp Realty, and is Agent #1 in the Revenue Share Program (defined *infra*) with DEFENDANT eXp REALTY.

16.     DEFENDANT BRENT GOVE is a citizen of the State of California; he is a real estate agent with DEFENDANT eXp REALTY, a top "Influencer" (defined *infra*) at DEFENDANT eXp REALTY, and a current Revenue Share Participant (defined *infra*) with DEFENDANT eXp REALTY.

17.     DEFENDANT EMILY KEENAN is a citizen of Arizona.

18.     DEFENDANT MICHAEL SHERRARD is a citizen of Canada and a real estate agent with DEFENDANT eXp REALTY; he is a top "Influencer" (defined *infra*) at DEFENDANT eXp REALTY, and a current Revenue Share Participant (defined *infra*) with DEFENDANT eXp REALTY.  DEFENDANT SHERRARD is a current Revenue Share Participant (defined *infra*) and regularly conducts business throughout the United States to recruit more members into eXp REALTY'S Revenue Share pyramid.

19.     The true names and capacities, whether corporate, associate, individual or otherwise of Defendants DOES 1 through 10, inclusive, are unknown to PLAINTIFF, who therefore sues said Defendants by such fictitious names. Each of the DEFENDANTS

designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to and caused injuries and damages proximately thereby to PLAINTIFF, as herein alleged. PLAINTIFF will seek leave to amend this Complaint to show their names and capacities when the same have been ascertained.

## SPECIFIC FACTUAL ALLEGATIONS

### The Initial Recruitment of Ms. Roberts into eXp Realty

20.     Prior to meeting DEFENDANTS, Ms. Roberts had a successful real estate career as a top agent in her market with ReMax.

21.     Beginning in 2018, Ms. Roberts was inundated with social media posts about joining eXp REALTY.

22.     As part of these recruiting efforts, Ms. Roberts travelled to New Orleans, LA to attend EXPCON which was held on October 22-24, 2018.

23.     As part of these recruiting efforts, Ms. Roberts' prospective sponsor and upline provided complimentary meals and attended multiple high-pressure, one on one meetings with some of eXp REALTY's top recruiting Sponsor Agents ("Influencers") in an effort to persuade her to join eXp REALTY.

24.     DEFENDANT GOVE was personally involved in this high-pressure recruitment effort of Ms. Roberts.

25.     One of the strongest pitches made to Ms. Roberts was that by joining eXp REALTY, she would be entering one of the top levels and strongest downlines of eXp's

multi-level marketing Revenue Share Plan pyramid[2] (*i.e.* DEFENDANT GOVE's downline).

26.    As her family's breadwinner, one of the main reasons Ms. Roberts was interested in joining DEFENDANT eXp REALTY was so that she could participate in its Revenue Share Program and Stock options which would allow her to receive "passive income."

27.    As a result of these promises and recruiting efforts, in December 2018, PLAINTIFF Roberts officially joined eXp.  Ms. Robert's eXp Realty "upline" is as follows (the position directly above her in the MLM pyramid is her sponsor Chris Bear listed below in the Tier 1 position):

| Level | eXp Sponsor Agent | eXpansion Share % of AGCI | eXponential Share % of AGCI |
|---|---|---|---|
| TIER 1 | Chris Bear | /// | 3.5% |
| TIER 2 | Cliff Freeman | .2% | 3.8% |
| TIER 3 | Brent Gove | .1% | 2.4% |
| TIER 4 | Sheila Fejeran | .1% | 1.4% |
| TIER 5 | Jennifer Vaughan Flick | .1% | 0.9% |
| TIER 6 | Gene Frederick | .5% | 2.0% |
| TIER 7 | Elizabeth Riley | .5% | 4.5% |

---

[2] DEFENDANT eXp REALTY maintains a revenue-sharing plan whereby each of its agents and brokers participate in and can receive monthly and annual residual overrides on the gross commission income resulting from transactions consummated by agents and brokers who they have attracted to eXp REALTY.

28.     When Ms. Roberts initially joined eXp REALTY, she selected Chris Bear as her sponsor because he promised to support her and to help her develop her downline, as well as her real estate business.

29.     Initially, the majority of Ms. Roberts' income came from selling homes. However, over time, this income stream began to shift, as she was pressured by DEFENDANT GOVE and DEFENDANT eXp REALTY to give up her sales career to completely focus on recruiting other agents to join eXp REALTY.

30.     At each eXp REALTY event Ms. Roberts attended, rather than educating attendees on the real estate trade, eXp REALTY focused mostly on Agent Attraction and how to attract more agents to join eXp REALTY; DEFENDANT GOVE espoused this as gospel.

31.     DEFENDANT eXp REALTY, DEFENDANT SANFORD and DEFENDANT GOVE stressed at these conferences that the sole path to success at eXp REALTY was not selling real estate, but rather, attracting more people to join DEFENDANT eXp REALTY. In essence, DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY's focus was on recruitment and the money that could be made by recruiting others, rather than simply selling real estate.

### Dallas, Texas

32.     On December 3, 2019, Ms. Roberts and a couple of members in her downline traveled to Dallas, Texas to attend a real estate training event hosted by eXp REALTY top agent influencer, Jay Kinder.

33.     During the event, they were invited by a top eXp agent in her upline to join their team happy hour event.  This event had an open bar with copious amount of alcohol.

34.     At the conclusion of the event, the upline agent invited a few individuals, including Ms. Roberts, to go to another location at a private club a few doors down.

