Jennifer A. Lenze, Esq., CA Bar No. 246858
**LENZE LAWYERS, PLC**
999 Corporate Drive, Suite 100
Ladera Ranch, CA 92694
T: (310) 322-8800
F: (310) 322-8811
jlenze@lenzelawyers.com

Brooke Cohen, Esq., TX Bar No. 24007019 (phv admitted)
Andrea Hirsch, Esq. GA Bar No. 666557 (phv admitted)
**COHEN HIRSCH, LP**
5256 Peachtree Road, Suite 195-E
Atlanta, GA 30341
T: (678) 268-4683
brooke@cohenhirsch.com
andrea@cohenhirsch.com
*Attorneys for PLAINTIFF*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANYA ROBERTS**, <br><br> Plaintiff, <br><br> v. <br><br> **EXP REALTY, LLC, EXP WORLD HOLDINGS, INC., MICHAEL L. BJORKMAN; DAVID S. GOLDEN; BRENT GOVE, EMILY KEENAN, GLENN SANFORD; MICHAEL SHERRARD, and DOES 1-10,** <br><br> Defendants. | **CASE NO.** 2:23-CV-10492-AB-AGR <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES FOR:** <br><br> 1) **Violation of 18 U.S.C. § 1591** <br> 2) **Violation of 18 U.S.C. § 1591** <br> 3) **Violation of 18 U.S.C. § 1595** <br> 4) **Sexual Battery** <br> 5) **Civil Battery** <br> 6) **Intentional Infliction of Emotional Distress** <br> 7) **Negligent Hiring, Retention, and Supervision** <br> 8) **Tortious Interference with Contractual Relations** <br><br> **DEMAND FOR JURY TRIAL** |

PLAINTIFF ANYA ROBERTS, complaining of DEFENDANTS eXp REALTY, LLC; eXp WORLD HOLDINGS, INC., hereinafter referred to collectively as "eXp" or "eXp REALTY"; MICHAEL L. BJORKMAN; DAVID S. GOLDEN; GLENN SANFORD; BRENT GOVE; EMILY KEENAN, MICHAEL SHERRARD; and DOES 1-10, (hereinafter referred to as "Defendants") by her attorneys Cohen Hirsch, LP, and Lenze Lawyers, PLC, respectfully sets forth and alleges the following, upon information and belief:

## PRELIMINARY STATEMENT

1.    This case involves "bad actors" that drugged and sexually assaulted their coworkers, and a company, eXp, who at *worst* knew of, encouraged, and permitted abhorrent behavior; or at the *least,* recklessly disregarded, and willfully turned a blind eye to "things that are on the wrong side of the law". [1]

2.    The detestable actions that are the subject of this Complaint (the drugging and sexual assault of agents) were rampant within eXp culture; they occurred during eXp events, at agent sponsored events, as well as at events where eXp was in attendance; it permeated the company's culture.

3.    The behavior that is the subject of this complaint should have been known to the named Defendants in this action prior, during, and after to the hiring of DEFENDANT GOLDEN and DEFENDANT BJORKMAN and was clearly apparent as early as October

---

[1] Glenn Sanford, eXp World Holdings, Q3 2023 Results Call with Investors, November 2, 2023.

2, 2019 when an Agent overdosed at eXpCon in front of DEFENDANT GOLDEN and Rosie Rodriguez, both Alpha Agents (*defined below*).

4.      On October 6, 2020 DEFENDANT eXp received a memo with granular detail describing the previous blatant, overt, and *well-known* behavior of DEFENDANT BJORKMAN and DEFENDANT GOLDEN who would routinely invite agents to recruiting parties where they would drug and assault individuals—under the guise of Agent Attraction. This information was provided by an agent, who herself had been drugged by DEFENDANTS BJORKMAN AND GOLDEN and described similar events and behavior to numerous other individuals.[2]

5.      This Agent Attraction included the enticement of both new recruits and the *poaching* of agents who had already signed with other Sponsor Agents.[3]

6.      Plaintiff Roberts, fell prey to poaching by DEFENDANT GOLDEN and DEFENDANT GOVE in their six-week aggressive pursuit of Ms. Roberts whereby DEFENDANTS GOLDEN AND GOVE explained to her that they would exponentially elevate her career at eXp.

---

[2] This Memorandum was in addition to the knowledge DEFENDANT eXp had gained in or around September of 2020 from an internal investigation following a Facebook post by Christy Lundy setting forth this abhorrent behavior, and from multiple conversations with women confirming the drugging and assaulting by DEFENDANTS GOLDEN and BJORKMAN.

[3] *Poaching,* or attempting to/or signing an agent from another Sponsor Agent's downline, though against eXp policy, was routinely done (and *approved*) because agents needed a certain number of Qualified Agents to open additional downlines. Discussed in more detail *infra*.

3

7.     Shortly after this poaching process and enticement began, DEFENDANT GOLDEN was drugging, assaulting, and love bombing Ms. Roberts (as this was part of the *modis operandi* of DEFENDANTS GOLDEN and BJORKMAN).

8.     In April 2022, Felicia "Fee" Gentry, an eXp Realty Board Member ("The Board Member") addressed eXp Realty's failure to take any action to curb the sexual assault incidents that were occurring at eXp Realty. She explained to the Board that a reporting plan, enforceable policies and procedures, and an independent investigation were all necessary based on the complaints of multiple women who had been drugged and assaulted at both conferences and recruiting events.

9.     On par with DEFENDANT eXp's treatment of complaints related to sexual harassment, sexual assault, drug use, and the like, DEFENDANT eXp REALTY ignored Ms. Gentry's request that DEFENDANT eXp take action and ignored her suggested solutions.

10.     Furthermore, DEFENDANT eXp CEO, GLENN SANFORD, expressed to Ms. Gentry that this was not eXp's problem, and the arrest of DEFENDANT BJORKMAN and the numerous complaints made against DEFENDANT BJORKMAN and DEFENDANT GOLDEN for illegal behavior that took place at DEFENDANT eXp conferences and recruiting events, would be simply a three to five day newspaper phenomenon which would then disappear.

11.     In complete contrast to DEFENDANT SANFORD's believing the incidents would of little impact or import on DEFENDANT eXp, Ms. Roberts will forever be

impacted by the events described in this complaint. In fact, to this day, DEFENDANT GOVE continues to attempt to harm and impact Ms. Roberts by communicating with her downline about this case.

## JURISDICTION

12.    This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1591.

13.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, which provides that district courts of the United States have jurisdiction over cases between a citizen of a state and a subject of a foreign state if the amount in controversy exceeds $75,000.

14.    This Court also has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the related federal claims over which this Court has original jurisdiction.

15.    This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. §1595.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as DEFENDANT MICHAEL L. BJORKMAN resided in this district and division at all times complained of herein.

## **THE PARTIES**

17.     PLAINTIFF ANYA ROBERTS is a citizen of Florida and is a licensed real estate agent with DEFENDANT eXp REALTY.

18.     DEFENDANT eXp WORLD HOLDINGS, INC. is a corporation duly organized and existing under and by virtue of the State of Delaware and has its principal place of business at 2219 Rimland Drive, Suite 301, Bellingham, Washington 98226.

19.     DEFENDANT eXp REALTY, LLC is a corporation duly organized and existing under and by virtue of the State of Washington has its principal place of business at 2219 Rimland Drive, Suite 301, Bellingham, Washington 98226.

20.     DEFENDANT MICHAEL BJORKMAN is a citizen of the State of California and resides in Ventura County, CA; he was a former real estate agent with DEFENDANT eXp REALTY, as well as an "Influencer" (defined *infra*) at DEFENDANT eXp REALTY, and upon information and belief, is a current Revenue Share Participant (defined *infra*) with DEFENDANT eXp REALTY.  DEFENDANT GOLDEN is DEFENDANT BJORKMAN's Sponsor Agent.

21.      DEFENDANT DAVID S. GOLDEN is a citizen of the State of Nevada and a former real estate agent with DEFENDANT eXp REALTY; he is also an "Influencer" (defined infra) at DEFENDANT eXp REALTY and on information and belief is still a current Revenue Share Participant (defined *infra*) with DEFENDANT eXp REALTY.

22.     DEFENDANT GLENN SANFORD is a citizen of the State of Washington, the Founder of eXp Realty, and is Agent #1 in the Revenue Share Program (defined *infra*) with DEFENDANT eXp REALTY.

23.     DEFENDANT BRENT GOVE is a citizen of the State of California; he is a real estate agent with DEFENDANT eXp REALTY, a top "Influencer" (defined *infra*) at DEFENDANT eXp REALTY, and a current Revenue Share Participant (defined *infra*) with DEFENDANT eXp REALTY.

24.     DEFENDANT EMILY KEENAN is a citizen of Arizona.

25.     DEFENDANT MICHAEL SHERRARD is a citizen of Canada and a real estate agent with DEFENDANT eXp REALTY; he is a top "Influencer" (defined *infra*) at DEFENDANT eXp REALTY, and a current Revenue Share Participant (defined *infra*) with DEFENDANT eXp REALTY.  DEFENDANT SHERRARD is a current Revenue Share Participant (defined *infra*) and regularly conducts business throughout the United States to recruit more members into eXp REALTY'S Revenue Share pyramid.

26.     The true names and capacities, whether corporate, associate, individual or otherwise of Defendants DOES 1 through 10, inclusive, are unknown to PLAINTIFF, who therefore sues said Defendants by such fictitious names. Each of the DEFENDANTS designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to and caused injuries and damages proximately thereby to PLAINTIFF, as herein alleged. PLAINTIFF will seek leave to amend this Complaint to show their names and capacities when the same have been ascertained.

27.    Under the TVPRA, Defendants are vicariously liable and jointly and severally liable for all damages a jury awards to Plaintiff for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## GENERAL FACTUAL ALLEGATIONS

### eXp's Revenue Share Pyramid[4]

28.    eXp is a multilevel marketing company made up of "Tiers" under each Agent, otherwise known as each Agent's Revenue Share Group.

29.    A Tier is defined by eXp as follows:

**Tier:** The hierarchy of eXp Agents that are sponsored in succession beginning with the Contractor [Agent] and each group of eXp Agents thereafter, as follows:

- Tier 1: the group of eXp Agents sponsored by the Contractor.
- Tier 2: the group of eXp Agents sponsored by Tier 1 eXp Agents.
- Tier 3: the group of eXp Agents sponsored by Tier 2 eXp Agents.
- Tier 4: the group of eXp Agents sponsored by Tier 3 eXp Agents.
- Tier 5: the group of eXp Agents sponsored by Tier 4 eXp Agents.
- Tier 6: the group of eXp Agents sponsored by Tier 5 eXp Agents.
- Tier 7: the group of eXp Agents sponsored by Tier 6 eXp Agents.

30.    A Revenue Share Group is defined by eXp as follows:

**Revenue Share Group:** A Contractor's Revenue Share Group consists of the eXp Agents he or she personally sponsors to join the sales ranks of the Company and those eXp Agents sponsored thereafter as a result of Contractor's [Agent's] original sponsorship(s).

---

[4] All "Key Terms" and their definitions were provided by DEFENDANT eXp Realty to the SEC in 2020: https://www.sec.gov/Archives/edgar/data/1495932/000155837020009246/expi-20200630xex10d1.htm

31.     Each Tier level is unlocked for purposes of sharing revenue only when there are sufficient Front-Line Qualifying Agents in the previous level. Front-Line Qualifying Active Agent is defined by eXp as follows:

**Front-Line Qualifying Active (FLQA):** A Front-Line Qualifying Active agent is a licensed agent who has been personally sponsored into eXp Realty and that has been active and productive with the Company during the prior rolling six- month period by closing: 1) a minimum of two full credit Sales, or the equivalent; or 2) $5,000 in Gross Commission Income. All FLQA agents are Tier 1 eXp Agents that have been directly sponsored by the Contractor; however, not all Tier 1 eXp Agents sponsored by Contractor are FLQA Agents.

32.     Participating Agents receive income from the Revenue Share Plan as defined by eXp as follows:

**Revenue Share Plan** The Company's Sustainable Revenue Share Plan exists to provide a financial incentive to the real estate licensees with the Company ("eXp Agents") who have helped grow company sales through the agent ranks of eXp Realty (defined below).

