# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


ANYA ROBERTS,

          Plaintiff,         Case No.

vs.                     2:23-cv-10492-AB (AGRx)

EXP REALTY, LLC.; EXP WORLD HOLDINGS, INC.;

MICHAEL L. BJORKMAN; DAVID S. GOLDEN;

BRENT GOVE; EMILY KEENAN; GLENN SANFORD;

MICHAEL SHERARD, and DOES 1-10,

          Defendants.

_____/



REMOTE VIDEOCONFERENCE DEPOSITION

OF EXPERT WITNESS,

LAWRENCE JACOBSON, ESQ.

VOLUME 1

February 4, 2026, 10:00 a.m.



Reported by:

Anne E. Vosburgh, RPR, CRR, CSR-6804, CRC-25001522

Job No. 1477503



Page 2

1                          -oOo-

2

3          On February 4, 2026, commencing at

4     approximately 10:00 a.m., the remote

5     videoconference deposition of LAWRENCE JACOBSON,

6     ESQ., Expert Witness, was held before and

7     stenographically reported by Anne E. Vosburgh,

8     Certified Shorthand Reporter No. 6804,

9     Registered Professional Reporter,

10    Certified Realtime Reporter, Certified Court

11    Reporter #25001522, Notary Public, LiveNote

12    Reporter.

13         All attorneys participating in this

14    deposition acknowledge and agree not to object

15    to the use of this transcript on the basis that

16    the reporter is not physically present in the

17    deposition room and will be reporting remotely,

18    and that in lieu of an official oath

19    administered in person, by swearing remotely,

20    the Witness verbally declares their testimony in

21    this matter under penalty of perjury.

22

23

24

25



Page 3

```
 1   REMOTE APPEARANCES:

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4        LENZE LAWYERS, PLC

 5        999 Corporate Drive, Suite 100

 6        Ladera Ranch, CA 92694

 7        (310) 322-8800

 8        BY:  JENNIFER A. LENZE, ESQ.

 9             jlenze@lenzelawyers.com

10   - and -

11        COHEN HIRSCH, LP

12        5256 Peachtree Road, Suite 195-E

13        Atlanta, GA 30341

14        (678)362-4444

15        BY:  ANDREA SOLOMON HIRSCH, ESQ.

16             andrea@cohenhirsch.com

17        BY:  BROOKE F. COHEN, ESQ.

18             brooke@cohenhirsch.com

19        BY:  TYLANDRA CALLANDS, ESQ.

20

21

22

23

24

25
```



```
                                                        Page 4
 1   REMOTE APPEARANCES (Continued):

 2

 3   ON BEHALF OF DEFENDANT, DAVID GOLDEN:

 4        CANNON & NELMS, P.C.

 5        160 South Old Springs Road, Number 200

 6        Anaheim, California 92808

 7        (714)637.4400

 8        BY:  DAVID ANTHONY POULL, ESQ.

 9            dpoull@cannonnelms.com

10   - and -

11        PETER K. LEVINE LAW OFFICES

12        5455 Wilshire Boulevard, Suite 1250

13        Los Angeles, CA 90036

14        325-934-1234

15        BY:  PETER K. LEVINE, ESQ.

16            peter@peterlawfirm.com

17

18   ON BEHALF OF DEFENDANTS EXP REALTY,

19   EXP WORLD HOLDINGS, AND GLENN SANFORD:

20        GREENBERG TRAURIG, LLP

21        222 South Main Street, Suite 1730

22        Salt Lake City, UT 84101

23        (801)478-6910

24        BY:  DANIEL J. WADLEY, ESQ.

25            wadleyd@gtlaw.com
```