35.     At the second event, someone in Ms. Roberts' upline acted grossly inappropriate to an agent in Ms. Roberts' downline.

36.     When Ms. Roberts' downline agent rebuffed the upline agent's inappropriate conduct, the upline agent stopped inviting Ms. Roberts to key meetings and events and no longer included her into the eXp REALTY inner circle which was necessary for her success in eXp REALTY.

37.     Ms. Roberts' downline agent ultimately left eXp REALTY and took her downline with her.

38.     Alienation from the inner circle at eXp REALTY translated into lost revenue.

## Puerto Vallarta, Mexico

39.     Starting as early as February 2019, eXp Top Influencer, Rob Flick and DEFENDANT GOVE started pushing its members to attend their conference Freedom Summit 2020 event in Puerto Vallarta, Mexico.



40.     DEFENDANT eXp REALTY was a sponsor of the event and contributed a significant amount of money to the conference.

41.     In one of the recruiting videos designed to convince real estate agents to attend this event, DEFENDANT GOVE told the audience that "Proximity is Power", after which he introduced Mr. Flick to promote the conference.

42.     Mr. Flick promoted the conference as a "super all inclusive, all your food, all your alcohol, everything…. It's based on double occupancy, two people to a room.  So, if you're signing up, you're gonna want to get two so that you've got the whole room otherwise you'll just be placed with someone, and you might not like that placement.  Oh well, get over it."  Flick explained that the big reason to go to this event is that "you're

COMPLAINT FOR DAMAGES

away from your work environment. People relax, they let go." The goal of the event is "getting to know other people on a personal level."

43.    He further explained that those people attending the event would be given recruitment "scripts and dialogues and talking and things to be able to utilize in different situations for whether it's individual agents, Team agents, offices, whatever that we've used that have worked very significantly for some of us that have done that quite a bit. That's that's [sic] a really big deal." "We are going to talk about building wealth."

44.    After receiving multiple personal invitations from DEFENDANT GOVE and Rob Flick, on February 4, 2020, Ms. Roberts and her business partner flew to Puerto Vallarta, Mexico to attend the Freedom Summit.

45.    Based on the numerous statements made by DEFENDANT GOVE and other eXp REALTY agents, Ms. Roberts understood it was very important that she attend the conference so she could get access to the top agents at eXp REALTY as well as information to use, which, according to DEFENDANT GOVE, was essential to her success at eXp REALTY.

46.    Due to the agent in Ms. Roberts' downline previous rejection of the inappropriate conduct of the agent in their upline, the upline agent did not invite her to any key meetings with top leaders, and Ms. Roberts was very concerned that her ability to be successful at eXp Realty was in jeopardy.

COMPLAINT FOR DAMAGES

47.     On February 8, 2020, Ms. Roberts attended one of the signature events - a sunset booze cruise across Banderas Bay to Las Caletas, a beach only accessible by boat. Included in this event was a lavish dinner, all you can drink, and entertainment.

48.     Nearly all of eXp REALTY's top executives and top agent influencers, including DEFENDANT GOLDEN, his girlfriend DEFENDANT KEENAN, DEFENDANT BJORKMAN and DEFENDANT GOVE were in attendance, which further validated the main reason Ms. Roberts decided to attend this special event -- she believed it was even more important for her career to "rub shoulders" (given the events described above) as DEFENDANT GOVE often lauds, with the "Who's Who" of eXp REALTY.

49.     DEFENDANT GOVE and his wife and children were on board the boat back to the hotel with DEFENDANT KEENAN, DEFENDANT GOLDEN, and Ms. Roberts, among others.

50.     While on the boat, DEFENDANT KEENAN, invited Ms. Roberts to sit at the back of the boat so that Ms. Roberts could personally meet DEFENDANT GOLDEN—an invitation Ms. Roberts was excited to get because she knew that DEFENDANT GOLDEN was one of eXp REALTY's top agent Influencers.

51.      DEFENDANT GOLDEN, in fact, was introduced by DEFENDANT GOVE to speak on stage at the conference; during the introduction DEFENDANT GOVE described DEFENDANT GOLDEN'S career as a "Cinderella Story" and allowed DEFENDANT GOLDEN to speak for over twenty minutes about his rags to riches success story with eXp REALTY.

52.     At that time, Ms. Roberts believed that she could trust DEFENDANT

GOLDEN since DEFENDANT eXp REALTY and DEFENDANT GOVE held

DEFENDANT GOLDEN out to be one of eXp REALTY's leaders in the real estate

industry as evidenced by his speaking engagement at the Freedom Summit.



53.     During that conversation on the boat with DEFENDANT GOLDEN,

DEFENDANT KEENAN, put a pill into Ms. Roberts' mouth, telling her it was an Adderall

and further stating that it simply would give her energy.  Soon thereafter, Ms. Roberts

blacked out and does not have any personal recollection of what happened the remainder of

the evening.[3]

---

[3] Ms. Roberts later learned from other attendees on the boat that she was acting wildly out
of character and was acting inappropriately for a work event. Ms. Roberts now understands
that she was drugged.

COMPLAINT FOR DAMAGES

54.     Ms. Roberts was told that she was kissing DEFENDANT KEENAN in front of DEFENDANT GOVE and his family.  She also learned that she got separated from her friends and that she went missing for an extended period of time during which her friends were searching for her and were very concerned for her safety. Ms. Roberts has no independent recollection of that night.