33.     Revenue Share is defined by eXp as follows:

**Revenue Share:** The Revenue Share Plan is paid out as a percentage of AGCI which is the GCI adjusted by a factor and calculated each month in an effort to achieve and pay out 50% of Company Dollar in the overall monthly Revenue Share Plan in the form of revenue share. Actual payouts on individual Transactions can be higher or lower than the 50% payout target depending on how many FLQAs are counted on each Tier.  As a Contractor encourages fellow active and productive agents to join the ranks of the Company and the Contractor is named as the sponsor of those new eXp Agents, the Contractor will begin earning the standard Tier 1 3.5% of AGCI revenue share amount on the Qualifying Sale Transactions of the Contractor's Tier 1 group of eXp Agents. As the Contractor's Tier 1 group of eXp Agents (Contractor's direct sponsored agents) become sponsors themselves of more new eXp Agents, each new eXp Agent added to the Contractor's Revenue Share Group can potentially expand and unlock the Contractor's ability to earn more revenue share in two different ways: 1) eXpansion Share; and 2) eXponential Share.

FIRST AMENDED COMPLAINT FOR DAMAGES

34.     eXp defines the Qualifications to Receive Revenue as follows:

**Qualifications To Receive Revenue:** Share In order to be qualified to receive revenue share under both the eXpansion Share and the eXponential Share Contractor must be Revenue Share Eligible on the date when a Qualifying Sale Transaction closes, and Contractor's license must be active and affiliated with eXp Realty in every state that Contractor engages in activities requiring a real estate license.

35.     eXp defines the Qualifications to Receive Revenue as follows:

**Revenue Share Vesting Policy:** To qualify for revenue share vesting, Contractor must satisfy the following conditions: 1) hold a current real estate license and be authorized to receive commissions; 2) be affiliated with the Company as a Contractor/real estate agent for not less than 36 consecutive months; and 3) and meet all requirements under the Revenue Share Eligible definition above for not less than 36 consecutive months.

### eXp's Sixty-One (61) Alpha Agents

36.     While eXp routinely boasts its agent count nearing 100,000 agents, roughly only a quarter of eXp Realty's agents (around 25,000) participate in eXp's Revenue Share Plan which generates approximately $28,000,000 a month in Revenue Share income ("Participating Agents").

37.     As described above, to maximize income from DEFENDANT eXp's Revenue Share Plan (during the relevant time periods) a Participating Agent must "unlock" each of the Seven (7) Tiers in the Revenue Share Plan.   "Unlocking" a level involves having the required number of Front Line Qualified Active Agents.

38.     As shown in the Revenue Share Chart below, an Agent must have the required number of FLQAs to receive the full financial benefit of the Revenue Share Plan:

FIRST AMENDED COMPLAINT FOR DAMAGES

## Revenue Share Chart

| | eXpansion Share | eXponential Share Tier 1 Front-line Qualifying Agents Count Needed | | | | | | | Total % of AGCI Paid on Transactions in Each Tier Group |
|---|---|---|---|---|---|---|---|---|---|
| | | 0 to 4 | 5 to 9 | 10 to 14 | 15 to 19 | 20 to 24 | 25 to 39 | 40+ | |
| Tier 1 | – | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% |
| Tier 2 | 0.2% | – | 3.8% | 3.8% | 3.8% | 3.8% | 3.8% | 3.8% | 4.0% |
| Tier 3 | 0.1% | – | – | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.5% |
| Tier 4 | 0.1% | – | – | – | 1.4% | 1.4% | 1.4% | 1.4% | 1.5% |
| Tier 5 | 0.1% | – | – | – | – | 0.9% | 0.9% | 0.9% | 1.0% |
| Tier 6 | 0.5% | – | – | – | – | – | 2.0% | 2.0% | 2.5% |
| Tier 7 | 0.5% | – | – | – | – | – | – | 4.5% | 5.0% |

AGCI = Adjusted Gross Commission Income

39.     Nearly half of the monthly income generated from the Revenue Share Plan ends up in the pockets of less than 0.3% of eXp Realty's Participating Agents, also referred to as its "Alpha Agents."

40.     An Alpha Agent is an agent who has at a minimum either 1,000 agents *and* 25 FLQAs or 2,000 agents *and* 20 FLQAs in their Revenue Share Group.

41.     On average, Alpha Agents receive $215,000 a month in Revenue Share Income. The other 97.7% of the Participating Agents receive, on average, $625 a month.[5]

42.     In 2022, DEFENDANT eXp Realty had only sixty-one (61) Alpha Agents.

---

[5] eXp also has approximately 105 Beta Agents with a monthly average Revenue Share income of $32,000. For all other agents, who do not qualify as an Alpha or Beta agent, the average monthly Revenue Share is less than $500 per Participating Agent.

43.     Ranking its agents by monthly Revenue Share income, DEFENDANT GOVE sits in the number two Alpha Agent position, averaging close to $1,000,000 a month in Revenue Share Income.[6]

44.     Irrespective of whether an Agent receives any Revenue Share Income or commissions, under their contractual terms they are still required to pay DEFENDANT eXp a monthly fee in the amount of $250.

45.     On average, approximately 75% of the Participating Agents are upside down – meaning they are paying more to DEFENDANT eXp each month than they are receiving in Revenue Share.

46.     Alpha Agents include DEFENDANTS BRENT GOVE, GLENN SANFORD, DAVID GOLDEN, and MICHAEL SHERRARD.

47.     Alpha Agents are invited to special meetings and receive special benefits which typically include speaking opportunities.

48.     It is widely known amongst the Agents and staff of DEFENDANT eXp Realty that DEFENDANT eXp Realty has two sets of rules, one set of rules for its Alpha Agents and another set of rules for everyone else.  One set of rules that do not apply to Alpha Agents relate to DEFENDANT eXp's Agent Attraction Prohibited Practices:

---

[6] The majority of Agents at eXp make zero income from revenue share at all which vastly contrasts to the Revenue Share of those at the Top of the Pyramid. Those at the top regularly espouse that those at the bottom can build and obtain great wealth through Agent Attraction; however, this appears to be highly unlikely due to the Pyramid parameters.

FIRST AMENDED COMPLAINT FOR DAMAGES

**Agent Attraction Prohibited Practices**

Agents are prohibited from engaging in the following practices while carrying out their attraction activities. These practices run contrary to eXp Realty's core values and only serve to harm eXp's brand, its community, and its sustainability. If an agent is found participating in the practices below, eXp Realty leadership may, at any time, make the determination that removal or severance from eXp Realty is in the best interest of the company and its agents.

Recruitment and Sponsorship

- Agents are prohibited from encouraging prospective agents to change sponsorship or change their intended sponsorship declaration. It is the responsibility of each agent to discover if a prospective agent is already in conversation with another eXp agent about joining and should refer them back to their first contact as a professional courtesy.

- Inappropriate incentives should never be used to entice or persuade an agent to change their intended sponsorship declaration. This includes offering enticements that are in addition to and outside of the benefits of the eXp Realty business model such as the promise of cash, cash equivalents, gifts, office space, additional revenue, leads or the payment of monthly technology or registration costs with eXp Realty.

- Compensating individuals, either directly or through affiliation, who are not agents or brokers affiliated with eXp Realty to recruit or attract agents to eXp Realty is not allowed.

- When an agent makes the decision to join, based on the efforts and relationship of an eXp Agent— there should be ZERO interference by other eXp agents from that time forward. Any efforts to coerce or otherwise unethically convince a prospective agent to change their selected sponsor will be subject to corrective action up to and including severance from eXp Realty.

- The use of recruitment companies or other similar third-party services, to send SMS text messages, emails, place phone calls, etc. is not allowed in the agent attraction process. Real estate agents who hang their license with eXp are the only individuals authorized to present the eXp opportunity to prospective agents.

49.     DEFENDANT eXp's Alpha Agents, like DEFENDANT GOVE,  have not been required to abide by DEFENDANT eXp's policies and procedures; complaints made against DEFENDANT eXp's Alpha Agents are routinely ignored.

50.     For example, it was DEFENDANT eXp Realty's policy to prohibit Revenue Share Agents from disclosing the amount they made monthly from its Revenue Share program. However, this rule did not apply to Alpha Agent, DEFENDANT GOVE, as it was known by DEFENDANT eXp that he was notorious for flashing around screenshots of

---

13

his monthly Revenue Share income as a way to entice agents to join, and even more importantly, to *stay,* in his downline.

51.    For example, on February 22, 2020, DEFENDANT GOVE shared his monthly Revenue Share income to Plaintiff.[7]



52.    Similarly, on a publicly available YouTube video showcasing DEFENDANT GOVE and DEFENDANT GOLDEN, DEFENDANT GOVE shared that his monthly Revenue Share income in 2020 was over $300,000.

---

[7] A similar screenshot was sent to Tami Sims, a Plaintiff in the *Acevedo* matter, by DEFENDANT BJORKMAN during her recruitment to eXp.



Explained Short Interview with Brent Gove and David Golden

Brent Gove
14.6K subscribers

277 views  Apr 9, 2020

53.     Under eXp's Agent Attraction Prohibited Practices Guide, Agents are prohibited from using recruitment companies or other similar third-party services to recruit agents.

54.     DEFENDANT eXp knew that Alpha Agents, including DEFENDANT GOLDEN, were using prohibited third-party services, but because they were Alpha Agents, the rules did not apply to them. This use of third-party services by DEFENDANT GOLDEN specifically was identified to DEFENDANT eXp in the Memorandum from an Agent to DEFENDANT eXp on October 6, 2020.

55.     Critically, under DEFENDANT eXp's Agent Attraction Prohibited Practices Guide, agents are forbidden from recruiting eXp agents away from their current Sponsor Agents (poaching as defined *supra*).

FIRST AMENDED COMPLAINT FOR DAMAGES

56.     The prohibition on this practice of *poaching* other agents from their current Sponsor Agents was not enforced when it came to the tactics of DEFENDANT GOVE and DEFENDANT GOLDEN.

57.     This poaching was allowed when it financially and otherwise benefited DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp. The high-pressure poaching of Ms. Roberts by DEFENDANT GOVE and GOLDEN began approximately a year after Ms. Roberts joined eXp and lasted for approximately six weeks after the first time Ms. Roberts met DEFENDANT GOLDEN.

58.     When Ms. Roberts' business partner definitively confirmed the poaching would not be successful, and communicated as much to the DEFENDANT GOLDEN, *i.e.* that they would not switch Sponsor Agents to DEFENDANT GOLDEN, DEFENDANT GOLDEN gave up his efforts which included the pursuing, drugging, and assaulting of Ms. Roberts.

**DEFENDANT BRENT GOVE'S INFLUENCE AT eXp**

59.     DEFENDANT GOVE's influence within eXp cannot be overstated.  He has the largest Revenue Share Group in eXp. DEFENDANT GOVE and his downline are responsible for the majority of income in DEFENDANT eXp REALTY'S Revenue Share Plan.

60.     For years, DEFENDANT GOVE has traveled around the country, appearing at conferences, on podcasts, in YouTube videos and on webinars, teaching real estate

agents how he makes hundreds of thousands of dollars a month through passive income through DEFENDANT eXp's Revenue Share plan.

61.    DEFENDANT GOVE also teaches eXp Agents how to recruit and sponsors DEFENDANT eXp's biggest Recruiting Events.

62.    At DEFENDANT GOVE'S Recruiting Events, agents are encouraged to share rooms with other agents.

63.    Also, at DEFENDANT GOVE'S Recruiting Events, DEFENDANT GOVE hosts lavish parties that are filled with beautiful young women, copious amounts of unlimited free alcohol, as well as drugs.

64.    DEFENDANT GOVE personally trained DEFENDANT GOLDEN and DEFENDANT BJORKMAN on how to host Recruiting Events, and they modeled their own Recruiting Events off Defendant Gove's Recruiting Events.

## SPECIFIC FACTUAL ALLEGATIONS

### The Initial Recruitment of Ms. Roberts into eXp Realty

65.    Ms. Roberts is a beautiful, charming, articulate, and intelligent woman who perfectly fit the mold of DEFENDANT eXp's highly valued image of success, which includes beautiful people, fancy things, and wealth, i.e., vacation homes, suites, parties, yachts, and fast cars.

66.    Prior to meeting DEFENDANTS, Ms. Roberts had a successful real estate career selling real estate in her market with ReMax.