Page 5

1    REMOTE APPEARANCES (Continued):

2

3    ON BEHALF OF DEFENDANT, MICHAEL BJORKMAN:

4         CHESNOFF AND SCHONFELD

5         520 South Fourth Street

6         Las Vegas, NV 89101-6593

7         702-384-5563

8         BY:  RICHARD A. SCHONFELD, ESQ.

9              rschonfeld@cslawoffice.net

10

11   ALSO PRESENT:

12        WILLIAM PALLARES, Lewis Brisbois

13        LORI DENISE NAMAZI, Expert Witness

14        SOLOMON SWENSON, Legal Videographer

15

16

17

18

19

20

21

22

23

24

25



Page 6

```
 1                  I N D E X

 2

 3            ----- EXAMINATIONS -----

 4   WITNESS:  LAWRENCE JACOBSON

 5      Examination by Mr. Wadley               9

 6      Examination by Mr. Schonfeld          230

 7      Examination by Mr. Levine             253

 8

 9

10

11

12      ----------  MARKED EXHIBITS  ----------

13    NUMBER           DESCRIPTION            PAGE

14   Exhibit 1    Expert Report of             18

15                Lawrence H. Jacobson, 377

16                pages

17   Exhibit 2    Supplemental Expert Reply    85

18                Report of

19                Lawrence H. Jacobson, 26 pages

20   Exhibit 3    Expert Witness Report of Lori  86

21                Denise Namazi, 16 pages

22   Exhibit 4    Expert Witness Rebuttal of     86

23                Lori Denise Namazi, 3 pages

24                 (EXHIBITS ATTACHED)

25
```



Page 7

```
 1                    ---------------

 2                      PROCEEDINGS

 3                    ---------------

 4           Remote Videoconference Deposition

 5        LAWRENCE JACOBSON, ESQ., Expert Witness

 6                        Volume 1

 7               February 4, 2026, 10:00 a.m.

 8                         -oOo-

 9           THE VIDEOGRAPHER:  We are now on the

10   record.  This begins videotape number 1 in the

11   deposition of Lawrence Jacobson in the matter of

12   Anya Roberts vs. eXp Realty LLC, et al.

13               Today is February 4th, 2026, and the

14   time is 9:59 a.m.

15               This deposition is being taken

16   remotely via Zoom.

17               The videographer is Solomon Swenson of

18   Magna Legal Services, and the court reporter is

19   Anne Vosburgh of Magna Legal Services.

20               Will counsel and all parties state

21   their appearances and whom they represent, and the

22   court reporter may swear in the witness.

23               MR. WADLEY:  I'll begin.

24   Daniel Wadley from Greenberg Traurig representing

25   eXp Realty, eXp World Holdings, and Glenn Sanford.
```



Page 8

```
 1              MR. PALLARES:  William Pallares with
 2  Lewis Brisbois just attending the deposition, also
 3  on behalf of the eXp entities.
 4              MS. LENZE:  Good morning.  Jennifer
 5  Lenze -- go ahead, Peter.
 6              MR. LEVINE:  Please, go first.
 7              MS. LENZE:  I didn't know if we were
 8  doing an age thing, so go for it, Peter.
 9              MR. LEVINE:  Obviously, I can't
10  remember, so it must be age.
11              Peter Levine, Counsel for
12  David Golden.  Thank you.
13              MR. POULL:  David Poull, also Counsel
14  for David Golden.
15              MS. LENZE:  Go ahead, Richard.  Finish
16  it out.
17              MR. SCHONFELD:  If it's by age, that's
18  probably right.
19              MS. LENZE:  Aw, good man.
20              MR. SCHONFELD:  Richard Schonfeld on
21  behalf of defendant, Michael Bjorkman.
22              MR. LEVINE:  We're rusty at this.  We
23  haven't done it for a while.  Come on.
24              MS. LENZE:  I know.  I know.
25              Jennifer Lenze on behalf of the
```



Page 9

1    Plaintiff.

2              MR. HIRSCH:  Andrea Hirsch here on

3    behalf of the Plaintiff.

4              MS. COHEN:  Brooke Cohen also here on

5    behalf of the Plaintiff.

6              THE VIDEOGRAPHER:  All right.  Did

7    everyone make their appearances, it sounds like?

8              MS. LENZE:  I think also in attendance

9    is Tylandra Callands from Cohen Hirsch.

10              And it looks like defense expert,

11    Lori Namazi, is also present.

12              MR. WADLEY:  Correct.  That is

13    correct.

14              (Reporter introduction.)

15                        ---

16              LAWRENCE JACOBSON,

17         (Having been called to testify, was

18         sworn to tell the truth, the whole

19         truth, and nothing but the truth.)