55.     Ms. Roberts believes she was sexually assaulted by DEFENDANT GOLDEN, DEFENDANT KEENAN and others that evening.

56.     The next thing Ms. Roberts recalls is waking up in her own hotel room the following day, February 9, 2020.  Shortly thereafter, DEFENDANT KEENAN contacted Ms. Roberts to let her know that she had her credit card[4] and that they should meet so that she could return the credit card to Ms. Roberts.

57.     That same morning, DEFENDANT KEENAN told another attendee that she "pulled a girl for the first-time last night"; the girl that was drugged and "pulled" was Ms. Roberts.

58.     Later that day, Ms. Roberts went to DEFENDANT GOLDEN's room to meet with DEFENDANT KEENAN and DEFENDANT GOLDEN to retrieve her belongings. DEFENDANT KEENAN and DEFENDANT GOLDEN were having drinks and offered her one, which she accepted.

---

[4] Ms. Roberts has no idea how DEFENDANT KEENAN got her credit card.

COMPLAINT FOR DAMAGES

59.     Soon after having that drink, Mr. Roberts lost a significant portion of her memory.

60.     While much of that day and night is a blur, Ms. Roberts does recall a few details.  In particular, she recalls regaining her consciousness to find DEFENDANT KEENAN 's fingers in her vagina and DEFENDANT GOLDEN standing over them rubbing his erect penis over his pants.  Ms. Roberts immediately jumped away—shocked and upset.  DEENDANT GOLDEN sent DEFENDANT KEENAN away and tried to calm Ms. Roberts down by talking to her as if they were in the middle of a business meeting, whereby he began promising he would take care of her financially.

61.      Ms. Roberts recalls DEFENDANT GOLDEN telling her that if she left her current eXp sponsor, Chris Bear, and choose DEFENDANT GOLDEN as her sponsor, DEFENDANT GOLDEN would catapult her career while promising her financial success.

62.     While drugged, dazed, and confused about what had just happened, DEFENDANT GOLDEN gaslit Ms. Roberts, telling her that he was going to make her a hugely successful top agent at eXp REALTY, just like him.

**Las Vegas, Nevada**

63.     As soon as Ms. Roberts returned home from Mexico, DEFENDANT GOLDEN began inundating her with text messages and calls to convince her to change her sponsor.  As part of this recruitment campaign, DEFENDANT GOLDEN would at times profess his love to Ms. Roberts, and at other times, would make promises that he would bring her financial success so long as she did EXACTLY what he told her to do.

64.     At DEFENDANT GOLDEN's invitation, Ms. Roberts travelled to Las Vegas on February 11, 2020, to attend another recruiting event.  During that trip, DEFENDANT GOLDEN continued with his pressure campaign to get her to change her current sponsor to DEFENDANT GOLDEN.

65.     Ms. Roberts was hesitant to change her sponsor because amongst other reasons as described above, to do so, under eXp REALTY's rules, would have required her to leave eXp REALTY for six months.

66.     On February 16, 2020, Ms. Roberts received a text message from DEFENDANT GOLDEN stating that he had spoken with DEFENDANT GOVE and based on their conversation it "looks like they just changed the rules."

67.     Despite her reluctance to switch sponsors, DEFENDANT GOLDEN proceeded to "love bomb"[5]  her to get her to switch sponsorship.

68.     On February 21, 2020, Ms. Roberts traveled to Las Vegas to attend the Grant Cardone's 10X Growth Conference because DEFENDANT GOVE had given her a free ticket to go as his guest.

69.     DEFENDANT GOVE and DEFENDANT GOLDEN also invited her to attend an exclusive dinner along with DEFENDANT GOVE's assistant and a prospective recruit,

---

[5] Love bombing is a form of psychological and emotional abuse that involves a person going above and beyond for you in an effort to manipulate you into a relationship with them.  https://health.clevelandclinic.org/love-bombing. This term is characterized by excessive attention, admiration, and affection where the end goal is to cause the recipient to feel dependent and obligated to that person.

COMPLAINT FOR DAMAGES

paid for by DEFENDANT GOVE.  DEFENDANT GOLDEN and DEFENDANT GOVE professed they could help her career by putting her in position to "rub shoulders" with eXp REALTY's inner circle of top agent Influencers.

70.     In an effort to further entice Ms. Roberts, DEFENDANT GOVE shared his monthly revenue share he received from the eXp Revenue Share pyramid at that time.

71.     Because Ms. Roberts's current sponsor provided only minimal assistance to grow Ms. Robert's downline, DEFENDANT GOLDEN, with DEFENDANT GOVE's knowledge and consent, pressured Ms. Roberts to switch sponsors and name DEFENDANT GOLDEN as her new sponsor.  DEFENDANT GOLDEN promised Ms. Roberts that if she did everything he told her to do, including changing her current sponsor to DEFENDANT GOLDEN, he would help her with her career and assured her financial prosperity.

72.     Had Ms. Roberts changed her sponsor, DEFENDANT GOLDEN would have poured his efforts into expanding Ms. Roberts' downline, which in turn would have meant a financial boon for DEFENDANT GOVE.

73.     Likewise, DEFENDANT SANFORD also stood to receive a financial benefit by having DEFENDANT GOLDEN as Ms. Roberts's sponsor.

74.     As a result of the promises of career advancement, monetary success, romantic professions of love and admiration, and "love-bombing", Ms. Roberts began a "relationship" with DEFENDANT GOLDEN.

**Daytona Beach, Florida**

75.     DEFENDANT GOLDEN invited Ms. Roberts and her business partner to attend an eXp REALTY recruiting event at the Hard Rock Hotel in Daytona Beach, Florida in or around March 12, 2020.