FIRST AMENDED COMPLAINT FOR DAMAGES

67.     Beginning in 2018, Ms. Roberts was inundated with social media posts about joining eXp REALTY.

68.     In response to these recruiting efforts, on October 22, 2018, Ms. Roberts traveled to New Orleans, Louisiana to attend EXPCON; she stayed until October 24, 2018.

69.     DEFENDANT eXp REALTY paid for all of Ms. Roberts' expenses for EXPCON; she was provided complimentary dinners, and she attended multiple one-on-one high-pressure meetings with some of DEFENDANT eXp REALTY's top recruiting Alpha Agents ("Influencers") recruiting her to join eXp REALTY.

70.     DEFENDANT GOVE, an Alpha Agent, was personally involved in the high-pressure recruitment effort of Ms. Roberts.

71.     One of the strongest pitches made to Ms. Roberts was that by joining DEFENDANT eXp REALTY, she would be entering one of the top levels and strongest downlines in DEFENDANT eXp's multi-level marketing Revenue Share Plan pyramid (i.e. DEFENDANT GOVE's downline).[8]

72.     As her family's breadwinner, one of the main reasons Ms. Roberts was interested in joining DEFENDANT eXp REALTY was so that she could participate in its

---

[8] DEFENDANT eXp REALTY maintains a revenue-sharing plan whereby each of its agents and brokers participate in, and can receive monthly and annual residual overrides on the gross commission income resulting from transactions consummated by agents and brokers who they have attracted to eXp REALTY.

Revenue Share Program by recruiting agents, and she could obtain eXp stock options, both of which would allow her to receive "passive income."

73.     As a result of these promises and recruiting efforts, in December 2018, PLAINTIFF Roberts officially joined DEFENDANT eXp and named Alpha Agent Chris Bear as her Sponsor Agent.[9]

74.     Ms. Robert's "upline" at eXp is as follows (the position directly above her in the MLM pyramid is her sponsor Chris Bear listed below in the Tier 1 position):

| Level | eXp Sponsor Agent | eXpansion Share % of AGCI | eXponential Share % of AGCI |
|---|---|---|---|
| TIER 1 | Chris Bear | /// | 3.5% |
| TIER 2 | Cliff Freeman | .2% | 3.8% |
| TIER 3 | Brent Gove | .1% | 2.4% |
| TIER 4 | Sheila Fejeran | .1% | 1.4% |
| TIER 5 | Jennifer Vaughan Flick | .1% | 0.9% |
| TIER 6 | Gene Frederick | .5% | 2.0% |
| TIER 7 | Elizabeth Riley | .5% | 4.5% |

75.     Ms. Roberts selected Chris Bear as her Sponsor Agent because he promised to support her and to help her develop her downline, as well as her real estate business.

76.     Ms. Roberts continued to excel in selling real estate as a top agent in her region.

_____

[9] Chris Bear is an Alpha Agent who lives in Brevard County, the same county in which Ms. Roberts resided.

FIRST AMENDED COMPLAINT FOR DAMAGES



77.     DEFENDANT GOVE saw Ms. Roberts' talent as a top real estate agent and recognized she had the "it" factor to become an Alpha Agent, as such, he personally invited her to attend the Freedom Summit in Puerto Vallarta.

78.     Based on her proven track record, Ms. Roberts believed she had what it took to become an Alpha agent and expressed interest in doing so, but due to the fact she and Chris Bear were recruiting in the same geographic region, she lacked the aid from an Alpha Agent necessary to become an Alpha herself.

79.     After coming to the conclusion that her current Sponsor Agent, Chris Bear, had no interest in her becoming an Alpha Agent (Ms. Roberts would take away from his

FIRST AMENDED COMPLAINT FOR DAMAGES

own ability to get sufficient FLQAs/ "TIER ONE" agents needed to unlock his seven (7) TIERS due to them competing in the same geographic region), Ms. Roberts reached out to Chris Bear's Sponsor, Alpha Agent Cliff Freeman, for assistance.

80.    Cliff Freeman explained to Ms. Roberts that to become an Alpha Agent, she would have to change her geographical territory (fish in a different pond), if she wanted to become an Alpha Agent because Chris Bear was not willing to share Brevard County.

81.    This advice frustrated Ms. Roberts in that she was getting more and more pressure by DEFENDANT GOVE and DEFENDANT eXp REALTY to give up her sales career in order to completely focus on recruiting other agents to join eXp REALTY.

82.    At each eXp REALTY event Ms. Roberts attended, rather than educating attendees on the real estate trade, DEFENDANT eXp REALTY focused mostly on Agent Attraction and how to attract more agents to join eXp REALTY's downline; DEFENDANT GOVE espoused this as gospel.

83.    DEFENDANT eXp REALTY, DEFENDANT SANFORD, and DEFENDANT GOVE stressed at these conferences that the sole path to success at eXp REALTY was not by selling real estate, but rather, by attracting more people to join eXp REALTY. In essence, DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp REALTY's focus was on recruitment and the money that could be made by recruiting others, rather than by simply selling real estate.

84.    Ms. Roberts felt stuck, and DEFENDANT GOLDEN and DEFENDANT GOVE offered her a solution.

### DEFENDANT GOVE'S FREEDOM SUMMIT: PUERTO VALLARTA, MEXICO
### February 4-10, 2020

85.     One of DEFENDANT GOVE's signature recruiting events for eXp is the Freedom Summit.

86.     This event was held in Puerta Vallarta, Mexico, in February 2020.

87.     The purpose of the event is threefold: to recruit new agents to eXp, to teach existing agents how to be better recruiters, and to showcase successful Alpha Agents at eXp in order to motivate other agents to recruit more; as such, DEFENDANT eXp REALTY was the sponsor of the event and contributed a significant amount of money to the conference.

88.     In one of the recruiting videos designed to convince real estate agents to attend this event, DEFENDANT GOVE told the audience that "Proximity is Power".

89.     DEFENDANT GOVE's co-sponsor of the event, the number one top grossing Alpha Agent at eXp, Rob Flick, explained that the main reason to go to this event is that "you're away from your work environment. People relax, they let go."  The goal of the event is "getting to know other people on a personal level."

90.     Flick further explained that those people attending the event would be given aids for recruitment, including, but not limited to, recruitment "scripts and dialogues and talking [points] and things to be able to utilize in different situations for whether it's individual agents, Team agents, offices, whatever that we've used that have worked very significantly for some of us that have done that quite a bit. That's that's [sic] a really big

deal." "We are going to talk about building wealth"; at eXp this translates into building a downline.

91.     On February 4, 2020, after receiving multiple personal invitations and personal text messages from DEFENDANT GOVE, Ms. Roberts and her business partner flew to Puerto Vallarta, Mexico to attend DEFENDANT GOVE's Freedom Summit.

92.     Based on the numerous statements made by DEFENDANT GOVE, Ms. Roberts understood it was very important that she attend the conference in order to meet, and learn from, Alpha Agents at eXp REALTY, as well as to get resources for recruitment, which, according to DEFENDANT GOVE, were essential to her success at eXp REALTY.

93.     On February 8, 2020, Ms. Roberts attended one of DEFENDANT GOVE's FREEDOM SUMMIT signature events - a sunset cruise across Banderas Bay to Las Caletas, a beach only accessible by boat. Included in this event was a lavish dinner, all you can drink alcoholic beverages, and entertainment.



*Brent Gove on the Boat*

94.     Nearly all of eXp REALTY's top executives and top Alpha Agents, including DEFENDANT GOLDEN, his girlfriend DEFENDANT KEENAN, DEFENDANT BJORKMAN, and DEFENDANT GOVE were in attendance, which further validated the main reason Ms. Roberts decided to attend this special event -- she believed it was important for her career to "rub shoulders" as DEFENDANT GOVE often lauds, with the "Who's Who" of eXp REALTY due to the fact she had witnessed a situation where a woman in her downline had rebuffed advances from an Alpha Agent and was ostracized.

95.     After the private island event, DEFENDANT GOVE, along with his wife and children, returned to the hotel on the private chartered boat, as did DEFENDANT KEENAN, DEFENDANT GOLDEN, and Ms. Roberts, amongst others.

96.     While on the way back to the hotel, DEFENDANT KEENAN, invited Ms. Roberts to come sit at the back of the boat so that Ms. Roberts could personally meet

DEFENDANT GOLDEN—an invitation Ms. Roberts was excited to get because she knew that DEFENDANT GOLDEN was one of eXp REALTY's top Alpha Agents.

97.     In fact, earlier that day while on stage at the conference, DEFENDANT GOVE, personally introduced DEFENDANT GOLDEN to the attendees, including Ms. Roberts, describing DEFENDANT GOLDEN'S career as a "Cinderella Story", much like his own.

98.     After being introduced and endorsed on stage by DEFENDANT GOVE, DEFENDANT GOLDEN spoke for over twenty minutes about DEFENDANT GOLDEN'S rags to riches success story with eXp REALTY.

99.     Ms. Roberts believed DEFENDANT GOLDEN to be a safe person since DEFENDANT eXp REALTY and DEFENDANT GOVE held DEFENDANT GOLDEN out to be one of eXp REALTY's leaders as evidenced by his speaking engagement at DEFENDANT GOVE'S Freedom Summit. [10]

---

[10] Comments, such as the following statement made by Alpha Agent Rick Geha, were often used by male Alpha Agents to describe DEFENDANT GOLDEN at eXp events and recruitment activities: "I think David Golden is a Rockstar, and he looks like a Rockstar, always wearing sunglasses, and he's in good shape, he has an attractive girlfriend, it's almost like he is a movie star, and I'm just so happy we are working together". *Stacie Koroly interview with Rick Geha, 2021.*

*DEFENDANT GOVE greeting DEFENDANT GOLDEN on stage*

100.   When DEFENDANT KEENAN asked Ms. Roberts to come meet DEFENDANT GOLDEN on the boat, Ms. Roberts, due to DEFENDANT GOLDEN'S position within eXp Realty, was starstruck.  In fact, DEFENDANT GOVE had been overheard on the boat saying that he vicariously lived through DEFENDANT GOLDEN.

101.   While Ms. Roberts was talking to DEFENDANT GOLDEN on the boat, DEFENDANT KEENAN placed a pill into Ms. Roberts' mouth, telling her not to worry, it was just an Adderall, then further stated it simply would give her energy; soon thereafter, Ms. Roberts blacked out and does not have any personal recollection of what happened for the remainder of the evening.

102.   Ms. Roberts later learned she was acting wildly inappropriate for being at a family-attended business event as she was publicly seen making out with DEFENDANT KEENAN in front of the Gove family; needless to say, she was mortified.

103.   Ms. Roberts later also learned, that upon exiting the boat, she got separated from her friends, and instead ended up with DEFENDANT GOLDEN and DEFENDANT KEENAN. Ms. Roberts friends next saw her at the hotel bar after having been frantically searching for her. At that time, Ms. Roberts had no independent recollection of that night. Ms. Roberts now believes she was sexually assaulted by DEFENDANT GOLDEN, DEFENDANT KEENAN, and others that evening.

104.   The next morning, DEFENDANT KEENAN contacted Ms. Roberts to let her know that she had her credit card and asked her to come later that day to her hotel room, which she was sharing with DEFENDANT GOLDEN, to retrieve the card. Ms. Roberts has no idea how DEFENDANT KEENAN got her credit card.

105.   That same morning, DEFENDANT KEENAN told another attendee that she had "pulled a girl for the first-time last night"; the girl that was drugged and "pulled" was Ms. Roberts.

106.   Not knowing at the time that she had been drugged the night before by DEFENDANT KEENAN, Ms. Roberts went to DEFENDANT KEENAN AND GOLDEN's hotel room to retrieve her credit card later that day.

107.   DEFENDANTS KEENAN AND GOLDEN were having a drink in their hotel room when Ms. Roberts arrived, and they offered Ms. Roberts a drink.

108.   Soon after having that drink, Mr. Roberts lost a significant portion of her memory.

109.   While much of that day and night is a blur, Ms. Roberts does recall a few details. In particular, she recalls regaining her consciousness to find DEFENDANT KEENAN's fingers in her vagina and DEFENDANT GOLDEN standing over them rubbing his erect penis over his pants.  Ms. Roberts immediately jumped away—shocked and upset.

110.   Upon seeing Ms. Roberts' reaction, DEENDANT GOLDEN sent DEFENDANT KEENAN away and began to gaslight Ms. Roberts by acting as if they were in the middle of a business meeting rather than her having been being assaulted.