20                        ---

21              THE REPORTER:  Thank you.

22              Counsel, you may proceed.

23                        ---

24              EXAMINATION

25



Page 41

1    is what, for purposes of your decision, Ladies and

2    Gentlemen of the Jury, is true.

3              I can only say it's what's alleged and

4    they have to conclude that they believed it or they

5    didn't believe it and then go forward.

6              MR. LEVINE:  May I just point out, he

7    didn't really answer your question.  So I'll make a

8    motion to strike.

9              So could you press him?  He never

10   answered your question.

11             MS. LENZE:  Well, I think, then,

12   there's a proper objection to make -- or by all

13   means, a motion, but as Mr. Wadley pointed out,

14   perhaps avoiding the speaking objections.

15             Thanks, Mr. Levine.

16             Go ahead, Mr. Wadley.

17             MR. WADLEY:  Thank you.

18   BY MR. WADLEY:

19        Q.   To get back to the question that I

20   asked, your report is not based on and does not

21   reference David Golden, correct?

22             MS. LENZE:  Objection to form.

23             Go ahead.

24        A.   I don't issue an opinion in regard to

25   his conduct.



Page 62

1              The person doing the vetting for

2    onboarding is making sure they are licensed and

3    checking their DRE records to see if there are any

4    restrictions.   And that's all they have to do if

5    they have no knowledge of anything else.

6              My assumption is that Debbie Penny had

7    knowledge of something else that required her to go

8    beyond that.   You can't ignore the allegations in

9    view of their seriousness.

10   BY MR. WADLEY:

11        Q.   Coming back to my question, would

12   philandering rise to the level of causing

13   Ms. Penny, in your opinion, to have a duty to

14   conduct further investigation?

15             MS. LENZE:  Objection to form.

16             Go ahead, sir.

17        A.   Philandering, sexual abuse, and rape

18   probably is broad enough to cover the territory.

19   BY MR. WADLEY:

20        Q.   What about limited to philandering?

21             MS. LENZE:  Objection to form.

22             Go ahead, sir.

23        A.   She also knew he drank.  She also knew

24   that he was terminated for what she believed was

25   appropriate cause.  As a minimum, that should at



Page 65

1    Ms. Penny's supervision?

2           A.    That's the -- that's the deposition

3    testimony that I looked at that's attached to my

4    opinion.

5           Q.    All right.  So --

6                 MS. LENZE:  Dan, I didn't mean to

7    interrupt you before.  We've been going over an

8    hour.  Is it a safe time to take a break?

9                 MR. WADLEY:  You bet.  If Mr. Jacobson

10   would like a break, that's just fine.

11                MS. LENZE:  Perfect.  Could we say 10,

12   15?  How much time does everybody want?

13                THE VIDEOGRAPHER:  Off the record,

14   11:14 a.m.

15                (Recess taken.)

16                THE VIDEOGRAPHER:  We are back on the

17   record at 11:27 a.m.

18   BY MR. WADLEY:

19           Q.    All right.  Mr. Jacobson, we'll just

20   tie a couple of things off and then we'll move

21   through the reports.

22                You indicated that Ms. Penny -- it's

23   your understanding that Ms. Penny was responsible

24   for vetting Mr. Bjorkman at the time he came on

25   board with eXp; is that correct?



Page 66

```
 1              MS. LENZE:  Objection to form.
 2              Go ahead, sir.
 3         A.   That's my understanding from reading
 4    her deposition and what she said she did or didn't
 5    do.
 6    BY MR. WADLEY:
 7         Q.   Okay.
 8         A.   That part was her job.
 9         Q.   Okay.  So if she was not -- if she was
10    not the state broker at the time that Mr. Bjorkman
11    entered into his ICA with eXp Realty, would that
12    affect your opinion?
13              MS. LENZE:  Objection to form.
14              Go ahead, sir.
15         A.   Can I ask for a ten-minute break?  I
16    have to go to the bathroom.
17              MS. LENZE:  Sure.
18              THE VIDEOGRAPHER:  Okay.  We are off
19    the record at 11:28 a.m.
20              (Recess taken.)
21              THE VIDEOGRAPHER:  We're back on the
22    record at 11:32 a.m.
23              (The reporter read back where
24              indicated.)
25              MS. LENZE:  Objection to form.
```



Page  77

1   or dealing with the public.  That's all it deals

2   with.