76.     Ms. Roberts understood the purpose of the trip was for DEFENDANT GOLDEN to teach her how to run her own eXp REALTY recruiting event.

77.     Ms. Roberts and DEFENDANT GOLDEN shared a room at the Hard Rock Hotel.

78.     On the first night of the event, DEFENDANT BJORKMAN showed up at DEFENDANT GOLDEN'S room with his luggage in hand and told Ms. Roberts that he would also be staying in their room.  At first, Ms. Roberts thought DEFENDANT BJORKMAN was joking.  DEFENDANT BJORKMAN told Ms. Roberts that this was not a joke as he *always* shared a room with DEFENDANT GOLDEN.

79.     The next day, while at the hotel, DEFENDANT GOLDEN received a delivery of GHB.

80.     DEFENDANT GOLDEN told Ms. Roberts that the delivery was a workout performance enhancing drug.  DEFENDANT GOLDEN told her that she could look the drug up online and see that it was used for workouts as it was routinely used by bodybuilders. He proceeded to show Ms. Roberts on Google verification while ensuring her that he is a "Pharmacist" and everyone relies on his expertise to give the correct dosage because he is so familiar with this substance.  Not understanding the risk involved in taking

the drug, and after being told that a small amount would be just fine, Ms. Roberts took the dosage recommended by DEFEDANT GOLDEN; Ms. Roberts did not understand that taking this drug would cause her not only to lose her memory, but also to become incapacitated such that she would lose the ability to consent as to what happened with her body.

81.     As a result of taking the drug, Ms. Roberts blacked out and does not recall much of the events from that night except for flashes of memories; however, Ms. Roberts does recall that the next morning while she was showering, DEFENDANT BJORKMAN walked into the bathroom naked, exposing himself to her.  Ms. Roberts was utterly shocked and asked what he was doing to which he replied, "oh, now you are shy?" implying that they had sexual contact the night before.  Ms. Roberts believes she was sexually assaulted by DEFENDANT GOLDEN and DEFENDANT BJORKMAN the previous night while she was incapacitated.

82.     Upon information and belief, DEFENDANT BJORKMAN and DEFENDANT GOLDEN took pictures and/or videos of her that night.

83.     Ms. Roberts' business partner, who was also in attendance at this recruiting event at the Hard Rock Hotel in Florida, made it very clear to DEFENDANT GOLDEN that she and Ms. Roberts would not be changing their sponsor.  Soon after this occurred, DEFENDANT GOLDEN immediately broke off his "relationship" with Ms. Roberts and began a smear campaign to try and discredit her within eXp REALTY.

84.     Several years later, after learning that other women had been drugged and assaulted by DEFENDANT GOLDEN and DEFENDANT BJORKMAN, Ms. Roberts began to piece together what had happened to her – that she was drugged and that she was fraudulently induced into engaging in a sexual relationship with DEFENDANT GOLDEN. She further realized that once it became clear that she would *not* do everything he wanted, including selecting him as her sponsor, he stonewalled her career.

## Los Cabos, Mexico

85.     On or around April 25, 2021, Ms. Roberts and her business partner attended another eXp REALTY Recruiting event hosted by DEFENDANT GOVE.  This time the event was in Los Cabos, Mexico.

86.     Ms. Roberts and her business partner attended the afternoon welcome reception by the pool.  This event had an open bar and copious amounts of alcohol.  Many of the attendees were intoxicated.

87.     While at this event, eXp Realty top agent influencer, DEFENDANT SHERRARD approached Ms. Roberts and introduced himself as the #1 agent at eXp REALTY.  Trying to impress her he showed her a picture of his Lamborghini.



88.    Unimpressed, Ms. Roberts rebuffed his advances and tried to continue her conversation with other attendees attempting to network. Uninvited, DEFENDANT SHERRARD sat next to her at a table where she was sitting by her business partner and talking to other agents and then repeatedly placed his hand on her leg and moved it up under her skirt.  His pinky and ring finger grazed her vagina multiple times while Ms. Roberts repeatedly tried to move DEFENDANT SHERRARD's hand off her -- he ignored her trying to stop his behavior.  He did this approximately 6-7 times.

89.    Finally, Ms. Roberts jumped up from the table mid-conversation with other agents and left the event.

90.    All of these events caused Ms. Roberts extreme emotional distress such that she stopped selling real estate and eventually moved out of the country to distance herself from eXp REALTY.

COMPLAINT FOR DAMAGES

### The Venture

91.     DEFENDANT eXp REALTY, created by DEFENDANT GLENN SANFORD, has two businesses. One business is the traditional real estate business of buying and selling homes. The other business is a multi-level-marketing pyramid scheme which rewards the participants for recruitment of new agents, not for selling real estate.

92.     The venture at issue centers around the recruitment of agents into eXp REALTY's Revenue Share Program (also referred to as the "multi-level marketing" or "pyramid scheme").[6]

93.     For this pyramid scheme to work, continuous recruitment of new agents is essential, without which it will collapse. To fund this pyramid scheme, each recruited agent must pay a monthly fee of $85.00, which amounts to $1,020.00 a year.

94.     As of November 2023, DEFENDANT eXp REALTY currently has more than 89,000 agents worldwide.

95.     DEFENDANT GOVE is a central figure in the pyramid scheme by virtue of his personal downline of agents that make up more than 20% (approximately 20,000 agents) of eXp REALTY.