111.   Confused, scared, and shocked, Ms. Roberts followed DEFENDANT GOLDEN'S lead and talked business with him.

112.   At this time, DEFENDANT GOLDEN turned up the charm and began promising her everything she ever wanted with respect to her career. Using the typical eXp Agent Attraction techniques, he promised Ms. Roberts the moon and the stars, as well as the pathway to generational wealth; DEFENDANT GOLDEN said he was going to make Ms. Roberts the next big Alpha Agent at eXp Realty such that she no longer would have to sell real estate.11

113.   Ms. Roberts recalls DEFENDANT GOLDEN telling her that the only way she could obtain her goal of becoming an Alpha Agent would be for her to leave her eXp

---

11 The whole point of recruitment and the Revenue Share Program was to enable real estate agents to gain regular monthly passive income such that they did not have to rely on income from selling real estate which can be sporadic.

Sponsor Agent, Chris Bear, and move to DEFENDANT GOLDEN's own Revenue Share Group.

114.   DEFENDANT GOLDEN told Ms. Roberts that if she did exactly what he told her to do, which included naming him as her Sponsor Agent, then he would make her an Alpha Agent and catapult her career and help her build life changing financial success.[12]

115.   Ms. Roberts, however, knew the rules and understood that she could not change Sponsor Agents due to DEFENDANT eXp's prohibition against switching sponsors.

116.   As soon as Ms. Roberts returned home from Mexico, DEFENDANT GOLDEN began inundating her with text messages and calls to convince her to change her eXp organization and join his Revenue Share Group, known as the Golden Team.

117.   As part of this recruitment campaign to join The Golden Team, DEFENDANT GOLDEN would at times profess his love to Ms. Roberts, and at other times, would make promises that he would bring her great financial success so long as she did EXACTLY what he told her to do.[13]

---

[12] Within the structure of eXp there are many "Revenue Share Groups"; Chris Bear leading one and David Golden leading another.

[13] DEFENDANT GOVE often told agents that if they did exactly what he said, he would help them build wealth.

118.   On February 11, 2020, a few days after DEFENDANT GOVE'S FREEDOM SUMMIT, at DEFENDANT GOLDEN's invitation, Ms. Roberts traveled to Las Vegas to attend another recruiting event.

119.   DEFENDANT GOLDEN had invited Ms. Roberts with the promises of future success and other career enticements as part of his pressure campaign to come to Las Vegas and get her to join The Golden Team Revenue Share Group.

120.   Ms. Roberts was hesitant to change organizations because under DEFENDANT eXp REALTY's rules, if she did so, she would have to leave eXp REALTY for six months.

121.   Under eXp's rules, Ms. Roberts would have had to get 100% approval from her entire upline to move into DEFENDANT GOLDEN's Revenue Share Group; her upline included eXp Board Member, Gene Frederick. Thus, the knowledge of this sponsor change would have necessarily been approved by the leadership team of eXp.

122.   The following week, on February 16, 2020, Ms. Roberts received a text message from DEFENDANT GOLDEN stating that he had spoken with DEFENDANT GOVE, and based on their conversation, it "looks like they just changed the rules."

FIRST AMENDED COMPLAINT FOR DAMAGES



123.   Ms. Roberts took this message to mean that the prohibition against Agent Interference would be waived because DEFENDANT GOLDEN and DEFENDANT GOVE, both Alpha Agents, wanted her on DEFENDANT GOLDEN's team.

124.   DEFENDANT GOLDEN and DEFENDANT GOVE would benefit from this move because they knew Ms. Roberts would provide significant financial benefit to them (and also those above them) as they helped her untap her potential in signing FLQA Agents, unlocking additional Tiers, and ultimately becoming, as they promised her, an Alpha Agent. The fruition of those promises would equal substantial financial benefit that she, they, and multiple other individuals, including Cliff Freeman knew that would never be realized under Chris Bear. The benefit to DEFENDANTS eXp, SANFORD, and GOVE who were in Chris Bear's upline, would be dramatically increased with the change of Ms. Roberts' sponsor under the direction of DEFENDANT GOLDEN.

125.   DEFENDANT GOLDEN proceeded to "love bomb" Ms. Roberts in an effort to get her to switch sponsors.[14]

126.   During the time that DEFENDANT GOLDEN was love bombing Ms. Roberts, DEFENDANT GOVE personally invited Ms. Roberts to attend the highly coveted Grant Cardone 10X Growth Conference which was held in Las Vegas on February 21, 2020.[15]

127.   Included with this personal invitation, was an invite to an exclusive private four-person dinner with DEFENDANT GOVE and a VIP event ticket worth thousands of dollars to the Cardone event.

128.   This special treatment was not only the promise, but the execution of DEFENDANT GOLDEN and DEFENDANT GOVE putting Ms. Roberts in the room with the inner circle of Alpha Agents.

129.   To further entice Ms. Roberts to become an Alpha Agent (which would require her to join DEFENDANT GOLDEN'S organization), DEFENDANT GOVE shared his monthly Revenue Share that he received from the eXp Revenue Share pyramid at that time.

---

[14] Love bombing is a form of psychological and emotional abuse that involves a person going above and beyond for you in an effort to manipulate you into a relationship with them. https://health.clevelandclinic.org/love-bombing. This term is characterized by excessive attention, admiration, and affection where the end goal is to cause the recipient to feel dependent and obligated to that person.

[15] Grant Cardone is a famous motivational speaker.

FIRST AMENDED COMPLAINT FOR DAMAGES

130.   DEFENDANT GOVE's and DEFENDANT GOLDEN's actions enticed Ms. Roberts into wanting to switch her Revenue Share Group and name DEFENDANT GOLDEN as her Sponsor Agent. Thus, the wheels were in motion to provide the financial boon for DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp.

### Daytona Beach, Florida
### March 2020

131.   In further attempt to entice Ms. Roberts to change her Sponsor Agent, DEFENDANT GOLDEN invited Ms. Roberts and her business partner to attend an eXp REALTY recruiting event at the Hard Rock Hotel in Daytona Beach, Florida in or around March 12, 2020.[16]

132.   Ms. Roberts understood that the purpose of the trip was for DEFENDANT GOLDEN to teach her how to run her own eXp REALTY recruiting event by attending one put on by another agent; when, in actuality, the purpose of the trip was to continue the pressure campaign to get Ms. Roberts to name DEFENDANT GOLDEN as her Sponsor

---

[16] Prior to attending the March 2020 recruiting event, DEFENDANT GOLDEN reached out to a Florida based eXp Agent and asked her to get him cocaine so he wouldn't have to fly with it.  Concerned by that request, the Florida Agent reached out to Defendant Golden's Sponsor Agent, Rosie Rodriguez, to report the incident, to which she responded, "you have to take the good with the bad."

Agent (a campaign which included love bombing Ms. Roberts and promising her great success alongside him).[17]

133.   Ms. Roberts thought the plan was for her to share a room with DEFENDANT GOLDEN; however, on the first night of the event, DEFENDANT BJORKMAN showed up at DEFENDANT GOLDEN'S room with his luggage in hand and told Ms. Roberts that he would also be staying in their room.  At first, Ms. Roberts thought DEFENDANT BJORKMAN was joking; however, DEFENDANT BJORKMAN told Ms. Roberts that it was not a joke as he always shared a room with DEFENDANT GOLDEN.

134.   The next day, while at the hotel, DEFENDANT GOLDEN received a delivery of GHB.

135.   DEFENDANT GOLDEN told Ms. Roberts that the delivery was a workout performance enhancing drug.  DEFENDANT GOLDEN told her to look up the drug online and see that it was used for workouts as it was routinely used by bodybuilders. He then googled GHB to show Ms. Roberts that some people used GHB as an energy enhancer. Not understanding the risk involved in taking the drug, and after being told that a small amount would be just fine, Ms. Roberts took the dosage recommended by DEFEDANT GOLDEN; Ms. Roberts did not understand that taking this drug would cause her not only

---

[17]  Victims respond to sexual assault in a variety of ways, some do continue or begin a relationship to help them cope with the lack of control they felt during the assault. Elizabeth Jeglic, Ph.D., a psychology professor at New York's John Jay College, https://abcnews.go.com/US/sexual-assault-victims-continue-relationships-assailants/story?id=68460398.

to lose her memory, but also to become incapacitated such that she would lose the ability to consent as to what happened with her body.

136.   As a result of taking the drug, Ms. Roberts blacked out and does not recall much of the events from that night except for flashes of memories; however, Ms. Roberts does recall that the next morning while she was showering, DEFENDANT BJORKMAN walked into the bathroom naked, exposing himself to her.

137.   When DEFENDANT BJORKMAN walked into the bathroom, Ms. Roberts was utterly shocked and asked what he was doing to which he replied, "oh, now you are shy?" implying that they had sexual contact the night before.

138.   Ms. Roberts believes she was sexually assaulted by DEFENDANT GOLDEN and DEFENDANT BJORKMAN the previous night while she was incapacitated.

139.   Upon information and belief, DEFENDANT BJORKMAN and DEFENDANT GOLDEN took pictures and/or videos of her that night.

140.   Ms. Roberts' business partner, who was also in attendance at this recruiting event at the Hard Rock Hotel in Florida, made it very clear to DEFENDANT GOLDEN that she and Ms. Roberts would not be changing their sponsor.  Soon after this occurred, DEFENDANT GOLDEN broke off his "relationship" with Ms. Roberts and began a smear campaign to try and discredit Ms. Roberts within eXp REALTY.

141.   Distraught, Ms. Roberts ended up moving to Costa Rica.

142.   Several years later, after learning that other women had been drugged and assaulted by DEFENDANT GOLDEN and DEFENDANT BJORKMAN, Ms. Roberts

began to piece together what had happened to her – including the drugging, the assault, the fraudulent inducement, and promises of career advancement.

143.   For years after the events described in this complaint, Ms. Roberts began having flashes of memories involving DEFENDANT GOLDEN. One of those memories was of an incident where she felt like she was overdosing, and she recalled in those drastic moments him still making promises to her.  Those promises ended nearly immediately after that incident when her business partner confirmed to DEFENDANT GOLDEN that she would not be switching sponsors.

**Los Cabos, Mexico**
**April 2021**

144.   On or around April 25, 2021, after the DEFENDANT GOLDEN debacle, Ms. Roberts and her business partner attended another eXp REALTY Recruiting event hosted by DEFENDANT GOVE.  This time the event was in Los Cabos, Mexico.

145.   Ms. Roberts and her business partner were trying to recover from the previous events that had occurred and save their career. At that time, they attended the afternoon welcome reception by the pool.  This event had an open bar and copious amounts of alcohol.  Many of the attendees were intoxicated.

146.   While at this event, eXp Realty Alpha Agent, DEFENDANT SHERRARD approached Ms. Roberts and introduced himself as the #1 agent at eXp REALTY.  Trying to impress her he showed her a picture of his Lamborghini.

FIRST AMENDED COMPLAINT FOR DAMAGES

147.   Unimpressed, Ms. Roberts rebuffed his advances and tried to continue her conversation with other attendees attempting to network. Uninvited, DEFENDANT SHERRARD sat next to her at a table by the pool where she was talking to other agents.

148.   DEFENDANT SHERRARD then began repeatedly placing his hand on Ms. Roberts' leg, attempting to move his hand up under her skirt.

149.   Ms. Roberts repeatedly tried to stop DEFENDANT SHERRARD from touching her; however, his pinky and ring finger grazed her vagina multiple times, making her exceedingly uncomfortable as she was sitting with Alpha Agent Cliff Freeman's daughter, amongst other women in her downline.

150.   DEFENDANT SHERRARD ignored Ms. Roberts' attempts to get him to remove his hands off her body; he simply ignored her rebuffs acting as if his behavior was acceptable. He did this approximately 6-7 times.

151.   Finally, Ms. Roberts jumped up from the table mid-conversation with other agents and left the event.

152.   These events which occurred over a whirlwind six-week high pressure campaign caused Ms. Roberts extreme emotional distress such that she stopped selling real estate and eventually moved out of the country to distance herself from eXp REALTY.

## **ACTUAL NOTICE**

153.   On September 15, 2020, an eXp Realty Agent, Christy Lundy, made a post on Facebook warning others that she had been drugged while at a recruiting event in Las Vegas. This post received hundreds of comments including several comments from people coming forward with stories of their own accounts of being drugged.