3             So, you know, there are no

4   prohibitions against committing murder, rape,

5   kidnapping.  That doesn't mean you ignore it.  And

6   it doesn't mean you have an obligation on your own

7   to investigate it when you have no reason to.

8             Limited to that, what she did in

9   regard to Bjorkman, or whenever they brought

10  Bjorkman on board, if they knew nothing about the

11  allegations, then they did everything that they

12  were required to do.

13            The question is what did they know and

14  when did they know it, because that's the wildcard.

15  At what point did they have to deal with a problem

16  that isn't discussed in the DRE regulations but is

17  in the penal code?

18       Q.    What -- I'm sorry, what is in the

19  penal code, Mr. Jacobson?

20       A.    Section dealing with rape, assault,

21  drugs.

22       Q.    So is it your opinion that Ms. Penny

23  or whoever's responsibility to do something, to

24  notify management, does not derive from real estate

25  rules and regulations but some other source?



Page 78

```
 1              A.    Common sense, yes.

 2              Q.    Oh, common sense.

 3              A.    Among other things.   It's the custom

 4    and practice of anyone in management -- I mean, the

 5    #MeToo movement, Harvey Weinstein, has an impact on

 6    what the management of any company should do and

 7    what they shouldn't do.

 8              And what they shouldn't do is if

 9    there's a suspicion that something is there, they

10    owe a duty to the prospective victims to protect

11    them.

12              Q.   So, Mr. Jacobson, again, your opinion,

13    as it's here on your report, is:

14              "The conduct of eXp Realty was not

15              consistent with the custom and practice

16              of residential real estate brokerages

17              as it relates to their supervision and

18              security of real estate agents working

19              under their corporate real estate

20              broker's license."

21              But now you're talking about common

22    sense and penal codes, not the custom and practice

23    of --

24              A.   Forgive me.   I'm just stating the

25    obvious.
```



Page 93

1 all have the same supervisory responsibility and

2 duties with respect to employee protection; is that

3 fair?

4          A.    That's right.  It doesn't matter

5 whether they're brick and mortar or whether they're

6 virtual or a combination.  It's the same rules.

7          Q.    All right.  So with respect to the

8 duties that a brokerage owes regarding supervisory

9 responsibility and employee protection, where does

10 that duty derive from?

11          MS. LENZE:  Objection to form.

12          A.    I don't know.  How many times have I

13 answered that question?  Same answer.  It won't

14 change.

15          Some are written regulations.  Some

16 are unwritten custom and practice based on

17 experience.  Some are in office manuals and the

18 like that they put together.  It's what they do,

19 whether they can point to a specific statutory

20 requirement, case law, common sense -- a great deal

21 of custom and practice is common sense.

22          So I don't know how many times I can

23 repeat that.

24 BY MR. WADLEY:

25          Q.    We're just trying to get some -- I'm



Page 95

1            This is not the beginning and the end

2    of an employer's responsibility to an employee.  I

3    think it's no stretch of the imagination that if

4    you're onboarding a female agent and you said:  By

5    the way, we have no policy on sexual harassment,

6    you know, you take your chances, I doubt very much

7    if they would successfully recruit them.

8            In the last couple of years, the

9    knowledge of sexual harassment has become more

10   known, and the obligations of an employer to

11   protect their employees is expanded.

12           You know, you don't need the NAR to

13   add something to the Code of Conduct that says that

14   brokers should not allow one employee to sexually

15   harass another.  That's not what the NAR Code of

16   Conduct is regulating.

17   BY MR. WADLEY:

18           Q.   So it sounds like -- you're a lawyer.

19   So it sounds like you're referring to tort law or

20   employment law; is that correct?

21           MS. LENZE:  Objection to form.

22           A.   I think it's more than that.  It's not

23   simply restricted to real estate brokerages.  It's

24   the course of conduct and custom and practice by any

25   company with any number of employees in terms of



Page 96

1    ==monitoring and protecting their agents.==

2              In the brick and mortar office, if

3    they don't provide proper exits in the event of a

4    fire, if they're sued because the door is locked

5    and someone's burned to death, they can't very well

6    say:  Well, where is it written that we had an

7    obligation to protect them from a fire?