96.     DEFENDANT GOLDEN and DEFENDANT BJORKMAN are in DEFENDANT GOVE'S downline in the pyramid, as is Ms. Roberts.

---

[6] https://www.sec.gov/oiea/investor-alerts-bulletins/investor-alerts-ia-pyramid

97.     Because DEFENDANT GOLDEN and DEFENDANT BJORKMAN were two of DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY's top recruiters, they financially benefitted from the recruitment activities of DEFENDANT GOLDEN and DEFENDANT BJORKMAN.

**Defendant eXp Realty, Defendant Sanford and Defendant Gove's Control Over Defendant Golden And Defendant Bjorkman And Vicarious Liability**

98.     DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY, instructed, required, and enabled DEFENDANT BJORKMAN and DEFENDANT GOLDEN on the means and methods on how to entice agents and how to join eXp REALTY's pyramid, and more specifically, how to join their personal downline within the pyramid.

99.     DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY provided DEFENDANT BJORKMAN and DEFENDANT GOLDEN with scripts, tools, and training on how to recruit agents into eXp's Revenue Share pyramid.

100.    DEFENDANT eXp requires all of its agents, including DEFENDANT BJORKMAN and DEFENDANT GOLDEN to follow the eXp AGENT ATTRACTION Best Practices Guide, the eXp Agent Attraction Success Strategy, and eXp REALTY's Policies and Procedures; DEFENDANT eXp controls all of its agents with respect to recruitment.

101.    DEFENDANT eXp required that DEFENDANT BJORKMAN and DEFENDANT GOLDEN use its branding and logos, provided them with databases, access

to its computer systems, company websites, forms, and documents; all of which they were required to use.

102.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN were agents of DEFENDANT eXp REALTY.

103.   Likewise, DEFENDANT BJORKMAN and DEFENDANT GOLDEN relied on DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp REALTY's methods and instructions when actively recruiting agents for eXp REALTY.

104.   DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY taught DEFENDANT BJORKMAN and DEFENDANT GOLDEN that the key to "Agent Attraction", *i.e.*, recruitment into the eXp REALTY pyramid, is to project an image of success – both personally and professionally.

105.   DEFENDANT eXp REALTY went to great lengths to showcase the success and wealth of its top influencers in order to convince others to join the pyramid and to attain the same level of prosperity. This tactic often included top agents sharing pictures of their yachts, airplanes, vacation properties and how much money they were making monthly due to their participation in the pyramid.

106.   DEFENDANT GOVE personally trained DEFENDANT GOLDEN and DEFENDANT BJORKMAN on how to attract agents to eXp REALTY; in fact, DEFENDANT GOLDEN stated in a video with DEFENDANT GOVE, that he called on DEFENDANT GOVE and other top eXp agent Influencers, "a million times" to get training help.

107.   This training included inviting agents to events held at beautiful, exotic locations, which successful real estate agents attended in order to "rub shoulders" with the big Influencers or Agent Attractors, essentially the "Who's Who" in real estate and with whom they were encouraged to develop relationships, as well as to be trained and to learn how to hone well-oiled recruitment techniques utilized by higher ups at eXp REALTY.

108.   DEFENDANT GOVE also recommended, and still recommends to this day, that agents "share hotel rooms" and encourages attendance at parties where he praises the fact that they have bars stocked with copious amounts of alcohol; the all-inclusive price that includes open bars is touted frequently in DEFENDANT GOVE's solicitation for DEFENDANT eXp REALTY's recruiting events, as well as the encouragement to "rub shoulders" with the top influencers at eXp.

109.   Using what they learned from DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY, DEFENDANTS BJORKMAN and GOLDEN also went to great lengths to showcase themselves as successful businessmen and leaders in the real estate industry by speaking at eXp REALTY events and hosting their own eXp REALTY recruitment events.

110.   At these recruitment events, DEFENDANTS BJORKMAN and GOLDEN promised agents that they would attain prosperity if they joined their downline in the pyramid.

111.   DEFENDANTS BJORKMAN and GOLDEN espoused the importance of attending their events so that agents could be in the room with top influencers like DEFENDANT GOVE.

112.   Both prospective eXp REALTY agents and agents wanting to grow their downline, believed that in order for them to develop their professional networks and become successful eXp REALTY agents like DEFENDANTS GOVE, BJORKMAN and GOLDEN, they had to be "in the room where it happens", rubbing shoulders with the agent influencers that DEFENDANT eXp REALTY often put on stage, promoted in online videos, highlighted in their eXp Life magazine, or otherwise promoted visibly and regularly.

113.   DEFENDANTS BJORKMAN and GOLDEN made sure that each of their events were fully stocked with copious amounts of alcohol and drugs, including GHB, which is commonly referred to as a date-rape drug.

114.   DEFENDANTS GOLDEN and BJORKMAN would then surreptitiously slip attendees intoxicants, or fraudulently induce them to take intoxicants, which would cause them to appear and to act as if they were attracted to DEFENDANTS BJORKMAN and GOLDEN and their friends – thereby elevating DEFENDANTS GOLDEN and BJORKMAN's status at eXp – all in the name of appearing successful and consequently better recruiters for eXp REALTY.

115.   It was known that after an evening at these events, DEFENDANTS BJORKMAN and GOLDEN would share videos and pictures of women they had drugged.

116.   DEFENDANT GOVE enticed Ms. Roberts and others to travel to recruitment events for the purpose of increasing the number of agents in his downline.

117.   As a result of these recruiting events, DEFENDANT GOVE benefited by the growth of his own downline, as did DEFENDANT SANFORD and DEFENDANT eXp.