154.   On September 17, 2020, an eXp agent reported to DEFENDANT eXp that she had been drugged and raped while attending a Brent Gove seminar. This agent identified DEFENDANT BJORKMAN as the rapist, and also, implicated DEFENDANT GOLDEN.

155.   On September 18, 2020, DEFENDANT eXp terminated DEFENDANT BJORKMAN's Independent Contractor Agreement ("ICA") and removed his license from eXp Realty.  That same day, DEFENDANT GOVE knew DEFENDANT eXp took this action and the reasons for it.

156.   Upon information and belief, after discussing the matter with DEFENDANT GOLDEN, DEFENDANT GOVE reached out to DEFENDANT BJORKMAN to offer his full support and commitment to lobby DEFENDANT SANFORD on DEFENDANT

BJORKMAN's behalf to get DEFENDANT BJORKMAN reinstated at eXp and to make sure that DEFENDANT BJORKMAN continued to receive his Revenue Share income.

157.   On October 6, 2020, eXp agent Tami Sims reported to Cory Haggard, a member of DEFENDANT eXp's executive leadership team, that in 2014 DEFENDANT BJORKMAN had told her to stay away from DEFENDANT GOLDEN because he "will drug you and rape you."  DEFENDANT eXp REALTY and DEFENDANT SANFORD ignored this and took no action to investigate DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

158.   On October 6, 2020, Sims further notified DEFENDANT eXp Realty that DEFENDANT BJORKMAN showed her videos of DEFENDANT GOLDEN completely naked performing sex acts with random women. DEFENDANT eXp REALTY and DEFENDANT SANFORD took no action against DEFENANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

159.   On October 6, 2020, Sims reported to DEFENDANT eXp REALTY that she knew DEFENDANT BJORKMAN kept GHB in his five-hour energy drink bottles. DEFENDANT eXp and DEFENDANT SANFORD took no action against DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

160.   On October 6, 2020, Sims reported to DEFENDANT eXp REALTY that in February 2019 at a Club Wealth event in Hawaii where eXp agents recruited other agents into eXp, a real estate agent was hospitalized with a dangerous Blood Alcohol amount after having just one drink while being recruited by DEFENDANT BJORKMAN.

DEFENDANT BJORKMAN told Sims that the agent that was taken to the hospital was wasted, "she wanted it," and "she was so into me."  Sims also told DEFENDANT eXp REALTY that DEFENDANT GOLDEN was not at this event because he had already been banned from attending Club Wealth events.  DEFENDANT eXp and DEFENDANT SANFORD took no action against DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

161.   On October 6, 2020, Sims reported to DEFENDANT eXp REALTY that DEFENDANT GOLDEN and DEFENDANT BJORKMAN would get agents drunk so that they could get them to join eXp Realty naming either of them as their sponsor. DEFENDANT eXp and DEFENDANT SANFORD took no action against DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

162.   Finally, Sims told DEFENDANT eXp that she did not want to be putting money into either DEFENDANT BJORKMAN or DEFENDANT GOLDEN's pockets and did not want either of them to be in her upline.  DEFENDANT eXp and DEFENDANT SANFORD took no action against DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

163.   Also on October 6, 2020, DEFENDANT eXp REALTY received an eleven (11) page detailed memorandum (the "Memo") from one of its top agents (hereafter Agent Doe) explaining that it is DEFENDANT GOLDEN and DEFENDANT BJORKMAN'S "MO" to (1) travel together "as a pack"; (2) get agent recruits so intoxicated that they can hardly function; (3) take advantage of them; (4) video them; and (5) follow up with

statements of "you're a whore", "you asked for it," "you drink too much," "you made a mistake", "you know I would never do something like that to you", "you liked it" etc.

164.   The Memo details how it was DEFENDANT BJORKMAN and DEFENDANT GOLDEN'S practice to supply copious amounts of drugs and alcohol at their Recruiting Events so that the attendees would do things "that are hard to take back and embarrassing" and then use that information to coerce them to join DEFENDANT eXp REALTY.  DEFENDANT eXp REALTY and DEFENDANT SANFORD took no action against DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

165.   Agent Doe also informed DEFENDANT eXp REALTY in the same Memo, that members of DEFENDANT BJORKMAN and DEFENDANT GOLDEN'S upline were aware of DEFENDANT GOLDEN and DEFENDANT BJORKMAN'S behavior but did nothing about it because they were the upline's "meal ticket."  DEFENDANT eXp REALTY took no action against DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

166.   The Memo also details the following incidents:

- In early April of 2019, at the invitation of Alpha Agent Jesse Zagorsky (an eXp Agent in DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT GOVE and DEFENDANT SANFORD'S downline), invited Agent Doe to a real estate Recruiting Event in La Jolla, California, where she met for the first time, DEFENDANT BJORKMAN and DEFENDANT GOLDEN.

- The Recruiting Event was held at a large beach house where many of the attendees were staying.  During this particular Recruiting Event, Agent Doe heard attendees discussing that "hookers and blow" were being offered in one of the rooms at the Recruiting Event.

- Also, during this event, DEFENDANT GOLDEN and DEFENDANT BJORKMAN both offered Agent Doe, made for her, and tried to get her to drink a mixed drink, which she declined as she does not like to drink alcohol at events unless her husband is also present.

- Agent Doe recalled DEFENDANT BJORKMAN making lewd and unwanted sexual comments to her all evening.

- The following week in April of 2019, Agent Doe attended a real estate event hosted by The Closing Table in Beverly Hills, California, where eXp agents recruited other agents to join eXp.  DEFENDANT BJORKMAN and DEFENDANT GOLDEN were also in attendance.

- When DEFENDANT BJORKMAN learned that Agent Doe's husband would be attending as well, DEFENDANT BJORKMAN got very upset and tried to get Agent Doe to go to his room before her husband arrived.  She declined the invitation.

FIRST AMENDED COMPLAINT FOR DAMAGES

- After that event, DEFENDANT BJORKMAN and DEFENDANT GOLDEN convinced Agent Doe to download Marco Polo, a messaging app they used to recruit agents.

- In mid-June of 2019, Agent Doe and her husband attended a real estate event hosted by Lab Coat Agents.  DEFENDANT BJORKMAN and DEFENDANT GOLDEN were in attendance and invited her and her husband to their private suite in Coronado to recruit Agent Doe to join DEFENDANT eXp REALTY.

- While at this meeting, DEFENDANT BJORKMAN and DEFENDANT GOLDEN offered Agent Doe and her husband a mixed drink.  Agent Doe remembers having a few sips but then her memory goes blank. Agent Doe was later told by people in attendance that she and her husband were acting "wasted" and left the suite early in the afternoon. The next thing Agent Doe and her husband recall is waking up the next morning in their hotel room feeling incredibly ill, ashamed, and mortified that she had allowed herself to get so "drunk".

- The day after she had been drugged (which she did realize until she read Christy Lundy's September 15, 2020 Facebook post describing a similar situation), Agent Doe recalls several people making fun of her for being so intoxicated. Agent Doe later learned that DEFENDANT BJORKMAN had texted others making fun of Agent Doe for getting so wasted in his suite.

FIRST AMENDED COMPLAINT FOR DAMAGES

- In August of 2019, still not realizing she and her husband had been drugged by DEFENDANT BJORKMAN and DEFENDANT GOLDEN, Agent Doe decided to join eXp and name DEFENDANT BJORKMAN as her sponsor.

- Soon thereafter, Agent Doe traveled to Las Vegas to attend an eXp Recruiting Event hosted by DEFENDANT BRENT GOVE at the Red Rock Resort.

- At this Recruiting Event, DEFENDANT GOLDEN was supposed to be one of DEFENDANT GOVE's speakers, but DEFENDANT GOLDEN was unable to take the stage because he was too high and too drunk to make it on stage.

- At that same recruiting event hosted by DEFENDANT GOVE, one of DEFENDANT GOVE's downline agents overdosed on cocaine and GHB in DEFENDANT GOLDEN's suite.

- Rosie Rodriguez, DEFENDANT GOLDEN'S Sponsor Agent and DEFENDANT GOVE's downline agent, knew of the drugging and overdose but discouraged the attendees from seeking medical help.

- Also at this recruiting event, male attendees in their 40s and 50s were having sex with very young women.  Agent Doe told DEFENDANT eXp REALTY that some of these sexual encounters were not consensual.

- DEFENDANT eXp and DEFENDANT SANFORD took no action against DEFENDANT GOVE or DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

FIRST AMENDED COMPLAINT FOR DAMAGES

- In November of 2019, Agent Doe saw DEFENDANT BJORKMAN at another Closing Table event, this time in Napa, California.  At that event DEFENDANT BJORKMAN was intoxicated and grabbed Agent Doe and tried to kiss her.

- In December of 2019, Agent Doe was invited by DEFENDANT BJORKMAN, DEFENDANT GOLDEN and Rosie Rodriguez to meet with DEFENDANT eXp Board Member, Gene Frederick in Puerto Rico. Agent Doe, Rosie Rodriguez, DEFENDANT GOLDEN, and DEFENDANT BJORKMAN were staying at an AIRBNB together. Agent Doe had agreed to go because Rosie Rodriguez, another female, would be in attendance. On her way there, Agent Doe learned that Rosie Rodriguez would not be attending because she was not feeling well.

- While at the Airbnb in Puerto Rico, DEFENDANT GOLDEN and DEFENDANT BJORKMAN made sexual comments, ridiculed Agent Doe about her religious beliefs, and left a 5-hour energy bottle on her nightstand next to her bed. Agent Doe felt so uncomfortable that she locked herself in her room and talked to her husband all night long. The next day she asked eXp Board Member and top Alpha Agent Gene Frederick to take her to the airport a day early. Agent Doe then spent the night in the airport in order to avoid being in the Airbnb with DEFENDANT BJORKMAN AND DEFENDANT

GOLDEN because she was so scared of their sexual advances, comments, and behavior.

- In early March of 2020, an eXp agent from Florida complained to Agent Doe that DEFENDANT GOLDEN tried to get her and one of her teammates to "score" cocaine for the Flagler recruiting event (detailed above in Footnote 25). Agent Doe immediately reported this to DEFENDANT GOLDEN'S Sponsor Agent, Rosie Rodriguez, and her response was that this was fine and that "boys will be boys." Not getting any help, Agent Doe went to Rosie Rodriguez's Sponsor Agent, Rick Geha. Geha didn't want to discuss the matter with her but instead offered to "coach" her on team growth. Still not getting any assistance, Agent Doe went to Rick Geha's Sponsor Agent, DEFENDANT GOVE. DEFENDANT GOVE refused to help as he was "late for a tee time."

167.   The Memo further details events that happened in Las Vegas and are at issue in the related action Acevedo v. eXp Realty, et al. Once, again, DEFENDANT eXp and DEFENDANT SANFORD took no action against DEFENDANT GOLDEN and continued to pay DEFENDANT BJORKMAN.

168.   One week after DEFENDANT eXp received a copy of the Memo, the detailed complaint from Sims, and the detailed complaint from the agent that was raped in Las Vegas, as well as the notorious Facebook post, rather than taking any action against DEFENDANT BJORKMAN and DEFENDANT GOLDEN, DEFENDANT SANFORD

46

and DEFENDANT GOVE offered DEFENDANT BJORKMAN their encouragement and support, all while ignoring the pleas from those assaulted who were asking DEFENDANT eXp, DEFENDANT SANFORD, and DEFENDANT GOVE for help.

169.   At that same time, DEFENDANT GOVE began to campaign actively to DEFENDANT SANFORD and DEFENDANT eXp on DEFENDANT BJORKMAN'S behalf to change DEFENDANT eXp's policies on vesting so that DEFENDANT BJORKMAN would be allowed to vest, lock in his Front Line Qualifying Agents ("FLQA"), and continue to receive his Revenue Share Income before the designated three year vesting mark.

170.   Also, around the same time, DEFENDANT eXp organized a call with its Alpha and Beta Agents to discuss the DEFENDANT BJORKMAN situation.  On that call, several agents were heard joking about the rape allegations and made comments like "what happens in Vegas, stays in Vegas."