8              It is the custom and practice of any

9    business.  You -- okay.  If I say anything else, I

10   will just be repeating myself.

11   BY MR. WADLEY:

12        Q.   So the duty, as I understand it, does

13   not necessarily -- the duty to provide for employee

14   protection with respect to sexual harassment issues

15   that are the center of this case don't necessarily

16   derive from rules and regulations issued by the

17   Division of Real Estate; is that correct?

18        A.   I don't get to ask questions, but just

19   for the record, I don't know if you have any

20   daughters.  I have three of them, and a

21   granddaughter.  And I would not expect, if they

22   decide to become real estate agents, that they would

23   be exposed to this kind of conduct, if the

24   allegations about it are true.

25              They blow it off by saying:  Where is



Page 100

 1    discuss sexual harassment and what you do to provide

 2    a safe environment.

 3              I would be appalled if anyone in a

 4    management position today isn't aware that they

 5    have to provide a safe environment.

 6    BY MR. WADLEY:

 7        Q.   That goes back to that common sense

 8    you referred to earlier, correct?

 9              MS. LENZE:  Objection to form.

10        A.   I want to make sure I don't give you a

11    loaded gun so that at cross-examination at trial you

12    say:  Well, common sense, that's not an expert

13    opinion or something.

14              It's common sense because the custom

15    and practice makes sense, is logical, and has

16    serious consequences if it's not implemented.

17              So, of course, protection of their

18    employees is one of the things that it's custom and

19    practice to do, providing a safe environment,

20    providing a working bathroom, anything.

21              There's nothing in the DRE regulations

22    that says you have to do that.

23    BY MR. WADLEY:

24        Q.   All right.

25              Paragraph c, moving on.  It says:



Page 162

1              So we've got now:

2              "One of the important issues in this

3              case is what Defendants knew about

4              Mr. Bjorkman's criminal conduct and

5              what they should have done to protect

6              their female agents."

7              So my question relates to what

8    criminal conduct are you referring to in this

9    sentence, behavior before joining eXp or behavior

10   after he joined eXp as an agent?

11             MS. LENZE:  Object to form.

12        A.   Whatever was known and when they knew

13   it.

14             As I said, the reason I even mentioned

15   Debbie Penny's vetting was that was the earliest

16   point in time there was any basis that I could make

17   an assumption -- with which the jury would or would

18   not agree -- that they were aware of what was going

19   on.

20             If that didn't rise to the point where

21   Debbie Penny was told he had a bad habit of blowing

22   his nose and sticking it under the desk, it doesn't

23   rise to the level of what we're talking about.

24             And if she had no knowledge of the

25   specific allegations of sexual abuse and drug use



Page 182

1          Q.    All right.

2               So the first bullet point -- and I get

3     that you claim that they complied with this, they

4     just didn't do enough.  I understand that.  But I'm

5     going to walk down --

6          A.    No, no.  That misstates my opinion.

7          Q.    Okay.

8          A.    I said they did everything they did to

9     comply with this.

10              When you say they didn't do enough,

11    they didn't do enough in regard to the information

12    they had and the express knowledge they had that

13    goes beyond the vetting process.

14         Q.    Right.  I think -- and not to quibble,

15    but that you are assuming they had, right?  Because

16    we don't -- we don't know as we sit here, or at

17    least you don't know whether or not they did or

18    didn't know.

19         A.    Assuming what?

20         Q.    You're assuming that they had

21    knowledge of his prior misconduct, right?

22         A.    That was one of my assumptions.

23         Q.    Right.

24         A.    That goes back to the start of the

25    deposition, after I was sworn in.



Page 191

```
 1              and onboard prospective real estate

 2              agents complied with and followed the

 3              practices and processes pursuant to the

 4              industry standard of care."

 5          Agree or disagree with that?

 6          MS. LENZE:  I'm going to just insert

 7  an objection to form.

 8          Go ahead.

 9      A.  She ignores the assumption that she had

10  actual knowledge, or whoever did the vetting

11  procedure ignores the assumption that they knew.

12          The whole thrust of my opinion is that

13  there was a sufficient basis to assume that they

14  knew.  So if the person knew, what did they need to

15  do?  It was okay as far as she went, but she didn't

16  take the next step.

17  BY MR. WADLEY:

18      Q.  Or whoever it was --

19      A.  Yeah.

20      Q.  -- may not have taken the next step,

21  in your opinion?

22          If that person had actual knowledge of

23  prior serious misconduct by Mr. Bjorkman, you're

24  saying that while eXp may have followed the

25  processes to vet and onboard, there was an
```



Page 212

1    about it.