118.   Because the success of DEFENDANTS GOLDEN and BJORKMAN directly impacted DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY, they routinely assisted DEFENDANTS GOLDEN and BJORKMAN in cultivating their image of success.

119.   DEFENDANT GOVE was keenly aware of the methods DEFENDANTS BJORKMAN and GOLDEN used at their recruitment events.

120.   DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY maintained and controlled DEFENDANT BJORKMAN and DEFENDANT GOLDEN's recruitment activities sufficient to establish vicarious or agency liability under the TVPRA.

## **Notice**

121.   Without access to actual complaints, Plaintiff avers that eXp knew of the actions of these agents as well as of so many other incidents that occurred such that they should have known of the *modus operandi* of DEFENDANT GOLDEN and DEFENDANT BJORKMAN to drug and assault agents at eXp events.

122.   DEFENDANT eXp REALTY, DEFENDANT SANFORD and DEFENDANT GOVE knew or should have known about the complaints described above.

123.    DEFENDANT eXp REALTY has failed to implement policies related to the same to protect against the actions, as occurred in the instant complaint.

124.    DEFENDANT eXp REALTY knew or should have known about the incidents which include, but are not limited to the following:

- According to a Las Vegas Police Report, around April or May 2018, an eXp REALTY Agent attended a real estate networking event in Denver, Colorado. One evening during the conference, the eXp REALTY Agent went to the bar with several other event attendees, including DEFENDANT BJORKMAN. This eXp REALTY Agent only had one drink at the bar and does not recall how she got the drink.  After having that drink, the eXp REALTY Agent stood up and immediately felt woozy and shaky.  DEFENDANT BJORKMAN immediately noticed she was sick and told her that she had been drugged, that she needed to eat and that she should not leave the bar with anyone except for him.  This eXp REALTY Agent does not recall the rest of the evening.  After learning about other women being drugged and assaulted by DEFENDANT BJORKMAN, this now former eXp REALTY Agent has come to the conclusion that she was also drugged by DEFENDANT BJORKMAN.

- According to a Las Vegas Police Report, in early February 2019, an eXp REALTY Agent attended a real estate networking event in Maui, Hawaii. During the event, this eXp REALTY Agent had two drinks with

DEFENDANT BJORKMAN.  Soon after, this eXp REALTY Agent began slipping in and out of consciousness and had to be taken to Maui Hospital. Despite only having two drinks, this eXp REALTY Agent had a Blood Alcohol Content of .21 (nearly three times the legal limit).  This eXp REALTY Agent now believes that she was drugged with alcohol powder and believes that DEFENDANT BJORKMAN was the individual who drugged her.

- According to a Las Vegas Police Report, in or around May-June 2019, a real estate agent and her husband attended an eXp recruiting event in Coronado, CA.  DEFENDANT BJORKMAN invited her and her husband to brunch. They each had one glass of wine and then DEFENDANT BJORKMAN invited them to DEFENDANT GOLDEN and DEFENDANT BJORKMAN's suite utilized for eXp recruiting parties.  While in the suite, DEFENDANT GOLDEN arrived.  The real estate agent and her husband were each offered a mixed drink.  Soon after, the real estate agent had limited memory of the rest of the day, missed pre-arranged dinner plans, missed many text messages, and did not wake up until the following morning. This agent believes she was drugged, but at the time did not know who was responsible.  This agent joined eXp REALTY in October 2019 and named DEFENDANT BJORKMAN as her sponsor.  Later that year, in December 2019, this eXp REALTY agent traveled to Puerto Rico to visit top eXp REALTY influencer and eXp

REALTY Board Member Gene Frederick.  Rosie Rodriquez, an agent in her upline, and DEFEDANT GOLDEN's eXp original sponsor, was supposed to attend the event but cancelled at the last moment.  Consequently, this eXp REALTY Agent was staying at a rental home alone with DEFENDANT BJORKMAN and DEFENDANT GOLDEN.  This eXp REALTY Agent was so fearful due to inappropriate comments and actions of DEFENDANT BJORKMAN and DEFENDANT GOLDEN that she locked her door to her bedroom to prevent them from entering. As they tried to wiggle the door open, she stayed on the phone with her husband for most of the night.  Due to being so uncomfortable, she left the trip early and had eXp REALTY Board Member Gene Frederick drive her to the airport.  On February 25, 2020, DEFENDANT GOLDEN flew to Minnesota to attend an eXp REALTY recruiting event in her hometown.  Sometime thereafter, this eXp REALTY Agent contacted eXp REALTY to request that she no longer be in DEFENDANT BJORKMAN and DEFENDANT GOLDEN'S downline.

### Count I
### Violation of 18 U.S.C. § 1591
### Against DEFENDANT GOLDEN

125.   PLAINTIFF realleges paragraphs 1 to 124 as if fully set forth herein.

126.   On two occasions in February, 2020, DEFENDANT GOLDEN and DEFENDANT GOVE induced Ms. Roberts to travel to Las Vegas, Nevada from Florida for the purpose of attending an eXp recruiting event.

127.   While in Las Vegas, DEFENDANT GOLDEN made promises to Ms. Roberts that he would help her with her career, provide her with financial security, and take care of her financially.

128.   DEFENDANT GOLDEN used those promises to engage Ms. Roberts into committing sexual acts with him.

129.   As part of his recruiting efforts, DEFENDANT GOLDEN continued to try to recruit Ms. Roberts into his downline so that he could receive a financial benefit from her commissions and her downline's commissions in the revenue share pyramid.