171.   Ultimately, DEFENDANT SANFORD and DEFENDANT eXp, at the incessant encouragement from DEFENDANT GOVE, took no action against DEFENDANT GOLDEN and allowed DEFENDANT BJORKMAN to keep his Revenue Share Income despite the multiple complaints of drugging and raping and despite the fact that eXp had "terminated" DEFENDANT BJORKMAN'S ICA and had his licensed removed from eXp Realty just a few weeks prior.

172.   In fact, after DEFENDANT eXp and DEFENDANT SANFORD knew about all of these allegations against DEFENDANT GOLDEN and DEFENDANT

BJORKMAN's arrest for sexual assault, DEFENDANT eXp and DEFENDANT

BJORKMAN executed a contract to allow DEFENDANT BJORKMAN to vest early so

that DEFENDANT SANFORD and DEFENDANT eXp could pay DEFENDANT

BJORKMAN Revenue Share indefinitely (the "Accelerated Compensation Agreement").

173.   The Accelerated Compensation Agreement states:

> As of the Effective Date, eXp will accelerate the vesting of
> Agent's Revenue Share, as defined in the ICA, as if Agent had
> been independent sales agent with eXp for three (3) years as
> the ICA Termination Date. Agent must qualify in the
> jurisdiction he is domiciled in order to receive Revenue Share
> and maintain an active real estate license in good standing to
> continue to receive Revenue Share payments. For so long as
> agent does not affiliate with a competitor of eXp, agent will be
> eligible to earn eXpansion and eXponential shares. If Agent
> affiliates with a competitor of eXp, Agent loses his ability to
> earn the exponential share portion of his revenue share. In
> addition, if any of the following are true, eXp will cease to pay
> agent either the eXpanison share, eXponential share, or both:
> 1) Agent is convicted of a crime; 2) If Agent commits or
> attempts to commit or admits to committing actors of moral
> turpitude that are inconsistent with eXp's core values; or 3)
> Agent has engaged in legal action against eXp or acted in a
> manner that facilitates legal action against eXp.

174.   DEFENDANT eXp and DEFENDANT SANFORD subsequently began

paying the accelerated payments to DEFENDANT BJORKMAN.  The first payment was

made on April 21, 2021, and the last payment was made on March 23, 2023.  In total, upon

FIRST AMENDED COMPLAINT FOR DAMAGES

information and belief, DEFENDANT eXp had paid DEFENDANT BJORKMAN over

$1,000,000 as part of this agreement.[18]

175.   In April 2024, DEFENDANT BJORKMAN filed his own lawsuit against

DEFENDANT eXp and DEFENDANT SANFORD for breach of contract based on their

failure to continue to pay DEFENDANT BJORKMAN under the terms of their executed

Accelerated Compensation Agreement on the grounds that DEFENDANT eXp knew about

the allegations against DEFENDANT BJORKMAN before it entered into the Accelerated

Compensation Agreement, and therefore, had no right to stop paying him based on the

morality clause cited above once it became public that eXp was paying DEFENDANT

BJORKMAN.  See Michael Bjorkman v. eXp Realty, LLC and Glenn Sanford, Superior

Court of the State of Washington, Case No. 24-2-01833-32.

176.   In March 2022, Fabiola Acevedo (a Plaintiff in the Acevedo matter) went to

eXpCon where she personally told DEFENDANT SANFORD and Jason Gesing that she

was drugged and assaulted by DEFENDANT BJORKMAN and that her entire upline was

aware of his behavior and were silent.

177.   DEFENDANT eXp REALTY sent Ms. Acevedo's request for a sponsor

change to DEFENDANT eXp's compliance committee but declined her request because

too much time had passed between the time she was assaulted and making her request.

---

[18] March 23, 2023 coincides with the filing of the lawsuit against DEFENDANT
SANFORD.  *See Acevedo v. eXp Realty*.

178.   In April 2022, Felicia Gentry, an eXp agent, eXp's Director and Leader of Diversity and Inclusion for eXp, and eXp Board Member addressed eXp's Board of Directors to discuss the multiple complaints brought by eXp agents, all independently reporting that they had been drugged and assaulted by DEFENDANT BJORKMAN and DEFENDANT GOLDEN.

179.   In her address to the Board of Directors, Ms. Gentry complained that DEFENDANT eXp REALTY only conducted an internal investigation that lacked independence.

180.   Ms. Gentry sought the advice of outside counsel from a law firm in Dallas, Texas asking what to do when DEFENDANT eXp REALTY did not take any action. This law firm suggested they do an outside investigation; however, Ms. Gentry was told by DEFENDANT eXp that it was not necessary and that DEFENDANT eXp REALTY would be handling the investigation internally. Ms. Gentry was one of the first Board Members ever not to be asked back to the Board for a second term.

181.   Ms. Gentry also complained to the Board of Directors about its inconsistent decisions to let some victims be allowed to switch sponsors but others, like Ms. Acevedo, not be allowed the same courtesy.

182.   Ms. Gentry proposed the following seven-point plan of action to the Board after learning about the assaults:

1. Launch an independent investigation;

2. Change the sponsorship for victims;

FIRST AMENDED COMPLAINT FOR DAMAGES

3.  Create an internal and external statement supporting a zero-tolerance policy for sexual harassment and sexual assault;

4.  Create an independent whistleblower hotline process for staff and agents to confidentially report complaints;

5.  Change the Revenue Share policy that would prohibit terminated agents from continuing to financially benefit from the Revenue Share plan;

6.  Encourage inclusion; and

7.  Proactively support women in the company.

183.  DEFENDANT eXp REALTY ignored Ms. Gentry's recommendations; however, years later, after the Acevedo lawsuit was filed, DEFENDANT SANFORD announced his own seven Point Plan to address sexual harassment and sexual assault at eXp.  It was the exact plan Ms. Gentry had proposed two years earlier.

184.  On March 20, 2023, DEFENDANT SANFORD addressed the allegations set forth in Acevedo v. eXp Realty and made the following public statement which was posted to YouTube:

> This is a kind of a tough week, obviously, you know, many of you have seen some of the news that's been out, some of you likely read the lawsuit that was filed against two agents, [Mike Bjorkman and David Golden] one [Bjorkman] who we released a few years ago when this came to light as a potential challenge. And, then we actually *suspended* another agent [Golden] yesterday [March 19, 2023], based on you know, I actually read through, and I know, many of the leadership team, and many others read through the civil complaint. ***And there were things***

*that I was not aware of being alleged,*[19] and, and things that that were there, that the obvious first step as an organization is to distance ourselves from that, pending the outcome of internal investigation, also attending the outcome of the civil suit.

\*\*\*\*

We took action a few years ago, immediately released [DEFENDANT BJORKMAN] when this was coming to a head, and as we were getting internal facts, we've got, you know, we have internal compliance committee that had reviewed the information back then, and the decision was made at that point, that, that we needed to release [DEFENDANT BJORKMAN] and [DEFENDANT BJORKMAN] needed to deal with the issue that they were having to deal with, because of actions or alleged actions that they had, had taken and or participated in.

\*\*\*\*

We do not take sexual assault, or even the potential of sexual assault, we take that very seriously…. And as, as the largest real estate brokerage, we also need to put in new processes and paths for how to address these types of, of issues. So, you know, *a lot of this has been in the last 48 hours*, *because the press release*….

\*\*\*\*

But we are going to be making a lot more overt in fact, later on today in Workplace we're going to be sharing some additional resources, phone numbers, whistleblower hotlines, and then also we are also setting up a task force made up exclusively of women to actually help design processes for us so that we can really address the needs that are unique in what is perceived and probably likely is a fairly male dominated industry.

And, you know, how do we level the playing field so that you've got the resources and the access and the abilities to have things address changed, etc. that need to, so that you can feel like you can be in places where maybe you don't feel as safe as you should?

---

[19] There were no new allegations set forth in the *Acevedo* Complaint that was not already known to DEFENDANT SANFORD and DEFENDANT eXp.

FIRST AMENDED COMPLAINT FOR DAMAGES

******

> We do need to continually go back and fix the things that we
> should have fixed in the past. And, and fix them as we continue
> to scale and grow.

*****

> For anybody who was a victim, we want to make sure that
> you're in, you have some way to address inside of EXP, so that
> you can get some resolution of some sort without resulting, you
> know, having to go to the legal system.

## CONSTRUCTIVE KNOWLEDGE/ SHOULD HAVE KNOWN/ WILLFUL BLINDNESS

185.    DEFENDANT GOLDEN AND DEFENDANT BJORKMAN had a widespread reputation, even prior to joining eXp, of drugging and assaulting women. DEFENDANT GOVE, SANFORD, GOLDEN, AND BJORKMAN had worked for Remax and/or Keller Williams for years prior to eXp's existence. It was a small community in which DEFENDANT GOLDEN and DEFENDANT BJORKMAN'S REPUTATION proceeded them.

186.    Many Alpha Agents and employees, including DEFENDANT GOVE, were present at events where women were drugged and assaulted.

187.    Upon information and believe, prior to the implementation of DEFENDANT eXp's seven-point plan, DEFENDANT eXp had no known sexual assault reporting/complaint handling policies for its agents or event attendees.

188.   Upon information and belief, DEFENDANT eXp had a history of permissible behaviors for employees/agents/presidents who sexually assaulted/harassed woman.

189.   Upon information and belief, NDA's were used to silence survivors of sexually assault and employees who attempted to investigate/speak out were fired.

190.   Upon information and belief, there was no training for eXp employees/agents for complaint handling of sexual assault/harassment incidents. A lot of events where employees of eXp in the presence of drug use.

191.   At the time of the alleged incidents as described in this complaint, DEFENDANT eXp had no policy against the use of drugs and alcohol during recruitment events both sponsored and non-sponsored by eXp.  As of the date of this complaint that policy has changed.

192.   In 2020, DEFENDANT eXp REALTY had no process or policy for its agents to report sexual harassment or sexual assault.

193.   Despite not having any process or policy in place to handle agent complaints, multiple eXp agents complained to DEFENDANT eXp about DEFENDANT GOLDEN and DEFENDANT BJORKMAN drugging and raping agents, yet DEFENDANT eXp took no meaningful action against DEFENDANT GOLDEN and insufficient action against DEFENDANT BJORKMAN.

194.   All DEFENDANTS' actions toward complainants of sexual assault have demonstrated a conscious disregard for the safety of all women agents in the presence of

DEFENDANT GOLDEN and DEFENDANT BJORKMAN and individuals capable of similar behavior that likewise is and has been regularly ignored by the Company.

## **BENEFIT TO DEFENDANTS eXp, SANFORD, and GOVE**

195.   DEFENDANT eXp, SANFORD, and GOVE stood to benefit financially if Ms. Roberts moved into DEFENDANT GOLDEN's Revenue Share Group.

196.   DEFENDANT GOLDEN was very clear that he would only help Ms. Roberts become an Alpha Agent if she named him as her Sponsor Agent.

197.   DEFENDANT GOLDEN and DEFENDANT GOVE both believed that Ms. Roberts would be DEFENDANT eXp's next Alpha Agent, as was evidenced by all the time, money, and effort that was expended to get her to switch sponsors.

198.   By adding another Alpha Agent to their ranks, DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp would financially benefit as it is the Alpha Agents who disproportionately generate income into DEFENDANT eXp's Revenue Share Plan, of which DEFENDANT GOVE and DEFENDANT SANFORD are two of the primary beneficiaries.

199.   DEFENDANT GOVE, acting in concert with DEFENDANT GOLDEN, attempted to entice Ms. Roberts to join DEFENDANT GOLDEN'S Revenue Share Group.

200.   Although Ms. Roberts was already in DEFENDANT GOVE's downline via Chris Bear, DEFENDANT GOVE knew that under Chris Bear (who wanted all the FLQA's in his region for himself), Ms. Roberts did not stand a chance at becoming an Alpha Agent despite having the "it" factor, but with DEFENDANT GOLDEN'S and

DEFENDANT GOVE's support, Ms. Roberts would become one of the next Alpha Agents; an act from which they, as well as DEFENDANTs eXp and SANFORD would receive a direct financial benefit.

201.   Thus, DEFENDANT GOVE, along with DEFENDANT GOLDEN, began a high-pressure campaign to get Ms. Roberts to join DEFENDANT GOLDEN's Revenue Share Group where she would be taught to become an Alpha Agent.

202.   The benefit of such a move, would also provide a financial benefit to DEFENDANT SANFORD as he is Agent #1 in DEFENDANT eXp's Revenue Share pyramid.