2                    And I have testified as to what I saw

3    that might have led Debbie Penny to believe it, but

4    the jury has to agree that's a valid fact.  And if

5    they don't agree, then we go on to something else.

6                    So if she didn't believe it from

7    Tamar House, it doesn't mean she didn't learn it

8    from someone else.  Or if she didn't know about it

9    at all, it doesn't mean there aren't a multitude of

10   people at the company who did know.

11                   The question is, did the company know

12   and when they knew.

13                   And to beat poor Debbie Penny to death

14   about what she did or didn't do when she's only

15   mentioned as a possible assumption that she knew

16   without just coming to the conclusion that she did.

17                   So I can hardly testify as to what

18   Tamar House did or did not say to Debbie Penny or

19   what Debbie Penny may have heard.

20                   My testimony in regard to her is

21   solely limited to the assumption that somehow she

22   found out.  And if that assumption is wrong, then

23   it's based on the assumption that someone else at

24   the company knew.

25



Page 214

1          Q.    Knew about the alleged assault by

2    Mr. Bjorkman of Ms. Tamar House?

3          A.    Yes.

4          Q.    Okay.  All right.  That's helpful.

5                All right.  So your understanding is

6    that either Ms. Penny -- or let me start over.

7    Strike that.

8                Your assumption is that either

9    Ms. Penny or somebody else within eXp's management

10    knew of the alleged assault by Mr. Bjorkman of

11    Tamar House; is that correct?

12                MS. LENZE:    Object to form.

13          A.    That is correct.

14    BY MR. WADLEY:

15          Q.    All right.  And if it's not --

16          A.    The problem with this case is there are

17    so many conflicting stories and so many conflicting

18    understandings or assumptions that could be made

19    that you find yourself turning around and facing

20    yourself.

21                So I have to consider the

22    alternatives.  I can't consider assumptions that I

23    find absolutely no basis for, not whether they're

24    true or not, but that I don't have evidence of.

25                And I can't assume that Bjorkman's



Page 222

1    Mr. Bjorkman's interests, but no one seemed to

2    express any concern about protecting the victims.

3    There's an obligation to them too.

4            Q.    So what would that investigation

5    entail in your opinion, Mr. Jacobson?

6            MS. LENZE:    Objection to form, a bit

7    beyond the scope.

8            But go ahead, sir, if you can.

9            A.    Take Ms. Penny as an example.    Her

10   obligation is to say:    In the course of vetting this

11   agent, I've learned about inappropriate conduct that

12   may or may not have occurred prior to the time he

13   came on board, that may have occurred last year or

14   the year before, that may be serious or not serious,

15   but I want you to be aware of it so you can call him

16   in and you can talk to him, and you can talk to the

17   people who filed the complaint, and you can make an

18   informed decision as to whether there's enough there

19   to take action when there's not been a criminal

20   conviction.

21           You don't have to wait until charges

22   are brought and a jury returns a guilty verdict.

23   If you have a reasonable basis, you don't want to

24   take the chance.

25           I've been involved in situations



Page 258

```
 1                   C E R T I F I C A T E

 2

 3              I, ANNE E. VOSBURGH, Certified

 4    Shorthand Reporter, Registered Professional

 5    Reporter, Certified Realtime Reporter hereby

 6    certify:

 7              That LAWRENCE JACOBSON, ESQ., EXPERT

 8    WITNESS, via remote videoconference, agreed to

 9    testify truthfully, under penalty of perjury; that

10    all counsel stipulated to the remote swearing and

11    waive objection, notwithstanding the location of

12    reporter or witness during testimony; and that this

13    transcript is a true and correct record of

14    testimony given.

15              I further certify that I am not

16    related to any of the parties and am in no way

17    financially interested in the outcome of this

18    matter.

19

20    _____

21    ANNE E. VOSBURGH, CSR, RPR, CRR

22    Notary Public - Exp. July 20, 2029

23

24

25
```