130.   At this time when DEFENDANT GOLDEN had approximately 800 agents in his downline, Ms. Roberts was still an emerging influencer.  Ms. Roberts hoped to increase her agent count in order to reach the highest Influencer status at eXp REALTY, similar to DEFENDANT GOLDEN's status.

131.   On or around February 24, 2020, DEFENDANT GOLDEN travelled in interstate commerce to Florida for the stated purpose of assisting an eXp REALTY Agent host an eXp recruiting event.

132.   DEFENDANT GOLDEN invited Ms. Roberts to attend the event which was held at the Hard Rock Hotel in Daytona, Florida.

133.   DEFENDANT GOLDEN continued to pressure Ms. Roberts to select him as her sponsoring agent so that he would receive a financial benefit from her agent count, commissions, and her downline's commissions in the Revenue Share pyramid.

134.    DEFENDANT GOLDEN planned prior to the event to have GHB delivered to the Hard Rock Hotel.

135.    During this event, DEFENDANT GOLDEN used fraud to get Ms. Roberts to take a substance that rendered her incapacitated for the purpose of engaging her in a sex act with him.

136.    DEFENDANT GOLDEN committed a sexual act with Ms. Roberts without her knowledge or consent due to her being incapacitated.

137.    Upon information and belief, DEFENDANT GOLDEN surreptitiously took highly valuable videos and pictures of Ms. Roberts while she was drugged without her consent.

**Count II**
**Violation of 18 U.S.C. § 1591**
**Against DEFENDANT BJORKMAN**

138.    PLAINTIFF realleges paragraphs 1 to 137 as if fully set forth herein.

139.    On or around February 24, 2020, DEFENDANT BJORKMAN traveled in interstate commerce to Florida for the stated purpose of assisting an eXp REALTY Agent host an eXp recruiting event.

140.    DEFENDANT BJORKMAN knew that DEFENDANT GOLDEN invited Ms. Roberts to attend the event which was held at the Hard Rock Hotel in Daytona, Florida.

141.    DEFENDANT BJORKMAN also knew that DEFENDANT GOLDEN arranged to have a delivery of GHB made to their hotel for the purpose of drugging Ms. Roberts so that they could both engage her in sex acts.

142.   It was the practice of DEFENDANT GOLDEN that once he was able to convince an agent to select him as his sponsor, he would then convince the agent to instead name DEFENDANT BJORKMAN as the agent's sponsor.  By doing so, both DEFENDANT GOLDEN and BJORKMAN would financially benefit; DEFENDANT GOLDEN would financially benefit because he made more money from agents that are two instead of one tier beneath him; DEFENDANT BJORKMAN would financially benefit because he would gain another agent in his downline.

143.   Though ultimately unsuccessful in getting Ms. Roberts to change her sponsor, both DEFENDANT BJORKMAN and DEFENDANT GOLDEN fraudulently caused Ms. Roberts to engage in sexual contact for the purpose of using that relationship to get Ms. Roberts to change her sponsor which would financially benefit both DEFENDANT BJORKMAN and DEFENDANT GOLDEN.

## Count III
### Participating in a Venture in Violation of 18 U.S.C. § 1595 Against
### DEFENDANTS EXP REALTY, SANFORD, AND GOVE

144.   PLAINTIFF realleges paragraphs 1 to 143 as if fully set forth herein.

145.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN are two of DEFENDANT eXp REALTY's top recruiters, whereby DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE share in the common purpose of allowing DEFEDANT BJORKMAN and DEFENDANT GOLDEN to recruit by any means necessary to secure and to maintain agents, and thus receive, a direct financial

benefit from DEFENDANT BJORKMAN and DEFENDANT GOLDEN's recruitment of new agents into all of their common downline.

146.   DEFENDANT eXp REALTY, DEFENDANT SANFORD, and DEFENDANT GOVE participated in a Venture with DEFENDANT GOLDEN and DEFENDANT BJORKMAN by promoting DEFENDANT BJORKMAN and DEFENDANT GOLDEN's recruitment efforts, which included luring agents to attend recruitment events with promises of career advancement.

147.   DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE received monetary gain from DEFENDANT BJORKMAN and DEFENDANT GOLDEN's recruitment activities.

148.   DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE knew or should have known that DEFENDANT GOLDEN and DEFENDANT BJORKMAN used drugs to sexually assault eXp REALTY real estate agents and prospective eXp REALTY real estate agents at eXp REALTY Recruitment Events.

149.   After having actual knowledge of DEFENDANT BJORKMAN and DEFENDANT GOLDEN's illegal conduct, DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE continued to endorse, to support and to promote DEFENDANT GOLDEN's and DEFENDANT BJORKMAN's recruiting efforts as a means to continue receiving a financial benefit from DEFENDANT BJORKMAN and DEFENDANT GOLDEN's activities.

## Count IV

**Sexual Battery**

**Against DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN; and DEFENDANT SHERRARD**

150.   PLAINTIFF realleges paragraphs 1 to 149 as if fully set forth herein.

151.   Through their conduct, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN, and DEFENDANT SHERRARD placed Ms. Roberts in a state of perpetual fear of imminent, unwanted, physical, and sexual contact.

152.   Through conduct including, but not limited to, the conduct describing the sexual assault of Ms. Roberts, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN, and DEFENDANT SHERRARD intentionally and unlawfully touched Ms. Roberts without her consent.

153.   This unwanted and unlawful, sexual physical touching caused Ms. Roberts to suffer great anxiety about the possibility of further unwanted sexual touching and sexual assault.