203.   As a result of the enticement by DEFENDANT GOVE, and promises made by DEFENDANT GOLDEN of career advancement, monetary success, and "love-bombing", Ms. Roberts had the intention of naming DEFENDANT GOLDEN as her Sponsor Agent. It was because of the concern for Ms. Roberts by her business partner that this pursuit was ultimately halted.

## AGENCY and CONTROL

204.   DEFENDANT GOLDEN AND DEFENDANT BJORKMAN were agents of DEFENDANTS GOVE, eXp, and SANFORD in their efforts to recruit more real estate agents into eXp's Revenue Share Plan.

205.   As agents participating in DEFENDANT eXp REALTY's Revenue Share Plan, DEFENDANT GOLDEN and DEFENDANT BJORKMAN were required to follow

certain policies and procedures pursuant to, among other things, the Independent

Contractor Agreement ("ICA").

206.   Per the ICA, DEFENDANT GOLDEN and DEFENDANT BJORKMAN

were required to use the eXp brand in their marketing and recruiting

efforts/emails/communications/branding.

207.   Per the ICA, all DEFENDANTs were required to be active members of the

National Association of Realtors ("NAR").

208.   Per the ICA, DEFENDANT eXp REALTY has the right to prevent

DEFENDANT GOLDEN and DEFENDANT BJORKMAN from manipulating the

Revenue Share Plan by adding agents to their downline for the purpose of artificially

qualifying that eXp Agent as an FLQA.

209.   With respect to the REVENUE SHARE PLAN, DEFENDAND GOLDEN

and DEFENDANT BJORKMAN were required to follow The Revenue Share Plan

guidelines that are attached to the ICA.

210.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN in their

employment were required to follow a set of policies in their retention of prospective

agents and their ultimate retention. These included, but were not limited to, the

requirement of a potential new agent to sign an "ICA" with their name listed as the

Sponsor; the inability for sponsor change without 100 percent agreement of all agents in an

upline; and the requirement for each agent to pay a one-time fee of $1,000 to facilitate a

change of sponsorship; the payment of monthly fees which included: Sign-up Fees,

Technology Fee, eXp University Tuition, Broker Review Fee, Risk Management Fee, Transaction Fee, Revenue Share Participation Fee.

211.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN, like other eXp agents, were automatically enrolled in the eXp Revenue Share Plan, Per Addendum B in the eXp Revenue Share Plan.

212.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN, like other agents, were required to sign the Agent Equity Program Participation Election Form allowing eXp World Holdings, Inc. to issue shares at their discretion of the restricted common stock to the Company's agents and brokers.

213.   DEFENDANT eXp could terminate DEFENDANT GOLDEN and DEFENDANT BJORKMAN at will per their ICA.

214.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN were required to be licensed Real Estate Agents, but no special skill was required in the recruitment aspect of the multi-level-marketing aspect.

215.   The services rendered by DEFENDANT GOLDEN and DEFENDANT BJORKMAN as "Alpha agents" was integral to the eXp business model as discussed supra. Without this role, DEFENDANT eXp, and its multi-level marketing model fails.

## **VICARIOUS LIABILITY**

216.   Through the acts and omissions described throughout this First Amended Complaint, the eXp Defendants exercised or retained the right to exercise systematic and

day-to-day control over the means and methods used by DEFENDANT GOLDEN and DEFENDANT BJORKMAN when enticing agents to switch their Sponsor agent.

217.   The eXp Defendants are vicariously liable for the TVPRA violations of DEFENDANT BJORKMAN and DEFENDANT GOLDEN.

218.   DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp REALTY, instructed, required, and enabled DEFENDANT BJORKMAN and DEFENDANT GOLDEN on the means and methods on how to entice agents and how to join DEFENDANT eXp REALTY's pyramid, and more specifically, how to join their personal downline within the pyramid.

219.   DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp REALTY provided DEFENDANT BJORKMAN and DEFENDANT GOLDEN with scripts, tools, and training on how to recruit agents into DEFENDANT eXp's Revenue Share pyramid.

220.   DEFENDANT eXp requires all of its agents, including DEFENDANT BJORKMAN and DEFENDANT GOLDEN to follow the eXp AGENT ATTRACTION Best Practices Guide, the eXp Agent Attraction Success Strategy, and eXp REALTY's Policies and Procedures; DEFENDANT eXp controls all of its agents with respect to recruitment.

221.   DEFENDANT eXp required that DEFENDANT BJORKMAN and DEFENDANT GOLDEN use its branding and logos, provided them with databases, access

to its computer systems, company websites, forms, and documents; all of which they were required to use.

222.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN were agents of DEFENDANT eXp REALTY.

223.   Likewise, DEFENDANT BJORKMAN and DEFENDANT GOLDEN relied on DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp REALTY's methods and instructions when actively recruiting agents for eXp REALTY.

224.   DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY taught DEFENDANT BJORKMAN and DEFENDANT GOLDEN that the key to "Agent Attraction", i.e., recruitment into the eXp REALTY pyramid, is to project an image of success – both personally and professionally.

225.   DEFENDANT eXp REALTY went to great lengths to showcase the success and wealth of its top influencers in order to convince others to join the pyramid and to attain the same level of prosperity. This tactic often included top agents sharing pictures of their yachts, airplanes, vacation properties, and how much money they were making monthly due to their participation in the pyramid.

226.   DEFENDANT GOVE personally trained DEFENDANT GOLDEN and DEFENDANT BJORKMAN on how to attract agents to eXp REALTY; in fact, DEFENDANT GOLDEN stated in a video with DEFENDANT GOVE, that he called on DEFENDANT GOVE and other top eXp agent Influencers, "a million times" to get training help.

227.   This training included inviting agents to events held at beautiful, exotic locations, which successful real estate agents attended to "rub shoulders" with the big Influencers or Agent Attractors, essentially the "Who's Who" in real estate and with whom they were encouraged to develop relationships, as well as to be trained and to learn how to hone well-oiled recruitment techniques utilized by higher ups at eXp REALTY.

228.   Using what they learned from DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp REALTY, DEFENDANTS BJORKMAN and GOLDEN also went to great lengths to showcase themselves as successful businessmen and leaders in the real estate industry by speaking at eXp REALTY events and hosting eXp REALTY recruitment events.

229.   DEFENDANT GOVE was keenly aware of the methods DEFENDANTS BJORKMAN and GOLDEN used at their recruitment events.

230.   DEFENDANT GOVE, DEFENDANT SANFORD and DEFENDANT eXp REALTY maintained and controlled DEFENDANT BJORKMAN and DEFENDANT GOLDEN's recruitment activities sufficient to establish vicarious or agency liability under the TVPRA.

## **THE VENTURE**

231.   DEFENDANT eXp REALTY, created by DEFENDANT GLENN SANFORD, has two businesses. One business is the traditional real estate business of buying and selling homes. The other business is a multi-level-marketing pyramid scheme which rewards the participants for recruitment of new agents, not for selling real estate.

232.   The venture at issue centers around the recruitment of agents into DEFENDANT eXp REALTY's Revenue Share Program (also referred to as the "multi-level marketing" or "pyramid scheme").[20]

233.   For this pyramid scheme to work, continuous recruitment of new agents is essential, without which it will collapse. To fund this pyramid scheme, each recruited agent must pay a monthly fee of $85.00, which amounts to $1,020.00 a year.

234.   As of November 2023, DEFENDANT eXp REALTY currently has more than 89,000 agents worldwide, nearly a quarter of those agents participate in the Revenue Share plan.

235.   DEFENDANT GOVE is a central figure in the pyramid scheme by virtue of his personal downline of agents that make up nearly 80% of the agents in the Revenue Share plan.

236.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN are two of DEFENDANT GOVE'S top recruiters in his downline and represent a significant portion of DEFENDANT GOVE'S Revenue Share income.

237.   Because DEFENDANT GOLDEN and DEFENDANT BJORKMAN were two of DEFENDANT GOVE, DEFENDANT SANFORD, and DEFENDANT eXp REALTY's top recruiters, they financially benefitted from the recruitment activities of DEFENDANT GOLDEN and DEFENDANT BJORKMAN.

---

[20] https://www.sec.gov/oiea/investor-alerts-bulletins/investor-alerts-ia-pyramid

## Count I
## Violation of 18 U.S.C. § 1591
## Against DEFENDANT GOLDEN

238.   PLAINTIFF realleges paragraphs 1 to 237 as if fully set forth herein.

239.   On two occasions in February, 2020, DEFENDANT GOLDEN and DEFENDANT GOVE enticed Ms. Roberts to travel to Las Vegas, Nevada from Florida for the purpose of attending an eXp recruiting event.

240.   While in Las Vegas, DEFENDANT GOLDEN made promises to Ms. Roberts that he would help her with her career, provide her with financial security, and take care of her financially.

241.   DEFENDANT GOLDEN used those promises to engage Ms. Roberts into committing sexual acts with him.

242.   As part of his recruiting efforts, DEFENDANT GOLDEN continued to try to recruit Ms. Roberts into his downline so that he could receive a financial benefit from her commissions and her downline's commissions in the revenue share pyramid.

243.   At this time when DEFENDANT GOLDEN had approximately 800 agents in his downline, Ms. Roberts was still an emerging influencer.  Ms. Roberts hoped to increase her agent count in order to reach the highest Influencer status at eXp REALTY, similar to DEFENDANT GOLDEN's status.

244.   On or around February 24, 2020, DEFENDANT GOLDEN traveled in interstate commerce to Florida for the stated purpose of assisting an eXp REALTY Agent host an eXp recruiting event.

245.   DEFENDANT GOLDEN invited Ms. Roberts to attend the event which was held at the Hard Rock Hotel in Daytona, Florida.

246.   DEFENDANT GOLDEN continued to pressure Ms. Roberts to select him as her sponsoring agent so that he would receive a financial benefit from her agent count, commissions, and her downline's commissions in the Revenue Share pyramid.

247.   DEFENDANT GOLDEN planned prior to the event to have GHB delivered to the Hard Rock Hotel.

248.   During this event, DEFENDANT GOLDEN used fraud to get Ms. Roberts to take a substance that rendered her incapacitated for the purpose of engaging her in a sex act with him.

249.   DEFENDANT GOLDEN committed a sexual act with Ms. Roberts without her knowledge or consent due to her being incapacitated.

250.   Upon information and belief, DEFENDANT GOLDEN surreptitiously took highly valuable videos and pictures of Ms. Roberts while she was drugged without her consent.

**Count II**
**Violation of 18 U.S.C. § 1591**
**Against DEFENDANT BJORKMAN**

251.   PLAINTIFF realleges paragraphs 1 to 250 as if fully set forth herein.

252.   On or around February 24, 2020, DEFENDANT BJORKMAN traveled in interstate commerce to Florida for the stated purpose of assisting an eXp REALTY Agent host an eXp recruiting event.

253.   DEFENDANT BJORKMAN knew that DEFENDANT GOLDEN invited Ms. Roberts to attend the event which was held at the Hard Rock Hotel in Daytona, Florida.

254.   DEFENDANT BJORKMAN also knew that DEFENDANT GOLDEN arranged to have a delivery of GHB made to their hotel for the purpose of drugging Ms. Roberts so that they could both engage her in sex acts.

255.   It was the practice of DEFENDANT GOLDEN that once he was able to convince an agent to select him as his sponsor, he would then convince the agent to instead name DEFENDANT BJORKMAN as the agent's sponsor.  By doing so, both DEFENDANT GOLDEN and BJORKMAN would financially benefit; DEFENDANT GOLDEN would financially benefit because he made more money from agents that are two instead of one tier beneath him; DEFENDANT BJORKMAN would financially benefit because he would gain another agent in his downline.

256.   Though ultimately unsuccessful in getting Ms. Roberts to change her sponsor, both DEFENDANT BJORKMAN and DEFENDANT GOLDEN fraudulently caused Ms. Roberts to engage in sexual contact for the purpose of using that relationship to get Ms. Roberts to change her sponsor which would financially benefit both DEFENDANT BJORKMAN and DEFENDANT GOLDEN.

### Count III
### Participating in a Venture in Violation of 18 U.S.C. § 1595 Against
### DEFENDANTS EXP REALTY, SANFORD, AND GOVE

257.   PLAINTIFF realleges paragraphs 1 to 256 as if fully set forth herein.

258.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN are two of DEFENDANT eXp REALTY's top recruiters, whereby DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE share in the common purpose of allowing DEFEDANT BJORKMAN and DEFENDANT GOLDEN to recruit by any means necessary to secure and to maintain agents, and thus receive, a direct financial benefit from DEFENDANT BJORKMAN and DEFENDANT GOLDEN's recruitment of new agents into all of their common downline.