154.   Ms. Roberts did not consent to any of the above-described contact.

155.   As a result of DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN, and DEFENDANT SHERRARD'S conduct, Ms. Roberts suffered legally compensable harm, including pain and suffering, loss of enjoyment of life, mental anguish, injury to reputation, humiliation, emotional distress damages, and costs of medical treatment necessary to address the psychological damages caused by

DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN, and DEFENDANT SHERRARD'S conduct.

## Count V
### Civil Battery
### Against DEFENDANT BJORKMAN, DEFENDANT GOLDEN, AND DEFENDANT KEENAN

156.    Ms. Roberts realleges paragraphs 1 to 155 as if fully set forth herein.

157.    Through their conduct, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN intentionally drugged Ms. Roberts without her knowledge or consent with the intent to harm/touch and did harm/touch Ms. Roberts.

158.    By intentionally drugging Ms. Roberts, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN, caused Ms. Roberts to unknowingly ingest a drug that would render her unable to provide consent to be touched.

159.    DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN all caused Ms. Roberts to suffer harm and offense through the unwanted touching. DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN'S actions in causing Ms. Roberts to consume a drug without her knowledge or consent in order to be touched, would be offensive to a reasonable person.

160.    As a direct and proximate result of DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN's actions, Ms. Roberts has suffered losses including, but not limited to, past and future medical expenses, loss of

income, pain and suffering, mental anguish, embarrassment, humiliation, and emotional distress.

161.    In causing Ms. Roberts to consume a drug without her knowledge or consent, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN acted intentionally, for an evil motive, and with reckless indifference Ms. Robert's right to be free from harmful or offensive contact. Accordingly, Ms. Roberts is entitled to punitive damages in addition to economic and noneconomic relief.

## Count VI
### Intentional Infliction of Emotional Distress
### Against DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN

162.    Ms. Roberts realleges paragraphs 1 to 161 as if fully set forth herein.

163.    DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN's conduct toward Ms. Roberts was extreme and outrageous.

164.    DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN intentionally caused Ms. Roberts' emotional distress by subjecting her to forceful sexual touching and assault, and other actions taken with reckless disregard of PLAINTIFF's emotional well-being.

165.    As a result of DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN's conduct, Ms. Roberts suffered legally compensable emotional distress, and is entitled to reimbursement for all costs associated with the treatment of the

severe emotional distress inflicted by DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN.

166.   DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN's conduct was a substantial factor in causing Ms. Roberts's severe emotional distress.

## Count VII
### Negligent Hiring, Retention, and Supervision
### Against DEFENDANT eXp REALTY and DEFENDANT SANFORD

167.   Ms. Roberts realleges paragraphs 1 to 166 as if set forth fully herein.

168.   DEFENDANT eXp REALTY and DEFENDANT SANFORD retained DEFENDANT GOLDEN and DEFENDANT BJORKMAN.

169.   DEFENDANT eXp REALTY and DEFENDANT SANFORD do not vet their agents, including DEFENDANT BJORKMAN and DEFENDANT GOLDEN's qualifications.  In fact, there were absolutely no qualifications to be hired and retained as an eXp REALTY agent/recruiter.

170.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN were unfit to perform the work for which they were retained.

171.   DEFENDANT eXp REALTY failed to supervise, train, educate DEFENDANT GOLDEN and DEFENDANT BJORKMAN related to sexual assault, sexual harassment, and drug use in their role as agents for DEFENDANT eXp REALTY.

172.   DEFENDANT eXp REALTY and DEFENDANT SANFORD knew or should have known that DEFENDANT GOLDEN and DEFENDANT BJORKMAN were and/or became unfit and that this unfitness created a particular risk to others. These DEFENDANTS knew of each other well before their employment at DEFENDANT eXp REALTY, as such they knew or should have known about DEFENDANT BJORKMAN and DEFENDANT GOLDEN's behavior prior to hiring. (DEFENDANT SANFORD, DEFENDANT GOVE, and DEFENDANT GOLDEN, all knew each other from previous brokerages and DEFENDANT GOLDEN knew DEFENDANT BJORKMAN from the Real Estate Owned market as well).

173.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN's unfitness harmed PLAINTIFF; and

174.   DEFENDANT eXp REALTY and DEFENDANT SANFORD's negligence in hiring/supervising/and retaining DEFENDANT GOLDEN and DEFENDANT BJORKMAN was a substantial factor in causing Ms. Roberts's harm.

## **REQUEST FOR RELIEF**

WHEREFORE, PLAINTIFF prays for the following relief against Defendants:

1.   For past, present, and future general damages in an amount to be determined at trial;

2.      For past, present, and future special damages, including but not limited to past, present and future lost earnings, economic damages, and others in an amount to be determined at trial;

3.      For interest as allowed by law;

4.      For civil penalties as provided by law;

5.      For any applicable costs of said suit;

6.      For any appropriate punitive or exemplary damages; and

7.      For such other and further relief as the Court may deem proper. The amount of damages sought in this Complaint exceeds the jurisdictional limits of this Court.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the *Federal Rules of Civil Procedure*, PLAINTIFF demands a trial by a jury on all of the triable issues of this Complaint.

Dated:  December 14, 2023

Respectfully submitted,

by: **LENZE LAWYERS, PLC**

/s/ Jennifer A. Lenze
Jennifer A. Lenze, Esq.

**COHEN HIRSCH, LP**
Brooke F. Cohen, Esq.
Andrea S. Hirsch, Esq.

*Attorneys for PLAINTIFF*

COMPLAINT FOR DAMAGES