259.   DEFENDANT eXp REALTY, DEFENDANT SANFORD, and DEFENDANT GOVE participated in a Venture with DEFENDANT GOLDEN and DEFENDANT BJORKMAN by promoting DEFENDANT BJORKMAN and DEFENDANT GOLDEN's recruitment efforts, which included luring agents to attend recruitment events with promises of career advancement.

260.   DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE received monetary gain from DEFENDANT BJORKMAN and DEFENDANT GOLDEN's recruitment activities.

261.   DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE had the potential to benefit in a significant financial way from DEFENDANT GOLDEN'S attempt to have Ms. Roberts make him her sponsor.

262.   DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE knew or should have known that DEFENDANT GOLDEN and DEFENDANT BJORKMAN used drugs to sexually assault eXp REALTY real estate

agents and prospective eXp REALTY real estate agents at eXp REALTY Recruitment Events.

263.   After having actual knowledge of DEFENDANT BJORKMAN and DEFENDANT GOLDEN's illegal conduct, DEFENDANT eXp REALTY, DEFENDANT SANFORD, AND DEFENDANT GOVE continued to endorse, to support and to promote DEFENDANT GOLDEN's and DEFENDANT BJORKMAN's recruiting efforts as a means to continue receiving a financial benefit from DEFENDANT BJORKMAN and DEFENDANT GOLDEN's activities.

**Count IV**
**Sexual Battery**
**Against DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN; and DEFENDANT SHERRARD**

264.   PLAINTIFF realleges paragraphs 1 to 263 as if fully set forth herein.

265.   Through their conduct, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN, and DEFENDANT SHERRARD placed Ms. Roberts in a state of perpetual fear of imminent, unwanted, physical, and sexual contact.

266.   Through conduct including, but not limited to, the conduct describing the sexual assault of Ms. Roberts, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN, and DEFENDANT SHERRARD intentionally and unlawfully touched Ms. Roberts without her consent.

267.   This unwanted and unlawful, sexual physical touching caused Ms. Roberts to suffer great anxiety about the possibility of further unwanted sexual touching and sexual assault.

268.   Ms. Roberts did not consent to any of the above-described contact.

269.   As a result of DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN, and DEFENDANT SHERRARD'S conduct, Ms. Roberts suffered legally compensable harm, including pain and suffering, loss of enjoyment of life, mental anguish, injury to reputation, humiliation, emotional distress damages, and costs of medical treatment necessary to address the psychological damages caused by DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN, and DEFENDANT SHERRARD'S conduct.

**Count V**
**Civil Battery**
**Against DEFENDANT BJORKMAN, DEFENDANT GOLDEN, AND DEFENDANT KEENAN**

270.   Ms. Roberts realleges paragraphs 1 to 269 as if fully set forth herein.

271.   Through their conduct, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN intentionally drugged Ms. Roberts without her knowledge or consent with the intent to harm/touch and did harm/touch Ms. Roberts.

272.   By intentionally drugging Ms. Roberts, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN, caused Ms. Roberts to unknowingly ingest a drug that would render her unable to provide consent to be touched.

273.   DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN all caused Ms. Roberts to suffer harm and offense through the unwanted touching. DEFENDANT BJORKMAN, DEFENDANT GOLDEN, DEFENDANT KEENAN'S actions in causing Ms. Roberts to consume a drug without her knowledge or consent in order to be touched, would be offensive to a reasonable person.

274.   As a direct and proximate result of DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN's actions, Ms. Roberts has suffered losses including, but not limited to, past and future medical expenses, loss of income, pain and suffering, mental anguish, embarrassment, humiliation, and emotional distress.

275.   In causing Ms. Roberts to consume a drug without her knowledge or consent, DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN acted intentionally, for an evil motive, and with reckless indifference Ms. Robert's right to be free from harmful or offensive contact. Accordingly, Ms. Roberts is entitled to punitive damages in addition to economic and noneconomic relief.

**Count VI**
**Intentional Infliction of Emotional Distress**
**Against DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN**

276.   Ms. Roberts realleges paragraphs 1 to 275 as if fully set forth herein.

277.   DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN's conduct toward Ms. Roberts was extreme and outrageous.

278.   DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN intentionally caused Ms. Roberts' emotional distress by subjecting her to forceful sexual touching and assault, and other actions taken with reckless disregard of PLAINTIFF's emotional well-being.

279.   As a result of DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN's conduct, Ms. Roberts suffered legally compensable emotional distress, and is entitled to reimbursement for all costs associated with the treatment of the severe emotional distress inflicted by DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN.

280.   DEFENDANT BJORKMAN, DEFENDANT GOLDEN, and DEFENDANT KEENAN's conduct was a substantial factor in causing Ms. Roberts's severe emotional distress.

**Count VII**
**Negligent Hiring, Retention, and Supervision**
**Against DEFENDANT eXp REALTY and DEFENDANT SANFORD**

281.   Plaintiff realleges paragraphs 1 to 280 as if set forth fully herein.

282.   DEFENDANT eXp REALTY and DEFENDANT SANFORD retained DEFENDANT GOLDEN and DEFENDANT BJORKMAN.

283.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN were under the control of DEFENDANT eXp REALTY.

a.   Per the Independent Contractor Agreement ("ICA") DEFENDANT GOLDEN and DEFENDANT BJORKMAN were only allowed to work as "Real Estate

Salesperson" or other such equivalent title as the state recognizes (i.e., broker, qualifying broker, principal broker, licensee, etc.) exclusively for the Company". (emphasis added).

b. With respect to the Sale of Real Estate the Control of eXp included but was not limited to the following: Duties set forth in the ICA related to the sale of home which included listing properties for sale under the eXp Realty brokerage brand, promptly uploading adding all listing contracts, purchase contracts, leases, referrals and any other transaction documentation into the transaction management system within two business days of execution date; the solicitation and marketing necessary to generate new listings or generating new buyers; such other services pertaining to the real estate business of the Company; ensuring all fees, commissions or other compensation earned by Contractor in connection with the sale, lease or rental of real estate and any interest therein or service in relation thereto are made payable to the Company." If an Agent has not completed and closed three residential real estate sales in the state they were licensed in prior to joining eXp they are automatically enrolled in the eXp Mentor Program Agreement.

c. DEFENDANT GOLDEN and DEFENDANT BJORKMAN were required to use the eXp brand in their marketing and recruiting efforts/emails/communications/branding.

d. With respect to the REVENUE SHARE PLAN, DEFENDAND GOLDEN and DEFENDANT BJORKMAN were required to follow The Revenue Share Plan guidelines are attached to the ICA and required to be executed and acknowledged by all Agents.

e. DEFENDANT GOLDEN and DEFENDANT BJORKMAN in their employment were required to follow a set of policies in their retention of prospective agents and their ultimate retention. These included, but were not

FIRST AMENDED COMPLAINT FOR DAMAGES

limited to the requirement of a potential new agent to sign an "ICA" with their name listed as the Sponsor; the inability for sponsor change without 100 percent agreement of all agents in an upline and the requirement for each agent to pay an on-time fee of $1,000 to facilitate a change of sponsorship; Monthly fees which included: sign-up Fees, Technology Fee, eXp University Tuition, Broker Review Fee, Risk Management Fee, Transaction Fee, Revenue Share Participation Fee.

    f. DEFENDANT GOLDEN and DEFENDANT BJORKMAN, like other agents were automatically enrolled in the eXp Revenue Share Plan, Per Addendum B in the eXp Revenue Share Plan.

    g. DEFENDANT GOLDEN and DEFENDANT BJORKMAN, like other agents were required to sign the Agent Equity Program Participation Election Form allowing eXp World Holdings, Inc. to issue shares at their discretion of the restricted common stock to the Company's agents and brokers.

    h. DEFENDANT GOLDEN and DEFENDANT BJORKMAN (include section on insurance requirements)

284. DEFENDANT GOLDEN and DEFENDANT BJORKMAN had the opportunity for profit and loss depending on their managerial skill.

    i. DEFENDANT GOLDEN and DEFENDANT BJORKMAN increased profit based on their role as "Apex Agents"

    j. Being an "Apex Agent" means being successful in recruiting new agents that they enticed based on their flashy recruiting efforts.

285. eXp could terminate DEFENDANT GOLDEN and DEFENDANT BJORKMAN at will per their ICA.

    k. The "ICA" indicates that there was the potential for "significant financial loss.

    l. "Significant financial loss" is defined to include but not be limited to pending

72

transactions, revenue share and stock awards."

286.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN were required to be licensed Real Estate Agents, but no special skill was required in the recruitment aspect of the multi-level-marketing aspect.

287.   The services rendered by DEFENDANT GOLDEN and DEFENDANT BJORKMAN as "Alpha agents" was integral to the eXp business model as discussed supra. Without this role, eXp, and its multi-level marketing model fails.

288.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN were unfit to perform the work for which they were retained.

289.   DEFENDANT eXp REALTY and DEFENDANT SANFORD knew or should have known that DEFENDANT GOLDEN and DEFENDANT BJORKMAN were and/or became unfit and that this unfitness created a particular risk to others. These DEFENDANTS knew of each other well before their employment of DEFENDANT eXp REALTY, as such they knew of should have known about DEFENDANT BJORKMAN and DEFENDANT GOLDEN's behavior prior to hiring. (DEFENDANT SANFORD, DEFENDANT GOVE and DEFENDANT GOLDEN all knew each other from Keller Williams and DEFENDANT GOLDEN knew DEFENDANT BJORKMAN from the Real Estate Owned market).

290.   DEFENDANT GOLDEN and DEFENDANT BJORKMAN's unfitness harmed Ms. Roberts; and

291.   DEFENDANT eXp REALTY and DEFENDANT SANFORD's negligence in hiring/supervising/and retaining DEFENDANT GOLDEN and DEFENDANT BJORKMAN was a substantial factor in causing Ms. Roberts' harm.

## COUNT VIII
## TORTIOUS INTERFERENCE
### Against Defendant Gove

292.   Plaintiff realleges paragraphs 1 to 291 as if set forth fully herein.

293.   On January 6, 2021, Eugene Crocket signed an ICA to join eXp Realty and named Ms. Roberts as his Sponsor Agent.

294.   DEFENDANT GOVE knew of the contract.

295.   Euguene Crocket is Ms. Roberts most prolific recruiter and is the primary source of her Revenue Share Income.

296.   Upon information and belief, in an attempt to harm Ms. Roberts, DEFENDANT GOVE began sending communications to Mr. Crocket that implied Ms. Roberts is a liar.

297.   DEFENDANT GOVE conduct made the performance of the contract more difficult.

298.   DEFENDANT GOVE intended or knew that the performance of this contact would be more difficult due to his actions.

299.   As a result, Ms. Roberts was emotionally harmed as was her relationship with Mr. Crocket.

300.   DEFENDANT GOVE's conduct was a substantial factor in causing Ms. Roberts' harm.

## **REQUEST FOR RELIEF**

WHEREFORE, PLAINTIFF prays for the following relief against Defendants:

1.   For past, present, and future general damages in an amount to be determined at trial;

2.   For past, present, and future special damages, including but not limited to past, present and future lost earnings, economic damages, and others in an amount to be determined at trial;

3.   For interest as allowed by law;

4.   For civil penalties as provided by law;

5.   For any applicable costs of said suit;

6.   For any appropriate punitive or exemplary damages; and

7.   For such other and further relief as the Court may deem proper. The amount of damages sought in this Complaint exceeds the jurisdictional limits of this Court.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the *Federal Rules of Civil Procedure*, PLAINTIFF demands a trial by a jury on all of the triable issues of this Complaint.

Dated:  June 13, 2024

FIRST AMENDED COMPLAINT FOR DAMAGES

Respectfully submitted,

by: **LENZE LAWYERS, PLC**

/s/ Jennifer A. Lenze
Jennifer A. Lenze, Esq.

**COHEN HIRSCH, LP**
Brooke F. Cohen, Esq.
Andrea S. Hirsch, Esq.

*Attorneys for PLAINTIFF*

FIRST AMENDED COMPLAINT FOR DAMAGES