# EXHIBIT 6

1   Jennifer A. Lenze, Esq. CA Bar No. 246858
    **LENZE LAWYERS, PLC**
2   999 Corporate Drive, Suite 100
    Ladera Ranch, CA 91765
3   T: (310) 322-8800
    F: (310) 322-8811
4   Jlenze@lenzelawyers.com

5
    Brooke Cohen, Esq., TX Bar No. 24007019 PHV Admitted
6   Andrea Hirsch, Esq. GA Bar No. 666557 PHV Admitted
    **COHEN HIRSCH, LP**
7   5256 Peachtree Road, Suite 195-E
    Atlanta, GA 30341
8   T: (678) 268-4683
9   brooke@cohenhirsch.com
    andrea@cohenhirsch.com
10  *Attorneys for Plaintiffs*

11              **UNITED STATES DISCTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13  ANYA ROBERTS,                    | Case No.:    2:23-CV-10492-AB-AGR

14          Plaintiff,

15  v.                                 **EXPERT REPORT OF LAWRENCE H. JACOBSON**

16  EXP REALTY, LLC, EXP WORLD
    HOLDINGS, INC., MICHAEL L.
17  BJORKMAN; DAVID S. GOLDEN; BRENT
    COVE, EMILY KEENAN, GLENN
18  SANFORD; MICHAEL SHERRARD, and
    DOES 1-10,
19
          Defendants.
20

21

22  H:\CC372\000\Docs\LHJ.Expert Report.01.08.26.(NS).doc

23

24

25

26

27

28
                    EXPERT REPORT OF LAWRENCE H. JACOBSON
                                    1

## EXPERT REPORT OF LAWRENCE H. JACOBSON

I, Lawrence H. Jacobson declare:

1.    I am an attorney admitted to practice in California since January 1968, having received my Juris Doctorate from the UCLA School of Law in 1967 where I was Senior Editor of the UCLA Law Review and was awarded the Order of the Coif. I am also admitted to practice before the United States District Court, Central District, the Ninth Circuit Court of Appeals and the United States Supreme Court.

2.    I have lectured on business, real estate, and ethics matters having served as an instructor for the California Continuing Education of the Bar, among others.  I have written on ethics and real estate topics, including "The Expert Witness in Real Estate Litigation:  A User's Guide" which was published in the Real Property Law Reporter of the California Continuing Education of the Bar, "On Wearing Two Hats: Ethical Consideration for the Attorney – Expert Witness", which was published in the California State Bar Civil Litigation Reporter, "Broker's Liability for Sale of Defective Homes" was cited with approval by the Appellate Court in the seminal decision of *Easton v. Strassburger*, 152 Cal.App. 3d 90, 100, 199 Cal.Rptr.383 (1984), a contributing author to the California Continuing Education of the Bar's two volume treatise "California Real Estate Broker Law and Practice" (2009), and I am the recipient of the California Continuing Education of the Bar's 2011 Spirit of CEB Award for outstanding contributions to legal education in the field of real estate.

3.    I am a volunteer Special Prosecutor for the State Bar of California and a former member of the Los Angeles County Bar Association Professional Responsibility and Ethics Committee. THE OPINIONS EXPRESSED HEREIN ARE MINE AND ARE NOT INTENDED AS OPINIONS OF THE STATE BAR OF CALIFORNIA OR THE LOS ANGELES COUNTY BAR ASSOCIATION. I am a member of the State Bar of California Fee Arbitration Program, Beverly Hills Bar Association Fee Arbitration Program and Los Angeles

County Bar Association Client Mediation and Arbitration Section. I have served as an arbitrator for the Los Angeles Superior Court, judge pro tem for the Beverly Hills and Los Angeles Municipal Courts and an Adjunct Professor of Law in the areas of real estate finance and administrative law.

4.      I am presently practicing law in Beverly Hills under the firm name Lawrence H. Jacobson, A Professional Corporation.  A substantial portion of my practice has been devoted to business, real estate, legal malpractice and real estate brokerage matters.  A copy of my full Curriculum Vitae is attached hereto as Exhibit "A".

5.      I have qualified and testified as an expert witness on numerous occasions on issues of real estate agent and real estate industry custom and practice.  A list of all cases in which I have testified at deposition, trial, mediation or arbitration is attached as Exhibit "B". My services on this matter are billed at $350.00 per hour (in increments of $1/10^{th}$ of an hour) for all time other than testimony at deposition or at trial.  Testimony at deposition or at trial is billed at $450.00 per hour (in increments of $1/10^{th}$ of an hour).

6.      In connection with *Anya Roberts* v. *EXP Realty, LLC, et al.,* In The United States District Court, Central District of California, Case No. 2:23-CV-10492-AB-AGR (the "Action"), relating to the Defendant ("eXp Realty, LLC") supervision of their real estate agents, I have received the documents set forth on Exhibit "C" attached herewith and incorporated by this reference. I may receive additional documents to review, and as such the below opinions may be augmented or changed based on my review of such documents.

7.      Based upon my review of the above-refenced items, I have the following opinions:

The conduct of Defendant ("eXp Realty") was not consistent with the custom and practice of residential real estate brokerages as it relates to their supervision and security of real estate agents working under their corporate real estate broker's license.

Analysis

a.  Since the facts on which an opinion is to be based, and the ultimate decision of what the facts of the case are solely within the province of the jury, any expert opinion must be based on assumed facts. The validity of the opinion is dependent on what the jury ultimately decides are the facts of the case.

In this case, there are three different versions of the facts. The Plaintiff ("Anya Roberts"), Defendant ("Michael L. Bjorkman"), and the deposition testimony of Defendant ("Glenn Sanford") the Chief Executive Officer of "eXp Realty, LLC".

b.  Real estate offices come in several formats. Some are "brick and mortar", some are "virtual", and some are a combination of both. Despite whether the office functions virtually or in person, they all have the same supervisory responsibility and employee protection. There is no difference between the offices in terms of overall managerial responsibility.

c.  The assumed facts I have based my opinions on are the Las Vegas Police Department Declaration of Warrant/Summons, Exhibit "D", the Court's Ruling Denying Defendant's Motion to Dismiss, Exhibit "E", selected portions of Michael L. Bjorkman's depositions, Exhibit "F", separate parts of Mr. Sanford's deposition, Exhibit "G", separate parts of Cory Haggard's deposition of May 2, 2025, Exhibit "H", and his deposition of August 20, 2025, Exhibit "H-1", and separate parts of Debbie Penny's deposition, Exhibit "I". As acknowledged by Mr. Sanford, and as reflected in the deposition of Mr. Haggard protection of the company's licensees from sexual harassment is a "core value" of Defendant "eXp Realty, LLC", Exhibits "G", "H", "J" & "J-1". Mr. Sanford's testimony and Mr. Haggard's testimony reflect a total

failure to implement that "core value", Exhibits "G", "H", "J" & "J-1". Their depositions acknowledge that they received, and they were aware of adequate notice of the allegations, Exhibits "G", "H" & "K", but there was little, or no action taken to support Plaintiff or to establish the truth of the accusations, Exhibits "G" & "H".

d. Debbie Penny has a very narrow view of her obligations as a supervising broker. In her deposition she testified to her understanding that she had no obligation to oversee agents, in any capacity other than in connection with compliance with California real estate laws responsibility to only overseeing transactions between a real estate agent and their clients, Exhibit "L".

Even though she may have been aware of Mr. Bjorkman's misconduct, she did nothing about it. Her position being that it was not her responsibility to monitor it. However, at the bare minimum, it would have been her responsibility to let senior management know (someone who has the responsibility and the authority to do something about it). If she knew about the alleged misconduct by Mr. Bjorkman, it would have made no difference if it had been alleged misconduct by Mr. Bjorkman, not directed toward a licensee under Ms. Penny's supervision but a prospective seller or buyer being represented by that agent, e.g. Mr. Bjorkman. On the answer to the question of who is responsible from a supervisory position for misconduct by a licensee acting under her license which does not relate to a specific violation of the Business and Professions code, she indicated it was not her responsibility.

e. Anyone who has supervisory responsibility over employees / agents has the responsibility to ensure safety and compliance with the law of these employees / agents working under their supervision and are responsible for their conduct and safety at eXp Realty. Mr. Haggard's department has that specific responsibility. Although they had actual knowledge of inappropriate conduct, and the threat to agents' personal security, no steps were taken to control inappropriate conduct. You don't need a section of The National Association of

Realtors Code of Ethics to understand that rape is an inappropriate conduct and cannot be permitted to happen.

f.    Even though Mr Sanford's deposition indicates substantial evidence of drug abuse and sexual harassment, he was not even aware of any procedures for reporting sexual harassment or inappropriate behavior by the agents under his supervision, Exhibit "G", and denied that as CEO he had any direct supervisory responsibilities, and that drug abuse and sexual misconduct was the agent's personal business, and outside the scope of his supervisory responsibility.  In his deposition, although he was supportive of the perpetrator, he ignored the victims, Exhibit "G".

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _8th_ day of _January_, 2026 at Beverly Hills, California.

_____
LAWRENCE H. JACOBSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT A</u>**

LAW OFFICES OF

# LAWRENCE H. JACOBSON

A Professional Corporation

PLEASE REPLY TO:

9777 WILSHIRE BLVD., SUITE 517
BEVERLY HILLS, CALIFORNIA 90212
TELEPHONE (310) 271-0747
TELECOPIER (310) 271-0757

*Website: www.lawrencejacobson.com*

Sender's Email:

Law.Jac@Lhjpc.com

## CURRICULUM VITAE

## LAWRENCE H. JACOBSON

Lawrence H. Jacobson received his Bachelor's degree in political science in 1964 from U.C.L.A and his Juris Doctorate in 1967 from the U.C.L.A. School of Law. While at the U.C.L.A. School of Law, Mr. Jacobson was a senior editor of the U.C.L.A. Law Review and graduated as a member of the Order of the Coif. He is a Past President of the Beverly Hills Bar Association. He has served as a judge pro tem for the Los Angeles and Beverly Hills Municipal Court Systems as well as having been an adjunct professor of law in the area of real estate secured transactions and administrative law, earning a lifetime Community College Instructor Credential in the area of Law. He is a Deputy Special Trial Counsel for the State Bar of California. In his over 54 years of practice, he has extensive experience in real estate and business matters, including business entity formation and restructure, purchase and sale of business, succession planning, purchase, sale, management and refinance of commercial and residential real estate, commercial leasing, and tax free exchanges. He has written and lectured extensively on business, real estate and ethics related matters including having taught for the U.S.C. Broker Development Program and Graduate Realtors Institute of the California Association of Realtors, as well as having lectured for the California Continuing Education of the Bar, and is the recipient of the California Continuing Education of the Bar's 2011 "Spirit of CEB" Award. His article "Brokers Liability for Sale of Defective Homes" was cited with approval by the Appellate Court in the seminal decision of *Easton v. Strasburger*. He is a contributing author to the California Continuing Education of the Bar two volume treatise "California Real Estate Brokers: Law and Litigation" (winner of the award for outstanding achievement from the Association for Continuing Legal Education) including writing the chapter on "Standard of Care Experts". He is the former Vice-President of Legal Affairs of the California Association of Realtors, Legal Counsel to the Beverly Hills Board of Realtors, the San Fernando Valley Board of Realtors, the Palm Springs Regional Board of Realtors, and California counsel to an international real estate brokerage firm. He is currently legal counsel to the Newport Beach Association of Realtors and a member of the California State Bar Real Estate Sales and Brokerage Steering Committee, all giving Mr. Jacobson extensive expertise in real estate brokerage custom and practice and all real estate related issues. He has testified numerous times as an expert witness in cases involving the interpretation of real estate documents, title, real estate broker, mortgage broker, business broker, escrow & title company standard of care and legal malpractice involving real estate, litigation, corporate finance, merger and acquisition, legal ethics and fee disputes.

**EDUCATION**

U.C.L.A. LAW SCHOOL - Juris Doctorate 1967
U.C.L.A. - A.B. (Political Science) 1964
U.C.L.A. Extension, Certificate in Archaeology (earned with distinction) 2009

**HONORS**

Senior Editor, U.C.L.A. Law Review
Insurance Counsel Journal Award
Order of the Coif
Southern California Super Lawyer 2006 - Present
Madison Who's Who
"Spirit of CEB" Award
Beverly Hills Bar Association Louis B. Fox Award

**PUBLICATIONS**
**(Partial)**

"Inverse Condemnation, Foreseeability Abandoned in California," U.C.L.A. Law Review 871, 1966
"Lessor's Bankruptcy: The Draftsman's Response to the Tenant's Plight" Real Estate Law Journal 152, 1972
"State Regulation of Stock Cooperatives," 7 Beverly Hills Bar Journal 12, 1973
"The California Lottery Law," 48 California State Bar Journal 58, 1973
"Independent Motion Picture Productions," 9 Beverly Hills Bar Journal 33, 1975
"Broker's Liability for Sale of Defective Homes," 52 Los Angeles Bar Journal 346, 1977 *
"Resolving Real Estate Disputes Through Arbitration," 27 Am. Jur. Trials 621, 1980

"Appraiser's Liability for False or Negligently Prepared Appraisal," 12 Appraisal and Mortgage Underwriting Journal 20, 1990

Lawrence H. Jacobson / Curriculum Vitae
Page 2

"Acquisition of Mortgage Banking Assets," 36 San Fernando Valley Bar Bulletin 10 (1993)
"Phantom Income - Understanding Taxable Gain From Foreclosure," Los Angeles Daily Journal, Real Property Law August 3, 1995
"The Expert Witness in Real Estate Litigation: A User's Guide," Real Property Law Reporter March 2004
"Tax-Free Exchange of Tenancies in Common," California Lawyer, February 2007
"Tenancy-in-Common: An Old Dog Learns New Tricks," 25 California Real Property Journal 25 (2007)
"On Wearing Two Hats: Ethical Considerations for the Attorney-Expert Witness," California Civil Litigation Reporter, February 2007

Contributing Author, "California Real Estate Brokers:  Law and Litigation" (Cal CEB 2009) **
\*  Cited with approval by the Appellate Court in the seminal decision of <u>Easton v. Strassburger</u>, 152 Cal App.3d 90, 199 Cal Rptr 383 (1984)
** Won an award for Outstanding Achievement from the Association for Continuing Legal Education (ACLEA)

| ADMISSIONS AND ASSOCIATIONS | California State Bar 1968 |
| :--- | :--- |
| | United States Supreme Court 1977 |
| | United States Court of Appeals for the Ninth Circuit 1982 |
| | Judge Pro Tem, Los Angeles and Beverly Hills Municipal Courts |
| | Arbitrator, Los Angeles Superior Court |
| | American Bar Association (Business and Real Estate Section) |
| | California State Bar Real Estate Sales and Brokerage Steering Committee |
| | Los Angeles County Bar Association, Trustee 2008 – 2009 |
| | Los Angeles County Bar Professional Responsibility and Ethics Committee, 2014-2018 |
| | Beverly Hills Bar Association, President 2011 – 2012 |
| | Association of Real Estate Attorneys, President 1978 - 1979 |
| | Association of Professional Responsibility Lawyers, 2016 - Present |
| | California Real Estate Expert Witness Group (CREEW) |
| | California Real Estate Broker License 1978 |
| | Newport Beach Association of Realtors, Realtor 2000 - 2024 |
| | California Notary Public, March 28, 1973 |
| | Beverly Hills Bar Association Fee Arbitration Program, 2013-Present |
| | State Bar of California Fee Arbitration Program, 2014-Present |
| | Los Angeles County Bar Association Client Mediation and Arbitration Service, 2015-Present |
| | State Bar of California Special Deputy Trial Counsel, 2018 - Present |

| TEACHING EXPERIENCE | California Community College Credentialed Instructor in Law |
| :--- | :--- |
| | University of San Fernando Valley College of Law, Adjunct Professor of Law |
| | (Real Estate Secured Transactions / Administrative Law) |
| | Graduate Realtor's Institute (Instructor) |
| | U.S.C.  Broker Development Program |
| | Continuing Education of the Bar: |
| | (a) Real Estate Brokerage Practice, (b) Current Developments in Real Estate Law, since 1991 |
| | Guest Lecturer, Pepperdine School of Law |
| | Guest Lecturer, U.S.C. School of Law |

| FIRM AFFILIATION | LAWRENCE H. JACOBSON, A PROFESSIONAL CORPORATION | 07/04 - Present |
| :--- | :--- | :--- |
| | RUBIN & JACOBSON, LLP | 11/02 - 06/04 |
| | LAWRENCE H. JACOBSON, A PROFESSIONAL CORPORATION | 07/02 - 10/02 |
| | JACOBSON, WHITE, BORDY & LEVEY, LLP (Senior Partner) | 07/94 - 06/02 |
| | SALTZBURG, RAY & BERGMAN (Of Counsel) | 12/91 - 06/94 |
| | KINDEL & ANDERSON (Partner) | 12/88 - 11/91 |
| | FISCHER, KRANE, JACOBSON & KABAT (Principal) | 1975 - 12/88 |
| | CALIFORNIA ASSOCIATION OF REALTORS (Vice President Legal Affairs) | 1974 - 1975 |
| | FRESHMAN, MARANTZ, COMSKY & DEUTSCH (Associate) | 1970 - 1974 |
| | MCA (Legal Staff) | 1969 - 1970 |
| | MITCHELL, SILBERBERG & KNUPP (Associate) | 1968 - 1969 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>EXHIBIT B</u>**

# Lawrence H. Jacobson

## EXPERT CASES

### (Testified at Deposition and/or Trial/Arbitration/Mediation)
### 2003 - Present

1. *Andrew Wiecks et al. v. Devine and Gong, et al.*
   Gary Alexander, Esq.
   Meis & Alexander
   100 Bush Street, Suite 1800
   San Francisco, California 94104

2. *Legacy Land Company v. Longyear, O'Dea & Lavra*
   c/o Robert Sanders
   John E. Cassinat, Esq.
   Cassinat Law Corporation
   4815 Laguna Park Drive, Suite C
   Elk Grove, California 95758

3. *Johnson v. Hedges*
   Joseph Guimera, Esq.
   Guimera & Guimera
   1600 Rosecrans Avenue, Suite 210
   Manhattan Beach, California 90266

4. *Steve Y. Kim, Trustee v. Citron & Deutsh and Melvin Markman*
   Frank Lee, Esq.
   Law Office of Frank Lee
   3435 Wilshire Blvd., Suite 2450
   Los Angeles, California 90010

5. *Boothby v. Karasik, et al.*
   Howard A. Kapp, Esq.
   Law Offices of Howard A. Kapp
   3731 Wilshire Boulevard, # 514
   Los Angeles, California 90010

6. *Laguna Beach Investments v. Cadden & Fuller, LLP*
   Jay J. Plotkin, Esq.
   Plotkin, Marutani & Kaufman
   15060 Ventura Blvd., Suite 490
   Sherman Oak, California 91403

7. *Stryker vs. Musick, Peeler & Garrett*
   R. Duane Westrup, Esq.
   Westrup, Klick & Associates
   444 West Ocean Boulevard, Suite 1614
   Long Beach, California 90802-4524

8. *Le-Cuyer v. Wildish*
   Stanley P. Lieber, Esq.
   Law Offices of Stanley P. Lieber
   6351 Owensmouth Avenue, Suite 100
   Woodland Hills, CA 91367

9. *Orange County Winwater Works Co. v. Kirkpatrick & Fields, L.L.P.*
   Eli J. Karpeles, Esq.
   Karpeles & Associates
   9150 Wilshire Boulevard, Suite 270
   Beverly Hills, California 90212

10. *Tong v. Brownstein*
    Zshonette Lorden Reed, Esq.
    Lorden & Reed
    15915 Ventura Boulevard, Suite 201
    Encino, California 91436

11. *Schaffter v. Creative Capital Leasing Group, LLC*
Walter Chung, Esq.
Creative Capital Leasing Group, LLC
619 Kettner Boulevard, Suite 110
San Diego, California 92101

12. *Goldstein, et al. v. Beck*
Craig M. Collins, Esq.
Collins Law Firm
707 Wilshire Boulevard, Suite 4880
Los Angeles, California 90017

13. *Larson v. Axelrod*
John R. Fuchs, Esq.
Fuchs & Associates, Inc.
12100 Wilshire Boulevard, Suite 1180
Los Angeles, California 90025-7116

14. *People vs. Jimmy Bassal*
Gilbert Geilin, Esq.
The Law Offices of Gilbert Geilin
4929 Wilshire Boulevard, Suite 825
Los Angeles, California 90010

15. *Hilton & Hyland v. Loggans*
Greg Korn, Esq.
Greenberg Glusker Fields Claman
Machtinger & Kinsella, LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067

16. *Harbor Vermont vs. Arden Realty/LASC BC 258939*
Harbor Vermont LLC
c/o Sunny Hills Paladium
1055 W. 7th Street, Suite 2580
Los Angeles, California 90017
Attn: Ray Crosby

17. *Tiemeyer v. Emerald Mortgage Corp., et al.*
Ryan Jike, Esq.
Hennelly & Grossfeld LLP
4640 Admiralty Way, Suite 850
Marina del Rey, California 90292

18. *David Houston and Dawn Umemoto v. Coldwell Banker et al.*
Rodney T. Lewin, Esq.
Law Offices of Rodney T. Lewin
8665 Wilshire Blvd., #210
Beverly Hills, California 90211

19. *Mitra Larian v. Silva Mirzoian and Mirzo International, Inc.*
Ryan T. Koczara, Esq.
Hamburg, Karic, Edwards & Martin LLP
1900 Avenue of the Stars, Suite 1800
Los Angeles, California 90067-4409

20. *Tai et al. vs. Properties, LLC*
Larry D. Mikelson, Esq.
Law Offices of Larry D. Mikelson
21515 Hawthorne Blvd., Suite 840
Torrance, California 90503

21. *KWI 6380 Wilshire Blvd. vs. Robin Jacobs*
Jeff Adelman, Esq.
Lieb & Adelman, LLP
15233 Ventura Blvd., Suite 410
Sherman Oaks, California 91403-2219

22. *Caesar v. Coldwell Banker, et al.*
Richard A. Kolber, Esq.
Law Offices of Richard A. Kolber
2029 Century Park East, Suite 900
Los Angeles, California 90067

23. *Lyons v. Chuka, et al.*
Steve & Christa Lyons
c/o Larry D. Mikelson, Esq.
Law Offices of Larry D. Mikelson
21515 Hawthorne Boulevard, Suite 840
Torrance, California 90503-6542

24. *Harlacher v. Coldwell Banker*
James Earle, Esq.
McGuire Woods, LLC

1800 Century Park East, 8th Floor
Los Angeles, California 90067

25. *Poura, et al. v. Major Properties*
Mr. James G. Morris
c/o Morris & Associates
13400 Riverside Drive, Suite 112
Sherman Oaks, California 91423

26. *Gross v. Vojdan*
Pejman Ben-Cohen, Esq.
Novak and Ben-Cohen
8383 Wilshire Boulevard
Penthouse 1004
Beverly Hills, California 90211

27. *Pacific Craft Custom Wood Design vs. Omega Framing*
Pacific Craft
Steve Wohn, Esq.
Law Offices of Steve Wohn
3828 Carson, Suite 100
Torrance, California 90503

28. *Estebo v. Gonzalez*
Timothy Peabody, Esq.
Law Offices of Timothy Peabody
2030 Main Street, Ste. 1300
Irvine, California 92614

29. *The Piken Company v. Richard Pallack*
Douglas Winter, Esq.
Riley & Reiner
633 W. 5th Street, 70th Floor
Los Angeles, California 90071

30. *Goldberg et al. v. Prickett*
Randall Fox, Esq.
Reetz, Fox & Bartlett, LLP
116 East Sola Street
Santa Barbara, California 93101

31. *Gehlhar v. Loan Correspondents, et al.*
Mohammed K. Ghods, Esq.
Ross, Dixon & Bell, LLP
5 Park Plaza, Suite 1200
Irvine, California 92614-8592

32. *Velasco, et al. v. Guzman, et al.*
Joseph N. Mirkovich, Esq.
Russell, Mirkovich & Morrow
One World Trade Center, Suite 1450
Long Beach, California 90831-1450

33. *Ferguson v. Gullickson*
Michael Terhar, Esq.
Shaw Terhar & LaMontagne, LLP
707 Wilshire Boulevard, Suite 3060
Los Angeles, California 90017

34. *American Mortgage Express Financial v. Bluestone Mortgage*
Bluestone Mortgage
Larry Webb, Esq.
Law Office of Larry Webb
484 Mobil Avenue, Suite 43
Camarillo, California 93010

35. *Sachan v. American Realty & Investments*
Allen B. Felahy, Esq.
Felahy & Associates
One World Trade Center
Suite 2350
Long Beach, California 90831

36. *Burlage v. Spencer*
David Jensen, Esq.
1643 Cromwell Place
Westlake Village, California 91361

37. *Brown v. Otis, et al.*
Roger Haag, Esq.
Lee, Ladasz & Haag, LLP
One World Trade Center, Suite 800
Long Beach, California 90831

38. *U.S. Lubes v. Richard Bell*
Robert Driskell, Esq.
Driskell & Gordon
180 N. Glendora Avenue, Suite 201
Glendora, California 91741

39. *Lake Tahoe Docks v. Distinctive Homes*
    Stephen S. Kent, Esq.
    Woodburn and Wedge
    6100 Neil Road, Suite 500
    Reno, Nevada 89511

40. *Lascoe et al. v. Equis Corp.*
    Mark Miller, Esq.
    Manfredi, Levine, Eccles & Miller, APC
    3262 E. Thousand Oaks Blvd.
    Suite 200
    Westlake Village, CA 91362-3400

41. *Vasquez v. Vivanco, et al.*
    Jayson Q. Marasigan, Esq.
    Dack, Marasigan & Flores, LLP
    23041 Avenida de la Carlota
    Suite 300
    Laguna Hills, California 92653

42. *Danny and Hae Sun Kim v. New Star Realty*
    Ms. Diane B. Sherman, Esq.
    Law Offices of Diane B. Sherman
    2029 Century Park East Suite 1040
    Los Angeles, California 90067

43. *Hanson v. McTiernan*
    Mr. Ronald J. Ignatuk, Esq.
    Shulman Hodges & Bastian, LLP
    26632 Towne Centre Drive
    Suite 300
    Foothill Ranch, California 92610

44. *Owensmouth C2B, L.P., et al. v. Silver & Freedman, et al.*
    Mr. David Smith, Esq.
    McNamara, Spira & Smith
    10866 Wilshire Boulevard
    Suite 800
    Los Angeles, California 90024

45. *Kapilow, et al. v. Coldwell Banker Residential Brokerage Company, et al.*
    Mr. Stephen Helfand, Esq.
    Helfand Law Office
    582 Market Street, Suite 1400
    San Francisco, California 94104

46. *Michael Tarbox v. Turner, Reynolds, Greco & O'Hara, APC, Fred Turner*
    Mr. Allan P. Leguay, Esq.
    Law Offices of Allan P. Leguay
    3501 Jamboree Road
    Suite 6000
    Newport Beach, CA 92660

47. *Rose v. Stewart Title & Trust of Phoenix, Inc.*
    Mr. Jesse Wulsin, Esq.
    Fennemore Craig, P.C.
    3003 North Central Avenue
    Suite 2600
    Phoenix, Arizona 85012

48. *Financial American v. CH Montrose, et al.*
    Mr. Anthony Golden, Esq.
    Fennemore Craig, P.C.
    300 South Fourth Street, Suite 1400
    Las Vegas, Nevada 89101

49. *Di Wu and Shu Min Guo v. Shizhang Xiao, et al.*
    Mr. Jeffrey L. Melczer, Esq.
    Law Office of Jeffrey L. Melczer
    901 Corporate Center Drive
    Suite 500
    Monterey Park, California 91754

50. *Jajieh and Canter v. JL Thomas, Inc., et al.*
    Ms. Renee L. Campbell, Esq.
    Law Offices of Renee L. Campbell
    1055 West 7th Street, Suite 2140
    Los Angeles, California 90017

51. *Buckley v. Deacon, et, al.*
Mr. Mark Austin, Esq.
Rutan & Tucker, LLP
611 Anton Boulevard
Fourteenth Floor
Costa Mesa, California 92626

52. *Ko v. Yang*
Jay Ritt, Esq.
Bensinger, Ritt, Tai & Tvedt, LLP
65 North Raymond Avenue
Suite 320
Pasadena, CA 91103

53. *Golf Brands, Inc. et al. v. Shaffer, Gold & Rubaum LLP, et al.*
Richard W. Pierce, Esq.
Richard W. Pierce Law Office, LLC
P.O. Box 503514 CK
Saipan MP 96950-3514

54. *Oak Park Calabasas Condominium Assoc. v. Calabasas Homeowners Assoc.*
Jodi K. Stanfield, Esq.
Morgan, Lewis & Bockius LLP
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132

55. *Brooks v. Larson, et al.*
Kevin Dorhout, Esq.
Manfredi, Levine, Eccles, Miller & Lanson, APC
3262 E. Thousand Oaks Blvd.
Suite 200
Westlake Village, CA 91362-3400

56. *Spa de Soleil, et al. v. Sherman, et al.*
Arik Shafir, Esq.
Law Offices of Gene J. Goldsman
501 Civic Center Drive West
Santa Ana, CA 92701

57. *Day v. Caswell, Bell & Hillison, Krbechek, et al.*
Richard L. Moser, Esq.
Law Offices of Richard L. Moser
Post Office Box 899
Mariposa, CA 95388-0899

58. *Kandalaft, et al. v. Sunshine Real Estate Inc., et al.*
Jay R. Stein, Esq.
Law Offices of Jay R. Stein
1801 Century Park East, Suite 2400
Los Angeles, California 90067

59. *Matthews, et al. v. Shaw, et al.*
Darrin F. Meyer, Esq.
Adelson, Testan, Brundo & Jimenez
9454 Wilshire Boulevard, #600
Beverly Hills, California 90212

60. *Cilani v. Douglas, et al.*
Scott Souders, Esq.
J. Scott Souders, P.C.
140 Newport Center Dr., Suite 250
Newport Beach, CA 92660

61. *Ghadimi v. Ghadimi*
Nicholas Cuneo, Esq.
12100 Wilshire Boulevard
Suite 1980
Los Angeles, CA 90025

62. *Glinski v. Channel Islands Realty, et. al.*
Randy Wells, Esq.
Ball & Yorke
1001 Partridge Dr., Suite 330
Ventura, CA 93003

63. *Steinberg v. Kristie Powell*
Kevin Dorhout, Esq.
Manfredi, Levine, Eccles, Miller &
Lanson, APC
3262 E. Thousand Oaks Blvd.
Ste. 200
Westlake Village, CA 91362-3400

64. *Diane Newton v. Shelley Smith, et. al.*
Johnathan D. Cloud, Esq.
Hollins Law
2601 Main Street
Penthouse Suite 1300
Irvine, CA. 92614-4239

65. *Henderson v. First Team*
Timothy Kozel, Esq.
Kozel & Rady
1991 Village Park Way, Suite B
Encinitas, CA 92024

66. *Calvert v. Vallejos, et al.*
Frank J. Lozoya IV, Esq.
Lozoya & Lozoya
15060 Ventura Blvd., Suite 211
Sherman Oaks, California 91403

67. *Bardack v. Tomjanovich, et al.*
Maureen M. Michail, Esq.
Daniels, Fine, Israel Schonbuch &
Lebovits, LLP
1801 Century Park East
Ninth Floor
Los Angeles, California 90067

68. *Wecker v. Pickford Realty, et al.*
Norman H. Levine, Esq.
Greenberg Glusker Fields Claman &
Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067

69. *Indulkar v. Sanchez, et al.*
Lawrence R. Bynum, Esq.
Law Offices of Lawrence R. Bynum,
APC
6700 Indiana Ave. Suite 240
Riverside, CA 92506

70. *Wells v. Prudential, et al.*
Aaron B. Bloom, Esq.
Greenberg Glusker Fields Claman &
Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067

71. *Knapp v. Marcus & Millchap Real
Estate Investment Brokerage Co.*
Hugh E. Knowlton, Esq.
2026 South Bentley Ave.
Los Angeles, CA. 90025

72. *Mammoth Fireside v. Liebersbach,
Mohun, Carney & Reed, APC*
William A. Munoz, Esq.
Murphy, Pearson, Bradley & Feeney
1375 Exposition Blvd., Suite 250
Sacramento, CA. 95815

73. *Sabadia v. Holland & Knight*
David Z. Ribakoff, Esq.
Enenstein & Ribakoff, APC
233 Wilshire Boulevard, Suite 900
Santa Monica, CA 90401

74. *Amsler et al. V. Fell, Marketing et al.*
Eric A. Woosley, Esq.
Law Office of Eric A. Woosley
1602 State Street
Santa Barbara, CA 93101

75. *Zaman v. Yoon*
Donald Ramenian, Esq.
Law Offices of Donald Ramenian
11355 W. Olympic Blvd., Suite 300
Los Angeles, California 90064-1632

76. *Cardona v. Vollucci*
   Hugh E. Knowlton, Esq.
   2026 South Bentley Ave.
   Los Angeles, CA. 90025

77. *Rios v. National Retail Properties, et al.*
   Gregory A. Ellis, Esq.
   Scheper Kim & Harris, LLP
   601 W. Fifth Street, 12th Floor
   Los Angeles, CA. 90071

78. *AEHCC, LLC v. Shin*
   Patrick J. Evans, Esq.
   16897 Algonquin St., Suite F
   Huntington Beach, CA 92649

79. *Soikkeli v. Wachovia Mortgage, et al.*
   Art Fields, Esq.
   4023 Dixie Canyon Avenue
   Sherman Oaks, CA 91423

80. *Capital State v. Eigenbrodt, et al.*
   Mark Kane, Esq.
   Robinson DiLando, APLC
   800 Wilshire Blvd., Suite 750
   Los Angeles, California 90017

81. *Klein v. Infante*
   Barry MacNaughton, Esq.
   Ervin Cohen & Jessup, LLP
   9401 Wilshire Boulevard, 9th Floor
   Beverly Hills, CA 90212

82. *Wu v. Magnus Sunhill Group*
   Nick Begakis, Esq.
   Paul Hastings LLP
   15 South Flower Street, 25th Floor,
   Los Angeles, CA 90071

83. *Briskin v. Oceanside Marina Towers Association*
   Rian Jones, Esq.
   Epsten Grinnell & Howell APC
   10200 Willow Creek Road, Ste. 100
   San Diego, CA 92131

84. *Vision West v. Pasternack*
   Gregory M. Hatton, Esq.
   Hatton Petrie & Stackler, APC
   20281 Birch Street, Suite 100
   Newport Beach, CA 92660

85. *Littlejohn v. Wilson, et al.*
   John F. Hodges, Esq.
   789 Valley Rd
   Arroyo Grande, CA 93420

86. *Chodos vs. Borman*
   Ronald Richards, Esq.
   P.O. Box 11480
   Beverly Hills, CA 90213

87. *Dovestreet Capital Lenders, LLC v. Lone Oak Fund, LLC*
   Heleni Suydam, Esq.
   Sands & Associates
   9606 Santa Monica Blvd. 3rd Flr
   Beverly Hills, California 90210

88. *Farzad v. Sadeghi*
   Bobby Samini, Esq.
   Samini Scheinberg PC
   949 South Coast Drive, Suite 420
   Costa Mesa, California 92626

89. *H.C.A.C., LLC , v. Percos Holdings, LLC, et al.*
   Larry D. Mikelson, Esq.
   Mikelson & Mikelson, LLP
   21515 Hawthorne Blvd., Suite. 840
   Torrance, California 90503

90. *In the Matter of the Robert J. Pond Living Trust*
   Andre Rekte, Esq.
   Girardi and Keese
   155 W. Hospitality Ln., Ste. 260
   San Bernardino, CA 92408

91. *United States v. Crisp, et al.*
    Anthony P. Capozzi, Esq.
    1233 West Shaw Avenue, Suite 102
    Fresno, California 93711

92. *Blomberg v. Evans, et al.*
    Brent Barnes, Esq.
    O'Hara Barnes LLP
    15012 Chestnut Ct.
    P.O. Box 5386
    Pine Mountain Club, CA 93222

93. *Merritt v. Erickson, et al.*
    Greg Ozhekim, Esq.
    21700 Oxnard Street, 7th Floor
    Woodland Hills, California 91367

94. *Bregman v. Ebiner*
    Lee Brown, Esq.
    Brown & Brown
    1152 N. Mountain Ave., Suite 210
    Upland, California 91786

95. *Jade Property Managers, Inc. v. Cocolan*
    Greg A. Rapoport, Esq.
    Business Legal Partners
    135 West Green St., Suite 100
    Pasadena, CA 91105

96. *Burton v Hoefflin & Burrows, et al.*
    Barry Zoller, Esq.
    Lewis Brisbois Bisgaard & Smith
    633 W. 5th Street, Suite 4000
    Los Angeles, CA 90071

97. *Trinh v. Lee, et al.*
    Roger Hsu, Esq. & Charles Sutton, Esq.
    Law Offices of Roger C. Hsu
    175 South Lake Avenue, Suite 210
    Pasadena, CA 91101

98. *Hudack v. Circuit McKellogg Kinney & Ross, LLP, et al.*
    William N. Blasser, Esq.
    Blasser Law
    20955 Pathfinder Road, Suite 100
    Diamond Bar, CA 91765

99. *Saltzman-Walker v. Deutsch, et al.*
    Phyllis Lamken, Esq.
    Law Office of Lamken
    1717 Proudfoot Lane
    P.O. Box 586
    Victor, ID 83455

100. *Neman, et al. v. Harkham, et al.*
     Timothy D. Reuben, Esq.
     REUBEN RAUCHER & BLUM
     10940 Wilshire Blvd, 18th Floor
     Los Angeles, California 90024

101. *LPT Properties v. Wystein Opportunity Fund, LLC, et al.*
     Thomas Quinn, Jr., Esq.
     NOKES & QUINN
     410 Broadway Street, Suite 200
     Laguna Beach, CA 92651

102. *State v. Dougan*
     Orlando J. Castano, Jr., Esq.
     Law Office of Orlando J. Castano, Jr.
     4675 MacArthur Court, Suite 465
     Newport Beach, CA 92660

103. *MPSN Properties II, LP v. Parkside Rentals, LLC, et al.*
     Stephen C. Johnson, Esq.
     S.C. Johnson & Associates P.C.
     P.O. Box 641277
     Los Angeles, CA 90064

104. *Saedi v. Alai, et al.*
     Kevin Badkoubehi, Esq.
     Badkoubehi & Dadmehr LLP
     10866 Wilshire Blvd., Ste 400
     Los Angeles, CA 90024

105. *Yanez v. Kler, et al.*
Stephen C. Johnson, Esq.
S.C. Johnson & Associates P.C.
P.O. Box 641277
Los Angeles, CA 90064

106. *Williamson v. Law Offices of Timothy P. Peabody*
Timothy P. Peabody, Esq
The Peabody Law Firm
620 Newport Center Drive, #1100
Newport Beach, California 92660

107. *Hospitality Ventures v. Singh, et al.*
Mandeep S. Rupal, Esq.
Law Office of Mandeep S. Rupal
5811 Pine Ave.
Chino Hills, CA 91709

108. *Abregov, et al v. Bio-Nutritional Research Group, Inc., et al.*
John B. Taylor, Esq
Cadden & Fuller LLP
114 Pacifica , Suite 450
Irvine, CA 92618

109. *Singh v. Holzer, et al.*
John R. Fuchs, Esq.
Fuchs Law Group, APC
12100 Wilshire Blvd., Suite 800
Los Angeles, CA 90025

110. *Gao v. Jalil, et al.*
Gary Berzner, Esq.
Law Office of Gary Berzner
3600 Wilshire Blvd. #2036
Los Angeles, CA 90010

111. *Xin, et al. v. Li, et al.*
Brian Urtnowski, Esq.
Urtnowski & Associates, P.C.
1801 Von Karman Avenue, Suite 200
Irvine, CA 92612

112. *Camarillo Hospitality, LLC v. Marcus & Millichap Real Estate Investment Services, Inc., et al.*
William C. Hoggard, Esq.
WCH Law Group, P.C.
625 The City Drive South, Suite 325
Orange, CA 92868

113. *Kuiumdjian, et al. v. Morris, et al.*
Andre E. Jardini, Esq.
KNAPP, PETERSEN & CLARKE
550 N. Brand Blvd., Suite 1500
Glendale, CA 91203

114. *Hallett, et al. v. Khau, et al.*
Stephen Z. Boren, Esq.
BOREN OSHER & LUFTMAN, LLP
222 N. Sepulveda Blvd., #2222
El Segundo, CA 90245

115. *CNK Properties LLC v. Park, et al.*
Jay Hong, Esq.
Legacy Pro Law, P.C.
3600 Wilshire Blvd., Suite 1510
Los Angeles, CA 90010

116. *Miller v. Jonkman, et al.*
Ralph Ascher, Esq.
Ascher & Associates, P.C.
11022 Acacia Parkway, Suite D
Garden Grove, CA 92840

117. *Kuiumdjian v. Locker, et al.*
Pavel Eckmekchyan, Esq.
Yu Mohandesi LLP
633 West Fifth St., Suite 2800
Los Angeles, CA 90071

118. *GF Services, LLC v. Rehabbers Financial Inc., et al.*
Bruce B. Paller, Esq.
Law Offices of Bruce B. Paller
3639 E. Harbor Blvd., #112
Ventura, CA 93001-4276

119. *Balian v. Carter, et al.*
Dennis P. Wilson, Esq.
The Law Offices of Dennis P. Wilson
3322 W. Victory Blvd.
Burbank, CA 91505

120. *JNB Plaza, LLC v. Beach Business Bank, et al.*
Pamela Tahim Thakur, Esq.
Thakur Law Firm
135 S. State College Blvd., Suite 200
Brea, CA 92821

121. *Vasques v. Penaranda, et al.*
Eric Lawton, Esq.
Law Offices of Eric Lawton
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025

122. *Pak v. Joo, et al.*
Matthew Hillix, Esq.
Law Offices of Edward Y. Lee
3731 Wilshire Blvd., Suite 940
Los Angeles, CA 90010

123. *Lee & Associates Ontario, Inc. v. Wang, et al.*
Susan Carter-SooHoo, Esq.
Chang Mattern LLP
301 E. Colorado Blvd., Suite 325
Pasadena, CA 91101

124. *Mojica, et al. v. Harron, et al.*
Christopher G. Kerr, Esq.
Hanger Steinberg Shapiro & Ash, ALC
21031 Ventura Blvd., Suite 800
Woodland Hills, CA 91364

125. *PHH Mortgage Corp. v. Barrett Daffin Frappier Treder & Weiss, LLP, et al.*
Bret Batchman, Esq.
Hansen, Kohls, Sommer & Jacob LLP
Roseville, CA 95661

126. *Zargaryan v. On Central Realty Inc., et al.*
Datev 'Dave' Shenian, Esq.
Adli Law Group
444 South Flower Street, Suite 3100
Los Angeles, CA 90017

127. *Garcia, et al. v. First Metropolitan Funding Corporation, et al.*
Anthony Kohrs, Esq.
Hennelly & Grossfeld LLP
4640 Admiralty Way, Suite 850
Marina del Rey, CA 90292

128. *Sarvak v. Wolff, et al.*
Raphael Cung, Esq.
Callahan & Blaine, APLC
3 Hutton Center Drive, 9th Floor
Santa Ana, CA 92707

129. *Tohme v. Estate of Michael Jackson, et al*
Zachary T. Elsea, Esq.
Kinsella Weitzman Iser Kump &
Aldisert LLP
808 Wilshire Blvd., 3rd Floor
Santa Monica, CA 90401-1894

130. *Horiike v. Coldwell Banker Residential Brokerage Company, et al.*
Zachary Schorr, Esq.
Schorr Law, APC
12100 Wilshire Blvd., Suite 1050
Los Angeles, CA 90025

131. *Khan v. JP Morgan Chase Bank, N.A., et al.*
David D. Kim, Esq.
The Law Offices of David Kim
5670 Wilshire Blvd., Suite 1350
Los Angeles, CA 90036

132. *Dibaei v. Randall, et al.*
Rodger A. Maynes, Esq.
Maynes & O'Hair Law, LLP
One Ridgegate Drive, Suite 135
Temecula, CA 92590

133. *Robbins Benson LLC v. Meardon, et al.*
Eoin Kreditor, Esq.
Fitzgerald Yap Kreditor LLP
16148 Sand Canyon Avenue
Irvine, CA 92618

134. *Nazari v. Tressler LLP, et al.*
Eric I. Michelman, Esq.
Law Offices of Eric I. Michelman
2301 Dupont Dr., Suite 530
Irvine, CA 92612

135. *Williams v. Teles Properties, Inc., et al.*
J. Scott Souders, Esq.
J. Scott Souders, P.C.
13 Corporate Plaza, Suite 200
Newport Beach, CA 92660

136. *Bilello, et al. v. Coldwell Banker Residential Brokerage Company, et al.*
Michael J. Fitzgerald, Esq.
Fitzgerald Yap Kreditor, LLP
16148 Sand Canyon Avenue
Irvine, CA 92618

137. *Summerland Falls, LLC v. Quinn Emanuel Urquhart & Sullivan, LLP, et al.*
Grant Maxwell, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

138. *Baharian-Mehr v. Wagner, et al.*
Naveen Madala, Esq.
Prima Law Group, Inc.
89 Sapphire
Irvine, CA 92602

139. *Mirage Holders LLC v. Y & C Pacific LLC, et al.*
Robert Sherman, Esq.
Law Offices of Robert Sherman
7972 Marbella Circle
Las Vegas, NV 89128

140. *Tajmiri v. Bosse, et al.* 01/10/2019
Adam Dolce, Esq.
Law Office of Adam Dolce
414 Yale Avenue, Suite B
Claremont, CA 91711

141. *Ireland, et al. v. Charles Dunn Company, Inc., et al.*
Michael N. Hirota, Esq.
Thompson, Coe & O'Meara, LLP
12100 Wilshire Blvd., Suite 1200
Los Angeles, CA 90025

142. *Horenstein, etc., et al. v. Schutzer, et al.*
James R. Felton, Esq.
Greenberg & Bass LLP
16000 Ventura Boulevard, Suite 1000
Encino, CA 91436-2730

143. *Selby v. Conrad, et al.*
Michael J. Fitzgerald, Esq.
Fitzgerald Yap Kreditor LLP
2 Park Plaza, Suite 850
Irvine, CA 92614

144. *CGGL City Parkway LLC v. Reliant Financial Corporation, et al.*
James S. Sifers, Esq.
Madison Law, APC
17702 Mitchell North
Irvine, CA 92614

145. *Gray v. Jonkman, et al.*
Ralph Ascher, Esq.
Ascher & Associates, P.C.
11022 Acacia Parkway, Suite D
Garden Grove, CA 92840

146. *Tehrani, et al. v. Coldwell Banker Real Estate LLC, et al.*
Michael Wilson, Esq.
Kundani Chang Khinda Wilson LLP
611 Wilshire Blvd., Suite 325
Los Angeles, CA 90017

147. *Woods & Erickson, LLP v. Platt, et al.*
James E. Shapiro, Esq.
Smith & Shapiro, PLLC
3333 E. Serene Avenue, Suite 130
Henderson, Nevada 89074

148. *Aframian v. Berokim, et al.*
Shawn Zaman, Esq.
Weiss & Zaman
1925 Century Park East, Suite 2140
Los Angeles, CA 90067

149. *Whittaker v. Glaser Weil Fink Howard Avchen & Shapiro LLP*
Scott M. Malzahn, Esq.
Baker Marquart LLP
2029 Century Park East, Suite 1600
Los Angeles, CA 90067

150. *Brubaker, et al. v. Marcus & Millichap Real Estate Investment Services, Inc., et al.*
Shenne J. Hahn, Esq.
Greenberg, Whitcombe, Takeuchi & Gibson, LLP
21515 Hawthorne Boulevard, Suite 450
Torrance, CA 90503

151. *Alum Rock Riverside, LLC v. PRP Investors Madison, LLC, et al.*
Kenneth R. Van Vleck, Esq.
GCA Law Partners, LLP
2570 W. El Camino Real, Suite 400
Mountain View, CA 94040

152. *Rogo v. Jacobson, et al.*
Richard P. Tricker, Esq.
Winget Spadafora & Schwartzberg LLP
1900 Avenue of the Stars, Suite 450
Los Angeles, CA 90067

153. *Multi Cable, Inc., et al. v. Jackson Lewis, P.C., et al.*
Joan Kenegos, Esq.
Kaplan, Kenegos & Kadin
9150 Wilshire Blvd., Suite 175
Beverly Hills, CA 90212

154. *McPherson, et al. v. Southard, et al.*
Eduardo Martorell, Esq.
Martorell Law, APC
Playa District
6100 Center Drive, Suite 1130
Los Angeles, CA 90045

155. *West Coast Private Investments, LLC v. Wright Finlay & Zak, LLP, et al.*
Behzad Vahidi, Esq.
Khouri Law Firm, APC
2222 Martin, Suite 210
Irvine, CA 92612

156. *Yoon, et al. v. Choi, et al.*
Sam M. Muriella, Esq.
Frederick W. Lee Law Firm, APC
500 N. State College Blvd., #1200
Orange, CA 92868

157. *Iskander, et al. v. Alberts, et al.*
Bruce G. Schweitzer, Esq.
Law Office of Bruce G. Schweitzer
P. O. Box 5306
Newport Beach, CA 92662

158. *Johnson Jr. v. Johnson, et al.*
Anita Jain, Esq.
Meylan Davitt Jain Arevian & Kim LLP
444 S. Flower Street, Suite 1850
Los Angeles, CA 90071

159. *Ballyhoo Media, Inc. v. Cox Wooton,*
*Lerner, Griffin & Hansen, LLP., et al.*
Christopher Barnes, Esq.
Carpenter, Zuckerman & Rowley
18600 MacArthur Blvd., Suite 200
Irvine, CA 92612

160. *Warsavsky, et al. v. Pett-Dante, et al.*
Wendy Thomas, Esq.
Tadjedin Thomas & Engbloom Law Group
6101 West Centinela Avenue, Suite 270
Culver City, California 90230

161. *Bates, et al. v. Marcus & Millichap Real*
*Estate Investment Services, et al.*
Patrick C. McGarrigle, Esq.
McGarrigle, Kenney & Zampiello, APC
9600 Topanga Canyon Blvd., Suite 200
Chatsworth, CA 91311

162. *Woods v. Law Offices of Shahrokh*
*Mokhtarzadeh PLC, et al.*
Alfredo Woods
1319 S. Van Ness Avenue
Los Angeles, CA 90019

163. *Orange County Association of Realtors v.*
*Horowitz, et al./ Case No. E-24-20ANON*
Joseph Carpello, Esq.
Barton Klugman & Oetting, LLP
350 South Grand Avenue, Suite 2200
Los Angeles, CA 90071-3485

164. *Shilo Mission Baptist Church, Inc., et al. v.*
*Fantroy, et al.*
Jenifer Anisman, Esq.
Law Firm of Harold Greenberg
2263 South Harvard Boulevard
Los Angeles, CA 90018

165. *Selvarajah, et al. v. World Oil Marketing*
*Company, et al.*
Jonathan E. Phillips, Esq.
LARSON LLP
555 South Flower Street, Suite 4400
Los Angeles, CA 90071

166. *Nellor, et al. v. O'Loughlin, et al.*
Leodis C. Matthews, Esq.
Zhong Lun Law Firm
4322 Wilshire Boulevard, Suite 200
Los Angeles, CA 90010

167. *Catt & Wells v. Horowitz, et al./ Case No. E-*
*23-20*
Joseph Carpello, Esq.
Barton Klugman & Oetting, LLP
350 South Grand Avenue, Suite 2200
Los Angeles, CA 90071-3485

168. *Behrouz and Jackelin Aframian Family Trust*
*Dated July 1, 1999 v. Freeport Renaisaance,*
*LLC, et al.*
James DiVerde, Jr., Esq.
Hardyman DiVerde
124 N. Water Street, Suite 100
Rockford, IL 61107

169. *Gonzalez v. Ortiz, et al.*
David Kestner, Esq.
Law Offices of David Kestner and
Associates, APC
410 East Merced Avenue
West Covina, CA 91790

170. *In Re Marriage of: White v. White, et al.*
Darryl E. White, Esq.
The Law Offices of Darryl E. White
P.O. Box 581811
Elk Grove, CA 95758

171. *Ahn v. Volumecocomo Apparel, Inc., et al.*
James K. Beck, Esq.
LAW OFFICE OF JEANNIE JOUNG
3600 Wilshire Boulevard, Suite 1416
Los Angeles, CA 90010

172. *Cal Continental Capital, Inc., et al. v. 1502 Rockwood, LLC, et al.*
A. Scott Brown, Esq.
LAW OFFICES OF A. SCOTT BROWN
21700 Oxnard Street, Suite 1770
Woodland Hills, California 91367

173. *Vizcaya, et al. v. HNA Realty, Inc., et al.*
J. Luke Hendrix, Esq.
Law Offices of J. Luke Hendrix
28465 Old Town Front Street, Suite 212
Temecula, CA 92590

174. *Dow v. Wright, et al.*
Michael Labrum, Esq.
Law Offices of Michael Labrum
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

175. *Seeley, et al. v. Zenith Homes, LLC, et al.*
Thomas N. FitzGibbon, Esq.
Apex Law APC
100 Wilshire Boulevard, Suite 700
Santa Monica, CA 90401

176. *City Breeze, LLC, et al. v. Janney & Janney Attorney Service Inc., et al.*
James Bainbridge, Esq.
Bainbridge Law APC
1801 Century Park East, 24th Floor
Los Angeles, California 90067

177. *Botach, et al. v. Newmark of Southern California, Inc., et al.*
Thomas J. Kearney, Esq.
Anderson, McPharlin & Conners LLP
707 Wilshire Boulevard, Suite 4000
Los Angeles, CA 90017

178. *Powerscourt Partners, LLC v. Warren, et al.*
Michael Fitzgerald, Esq.
Fitzgerald Kreditor Bolduc Risbrough LLP
2 Park Plaza, Suite 850
Irvine, CA 92614

179. *Saroyan v. Yess Investments, Inc., et al.*
Tiffany D. Chukiat, Esq.
Molnar Atabek LLP
250 Newport Center Drive, Suite 306
Newport Beach, CA 92660

180. *Moore v. Bamboo Retreats LLC, et al.*
Brian J. Virag, Esq.
MYBEDBUGLAWYER, INC.
16400 Ventura Blvd., Suite 301
Encino, CA 91436

181. *Clark v. Golden Ticket Real Estate, II, et al.*
Roger E. Naghash, Esq.
Law Offices of Roger E. Naghash
19800 MacArthur Blvd., Suite 1000
Irvine, CA 92612-2433

182. *Hensarling, et al. v. Crooks, et al.*
Kevin Kay, Esq.
Ecoff Campain Tilles & Kay, LLP
280 S. Beverly Drive, Suite 504
Beverly Hills, CA 90212

183. *Petersen, et al. v. Galligan, et al.*
Thomas P. Kelly, III, Esq.
50 Old Courthouse Square, Suite 609
Santa Rosa, CA 95404-4926

184. *Collins, et al. v. Lagmuir-Logan, et al.*
Daniel A. Harrison, Esq.
HARRISON LAW CORP
24040 Camino Del Avion, # E185
Monarch Beach, CA 92629

185. *Hung Kim Nguyen, et al. v. Back Bay Westminster, LLC, et al.*
Thomas F. Nowland, Esq.
Law Offices of Thomas F. Nowland
20241 SW Birch Street, Suite 203
Newport Beach, CA 92660

186. *White v. Fahoum, et al.*
Richard G. Flanagan, Esq.
2906 W. Magnolia Boulevard
Burbank, CA 91505

187. *Textile 26, Inc., et al. v. Athletix Fabrics, Inc., et al.*
David Scott Kadin, Esq.
Kaplan, Kenegos & Kadin
9150 Wilshire Blvd., Suite 175
Beverly Hills, CA 90212-3450

188. *Amirianfar, et al. v. Kaiser, et al.*
Stephen M. Feldman, Esq.
Law Offices of Stephen M. Feldman, Inc.
78390 Sterling Lane
Palm Desert, CA 92211-1896

189. *Price v. Ghalari, et al.*
Mark J. Mulkerin, Esq.
Burke, Williams & Sorensen, LLP
18300 Von Karman Avenue, Suite 650
Irvine, CA 92612-1031

190. *Do v. Raptakis, et al.*
Christopher E. Delaplane, Esq.
Delaplane Law Group, APC
3625 E. Thousand Oaks Boulevard, Suite 109
Westlake Village, CA 91362

191. *Ashrafi, et al. v. Vidal, et al.*
Christopher Kerr, Esq.
Hanger, Steinberg, Shapiro & Ash, ALC
21031 Ventura Blvd., Suite 800
Woodland Hills, CA 91364

192. *Kwan, et al. v. Law Offices of George L. Young, APC, et al.*
Zachary Mayer, Esq
Miller Law Associates, APC  .
411 South Hewitt Street
Los Angeles, CA 90013

193. *Selene Finance LP v. Malcolm & Cisneros, A California Law Corp., et al.*
Shawn Krogh, Esq.
Krogh & Decker, LLP
555 Capitol Mall, Suite 700
Sacramento, CA 95814

194. *Sheppard, et al. v. Compass, Inc., et al.*
Patricio T.D. Barrera, Esq
Barrera & Associates
2298 E. Maple Avenue
El Segundo, CA 90245

195. *The Lab, LLC, et al. v. Strathmore Custom Homes, Inc., et al.*
Aaron B. Fairchild, Esq.
Fairchild & Levine LLP
2 Corporate Park, Suite 202
Irvine, CA 92606

196. *Clear Homes, LLC v. Wee, et al.*
Gregory S. Walston, Esq.
The Walston Law Group
Four Charlton Court
San Francisco, CA 94123

1

2

**EXHIBIT C**

Documents Received:

3

1. First Amended Complaint (Roberts v. EXP Realty, LLC, et al.)
2. Third Amended Complaint (Acevedo, et al. v. EXP Realty, LLC, et al.)
3. Order granting in part and denying in part Defendants' motions to dismiss Plaintiffs' First Amended Complaint
4. Tamar M. House Deposition 11/13/2025
5. Michael Bjorkman Deposition vol. 1 8/6/2025 & exhibits
6. Michael Bjorkman Deposition vol. II 10/13/2025 & exhibits
7. Michael Bjorkman Deposition vol. III 10/29/2025
8. Glenn Sanford Deposition 3/21/2025 & exhibits
9. Debbie Penny Deposition 5/29/2025 & exhibits
10. Cory Haggard Deposition 5/2/2025 & exhibits
11. Cory Haggard Deposition 8/20/25 & exhibits

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT D**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# DECLARATION OF WARRANT/SUMMONS
## (N.R.S. 171.108)
## (N.R.S. 53 amended 7/13/1993)



FILED

Event Number: 200900070704

JUSTICE COURT
LAS VEGAS NEVADA

BJG

| | | |
|---|---|---|
| **STATE OF NEVADA** | ) | Michael Bjorkman |
| | ) **ss:** | ID#: |
| **COUNTY OF CLARK** | ) | DOB: |

J. Lafreniere, being first duly sworn, deposes and says:

That he is a Detective with the Las Vegas Metropolitan Police Department, being so employed for a period of 19 years, assigned to investigate the crime(s) of Sexual Assault (2 counts) committed on or about August 2020, which investigation has developed Michael Bjorkman as the perpetrator thereof.

THAT DECLARANT DEVELOPED THE FOLLOWING FACTS IN THE COURSE OF THE INVESTIGATION OF SAID CRIME, TO WIT:

In September 2020, I, Detective J. Lafreniere (P# 7570) with the Sex Crimes Unit of the Las Vegas Metropolitan Police Department (LVMPD), was assigned to follow-up on reports of drugging and drug facilitated sexual assaults.

## Initial Report

The initial reporting party/victim was identified as:                    [DOB          ] (Numerous additional involved subjects/victims were identified during the investigation).

The suspect was reported as: Michael (Mike) Bjorkman (DOB

The incidents/allegations were reported to have occurred in numerous locations around the United States.

The allegations were reported to have spanned over several years, with the most recent incident occurring in August 2020.

The following details were reported:

          was in Las Vegas from August 27th, 2020 – August 29th, 2020, for a work-related event. One evening during her stay in Las Vegas,        went out to dinner at a gathering in a Tower Suite at the Encore Hotel and Casino, with other attendees from the event. While at dinner,        began feeling extremely intoxicated after having only one drink earlier in the evening.        then lost total memory and she next recalled waking up in her hotel room, alone and nude.        has no memory from the evening or event, including how she got back to her room. The following day,        co-workers told her about her actions and events from the previous night, which she also had no memory of.        believes she was drugged that evening.

LVMPD 314 (Rev. 8/00) WORD 2010

EXHIBIT

17

1 VEGAS METROPOLITAN POLICE DEPARTMEN<sup>-</sup>
## CONTINUATION

Event #: _____ 200900070704 _____

has since shared her experience with co-workers and she recently learned that another attendee disclosed being drugged and sexually assaulted, after attending the same event.            was also recently informed that two other females disclosed being drugged and sexually assaulted while attending events in Hawaii and Mexico, involving the same people. After speaking with several people, they believed Mike Bjorkman, a person they all work with and have all known for years, to be the person drugging and/or sexually assaulting them.

Due to learning of multiple incidents,         decided to report her incident to police.            did not want to provide the names and/or identifying information of potential victims to police, but she has passed on the name and number of the investigating detective, to the other possible victims.

After the initial contact with         , I received phone calls from numerous people informing me they had information and/or experiences of being drugged, and/or sexually assaulted, involving Mike Bjorkman.

Interview with Michael

I received a phone call from a man who identified himself as Michael         Michael explained that         works for him and         recently, and publicly, disclosed her experience in Las Vegas. Michael said he has since learned of several other victims. Michael said he was willing to provide a statement.

On September 17<sup>th</sup>, 2020, I conducted a phone interview with Michael         (DOB         ). The interview was recorded for full, specific content. The following is a summary of the interview:

Michael acknowledged the phone call was being recorded and consented to our conversation being recorded in its entirety.

Michael owns and operates Club Wealth, a real estate coaching business, based out of Washington. Club Wealth operates and holds training events and employs real estate coaches around the United States.         is an employee and coach at Club Wealth, and Michael has known         for years.

Within the previous week,         disclosed to Michael that she believed she was drugged while at a real estate event held in Las Vegas, around the end of August 2020 – beginning of September 2020.         disclosed that while at a party, during the weekend, she had one drink. The drink affected her in a way which one drink would not normally affect her, and she then lost all memory of the evening.         told Michael that she talked with others about what happened to her and another attendee also disclosed being drugged and sexually assaulted, at the same event.         said that other people have also come forward and disclosed similar experiences, over the course of several years, in several different locations. Michael explained that         was "very careful" not to accuse any single person for her being drugged but based on disclosure, the disclosures and relayed experiences of numerous other people, and additional learned factors,         and others believe Mike Bjorkman, to be the responsible subject.

Michael identified Mike Bjorkman as a real estate agent with EXP Real Estate, a multi-level marketing real estate business. Mike Bjorkman regularly attends real estate training all around the United States and spends a lot of time traveling. Michael said he has known Mike Bjorkman for several years and he found the allegations to be "shocking."

VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #: _____ 200900070704 _____

Michael has not spoken with Mike Bjorkman about the allegations, but he believes Mike Bjorkman has been made aware of the allegations. Michael said he was specifically informed that Mike Bjorkman uses GHB (known as a "date rape drug") to drug men and women and to facilitate the sexual assaults. Michael identified Mike Bjorkman's close friend as David _____, and it was suggested to Michael that David supplies Mike Bjorkman with the GHB and people who have spoken with Michael believe David to be involved in the incidents as well.

Michael said that Mike Bjorkman is aware of the allegations being made against him and Mike Bjorkman recently left for Mexico. Michael has also heard that Mike Bjorkman has contacted some of the victims, "threatening" them and telling them not to say anything. Michael has also been informed that Mike Bjorkman and David may have made videos of their sexual acts with victims.

Michael said that _____ recently posted about her experience on Facebook, and numerous people have commented on the post, or contacted _____ to disclose that they were also drugged and/or "raped" by Mike Bjorkman. Michael said he would screenshot the Facebook post and send it to me.

Michael said he would also provide my name and number to those who have reached out to him or to those who he knows have disclosed incidents involving Mike.

Michael provided me with a cell phone number for Mike Bjorkman; _____

Michael provided me with a cell phone number for David _____

### Interview with _____

I received a phone call from a female who identified herself as _____ said she recently heard about allegations, regarding Mike Bjorkman. _____ said she worked for Mike for several years and she was sexually assaulted by Mike, multiple times. _____ said she was willing to provide a statement.

On September 18th, 2020, I conducted a phone interview with _____ DOB _____. The interview was recorded for full, specific content. The following is a summary of the interview:

 _____ acknowledged the phone call was being recorded and consented to our conversation being recorded in its entirety.

 _____ said she did not know any details about the current investigation or allegations, but she knew they involved Mike Bjorkman. _____ explained she was recently contacted by Michael _____ a former co-worker of hers. Michael informed her about the investigation and asked her questions about her experiences with Mike Bjorkman. _____ told Michael that she was not comfortable discussing the details with him, but she would speak with the investigating detective. Michael then provided _____ with my contact information.

 _____ explained that around 2000, she was hired by Mike Bjorkman, to work as a Real Estate Agent at Remax of Valencia, in Valencia, CA. Shortly after _____ was hired, Mike told _____ that he could not invite her to his wedding (he was getting married later that year) because he was attracted to her. _____ dismissed the comment because Mike was her employer.

VEGAS METROPOLITAN POLICE DEPARTMENT

## CONTINUATION

Event #:     200900070704

Shortly after _____ began working for Mike, Mike began masturbating in front of her. _____ described times when she would go into Mike's office to discuss business and business matters and Mike would then lock the door to his office, expose his penis, and masturbate until he ejaculated. _____ explained she would be at the white board in Mike's office, writing down information, and when she turned around Mike would "have his dick in his hand." _____ recalled Mike telling her things such as, "You know you want this", while he masturbated. _____ said she would tell Mike to "knock it off" and she would look away and walk away from Mike when he did this. Mike then locked the door and "forced" her to watch him. _____ described the masturbating acts ended quickly (she estimated he would ejaculate within 30 seconds -1 minute) and he would then clean himself and the ejaculatory fluid, with a tissue. _____ said that after one incident, she collected the tissue Mike used to clean himself, and she saved it in a plastic baggie, as evidence of the act. _____ never reported the incident, and she is not sure what she ever did with the tissue. _____ estimated that Mike masturbated in front of her approximately 5 – 6 times while in his office. _____ denied that she ever participated in the act. _____ explained she was a single mother at the time and needed the paycheck, so she never reported to authorities. _____ provided Mike's office address (where the incident occurred) as:

_____ described a specific incident which occurred in Las Vegas during a real estate event, between 2000 and 2005. _____ believes she and Mike stayed at the Hard Rock Hotel and Casino, for the event (in separate rooms). During their time in Las Vegas, they were hanging out at the Hard Rock Pool when Mike swam up to her, quickly slipped his hand into _____ swimsuit bottoms, and he penetrated her vagina with his fingers. _____ immediately pushed Mike away and told him he was "totally inappropriate." _____ said she then stayed away from Mike for the rest of the trip. _____ said she and Mike never discussed this incident again.

_____ recalled a time she held a birthday party for her boyfriend, Mark _____ Mike Bjorkman attended the birthday party (in California) and during the party, _____ passed out and had to be transported to the hospital via ambulance. _____ recalled that just prior to being transported Mike was standing at the ambulance door, next to her. _____ was not sure if she was drugged but she did not recall drinking excessively and she believes factors other than alcohol were involved. _____ explained she had very little memory of the evening and she only recalled drinking a single martini. **Detective's Note:** _____ recalled being transported to Henry Mayo Hospital and she only spent a short time in the hospital. _____ was told she was extremely intoxicated, but she did not receive the medical report or records and was not sure if she was tested for common date rape drugs. I requested that _____ attempt to obtain the medical records form the described evening.

_____ described another time when several co-workers went out in a limo (also in California- Los Angeles area). The agency's real estate title representative, Shelly _____ took several people out for the evening and they drove around, drank, and possibly went to a strip club. While in the limo, Mike either "touched" _____ or "jacked off" in front of _____ and _____ elieves this was also witnessed by _____ described only remembering "blurbs" from the evening and was not sure what exactly happened that evening.

_____ recalled another incident which occurred around 2006 – 2007. _____ still worked for Mike and they both were studying for their real estate broker's license. They both signed up for a "crash course" which was two days of studying for their exam. The course was located outside of their hometown but within driving distance. Mike and

**Page 4 of 27**

**VEGAS METROPOLITAN POLICE DEPARTMENT**
## CONTINUATION

Event #:  _____  200900070704

_____ drove to the course together for both days of the course. On the way to the second day of class, Mike suggested that they just go sit and study together and not take the second day of the class. Mike drove them to the Marriott Hotel in Marina Del Rey. _____ recalled her and Mike sitting on a patio, having drinks, and studying. _____ next memory was waking up to Mike having sex with her on a bed, in a room, at the Marriott. When _____ first came to, she was lying on her back and Mike was on top of her having sexual intercourse with her. _____ told Mike to get off her, but she recalled feeling extremely weak and incoherent, _____ passed out again and when she next came to Mike was behind her, again having sex with her. _____ believes Mike was having anal sex with her. She again passed out and when she woke up next Mike told her to hurry up and get dressed because they needed to leave. They then left the hotel and while Mike drove them back to his house, _____ left her car at Mike's house and rode to the event with him) _____ felt extremely sick. Mike told _____ that once they arrived at his house she could not come inside the house because his wife could not see her in that condition. Shortly after this described incident, _____ quit her job working for Mike Bjorkman. A records check showed Marina Del Rey Marriott is located at 4100 Admiralty Way, Marina Del Rey, CA, 90290.

_____ eventually began working at EXP Realty, a multi-level marketing real estate company. Shortly after _____ began working at the company, she learned that Mike Bjorkman also started working for the company (the company operates all over the United States and _____ and Mike were not in the same physical location). While working for the company, _____ and her husband ran into Mike at a real estate event in New Orleans. _____ immediately became upset and had a physical reaction to seeing Mike at the event. _____ then told a co-worker, Frank _____ that she had been raped by Mike. Frank told _____ he heard this about Mike. _____ told her husband she could not be there with Mike, and they had to leave the event _____ estimated that she disclosed the incidents to her husband approximately nine years earlier). Shortly after, _____ quit working for EXP, because she could not work for the same company as Mike.

Approximately one year prior to this interview, _____ was contacted by her friend, _____ told _____ that Mike was going around telling people that he did not "rape" _____ said she did not know why Mike was saying this, as she had not talked about the incident. _____ said she was surprised by this, and that she had discussed the incident with very few people. _____ explained that she never even confronted Mike about the incidents.

_____ denied that she and Mike were ever involved in any type of intimate or dating relationship. _____ disclosed that all sexual acts/incidents involving Mike were done without her consent.

### Hard Rock Hotel and Casino

To confirm dates and location of _____ reported incident, I responded to the former Hard Rock Hotel and Casino - now Virgin Hotel and Casino. I met with the supervisor, Mr. Rodrigues. He provided me with his email address _____ and asked that I email him names and possible dates, which the rooms would have been reserved under, and he would check the reservation system. I sent him and email with the requested information.

### Interview with _____

VEGAS METROPOLITAN POLICE DEPARTMEN"
## CONTINUATION

Event #: _____ 200900070704

On September 19th, 2020, I conducted a phone interview with _____ }.
The interview was recorded for full, specific content. The following is a summary of the interview:

_____ acknowledged the phone call was being recorded and consented to our conversation being recorded in its entirety.

_____ lives in California, she works in real estate, and she coaches real estate agents.

Around the end of August 2020, _____ attended a "Mastermind" real estate event held in Las Vegas, NV. _____ was in Las Vegas from August 27th, 2020 – August 29th, 2020, for the event. Numerous other real estate agents from around the United States also attended the event _____ and several other attendees stayed at the Wynn and Encore Hotel and Casino, while in Las Vegas.

On Friday, August 28th, _____ and other attendees took an event-provided bus from their hotel to the host's residence, in Henderson, NV, where the day's event was being held. After the event, the bus returned them to their hotel (Wynn). _____ and a couple friends planned on going to dinner that evening but first they wanted to stop by a get-together held by two of the event's hosts, Mike Bjorkman and David _____ That evening, Mike and David held the get-together inside of their suite, at the Encore Hotel and Casino. Mike and David invited event attendees to their suite for drinks, snacks, and to hangout for the evening. _____ estimated there were 12-15 people at the suite when she arrived around 6:30 PM. After arriving, _____ poured herself one cup of vodka and soda water, which she sipped during the event. _____ explained she continually added soda water to the drink and never added more vodka. _____ explained this was the only alcoholic beverage she drank over the course of the entire evening and she did not finish the entire drink. While at the event, _____ spoke with several different people and even worked on her laptop, for a while. While at the event, _____ and a group of girls went into another room to talk together and during this time she believes she may have left her drink unattended. _____ was not certain if she left her drink unattended but said she was not consciously careful about watching her drink.

_____ and a few of her friends, _____ had dinner reservations that evening so they left the get-together and took an Uber or Lyft to Caesar's Palace, where they had dinner.

_____ recalled leaving the event at the Encore but has very limited memory for the remainder of the evening. While at dinner, her friends ordered wine, but _____ did not drink any wine. _____ recalled that while at dinner, she went to the bathroom one time, where she vomited. She again recalled sitting at the dinner table but has no memory of leaving the dinner. _____ next recalled waking up the next morning feeling "really groggy." _____ was nude and she was in her own bed in her hotel room. _____ had a bad headache and slept much longer than she normally does. Later that morning, _____ met her friends for brunch. During brunch, her friends filled _____ in on the way she acted and what she did, the previous evening. _____ had no memory about the events her friends were telling her about. _____ said she only had the one drink, the previous evening, at the hotel suite inside the Encore. _____ friends told her that while they were at dinner, _____ went to the bathroom, multiple times, and she was gone for so long that her friends had to go to the restroom to find her. _____ said she had no memory of this. _____ was told about conversations she had and things she did, which she had no memory of. _____ said that based on her drinking experience - she has a very high alcohol tolerance - she started thinking she may have been drugged. _____ talked with a few friends about her experience and people began telling her about them

' VEGAS METROPOLITAN POLICE DEPARTMENT'
## CONTINUATION

Event #: ___200900070704___

believing they were also drugged at various real estate events. ▓▓▓ explained that word began to spread, and more men and women came forward, claiming they believed they were drugged at real estate events around the United States. ▓▓▓ explained that as people began talking, they realized that Mike Bjorkman was present at the different events when people believed they may have been drugged. ▓▓▓ was never tested for any drugs the evening of the event but explained that the way she felt, compared to the limited amount of alcohol she drank, "did not make sense." ▓▓▓ explained that after she returned home, she called one of her local help lines to ask about being tested for date rape drugs and she was told they could not assist her unless she felt as though she had been sexually assaulted. ▓▓▓ said she did not believe she was sexually assaulted.

▓▓▓ then decided to make a Facebook Post, briefly describing her experience and what she went through, in Las Vegas. ▓▓▓ did not publicly provide Mike Bjorkman's name and did not put his name anywhere in her posting. Numerous people replied to her post and more people came forward saying they believed they were drugged and/or sexually assaulted by Mike Bjorkman. **Detective's Note:** ▓▓▓ **Facebook account was identified as** ▓▓▓ **I located the described Facebook Post and sent a preservation request to Facebook, regarding the identified account, posting, and comments. I also collected a screen shot of the initial posting.**

After learning about other possible victims of drugging and sexual assault, ▓▓▓ decided to report the allegations to police.

Since making the report, ▓▓▓ was contacted by another attendee from the event in Las Vegas. The other attendee told ▓▓▓ that she was "raped" by Mike Bjorkman, while in Las Vegas.

▓▓▓ was also contacted by another attendee, ▓▓▓, who claimed he may have been drugged at the same event. ▓▓▓ told ▓▓▓ that he got sick after drinking at the party and had limited memory of the evening.

Since the incident/posting, Mike Bjorkman and David ▓▓▓ have both messaged ▓▓▓ and attempted to contact her. Mike sent her messages saying that he did not "roofie" her or anyone. Mike and David also attempted to call ▓▓▓ and sent her messages asking her to call him.

▓▓▓ emailed me screenshots of communication between her and Mike Bjorkman, and her and David ▓▓▓ sent me a picture from her time in Las Vegas (confirming the dates) and a picture of her Facebook post. Separately ▓▓▓

Interview with ▓▓▓

I was put into contact with ▓▓▓ a real estate agent who also attended the event in Las Vegas, NV. ▓▓▓ and I communicated with each other, multiple times, prior to her formal, recorded interview. During our communications ▓▓▓ would schedule an interview and then cancel, or reschedule, due to her extreme emotional state and due to being afraid of what may come of the investigation. ▓▓▓ explained that she did share her experience with others. Since then, ▓▓▓ has been contacted by multiple people telling her that she was misremembering the way things happened and that she should not speak with me. ▓▓▓ explained she went back and forth with herself, multiple times, about speaking with me but she ultimately decided to provide a statement.

'VEGAS METROPOLITAN POLICE DEPARTMEN¯

## CONTINUATION

Event #: ___ 200900070704 ___

On October 1st, 2020, I conducted a phone interview with ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ). The interview was recorded for full, specific content. The following is a summary of the interview:

⬛⬛⬛ acknowledged the interview was being recorded and consented to the interview being recorded in its entirety.

⬛⬛⬛ a real estate agent, and she works for a company called EXP Realty. ⬛⬛ and her husband, ⬛⬛⬛⬛ live and work in Florida where they run a real estate branch for EXP Realty.

Prior to speaking with ⬛⬛⬛ she was aware of allegations and an active investigation involving Mike Bjorkman and David ⬛⬛ said she knows Mike and David through EXP Realty. Mike was ⬛⬛⬛ sponsor at EXP Realty, and he was the person who brought ⬛⬛ and her team into the company. David was Mike's sponsor and David brought Mike into the company. ⬛⬛⬛ said she has known Mike and David for "several years", she considered them both friends, and she trusted them both.

⬛⬛⬛ explained that in September 2020, her friend ⬛⬛⬛⬛ disclosed that in August 2020, she was "drugged" while attending a real estate event in Las Vegas. ⬛⬛⬛ informed me that she attended the same real estate event, and she had direct knowledge of Mike and David possessing and consuming "GHB" (Gamma Hydroxybutyrate — commonly referred to as the "date rape drug") while in Las Vegas. ⬛⬛⬛ also disclosed that she was sexually assaulted and possibly drugged by Mike Bjorkman, while in Las Vegas for the same event. ⬛⬛⬛ explained that immediately after the incidents and even after returning home, she did not have full and complete memory of the sexual assault incidents but many of the memories have since returned and she was now ready to provide a statement. ⬛⬛ explained that she does still have partial memory loss from the events in Las Vegas.

⬛⬛⬛ said the described real estate event was held in Las Vegas, NV, August 28th and August 29th, 2020. ⬛⬛⬛ flew to Las Vegas on August 27th and returned home to Florida on the 30th. During her stay ⬛⬛ reserved a room at the Encore Hotel and Casino and the room was reserved under her name. ⬛⬛⬛⬛ stayed with ⬛⬛ in her reserved room. ⬛⬛⬛ husband did not attend the event.

⬛⬛⬛ said she did have direct knowledge that Mike Bjorkman and David ⬛⬛ (two of the event organizers and hosts) had "GHB" with them, in their hotel suite at the Encore ( ⬛⬛ believed that Mike and David each had a suite reserved in their names) during the identified event in Las Vegas. ⬛⬛⬛ said she witnessed Mike and David with the GHB, and they kept the GHB in a plastic "5 Hour Energy" bottle. ⬛⬛ said she watched both Mike and David consume the GHB and they both encouraged her to take the substance, as well. Mike and David both told ⬛⬛ that the liquid inside the "5 Hour Energy" bottle was "GHB." ⬛⬛ asked Mike and David why they had the GHB and they told her that they both use it, "recreationally." ⬛⬛⬛ said she has witnessed David with GHB on another separate incident in Las Vegas. ⬛⬛ also recalled a time when she and Mike were talking on the phone and Mike told her that he was driving and needed to stop and pick-up his GHB. ⬛⬛ said Mike was on a road trip at the time and she thought he was stopping in Las Vegas.

⬛⬛⬛ said that in March 2020, when Mike and David were in Florida, they brought GHB with them and they consumed it at that time too. ⬛⬛ thinks Mike and David also offered GHB to ⬛⬛ at that time.

" VEGAS METROPOLITAN POLICE DEPARTMENT"
## CONTINUATION

Event #: _____ 200900070704 _____

plained that when Mike and David consumed the GHB, they were in their suite at the Encore.        said that David's girlfriend, Emily        , may have also been present when they consumed GHB.        believed Mike and David took the GHB on Friday evening, in their hotel suite, after the day's real estate event.        said Mike and David each poured the GHB into the cap of the 5 Hour Energy bottle and drank the liquid from the cap.        explained that on Friday evening she also consensually consumed the GHB provided by Mike and David (        explained that she and David also took GHB together one other time in Las Vegas, during a different trip). explained she still has gaps of memory loss from the identified weekend in Las Vegas.

        did recall and provided the following timeline of the identified weekend:

The week prior to arriving in Las Vegas, Mike text        and told her that while they were in Las Vegas he was "banging 20 strippers, at least."

On Thursday (8/27/2020),        arrived in Las Vegas. She and David went to the store where they bought snacks, alcohol, and mixers to have in David's suite. Because of the large amount of alcohol purchased by David and        the hotel "flagged" the liquor, and would not allow them to bring it all into the suite on the same day. Mike arrived in Las Vegas later that day and he had a suite which shared a connecting door with David's suite.        and a group, including Mike and David, went out to dinner. After dinner        met with the group at the hotel pool and she then went to bed.

On Friday (8/28/2020), the group attended a real estate event at a private residence. After the event,        and David's girlfriend,        , drank champagne and got ready for the evening while in David's suite. "A whole bunch of people" then came to Mike and David's suites, and        has limited memory of the events from the night.        said she did consensually "hook up" with        and        (a friend of David and        ), that evening.

On Saturday (8/29/2020), the group attended another real estate event and after the event the group went to the hotel pool.        took a "recreational drug" (        later identified this as a single pill of Ecstasy, which she divided up and took over the course of the weekend) just prior to going to the pool, and she then drank "cocktails" while at the pool. After the pool closed,        went to her room and changed (she wore jean shorts and a white blouse) and went to Mike and David's suite for another group get-together.        said she took a bag with her to the rooms and the bag contained a sweatshirt and yoga pants in case she wanted to sleep in their suite that evening.        remembered David becoming upset during the evening, so she and Mike went for a walk on the Las Vegas Strip, and gambled at the casino. After gambling for a while,        and Mike returned to Mike and David's suites and her memory becomes spotty and limited.        next recalled waking up in a bed with        and Mike Bjorkman. Mike had his hand inside of        pants and his fingers were inside of        vagina (        did not consent to this – Sexual Assault).        said she "brushed it off" and rolled over.        explained that because of their business and personal relationship, she initially was going to just forget this and not say anything about Mike fingering her.        next recalled sitting in the living room of the hotel suite and again drinking alcoholic beverages.        then recalled sitting on a bed in David's room.        was also in the suite and        was nude.        said she then changed her flight to return home to a later time and she flew home later that day.

Regarding being sexually assaulted _____ explained that when she initially returned home, she only had the memory of Mike with his hand in her pants and his fingers in her vagina.

_____ explained that after she returned to Florida and after she learned about making the allegation of being drugged in Las Vegas, _____ called Mike Bjorkman and asked him if he drugged _____ since she knew that Mike had the GHB. Mike denied drugging _____ and he told _____ that _____ was "wasted" and she had been drinking "50/50 Vodka sodas all night." _____ described the phone conversation with Mike as "peculiar" and "weird" because Mike quickly "discredited" _____. Mike also told _____ that he "wouldn't waste" his drugs on _____. _____ asked Mike if he thought _____ may have accidentally drank from his drink, which may have contained GHB. Mike then made a comment about alcohol powder being tasteless, but that someone would notice if he mixed it in a drink because you must stir it around _____ again thought the comments were peculiar. Mike made another comment about _____ appearance and that he would not "drug her to fuck her" (referring to _____) _____ explained that her husband listened in on this described phone conversation. _____ explained that after _____ made her Facebook post regarding drugged, at least seven different people have come forward with allegations of being drugged, and/or alleging inappropriate and/or criminal acts while at real estate events involving Mike Bjorkman.

_____ recalled that on September 15th, 2020, she was at home alone reading a book about the "unconsciousness mind." While reading, "the words started coming off the pages" and _____ began to shake. _____ then recalled additional incidents which occurred in Las Vegas. _____ additionally recalled that while in Las Vegas on Saturday evening, after she rolled over and Mike removed his hand from her pants, Mike pulled her out of the bed and he escorted her from the bedroom to a massage room, also inside the suite. Mike picked _____ up and placed her on a massage table, on her back. Mike took off _____ pants and he inserted his penis into her vagina (Sexual Assault). _____ explained she did not have full control of her body and she was unable to move. _____ still does not have full memory of the moments/incident, but she remembered having her hands over her head. Mike did not use a condom and _____ believes Mike ejaculated inside of her vagina. _____ explained that she cried while Mike committed the act and after Mike finished, he stood near _____ head and held her while she cried. _____ next recalled being in the living room in the suite. _____ explained she has been "reliving" the incident over and over since the memory came back to her.

_____ explained that when she first returned to Florida from Las Vegas, Mike kept telling her, "Don't tell Brady. Don't tell Brady." _____ initially assumed it was about all the partying and about his hand in her pants, but she now believes it was also about the sexual assault. _____ said that after she asked Mike about him possibly drugging _____ Mike gave _____ one of his clients to work for her, which is something he has never done before. _____ thought of this as Mike trying to bribe her, so she would not talk about the incidents.

_____ denied that she and Mike have ever been in any type of consensual sexual relationship and she has never consented to any sexual act with Mike. The evening of the sexual assault, _____ wore jean shorts, before and after the incident. _____ said she still has the same shorts and as of the time of our interview, they had not been washed. _____ said she also awoke wearing a black t-shirt, which she believed belonged to Mike. At the time of the interview _____ still had the shirt.

' '*S VEGAS METROPOLITAN POLICE DEPARTMENT'
## CONTINUATION

Event #: _____ 200900070704 _____

After _____ had the memory of being sexually assaulted by Mike, **she** told other people, including David, about the incident _____ said David encouraged her to lie during her interview with police, about him having drugs in his room. _____ also stated that she, Mike, David, _____ and _____ all took Ecstasy pills during the weekend. _____ said the pills were provided by David or Mike. Additionally, she explained that David has a drug addiction and he regularly uses MDMA, Ecstasy, and cocaine.

Since _____ made the allegations, she has received voice and text messages from Mike, regarding the allegations _____ agreed to provide me with the recordings and text messages. Mike told _____ that he would never hurt her and that maybe she feels guilty.

_____ has also received calls and messages from other people, asking her about the allegations and talking about different things that occurred. One of the people who called _____ was _____ (present the evening of the sexual assault). _____ told _____ that _____ gave Mike a blow job while in the shower and _____ was having "so much fun." _____ said she has no recollection of _____ claim.

_____ said she has been contacted by numerous people regarding additional allegations of drugging and sexual allegations involving Mike and David. _____ did not want to provide names of people she was contacted by, but she did say that another real estate agent, _____, wanted to her to share his name and contact information. _____ told _____ that he also believes he was drugged while at the event in Las Vegas.

### Text and Voice Messages from _____

Megan emailed me screen shots of text messages between her and "Mike" which she identified as being from before and after the incident. While discussing the trip to Las Vegas (Prior to the event and prior to them arriving in Las Vegas), Mike told _____ that he and David were sharing a room. _____ responded with "Ooh lord Jesus" and Mike replied, "After 11pm you need to go to bed. #rules". _____ told Mike that she was not drinking and not to worry about her and Mike replied, "Stay home lol".

On September 12 (almost two weeks after the incident and after _____ returned home to Florida), _____ sent Mike a text which read, "Morning sunshine!!! I sent you an invitation to our event on Sept 30 1-3pmEST like you asked. Do you know if you're available?"

On September 14, _____ text Mike, "Any word from _____ Last she told me is she had a busy weekend and was going to do paperwork this week."

On September 17, Mike text _____; "What is going on? Why is my name coming up?"; "Please help this stop. Dave is freaked out too"; "Can we talk. Can't ruin what we have over Guilt and mistakes. Please." And "I just can't believe this. Please stop. I love you and this is enough."

_____ lso forwarded me a voicemail left for her from Mike Bjorkman and I reviewed the voicemail. The voicemail is 34 seconds long. There is no date or time stamp provided with the recording. The following is a summary of the voicemail:

The voicemail sounds to be from a male. He says he talked to Dave, and he knows _____ may feel guilty. The male says he "pray to God" that _____ does not "try to take me down" and that he did not "rape" her. The male says he knows that _____ knows this and asks her to stop saying that he did. The male tells _____ that she knows in her heart that he did not hurt her, and he asks her to call him back so they can "talk it out."

REPORTS - 000012

**' '  VEGAS METROPOLITAN POLICE** DEPARTMENT
## CONTINUATION

Event #:     200900070704

### Collection of Clothing

⬛ resides in Flagler County, Florida. I contacted Flagler County Sheriff's Department Sergeant M, Miller. Sergeant Miller agreed to assist with the collection of the shorts ⬛ wore before and after the sexual assault, as well as Mike's t-shirt, and a DNA sample from ⬛

On November 20th, 2020, Sergeant Miller and Deputy Butler collected the requested items and the items were shipped to LVMPD.

On December 12th, 2020, I received a package from Flagler County Sheriff's Department, shipped via FedEx. The package contained (1) paper bag which was sealed with evidence tape and (1) tan envelope, also sealed with evidence tape. The paper bag had a tag which labeled the contents as "one black colored t-shirt" and "blue colored denim shorts." The envelope had a tag which labeled the contents as "two DNA buccal swabs from ⬛." I impounded the bag, envelope, and their contents into LVMPD Evidence, without opening the bags, without breaking the evidence tape seals, and without disturbing the contents. I photographed the received package, bags, seals, and labels, prior to impounding.

### Interview with

I was contacted, via phone, by a female who identified herself as ⬛ claimed that she was drugged while attending a real estate event in 2019, which was also attended by Mike Bjorkman. ⬛ agreed to provide a statement.

On October 1st, 2020, I conducted a phone interview with ⬛ (DOB ⬛ The interview was recorded for full, specific content. The following is a summary of the interview:

⬛ acknowledged the phone call was being recorded and consented to the call being recorded in its entirety.

⬛ lives in North Carolina and she works in real estate.

In early February 2019, ⬛ attended a Club Wealth Mastermind Real Estate event in Maui, Hi. The event was with a "small group" ( ⬛ estimated this as approximately 20-30 people) of co-workers who ⬛ trusted and knew well. One day during the trip the group went out on excursions and ⬛ stayed back at the hotel (Sheraton Maui), to just relax. While at the hotel, another friend from the group ( ⬛ ) bought ⬛ e a Mai Thai (alcoholic beverage) and ⬛ did not want to be rude so she accepted the drink. ⬛ took her time consuming the drink and eventually bought a second Mai Thai drink for her and ⬛ Over the course of the day ⬛ and her friend each drank their two drinks and eventually others from the group, who were all out on the excursions, began returning to the hotel (they all stayed at the same hotel). Someone from the group ordered drinks for everyone and ⬛ accepted the third drink. ⬛ said she only took a "sip" from the third drink and she had no recollection of drinking the remainder of the drink. ⬛ then did accept an Adderall (prescription pill) from another friend in the group (the friend has since passed away) and within minutes of taking the pill, ⬛ felt the effects of the pill. ⬛ described throwing up and slipping in and out of consciousness. ⬛ said she has very limited memory of the next approximate 3-4 hours. ⬛ recalled telling someone that she felt like she was going to die and they called for ambulance ⬛ was transported to Maui Hospital, where she was treated and released. While at the hospital, ⬛ tested positive for the drugs contained in an Adderall and tested negative for GHB.

'' 9 VEGAS METROPOLITAN POLICE DEPARTMEN'
## CONTINUATION

Event #:    200900070704

‎said another female friend of hers told her that she stayed with ‎, the entire time she was experiencing her sickness and memory loss, and while at the hospital. ‎said she does not believe she was sexually assaulted. ‎believes that she may have been drugged because she became so sick and had such large gaps of memory loss, after only drinking two full Mai Thai drinks, a sip of a third Mai Thai drink, and taking one Adderall pill. ‎also said that her blood alcohol level (BAC) was tested at 8:44 PM and at that time her BAC returned at .21. ‎estimated her last alcoholic drink that evening was at approximately 3:48 PM (she used a picture she took with a time stamp for this estimate). ‎explained that because she only drank two full drinks and had "sip" of a third drink during the lengthy time lapse (approximately 5 hours between 3:48 PM and 8:44 PM), she believes she may have been drugged with a substance called "alcohol powder." Aimee said she initially had a feeling that she was drugged by Mike Bjorkman or Brent ‎(two other real estate agents who attended the event and were with ‎that day and evening). ‎said Mike also did not go on the excursions and stayed at the hotel with her the day of the incident. ‎said she was sure she left her drinks unattended around them because she trusted them so much. ‎described she knew Mike well, but Mike was like "a big brother" to her, so she did not want to believe Mike would drug her. ‎described she and Brent have become very close since the event in Maui, and she does not believe Brent drugged her. ‎never confronted Mike about the allegation.

Recently, ‎learned about allegations of other people claiming that they were drugged while at various real estate events. In August 2020, ‎was contacted by ‎informed ‎about the incident in Las Vegas. ‎said she also heard about allegations made by ' ‎' and ‎, as well as by men possibly being drugged. When ‎and ‎spoke, they realized that Mike Bjorkman was present during both of their incidents.

Since the allegations have come out, Mike Bjorkman attempted to call ‎but she did not answer. Mike then sent her a message, saying that he hopes she does not think he "roofied" her. ‎did not respond. ‎agreed to send me screenshots of the missed call and of the message.

‎agreed to send me a copy of her medical report from Maui Hospital, as well as the picture she used to estimate her time frame from the day of her incident.

## Interview with

I was contacted, via phone, by a male who identified himself as ‎claimed that he may have been drugged while at the real estate event in Las Vegas, in August 2020. ‎agreed to provide a statement.

On 10/7/2020, I conducted a phone interview with ‎The interview was recorded for full, specific content. The following is a summary of the interview:

‎acknowledged the interview was being recorded and consented to the interview being recorded in its entirety.

‎a real estate broker in Southern California. He has worked in real estate since 2009, and he attended a real estate event held in Las Vegas, NV, in August 2020.

* *S VEGAS METROPOLITAN POLICE DEPARTMEN*
## CONTINUATION

Event #:    200900070704

was aware of the investigation and allegations, and he learned of the allegations though          Facebook post.          estimated the post was made approximately two weeks after the described real estate event.          also attended the same real estate event and she posted that she believed that she was drugged one evening during the weekend.          said he believed he also may have been drugged the same evening and after he learned the allegations were being investigated, he contacted me to report his experience.

said he drove to Las Vegas, from California, on August 28th, 2020. He stayed at the Wynn/Encore Hotel and Casino during his stay and he returned to California on August 30th, 2020. On the evening of the 28th, after the real estate event of the day, attended a gathering in hotel suites with several other event attendees. The gathering was held in adjoining suites reserved by Mike Bjorkman and David          at the Encore Hotel and Casino.          estimated that he stayed at the suites for a couple hours and while in the suites he had (2) drinks.          said David's girlfriend (he could not remember David's girlfriend's name) made him one of the drinks and he made himself the other. Both drinks were Tito's Vodka and soda water.          estimated there were 15-20 people in attendance at the gathering in the suites. After a couple hours, someone got a room/table in a night club and the group decided to leave the suites.          said just prior to him leaving to go to the club, I          (a friend of          and another attendee of the event) walked into the bedroom in David's suite, and David followed her into the bedroom shortly after. After David and          were in the bedroom, the door closed, and          heard a female make a noise which he described as a "yelp",          then left the room and when he did only David, Mike, and          stayed in the suites.          did not see the three of them again, that evening.

and his friend went to gamble and then to the club. While gambling and at the club,          had more drinks.          estimated that he had approximately six or seven drinks that evening, over the course of approximately six hours.          described himself as "a drinker" and explained "I can really, kinda, you know, hold my liquor, if you will."

The following day (Saturday)          spoke with his wife and described how "hammered" he was the previous evening.          recalled that while at dinner he was unable to "talk to the waiter" and he could not say what he wanted to say.          felt his actions and behaviors over the course of the evening did not match the amount he had to drink, and he did not understand how he was so affected by a relatively normal amount of drinks, for him.          also noticed that he did not feel "hungover" the following day, like he typically would have had he drank enough alcohol to make him as intoxicated as he felt.          said after that morning he did not think much more of it, until he saw Facebook post.

also specifically recalled that when he arrived in the suites, he noticed          was in David's bedroom (David's suite has a bedroom separate from the living area) and she was in the bed, lying under the covers          was awake, talking, and having conversations with people and the door to the room was open, but this stood out to          and he described it as "weird."          also recalled while in the suites he and          had a conversation with each other, and they talked for approximately 20-30 minutes. He recalled them talking about family, marriage, and other topics which he identified as "more than casual conversation."          said he has spoken with          since the event and she told him she has no memory of their lengthy conversation.

nas not spoken with Mike Bjorkman or David          since the described event.

* *S VEGAS METROPOLITAN POLICE DEPARTMENT*
## CONTINUATION

Event #:  200900070704

said that since these allegations have been made, numerous people have been coming forward to talk about their experiences at events with David and Mike.        said he would pass on my name and number to anybody who wanted to speak with me.

After        learned of the allegations and investigation, he decided to contact me to provide a statement.

### Interview with

I was contacted, via phone, by a female who identified herself as                    , claimed that she was drugged while attending a real estate event in Colorado, in 2018, which was also attended by Mike Bjorkman.        agreed to provide a statement.

On 10/14/2020, I conducted a phone interview with                    . The interview was recorded for full, specific content. The following is a summary of the interview:

        acknowledged the phone interview was being recorded.

        explained she is a real estate agent, and she is based out of Baton Rouge, Louisiana.        is friends with                    and Mike Bjorkman.        , knows them all through the real estate business and she has known them for several years.        has attended several real estate events with all parties.

        learned of the allegations and investigation, prior to contacting me.        said she learned of the allegations from multiple people within her circle of friends and co-workers, including a Facebook post by        After        first learned that allegations were made of Mike Bjorkman drugging and sexually assaulting women, she found it hard to believe.        recalled a time she was with Mike Bjorkman at a real estate event and she was drugged.        specifically recalled Mike Bjorkman telling her that she had been drugged, that she should stay with him, and that he would take care of her.        said she thought of Mike Bjorkman as her "savior" at the event and she never suspected him of drugging her or anyone else. As        learned of more and more allegations being made against Mike Bjorkman, she began to think that he may have been the person who drugged her.

Around April-May of 2018,        attended a real estate event in Denver, Colorado. On the Monday or Tuesday of the approximately week-long event        went to the bar with several other event attendees, including Mike Bjorkman        said she had one drink at the bar, and she could not recall who purchased the drink or who handed it to her. After drinking her single drink        stood up but was "woozy" and "shaky."        thought to herself "what the hell?" and she realized she had an extreme reaction to the single drink, which was out of the ordinary for her.        reaction to the single drink was so extreme that Mike Bjorkman took immediate notice and he told        that she had been "drugged", that she needed to eat, and for her not to leave with anybody except him.        has very little memory of the remainder of the evening and she later heard stories from her friends about them going to dinner and having conversations, which she also had no memory of.        does not believe she was sexually assaulted or anything else happened to her, but she has no memory of the evening.

        described she felt "uncomfortable" for the remainder of the trip and because of the incident she has limited herself from attending other events.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #:    200900070704

⬛⬛ explained that because of her obvious reaction to the one drink, because of her loss of memory from the described evening, because she can remember all other details about the event except from that evening after her single drink, and because the feeling was unlike any other drinking experience she ever had, she believes that she was drugged at the event in Denver, CO. Initially, ⬛⬛ believed Mike Bjorkman was there to protect her and take care of her but since the allegations continue to compound, and because Mike Bjorkman was with her when she was drugged, she is now not sure what she thinks. ⬛⬛ said she has since learned of other people being drugged at the same event and of others who claim they were victimized by Mike Bjorkman. ⬛⬛ said she would pass on my name and numbers to other who may be willing to speak.

⬛⬛ has not spoken with Mike Bjorkman since learning of the new allegations.

Interview with ⬛⬛

On 11/12/2020, I conducted a phone interview with ⬛⬛ The interview was recorded for full, specific content. The following is a summary of the interview:

⬛⬛ acknowledged the phone call was being recorded and consented to the call being recorded in its entirety.

⬛⬛ said he was aware of allegations made by ⬛⬛ and ⬛⬛ learned of the allegations after reading ⬛⬛ Facebook post. ⬛⬛ said he also believes he was drugged while attending the gathering at the Wynn, the same weekend ⬛⬛ claimed she was drugged.

⬛⬛ works in real estate and lives in Ohio. ⬛⬛ said he attended a real estate event held by EXP Realty, in Las Vegas, NV, around the end of August 2020. ⬛⬛ spent three nights in Las Vegas for the event and while in Las Vegas he stayed at the Wynn Hotel and Casino. Several other event attendees also stayed at the Wynn. Some of the real estate events and an after party were also held at the Wynn.

On the Friday evening of the event weekend, ⬛⬛ attended an after party held in a suite at the Wynn. ⬛⬛ believed the suite was shared by Mike Bjorkman and David ⬛⬛ knows both Mike Bjorkman and David through work. ⬛⬛ estimated that he stayed at the suite for less than two hours and while in the suite he drank approximately 2-3 vodka-based drinks. ⬛⬛ said the drinks were provided by the hosts and attendees were able to mix their own drinks. ⬛⬛ explained that after his last drink, "things became fuzzy." ⬛⬛ recalled leaving the suite to attend dinner and he has very little memory of the evening after leaving the suite. ⬛⬛ did recall one of the event hosts, Brent ⬛⬛ told him that he should go to bed. ⬛⬛ recalled not being able to hold his head up and feeling like he was extremely intoxicated and tired. ⬛⬛ explained that based on only having 2-3 drinks, he should not have felt as intoxicated as he did. ⬛⬛ had little memory of dinner and no memory of leaving dinner. ⬛⬛ next recalled waking up in his hotel suite, at approximately 1-2 am. He explained that he was not even able to make it to his bathroom and he began vomiting. Michael Henry explained he has never experienced this type of effect from drinking. The following day ⬛⬛ was able to make it to the morning event, but he felt so sick and hung over that he did not attend another event over the weekend. ⬛⬛ said he attempted to go to a gathering at the pool, late on Saturday, but he still felt so sick that he just returned to his room.

Page 16 of 27

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #:    200900070704

Michael [redacted] explained that he was initially "disappointed" in himself and thought he just had an extreme adverse reaction to the vodka drinks but after reading [redacted] Facebook post, he now believes he was unintentionally drugged while in the hotel suite, during the event get-together. Michael [redacted] did not actually observe any person with drugs and did not accuse any one person of putting something into one of his drinks, but based on his physical reaction, loss of memory, and being so sick the following day, he does not believe he was reacting to only drinking 2-3 drinks.

Mike Bjorkman and David [redacted] both attempted to contact Michael [redacted] after he told people about his experience. Michael [redacted] did not return either of their calls/texts.

Phone Interview with [redacted]

[redacted] provided me with a phone number for [redacted]. Per Accurint, phone number [redacted] returned to [redacted] I located a California Driver's License [redacted] for [redacted] {DOB [redacted]

I was able to contact [redacted] via phone, and she agreed to an interview.

On 11/18/2020, I conducted a phone interview with [redacted]}. The interview was recorded for full, specific content. The following is a summary of the interview:

[redacted] acknowledged the phone call was being recorded and consented to the call being recorded in its entirety.

[redacted] said she was aware of the allegations and investigation, prior to me contacting her. [redacted] said she heard that [redacted] alleged that she and Mike Bjorkman engaged in nonconsensual sexual activity. [redacted] said she learned of the allegations from her friend, David [redacted]

At the time of the interview, [redacted] resided in Pasadena, California. [redacted] confirmed that she was in Las Vegas around the end of August 2020, from a Friday evening until Monday evening. David and [redacted] (David's girlfriend) were in town for a real estate convention and they stayed at the Wynn Towers. [redacted] flew to Las Vegas to visit with David and [redacted] while they were in Las Vegas. Mike Bjorkman had an adjoining room/suite and [redacted] stayed with David, [redacted] and Mike, in their rooms. [redacted] estimated she has known David for approximately 8 years and [redacted] for approximately 2 years. [redacted] said she has met Mike Bjorkman prior to the described weekend but it was the first time she met [redacted]

[redacted] recalled that she arrived at the hotel in Las Vegas at approximately 10:30 PM, on Friday night. When [redacted] arrived, [redacted] was already in the rooms. [redacted] said she hung out with David, [redacted] Mike, and [redacted] in Mike and David's rooms. They all were drinking, and [redacted] said it was her birthday weekend. [redacted] said [redacted] brought "Molly" (a common name for MDMA or Ecstasy) and [redacted] took the Molly. [redacted] said she only saw [redacted] take the Molly while everyone else drank "White Claws". [redacted] described [redacted] as "a little bit unstable" and [redacted] was still upset about getting into a fight with her husband before she came on the trip. [redacted] said she made bubble bath for her, David, and [redacted] While [redacted] was in the tub with David and [redacted] they could see [redacted] and Mike in a shower together. Both Mike and [redacted] were nude, and they performed oral sex on each other. [redacted] said all acts appeared consensual, [redacted] did not appear to object, and they both seemed "enthusiastic." [redacted] estimated Mike and [redacted] were in the shower together for

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #: _____200900070704_____

approximately 15 – 30 minutes and then ▆▆▆▆ and ▆▆ got into the shower with them. David went to the bedroom and ▆▆ performed oral sex on ▆▆▆▆ while they were in the shower. ▆▆▆▆ again described the acts as consensual and they all eventually got out of the shower and got into David's bed together. ▆▆▆▆ explained that while in the bed they all discussed past stories of "sexual trauma" and ▆▆▆▆, described it as a "cuddle puddle" (she described this as them all lying in the bed and cuddling). ▆▆▆▆ thanked ▆▆▆▆ for allowing her to "experiment" on her and they discussed difficulties of being bisexual. They all eventually became tired, so Mike went to his bed and ▆▆▆▆ left. ▆▆▆▆ initially fell asleep with David and ▆▆ but she eventually got up and went to Mike's bed. ▆▆▆▆ said Mike was alone in his bed and ▆▆▆▆ was not there.

The following day, the real estate group went to the hotel pool for a get-together. ▆▆▆▆ told ▆▆ that she had "Molly for breakfast." ▆▆▆▆ described ▆▆ as "emotional" so ▆▆▆▆ initially stayed away from ▆▆▆▆. ▆▆ said ▆▆▆▆ ended up being in "good spirits" and ▆▆▆▆ remembered ▆▆ using "Facetime" to call her son. After the pool event a group of real estate agents went back to David and Mike's hotel suites. Other real estate convention attendees, including ▆▆ also went back to the suites. ▆▆▆▆ again said she was going to take Molly, but ▆▆ convinced ▆▆ not to take the Molly, due to her emotional state. ▆▆▆▆ said ▆▆ was initially offended or upset with her, but ▆▆ then realized that ▆▆ was right, and ▆▆ did not take the Molly. ▆▆ ordered room service and talked for a while. Mike and ▆▆ decided to leave the rooms to go walk the Las Vegas Strip and to gamble. After Mike and ▆▆ left the room, ▆▆▆▆ David, and ▆▆ went to bed. ▆▆▆▆ said she slept in Mike's bed and recalled waking up to Mike and ▆▆ in the bed, and ▆▆ was cuddling her. ▆▆▆▆ described herself as "half-asleep" and she was not sure what time that occurred.

When ▆▆▆▆ awoke the next morning, ▆▆ Mike, David, and ▆▆ were all in the living room area of the adjoining rooms. ▆▆ was still wearing the same clothing from the previous night, so ▆▆ left to go to her room to change. They all then met for brunch, and after brunch the same group went to go get piercings. All the girls' got piercings and ▆▆▆▆ paid for everyone's piercing. ▆▆ changed her return flight time to be able to stay with the group for longer. They all flew home later that day.

▆▆▆▆ denied seeing any GHB or any drugs over the course of the weekend, other than the Molly brought by ▆▆▆▆ ▆▆▆▆ said she did not have any memory gaps from the weekend, and she was never so intoxicated that she did not recall events. ▆▆▆▆ said she has never known Mike or David to have or use GHB.

▆▆▆▆ said she first learned about the allegation made by ▆▆ from ▆▆ After she learned of the allegation, ▆▆▆▆ called ▆▆ to ask her "What the heck is going on?" ▆▆ told ▆▆▆▆ that she did not want to talk with her and hung up on ▆▆.

▆▆▆▆ said she also spoke with Mike about the allegations, after she learned of them.

▆▆▆▆ said after I called her and asked her for an interview, she did call David and told him that she was going to speak with detectives. ▆▆▆▆ denied that David told her what to say.

**Phone Interview with** ▆▆▆▆

** *S. VEGAS METROPOLITAN POLICE DEPARTMEN**
## CONTINUATION

Event #: _____ 200900070704

On 11/19/2020, I conducted a phone interview with _____ {DOE _____ . The interview was recorded for full, specific content. The following is a summary of the interview:

_____ acknowledged the phone call was being recorded and consented to the call being recorded in its entirety.

_____ is the husband of _____ and they have been married for approximately 4 years. _____ and _____ live in Florida and work in real estate, with EXP Realty.

_____ said he was aware of the allegations and investigation.

On August 27th, 2020, _____ flew to Las Vegas, for a real estate convention. _____ did not attend the event and _____ stayed in Las Vegas until August 30th, when she returned home. While she was in Las Vegas, _____ stayed in contact with _____ and she never disclosed anything concerning while she was still in Las Vegas.

At the time of the real estate event, Mike Bjorkman and David _____ both worked with EXP Realty and they also attended the event in Las Vegas. _____ knew both Mike and David, through work.

While _____ was in Las Vegas, she did tell _____ that she had consensual, "physical relations" with _____ (David's girlfriend) and "Bounce House" (a female at the event who _____ has never met – during _____ interview, she also referred to _____ as "Bounce House") on Friday night.

Approximately one week after _____ returned from Las Vegas, _____ contacted _____. _____ told _____ that she thought she was drugged on the Friday night they were all in Las Vegas. After _____ talked with _____ and _____ discussed _____ allegation. Additional people also began to come forward and reported that they thought they were "under the influence of something" while in Las Vegas. Shortly after these disclosures, _____ also began to have "flash backs" and she remembered what happened to her the Saturday night/Sunday morning, she was in Las Vegas. _____ said that _____ eventually had memories of Mike's hands going into her pants while she was sleeping. _____ also recalled that Mike took her into another room where he pulled down _____ pants and "raped" her. _____ told _____ that she cried, and Mike then held her head and consoled her. _____ said he never confronted Mike about the allegations.

_____ said both he and _____ knew Mike Bjorkman and David _____ to use GHB.

_____ recalled an incident which took place in March 2020, when Mike and David where in Florida for a real estate event. Mike, David, and _____ (a female real estate agent in Florida) stopped by _____ house, to visit. While at the house they all ate and had some mixed drinks. _____ recalled David pulled out a small plastic energy drink bottle and he asked _____ if he wanted some "GHB." _____ declined David's offer and _____ did not actually see any person consume the GHB. _____ did described _____ as intoxicated and unable to drive, so much so that she had to remain at their home for a couple hours after Mike and David left.

_____ said he has also heard about David using GHB at other events.

' ' *S VEGAS METROPOLITAN POLICE DEPARTMENT"
## CONTINUATION

Event #:      200900070704

_____ also disclosed that other allegations have come out, regarding Mike and David drugging and/or sexually assaulting others, at various real estate events around the country.

Per _____ , as of the date of the interview Mike has been fired from EXP Realty but David was still working with the company.

_____ has not confronted Mike Bjorkman about the allegations.

### Phone Interview with

I was put into contact with EXP Real Estate Agent, _____ , regarding possibly being drugged by Mike Bjorkman and/or David

On January 15, 2021, I conducted a phone interview with _____ ). The phone conversation was recorded for full, specific content. The following is a summary of the interview:

_____ acknowledged the phone interview was being recorded and consented to the conversation being recorded in its entirety.

_____ was aware of the investigation and allegations, prior to our contact.

_____ said she is a licensed attorney and real estate broker, and she resides in Minnesota. _____ joined EXP Realty in October 2019 and she was sponsored into EXP by Mike Bjorkman.

_____ was introduced to Mike Bjorkman and David _____ around April 2019, when she attended a real estate event in La Jolla, CA. _____ explained the event was held in a large beach house in La Jolla, and many of the event attendees also stayed at the house. _____ did not actually stay at the beach house overnight, but she went back and forth between the beach house and her hotel room, for events. _____ described that when she first arrived in La Jolla and went to the beach house, many of the attendees were already drinking and intoxicated. _____ said she witnessed excessive drinking and drug usage by attendees (she witnessed people consuming marijuana "gummies" and was told that others were using cocaine), specifically recalled the first time she met Mike Bjorkman, he was "incredibly lewd" toward her. _____ said that Mike told her he "wanted to fuck me in the face." _____ explained she dismissed the comment due to Mike being so intoxicated and she never confronted Mike about the comment and never told her husband what Mike said to her. _____ recalled while at the beach house she was offered mixed drinks by both David _____ and Mike Bjorkman, but she did not accept drinks from either of them. _____ explained that at the time she did not think much about being offered the drinks and she declined because she rarely consumes alcohol, and she was traveling without her husband.

The following week, _____ drove to Beverly Hills to attend another real estate event, this time along with her husband. Mike Bjorkman also attended this event and while at this event, _____ met Mike's business partner, _____ explained she and her husband did not have much interaction with Mike during this event, other than Mike talking with them about EXP Realty _____ described that when she left the event that week, she was beginning to become friends with Mike, and he seemed to be "real estate focused."

_____ next face-to-face interaction with Mike and David occurred when she and her husband attended another real estate event, around May-June 2019, in Coronado, CA. The day before the scheduled event, Mike took _____ and her husband to brunch. _____ had one

' ' S VEGAS METROPOLITAN POLICE DEPARTMEN'

# CONTINUATION

Event #:    200900070704

glass of wine with brunch and Mike invited ____ and husband to the company suite, to further discuss joining EXP Realty. They all went to the suite and Brannon ____ another EXP Realtor, was already at the suite. While in the suite ____ and her husband were each given a mixed drink. David ____ also showed up to the suite but ____ was not sure exactly when David arrived. ____ has memory of only drinking the one mixed drink and has very little memory of the remainder of the day. ____ was not sure how long they were in the suite and cannot remember any details of the afternoon. ____ does have a limited memory of her and Mike leaving the suite together and they met with other event attendees at an outdoor patio. When ____ and Mike left the suite, ____ husband and David remained at the suite. ____ estimated that by approximately 3:30 – 4 PM, she and her husband passed out in her hotel room and she did not wake up until the following morning, at approximately 3 AM. When ____ awoke, she was fully clothed, had not brushed her teeth, and had numerous missed messages on her phone. ____ said she and her husband slept through their scheduled dinner and events from the previous night. ____ described she and her husband were extremely ill the following day and they both have large memory gaps. ____ explained she did not believe anything sexual happened to her but based on the way she felt and how she was told she acted, she believes she and her husband may have been drugged. ____ explained her behavior was "out of character" and people told her that she behaved "funny" and "out of control drunk." ____ explained that she and her husband were unable to account for several hours of the day, and they had no idea what they drank or how they behaved.

In October 2019, ____ and her real estate brokerage officially joined EXP Realty and she was sponsored into the company under Mike Bjorkman.

In November 2019, after ____ joined EXP Realty, she attended another real estate event in Napa, CA. ____ husband did not attend this event and ____ shared a hotel room with her friend, ____ When ____ rst arrived at the event hotel, Mike Bjorkman was already at the hotel and he appeared to already be intoxicated. ____ described Mike started "hanging" on her by putting his "full weight" onto her, he tried to kiss her , ____ pushed him away), he continually pulled at her, and he continually tried to kiss her hand and arms. Mike's behavior was witnessed by others, including event organizers, Oliver ____ and Sam ____ Oliver and Sam had Mike move away from ____ and to a different table. Oliver stayed with ____ for the remainder of the evening and ____ again "chalked it up" to Mike being overly intoxicated. ____ described Mike's behavior was "embarrassing" and "annoying."

In December 2019, ____ traveled to Puerto Rico where she met with Mike Bjorkman and David ____ They were in Puerto Rico to visit Gene ____ a high-level employee with EXP Realty; ____ further explained that David's EXP Realty sponsor, Rosie ____, was also supposed to join them in Puerto Rico but Rosie cancelled her trip while ____ was already on her way to Puerto Rico. While in Puerto Rico, ____, Mike, and David all stayed in a "VRBO" (Vacation Rental Homes) together. ____ explained that neither Mike nor David inappropriately touched her or attempted to do anything to her while in Puerto Rico, but they did offer her mixed drinks (she never accepted) and they did have "uncomfortable conversations" with her. ____ described the "uncomfortable conversations" as being Mike asking ____ about her and her husband's sex life and asking if they watched pornography. David told ____ that he and his girlfriend invite other women into their relationship and that humans are not supposed to be monogamous. ____ explained she and David have opposing views on the subject and while discussing their stances, David became upset with her. ____ ended the evening when David became upset and said she went and locked herself in her room. ____ explained that each night in Puerto Rico she would lock herself in her bedroom and Facetime with her husband until she fell asleep. Mike and David would act like they were trying to get into her room and wiggle the door handle, but they never actually entered her

**¹ ^S VEGAS METROPOLITAN POLICE DEPARTMENT**
# CONTINUATION

Event #:    200900070704

room.    explained that due to the "uncomfortable conversations" Mike and David had with her and due to Mike and David's behavior, she left Puerto Rico early and she requested a ride to the airport from

In February 2020, Mike and David traveled to Minnesota for business purposes and to visit with    and her husband. During the trip, David got into a "bar fight" with another real estate agent, and    got into an argument with Mike and David. After Mike and David left Minnesota,    contacted EXP and removed herself from Mike and David's team, as she did not want to be associated with them any longer.    explained she then "went radio silent" and limited her communication with Mike, David, and people associated with them.

    explained she then stopped receiving invitations to EXP events and she believes she was referred to as the "mom" of the group.    said she was not invited to the event in Las Vegas, in August 2020, and she believes it was because Mike and David did not want "nosing into their nightlife."

After allegations in Las Vegas were made against Mike and David,    was contacted by numerous people, asking if Mike ever did anything to her, and checking on her.

    further explained that while in Coronado, CA, she and her husband initially believed she they just drank too much, and they were embarrassed by their behavior. After they learned about the recent allegations involving Mike Bjorkman and David    , and their pattern of behavior,    now questions what she and her husband drank and felt that she needed to report the incidents.

    said heard that many of the women who made allegations against Mike and David have been contacted by both Mike and David. Neither Mike nor David have had any contact with    since the recent allegations were made.

## Interview with

On January 23, 2021, I conducted a phone interview with    . The interview was recorded for full, specific content. The following is summary of the interview:

    acknowledged the interview was being recorded and consented to the call being recorded in its entirety.

    said he was aware of the investigation and the allegations, prior to my contacting him.

    works for EXP Realty and he has known    , Mike Bjorkman, and David    for several years.    used to work for    : when    owned his own Real Estate brokerage.    was sponsored into EXP Realty by Mike Bjorkman.

In summer, 2020,    attended a real estate event held in Las Vegas. All referenced parties attended the same event. Approximately 2-3 weeks after the Las Vegas real estate event,    disclosed being drugged while in Las Vegas    told    t that she believed the drugging occurred while in Mike and David's hotel suites.    could not recall specifically which night    said the incident occurred and he did not believe he saw    , the evening in question.    did not have any memory of witnessing    appearing overly intoxicated or out of control, the identified weekend.    said he was "blown away" by    allegation.    explained that    was his invited guest to the Las Vegas event, and he was trying to recruit    to EXP Realty, at that time.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #:    200900070704

recalled that during the Las Vegas event, David and Mike Bjorkman held events in their hotel suites. During the suite events, people were drinking and socializing, and they broke off from there.        did not witness and drug usage while in the suites.        also drank alcoholic based beverages while in the suites and he never felt that he had been drugged.        could not recall what he specifically drank while in the suites, but he usually drinks vodka-based drinks.

After        came forward with her allegation,        heard "gossip" about other people claiming to also have been drugged while in Mike and David's suite. When asked for specifics or names,        scribed the rumors as "speculation" and he did not want to provide more information regarding additional allegations.        explained there was a "Facebook announcement" made by        and after the "announcement" he received calls from other people regarding the event in Las Vegas and possibly being drugged.        explained he did not understand why people were coming out with allegations weeks after the event, and not the day after the event, or even the following weekend.        said he has a problem with the delayed disclosures because it gave people time to make up stories.

said he also learned that        made an allegation of sexual assault, against Mike Bjorkman.        has not spoken with        since he heard about the allegation.        never spoke with        directly about the allegations.

I        said he did speak with Mike Bjorkman and David, after learning about the allegations. Mike completely denied the allegation of sexual assault, made by

said he had no knowledge of Mike Bjorkman or David ever consuming drugs or giving drugs to other people.        said he has been intoxicated with David and Mike, multiple times, while they all were intoxicated, and he has never witnessed any drug usage. Mike said he has traveled with Mike and David and shared hotel rooms with Mike and David, and he has never witnessed them act in the manner they are being accused of.

explained that since the allegations have been made, he does not know what to believe and he has been trying to distance himself from all those involved.

### Wynn/Encore Hotel and Casinos

I met with Wynn/Encore Corporate Security Investigator James Pendleton. The following information was provided:

Per hotel reservation records,        reserved room        at the Wynn Hotel and Casino (3131 S. Las Vegas Blvd., Las Vegas, NV 89109), from August 27th, 2020 – August 30th, 2020.

Per hotel reservation records, I        eserved room        at the Wynn Hotel and Casino, from August 27th, 2020 – August 30th, 2020.

Per hotel reservation records, David        and Mike Bjorkman reserved rooms i        and        at the Wynn Hotel and Casino, from August 27th, 2020 – August 30th, 2020. Per the reservation notes, Mike Bjorkman and David        shared room 61107.

I was provided with "reservation comments", regarding David's room. The comments read:

REPORTS - 000024

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #     200900070704

"Guest attempted to bring two carts full of alcohol and MJ to room. Guest left items with bellman.
3- cases white claw
1-large case coors light
6- pinot grigo
4- preseco
6- rose
6- white wine
5- large titos vodka
1- large fireball

5- cases of water
4- mixers
3- store bag of chips
   ----------1 large bag of MJ--------
   HM Nancy has been advised.
//vremington
UPDATE: HM spoke with guest in regards to items at the Bell Desk, and agreed to have 1 fireball, 1 vodka, 1 coors light pack and 6 wines sent to the room at this time 8/27 @5:30 pm. Guest was informed on marijuana policy and opted to take this off property. Guest was informed he will be able to request more items tomorrow 8/28. //NBarreto"

### Follow-up with ▮▮▮▮▮▮

On 11/19/2020, I spoke with ▮▮▮▮ via phone.

I asked ▮▮▮▮ f she recalled having any sexual encounters with Mike Bjorkman, on the Friday night of the event weekend in Las Vegas ▮▮▮▮ reported that Mike and ▮▮▮▮ showered together and performed oral sex on each other, while ▮▮▮▮▮▮▮▮, and David viewed) ▮▮▮▮ said she was also told about the incident, but she had no memory of the incident, and if it occurred, she did not consent to the acts.

### David ▮▮▮▮

I was provided with a phone number for David ▮▮▮▮ of ▮▮▮▮▮▮▮▮ I was informed that David works for EXP Realty, in Las Vegas, NV, and he resides in Las Vegas, NV.

I was able to locate a Nevada Driver's License for David; Identification Number ▮▮▮▮. The ID provided a Date of Birth for David of ▮▮▮▮ and an address of ;▮▮▮▮▮▮▮▮

Investigative resources revealed Verizon Cell Co. as the provider for phone number ▮▮▮▮ The identified phone number returned to a subscriber of David ▮▮▮▮

On 12/4/2020, Sergeant Parker (P# 7463) and I responded to 2700 S. Las Vegas Blvd, Unit # 1110, Las Vegas, NV 89109 to try and contact David. Per security, David ▮▮▮▮ showed as the resident of unit 1110 and they had a phone number of ▮▮▮▮, on file. There was no answer at the door. I then called ▮▮▮▮ and contacted a male who identified himself as David ▮▮▮▮ David said he believed he knew why I was calling and agreed to meet for an interview on 12/10/2020, at my office. Prior to his scheduled interview, I contacted David to confirm our appointment. David informed me he was busy and we would have to schedule for another day. While attempting to reschedule our

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #: __200900070704__

interview, David informed me that he was not going to meet with me and would not provide a statement.

### David _____ Facebook Account

David _____ Facebook page has been identified as _____ with a vanity name of "David _____ David's page is set as public and a review of his account shows that he posts to his account and page, on a regular basis, and often multiple times daily. David regularly posts and supports EXP Reality on his Facebook account and often posts his locations.

### Search Warrant for _____ Facebook Post

On January 6, 2021, I authored an Application and Affidavit for Search Warrant, Search Warrant and Sealing Order requesting the authority to collect the original posting on Facebook from _____ as well as all comments on the posting. The Application and Affidavit, Search Warrant, and Sealing Order were reviewed, approved, and signed by the Honorable Judge Cristina Silva.

On January 6, 2021, I submitted the signed Search Warrant, Sealing Order, and Search Warrant Return to Facebook; RE: Facebook Case _____

### Search Warrant for David _____ Cell Phone

On January 6, 2021, I authored an Application and Affidavit for Search Warrant, Search Warrant, and Sealing Order requesting the authority to collect and seize David _____ cellular phone, associated with phone number _____ The Application and Affidavit, Search Warrant, and Sealing Order were reviewed, approved, and signed by the Honorable Judge Cristina Silva.

On January 14, 2021, I responded to David's residence; _____ Parked in the parking garage was a 2013 Lexus, 4-door sedan, bearing Nevada License Plate _____ Per Nevada DMV, the vehicle showed registered to David _____ {DOE _____

I, along with LVMPD Patrol Officer V. Banos {P# 17572}, Detective Friess {P# 12873}, and Sergeant Parker {P# 7463} used a ruse and asked David to come down to his vehicle. At approximately 11:15 AM, David _____ was observed walking to his vehicle. I approached David, introduced myself, and explained that I obtained a Search Warrant, authorizing the collection and seizure of his cellular phone {Phone number _____ . David provided me with his Apple iPhone, cellular phone, and he confirmed his phone number as _____ David provided me with his phone passcode of _____ which was then used to open and active the referenced cellular phone, also confirming that the phone was David's personal cellular phone. David was provided with a copy of the Search Warrant, Sealing Order, and Search Warrant Return. Also, while in David's presence, the cellular phone was placed into "Airplane Mode" and powered off. This full interaction was captured and recorded with Officer Banos' LVMPD issued body camera.

### Digital Forensic Laboratory Search Warrant- David _____ Seized Cellular Phone

The cellular phone was taken to LVMPD Headquarters {400 S. Martin L. King Blvd., Las Vegas, NV 89106} and placed into a LVMPD Temporary Evidence Locker, to await the submittal of a subsequent Search Warrant, requesting the authority to conduct a full forensic review of the cellular phone.

On January 14, 2021, I authored an Application and Affidavit for Search Warrant, Search Warrant, and Sealing Order, requesting the authority for a full forensic review of David's seized cellular phone. The Application and Affidavit, Search Warrant, and Sealing Order were all reviewed, approved, and signed by the Honorable Judge Ronald Israel.

Page 25 of 27

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #: _____ 200900070704

On January 15, 2021, I delivered the Search Warrant, Digital Forensic Laboratory Request, and David's seized cellular phone to Digital Forensics Laboratory (DFL) Supervisor Z. Johnson {P# 6527}.

On January 21, 2021, I was provided with the digital phone extraction and began my review of the provided material. Due to the excessive of stored/saved items, it is not realistic to fully review every single picture, message, video, contact, piece of stored data, etc. I reviewed much of the provided material with direct searches, keyword searches, timeframe searches, and targeted searches. I will complete a supplemental Officer's Report, providing additional details regarding the cell phone review.

Due to the amount of data, the following is a very basic overview of David _____ cellular phone digital contents and the amount of stored data:

### General Information

- The cellular phone showed to have (2) assigned Applie IDs: _____ and _____

- The phone showed to have an assigned phone number of _____

- The phone showed to have 39,940 stored contacts.

- The phone showed to have 1,366 installed applications.

- The phone showed to have 52,378 log entries.

- The phone showed to have 42 recordings.

- The phone showed to have 1,933 searched items.

- The phone showed to have 57 voicemails.

- The phone showed to have 9,802 audio files.

- The phone showed to have 4,050 documents.

- The phone showed to have 396,517 images.

- The phone showed to have 10,476 videos.

- The phone showed to have 4,050 documents.

- The phone showed to have 1,368 social media files.

REPORTS - 000027

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #:    200900070704

Michael Bjorkman

On 9/24/2020, I received a voicemail from Attorney RJ Manuelian, with the Manuelian Law Firm, in Los Angeles, CA. Mr. Manuelian informed me that he was hired to represent Michael Bjorkman, and he requested that I contact him. I contacted Mr. Manuelian, via phone, and he agreed to email me a Letter of Representation.

On September 25th, 2020, I received a letter indicating that Mr. Manuelain had been retained by "Mark" Bjorkman. I spoke with Mr. Manuelian, confirmed he was hired to represent Michael Bjorkman, and informed him the investigation was only beginning and ongoing, and I was not yet ready to discuss the details of the allegations with him or Mr. Bjorkman. We agreed to speak later.

On January 29, 2021, I spoke with Mr. Manuelian and he informed me his client would not be speaking with me and would not provide a statement. Mr. Manuelian said his client would cooperate, should law enforcement obtain Arrest Warrants and/or Search Warrants for Mike Bjorkman.

Wherefore, Declarant prays that a Warrant of Arrest be issued for suspect Michael Bjorkman on the charge(s) of Sexual Assault (2 counts)

I declare under penalty of perjury under the law of the State of Nevada that the foregoing is true and correct.

Executed on this 5th day of February, 2021.

DECLARANT: _____

WITNESS: _____ 1407L          DATE:  2/5/2021

REPORTS - 000028

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT E**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FABIOLA ACEVEDO, JANE DOE 1, JANE DOE 2, JANE DOE 3, and JOHN DOE 1,<br><br>                    Plaintiffs,<br><br>v.<br><br>EXP REALTY, LLC; EXP WORLD HOLDINGS, INC.; MICHAEL L. BJORKMAN; DAVID S. GOLDEN; GLENN SANFORD; BRENT GOVE; and DOES 1–10,<br><br>                    Defendants. | Case No. 2:23-cv-01304-AB-AGR<br><br><br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT |

## I.  INTRODUCTION

Before the Court are four Motions to Dismiss Plaintiffs FABIOLA ACEVEDO, JANE DOE 1, JANE DOE 2, JANE DOE 3, and JOHN DOE's ("Plaintiffs") First Amended Complaint. (Dkt. 30). The motions were filed separately by Defendants EXP REALTY, LLC, EXP WORLD HOLDINGS, INC., and GLENN SANFORD (Dkt. 41-1); Defendant BRENT GOVE (Dkt. 63); Defendant MICHAEL L. BJORKMAN (Dkt. 77-1); and Defendant DAVID S. GOLDEN (Dkt. 88) ("Defendants"). Plaintiffs oppose

1.

Defendants' motions, (Dkts. 48, 71, 82, 101), and Defendants filed Replies. (Dkts. 55, 74, 89, 104). The Court held oral arguments on June 30, 2023, regarding Defendants eXp Realty, Sanford and Gove's motions, and on August 18, 2023, regarding Defendants Bjorkman and Golden's motions. For the reasons stated below, the Court **GRANTS in part and DENIES in part** Defendants' motions to dismiss.

## II. BACKGROUND

This case concerns allegations of a large real estate corporation's "longstanding culture" of allowing its most influential male agents to sexually assault female agents and then "silenc[e] those whose accounts of sexual harassment and assault would impact profit," in violation of the Trafficking Victims Protection Reauthorization Act. (Dkt. 30, "FAC" ¶¶ 1–2). In sum, Plaintiffs' First Amended Complaint alleges: (1) Defendants Bjorkman and Golden engaged in an ongoing venture to entice Plaintiffs Fabiola Acevedo ("Acevedo"), Jane Doe 1, Jane Doe 2 and Jane Doe 3 (collectively, "Plaintiffs" or "the female Plaintiffs") to travel to recruitment events with the promise of career advancement, knowing that they would use illicit drugs to cause the women to engage in a sex act; (2) Defendants eXp Realty, LLC, eXp World Holdings, Inc. (collectively, "eXp" or "eXp Realty"), Glenn Sanford, and Brent Gove knew of and ignored this conduct, so they could financially benefit from Bjorkman and Golden's recruiting activities; and (3) because of eXp's business model, Defendants continue to financially benefit and Plaintiffs continue to suffer damages. (*Id.*). Specifically, Plaintiffs allege the following.

### 1. eXp Realty

eXp Realty is a multi-level, "cloud-based," global real estate company that is publicly traded on the NASDAQ. (*Id.* ¶ 19). It is the "fastest growing residential real estate brokerage" and "largest independent brokerage on the planet." (*Id.* ¶¶ 20–21). eXp Realty has two "intricately intertwined" revenue streams: (1) the sale of residential and commercial properties which creates a Revenue Share Program ("RSP" or "the Pyramid"); and (2) the recruitment of agents to eXp. (*Id.* ¶ 22). The Pyramid operates

as follows.

eXp agents and brokers receive monthly and annual residual overrides on the gross commission generated by agents or brokers they have recruited to eXp. (*Id.* ¶ 23). eXp agents are automatically enrolled in the RSP, and their revenue share is based on the number of "Front Line Qualifying Active" ("FLQA") agents they have recruited to the company. (*Id.* ¶¶ 23, 25). FLQA agents are those who have met a certain sales transaction volume. (*Id.* ¶ 23). eXp's business model—termed "Agent Attraction"— incentivizes its agents to become "Sponsor Agents" whom eXp trains to entice "Recruited Agents" to join the company. (*Id.* ¶¶ 25–26). The higher a Sponsor Agent is placed in the Pyramid (the more tiers of Recruited Agents in their "downline") the more money eXp pays that Sponsor Agent. (*Id.* ¶ 27). For example, agents receive 3.8% from agents that are two tiers below them and only 3.5% from agents that are one tier below them. (*Id.* ¶ 27). eXp receives a direct financial benefit every time a Sponsor Agent recruits an agent including, but not limited to, various fees the Recruited Agent pays to the company. (*Id.* ¶¶ 30–31). To qualify for RSP vesting, an agent must be affiliated with eXp for at least 36 months, but a "Vested Participant" continues to share in the income of their Recruited Agents after they disassociate from eXp. (*Id.* ¶ 24). Sponsor Agents also receive a stock award every time one of their Recruited Agents sells a property. (*Id.* ¶ 28). Top Sponsor Agents are "Influencers" who invite prospective and current eXp agents to social networking events for the purpose of recruiting new agents and retaining current agents. (*Id.* ¶ 29). An Influencer's role is to recruit as many agents as possible to keep the Pyramid from collapsing. (*Id.* ¶ 32).

This case concerns the conduct of certain eXp Realty Influencers and members of eXp Realty's executive "Leadership Team" related to the recruitment of the female Plaintiffs. Defendant Michael L. Bjorkman ("Bjorkman") is a former eXp agent and Influencer, and current RSP Vested Participant. (*Id.* ¶ 14). Defendant David S. Golden ("Golden") is a current eXp Realty agent, Influencer and Vested Participant. (*Id.* ¶ 15). Golden recruited Bjorkman to eXp Realty in August of 2018, Golden is Bjorkman's

Sponsor Agent, and Bjorkman is in Golden's downline. (*Id.* ¶¶ 15, 35, 37, 48). Prior to joining eXp, Bjorkman and Golden worked together at Remax. (*Id.* ¶ 36). Both Golden and Bjorkman were top Influencers, known for generating a substantial part of their income from recruitment. (*Id.* ¶¶ 38, 59, 205). According to Bjorkman's "eXp Agent Attraction Boot Camp" video, "your net worth directly relates to your network." (*Id.* ¶ 39). Plaintiffs allege Bjorkman and Golden built their network by making recruits feel like "family" in order to exploit their trust. (*Id.* ¶¶ 39–40, 60). Golden and/or Bjorkman recruited the female Plaintiffs and, with the exception of Jane Doe 2, all were in the Golden-Bjorkman downline with Bjorkman as their Sponsor Agent. (*Id.* ¶¶ 102, 111, 148).

Defendant Brent Gove ("Gove") is a current eXp agent, Influencer and RSP Vested Participant. (*Id.* ¶ 17). He is one of eXp's top recruiters and Golden and Bjorkman are two of 20,000 agents in Gove's downline. (*Id.* ¶¶ 17, 69). All female Plaintiffs were in Gove's downline. (*Id.* ¶¶ 102, 111, 148). Defendant Glenn Sanford ("Sanford") is the Founder and former CEO of eXp Realty. (*Id.* ¶¶ 14–16). As eXp's "Agent #1" he sits at the top of the Pyramid and every eXp agent is in his downline. (*Id.* ¶ 72). All Defendants previously worked together at Keller Williams. (*Id.* ¶ 250; Dkt. 48, "Sanford Opp." at 18).[1] At all relevant times, eXp's Leadership Team included, but was not limited to, Defendant Sanford, Jason Gesing, Jeff Whiteside, Jim Bramble, David Conrad, Michael Valdez, Courtney Keating, and Corey Haggard. (FAC ¶ 34).

Bjorkman and Golden regularly sponsored eXp recruitment events, a key part of which was to create the image of "success" and "being surrounded by beautiful women whom they could sexually exploit." (*Id.* ¶ 65). Plaintiffs allege Bjorkman and Golden enticed them to attend these events as part of a scheme to drug and sexually assault

---

[1] When citing to the parties' briefs, the Court refers to the page numbers at the upper right corner of each document and not the pagination at the bottom of the page.

them. (*Id.* ¶ 2). Plaintiffs allege Sanford, Gove and eXp Realty knew of, ignored and attempted to cover up this conduct so they could continue to financially benefit from Golden and Bjorkman's contribution to the Pyramid. (*Id.* ¶¶ 2, 70, 81–83, 176).

### 2. Fabiola Acevedo

Defendant Golden began recruiting Plaintiff Acevedo at a real estate networking event in early 2018. (*Id.* ¶ 89). Acevedo trusted Golden based on their long-term platonic friendship and Golden's reputation as a leader in the real estate business. (*Id.* ¶¶ 98, 90–91). After many conversations, she decided to join eXp with Golden as her Sponsor Agent, and a contract was sent to her with those terms. (*Id.* ¶¶ 92–93). Shortly thereafter, Golden recalled the contract and convinced Acevedo to name Bjorkman as her Sponsor Agent by telling her it would benefit her career to have more Sponsor Agents in her upline. (*Id.* ¶ 93).

Defendant Golden then explained to Acevedo that Bjorkman had purchased two tickets to a real estate networking event hosted by the Closing Table in Pelican Hill, California, between July 20 and July 22, 2018, and that it would be "good for her career" to attend. (*Id.* ¶ 94). Acevedo traveled from her home in Florida to California to be Bjorkman's guest, but was told there were no vacancies upon her arrival at the hotel. (*Id.* ¶¶ 97, 179, 193). Golden told her to stay in Bjorkman's hotel room and that she could trust him because they were "family." (*Id.* ¶ 97). Because she trusted Golden, Acevedo agreed. (*Id.* ¶ 97). That evening, Acevedo had a single cocktail with Bjorkman and others at the hotel bar. (*Id.* ¶ 99). She remembers nothing until the next morning when she woke up disoriented and naked in Bjorkman's hotel room. (*Id.* ¶¶ 99, 180). Bjorkman and another woman were naked in the other bed and a clothed man was on the floor. (*Id.* ¶ 99). Acevedo ran to the bathroom and Bjorkman followed her, exposing himself and attempting to engage her in sexual contact. (*Id.* ¶¶ 100, 181).

While Acevedo was at the Closing Table event, eXp sent her an offer to join the company with Bjorkman as her Sponsor Agent. (*Id.* ¶ 101). She signed the agreement on July 23, 2018, placing her in the Gove-Golden-Bjorkman downline. (*Id.* ¶¶ 101–02,

182). Acevedo is currently a licensed real estate agent at eXp Realty. (*Id.* ¶ 7). She alleges, as result of her trauma, she was unable to work as a real estate agent but continued to pay all fees required by Defendants. (*Id.* ¶ 103).

### 3. Jane Doe 1

Jane Doe 1 is a real estate agent and former business partner of Bjorkman's, whom he recruited to join eXp Realty. (*Id.* ¶¶ 107–08).[2] Like Acevedo, Jane Doe 1 was in the Gove-Golden-Bjorkman downline. (*Id.* ¶ 111). Initially Jane Doe 1 refused to join eXp based on Golden's reputation as a "dirtbag" and "rapist" and her reluctance to have him in her upline. (*Id.* ¶¶ 108–109). After "incessant recruiting efforts," Jane Doe 1 agreed to name Bjorkman as her Sponsor Agent, in return for a 50/50 share in all revenue share, stock and financial gain from eXp.  (*Id.* ¶ 110).

Shortly thereafter, on April 11, 2019, Jane Doe 1 attended an event hosted by the Closing Table in Beverly Hills, California, for the purpose of learning and recruiting more real estate agents to join eXp Realty. (*Id.* ¶ 112). At dinner with Bjorkman and other attendees Jane Doe 1 had one glass of wine, followed by one drink at the hotel bar. (*Id.* ¶¶ 113–14). Later that evening, one of the event hosts invited attendees to his hotel room and Jane Doe 1 felt professionally obligated to attend. (*Id.* ¶ 115). When she arrived, Bjorkman handed her a drink and she quickly "blacked out." (*Id.* ¶ 116–17). She woke up the next day naked in her hotel room, which was in disarray. (*Id.* ¶117). She felt sick, had a "spotty memory" and experienced pain. (*Id.* ¶¶ 117–18). She went to the bathroom and saw blood from her vagina. (*Id.* ¶ 118). When Bjorkman called her soon after, she got "flashes of memories" and accused him of having sex with her, which he denied. (*Id.* ¶¶ 119–120). A few days later, Bjorkman sent Jane Doe 1 a video of her "hallucinating" on the night of the event to "prove" she had been drunk. (*Id.* ¶¶ 121,

---

[2] Based on Plaintiffs' statements made in court on June 30, 2023, Bjorkman recruited Jane Doe 1 to join eXp Realty in April of 2019. (*Id.* ¶¶

185). Jane Doe 1 has no memory of the events depicted, despite having consumed only three drinks that evening. (*Id.* ¶¶ 121, 185).

On April 27, 2019, Jane Doe 1 and Bjorkman attended another networking and recruiting event in San Antonio, Texas, where she continued to ask if he had assaulted her at the previous event. (*Id.* ¶¶ 123–24). Bjorkman eventually admitted that they did have sex but he hadn't wanted to "embarrass" her because she had been "fucked up" and "all over him." (*Id.*). Bjorkman did not admit to drugging Jane Doe 1. (*Id.* ¶¶ 124, 184). Jane Doe 1 decided she would sever ties with eXp as soon as financially possible, (*id.* ¶¶ 125, 127), though she continues to be a licensed eXp real estate agent. (*Id.* ¶ 8). She alleges extreme emotional distress, PTSD, and lost business as a result of the assault. (*Id.* ¶ 128).

**4. Jane Doe 2**

Jane Doe 2 was invited as a prospective recruit to attend an eXp event at the Wynn and Encore Hotel and Casino in Las Vegas, Nevada, from August 27, 2020 to August 30, 2020 ("the Las Vegas event"). (*Id.* ¶¶ 131, 186). The event was hosted by Golden and Bjorkman, and Jane Doe 2 traveled from California to attend. (*Id.* ¶¶ 131, 186, 198).

On Thursday, August 27, Jane Doe 2 attended a get-together at Golden and Bjorkman's pool cabana. (*Id.* ¶ 145). Afterwards, Bjorkman asked Jane Doe 2 to stay behind to have a cigarette and then invited her to his hotel suite where he said "everyone" would be networking. (*Id.*). When she got there, the only people present were Golden and his girlfriend, who pressured her to have another drink. (*Id.*). Jane Doe 2 declined and returned to her hotel room. (*Id.*).

On Friday, August 28, Jane Doe 2 and other attendees took an eXp-provided bus from their hotel to the home of influential real estate coach and event guest speaker, Jon Cheplak, in Henderson, Nevada. (*Id.* ¶ 132). Defendant Gove and many other eXp agents attended to discuss Agent Attraction and the Pyramid. (*Id.*). The bus returned attendees to the Wynn Hotel, where Jane Doe 2 attended a get-together hosted by

7

Golden and Bjorkman in their hotel room. (*Id.* ¶¶ 134–35). Jane Doe 2 poured herself a single cup of vodka and soda water which she sipped during the event. (*Id.* ¶¶ 136–37). She then left to have dinner at Caesar's Palace. (*Id.* ¶ 138). Jane Doe 2 has a limited memory of the remainder of the evening, though she recalls excusing herself from the table to vomit, and waking up the next morning feeling groggy with a headache. (*Id.* ¶¶ 139–141).

Coworkers that were at dinner with Jane Doe 2 told her that she left the table multiple times and they found her in the bathroom. (*Id.* ¶ 142). Jane Doe 2 posted about her experience on Facebook and, though she did not name Defendants Bjorkman and Golden, she discovered that other women associated with eXp Realty had been drugged, rendered incapacitated and sexually assaulted at eXp recruitment events, including the Las Vegas event. (*Id.* ¶¶ 143, 187). Jane Doe 2 believes she was also drugged by Defendants Golden and Bjorkman. (*Id.* ¶ 144).

After the Las Vegas event, Bjorkman and his downline agents continued to recruit Jane Doe 2 so that she would select someone from Bjorkman's downline as her Sponsor Agent. (*Id.* ¶ 188). Jane Doe 2 eventually joined eXp but named another Sponsor Agent, placing her out of Bjorkman's downline but in Gove's downline. (*Id.* ¶ 200). Jane Doe 2 continues to be a licensed real estate agent at eXp Realty. (*Id.* ¶ 9). As a result of the incident, Plaintiff alleges extreme emotional distress and lost business opportunities. (*Id.* ¶ 146).

### 5. Jane Doe 3

Jane Doe 3 was an eXp agent whom Bjorkman recruited. (*Id.* ¶¶ 147–48).[3] Bjorkman, as her Sponsor Agent, and Golden both invited Jane Doe 3 to the Las Vegas event, telling her it "would be good for her real estate career to attend." (*Id.* ¶¶ 148,

---

[3] Based on Plaintiffs' statements made in court on June 30, 2023, this occurred in February of 2019.

8

189). On Thursday, August 27, Jane Doe 3 traveled from Florida to stay at the Encore Hotel and Casino, where parts of the event were hosted. (*Id.* ¶¶ 149, 189, 201).

On Saturday, August 29, Jane Doe 3 went to Bjorkman and Golden's hotel suite at the Wynn Hotel for an eXp get-together. (*Id.* ¶ 150). At some point, Golden became upset and Jane Doe 3 and Bjorkman left to walk on the Las Vegas Strip and gamble in the casino. (*Id.*). After they returned to the hotel suite, Jane Doe 3's memory became "spotty and limited" for the rest of the evening, though she recalls being sexually assaulted by Bjorkman. (*Id.* ¶¶ 151–52). She also  recalls Bjorkman and Golden consuming GHB from a plastic "5 Hour energy" bottle and telling her they do so recreationally. (*Id.* ¶¶ 153, 190).[4]  After the event, Defendant Bjorkman "gave Jane Doe 3 a highly valuable" FLQA agent. (*Id.* ¶¶ 191, 203).

A few weeks later, Defendant Golden encouraged Jane Doe 3 to lie to police, and people associated with Bjorkman and Golden sent her threatening messages. (*Id.* ¶¶ 154–55). Jane Doe 3 is no longer an eXp agent. (*Id.* ¶ 10). Plaintiff alleges she suffered and continues to suffer from PTSD and extreme emotional distress. (*Id.* ¶ 159). Her husband, Plaintiff John Doe, also alleges loss of consortium. (*Id.* ¶ 162).

### 6. eXp Realty's response

Jane Doe 2 and Jane Doe 3 reported their experiences to eXp's Leadership Team shortly after the Las Vegas event, in August of 2020. (*Id.* ¶ 164). Plaintiffs allege Defendants eXp, Sanford and Gove had actual knowledge of Defendants Golden and

---

[4] GHB (Gamma-Hydroxybutric Acid) is commonly known as the "date rape" drug. It comes in a liquid or as a white powder that is dissolved in water, juice, or alcohol. In liquid form, GHB is clear and colorless. When taken, it can cause hallucinations, euphoria, drowsiness, decreased anxiety, excited and aggressive behavior. Overdose symptoms include unconsciousness, seizures, slowed heart rate, greatly slowed breathing, lower body temperature, vomiting, nausea, coma, and death. (FAC ¶ 61, n. 4) (citing https:www/dea.gov/factsheets/ghb-gamma-hydroxybutyric-acid).

Bjorkman's conduct before this. (*Id.* ¶ 163).[5] Plaintiffs allege eXp took no action against Golden because his upline agents—namely, Defendants Gove and Sanford—stood to lose substantial income. (*Id.* ¶ 68). eXp Board Member Gene Frederick ("Frederick") was heard saying, "[Jane Doe 3] wants [Golden] fired, and we all know that's not going to happen." (*Id.* ¶ 171). Gove threatened to pull his entire team, which was roughly one-fifth of the company. (*Id.* ¶ 74). Sanford, Gove, and eXp eventually "came to an agreement" to keep Golden, but remove Bjorkman. (*Id.* ¶ 75).

On September 18, 2020, Bjorkman's contract with eXp Realty was terminated. (*Id.* ¶¶ 48, 50). However, eXp decided it made "economic sense" to pay Bjorkman his downline revenue, allowing him to become a Vested Participant despite the fact that he had been at eXp less than 36 months. (*Id.* ¶¶ 51–52, 78). eXp did not grant the same vesting exception to Jane Doe 3, nor did they allow her to switch Sponsor Agents, forcing her to pay Bjorkman and Golden. (*Id.* ¶¶ 53, 55). Plaintiffs allege eXp denied a similar request by an anonymous agent who reported Golden had raped her. (*Id.* ¶ 175). Jane Doe 1 also reported her assault to Corey Haggard in or around October of 2020 and repeatedly requested to move downlines. (*Id.* ¶¶ 129, 130, 165). Fearing more women would come forward, eXp initially denied this request. (*Id.* ¶ 166). While eXp eventually agreed to move Jane Doe 1, they refused to pay her the part of the revenue share that they were sending to Bjorkman. (*Id.* ¶ 130). eXp continued to promote Golden as one of their "respected agents" and former CEO Jason Gesing still works closely with Golden. (*Id.* ¶¶ 67, 170). eXp allowed Bjorkman to attend eXp events where Frederick publicly socialized with Bjorkman and Golden. (*Id.* ¶¶ 54, 169). Bjorkman is currently an RSP Vested Participant. (*Id.* ¶ 50).

Around this time, the Las Vegas Police Department ("LVPD") was investigating

---

[5] Plaintiffs allege, for example, Defendant Gove personally hosted recruiting events where Defendant Bjorkman and Golden assaulted other women. (FAC ¶ 71).

10

the sexual assault of Jane Doe 3, and Gove allegedly asked multiple eXp agents to make false statements as part of that investigation. (*Id.* ¶¶ 43, 156, 233). On March 3, 2021, Jane Doe 3 discussed her assault with Gove, who told her that he saw her at the Las Vegas event, she had been "out of her mind" and he "had no idea what she was talking about" regarding the assault, but "hoped it wasn't true." (*Id.* ¶¶ 157–58). On March 8, 2021, Bjorkman was arrested in Miami-Dade, Florida, on two counts of sexual assault of Jane Doe 3. (*Id.* ¶ 42).[6] The Arrest Warrant Declaration includes multiple accounts of women being drugged and assaulted by Bjorkman at eXp Realty recruitment events, as well as a "long history" of similar accusations dating back to 2000. (*Id.* ¶¶ 43–44, 47). This includes an eXp agent that reported her 2007 rape to Frank Crandall in October of 2018. (*Id.* ¶¶ 45–46). The  same woman tried to report the incident to eXp Realty's Designated California Broker, Debbie Penny, but never received a response. (*Id.* ¶ 46). Many women informed the LVPD that they personally saw Golden with GHB which they believed was used to drug them. (*Id.* ¶ 61). Several women reported that Golden was a participant in their sexual assault, and that Golden and Bjorkman both had videos of their assault. (*Id.* ¶¶ 61–63). Police obtained a search warrant for Golden's cell phone, the digital extraction of which remains in police custody. (*Id.* ¶ 64).

Certain members of eXp's Leadership Team and the Board of Directors suggested ways in which eXp could assist the women, such as changing their sponsors, which Sanford explicitly rejected. (*Id.* ¶ 168). On March 7, 2022, Acevedo discussed her assault with Sanford, who did not offer any support. (*Id.* ¶¶ 104, 172). On June 9, 2022, Acevedo discussed her assault with then CEO, Jason Gesing, who did not offer any support. (*Id.* ¶¶ 105, 173). Acevedo reached out to several people at eXp who did not offer help. (*Id.* ¶ 174).   Rather, Plaintiffs allege eXp attempted to cover up

---

[6] These charges have since been dismissed. (Dkt. 71, "Gove Opp." at 19).

11

Acevedo's assault through the use of nondisclosure agreements. (*Id.* ¶ 83).[7] Similarly, Plaintiffs allege eXp silenced or terminated those that knew its past president had sexually assaulted women. (*Id.* ¶ 177).

### 7. Procedural background

Based on the above allegations, Plaintiffs bring three causes of action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, 1595, as well as several state tort claims. (*Id.* ¶¶ 178–210). Plaintiffs filed a Complaint on February 22, 2023, (Dkt. 1), and a First Amended Complaint on March 2, 2023. (FAC). Female Plaintiffs allege Defendant Bjorkman perpetrated sex trafficking under the TVPRA (Count 1), and Acevedo, Jane Doe 2 and Jane Doe 3 allege Defendant Golden also perpetrated sex trafficking (Count 2). (FAC ¶¶ 178–203). Female Plaintiffs allege Defendants Golden, Gove, Sanford and eXp Realty benefitted from sex trafficking within the meaning of the TVPRA (Count 3). (*Id.* ¶¶ 204–210). Acevedo, Jane Doe 1 and Jane Doe 3 bring a sexual battery claim against Defendant Bjorkman (Count 4) and all female Plaintiffs allege civil battery against Bjorkman (Count 5). (*Id.* ¶¶ 211–223). Jane Doe 2 and Jane Doe 3 also allege civil battery against Golden (Count 5). (*Id.* ¶¶ 216–223). Female Plaintiffs bring a claim for intentional infliction of emotional distress against Defendants Bjorkman, Golden, Gove and Sanford (Counts 6–8). (*Id.* ¶¶ 224–241). Female Plaintiffs allege negligence against all Defendants (Count 9) and negligent hiring, retention and supervision against Defendants Sanford and eXp Realty (Count 10). (*Id.* ¶¶ 242–252). John Doe brings one claim for loss of consortium against all Defendants (Count 11). (*Id.* ¶¶ 253–54). Plaintiffs also sue Does 1–10, whose names and corporate or individual capacities are unknown. (*Id.* ¶ 18).

On April 13, 2023, Defendants eXp Realty and Sanford filed a Motion to Dismiss

---

[7] On June 30, 2023, Plaintiffs stated to the Court that this allegation refers to Acevedo, but that Plaintiffs have subsequently learned many other women were given non-disclosure agreements, prior to the alleged assaults here.

Plaintiffs' Fist Amended Complaint. (Dkt. 41-1, "Sanford MTD"). Plaintiffs filed an Opposition on April 21, 2023, (Dkt. 48, "Sanford Opp."), and Defendants filed a Reply on April 28, 2023. (Dkt. 55, "Sanford Reply"). Defendant Gove then filed a Motion to Dismiss on May 26, 2023. (Dkt. 63-1, "Gove MTD"). Plaintiffs filed their Opposition on June 9, 2023, (Dkt. 71, "Gove Opp."), and Gove filed a Reply on June 16, 2023. (Dkt. 74, "Gove Reply"). The Court held a hearing on June 30, 2023, and took the motions under submission. (Dkt. 79). On July 12, 2023, the Court granted Gove's Ex Parte Application to File Supplemental Briefing, (Dkt. 81), on the effect of recent amendments made to the TVPRA. (Dkt. 90). The Court has considered the parties' briefing on that issue. (Dkts. 83, 98).

On  June 27, 2023, Defendant Bjorkman filed a Motion to Dismiss Plaintiffs' First Amended Complaint. (Dkt. 77-1, "Bjorkman MTD"). On July 7, 2023, Plaintiffs filed an Opposition, (Dkt. 82, "Bjorkman Opp."), and Bjorkman filed a Reply on July 12, 2023. (Dkt. 89, "Bjorkman Reply"). On July 11, 2023, Defendant Golden filed a Motion to Dismiss. (Dkt. 88, "Golden MTD"). On July 28, 2023, Plaintiffs filed an Opposition, (Dkt. 101, "Golden Opp."), and Golden filed a Reply on August 4, 2023. (Dkt. 104, "Golden Reply"). The Court held a hearing on August 18, 2023, and took the motions under submission. (Dkt. 111). On August 28, 2023, the Court ordered supplemental briefing on the effect of recent state law legislation, in response to Golden's argument that some of Plaintiffs' state law claims are barred by Nevada's two-year statute of limitations. (Dkt. 118). The Court has considered that briefing. (Dkts. 121–23).

All four motions discuss the extent to which the TVPRA applies in this case—whether it applies at all and, if so, whether any or all Defendants are liable under direct or beneficiary theories—and whether Plaintiffs' state claims are timely. Defendants eXp Realty, Sanford and Gove set forth additional arguments as to why the Court should dismiss Plaintiffs' state causes of action. Considering the overlapping nature of Defendants' motions, the Court addresses Plaintiffs' claims in the following order: (1)

Defendants Bjorkman and Golden's direct liability under § 1591; (2) Defendants Golden, eXp Realty, Sanford, and Gove's beneficiary liability under § 1595; (3) whether Plaintiffs' state law claims are procedurally barred; and (4) whether Plaintiffs have otherwise sufficiently pled their state law claims against Defendants eXp Realty, Sanford and Gove.

## III.  LEGAL STANDARDS

### 1. Motion to dismiss standard

Federal Rule of Civil Procedure 8 requires a plaintiff to present a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a pleading for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough factual detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also be "plausible on its face," meaning that it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed under Rule 12(b)(6) for the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But a court is

"not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted).

The court generally may not consider materials other than facts alleged in the complaint and documents that are made a part of the complaint. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). However, a court may consider materials if (1) the authenticity of the materials is not disputed and (2) the plaintiff has alleged the existence of the materials in the complaint or the complaint "necessarily relies" on the materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). The court may also take judicial notice of matters of public record outside the pleadings and consider them for purposes of the motion to dismiss. *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Lee*, 250 F.3d at 689–690.

## 2. TVPRA

Congress enacted the Trafficking Victims Protection Act of 2000 ("TVPA") to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominately women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Ditullio v. Boehm,* 662 F.3d 1091, 1094 (9th Cir. 2011) (quoting Pub. L. No. 106–386, 114 Stat. 1464 (Oct. 28, 2000) (codified as amended at 18 U.S.C. § 1589 et. seq.)). The legislation created several new federal criminal offenses for forced labor and sex trafficking "intended to more comprehensively and effectively combat human trafficking." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022) (quoting *Roe v. Howard*, 917 F.3d 229, 236 (4th Cir. 2019)).[8] Congress has repeatedly reauthorized and amended the Trafficking Victims Protection and Reauthorization Act ("TVPRA") to expand

---

[8] Section 1589 imposes criminal liability for forced labor; Section 1590 for trafficking with respect to peonage, slavery, involuntary servitude, or forced labor; and Section 1591 for sex trafficking of children or by force, fraud, or coercion. 18 U.S.C. §§ 1589, 1590, 1591.

15

coverage—most significantly, by creating a civil remedy against traffickers and then extending liability to those that benefit from what they should have known was a trafficking venture. [9] The Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108–193, 117 Stat. 2875 (Dec. 19, 2003) (enacted as amended at 18 U.S.C. § 1595) (creating civil liability); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, 122 Stat. 5044 (Dec. 23, 2008) (enacted as amended at 18 U.S.C. § 1595) (including civil liability for beneficiaries).

Two provisions of the TVPRA are relevant to this case. First, 18 U.S.C. § 1591 provides for criminal penalties for sex trafficking:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, ... recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Section 1591 defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)," 18 U.S.C. § 1591(e)(4), "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity," 18 U.S.C. § 1591(e)(6), and "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

---

[9] The Court hereinafter refers to the TVPA, as reauthorized and amended, as the TVPRA.

16

Second, 18 U.S.C. § 1595 sets forth the standard for civil liability under the TVPRA. That section currently provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).[10] Thus, § 1595 provides trafficking victims with a private right of action to pursue claims against perpetrators of trafficking ("direct liability") or those who knowingly financially benefit from trafficking ("beneficiary liability"). *Doe v. Mindgeek,* 558 F. Supp. 3d 828, 835 (C.D. Cal. 2021) (*Mindgeek*). The requirements for beneficiary liability can be stated as follows: (1) the person or entity must "knowingly benefit[ ], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of [the TVPRA]." 18 U.S.C. § 1595(a); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019).

## IV.   DISCUSSION

### 1.   Counts 1 and 2: TVPRA direct liability

Plaintiffs' first two causes of action are for violation of § 1591 of the TVPRA, 18 U.S.C. § 1591. A "perpetrator" of sex trafficking can be either a direct violator under § 1591(a)(1) or a participant under § 1591(a)(2), but both require actual knowledge of the trafficking under § 1591(e)(4). *Geiss v. Weinstein*, 383 F. Supp. 3d 156, 167, n. 3

---

[10] In 2023, Congress amended § 1595 to permit recovery against anyone who "attempts or conspires to benefit" from sex trafficking. Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117–347, 136 Stat. 6199 (Jan. 5, 2003) (enacted as amended at 18 U.S.C. § 1595). Defendant Gove argues this amendment cannot be applied retroactively, (Dkt. 83), but Plaintiffs only allege attempt as to the benefit he continues to seek. (Dkt. 98 at 2). *See* discussion *infra* Part IV, 2, a, iii.

(S.D.N.Y. 2019). Here, Plaintiffs allege direct violator liability against both Bjorkman and Golden under § 1591(a)(1). Accordingly, Plaintiffs must adequately plead that Bjorkman and Golden knowingly and in interstate or foreign commerce: (1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud … or any combination of such means will be used"; (3) "to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591. In sum, Plaintiffs allege that Bjorkman and Golden enticed them with career advancement—including recruitment opportunities, training materials, and coaching by top Influencers—to attend networking events so that Defendants could lure them into hotel rooms, knowing that drugs would be used to cause their assault. (FAC ¶ 2; Bjorkman Opp. at 7). The Court finds these allegations plausibly establish that both Defendants directly violated § 1591(a)(1).

As a threshold matter, the Court agrees with Plaintiffs that the "enticement" used to induce the sex act and the "commercial" nature of the sex act itself are intertwined—if not, in some instances, the same thing. (*See* Bjorkman Opp. at 6, n. 2). Moreover, the parties agree that a series of cases analyzing claims brought against movie producer Harvey Weinstein make clear that enticement of victims by means of fraudulent promises of career advancement for the purpose of engaging them in sexual activity is violative of the TVPRA. (Bjorkman MTD at 11–12; Golden MTD at 10; Bjorkman Opp. at 6–7; Golden Opp. at 5) (all citing *Geiss*). In other words, the career opportunity can be the thing used to entice the victim *and* the thing of value that makes the sex act commercial.

All female Plaintiffs bring a claim against Bjorkman (Count 1), and Acevedo, Jane Doe 2 and Jane Doe 3 bring a claim against Golden (Count 2). (FAC ¶¶ 178–203). Defendants move to dismiss on two grounds: (1) Plaintiffs fail to allege "enticement" and (2) Plaintiffs fail to allege a "commercial sex act." (Bjorkman MTD at 11–20; Golden MTD at 6–8). Particularly, both Defendants argue the Weinstein cases

18

demonstrate that a "commercial sex act" requires a "quid pro quo" exchange. (Bjorkman MTD at 12–15; Golden MTD at 7–8). As discussed below, the Court disagrees and denies Defendants' motions to dismiss Counts 1 and 2.

### a. Sections 1591 and 1595 require broad interpretation

Though not raised by Bjorkman and Golden, the Court rejects Defendants eXp Realty, Sanford and Gove's argument that the TVPRA is wholly inapplicable to the circumstances alleged here. (Sanford MTD at 18; Gove MTD at 25) (both arguing Plaintiffs seek to "transform" workplace sexual assault into federal sex trafficking offenses). This belies the TVPRA's statutory construction and caselaw.

Section 1595, which permits civil actions for damages under § 1591, amended the TVPRA for the remedial purpose of "enhancing provisions on prevention of trafficking, protections of victims of trafficking, and prosecution of traffickers[.]" H.R. Rep. No. 108–264(I), 8, 2004 U.S.C.C.A.N. 2408, 2408. Remedial statutes require broad interpretation. *See Peyton v. Rowe,* 391 U.S. 54, 65 (1968) (recognizing the "canon of construction that remedial statutes should be liberally construed."); *see also Marshall v. Coastal Growers Ass'n*, 598 F.2d 521, 525 (9th Cir. 1979) (applying *Peyton* and finding the Farm Labor Registration Act should be broadly construed because it is remedial). Sections 1591 and 1595 also employ broad, expansive language. *See*, *e.g.*, *Noble v. Weinstein,* 335 F. Supp. 3d 504, 515–16 (S.D.N.Y. 2018) ("Congress's use of the word 'whoever' and its repeated use of the word 'any' does not lend itself to restrictive interpretation.") (citing *United States v. Jungers*, 702 F.3d 1066, 1070 (8th Cir. 2013)). "Where, as here, a broad statute has a plain and unambiguous meaning, it ought to be interpreted broadly." *Noble*, 335 F. Supp. 3d at 516 (citing *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)).

Thus, numerous courts have found "the TVPRA covers allegations of coercive sexual assault where the defendant uses force and/or fraud to entice the plaintiff to engage in a 'commercial sex act,' even if the defendant has not 'trafficked' the plaintiff within the ordinary or traditional meaning of that word." *David v. Weinstein Company,*

19

*LLC*, 431 F. Supp. 3d 290, 299 (S.D.N.Y. 2019). *See Ardolf v. Weber,* 332 F.R.D. 467, 473 (S.D.N.Y. 2019) ("Even though this law has been traditionally used to prosecute the types of sex trafficking that Defendant describes, [i.e., 'the illicit sex trade and human trafficking for commercial gain,'] that does not mean that it only applies in those circumstances."); *Geiss*, 383 F. Supp. 3d at 168 ("[T]he TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or, as alleged here, non-consensual sexual activity."); *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019) ("[Defendants'] attempt to cabin the TVPA to reach only caricatures of child slavery, and to exclude corporate-supported conduct, is wholly unpersuasive. The text of the TVPA does not provide any charter for this self-serving distinction."); *Noble*, 335 F. Supp. 3d at 516 (rejecting the argument that "the application of Section 1591 should be limited to 'the type of criminality for which the Government has historically prosecuted under Section 1591, such as child prostitution, torture, and child pornography,' " and noting that "other courts have applied Section 1591 to defendants who have lured women, under false pretenses and with lucrative promises, for sexual purposes") (citations omitted); *see also Huett v. Weinstein Co. LLC,* No. 18-cv-06012-SVW-MRW, 2018 WL 6314159, at *1 (C.D. Cal. Nov. 5, 2018) ("[N]otwithstanding Defendant's argument regarding legislative intent, there are reasons to believe that Sections 1591 and 1595 should be interpreted broadly.").

Thus, while this might not be the "archetypal" sex trafficking action, *see Noble* 335 F. Supp. 3d at 515, the TVPRA extends to allegations such as those described in Plaintiffs' First Amended Complaint.

### b. Enticement

Defendants argue that Plaintiffs have failed to sufficiently plead "enticement" as required by § 1591. (Bjorkman MTD at 18–20; Golden MTD at 7). When a word is undefined in a statute courts "normally construe it in accord with its ordinary and natural meaning." *Smith v. United States,* 508 U.S. 223, 228 (1993); *F.D.I.C. v. Meyer,* 510

U.S. 471, 476 (1994) ("In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning."). The ordinary and natural meaning of "entice" is "to attract artfully or adroitly or by arousing hope or desire." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/entice (last visited Jan. 24, 2024); *see also Noble*, 335 F. Supp. 3d at 517 (defining "entice" under § 1591 as "to attract artfully or adroitly or by arousing hope or desire" or "to attract or tempt by offering pleasure or advantage"); *Ardolf,* 332 F.R.D. at 474 (same). Here, Plaintiffs allege Defendants enticed them with the chance to have a lucrative career as an eXp Realty agent, if they joined the Gove-Golden-Bjorkman downline and recruited other agents. Defendants argue this does not satisfy the definition of enticement. The Court disagrees.

Acevedo alleges Golden recruited her to join eXp, stressed the importance of attending the Closing Table event as Bjorkman's guest and choosing him as her Sponsor Agent, and then convinced her to stay in Bjorkman's hotel room where Bjorkman drugged and assaulted her. (FAC ¶¶ 90–94, 97, 101, 182). [11] Jane Doe 1 alleges Bjorkman recruited her to join eXp and choose him as her Sponsor Agent, that she attended the Closing Table event with him for the purpose of attracting more agents to their downline, and she was motivated by this purpose to attend the smaller gathering where Bjorkman drugged and assaulted her. (*Id.* ¶¶ 112, 185). Jane Doe 2 alleges the following: she was invited as a prospective eXp recruit to attend the Las Vegas event; she was promised coaching by the famous John Cheplak and Defendant Gove; Defendants Golden and Bjorkman hosted the larger event, as well as the smaller gatherings; Bjorkman and Golden attempted to get Jane Doe 2 to drink with them in

---

[11] Implicit in these allegations is that Bjorkman also enticed Acevedo. For example, he clearly invited, or at the very least allowed, Acevedo to attend the event as his guest and stay in his hotel room. (FAC ¶¶ 94, 97–99). Regardless, Bjorkman admits to telling Acevedo she should attend the event. (*See* Bjorkman MTD at 19).

their hotel suite under the false pretense that other event attendees would be there; and the next night she attended a networking event in Defendants' hotel suite where she was drugged. (*Id.* ¶¶ 131–32, 135, 145).  Jane Doe 3 alleges both Bjorkman (her Sponsor Agent) and Golden (an Influencer in her upline) promised it would be good for her career to attend their recruiting event and hotel suite, where she was drugged and sexually assaulted. (*Id.* ¶¶ 148–49).

Defendants put forth two arguments, neither of which the Court finds persuasive. First, Bjorkman argues that he did not personally invite Jane Doe 1 or Jane Doe 2 to the recruiting events, and Golden argues the same as to Jane Doe 2. (Bjorkman MTD at 12–13; Golden Reply at 6).[12] This argument ignores that enticement is done "artfully" or "adroitly" which implies, or at the very least includes, a number of events several steps removed from one another. The fact that Bjorkman and Golden did not *need* to personally invite Jane Doe 1 or Jane Doe 2 does not defeat their claims—it more likely demonstrates Defendants' ability to surreptitiously attract women to these events. This argument also imposes an element of precision that the statute does not. Section 1591 requires that the defendant entice the victim, knowing that a commercial sex act will occur. It does not require that the defendant direct that enticement at any particular

---

[12] Golden does not raise the issue of enticement as to a specific Plaintiff until his Reply. (Golden Reply at 5–6). Nonetheless, the Court has considered those arguments and dismisses them for the following reasons. First, Golden's argument that he did not entice Jane Doe 1 and Jane Doe 3 to join eXp Realty is irrelevant. Jane Doe 1 does not allege direct liability (and, thus, enticement) against Golden and Jane Doe 3 explicitly alleges Golden invited her to attend the Las Vegas event. (FAC ¶ 148). Second, as explained, the Court disagrees with Golden's assertion that he did not sufficiently entice Jane Doe 2 to attend the Las Vegas event. Finally, Golden's argument that Acevedo agreed to join eXp Realty before the alleged enticement is both inaccurate and immaterial. Golden's repeated efforts to get Acevedo to join eXp Realty and choose Bjorkman as her Sponsor Agent *was* the enticement—as was his encouragement that Acevedo attend the event as Bjorkman's guest and stay in his hotel room. Whether these events took place while Acevedo was an eXp agent or prospective recruit does little to affect the Court's analysis.

person. In other words, the statute does not necessarily require that the defendant know *who* will be enticed—only that the defendant know *whoever* is enticed will be subjected to a commercial sex act.

Perhaps more importantly, Defendants overlook crucial allegations. eXp's entire business model is Agent Attraction, and Bjorkman and Golden's specific role as top Influencers was to attract existing and prospective agents to attend recruiting events, in furtherance of Agent Attraction. (FAC ¶¶ 25, 29, 32). Given this pervasive priority, the allegations plausibly establish that Defendants' conduct "aroused" Plaintiffs' "hope or desire" that the recruiting events would benefit their careers. Jane Doe 1 and Bjorkman attended the same event to recruit more agents into their shared downline, just days after Bjorkman recruited Jane Doe 1 to join eXp—which he did, at least in part, by "offering the advantage" of this very opportunity. (FAC ¶¶ 110, 112). Jane Doe 2 attended a recruitment event hosted by Bjorkman and Golden which, by its very purpose, was intended to attract women like her by "offering the advantage" of eXp affiliation, Agent Attraction, and top Influencers' coaching services. (FAC ¶¶ 131–35). At the event, Bjorkman's downline personally recruited Jane Doe 2 and she was invited to Defendants' hotel suite on two occasions, once by Bjorkman himself. (FAC ¶¶ 134–35, 145). By inviting Jane Doe 2 to his hotel suite, Bjorkman "aroused the hope or desire" to network with agents and both Defendants did the same by hosting the smaller gathering the following evening—consistent with the original opportunity that enticed Jane Doe 2 to attend the Las Vegas event altogether. Considering this context, the Court finds Plaintiffs' allegations plausibly establish Bjorkman enticed Jane Doe 1 and Bjorkman and Golden enticed Jane Doe 2.

Second, Defendants argue Plaintiffs' potential career advancement is too speculative to satisfy "enticement." (Bjorkman MTD at 18–20; Golden MTD at 7–8). Bjorkman argues he told Acevedo and Jane Doe 3 "nothing more than [it] would be good for their careers to attend." (Bjorkman MTD at 19). Golden argues his "[v]ague assertions of 'career advancement' are too ambiguous and conclusory" to withstand a

motion to dismiss. (Golden MTD at 8). The Court disagrees. First, some of Defendants' "assertions" were not "vague." For example, Golden explicitly (and fraudulently) told Acevedo that it would benefit her career if she chose Bjorkman as her Sponsor Agent, legitimizing his suggestion that she attend the event as Bjorkman's guest. (FAC ¶ 93). Second, considering the significance of Agent Attraction and the purpose of the recruitment events, Bjorkman's statements to Acevedo and Jane Doe 3 were self-explanatory and compelling. (*Id.* ¶¶ 94, 148). Finally, to the extent that other representations were more subtly made, they effectively "aroused" Plaintiffs' "hope or desire" to obtain a specific advantage. At the time of the alleged enticement, Bjorkman and Golden were top Influencers and in each Plaintiffs' actual or prospective uplines, with Bjorkman already named as Jane Doe 1 and Jane Doe 3's Sponsor Agent. (*Id.* ¶¶ 102, 111, 131, 148). Any representation that the events in question were likely to benefit Plaintiffs' career—whether explicitly or implicitly made—were wholly consistent with eXp's business model. In fact, to a certain extent, the speculative nature of the opportunity strengthens Plaintiffs' claims. Plaintiffs' entire career at eXp depended on selecting a successful Sponsor Agent and recruiting agents, making *any* opportunity to do so that more valuable. Providing Plaintiffs with the opportunity to attend recruitment events under these circumstances was more than enough to arouse Plaintiffs' "hope or desire" that their career would benefit.

Construing these factual allegations in the light most favorable to Plaintiffs, as required by Rule 12(b)(6), there is a plausible inference that Defendants "attracted" the female Plaintiffs to the various recruiting events by arousing their "hope or desire" that it would advance their careers. The Court concludes that Plaintiffs have met their burden of pleading facts showing that Bjorkman enticed all female Plaintiffs and Golden enticed Acevedo, Jane Doe 2 and Jane Doe 3 to attend the recruiting events, in violation of § 1591.

### c. *Knowing that means of force, fraud, or coercion will be used*

The plain language of § 1591(a) requires Plaintiffs to plausibly allege that

24

Defendants enticed them with knowledge that means of force or fraud would be used to cause a commercial sex act to take place. *United States v. Todd*, 627 F.3d 329, 333–34 (9th Cir. 2010). This does not impose another "layer" of knowledge on the pleader, but merely requires an allegation of awareness that, at the initial recruitment or enticement stage, certain prohibited means will be employed to cause a commercial sex act. *Id.* ("The knowledge required is such that if things go as he planned, force, fraud or coercion will be used to cause his victim to engage in a commercial sex transaction."). This element is sufficiently pled by demonstrating "a state of mind in which the [defendant] is familiar with a pattern of conduct." *Id.* at 334.

Defendants do not contest this issue. Moreover, the Court agrees with Plaintiffs that Defendants ignore allegations that Plaintiffs were drugged and, thus, "force, fraud and coercion" were employed. (Bjorkman Opp. at 8, n. 4). Consequently, the only issue—to the extent that Defendants have not waived it—is whether Plaintiffs have plausibly established a state of mind in which Bjorkman and Golden were familiar with the alleged pattern of conduct when they enticed the women to attend the events in question. The Court finds that Plaintiffs have met this burden with allegations including, but not limited to, the following.

Multiple women reported—to the LVPD and Jane Doe 2's Facebook post—that they saw Defendants Golden and Bjorkman with GHB and that they were drugged and/or raped by them. (FAC ¶¶ 43, 61, 63, 129, 143). Jane Doe 3 alleges Defendants admitted to using the drug recreationally, and that she saw them use it on the night of her assault. (*Id.* ¶ 153). Plaintiffs allege Golden had previously been accused of rape and Bjorkman had a long history of similar allegations, dating back to 2000. (*Id.* ¶¶ 45, 175). Plaintiffs allege Bjorkman and Golden had a relationship throughout this history and, in fact, Jane Doe 1 alleges Bjorkman told her Golden was a "dirtbag" and "rapist." (*Id.* ¶ 36). Taken as true, these allegations demonstrate Defendants' access to and familiarity with a drug known to cause sexual assault, as well as a mutual knowledge of each other's reputations for, in fact, using that drug for that purpose.

Plaintiffs also allege Golden and Bjorkman made several fraudulent representations designed to induce trust, that was then exploited to cause a commercial sex act. For example, Golden explicitly stated that Acevedo's career would benefit from choosing Bjorkman as her Sponsor Agent when, in fact, only Defendants stood to benefit by creating an additional tier in Golden's downline. (*Id.* ¶ 93). This underpins Acevedo's entire decision to attend the Closing Table event, where Golden then insisted that Bjorkman was a trustworthy individual, despite his reputation to the contrary. Similarly, Jane Doe 2 alleges that Bjorkman explicitly stated that "everyone" would be in his hotel suite, fraudulently promising the opportunity to network. (*Id.* ¶ 145). Read as a whole, these allegations plausibly establish that Defendants had a pattern of luring women into vulnerable situations by misrepresenting professional opportunities, in order to forcibly cause a sex act.

Construing these factual allegations in the light most favorable to Plaintiffs, as required by Rule 12(b)(6), there is a plausible inference that Defendants enticed Plaintiffs' with knowledge of this pattern of conduct—drugging and sexual assault—in violation of § 1591.

### d. Commercial Sex Act

Defendants argue Plaintiffs have failed to allege a "commercial sex act" within the meaning of § 1591. (Bjorkman MTD at 11–18; Golden MTD at 7–8). "Commercial sex act" is defined in § 1591(e)(3) as "*any sex act* on account of which *anything of value* is given to or received by *any person.*" 18 U.S.C. § 1591(e)(3) (emphasis added). Defendants raise several arguments related to this element of a § 1591 claim, though they do not proffer many of them until their Replies and, regardless, offer little authoritative support. Nevertheless, the Court has considered Defendants' arguments which can be summarized as follows: (1) Plaintiffs have insufficiently alleged a "sex act" and (2) even if a "sex act" is sufficiently alleged, it was not "commercial" in nature because it was not part of a "quid pro quo" or "bargained for" exchange. The Court addresses these two arguments in turn.

26

### i. Sex Act

The term "sex act" is not defined in § 1591. The Court therefore relies on the plain and ordinary meaning. "Sex act" means "an act performed with another for sexual gratification." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/sexact (last visited Jan. 24, 2024); *Noble*, 335 F. Supp. 3d at 521–23 (defining "sex act" under § 1591 as "an act performed with another for sexual gratification"); *Ardolf v. Weber,* 332 F.R.D. at 477 (same). This "purposefully broad definition allows perpetrators to be liable … for fraudulently enticing Plaintiffs or forcefully engaging them in commercial sex acts with the perpetrators themselves." *Ardolf,* 332 F.R.D. at 478.

Bjorkman argues that Jane Doe 2 and Jane Doe 3 have not alleged "sexual gratification." (Bjorkman MTD at 16–18). Jane Doe 2 alleges that her memory is limited from the time she consumed a single cocktail in Bjorkman and Golden's hotel room. (FAC ¶¶ 136–39). She became ill at dinner, woke up the next morning feeling sick, and has no memory of the events her friends describe from the evening. (*Id.* ¶¶ 140–42). She alleges to have subsequently discovered other women were drugged and assaulted after attending the same event. (*Id.* ¶ 143). Jane Doe 3 alleges that her memory is limited from the time she and Bjorkman returned to the hotel suite. (*Id.* ¶ 151). Jane Doe 3 explicitly recalls witnessing Golden and Bjorkman consume GHB and she explicitly recalls being sexually assaulted by Bjorkman. (*Id.* ¶¶ 152–53). In other words, Plaintiffs allege experiences that are consistent with the known effects of GHB and its known purpose of causing rape—which is, by definition, "sexual activity and usually sexual intercourse[.]" S*ee* MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/rape (last visited Jan. 24, 2024). This creates the plausible inference that Plaintiffs were also drugged for the purpose of causing a sex act.

To the extent that further analysis is required, the Court rejects Bjorkman's argument for two reasons. First, there is no requirement that a sex act, in fact, occur.

*United States v. Hornbuckle,* 784 F.3d 549, 553–54 (9th Cir. 2015) (finding commission of a sex act or sexual contact is not an element of a conviction under 18 U.S.C. § 1591). Rather, the relevant statutory language requires the defendant take certain action (i.e., "entice" the victim) knowing that she "will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). This future verb tense "indicates that a sex act does not have to occur" and the "offense was complete when [the defendant] acted with the requisite knowledge[.]" *Hornbuckle,* 784 F.3d at 554 (citing *United States v. Willoughby*, 747 F.3d 229, 241 (6th Cir. 2014)). Thus—insofar as Bjorkman implies this element is not satisfied because Jane Doe 2 was not sexually assaulted—this argument is irrelevant. Golden's argument that Plaintiffs fail to allege any sex act *by him* is even less relevant. (Golden MTD at 8.  The statute does not require that the perpetrator commit the sex act himself. 18 U.S.C. § 1591(a). Again, the relevant action is the enticement and— having established that Golden enticed Acevedo, Jane Doe 2 and Jane Doe 3—his "offense was complete when [he] acted with the requisite knowledge" that a sex act would occur. *Hornbuckle*, 784 F.3d at 554.

Second, Jane Doe 3's statement that she recalls being sexually assaulted is not conclusory. (Bjorkman MTD at 12; FAC ¶ 152). The legal element in question, that Jane Doe 3 must plausibly establish, is "a commercial sex act." 18 U.S.C. 1591(a). She alleges Bjorkman performed the act of "sexual assault"—that is, he subjected Jane Doe 3 to nonconsensual "sexual contact." *See* MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/sexualassault (last visited Jan. 24, 2024). In support of this, Jane Doe 3 alleges that she was drugged—and in support of that, she alleges to have experienced symptoms consistent with GHB and, in fact, to have seen Defendants use GHB. (FAC ¶ 151–53). She further alleges coercive efforts to interfere with the LVPD investigation of these allegations. (*Id.* ¶¶ 154–55). This creates the plausible inference that Jane Doe 3's alleged sex act occurred.

Plaintiffs have alleged a series of events that, taken as true, suggest all four women involuntarily ingested the same drug, that caused the same response, and created

the same opportunity for a sex act to forcibly occur. Plaintiffs have also alleged a pattern of conduct that creates the plausible inference that Defendants Bjorkman and Golden both had the requisite knowledge that such events would occur when they enticed Plaintiffs' presence at the various events. The fact that Jane Doe 2 was never forced to commit a sex act, or Jane Doe 3's sexual assault is not alleged in more graphic detail, does not alter this inference. Plaintiffs have sufficiently alleged a "sex act" and, thus, the only remaining question is whether it was "commercial in nature."

### ii.    Commercial in nature

Defendants argue, even if Plaintiffs have alleged enticement and a sex act, they have insufficiently alleged that it was "commercial" because a "quid pro quo" or "bargained for" exchange is required. (Bjorkman MTD at 11–15; Golden MTD at 7–8). The Court disagrees. Plaintiffs must allege "*any sex act* on account of which *anything of value* is given to or received by *any person*." 18 U.S.C. § 1591(e)(3) (emphasis added). While this implies a causal connection between the sex act and the commercial exchange, it does not require a bargained for exchange. The coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act.

The TVPRA extends to enticement by means of fraudulent promises of career advancement that are made for the purpose of engaging in consensual or nonconsensual sexual activity. *See*, *e.g., Noble*, 335 F. Supp. 3d 504 (reasonable expectation of a film role, modeling career, and a continued relationship with film producer's company were "things of value"); *Geiss*, 383 F. Supp. 3d at 168 (declining to dismiss TVPRA claims against Harvey Weinstein where the complaint alleged that Weinstein promised plaintiffs career advancement and, during private meetings, sexually assaulted them); *David*, 431 F. Supp. 3d at 303 (finding a commercial sex act based on Weinstein's " 'promise of a role' in one of his productions," coupled with his "pattern of doing the same with other women over decades"); *Canosa v. Ziff,* 2019 WL 498865, at   *2 (declining to dismiss TVPRA claims against Harvey Weinstein and The Weinstein Company where the complaint alleged that Weinstein met with plaintiff "under the

guise of working together on productions," and "t[ook] advantage of the seclusion of those meetings and his power as a well-known producer to sexually assault and intimidate her"); *see also Ardolf,* 332 F.R.D. at 471–73 (declining to dismiss TVPRA claims against renowned photographer Bruce Weber where the complaint alleged that Weber enticed plaintiffs with the prospect of modeling career advancement, fraudulently convinced them to be alone with him for a "breathing exercise" and sexually molested them during photoshoots).

Put another way, when a victim is enticed with a fraudulent career opportunity for the purpose of causing a sex act, that sex act is commercial in nature. This "reflect[s] the modern reality" that even the opportunity for career advancement is a "thing of value." *Noble,* 334 F. Supp. 3d at 515, 521. Defendants concede this but argue it requires a "quid pro quo" or "bargained for" exchange. Bjorkman argues the Weinstein cases demonstrate a commercial sex act "where it is credibly alleged that the defendant made a fraudulent promise of career advancement in exchange for (i.e., quid pro quo for) the aspiring plaintiff's provision of some sort of 'sexual activity.'" (Bjorkman MTD at 12). Golden argues, "[t]here must be some allegations of a quid pro quo that connects the alleged sex act to a thing of value exchanged." (Golden MTD at 7). The Court disagrees. First, the Weinstein cases do not require that a promise be made on the condition of sex—only that a promise be made with the intent that it cause a sex act. Second, while Defendants separate the two, "enticement" and "commercial sex act" are intertwined such that sometimes, as in the Weinstein cases, the enticement necessarily makes the sex act commercial. Finally, the Weinstein cases exemplify allegations sufficient—not necessary—to violate the TVPRA.

Defendants offer scant authority in support of their position. Bjorkman relies entirely on *Corradino v. Liquidnet Holdings Inc.,* No. 19 Civ. 10434 (LGS), 2021 WL 2853362 (S.D.N.Y. July 8, 2021). (Bjorkman MTD at 14–15). In that case, plaintiff alleged sexual harassment where she repeatedly refused defendants' propositions for sex and was later promoted. *Corradino,* 2021 WL 2853362, at *1–2. Unlike here, the

court was asked to determine whether sexual harassment is a "sex act" and, if so, whether defendants promised career advancement in exchange for that act. *Id.*, at *3. The court deferred its answer to the first question because the complaint failed to allege that any promise had been made. *Id.* at *3 ("While the Complaint alleges that [Defendants] propositioned Plaintiff for sex on several occasions, it does not allege that they ever proposed any sort of quid pro quo, like sex for career advancement."). Under *Corradino*'s facts—where the alleged sex act is a request for sex, and the alleged value is a promise—a violative exchange might necessarily be quid pro quo. However, the court did not answer that question and, regardless, Plaintiffs do not allege sexual harassment.

Golden argues that a subsequent decision in the *Noble* case precludes Plaintiffs' assertion that none of the Weinstein cases considered allegations that defendant offered movie roles on the condition of sex. (Golden Reply at 5; Golden Opp. at 5). While Golden provides no explanation for his conclusion, the Court notes the following.

The Weinstein cases demonstrate that "commercial sex acts" are plausibly established in a variety of circumstances, ranging from coercive assault to forcible rape. This is demonstrated by *Geiss*, alone, in which the court found that the diverse allegations of nine plaintiffs all demonstrated that Weinstein "enticed women to attend meetings with him by promising them a chance to work for him, and then assaulted them[.]" 383 F. Supp. 3d at 168. While Weinstein went so far as to proposition some women for sex before he assaulted them, and offer others career prospects after he assaulted them, several *Geiss* plaintiffs alleged exchanges that were far less explicit— the court saw no distinction. *See Geiss*, 383 F. Supp. 3d at 164–65. This does not demonstrate, nor does *Geiss* discuss, a quid pro quo or bargained for exchange.

This is true even in *Noble*, where Weinstein repeatedly told plaintiff "everything would be taken care of" throughout her assault, and plaintiff "understood this to mean" that Weinstein would help her career "if the sex act was completed." F. Supp. 3d at 512–13. Surely, the court did not mean to imply Weinstein's coercion—after he had

forcibly initiated the sex act—and the plaintiff's ultimate submission demonstrated a negotiation. This contradicts the very definition of sexual assault, which is nonconsensual. Golden argues that the court's subsequent order in *Noble*, denying Weinstein's interlocutory appeal, changes this. *Noble v. Weinstein,* No. 17-cv-09260 (AJN), 2019 WL 3940125 (S.D.N.Y. Aug. 5, 2019) (*Noble II*). However, in that opinion the court merely rejected Weinstein's argument verbatim and confirmed its earlier ruling: the expectation of career advancement, even if based on fraudulent promises, is a "thing of value." *Noble II*, 2019 WL 3940125, at *4. Weinstein argued that, because he never intended to help plaintiff, there was no "quid pro quo, no conferring of a real benefit, and no actual value provided." *Id.* The court clearly considered this argument as it relates to the value of the thing promised, not the way in which it is exchanged. *Id.* (describing Weinstein's argument as "the proposition that a promise—particularly a promise of a career-making and life-changing opportunity—is of *no* actual value to the recipient simply because the promisor was lying at the time.") (emphasis in original).

The only Weinstein case in which the court includes the language "quid pro quo" in its reasoning is *David*, and it is not helpful to Defendants. 431 F. Supp. 3d at 304, n.5. ("the [complaint] plausibly alleges that Plaintiff received a "thing of value"—both the meetings and the promises of certain movie and television roles—as a quid pro quo for meeting with [Weinstein] and being caused to engage in the sex acts."). Even if the court's decision hinged on the exchange being quid pro quo, the objects of that exchange were the meeting and plaintiff's attendance at the meeting (i.e., the circumstances that enabled her sexual assault)—not the assault itself. The same reasoning applies here. Plaintiffs have plausibly established that they attended each networking event in exchange for the "value" of either recruiting agents or being recruited themselves which, in turn, provided Defendants with the opportunity to cause their assault.

Golden cites to *Marcus* which is similarly unpersuasive. *United States v. Marcus*, 487 F. Supp. 2d 289 (E.D.N.Y. 2007), *rev'd on other grounds*, 538 F.3d 97 (2d. Cir. 2008). First, Marcus was decided in 2007—long before courts considered TVPRA

allegations like those here. Second, *Marcus* resolved the specific issue of whether the TVPA was limited to prostitution or if it includes pornography. *Id.* at 306–07. The court rejected defendants' narrow interpretation of the statute and found that, because there was a "causal relationship" between the sex and the photography, pornography was a "sex act." *Id.* at 306. In other words, the court considered the sufficiency of the act, not the sufficiency of the value—or the exchange. ("The statutory language provides no basis for limiting the sex acts at issue to those in which payment was made for the acts themselves.").

Finally, a promise of career advancement is not the only way Plaintiffs can establish a thing of "value." In fact, Plaintiffs have put forth allegations suggesting their careers did, in fact, advance after Defendants caused their sex act. Acevedo officially joined eXp Realty after Bjorkman assaulted her, (FAC ¶¶ 101–02), and Bjorkman "gave" Jane Doe 3 a highly valuable FLQA after her assaulted her. (*Id.* ¶¶ 191, 203). Jane Doe 1 also alleges Bjorkman received a thing of value in photographs and videos he took of her assault. *See*, *e.g.*, *Doe v. Fitzgerald*, No. cv-20-10713-MFW (RAOx), 2022 U.S. Dist. LEXIS 8194, at *18 (C.D. Cal. Jan. 6, 2022) (declining to find that sexual acts themselves represent things of "value" but finding that photographs and videos of the alleged sex acts do).

Construing these factual allegations in the light most favorable to Plaintiffs, there is a plausible inference that Defendants caused Plaintiffs to engage in a commercial sex act within the meaning of § 1591. Accordingly, the Court **DENIES** Defendants Bjorkman and Golden's motions to dismiss Counts 1 and 2, respectively.

### 2. Count 3: TVPRA beneficiary liability

Plaintiffs' third cause of action is for violation of § 1595 of the TVPRA, 18 U.S.C. § 1595. All female Plaintiffs allege Defendants Golden, Gove, Sanford and eXp Realty benefitted from their sex trafficking (Count 3). (FAC ¶¶ 204–210). The requirements for beneficiary liability under the TVPRA can be stated as follows: (1) the person or entity must "knowingly benefit[ ], financially or by receiving anything of

value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of [the TVPRA]." *M.A.*, 425 F. Supp. 3d at 964 (citing 18 U.S.C. § 1595(a)). Unlike § 1591, § 1595 does not define "participation in a venture." *Compare* 18 U.S.C. § 1595 *with* 18 U.S.C. § 1591(e)(4) (defining "participation in a venture" as "knowingly assisting, supporting, or facilitating a [TVPRA] violation[.]").

As a threshold matter, the Court agrees with numerous courts that have held this and the "should have known" language means that a beneficiary's "participation" need not include an overt act in furtherance of or actual knowledge of a sex trafficking venture. *See A.B. v. Marriot Int'l, Inc.*, 455 F. Supp. 3d 171, 183–88 (E.D. Pa. 2020) (collecting cases and declining to apply § 1591's "participation in a venture" definition to a § 1595 claim).[13] In other words, § 1595's "venture" is not limited to a "sex trafficking venture." This conclusion follows from the *M.A.* court's statutory construction analysis, which reasoned that applying the "participation in a venture" definition from § 1591, "would void the 'should have known' language in the civil remedy" and, thus, "violate[ ] the 'cardinal principle of statutory construction that a

---

[13] The *A.B.* court provided extensive analysis of two schools of thought in § 1595 cases involving hotel liability. *A.B.*, 455 F. Supp. 3d at 183-88. The Southern District of Ohio and the Western District of Washington have adopted the *M.A.* court's reasoning and concluded the following: (1) financial benefit is satisfied from a relationship with the trafficker and need not be received on account of the trafficking; (2) knowledge is satisfied along a spectrum; and (3) participation requires direct association or a business relationship, the latter of which can be demonstrated by a pattern of conduct or a tacit agreement. *M.A.*, 425 F. Supp. 3d at 964–971; *see also Doe S.W. v. Lorain-Elyria Motel, Inc.,* No. 2:19-cv-1194, 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020); *H.H. v. G6 Hospitality, LLC,* No. 2-19-cv-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019). In contrast, the *Red Roof* cases in the Northern District of Georgia held that § 1595 has three separate knowledge requirements: (1) knowledge that the benefit is from trafficking; (2) knowledge as to "assisting, supporting, or facilitating" trafficking; (3) knowledge Plaintiff was subjected to force. *See, e.g., Doe 1 v. Red Roof Inns Inc.*, No. 1:19-cv-03840-WMR, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020) (relying on the criminal liability analysis in *U.S. v. Afyare*, 632 Fed. Appx. 272 (6th Cir. 2016)).

statute ought, upon the whole, to be construed so that, if it can be prevented, no clause, sentence, or word should be superfluous, void or insignificant." *J.C. v. Choice Hotels Int'l, Inc.,* No. 20-cv-00155-WHO, 2020 WL 3035794, *1, n.1 (N.D. Cal. June 5, 2020) (quoting *M.A.,* 425 F. Supp. 3d at 969). At least one court in this district has applied this reasoning outside the hotel context. *Mindgeek,* 558 F. Supp. 3d at 836 (plaintiffs' claim that websites published child pornography in violation § 1595 need only "meet the more lenient requirements of a Section 1595 claim[ ]" and is not barred by FOSTA immunity, 47 U.S.C. § 230); *see also Doe v. Twitter,* 555 F. Supp. 3d 889, 926 (N.D. Cal. 2021) (same). The Court is persuaded by this precedent and, thus, addresses Defendants' arguments only insofar as it is necessary to analyze Plaintiffs' claims under the standard announced in *M.A.*.

Plaintiffs allege, even if Golden did not directly violate § 1591, he benefitted from sex trafficking because he, at the very least, financially benefitted from his relationship with Bjorkman when he should have known Bjorkman had assaulted the women. (Golden Opp. at 7–9). Golden moves to dismiss for failure to allege the requisite "knowledge" and "benefit" under § 1595. (Golden MTD at 9). However, having found that Plaintiffs have plausibly demonstrated Golden's conduct towards Acevedo, Jane Doe 2 and Jane Doe 3 did violate § 1591(a)(1) and he is, thus, liable for those damages under § 1595, the Court denies Golden's motion to dismiss the corresponding Count 3 claims and only addresses his arguments with respect to Jane Doe 1's claim for beneficiary liability.

Plaintiffs allege Defendants eXp Realty, Sanford and Gove also benefitted from their relationship with Bjorkman and—with respect to Acevedo, Jane Doe 2 and Jane Doe 3's claims—their relationship with Golden, and that they should have known about the violative conduct. (Sanford Opp. at 9–19; Gove Opp. at 9–17). Both Sanford and Gove move to dismiss Count 3 for failure to allege "knowledge," "benefit" and

"participation in a venture." (Sanford MTD at 17–25; Gove MTD at 12–24).[14]

Plaintiffs have sufficiently pled a sex trafficking venture in Counts 1 and 2. For the purposes of Count 3, the alleged "venture" is the Revenue Share Plan or Pyramid and the question is whether *that* venture violated § 1595. For the reasons discussed below, the Court finds Plaintiffs' allegations plausibly establish that it did and the Court denies Defendants' motions to dismiss Count 3.

### a. Benefit

Defendants argue Plaintiffs have insufficiently pled the "benefit" element of a § 1595 claim. (Golden MTD at 9; Sanford MTD at 22–24; Gove MTD at 16–20). Plaintiffs must plausibly establish Defendants "knowingly benefit[ted] . . . financially or by receiving anything of value from participation" in the alleged venture. 18 U.S.C. § 1595. This only requires that Defendants knowingly received "a financial benefit from a relationship" with Bjorkman—not that Bjorkman provided any benefit because Defendants facilitated in the sexual misconduct. *M.A.*, 425 F. Supp. 3d at 964–65 (rejecting the § 1591(a)(2) liability standard articulated in *Geiss*); *see also B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214 (N.D. Cal. Jul. 30, 2020) (finding the rental of a hotel room or franchisors' receipt of royalties constitutes a financial benefit "from a relationship with the trafficker" in violation of § 1595).

### i. Golden

Golden argues Plaintiffs' allegations are conclusory and vague. (Golden MTD at 8–10). ("Plaintiffs have not identified a concrete specific benefit to Mr. Golden other than vague references to the revenue share program."). However, he argues these allegations do not satisfy the "benefit" required by § 1591(a)(2). (Golden MTD at 9)

---

[14] For the reasons discussed above, the Court rejects Defendants' argument that the TVPRA is not applicable to the circumstances alleged. (Sanford MTD at 17–18; Gove MTD at 25).

(citing *Geiss* and § 1591(a)(2)). The codefendants in *Geiss*—and all the Weinstein cases—were alleged to have been perpetrators of sex trafficking under § 1591(a)(2), not § 1595. Moreover, the Court has already concluded that Golden's conduct violated §1591(a)(1), resolving three of the four claims here. The only issue is whether the First Amended Complaint is also sufficient to sustain Jane Doe 1's claim against Golden. The Court considers the following allegations.

Golden was a top Influencer who generated a substantial part of his income from recruiting agents to join eXp Realty. (FAC ¶ 59). Golden recruited Bjorkman to eXp Realty, Golden was Bjorkman's Sponsor Agent, and Bjorkman was in Golden's downline. (*Id.* ¶¶ 15, 35, 37, 48). Golden receives a financial benefit from Bjorkman's downline. (*Id.* ¶¶ 27, 206). Bjorkman recruited Jane Doe 1, she was in his downline and, therefore, Golden receives a financial benefit from Jane Doe 1's downline. (*Id.* ¶¶ 27, 107–08, 111, 206). Jane Doe 1 is still a licensed real estate agent with eXp Realty and Golden is currently an eXp real estate agent, Influencer and RSP Vested Participant. (*Id.* ¶¶ 8, 15). Irrespective of Jane Doe 1's exact contribution to eXp Realty, Golden received a financial benefit from her recruitment and, considering eXp's business model, this receipt was knowingly made. Jane Doe 1's allegations are sufficient to meet this element of a claim at the motion to dismiss stage.

### ii.      Sanford[15]

Sanford argues the § 1595 benefit must "derive directly from, and be knowingly received in exchange for, participating in a venture that committed sex trafficking crimes." (Sanford MTD at 23). However, Sanford's proffered authority is neither

---

[15] eXp Realty and Sanford file their Motion to Dismiss collectively and the parties make no distinction between Sanford in his individual capacity and eXp Realty in its corporate capacity. (Dkts. 41-1, 48, 55). Thus, the Court only distinguishes between Sanford and eXp Realty where necessary and otherwise refers to these Defendants collectively as "Sanford."

binding nor persuasive. (*Id.* at 22–23). First, he cites to *Bridges v. Poe*, which explicitly declined to decide which "participation in a venture" standard was required for beneficiary liability. 487 F. Supp. 3d 1250, 1261–62 (N.D. Ala. 2020) ("This Court does not need to decide whether 'participation' requires scienter, because Bridges 'participated' in the venture even under a stricter 'knowingly' standard."). Because the defendant "expressly agreed" to participate in the sex trafficking venture, his benefit— which was not at issue—necessarily violated §1595, regardless of what standard the court applied. *Id.* Sanford's reliance on *Kolbeck v. Twenty First Century Holiness Tabernacle Church, Inc.* is similarly misplaced. No. 10-cv-4124, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013). There, the court found § 1595's civil remedy was not available to plaintiffs because a "commercial sex act" was not sufficiently alleged under § 1591. *Id.* at, *16 ("The fact that sexual abuse was committed by the ministry's leader and that members of the ministry had their expenses paid for through ministry funds is simply not sufficient to establish a violation under 18 U.S.C. § 1591."). Even if the Court found *Kolbeck*'s reasoning persuasive, the facts are very different here, where the Court has already concluded that Bjorkman and Golden plausibly violated § 1591. Finally, Sanford's arguments that eXp did not "benefit from Bjorkman engaging in non-consensual sexual acts" or that "Bjorkman's alleged drugging and assaults [did not] cause[ ]" Plaintiffs to join or remain at eXp are irrelevant. (Sanford MTD at 23). Even if, as Sanford implies, such causation would be necessary to satisfy a § 1591(a)(2) claim under *Geiss*, that is not the inquiry here.

Here, Plaintiffs allege Sanford knowingly benefitted from the recruitment of the female agents due to his relationship with Bjorkman. (Sanford Opp. at 17). Specifically, Plaintiffs allege the following: eXp's revenue derives from the sale of real estate and its recruited agents' contribution to the RSP or Pyramid (FAC ¶ 23); Bjorkman, Golden, Sanford and Gove are all current RSP Participants (*id.* ¶¶ 14–18, 50); Sanford is Agent #1 and every eXp agent is in his downline (*id.* ¶ 72); Sanford benefits from the real estate transactions of his downline agents in the form of a commission and a stock award

(*id.* ¶¶ 27–28); eXp Realty additionally benefits from agent fees, including a fee for failure to generate a minimum gross income (*id.* ¶¶ 30–31, 48);  Bjorkman recruited Acevedo, Jane Doe 1 and Jane Doe 3 to eXp Realty and all three women named him as their Sponsor Agent (*id.* ¶¶ 101, 110, 148); Jane Doe 2 joined eXp Realty after recruiting efforts by Bjorkman's downline at an eXp recruitment event, hosted by Bjorkman (*id.* ¶¶ 131, 188); and three of the four female Plaintiffs are currently eXp real estate agents and all four female Plaintiffs allege to have paid all necessary eXp fees. (*Id.* ¶¶ 7, 8, 9). Again, irrespective of the female agents' exact contribution to eXp Realty, the First Amended Complaint plausibly demonstrates that Sanford, at the very least, benefitted from their agent fees. These allegations are sufficient to meet the "benefit" element at the motion to dismiss stage.

### iii.     Gove

Gove argues that Plaintiffs have only alleged that he "attempted" to benefit from Bjorkman's sex trafficking which is insufficient to state a claim under the Ninth Circuit's ruling in *Ratha*, 35 F.4th at 1164. (Gove MTD at 20, n. 7). In sum, he argues that because Plaintiffs allege that "Gove only received money from the sale of real estate, and that Plaintiffs could not sell real estate as a result of their assaults[,]" the First Amended Complaint fails to allege that "benefit flowed to Gove." (Gove at 20). The Court granted Gove's Ex Parte Application to File Supplemental Briefing and has considered the parties' arguments related to the effect of the TVPRA's 2023 Amendment which extends civil liability to attempted benefit. (Dkts. 81, 83, 98). The Court concludes the new language is applicable and that, regardless, Plaintiffs sufficiently allege an actual benefit. Finally, for reasons already discussed, the Court disagrees with Gove's attempt to impose more stringent causation between the sex acts, under § 1591, and the benefit received, under § 1595. (*See*, *e.g.*, Gove MTD at 18) (arguing commissions and fees are paid "regardless of whether a sexual assault has taken place" and are, thus, insufficient to allege benefit.).

On January 5, 2023, Congress amended § 1595 of the TVPRA to extend civil

liability to anyone who "attempts or conspires to benefit" from a violation of the TVPRA. Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117–347, 136 Stat. 6199 (Jan. 5, 2003) (enacted as amended at 18 U.S.C. § 1595). Congress expressly noted that this amendment was "a technical and clarifying update." *Id.* § 102 (section adding new language titled as "SEC 102. TECHNICAL AND CLARIYING UPDATE TO CIVIL REMEDY."); *see ABKCO Music, Inc. v. LaVere,* 217 F.3d 684, 689 (9th Cir. 2000) ("We have long recognized that clarifying legislation is not subject to any presumption against retroactivity and it applies to all cases pending as of the date of its enactment[.]").

Gove acknowledges this precedent, but argues *Ratha* compels dismissal here. Prior to the enactment of the 2023 Amendment, the Ninth Circuit held "the phrase 'knowingly benefits' as used in § 1595(a) does not encompass attempts to benefit[.]" *Ratha*, 35 F.4th at 1176. "Had Congress intended to create liability under § 1595 for attempts to benefit, we can reasonably conclude that it would have done so in express terms." *Id.* Because plaintiffs had failed to raise a triable issue of fact as to whether defendants had, in fact, benefitted from their relationship with the alleged trafficker— as well as whether they had knowledge or participated—the court affirmed the district court's grant of summary judgment in defendants' favor. *Id.* Following the enactment of the 2023 Amendment, plaintiffs filed a motion for relief from judgment, arguing § 1595's new language should be retroactively applied, pursuant to Rule 60(b)(6)'s "extraordinary circumstances" analysis. *Ratha v. Phatthana Seafood Co., Ltd.*, No. 16-4271-JFW (ASx), 2023 WL 2762044 (C.D. Cal. Mar. 3, 2023) (*Ratha II*). Unlike the inquiry before this Court, post-judgment changes in law are analyzed under a six non-exhaustive factor test. *Ratha II*, 2023 WL 2762044, at *3 (citing *Byone v. Bacca,* 966 F.3d 972, 980 (9th Cir. 2020)). Under that test, the court reasoned that plaintiffs had failed to demonstrate participation, knowledge *and* benefit and, thus, the 2023 Amendment would not alter the court's decision—regardless of whether the new language applied. *Id.*, at *4.

40

The present motion is clearly distinguishable. Here, Plaintiffs filed their Complaint on February 22, 2023. (Dkt. 1). Their case was pending at the time of the 2023 Amendment's enactment and it is still pending. Regardless, Plaintiffs do not seek to apply this new language retroactively and only argue "attempt" as to Gove's continuing benefit. (*See* Dkt. 98 at 3) ("Plaintiffs have sufficiently alleged that Defendant Gove was in actual receipt of something of value prior to the 2023 Amendment but the question of attempt or conspire remains at issue for the ongoing benefit post 2023 Amendment. Any attempts made by Defendant Gove in 2023 to continue to receive something of value from the 'venture' falls squarely under the new amendment."). Therefore, the Court need not decide whether the 2023 Amendment represents a "change in substantive law and attaches new legal burdens to violations of the TVPRA[,]" requiring a clear statement from Congress before applying it retroactively. *Ratha II*, at *4 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 267 (1994)); *see also Ditullio,* 662 F.3d at 1100 (denying plaintiff's motion for partial summary judgment, seeking to retroactively apply newly enacted civil remedy to prior criminal conviction, pursuant to *Landgraf*).

Again, Plaintiffs allege that the RSP and Gove's placement within the Pyramid sufficiently establish his actual benefit. (Gove Opp. at 14) (citing to FAC ¶¶14–17; 22–28, 30-32, 48, 50, 55). The Court agrees. Each female Plaintiff was recruited by Bjorkman or his downline. (FAC ¶¶ 102, 111, 148). Each female Plaintiff was in Gove's downline and contributed to the RSP, of which Gove is a Vested Participant. (*Id.* ¶¶ 17, 22–28).  Again, regardless of the precise monetary amount that they individually contributed to the company, Plaintiffs' allegations, taken as true, demonstrate that Gove actually benefitted from Plaintiffs' recruitment and continues to benefit from the RSP. Gove argues Plaintiffs' allegations fail for two reasons. First, Gove did not receive new agent fees and, second, the benefit that he did receive from sale proceeds is unconnected to the sex acts. (Gove MTD at 18–20). The Court agrees

with Plaintiffs that the former argument disputes the facts and is, thus, not appropriate at this stage of proceedings. (Gove Opp. at 14–15). The latter argument which is partially irrelevant for reasons already discussed, concedes that Gove did, in fact, benefit from Plaintiffs' sale of real estate.

Construing these factual allegations in the light most favorable to Plaintiffs, as required by Rule 12(b)(6), there is a plausible inference that Gove financially benefitted from his relationship with Bjorkman and Golden. Plaintiffs have met their burden of pleading facts showing that Golden, Sanford and Gove "knowingly, financially benefitted" within the meaning of § 1595.

### b. Knowledge

All three Defendants argue Plaintiffs fail to allege the requisite "knowledge" for beneficiary liability. (Golden MTD at 9; Sanford MTD at 24–25; Gove MTD at 20–24). Beneficiary liability extends to those with constructive knowledge of, here, the drugging and sexual assaults. 18 U.S.C. § 1595 ("whoever knowingly benefits … from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."). This "should have known" language invokes a negligence standard which is satisfied along a spectrum. *M.A.*, 425 F. Supp. 3d at 965–66. In *M.A.,* the court provided an instructive discussion of this spectrum. *Id.* At one end is *Ricchio v. McLean*, where plaintiff alleged their trafficker worked with a hotel owner who intended to profit on the venture, satisfying the "reckless disregard" standard of § 1589 and, thus, the lower negligence standard of § 1595. 853 F.3d 553, 555 (1st Cir. 2017). Plaintiff alleged the two had a past business relationship, "high-fived" when they discussed the desire to "get[ ] this thing going again," and the hotel owner personally witnessed plaintiff's abuse. *Id.*. At the other end of the spectrum is *Lawson v. Rubin*, where plaintiff sued the owner of a condominium who leased to her trafficker. No. 17-cv-6404 (BMC), 2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018). There, the court found that one police visit and one ambulance visit at the condominium in six years was

insufficient to demonstrate defendant "knew or acted in reckless disregard" of the alleged trafficking. *Id.*, at * 13–14.

The *M.A.* court found plaintiff's claims fell somewhere between these two cases. 425 F. Supp. 3d at 966–67. There, the plaintiff alleged the following: their trafficker frequently paid in cash, requested rooms near exit doors, refused housekeeping services, and left "an extraordinary number" of used condoms in the trash cans; the same staff worked at hotels where plaintiff was trafficked for multiple days or weeks in succession; plaintiff's trafficker routinely escorted her in view of the front desk; staff ignored plaintiff's pleas and screams for help; and defendant's hotel locations were in areas "known for sex trafficking." *Id.* at 967. While the court found these allegations insufficient to demonstrate actual knowledge, it found they were sufficient to demonstrate negligence where "Defendants were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence." *Id.*

### i. Golden

Golden states, "there are no specific allegations that Defendant Golden had knowledge that each specific Plaintiff was allegedly being trafficked." (Golden MTD at 9). To the extent that this effectively raises the issue, the Court rejects Golden's argument. As discussed above, the Court finds Acevedo, Jane Doe 2 and Jane Doe 3 have plausibly demonstrated Golden's direct liability and, thus, his actual knowledge of their trafficking because even a "participant" under §1591(a)(2) must know that subsection (a)(1) was violated. *See Geiss*, 383 F. Supp. 3d at 167, n. 3 (discussing the two types of direct liability); *see also* 18 U.S.C. 1591(e)(4) (defining "participation in a venture" for subsection (a)(2) claims). The Court, therefore, only analyzes Golden's constructive knowledge insofar as it is necessary to analyze Jane Doe 1's claim— beginning with the observation that Golden's actual knowledge of the other Plaintiffs' trafficking informs what he should have known with respect to Jane Doe 1's assault. This conclusion is based on allegations including, but not limited to, the following.

All four women allege they were surreptitiously drugged by Bjorkman, Jane Does 2 and 3 specifically allege Golden supplied that drug, and Jane Doe 3 explicitly alleges to have seen Golden consume GHB. (FAC ¶¶ 153, 180, 184, 187, 190, 199, 202). Multiple women reported to police that Golden supplied Bjorkman with GHB and other illicit drugs. (*Id.* ¶ 61). Golden made it known to several women that he had videos and photos of their assault, which police allegedly have in their possession. (*Id.* ¶¶ 62–64). As discussed above, Golden and Bjorkman had a previous relationship that coincided with numerous allegations of drugging and sexual assault. (*Id.* ¶¶ 36, 43–47, 250). Despite knowing about these allegations, Golden encouraged Acevedo to stay in Bjorkman's hotel room. (*Id.* ¶¶ 90–98). Jane Doe 3 alleges that she discussed her assault with Golden, who told her to lie to the police. (*Id.* ¶ 154). Plaintiffs also allege that Golden has been accused of rape and that Bjorkman specifically told Jane Doe 1 that Golden was a "rapist" and a "dirtbag." (*Id.* ¶¶ 108–09, 175).

Taking these allegations as true, the First Amended Complaint demonstrates Golden was familiar with and had access to GHB, a known purpose of which is to render women incapacitated for the purpose of causing their sexual assault. These allegations also create the plausible inference that—at multiple points along the timeline of Bjorkman and Golden's relationship—Defendants were both engaged in drug use and sexual assault or, at the very least, that Golden knew of Bjorkman's reputation for such conduct. Plaintiffs have sufficiently pled that, at the very least, Golden should have known Bjorkman was routinely drugging women in order to sexually assault them, in violation of § 1591(a)(1).

### ii.    Sanford

Sanford argues Plaintiffs must allege "constructive knowledge of the trafficking venture specifically involving Plaintiffs[.]" (Sanford MTD at 24). However the authority he relies on is unpersuasive. First, Sanford draws an inapposite conclusion from *B.M.,* 2020 WL 4368214. There, the court did not find that the complaint insufficiently involved the plaintiff—it insufficiently involved the defendant. *B.M.,*

2020 WL 4368214, at *6 (finding allegations supported a theory that staff had knowledge, but "fail[ed] to allege facts as to how Wyndham (the ultimate parent company of the franchisor) and Choice (the franchisor)" were on notice). Second, *Doe 1 v. Red Roof Inns, Inc.*, applied the criminal statute's "participation" standard which this Court does not. 2021 WL 1872335, at *3. Sanford next points to cases in the hotel context that have found "an abstract awareness of sex trafficking" is not sufficient to sustain a TVPRA claim. (Sanford MTD at 24) (citing *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020); *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921, 938 (D. Or. 2020)). Even if the Court were persuaded by the reasoning in these decisions, they dealt with the specific context of hotel franchisor versus franchisee liability not applicable to the facts here and, regardless, Plaintiffs do not allege "an abstract awareness of sex trafficking."

Plaintiffs allege Defendant Sanford had both actual and constructive knowledge of Bjorkman's conduct. (Sanford Opp. at 17–19). In support of actual knowledge, Plaintiffs allege the following facts, which the Court considers true: Jane Doe 2 posted her experience on Facebook in September of 2020 (FAC ¶ 76); Jane Doe 1 reported her assault to eXp Leadership Team member, Corey Haggard, in October of 2020 (*id.* ¶ 129); and Acevedo reported her assault to Sanford directly on March 7, 2022. (*Id.* ¶ 104). Plaintiffs argue "§ 1595 has no timing requirement on 'actual knowledge[,]'" and, in the alternative, Defendants continue to receive a financial benefit from the venture even after, inevitably, acquiring actual knowledge of these allegations. (Sanford Opp. at 18; *see also* FAC ¶¶ 50–55, 75). Setting aside whether § 1595's knowledge element has *any* timing requirement, that timing is clearly with respect to the benefit obtained. *See* 18 U.S.C. § 1595(a) ("receiving anything of value from participation in a venture which that person knew or should have known has *engaged* in an act in violation of this chapter[.]") (emphasis added). Thus, the fact that Plaintiffs fail to allege Sanford had actual knowledge of Bjorkman's sex trafficking before they were individually assaulted is irrelevant for purposes of this claim. The issue is when he received the benefit and

45

Plaintiffs allege Sanford continues to benefit from the alleged venture. Taken as true, these allegations, alone, are sufficient to withstand a motion to dismiss.

To the extent that further analysis is necessary, the Court also considers Defendants' previous employment at Keller Williams, (FAC ¶ 250; Sanford Opp. at 18), and the extensive history of allegations that Bjorkman and Golden drugged and assaulted women and used GHB recreationally during that time. (FAC ¶¶ 44–46, 153). Plaintiffs argue Sanford is liable for failing to implement policies sufficient to address this known behavior. (Sanford Opp. at 18). Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence. *See Brown v. Corr. Corp. of Am.*, 603 F. Supp. 2d 73, 81 (D.D.C. Mar. 26, 2009) (finding that complaint stated sufficient allegations under § 1983, based on willful blindness, where defendants knew that a supervisor at a correctional facility raped his employee, sexual harassment at the facility "was not an isolated incident," and defendants failed "to implement and effectuate the appropriate policies ... to remedy and/or prevent the discriminatory conduct, sexual abuse and sexual harassment and rape."); *Trollinger v. Tyson Foods, Inc.*, No. 4:02-cv-23, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007) (finding that a "willful blindness policy" could be sufficient to show a RICO violation); *see also M.A.*, 425 F. Supp. 3d at 968 (applying this reasoning and finding TVPRA liability for franchisor hotels' failure to implement such policies). Here, the allegations are sufficient to meet § 1595's negligence standard. Plaintiffs have alleged that Sanford was on notice about the prevalence of illicit drug use and sexual assault at recruitment events, generally, and at the hands of Bjorkman and Golden, specifically, and he failed to take adequate steps when training Sponsor Agents to prevent its occurrence—despite eXp's control over training and emphasis on recruiting. These allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss.

### iii. Gove

Gove argues Plaintiffs fail to allege he had knowledge of the sexual misconduct

before his alleged benefit, as required by *Ratha*, 35 F.4th at 1180. (Gove MTD at 20).[16]

Plaintiffs argue "the TVPRA is silent as to when the receipt of the benefit must occur in relation to the actual or constructive knowledge." (Gove Opp. at 17). However, the Court need not resolve that issue because Plaintiffs allege Gove continues to benefit from Bjorkman's conduct.[17]

Gove argues "[a]t most, the FAC alleges that Gove learned of this misconduct on March 8, 2021, well after the end of the venture, and after Bjorkman's termination." (Gove MTD at 20–21). Gove argues Plaintiffs' other allegations—namely, that he attended some of the events where the conduct occurred—are insufficient to demonstrate otherwise. (Gove MTD at 21–22). However, Bjorkman's termination is largely irrelevant. The "venture" is the Revenue Share Program. Not only has the RSP not ended, but Bjorkman's recruited agents continue to contribute to it and Bjorkman continues to benefit from it. (*See* FAC ¶ 17).

Plaintiffs argue Gove's reliance on March 8, 2021, is misplaced because Gove obtained actual knowledge on March 3, 2021, when Jane Doe 3 told him that Bjorkman had assaulted her. (*Id.* ¶¶ 158, 232). Ignoring this allegation creates the plausible inference that Gove ignored or, at least, overlooked other notice about Bjorkman's conduct. Plaintiffs argue the following allegations support this: in August of 2020, Gove attended the Las Vegas event, where he saw Jane Doe 3 was "out of her mind which

---

[16] Gove also relies on the same cases as Golden which the Court has already discussed above. (*See* Gove MTD at 23–24).

[17] *Ratha* found plaintiffs failed to create a triable issue that defendant benefitted from the alleged venture after the undisputed date upon which knowledge was obtained and, thus, affirmed summary judgment in defendant's favor. 34 F. 4th at 1180. While this ostensibly defeats Plaintiffs' argument that the TVPRA has no timing requirement, the Court declines to answer that question. Here, on a motion to dismiss, the Court does not have the benefit of undisputed facts and, more importantly, Plaintiffs allege Defendants continue to benefit, unlike *Ratha.*

47

was completely out of character" (FAC ¶ 157); in September, Jane Doe 2's Facebook Post detailing her experience at the Las Vegas event was spread widely among eXp agents, as were the replies to that post detailing similar experiences at eXp recruiting events (*id.* ¶ 76); days later, Bjorkman was removed from eXp and Gove threatened to pull his entire team if Defendant Golden was terminated (*id.* ¶¶ 48, 74); and Gove attempted to interfere with the LVPD police investigation before Bjorkman was arrested. (*Id.* ¶ 233) (*See also* Gove Opp. at 16). Plaintiffs also allege Gove personally hosted recruiting events where Defendants Bjorkman and Golden assaulted other women. (FAC ¶ 71).

Taken as true and read together in the light most favorable to Plaintiffs, these allegations plausibly demonstrate that Gove actually knew about Bjorkman's alleged conduct, at the very least, in August or September of 2020. Moreover, for the reasons discussed above, Plaintiffs plausibly demonstrate that Gove and Sanford knew or should have known about Bjorkman's reputation and, therefore, should have known about his violative conduct much earlier. Plaintiffs have met their burden of satisfying "knowledge" as required by § 1595 beneficiary liability sufficient to survive a motion to dismiss.

### c. *Participation*

Defendants Sanford and Gove argue Plaintiffs fail to allege that they "participated in a venture" within the meaning of § 1595. (Sanford MTD at 18–22; Gove MTD at 14–16).[18] Specifically, Sanford argues this requires "an overt act" and

---

[18] Golden does not raise and, thus, waives argument on this issue. Regardless, having found that Plaintiffs have plausibly demonstrated Golden violated § 1591(a)(1) and, thus, participated in a sex trafficking venture, the Court finds Plaintiffs have also sufficiently alleged Golden participated in the broader definition of a "venture" under § 1595. To the extent that further analysis is necessary, as to Jane Doe 1's claim, the Court finds the First Amended Complaint plausibly establishes a direct association and business relationship between Golden and Bjorkman, sufficient to state a claim.

1    Gove argues this requires "physical participation" that is "more than a passive

2    benefit." (Sanford MTD at 18; Gove MTD at 16). As explained above, the *M.A.*

3    school of thought does not require a plaintiff asserting beneficiary liability to allege an

4    overt act. *M.A.,* 425 F. Supp. 3d at 970. Rather, a plaintiff must allege the defendant

5    had a direct association or a business relationship with their trafficker, the latter of

6    which can be demonstrated by a pattern of conduct or a tacit agreement. *Mindgeek*,

7    558 F. Supp. 3d at 837 (citing *M.A.*, 425 F. Supp. 3d at 970; *J.B. v. G6 Hospitality,*

8    *LLC,* No. 19-cv-07848-HSG, 2020 WL 4901196, *9 (N.D. Cal. Aug. 20, 2020); *A.B.*

9    *v. Marriot Int'l, Inc.*, 455 F. Supp. 3d at 186).

10        Sanford's proffered authority does not dissuade the Court from adopting this

11   standard. *See*, *e.g.*, *Afyare*, 632 F. App'x at 280–86; *Ricchio,* 853 F.3d 553; *Noble*,

12   335 F. Supp. at 524 (all involving § 1591(a)(2) claims); *see also Red Roof Inns, Inc.*,

13   21 F.4th at 726–27 (Eleventh Circuit applying the criminal standard to § 1595 where

14   plaintiff did not, until appeal, allege anything other than a "sex trafficking venture").

15   In fact, while Sanford is correct that the court in *S.G. v. Vagabond Inn Corp.*

16   recognized the Eleventh Circuit's rationale was not "inconsistent with those laid out

17   by Courts in this circuit[,]" the court ultimately adopted the more lenient standard set

18   out in *M.A.* No. SACV 21-955 PSG (KESx), 2022 U.S. LEXIS 104102, *9 (C.D. Cal.

19   Mar. 2, 2022). This Court also adopts that standard.

20        In support of his argument that "more than a passive benefit" is required, Gove

21   cites to a prior opinion in the *Ratha* case that is inapplicable—although, arguably

22   detrimental to his argument. No. 16-4271-JFW (ASx), 2017 WL 8293174, *4 (C.D.

23   Cal. Dec. 21, 2017), *aff'd*, 26 F.4th 1029 (9th Cir. 2022), and *aff'd sub. nom.*, *Ratha*, 35

24   F.4th 1159 (9th Cir. 2022). There, the court granted summary judgment in favor of

25   defendants alleged to have violated the TVPRA's sections prohibiting peonage, forced

26   labor, involuntary servitude, unlawful conduct with respect to documents, and human

27   trafficking—not sex trafficking. *Id.*, at *2. In fact, the court rejected plaintiffs' argument

28   that "the TVPRA criminalizes merely 'passive' beneficiaries" because it "relie[d] on

49

the definition of 'venture' in the TVPRA that expressly relates solely to sex trafficking[
]"—signaling, though not deciding, that "passive" beneficiaries of *sex* trafficking *may*
violate the TVPRA. *Id.*, at \*4. Thus, to the extent that evidence of "action to operate or
manage the venture" is required for some TVPRA claims on a motion for summary
judgment, that is not the inquiry here. *Id.*

Here, Plaintiffs argue Bjorkman's relationship with Sanford and Gove
demonstrates direct association and a business relationship—not requiring a tacit
agreement, though "one exists and could be demonstrated." (*See* Sanford Opp. at 14).
In sum, Plaintiffs allege, "all Defendants are involved in a venture, described in detail
as a multi-level marketing ("MLM") enterprise from which its members are partners in
a Revenue Share Pyramid that requires continual recruitment of new agents for the
direct financial benefit of everyone upline, including, and most specifically, Defendant
Sanford, sitting alone at the top of the  pyramid." (Sanford Opp. at 16) (citing FAC ¶
16). Gove participated in the same venture, in order to benefit from each Plaintiffs'
placement in his upline, by "promot[ing] Defendants Bjorkman and Golden's
recruitment efforts, which included luring agents to attend recruitment events with
promises of career advancement." (Gove Opp. at 13) (citing FAC ¶¶ 1–2, 26–27, 32,
72, 102, 133, 163, 205–210).

Construing these factual allegations in the light most favorable to Plaintiffs, as
required by Rule 12(b)(6), there is a plausible inference that Sanford and Gove had
direct association and a business relationship with Bjorkman and, thus, "participated
in a venture"—the Revenue Share Plan—that they knew or should have known
violated the TVPRA. Plaintiffs have met their burden of pleading facts showing that
Golden, Sanford and Gove are beneficiaries of Bjorkman's sex trafficking and, thus,
liable under § 1595. Accordingly, the Court **DENIES** Defendants Sanford, eXp
Realty, Golden, and Gove's motions to dismiss Count 3.

### 3. Counts 4–11: State Tort Claims

Plaintiffs' remaining causes of action (Counts 4–11) are all state law claims.

50

(FAC ¶¶ 211–252). All Defendants argue these claims are barred by a two-year statute of limitations. (Bjorkman MTD at 22–24; Golden MTD at 12; Sanford MTD at 25–26; Gove MTD at 26, 29). Defendants Sanford and Gove argue the claims against them also fail to sufficiently plead various elements. (Sanford MTD at 27–31; Gove MTD at 27–30). The Court first addresses the statute of limitations and then Defendants' arguments as to each claim in turn.[19]

### a. Statute of Limitations

Plaintiffs bring the following state law claims: Acevedo, Jane Doe 1 and Jane Doe 3 allege sexual battery against Bjorkman (Count 4); all female Plaintiffs allege civil battery against Bjorkman and Jane Doe 2 and Jane Doe 3 also allege civil battery against Golden (Count 5); all female Plaintiffs allege intentional infliction of emotional distress ("IIED") against all Defendants (Counts 6–8); all female Plaintiffs allege negligence against all Defendants (Count 9) and negligent hiring, retention and supervision against Sanford (Count 10); John Doe alleges loss of consortium against all Defendants (Count 11). (FAC ¶¶ 211–254).

The statute of limitations is an affirmative defense that "may be raised by a motion for dismissal . . . . [i]f the running of the statute is apparent on the face of the complaint . . . ." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) (external citations omitted). "[T]he defendant has the burden of proving the action is time-barred." *Grisham v. Phillip Morris, Inc.*, 670 F. Supp. 2d 1014, 1020 (C.D. Cal. 2009) (external citations omitted); *see also ASARCO, LLC v. Unicon Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) ("Dismissal under Rule 12(b)(6) on the basis of an affirmative defense is proper only if the defendant shows some obvious bar to securing

---

[19] Having found Plaintiffs' TVPRA claims have been sufficiently pled, the Court rejects Bjorkman and Golden's argument that the state law claims lack subject matter jurisdiction. (Bjorkman MTD at 20–22; Golden MTD at 11).

relief on the face of the complaint."). A defendant's motion to dismiss, therefore, can be granted "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove plausibly that the statute was tolled." *See Jablon*, 614 F.2d at 682.

It is undisputed that until recently Plaintiffs' state tort claims were subject to a two-year statute of limitations, whether brought in California or Nevada. *See* Cal. Civ. Proc. Code § 335.1 (actions for "assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another[,]" must be brought within two years); *see also* Nev. Rev. Stat. § 11.90 ("Except as otherwise provided … an action to recover damages for injuries to a person or for the death of a person caused by the wrongful act or neglect of another[,]" must be brought within two years). It is also undisputed that the California and Nevada legislatures have extended that period for certain claims of sexual assault. *See* Cal. Civ. Proc. Code § 340.16(a); 2018 Cal. Stat. Ch. 939 (A.B. 1619), § 1, eff. Jan 1, 2019; *see also* 2023 Nev. Stat. Ch. 112 (S.B. 129), eff. May 31, 2023.[20] The Court must apply California's choice-of-law rules in order to address the parties' arguments about these new laws, which can be summarized as follows.

In their motions to dismiss each Defendant argues Plaintiffs' claims are barred by California's two-year statute of limitations. (Sanford MTD at 25–26; Gove MTD at

---

[20] Section 340.16 has been amended four times since it was enacted. 2019 Cal. Stat. Ch. 462 (A.B. 1510), § 1, eff. Oct. 2, 2019; 2020 Cal. Stat. Ch. 246 (A.B. 3092), § 1, eff. Jan. 1, 2021; 2022 Cal. Stat. Ch. 442 (A.B. 2777), § 3, eff. Jan. 1, 2023. The Court hereinafter refers to California's statute as "section 340.16."

While S.B. 129 made changes to Chapter 11 of the Nevada Revised Statutes ("NRS") that were immediately effective on May 31, 2023, the most recent publication of the NRS is the 2021/2022 edition. *See* Nevada Legislative Counsel Bureau, *Nevada Law Library,* https://www.leg.state.nv.us/law1.html (last visited Jan. 24, 2024). The Court hereinafter refers to Nevada's statute as "S.B. 129."

26, 29; Bjorkman MTD at 22–24; Golden MTD at 12). In their oppositions Plaintiffs argue their claims are revived under section 340.16. (Sanford Opp. at 19–22; Gove Opp. at 18–19; Bjorkman Opp. at 14–16; Golden Opp. at 10–11). Sanford, Gove and Bjorkman respond by arguing that Plaintiffs fail to allege a "cover up" under subsection (e) of section 340.16. (Sanford Reply at 12–13; Gove Reply at 18–19; Bjorkman Reply at 13–14). Golden additionally argues, for the first time in his Reply, that Jane Doe 2, Jane Doe 3 and John Doe's claims are controlled by Nevada law and, thus, time-barred irrespective of section 340.16's applicability. (Golden Reply at 7). In their supplemental briefs on that issue, Plaintiffs argue their claims are open under either section 340.16 or S.B. 129 and, thus, there is no conflict of law. (Dkt. 121 at 5, 7). Defendants Bjorkman and Golden argue this Court must apply Nevada law to Jane Doe 2, Jane Doe 3 and John Doe's claims which are not subject to S.B. 129. (Dkt. 122 at 5–8; Dkt. 123 at 4–5).

For the reasons stated below, the Court finds that there is a difference between California's section 340.16 and Nevada's S.B. 129 but, by operation of California's borrowing statute, only Jane Doe 2's claims require choice-of-law analysis. Ultimately, the Court concludes that all of Jane Doe 2's claims are revived under section 340.16, some of Jane Doe 3's claims are revived under S.B. 129, and John Doe's claim is time-barred.

### i.     California's Governmental Interest Test

"In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state—in this case, California." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996) (citations omitted). In California, "general choice-of-law rules have been formulated by courts through judicial decisions rendered under the common law, rather than by the legislature through statutory enactments." *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 83 (2010) (collecting cases). California courts apply the "governmental interest" test to resolve choice-of-law questions. *Id.* That test

sets out the following three-part inquiry:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" [citation], and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied."

*Chen v. Los Angeles Truck Centers, LLC*, 7 Cal. 5th 862, 867–68 (citing *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107–08 (2006)).

Here, the potentially affected jurisdictions are California and Nevada. Thus, the Court must determine whether any of Jane Doe 2, Jane Doe 3 or John Doe's claims are time-barred in either of those states. First, the Court applies California law to those claims and, at the same time, considers whether Plaintiffs Acevedo and Jane Doe 1's claims are revived by section 340.16. Next, the Court applies Nevada law to Jane Doe 2, Jane Doe 3 and John Doe's claims to determine if there is a different result.

### ii.    California's Borrowing Statute

A majority of states have enacted "borrowing statutes" that direct the courts of a state, in lawsuits filed within that state, to apply or "borrow" the statute of another state when the cause of action in question "arose," "originated," or "accrued" in the other state and would be barred as untimely in that state. *McCann,* 48 Cal. 4th at 83–85. Borrowing statutes specifically seek to prevent forum shopping. *Id.* at 84. Under common law, the local statute of limitations of the forum state applied to an action filed in the forum state, regardless of the location of the most significant events. *Id.* When a forum state's statute was shorter than the other jurisdiction's statute, the plaintiff could still bring suit in the other state. *Id.* However, when the forum state's statute was longer, a plaintiff who had failed to timely file an action in the state in which the action arose, had the opportunity to search out another jurisdiction with a longer statute—"a classic

example of questionable forum shopping." *Id.* Many borrowing statutes include an exception for lawsuits filed by residents or citizens of the forum state. *Id.* at 85. California's borrowing statute adopts this general rule and exception:

> When a cause of action has arisen in another State, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this State, except in favor of one who has been a citizen of this State, and who has held the cause of action from the time it accrued.

Cal. Civ. Proc. Code § 361.[21]

In their supplemental briefs on the choice-of-law issue, Bjorkman and Golden argue Jane Doe 2, Jane Doe 3 and John Doe's claims are time-barred by Nevada's two-year statute of limitations because they allege torts that occurred exclusively in Nevada. (Dkts. 122–23). Specifically, Bjorkman argues that section 361's exception does not apply because Jane Doe 2 has not alleged that she is a citizen of California and Jane Doe 3 and John Doe are citizens of Florida. (Dkt. 122 at 5, n. 1, 6). Because Jane Doe 2 has alleged that she is a citizen of California, (FAC ¶ 9), the Court proceeds with California's governmental interest test with respect to her claims. *See McCann*, 48 Cal. 4th at 86–87 (section 361 cannot compel application of the California statute of limitations and the question of which jurisdiction's statute should be applied in a particular case must be determined through application of the governmental interest analysis). However, because Jane Doe 3 and John Doe are citizens of Florida, (FAC ¶¶ 10–11), and their cause of action stems from alleged incidents that occurred in Nevada,

---

[21] Nevada's borrowing statute operates similarly, by applying the general rule and creating an exception for lawsuits filed by Nevada residents or citizens. *See* Nev. Rev. Stat. § 11.020. With respect to Nevada's borrowing statute, Jane Doe 2's claims did not "arise" in another state—the premise of Defendants' choice-of-law argument is that they arose in Nevada. Thus, it is irrelevant that Jane Doe 2 is not a citizen or resident of Nevada for purposes of applying S.B. 129.

those claims may only be brought in California if permitted under the laws of Nevada. *See Shubin v. Universal Vacation Club*, 622 F. Supp. 3d 849, 852 (C.D. Cal. 2022) (under California choice-of-law rules, section 361 barred Idaho residents' claims that arose from alleged incidents that occurred in Cabo San Lucas, Mexico). Accordingly, the Court need not address the applicability of section 340.16 with respect to Jane Doe 3 and John Doe's claims.

### iii.     California's Section 340.16

Section 340.16 was enacted in 2018 and took effect on January 1, 2019. Cal. Civ. Proc. Code § 340.16; 2018 Cal. Stat. Ch. 939 (A.B. 1619), § 1. Since October 2, 2019, section 340.16 has provided:

> [i]n any civil action for recovery of damages suffered as a result of sexual assault, where the assault occurred on or after the plaintiff's 18th birthday, the time for commencement of the action shall be the later of the following:
>
> (1) Within 10 years from the date of the last act, attempted act, or assault with the intent to commit an act, of sexual assault against the plaintiff.
>
> (2) Within three years from the date the plaintiff discovers or reasonably should have discovered that an injury or illness resulted from an act, attempted act, or assault with the intent to commit an act, of sexual assault against the plaintiff.

Cal. Civ. Proc. Code § 340.16(a) (as amended by 2019 Cal. Stat. Ch. 462 (A.B. 1510), § 1).

Among other changes, the 2019 amendment specifically enlarged the statute of limitations for civil claims against defendants who were not alleged to have committed sexual assault.[22] "Sexual assault" under section 340.16 is defined to mean any of a

---

[22] From January 1, 2019 through October 1, 2019, the ten-year and three-year periods were defined with reference to an "act, attempted act, or assault with intent to commit an act, of sexual assault *by the defendant* against the plaintiff." 2018 Cal. Stat. Ch. 939 (A.B. 1619), § 1 (italics added). Since October 1, 2019 subsection (a), by its terms, is not limited to defendants who sexually assaulted the plaintiff. Cal. Civ. Proc. § 340.16(a); *see also Doe #21 (S.H.) v. CFR Enterprises, Inc.,* 93 Cal. App. 5th 1199, 1208, n. 9 (Cal. Ct. App. First 2023).

The 2019 amendment also added subsection (b)(2) which provides: "For the

number of crimes described in the California Penal Code, assault with the intent to commit any of those crimes, or an attempt to commit any of those crimes. Cal. Civ. Proc. Code § 340.16(b)(1).[23] This definition includes sexual battery and rape, which are described in distinct sections of the California Penal Code. *Id.*[24]

Effective January 1, 2023, section 340.16 was amended to add two revival provisions. 2022 Stats. Ch. 442 (A.B. 2777), § 3. First, subdivision (b)(3) was added to provide that section 340.16 apply retroactively to "any action described in subdivision (a) that is based upon conduct that occurred on or after January 1, 2009, and is commenced on or after January 1, 2019, that would have been barred solely because the applicable statute of limitations has or had expired. Such claims are hereby revived and may be commenced until December 31, 2026." Cal. Civ. Proc. Code § 340.16(b)(3).

Second, subdivision (e) was added to establish a one-year window reviving claims where the plaintiff additionally alleges that the defendant or defendants "engaged in a cover up or attempted a cover up of a previous instance or allegations of

---

purposes of this section, it is not necessary that a criminal prosecution or other proceeding have been brought as a result of the sexual assault or, if a criminal prosecution or other proceeding was brought, that the prosecution or proceeding resulted in a conviction or adjudication. This subdivision does not limit the availability of causes of action permitted under subdivision (a), including causes of action against persons or entities other than the alleged person who committed the crime." Cal. Civ. Proc. § 340.16(b)(2).

[23] Between 2019 and 2023, there were minimal changes made to the language of subsection (b)(1), however the same Penal Code sections are identified. *See* 2019 Cal. Stat. Ch. 462 (A.B. 1510), § 1; 2020 Cal. Stat. Ch. 246 (A.B. 3092), § 1; 2022 Cal. Stat. Ch. 442 (A.B. 2777), § 3.

[24] Section 340.16(b)(1) provides: "As used in this section, 'sexual assault' means any of the crimes described in Sections 243.4, 261, 264.1, 286, 287, or 289, or former Sections 262 and 288a, of the Penal Code, assault with the intent to commit any of those crimes, or an attempt to commit any of those crimes." *See* Cal. Penal Code §§ 243.4 (sexual battery), 261 (rape).

sexual assault by an alleged perpetrator of such abuse." Cal. Civ. Proc. Code §
340.16(e).[25] Such claims may be brought until December 31, 2023, regardless of when
the underlying conduct occurred. Cal. Civ. Proc. Code § 340.16(e)(1).[26] A claim is
revived under subdivision (e) where the plaintiff alleges that they were sexually
assaulted; that one or more entities are legally responsible for damages arising out of
the sexual assault; and that "[t]he entity or entities, including but not limited to, their
officers, directors, representatives, employees, or agents, engaged in a cover up or
attempted a cover up of a previous instance or allegations of sexual assault by an alleged
perpetrator of such abuse." Cal. Civ. Proc. Code § 340.16(e)(2)(A)–(C). "Legally
responsible" is defined as meaning that "the entity or entities are liable under any theory
of liability established by statute or common law, including, but not limited to,
negligence, intentional torts, and vicarious liability." Cal. Civ. Proc. Code §
340.16(e)(4)(C). "Cover up" is defined as "a concerted effort to hide evidence relating
to a sexual assault that incentivizes individuals to remain silent or prevents information
relating to a sexual assault from becoming public or being disclosed to the plaintiff,

---

[25] Subdivision (e)(1) provides: "Notwithstanding any other law, any claim seeking to
recover damages suffered as a result of a sexual assault that occurred on or after the
plaintiff's 18th birthday that would otherwise be barred before January 1, 2023, solely
because the applicable statute of limitations has or had expired, is hereby revived, and
a cause of action may proceed if already pending in court on January 1, 2023, or, if not
filed by that date, may be commenced between January 1, 2023, and December 31,
2023." Cal. Civ. Proc. Code § 340.16(e)(1).

[26] Opposition to A.B. 2777 makes clear that—in addition to the "cover up" pleading
requirement—the qualifying distinction between the two revival provisions is whether
the alleged sexual assault must have occurred before 2009. "AB 2777 provides a one-
year 'reviver' window in 2023 to sue for alleged sexual assault or other inappropriate
conduct of a sexual nature that can go back in time for half a century or more." 21
California Assembly Bill No. 2777, California 2021-2022 Regular Session, Senate
Floor Analysis at 8; *see also Doe #21 (S.H.) v. CFR Enterprises, Inc.,* 93 Cal. App. 5th
1199, 1211 (Cal. Ct. App. First 2023) ("Unlike the revival provision in section
340.16(b)(3), section 340.16(e) applies to claims regardless of when the alleged sexual
assault occurred[.]").

including, but not limited to, the use of nondisclosure agreements or confidentiality agreements." Cal. Civ. Proc. Code § 340.16(e)(4)(A). "[N]othing in the language of the statute requires that the alleged cover up involve a previous instance of sexual assault by the same individual who later assaulted plaintiff[,]" but requires only that the plaintiff allege a cover up that predated her alleged assault. *Doe #21 (S.H.) v. CFR Enterprises, Inc.,* 93 Cal. App. 5th 1199, 1211, 1222 (Cal. Ct. App. First 2023).

The parties' briefing on this issue is circuitous and suffers, in part, due to the repetitive nature of Defendants' motions to dismiss which were individually filed nearly three months apart. (Dkts. 41-1, 63, 77-1, 88). The Court summarizes the critical points as follows. In Plaintiffs' oppositions and Defendants' replies the parties only dispute the applicability of subsection (e) and, specifically, whether Plaintiffs have sufficiently alleged a cover up. (Sanford Opp. at 19–22; Gove Opp. at 18–19; Bjorkman Opp. at 14–16; Golden Opp. at 10–11; Sanford Reply 12–13; Gove Reply 18–19; Bjorkman Reply at 13–14; Golden Reply at 7). In their supplemental brief, Plaintiffs argue that Defendants Bjorkman and Golden are directly liable under subsection (a) and, therefore, need not demonstrate a cover up to revive those claims. (Dkt. 121 at 6, n. 3). Golden and Bjorkman do not respond to this argument. (Dkts. 122–23). Plaintiffs do not argue that Defendants Sanford or Gove are also directly liable under subsection (a) and, instead, imply that they are *only* liable *if* Plaintiffs sufficiently allege a cover up under subsection (e). However, upon a complete review of the briefing—and because Defendants Bjorkman and Golden raise the issue of choice-of-law, which requires the Court to analyze which statute of limitations does, in fact, apply in California state court—the Court concludes subsection (a) directly applies to Defendants Sanford and Gove, as well. It is Defendants' burden on a motion for dismissal to demonstrate why Plaintiffs cannot possibly revive their claims under section 340.16. Consequently, the Court only addresses the parties' arguments about specific subsections of the California statute, insofar as it must decide whether Defendants have met their burden.

While there is little caselaw on this newly enacted statute, the Court is persuaded

59

by the statutory analysis provided by the First Division of the Second District of the California Court of Appeal. *S.H.*, 93 Cal. App. 5th 1199. There, plaintiffs alleged that massage chain franchise defendants "concealed or suppressed" information about a "rampant problem of sexual assaults" occurring at their stores between August of 2003 and November of 2014. *Id.* at 1204. In 2019, eighteen plaintiffs brought multiple causes of action including sexual battery, negligence, and intentional infliction of emotional distress, against the franchises based on their employees' conduct, arguing their claims were revived under both subdivisions (b)(3) and (e) of section 340.16. *Id.* at 1205. After extensive statutory analysis, the Court made two conclusions that are relevant here.

First, section 340.16, by its terms, is not limited to *claims* of sexual assault, but applies to *any action* seeking damages *as a result of* sexual assault, regardless of the legal theory alleged. *Id.* at 1209–1210. Second, subdivisions (b)(3) and (e) are distinct, but not mutually exclusive, revival provisions. The Court explained the distinction between the two provisions—apart from the cover up—is the date of the underlying assault. *Id.* at 1211 ("[T]his means that the claims of Jane Doe No. 18 and Jane Doe No. 19, who allege they were assaulted before January 1, 2009, are potentially subject to revival under section 340.16(e) even though those claims are not revived by section 340.16(b)(3). And the claims of the other remaining plaintiffs who allege they were assaulted on or after January 1, 2009 are also potentially subject to revival by section 340.16(e), as well as section 340.16(b)(3)."). In other words, a "cover up" is not necessary to hold an entity liable under section 340.16. Rather, subdivision (e) creates an additional way to hold entities liable, even when an individual may evade liability under subdivision (b)(3) because the alleged sexual assault occurred before 2009.

Here, Plaintiffs seek damages resulting from sexual assault that allegedly occurred after January 1, 2009, potentially reviving their claims under subdivision (b)(3), *and* they allege some or all Defendants engaged in a cover up, potentially

reviving their claims under subdivision (e) as well.[27] Regardless of which subdivision applies, the same underlying claim is revived—namely, an "action for recovery of damages suffered as a result of sexual assault" as defined by subdivision (b)(1). *See* Cal. Civ. Proc. § 340.12(a)–(b). Plaintiffs argue their claims against Bjorkman and Golden are revived under subdivision (b)(3) and correctly state that they need not allege a cover up with respect to those claims. (Dkt. 121 at 6, n. 3). However, no Defendant persuades the Court that Plaintiffs need allege a cover up at all.

Acevedo and Jane Doe 1 bring an action for sexual battery against Bjorkman (Count 4). (FAC ¶¶ 211–215).[28] As one of the enumerated actions constituting "sexual assault" under subdivision (b)(1), Count 4 is clearly revived. All female Plaintiffs bring an action for civil battery against Bjorkman and Jane Doe 2 brings a claim for civil battery against Golden (Count 5). (*Id.* ¶¶ 216–223). Plaintiffs allege that Defendants intentionally placed a drug in their drinks, without their consent, to render them unconscious for the purpose of causing their sexual assault. In other words, Plaintiffs allege battery "with the intent to commit" sexual battery, provided for in subdivision (b)(1). Thus, subdivision (b)(3) revives, not only Counts 4 and 5, but any claim "for recovery of damages suffered as a result of" those sexual assaults. So long as Plaintiffs seek damages that they experienced as a result of being sexually battered or drugged, those claims are revived under subdivision (b)(3), regardless of the legal theory alleged. This includes Plaintiffs' IIED claims against Bjorkman and Golden (Count 6), alleging Defendants caused their injuries by "subjecting them to forceful sexual touching and assault" (i.e., sexual battery and/or drugging), as well as the negligence claims against Bjorkman and Golden (Count 9) realleging the same conduct. (*Id.* ¶¶ 224–28, 242–46).

---

[27] Unlike the plaintiffs in *S.H.*, Plaintiffs do not allege sexual assault that occurred before 2009 and, thus, subsection (e) is not necessary to save their claims.

[28] Because Jane Doe 3 and John Doe are not subject to section 361's exception, the Court excludes those claims (Counts 4–11) from its analysis of section 340.16.

It also includes the IIED and negligence claims against Sanford and Gove (Counts 7–9) because Plaintiffs allege Defendants' various actions—such as denying sponsorship requests and interfering with the criminal investigation—exacerbated the injuries they experienced "as a result of [their] sexual assault." (*Id.* ¶¶ 229–246). Plaintiffs also allege Sanford negligently hired, retained and supervised Golden and Bjorkman (Count 10). (*Id.* ¶¶ 247–252). While the hiring and training predated the alleged sexual battery and drugging, Plaintiffs allege Sanford's negligent practices caused their sexual battery and drugging, and they seek damages suffered "as a result of [that] sexual assault." Cal. Civ. Proc. Code § 3401.16(a). Plaintiffs also argue that Sanford retained Bjorkman and Golden after learning about their reputation and after learning about Plaintiffs' own assaults. (*See* FAC ¶¶ 250, 45–47, 83). The nexus of these events underscores that the injuries all stem from the alleged sexual assaults. Like the plaintiffs in *S.H.*, Plaintiffs allege various legal theories, but each claim seeks to recover damages that Plaintiffs would not have suffered, but for their sexual assault. Such claims are actions for "recovery of damages suffered as a result of sexual assault[.]"

While not necessary, the Court also finds that Plaintiffs have sufficiently alleged a cover up within the meaning of subdivision (e). Plaintiffs allege: (1) they were sexually assaulted; (2) Defendant eXp, a limited liability company and corporation, is legally responsible under the TVPRA, as well as theories of negligence; and (3) Defendants Sanford and Gove made a concerted effort to hide specific incidents of sexual assault, as well as Defendants Bjorkman and Golden's known "pattern and practice of predatory sexual conduct." (FAC ¶¶ 12–13, 83–84, 104–05, 173). Defendant Sanford is the Founder, Chairman of the Board, and CEO of eXp, as well as the top agent of its Revenue Share Pyramid. (*Id.* ¶¶ 16, 239). Defendant Gove is a real estate agent and top Influencer at eXp, whose downline translates to more than one-fifth of eXp's agents. (*Id.* ¶ 69). These roles satisfy the expansive language which "include[es] but [is] not limited to … officers, directors, representatives, employees or agents[,]" of a "limited liability company [or] corporation[.]" Cal. Civ. Proc. Code §§

340.16(e)(2)(C), (4)(B). Plaintiffs allege Sanford and Gove engaged in a cover up by means of "repeated gaslighting, the use of Non-Disclosure Agreements, and interference with the criminal investigation." (Sanford Opp. at 20; FAC ¶¶ 80–84, 154–56, 168, 175, 176). This describes a "concerted effort to hide evidence … that incentivizes individuals to remain silent or prevents information relating to a sexual assault from becoming public … including, but not limited to, the use of *nondisclosure agreements*[.]" Cal. Civ. Proc. Code § 340.16(e)(4)(A) (emphasis added).

Several of these allegations demonstrate that Defendants attempted to cover up Plaintiffs' own alleged sexual assaults because "they thought more women would come forward." (FAC ¶ 166). However, read as a whole, the First Amended Complaint creates the plausible inference that Defendants also attempted to cover up a "previous instance or allegations of sexual assault" as required by subsection (e)(2)(C). The Arrest Warrant Declaration includes multiple accounts of women being drugged and assaulted by Bjorkman at eXp Realty recruitment events, as well as a "long history" of similar accusations dating back to 2000. (*Id.* ¶¶ 43–44, 47). This includes an eXp agent that reported her 2007 rape to her Sponsor Agent in October of 2018 and tried to report it to eXp's Designated California Broker. (*Id.* ¶¶ 45–46). Another eXp agent informed eXp that Golden raped her and eXp denied her request to change sponsorship. (*Id.* ¶ 175). All Defendants knew each other from Keller Williams which overlaps with the alleged prior assaults. (*Id.* ¶¶45–46, 175, 250). At the hearing, Plaintiffs also stated that their allegations regarding the use of nondisclosure agreements refer to incidents that predate Plaintiffs' alleged assaults. Plaintiffs further allege that eXp's former president was accused of sexual assault and women were "silenced" and terminated when they knew or complained about those allegations. (*Id.* ¶ 177). Read as a whole and with the required liberality, Plaintiffs' allegations create the plausible inference that the eXp Leadership Team had a "longstanding culture—their pattern and practice—of creating an environment that allowed these assaults, then silencing those whose accounts of sexual harassment and assault would impact profit." (*Id.*¶ 1). The Court finds that

1  Plaintiffs have sufficiently alleged a cover up to, alternatively, revive Plaintiffs

2  Acevedo, Jane Doe 1 and Jane Doe 2's claims.[29]

3      In sum, Defendants provide no argument that disproves the following conclusion:

4  section 340.16, by its terms, is not limited to *claims* for sexual assault and it is not

5  limited to claims *against the perpetrator* of sexual assault. Having sufficiently alleged

6  that Acevedo, Jane Doe 1 and Jane Doe 2 (1) were sexually assaulted within the

7  meaning of subdivision (b)(1) after January 1, 2009, and (2) suffered injuries as a result

8  of that sexual assault as required by subdivision (a), section 340.16 applies retroactively

9  under subdivision (b)(3) to any of Plaintiffs' claims that seek damages for those injuries,

10  regardless of the legal theory alleged—and regardless of whether subdivision (e)

11  provides an alternative means of revival. For the reasons discussed above, Acevedo,

12  Jane Doe 1 and Jane Doe 2 have sufficiently alleged such injuries for all of their state

13  law claims and, thus, those claims are open under section 340.16(b)(3). Plaintiffs have

14  also plausibly demonstrated a cover up and, thus, their claims are also open under

15  section 340.16(e).

16      Accordingly, Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2 have sufficiently

17  pled that their claims in Counts 4–10 against all Defendants are timely in California.[30]

18  The Court **DENIES** Defendants' motions to dismiss those claims on the grounds that

19  they are time-barred by California's two-year statute of limitations. Next, the Court

20  applies Nevada law to Jane Doe 2, Jane Doe 3, and John Doe's claims to determine

21  whether there is a conflict of law, with respect to Jane Doe 2, and whether Jane Doe 3

22

23

24  [29] Plaintiffs, in the alternative, seek leave to amend the FAC with several allegations

25  against Gove and Sanford that plausibly demonstrate a cover up. (*See* Sanford Opp. at 29; Gove Opp. at 21–23).

26

27  [30] While Plaintiffs Acevedo and Jane Doe 1 are citizens of Florida and Tennessee,

28  respectively, they allege substantial conduct that took place in California. Defendants fail to meaningfully argue that these claims are subject to Florida or Tennessee law.

or John Doe's claims are time-barred.

### iv.　　Nevada's S.B. 129

Under California's governmental interest test, the Court must decide if there is a difference between application of California's section 340.16 and Nevada's S.B. 129, with respect to Jane Doe 2's claims. At the same time, the Court considers whether Jane Doe 3 and John Doe's claims are barred by Nevada's two-year statute of limitations or whether S.B. 129 revives those claims.

As of May 31, 2023, Nevada no longer has a statute of limitations for civil actions to recover damages for sexual assault that occurred when the plaintiff was 18 years of age or older. Section 1 of this bill provides:

> 1. An action to recover damages for an injury to a person arising from the sexual assault of the plaintiff which occurred when the plaintiff was 18 years of age or older may be commenced against the alleged perpetrator or person convicted of the sexual assault at any time after the sexual assault occurred. In such an action, if the alleged injury to the plaintiff is the result of a series of two or more acts constituting sexual assault, the plaintiff is not required to identify which specific act in the series of acts caused the alleged injury.
>
> 2. As used in this section, "sexual assault" has the meaning ascribed to it in NRS 200.366.

2023 Nev. Stat. Ch. 112 (S.B. 129), § 1, eff. May 31, 2023.

Section 3 of this bill provides that the changes shall be applied retroactively:

> The amendatory provisions of this act apply retroactively to any act constituting sexual assault as defined in section 1 of this act that occurred before the effective date of this act, regardless of any statute of limitations that was in effect at the time the act constituting sexual assault occurred, including, without limitation, any civil action that would have been barred by the statute of limitations that was in effect before the effective date of this act.

*Id.*, § 3.

By its terms, S.B. 129 differs from section 340.16 in two ways. First, S.B. 129 is limited to allegations of rape because, in Nevada, "sexual assault" specifically describes rape. "A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or herself or another, or on a

beast, against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his or her conduct, is guilty of sexual assault." Nev. Rev. Stat. § 200.366. Significantly, S.B. 129 does not apply to "battery with the intent to commit sexual assault," Nev. Rev. Stat. § 200.400, nor does it apply to any other definition of assault or battery. *See* Nev. Rev. Stat. §§ 200.471 (assault), 200.481 (battery). Thus, even if the language "a person who *subjects* another person to sexual penetration" includes attempt, aiding and abetting, or conspiracy, those theories only advance allegations of rape. Second, S.B. 129 is limited to actions commenced "against the perpetrator" of the sexual assault. Thus, S.B. 129 applies to a more limited type of conduct and defendant than section 340.16.

Here, Jane Doe 2 and Jane Doe 3 bring claims for "civil battery" against Bjorkman and Golden (Count 5). (FAC ¶¶ 216–220). They allege Defendants put GHB in their drinks, causing them to "unknowingly ingest the drug and be touched for which they did not consent." (*Id.* ¶¶ 144, 151–53, 217–19). Such allegations do not satisfy the conduct described in NRS § 200.36 and, rather, describe "battery" as defined by NRS § 200.481. Thus, Count 5 is not revived under S.B. 129.

Jane Doe 3 also brings a claim for "sexual battery" against Bjorkman (Count 4). (*Id.* ¶¶ 211–15). Jane Doe 3 describes "unwanted and unlawful, sexual physical touching… " and "recall[s] being sexually assaulted by Defendant Bjorkman" on the night of August 20, 2020. (*Id.* ¶¶ 152, 213). While Jane Doe 3 does not explicitly allege an act of penetration, her allegations do not negate the occurrence of such an act.[31]

---

[31] At the hearing on August 18, 2023, the Court agreed with Plaintiffs that Jane Doe 3's statement that she recalls being sexually assaulted by Bjorkman is not conclusory. (*See* FAC ¶ 153). Plaintiffs requested, in the alternative, that the Court grant leave to amend this allegation with a description of Bjorkman's physical acts. Because it is Defendant's burden to prove that Plaintiff cannot possibly demonstrate this allegation amounts to sexual battery as defined by NRS § 200.36 and he fails to meet that burden, it is not

66

Case 2:23-cv-01049-APG-BNW   Document 156-1   Filed 01/29/24   Page 123 of 378
Case 2:23-cv-00492-ABR-GR   Document 115   Filed 03/13/26   Page 123 of 181
Page ID #:3235
Page ID #:3781363

1    Moreover, Bjorkman does not argue that Jane Doe 3 fails to allege a qualifying sexual

2    assault. In fact, Bjorkman argues that—*except for* her allegation of "sexual battery"—

3    Jane Doe 3 fails to allege an act defined by NRS § 200.366. (*See* Dkt. 122 at 7–8).

4    Bjorkman effectively concedes that at least Count 4 is revived by S.B. 129. (*Id.* at 8).

5    At this stage of litigation, Jane Doe 3's allegations are sufficient to demonstrate that she

6    was subjected to rape.

7        However, this only revives Jane Doe 3's sexual battery, IIED and negligence

8    claims against Bjorkman (Counts 4, 6 and 9). (FAC ¶¶ 211–215, 224–228, 242–246).

9    S.B. 129 only applies to claims against the perpetrator of sexual assault and, thus, Jane

10   Doe 3's claims against Sanford, Gove and Golden are time-barred (Counts 5–10). (FAC

11   ¶¶ 216–252). Jane Doe 3's civil battery claim against Bjorkman is also time-barred. As

12   discussed above, it is not a qualifying sexual assault under S.B. 129, nor do its injuries

13   arise from the revived sexual battery claim. The Court's analysis of Plaintiffs' negligent

14   hiring, supervision and retention claims against Sanford under section 340.16, above, is

15   inapposite to Jane Doe 3's civil battery claims against Bjorkman under S.B. 129. It is

16   possible that—like the act of negligently hiring Defendants—the act of drugging Jane

17   Doe 3 caused her to be raped. However, with respect to negligent hiring, Jane Doe 3's

18   injuries did not arise *until* she was raped (or drugged). In contrast, Jane Doe 3 was

19   immediately injured when she was drugged and those injuries did not "arise from" her

20   subsequent rape. Finally, John Doe 3's claim (Count 11) is not revived by S.B. 129

21   which requires injuries "arising from the sexual assault *of the plaintiff*." Because John

22   Doe does not allege that he was sexually assaulted, his claim is time-barred. (FAC ¶¶

23   253–54).

24       In sum, Jane Doe 2 and John Doe's state law claims are all barred by Nevada's

25   two-year statute of limitations and, with the exception of Counts 4, 6, and 9 against

26

27   _____

28   necessary for Plaintiffs to amend this allegation.

Bjorkman, Jane Doe 3's claims are barred by Nevada's two-year statute of limitations. Because Jane Doe 3 and John Doe's claims are also time-barred under California law, the Court need not proceed any further with choice-of-law analysis with respect to those claims. The Court **DENIES** Bjorkman's motion to dismiss Jane Doe 3's Counts 4, 6 and 9, only, on the grounds that they time-barred in Nevada. The Court **GRANTS** Defendants' motions to dismiss Jane Doe 3 and John Doe's remaining claims, on the grounds that they are time-barred.

However, because there is a difference between California's section 340.16 and Nevada's S.B. 129, with respect to Jane Doe 2's claims, the Court proceeds to the second prong of California's governmental interest test to see if there is a true conflict of law.

### v. Conflict

The second step of the governmental interest analysis requires the Court to examine "each jurisdiction's interest in the application of its own law in the circumstances of the particular case to determine whether a true conflict exists." *McCann*, 48 Cal. 4th at 90 (quoting *Kearney*, 39 Cal. 4th at 107–08). Although two involved states may have different laws governing the issue presented in a tort action, a "true conflict" only arises if both states have an interest in having their respective law applied. *Bernhard v. Harrah's Club,* 16 Cal. 3d 313, 318–19 (1976). Here, the Court must establish the relationship of the parties and the pertinent state policies underlying civil liability for Jane Doe 2's claims to determine if there is a true conflict between California and Nevada's law.

California's statute of limitations serves two purposes: (1) "it protects state residents from the burden of defending cases in which memories have faded and evidence has been lost" and (2) "it protects the courts of the state from the need to process stale claims[.]" *Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1092 (9th Cir. 2021) (citing *Ledesma v. Jack Stewart Produce, Inc.*, 816, F.2d 482, 485 (9th Cir. 1987)). "California courts and a California resident would be protected by applying

California's statute of limitations when California is the forum and the defendant is a California resident." *Nelson v. International Paint Co.*, 716 F.2d 640, 644 (9th Cir. 1983). Generally, a forum state's interest in applying its own law is strongest when its statute of limitations is shorter than that of the foreign state, because a "state has a substantial interest in preventing the prosecution in its courts of claims which it deems to be 'stale.'" *Deutsch v. Turner Corp.*, 324 F.3d 692, 716–17 (9th Cir. 2003) (quoting Restatement (Second) of Conflict of Laws, § 142, cmt. f (1988)). However, the key inquiry is the relationship of the parties and events to the forum state. For example, *"*California has little interest in applying its statute of limitations when no California defendant is involved and when California plaintiffs seek to recover for injuries that occurred in a state in which the claim was not time-barred." *Ledesma* , 816 F.2d at 486 (applying the non-forum's longer statute of limitations where Arizona's legitimate government policy would be impaired by failure to bring those personal injury claims).

Similarly, borrowing statutes seek to protect state courts against forum shopping, by "borrowing" the statute of limitations from the state in which the action accrued. *McCann*, 48 Cal. 4th at 84 (citing Leflar et al., American Conflicts Law (4th ed. 1986), § 127, pp. 348–349). Both California and Nevada's borrowing statutes protect their residents and citizens from this general rule, when their action is time-barred in the state of accrual but their own state has provided a longer period of recovery for the same action. *See McCann*, 48 Cal. 4th at 85 (explaining purpose of California's borrowing statute, Cal. Civ. Proc. Code § 361)*; Flowers v. Carville,* 310 F.3d 1118, 1123 (9th Cir. 2022) (explaining purpose of Nevada's borrowing statute, Nev. Rev. Stats. § 11.020). In choosing to extend the statute of limitations beyond two years, California and Nevada have both expressed a similar interest—namely, protecting individuals' ability to recover for injuries arising due to sexual assault. Specifically, California has an interest in protecting plaintiffs' ability to recover for a broad range of conduct and an interest in protecting defendants against liability after the ten-year or three-year periods. Meanwhile, Nevada has an interest in protecting plaintiffs' ability to recover against

perpetrators of rape regardless of when they bring a claim and an interest in protecting local defendants from liability for lesser conduct. By its terms, neither of these statutes are limited only to persons assaulted in California or Nevada.

The parties do not present any arguments related to governmental interests. (Dkts. 121–23). However, the Court considers the following. In California, all of Jane Doe 2's claims survive against all Defendants, by operation of the applicable statute of limitations and borrowing statute. In contrast, all of Jane Doe 2's claims are time-barred against all Defendants under Nevada's statute of limitations. Jane Doe 2 is a citizen of California who alleges injuries that occurred primarily in Nevada by the following Defendants: Bjorkman, a California resident; Golden, a Nevada resident; Sanford, a Washington resident; Gove, a California resident; and eXp Realty, a corporation organized in Delaware, with its principal place of business in Washington. (FAC ¶¶ 9, 12–17). Thus, a California resident has alleged the type of sexual assault that section 340.16 expressly seeks to address, and California has an interest in protecting her right to recover for those injuries. To the extent that California has an interest in protecting its in-state Defendants, Bjorkman and Gove, Jane Doe 2 has satisfied California's requirement that a claim be brought within 10 years. Meanwhile, as the non-forum state, Nevada has no interest in judicial economy. It also has no interest in protecting non-local Defendants. However, Nevada does have an interest in protecting Golden, a Nevada citizen, from liability for conduct that occurred in Nevada and does not rise to the level recognized as sexual assault in Nevada.

Thus, the only question is, under step three of California's governmental interest test, "which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Chen*, 7 Cal. 5th at 868. Specifically, the Court must decide whether California's interest in allowing Jane Doe 2 to recover would be greater impaired than Nevada's interest in protecting Golden from the "burden of defending cases in which memories have faded and evidence has been lost." *Rustico*, 993 F.3d at 1092. In light of the overlapping nature of Plaintiffs' allegations, including Golden's

70

purposeful availment of California's citizens and economy, the Court concludes that California law should apply to Jane Doe 2's claims. Golden recruited Bjorkman, a California citizen, to join eXp; he recruited Acevedo, a California citizen, to join eXp and caused her relationship with Bjorkman and her attendance at events in California; Golden hosted the Las Vegas event and invited several California residents; he directly invited Jane Doe 3 and his invitation was allegedly extended to Jane Doe 2; he personally hosted the event where Jane Doe 2 was drugged; Jane Doe 2 specifically alleges Golden caused her to travel from California to Nevada. (*See*, *e.g.*, FAC ¶¶ 15, 35, 37, 48, 89, 93–94, 131, 135, 186, 189, 198, 201). Nevada law enforcement has documented critical evidence which, apparently, led to the dismissal of the criminal charges underlying the alleged sexual misconduct. Moreover, Golden must already litigate similar claims against three other defendants in California. This weighs against the inference that Golden will be unduly burdened with faded or lost evidence.

For the reasons discussed above, the Court concludes that California, as the forum state where several of the parties are residents and substantial events took place, has a greater interest in protecting its citizen's right to recover for injuries it has expressly sought to protect than Nevada does in protecting Golden in a case which he already must litigate. Accordingly, the Court applies California's section 340.16 to Jane Doe 2's claims (Counts 4–10) and **DENIES** Defendant's motions to dismiss those claims on the grounds that they are barred by California or Nevada's two-year statute of limitations.

### vi.     Discovery rule

In the alternative, Plaintiffs argue their claims satisfy the "discovery rule." (Sanford Opp. at 20–22; Gove Opp. at 19; Bjorkman Opp. at 15–16; Golden Opp. at 11). Plaintiffs argue that the "added layer of drugging, gaslighting, and concealment adds a separate—critical—consideration that must be more fully vetted and developed through discovery." (Golden Opp. at 11). They argue that as Plaintiffs learn more about Defendants' conduct, they understand the nature of their injuries and new injuries arise.

71

(*See*, *e.g.*, Sanford Opp. at 21). Plaintiffs argue the Court must consider the following allegations to be true: Plaintiffs have been "putting the pieces of the puzzle together" and the most cognized realization of their injuries occurred after learning of the facts contained in the March 8, 2021, police report, which occurred less than two years before filing their complaint on February 22, 2023. (FAC ¶¶ 43, 80, 143).

Defendants argue the First Amended Complaint is dispositive of Plaintiffs' knowledge because Jane Does 1, 2 and 3 all state they were aware of their alleged assaults shortly after they occurred, all three reported their assaults in September or October of 2020, and Acevedo was no longer under the influence of drugs or alcohol the morning that Bjorkman allegedly attempted to assault her, placing her on notice. (Sanford Reply at 14; Gove Reply at 17–18; Bjorkman Reply at 14–15; Golden Reply at 7; FAC ¶¶ 25, 144, 152, 164). Sanford additionally argues that Plaintiffs fail to identify the discovery needed and fail to plead they engaged in reasonable diligence to obtain the necessary information. (Sanford Reply at 14). Gove argues Plaintiffs do not explain why "gaslighting" and "drugging" delayed Plaintiffs' discovery of the alleged harm. (Gove Reply at 19). Finally, Gove argues his alleged actions with regard to the criminal investigation took place in January of 2021 and Plaintiffs fail to allege in their First Amended Complaint that they only learned about this conduct long after that date. (*Id.*; *see also* FAC ¶¶ 156, 233).

Having found that Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2's claims are timely, the Court only addresses this argument with respect to Jane Doe 3 and John Doe's claims that are time-barred. Thus, the claims at issue are the following: Jane Doe 3's civil battery claim against Bjorkman and Golden (Count 5); Jane Doe 3's IIED claims against Golden, Gove and Sanford (Counts 6–8); Jane Doe 3's negligence claims against Golden, Gove and Sanford (Count 9); Jane Doe 3's negligent hiring, retention, and supervision claim against Sanford (Count 10); and John Doe's loss of consortium claim (Count 11). (FAC ¶¶ 216–253). Importantly, for the reasons already discussed, these claims are subject to Nevada's discovery rule. Because the issue of Nevada law

was not raised until Defendant Golden's Reply, the parties have provided no choice-of-law analysis or Nevada authority.

Generally, the discovery rule operates similarly in California and Nevada. *See Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (1988) ("The discovery rule provides that the accrual of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause. A plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her."); *see also Siragusa v. Brown*, 114 Nev. 1384, 1392 (1998) ("An exception to the general rule has been recognized by this court and many others in the form of the so-called 'discovery rule.' Under the discovery rule, the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action.").

Jane Doe 3 and John Doe have failed to plead facts that demonstrate the discovery rule tolls their claims. John Doe only alleges that he has been married to Jane Doe 3 at all times relevant to this complaint and that he has suffered injury. (FAC ¶¶ 161–62). Jane Doe 3 alleges that she recalls Bjorkman and Golden consuming GHB and she recalls "blacking out," and being sexually assaulted on August 29, 2020. (FAC ¶¶ 151–53). She alleges that "[a] few weeks later" Golden encouraged her to lie to LVPD and she began receiving threatening messages from people associated with Bjorkman and Golden. (*Id.* ¶¶ 154–55). This sufficiently made Jane Doe 3 aware of the facts supporting her civil battery, IIED and negligence claims against Bjorkman and Golden.

Jane Doe 3 alleges she reported her assault shortly after it occurred in August of 2020. (*Id.* ¶ 164). She alleges that eXp was unhelpful and, specifically, allowed Golden to remain at eXp after she complained about his conduct. (*Id.* ¶ 171). Jane Doe 3 alleges Bjorkman's contract was terminated in September of 2020, but he was allowed to become a Vested Participant, while she was not. (*Id.* ¶ 50–53, 78). She alleges that around the same time eXp denied her sponsorship change requests. (*Id.* ¶ 55). These allegations demonstrate that, at least by September of 2020, Plaintiff knew eXp had,

73

1    among other things, decided to pay Bjorkman, retain Golden, and thwart Jane Doe 3's

2    attempts to remedy her workplace injuries. These are the same facts supporting her

3    IIED, negligence, and negligent hiring, retention and supervision claims against

4    Sanford.

5         Finally, Plaintiffs argue they did not learn the full extent of Gove's conduct until

6    Bjorkman's criminal charges were dismissed. (Gove Opp. 19). Jane Doe 3 alleges Gove

7    reached out to multiple eXp agents requesting false police statements on or around

8    January of 2021, (FAC ¶ 156), and she discussed her assault with Gove on March 3,

9    2021. (*Id.* ¶¶ 157–58). This supports an argument that Gove's intentions became

10   increasingly evident. However, considering the existence of Jane Doe 3's other claims,

11   it does not explain why she waited two and one-half years after reporting her assault to

12   eXp and law enforcement to bring this lawsuit.

13        The Court acknowledges the nuance and the gravity of Plaintiffs' allegations,

14   including those regarding the combination of drugs, sexual abuse, gaslighting and

15   mental distress. However, absent specific factual allegations connecting Defendants'

16   actions to Plaintiffs' inability to discover facts about those actions, the discovery rule

17   does not toll Plaintiffs' claims.

18              **vii.     Conclusions regarding the statute of limitations**

19        In sum, the Court concludes that California's section 340.16 revives all of

20   Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2's claims against all Defendants. The

21   Court **DENIES** Defendants' motions to dismiss those claims on the grounds that they

22   are time-barred. The Court also concludes that Nevada's S.B. 129 applies to Jane Doe

23   3's sexual battery, IIED, and negligence claims against Bjorkman. Moreover, because

24   Bjorkman does not move for dismissal on any other ground, the Court **DENIES**

25   Bjorkman's motion to dismiss those claims (Count 4, 6 and 9). (FAC ¶¶ 211–215, 224–

26   228, 242–246). However, the Court concludes that Jane Doe 3's civil battery claim

27   against Bjorkman and Golden (Count 5), as well as her IIED, negligence, and negligent

28   hiring claims against Defendants Golden, Gove and Sanford (Counts 6–10) are barred

by Nevada's two-year statute of limitations and not tolled by the discovery rule. (FAC ¶¶ 216–252). The Court **GRANTS** Defendants' motions to dismiss those claims. Finally, the Court concludes that John Doe's loss of consortium claim (Count 11) is also barred by Nevada's two-year statute of limitations and, thus, **GRANTS** Defendants' motions to dismiss that claim. (FAC ¶¶ 253–54).

The Court next addresses Defendants Sanford and Gove's arguments with respect to Plaintiffs Acevedo, Jane Doe 1 and Jane Doe 2's IIED, negligence, and negligent hiring, retention and supervision clams.

### b. Counts 6–8: Intentional infliction of emotional distress

All female Plaintiffs bring IIED claims against all Defendants, though only Sanford and Gove move for their dismissal, arguing that Plaintiffs fail to allege conduct that was "extreme and outrageous" and "directed at" Plaintiffs. (Sanford MTD at 29, Gove MTD at 27–28). The Court addresses these arguments with respect to Acevedo, Jane Doe 1 and Jane Doe 2's claims which are subject to California law.[32]

To state a claim for intentional infliction of emotional distress a Plaintiff must plead: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct ....[ ] Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (quotations and citation omitted); *see also Doe 1 v. Manhattan Beach Unified Sch. Dist.*, No. 19-cv-6962 DDP (RAOx), 2020 WL 2556356, at *9 (C.D. Cal. May 19, 2020)

_____

[32] The elements of this cause of action are the same under Nevada law. *See Star v. Rabello*, 97 Nev. 124, 125 (1981). However, because Defendant Bjorkman does not make any substantive arguments regarding Plaintiffs' state tort claims, the Court need not address whether Jane Doe 3 has sufficiently alleged her IIED claim against Bjorkman.

(applying *Christensen*). The outrageous conduct must be "directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." *Christensen*, 54 Cal. 3d at 903. The plaintiff need not suffer physical injury to recover for emotional distress. *Stoiber v. Honeychuck*, 101 Cal. App. 3d 908, 921 (Cal. Ct. App. Fifth 1980) (citing *State Rubbish etc. Assn. v. Siliznoff*, 38 Cal. 2d 330 (1952); *Golden v. Dungan*, 20 Cal. App. 3d 295, 307–308 (Cal. Ct. App. First 1971)). "Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." *Stoiber*, 101 Cal. App. 3d at 921 (citing *Newby v. Alto Riviera*, 60 Cal. App. 3d 288, 297 (Cal. Ct. App. First 1971)). In *State Rubbish*, "the seminal case permitting recovery even absent physical manifestation of the injury," the California Supreme Court allowed recovery for serious mental distress where "agents of the defendant had intentionally caused the plaintiff to suffer extreme fright for the purpose of gaining a business advantage of the particular plaintiff." *Christensen*, 54 Cal. 3d at 903 (citing *State Rubbish*, 38 Cal. 2d at 337).

Plaintiffs argue Sanford and Gove—by denying Plaintiffs' requests to switch sponsors and effectively forcing them to pay their sex traffickers—demonstrated "extreme and outrageous" conduct "directed at" Plaintiffs. (Sanford Opp. at 26–27; Gove Opp. at 19–21.) Plaintiffs argue Sanford allowed other agents to switch sponsors when it financially benefitted him. (Sanford Opp. at 26). Plaintiffs argue Gove abused his specific position as "one of the most powerful agents at eXp" and a member of Plaintiffs' immediate upline. (Gove Opp. at 20). Plaintiffs argue both Sanford and Gove gaslit Plaintiffs by feigning ignorance, despite having actual knowledge of the drugging and assault allegations. (Sanford Opp. at 27; Gove Opp. at 20–21). Plaintiffs allege this experience caused severe emotional distress, including PTSD diagnoses and suicide attempts, and it has interfered with Plaintiffs' ability to network and sell real estate. (Sanford Opp. at 27). In his Reply, Sanford argues Plaintiffs fail to allege that he had

1   the ability to terminate Bjorkman and Golden's vested participation in the RSP.

2   (Sanford Reply at 18–19). Gove argues Plaintiffs fail to allege that this conduct was

3   "directed at" Plaintiffs or that Gove had the ability to switch Plaintiffs' uplines because

4   he was not part of eXp's Leadership Team. (Gove Reply at 17).

5       Plaintiffs have sufficiently pled their IIED claims against Sanford and Gove.

6   First, the First Amended Complaint clearly demonstrates that eXp had the ability to

7   switch Plaintiffs' uplines because Jane Doe 1 alleges that she was eventually allowed

8   to do so. (FAC ¶ 130). Plaintiffs have also alleged that Sanford rejected the Leadership

9   Team and Board of Director's own requests to switch Plaintiffs, demonstrating the

10  company's ability to move agents and Sanford's specific ability to prevent that from

11  happening. (*Id.* ¶ 168). Plaintiffs allege Sanford refused these requests—not because he

12  was ignorant to Plaintiffs' accounts of being drugged and raped—but because he feared

13  more women would come forward with the same allegations. (*Id.* ¶¶ 166, 168). Second,

14  the First Amended Complaint plausibly demonstrates that eXp had the ability to

15  restructure the RSP or Pyramid, such that Bjorkman and Golden would not directly

16  benefit from Plaintiffs' downlines. Plaintiffs allege that eXp allowed Bjorkman to

17  become a Vested Participant even though he did not meet the requirements. (*Id.* ¶ 52).

18  Jane Doe 3 alleges eXp did not grant the same vesting exception to her. (*Id.* ¶ 53). eXp

19  eventually terminated Bjorkman's contract all together. (*Id.* ¶ 50). It stands to reason

20  that eXp had the ability to alter the terms of a contract that they had the authority to

21  terminate. However, that was not necessary to prevent Plaintiffs' financial contribution

22  to Bjorkman—had eXp simply enforced the original vesting requirements, Bjorkman

23  would never have vested. Whether through sponsorship changes or RSP restructuring,

24  Plaintiffs have plausibly demonstrated that Sanford abused his position of authority to

25  damage Plaintiffs' interests by choosing to financially benefit from Bjorkman and

26  Golden's unique position within the Pyramid.

27      It is relevant, though not dispositive, that Gove is not a member of the eXp

28  Leadership Team. (*Id.* ¶ 34). Plaintiffs have demonstrated that Gove held a position of

77

power at eXp—specifically, with respect to Plaintiffs because they were all in his individual downline. (*Id.* ¶¶ 102, 111, 148). He is one of eXp's top recruiters with more than 20,000 agents in his downline. (*Id.* ¶¶ 17, 69). After obtaining actual knowledge of Plaintiffs' allegations, he threatened to pull his team—more than one-fifth of the entire company—if eXp removed Defendants Bjorkman and Golden. (*Id.* ¶ 74). Instead, Gove and Sanford "came to an agreement" which allowed, among other things, Bjorkman and Golden to financially benefit from Plaintiffs' contribution to the Pyramid. (*Id.* ¶¶ 74–75). Read together, these allegations support the plausible inference that—not only did Gove have the ability to force these outcomes—but the financial incentive to do so.

Finally, Defendants' arguments that these actions were not "directed at" Plaintiffs are not persuasive. In sum, Plaintiffs have alleged that Sanford and Gove engaged in a concerted effort to prevent Plaintiffs' allegations from becoming public knowledge so they could continue to financially benefit from Bjorkman and Golden's contribution to the Pyramid, knowing that it would force Plaintiffs to financially contribute to their sex traffickers. Defendants' conduct was in reaction to Plaintiffs' allegations and for the purpose of thwarting their impact on the Pyramid, at the calculated cost of Plaintiffs' mental distress. This is sufficient to demonstrate "extreme and outrageous" conduct "directed at" Plaintiffs.

The Court finds Plaintiffs have plausibly demonstrated that they suffered intentional infliction of emotional distress and, thus, **DENIES** Defendants Sanford and Gove's motions to dismiss Acevedo, Jane Doe 1 and Jane Doe 2's IIED claims (Counts 7– 8). (FAC ¶¶ 229–241).

### c. Counts 9: Negligence

All female Plaintiffs allege negligence against all Defendants. (FAC ¶¶ 242–246). Sanford and Gove conclusively argue Plaintiffs fail to allege the requisite elements of a negligence claim. (Sanford MTD at 30; Gove MTD at 29). Defendants do not meaningfully raise this issue and the Court agrees with Plaintiffs that it is "almost dealt with in passing." (Sanford Opp. at 27–28). "The elements of a cause of action for

negligence are well established. They are '(a) a legal duty to use due care; (b) a breach of such legal duty; (c) the breach as the proximate or legal cause of the resulting injury.'" *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996) (quoting *Evan F. v. Hughson United Methodist Church,* 8 Cal. App. 4th 828, 834 (Cal. Ct. App. Third 1992)). Plaintiffs reallege the same facts as their previous eight claims, (FAC ¶¶ 242–246), including those for violation of § 1595 of the TVPRA which "invokes a negligence standard[.]" *M.A*., 425 F. Supp. 3d at 965.

Because it is Defendants' burden to demonstrate that the Court should dismiss Count 9, the Court only analyzes this claim insofar as it must consider Defendants' arguments. Sanford argues, "[a]t best this count is duplicative of Plaintiffs' negligent hiring, retention and supervision count[.]" (Sanford MTD at 30). Gove argues Plaintiffs failure to allege that he "held a position of authority at eXp," and name him in their Count 10 for negligent hiring, demonstrates that he did not owe them a duty. (Gove MTD at 29). Both arguments are incorrect for similar reasons. Plaintiffs' negligence and negligent hiring claims are distinct—while both may require negligent conduct, only the former requires that conduct to include *hiring.* In other words, while one may sufficiently demonstrate the other, it does not necessarily do so and, thus, is not duplicative. Gove's argument demonstrates the same circular point: his role at eXp did not include hiring Bjorkman or Golden. For that reason, and that reason only, Plaintiffs do not allege that he violated Count 10. Rather, they allege that his role at eXp created a duty to act with reasonable care towards the agents in his downline (i.e., Plaintiffs), which he violated by recklessly subjecting them to alleged sexual predators and ignoring their allegations about those predators, all while financially benefitting and allowing the predators to benefit, as well. Absent an argument as to why these allegations do not sufficiently support Plaintiffs' claims for negligence, Defendants fail to meet their burden on a motion for dismissal.

The Court has already concluded that Sanford and Gove negligently violated the TVPRA (Count 3) and intentionally caused Plaintiffs' injuries (Count 7–8). For many

79

1  of those same reasons, the Court concludes Plaintiffs have sufficiently pled Sanford and
2  Gove negligently caused those injuries as well. Accordingly, the Court **DENIES**
3  Defendants Sanford and Gove's motions to dismiss Plaintiffs Acevedo, Jane Doe 1 and
4  Jane Doe 2's negligence claims (Count 9). (FAC ¶¶ 242–46).

### d. Count 10: Negligent hiring, retention and supervision

6  All female Plaintiffs allege Sanford and eXp Realty are liable for the negligent
7  hiring, retention and supervision of Bjorkman and Golden (Count 10). (FAC ¶¶ 247–
8  252). "An employer may be liable to a third person for the employer's negligence in
9  hiring or retaining an employee who is incompetent or unfit." *Phillips v. TLC Plumbing,*
10 *Inc.*, 172 Cal. App. 4th 1133, 1139 (Cal. Ct. App. Fourth 2009) (citing *Roman Catholic*
11 *Bishop v. Superior Court,* 42 Cal. App. 4th 1556, 1564–65 (Cal. Ct. App. Fourth 1996));
12 *see also Dent v. National Football League*, 902 F.3d 1109, 1121–22 (9th Cir. 2018). To
13 establish liability, a plaintiff must demonstrate the elements of negligence: duty, breach,
14 proximate causation, and damages. *Phillips*, 172 Cal. App. 4th at 1139. There are "two
15 elements necessary for a duty to arise in negligent hiring and negligent retention cases—
16 the existence of an employment relationship *and* foreseeability of the injury." *Phillips,*
17 172 Cal. App. 4th at 1142 (quoting *Abrams v. Worthington*, 169 Ohio App. 3d 94 (Ohio
18 Ct. App. Tenth 2006) (emphasis in original)). A claim for negligent supervision requires
19 a plaintiff to allege that a particular risk of harm was foreseeable. *D.Z. v. Los Angeles*
20 *Unified School District,* 35 Cal. App. 5th 210, 235 (Cal. Ct. App. Second 2019).

21 The California Supreme Court has set out a six-factor test for determining
22 whether an individual is an employee or an independent contractor. *S.G. Borello &*
23 *Sons, Inc. v. Department of Industrial Relations,* 48 Cal. 3d 341, 354–55 (1989). Those
24 factors include: (1) the extent to which the employer had the right to control activities;
25 (2) the alleged employee's opportunity for profit or loss depending on his managerial
26 skill; (3) the alleged employee's investment in equipment or materials required for his
27 task, or his employment of helpers; (4) whether the service rendered requires a special
28 skill; (5) the degree of permanence to the working relationship; and (6) whether the

service rendered is an integral part of the alleged employer's business. *Id.* at 355. "Each service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." *Id.* at 354. "What matters is whether the hirer 'retains all *necessary* control' over its operations." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531 (2014) (quoting *S.G. Borello*, 48 Cal. 3d at 350) (emphasis in original). "Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.'" (quoting *Malloy v. Fong*, 37 Cal. 2d 356, 370 (1951)).

Sanford argues the Court should dismiss Count 10 because Plaintiffs fail to allege an employer-employee relationship, as well as foreseeability. (Sanford MTD at 27–28). While Plaintiffs do not concede that Defendants Bjorkman and Golden are Sanford's independent contractors, they fail to offer a robust argument that they are his employees. Plaintiffs argue "the uniqueness of the venture creates a question of the employment status of Defendants such that they might be considered employees for the purpose of their role in the venture." (Sanford Opp. at 24).

While the Court agrees that several aspects of eXp's business model obfuscate the issue of an employment relationship, it is not prepared to conclude that Bjorkman or Golden were Sanford's employees without the parties thoroughly addressing the six-factor test. In fact, to the extent that Plaintiffs do address that test, their arguments are brief and unclear. Plaintiffs argue, "Defendants have had control over their downlines, directing them, training them, setting forth their long-term payment structure." (Sanford Opp. at 25). Plaintiffs cite to FAC ¶¶ 25 and 26 which allege that eXp Realty automatically enrolls its agents in the RSP, incentivizes them to become Sponsor Agents, and then directs, trains, and teaches them how to recruit and entice other real estate agents to join the RSP. In sum, the Plaintiffs' First Amended Complaint alleges that Sanford contracted with Defendants Bjorkman and Golden to become eXp agents—*and* contracted with Plaintiffs to become eXp agents. (FAC ¶¶ 7–10, 14–15).

It also alleges that all eXp real estate agents share a two-fold common purpose of selling real estate and recruiting new agents. (*Id.* ¶ 22). The First Amended Complaint also demonstrates that, to further that latter purpose, eXp's entire business model incentivized, and relied upon, its Recruited Agents becoming Sponsor Agents, and its Sponsor Agents becoming Influencers. (*Id.* ¶¶ 25–27). These allegations are relevant to, though not sufficiently evident of, an employment relationship.

Finally, the Court has considered Plaintiffs' primary argument that—if Bjorkman and Golden are independent contractors—Sanford owes a non-delegable duty of care to Plaintiffs based on the actions of his independent contractors (Bjorkman and Golden) to his other independent contractors (Plaintiffs). (Sanford Opp. at 22–25). In sum, Plaintiffs argue that the same policy reasons protecting hirers of independent contractors from liability to the independent contractors' employees do not exist here, where both parties are independent contractors of the same hirer. This argument is premised on Plaintiffs' analysis of several California Supreme Court cases analyzing theories of negligent hiring and control described in the Restatement 2nd of Torts. *Privette v. Contreras,* 5 Cal. 4th 689 (1993) (employees of independent contractors cannot recover against contractor's hirer under the peculiar risk doctrine); *Toland v. Sunland Housing Group, Inc.*, 18 Cal. 4th 253 (1998) (this "bars employees of a hired contractor who are injured by the contractor's negligence from seeking recovery against the hiring person, irrespective of whether recovery is sought under the theory of peculiar risk set forth in section 416 or section 413 of the Restatement Second of Torts[.])"; *Camargo v. Tjaarda Dairy*, 25 Cal. 1234 (2001) ("For the same reasons, an employee of a contractor should be barred from seeking recovery from the hirer under the theory of negligent hiring set forth in section 411."); *Hooker v. Department of Transp.*, 27 Cal. 4th 198 (2002) (hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over safety conditions but is liable if the hirer's exercise of retained control affirmatively contributed to the employee's injuries.). In a case of first impression, the Second District of the California

82

Court of Appeal held that *Privette* and its progeny also applies when the injured party is an independent contractor. *Michael v. Denbest Transportation, Inc.*, 137 Cal. App. 4th 1082, 1093–94 (Cal. Ct. App. Second 2006). The court held this decision was "consistent with common law principles and public policy … including the strong policy in favor of delegation by hirers." *Id.* at 1094.

Plaintiffs argue *Michael* demonstrates that the important principles in examining liability of a hirer directly to the independent contractor are "whether there was a nondelegable duty, whether there was a policy consideration, and whether the defendant affirmatively contributed to [Plaintffs'] injury." (Sanford Opp. at 23–24) (citing *Michael*, 137 Cal. App. 4th at 1095–97). Plaintiffs argue Sanford had an affirmative role in causing their injury, demonstrating liability under *Hooker* and *Michael.* (Sanford Opp. at 22). Plaintiffs argue they have alleged "affirmative actions that ultimately contributed to Plaintiffs' initial and ongoing injury, including, but not limited to, their failure to know or identify that the Perpetrators were and / or became unfit and that unfitness created a particular risk. This included Defendants' actual knowledge of the Perpetrators' violations against Plaintiffs yet continued their support of them (retention); history with the Defendant Perpetrators in their previous company Keller (negligent hiring), as well as their training and perpetuation of a permissive culture (supervision)." (Sanford Opp. at 24). Specifically, Plaintiffs point to the following allegations: Sanford personally knew Bjorkman and Golden before he hired them; Sanford worked with all Defendants at Keller Williams; during this time, Bjorkman allegedly raped a woman who later became an eXp real estate agent and reported the incident in 2018; Bjorkman drugged and assaulted women and threatened them to stay silent; and Sanford attempted to cover up Bjorkman and Golden's behavior with nondisclosure agreements.  (FAC ¶¶ 250, 45–47, 83).

Sanford argues Plaintiffs' reliance on these cases is misplaced because Plaintiffs were neither employees nor contractors hired by Bjorkman and Golden. (Sanford Reply at 16). The Court agrees that these cases are not instructive. What matters is whether

Bjorkman and Golden were Sanford's employees. If they were not, Plaintiffs have merely demonstrated that Bjorkman, Golden and Plaintiffs were all Sanford's independent contractors. To the extent that Plaintiffs' policy arguments are compelling, they are ultimately irrelevant. The *Privette* cases demonstrate when a hirer does not have a duty to various individuals employed or contracted by their own employees' contractors. The policy barring recovery in those cases—namely, the policy in favor of delegation—is not at issue. The First Amended Complaint does not allege that Sanford delegated the duty he owed to Plaintiffs—whatever that duty was—to Defendants Golden and Bjorkman. At the same time, the First Amended Complaint clearly demonstrates a multi-tiered structure of roles at eXp and raises questions as to whether all eXp real estate agents had the same employment relationship with Sanford. This implicates the issue of duty.

A district court should provide leave to amend upon granting a motion to dismiss unless it is clear that the complaint could not be saved by amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend a complaint should be freely granted. Fed. R. Civ. P. 15(a). Leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). In Plaintiffs' Complaint, they brought claims against eXp, Bjorkman, Golden and John Does 1–100. (Dkt. 1 ¶¶ 12–16). In the First Amended Complaint, they added several claims against Sanford, as the Founder of eXp. (FAC ¶ 16). Thus, they have not yet attempted to cure these allegations. Because Plaintiffs' First Amended Complaint fails to allege specific factual allegations that raise a plausible inference that an employer-employee relationship existed between Sanford and Bjorkman and/or Golden, the Court **GRANTS** Sanford's motion to dismiss Plaintiffs' Count 10, with leave to amend. (FAC ¶¶ 247–252).

### *e. Count 11: Loss of consortium*

Finally, because John Doe's claim is time-barred, the Court need not address the

84

parties' remaining arguments regarding Count 11. (Sanford MTD at 30; Gove MTD at 30; *see also* Bjorkman MTD at 24). The Court **GRANTS** Defendants' motions to Dismiss John Doe's claim. (FAC ¶¶ 253–54).

**V. CONCLUSION**

For the reasons stated above, Defendants' motions to dismiss are **DENIED IN PART AND GRANTED IN PART**:

1. Defendant Sanford and eXp Realty's motion to dismiss is **GRANTED** as follows: Counts 8 and 9, with respect to Jane Doe 3's claims only; Count 10, with respect to all Plaintiffs, with leave to amend; and Count 11.

2. Defendant Gove's motion to dismiss is **GRANTED** as follows: Counts 7 and 9, with respect to Jane Doe 3's claims only; and Count 11.

3. Defendant Bjorkman's motion to dismiss is **GRANTED** as follows: Count 5, with respect to Jane Doe 3's claims only; and Count 11.

4. Defendant Golden's motion to dismiss is **GRANTED** as follows: Counts 5, 6 and 9, with respect to Jane Doe 3's claims only; and Count 11.

5. Defendants' motions to dismiss are **DENIED** as to all other Counts.

IT IS SO ORDERED.

Dated: January 29, 2024

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

85

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT F</u>**

1  times you had gone down between kicking everyone out

2  and watching yourself in this bathroom?

3       A    There is no way.  I would not remember that.

4       Q    Did you ever penetrate Ms. Megan

5  Farrell-Nelson in any way, shape, or form in that

6  shower?

7       A    No.

8       Q    And --

9       A    No.  I know the testimony, but that didn't

10  happen.

11       Q    Did you ever penetrate Ms. Megan

12  Farrell-Nelson with your fingers in that shower?

13       A    No.

14       Q    Did -- was Ms. Megan Farrell-Nelson ever

15  performing oral sex on you in that shower?

16       A    No.  She tried like hell, but no.

17       Q    What do you mean she tried like hell?

18       A    Every time we'd walk by, she'd grab us.  It

19  was a very experimental night for her.  Let me tell

20  you that.

21       Q    Did Ms. -- I'll strike that.

22            Did you engage in sexual activity with Ms.

23  Megan Farrell-Nelson at all on that Friday, August 28,

24  2020, to the morning of Saturday, August 29, 2020?

25       A    No.

Page 447

Megan Bjornstad, Volume II
October 13, 2025

1      Q     After that five minutes in the -- well,
2   strike that.
3            Did you see Defendant Golden engage in
4   sexual activity with anyone in the bathroom Friday,
5   August 28, 2020, to Saturday, August 29, 2020?
6      A     I don't recall.  I don't -- I probably
7   wasn't watching the dude.
8      Q     You don't recall if the knot you saw the
9   women in on the bed was either before or after this
10  five minutes in the bathroom; correct?
11     A     It was before and after.
12     Q     Okay.  Understood.  So before and after, you
13  saw the women continuing to engage in sexual activity
14  together?
15     A     Let me make this clear for you.
16     Q     Please.
17     A     The whole weekend was a sex fest for those
18  girls.  There was on and off, in and out, everywhere.
19  Not just in the room.  Like, they were -- you would
20  think they were a throuple the whole weekend.
21     Q     When you say a throuple, you're talking
22  about Ms. Megan Farrell-Nelson, Ms. Tungst [ph], and
23  Ms. Keenan [ph]; correct?
24     A     Yeah.  They were just hanging out together
25  for the few days.

                                        Page 448

1          Q    Focusing on this Friday, August 28, 2020,

2     till perhaps the early morning hours of Saturday,

3     August 29, 2020, what do you recall after that

4     bathroom activity?

5          A    I remember everybody getting ready, like

6     hair dryers going again, 'cause the first attempt

7     didn't work to go to dinner -- or all -- everybody

8     together.

9               And then at some point Megan was just

10    wolfing down the drugs again and started

11    hallucinating, freaking out, talking about nonsense,

12    about all this Burning Man crap, and all the -- just a

13    bunch.

14              She just went sideways really bad.  Like,

15    she was smoking that weed pen all day, sucking the

16    heck out of it, pounding pills, like pounding

17    cocktails.  It was a nightmare.

18              So finally Emily and Dave just got so mad

19    and we just -- I just took her for a walk.  I just

20    said, "Let's go."

21         Q    You took her for a walk on Friday, August

22    28, 2020?

23         A    Or Saturday.  Whatever -- whatever day that

24    was.  Whatever the knot day was.

25         Q    Let me ask you this.  Friday, August 28,

                                        Page 449

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT G

| | | |
|---|---|---|
| 1 | Q.  Is part of the responsibilities of eXp World | 10:31 |
| 2 | Holdings, Inc., and specifically your role as CEO, to | 10:32 |
| 3 | oversee eXp Realty, LLC? | 10:32 |
| 4 | MR. PALLARES:  Objection.  Form. | 10:32 |
| 5 | THE WITNESS:  Yeah, as -- as all the | 10:32 |
| 6 | subsidiaries, yeah, I work with the management teams of | 10:32 |
| 7 | all the -- all the companies. | 10:32 |
| 8 | BY MS. LENZE: | 10:32 |
| 9 | Q.  But you yourself as CEO of eXp World Holdings, | 10:32 |
| 10 | Inc., oversee eXp Realty, LLC, true? | 10:32 |
| 11 | MR. PALLARES:  Objection.  Form. | 10:32 |
| 12 | THE WITNESS:  True. | 10:32 |
| 13 | BY MS. LENZE: | 10:32 |
| 14 | Q.  As CEO of eXp World Holdings, Inc., do you | 10:32 |
| 15 | accept responsibility for the implementation and | 10:32 |
| 16 | training of the policies and procedures of eXp Realty, | 10:32 |
| 17 | LLC? | 10:32 |
| 18 | MR. PALLARES:  Objection.  Form. | 10:32 |
| 19 | THE WITNESS:  From an oversight | 10:32 |
| 20 | perspective of general oversight and strategic | 10:32 |
| 21 | oversight, yes, but actual implementation, no. | 10:32 |
| 22 | BY MS. LENZE: | 10:32 |
| 23 | Q.  How do you endeavor to do that as CEO of eXp | 10:33 |
| 24 | Realty, LLC -- excuse me, strike that. | 10:33 |
| 25 | How do you endeavor to oversee the policies | 10:33 |

Page 40

Glenn Sanford
Page ID #:3601
March 21, 2025

| | | |
|---|---|---|
| 1 | MR. PALLARES:  Object to form. | 11:05 |
| 2 | THE WITNESS:  Correct. | 11:05 |
| 3 | BY MS. LENZE: | 11:05 |
| 4 | Q.  You agree with me, Mr. Sanford, don't you, | 11:05 |
| 5 | that a brokerage should be responsible for creating | 11:05 |
| 6 | reporting policies related to sexual -- | 11:05 |
| 7 | (Reporter clarification.) | 11:05 |
| 8 | | 11:05 |
| 9 | BY MS. LENZE: | 11:05 |
| 10 | Q.  Brokerage should be responsible for creating | 11:05 |
| 11 | reporting policies in relation to sexual misconduct | 11:05 |
| 12 | against its agents, correct? | 11:05 |
| 13 | MR. PALLARES:  Objection.  Form. | 11:05 |
| 14 | THE WITNESS:  There's a lot of policies | 11:05 |
| 15 | that companies should create and that's one of them. | 11:05 |
| 16 | BY MS. LENZE: | 11:05 |
| 17 | Q.  You agree with me that training employees | 11:05 |
| 18 | related to reporting on sexual misconduct is an | 11:05 |
| 19 | extremely important part of the prevention of sexual | 11:05 |
| 20 | misconduct within a company, true? | 11:06 |
| 21 | MR. PALLARES:  Objection.  Form. | 11:06 |
| 22 | Foundation. | 11:06 |
| 23 | THE WITNESS:  It is important to have. | 11:06 |
| 24 | BY MS. LENZE: | 11:06 |
| 25 | Q.  You agree with me, don't you, Mr. Sanford, | 11:06 |

Page 63

| | | |
|---|---|---|
| 1 | Argumentative. | 02:10 |
| 2 | Go ahead and answer. | 02:10 |
| 3 | THE WITNESS: True, I've heard rumors. | 02:10 |
| 4 | But not -- no actual accusations. | 02:10 |
| 5 | BY MS. LENZE: | 02:10 |
| 6 | Q. What rumors have you heard, sir? | 02:10 |
| 7 | A. I've heard rumors from -- I think from it Fee | 02:10 |
| 8 | and some others about a supposed affair. But talking | 02:10 |
| 9 | with Mike Bain, he wasn't able to determine it in HR, | 02:10 |
| 10 | direct conversation with Dave Conord, he said that it | 02:10 |
| 11 | didn't happen. And -- and other than that, it was -- | 02:10 |
| 12 | it was just a -- a thing that people talked about | 02:10 |
| 13 | potentially happened, but nobody came forward or there | 02:11 |
| 14 | was no -- nothing that actually solidified that that | 02:11 |
| 15 | did happen. | 02:11 |
| 16 | Q. Did you yourself have a conversation with Dave | 02:11 |
| 17 | Conord? | 02:11 |
| 18 | A. I did. | 02:11 |
| 19 | Q. Did you yourself have a conversation with the | 02:11 |
| 20 | woman -- woman who was alleged to have been harassed by | 02:11 |
| 21 | Dave Conord? | 02:11 |
| 22 | A. No. | 02:11 |
| 23 | Q. Do you have an understanding of repercussions | 02:11 |
| 24 | surrounding other employees of eXp related to their | 02:11 |
| 25 | complaints about Dave Conord and his inappropriate | 02:11 |

Page 156

Glenn Sanford
March 21, 2025

| | | |
|---|---|---|
| 1 | of various things that can happen and remind people | 02:56 |
| 2 | what they should be doing.  When you're a small | 02:56 |
| 3 | company, you can see everybody around the room.  When | 02:56 |
| 4 | you're a large company, you now need to document this | 02:56 |
| 5 | stuff because as much as I think they should be adults, | 02:56 |
| 6 | they're not always acting in accordance with what you | 02:56 |
| 7 | would consider to be good human behavior. | 02:56 |
| 8 | BY MS. LENZE: | 02:56 |
| 9 | Q.  You said you were professionalizing the | 02:56 |
| 10 | corporation as of 2018 but, in fact, your company had | 02:56 |
| 11 | gone public well in advance of 2018, true? | 02:56 |
| 12 | A.  We were a public company, but gone public and | 02:56 |
| 13 | being a public company are two different things. | 02:56 |
| 14 | Q.  You had, in fact -- | 02:56 |
| 15 | A.  So going public means an IPO. | 02:56 |
| 16 | Q.  Understood. | 02:56 |
| 17 | A.  We did not do an IPO. | 02:56 |
| 18 | Q.  But you were a public company, correct? | 02:56 |
| 19 | A.  Correct. | 02:56 |
| 20 | Q.  You were a professional company, correct, | 02:56 |
| 21 | prior to 2018? | 02:57 |
| 22 | A.  We were a professional company in 2009. | 02:57 |
| 23 | Q.  And you agree with me that professional | 02:57 |
| 24 | companies are concerned with the safety of their | 02:57 |
| 25 | employees and their agents, correct? | 02:57 |

Page 180

Glenn Sanford
March 21, 2025

| | | |
|---|---|---|
| 1 | Q.  Page 387, if you could, sir. | 03:18 |
| 2 | A.  Uh-huh. | 03:18 |
| 3 | Q.  It says, from Jim Nuth there that "Jim Nuth | 03:18 |
| 4 | spoke with a California broker, and she was his broker | 03:19 |
| 5 | at KW where they had to part ways for issues." | 03:19 |
| 6 | Do you see that? | 03:19 |
| 7 | A.  I do. | 03:19 |
| 8 | Q.  Does that refresh your recollection of any | 03:19 |
| 9 | conversations on September 18th of 2020 related to | 03:19 |
| 10 | Michael Bjorkman and his California broker? | 03:19 |
| 11 | A.  Nope. | 03:19 |
| 12 | Q.  The next line there says, "According to our | 03:19 |
| 13 | broker, Mike liked to drink at the time, and his wife | 03:19 |
| 14 | had come to the office, possibly more than once, so | 03:19 |
| 15 | they could scream and fight when she found out about | 03:19 |
| 16 | his, quote, 'side friends.'" | 03:19 |
| 17 | Do you see that there, sir? | 03:19 |
| 18 | A.  I do. | 03:19 |
| 19 | Q.  Does that refresh your recollection related to | 03:19 |
| 20 | any conversation you had on September 18th, 2020, with | 03:19 |
| 21 | any individual relating to Michael Bjorkman's | 03:19 |
| 22 | California broker and knowledge she had about side | 03:20 |
| 23 | friends? | 03:20 |
| 24 | A.  Nope. | 03:20 |
| 25 | Q.  Do you recall any conversations you had on | 03:20 |

Page 200

Glenn Sanford
March 21, 2025

```
 1        A.   I see it's to Dave Conord at eXp.           03:25

 2        Q.   It says "Dave Conord, eXp."  Do you see that?   03:25

 3        A.   I do, uh-huh.                                03:25

 4        Q.   And do you recall Dave Conord talking to you   03:25

 5   about this request to change sponsor by Ms. Noelle     03:25

 6   Nielsen?                                               03:26

 7             MR. PALLARES:  Objection.  Time.  Vague.     03:26

 8             THE WITNESS:  I don't remember the           03:26

 9   conversation with Dave.                                03:26

10    BY MS. LENZE:                                         03:26

11        Q.   Did you have a conversation with Dave?       03:26

12        A.   I don't remember one.                        03:26

13        Q.   You understood -- do you -- did you have an   03:26

14   understanding that Ms. Noelle Nielsen -- well, strike  03:26

15   that.                                                  03:26

16             Did you have an understanding in September of   03:26

17   2020 that Ms. Noelle Nielsen was requesting to change  03:26

18   sponsors in relation to the allegations of sexual      03:26

19   misconduct and drugging by a Michael Bjorkman?         03:26

20        A.   No.                                          03:26

21        Q.   You can put that one aside.                  03:26

22             Going back to Ms. Tami Edwards, I will       03:26

23   introduce Exhibit 14 as next in line, 2eXp_0005141     03:26

24   through 5143.  It looks like -- oh, yeah, there's      03:27

25   another copy for your counsel.                         03:27
```

Page 204

Glenn Sanford
March 21, 2025

| | | |
|---|---|---|
| 1 | mental manipulation, coercion, abuse of position.  And | 03:34 |
| 2 | if none of that matters, hiring a recruiting company." | 03:34 |
| 3 | Do you see that section? | 03:34 |
| 4 | A.  I do. | 03:34 |
| 5 | Q.  Next section, "David Golden:  Knowledge of | 03:34 |
| 6 | Mike's behavior." | 03:34 |
| 7 | And you see the list, including sexual | 03:34 |
| 8 | harassment, illegal drug use, and so on.  Do you see | 03:34 |
| 9 | that? | 03:34 |
| 10 | A.  I do. | 03:34 |
| 11 | Q.  A similar one about Rosey Rodriguez.  Do you | 03:34 |
| 12 | see that? | 03:34 |
| 13 | MR. PALLARES:  Objection.  Form. | 03:34 |
| 14 | THE WITNESS:  I do. | 03:34 |
| 15 | BY MS. LENZE: | 03:34 |
| 16 | Q.  A similar one about Rick Geha.  Do you see | 03:34 |
| 17 | that? | 03:34 |
| 18 | MR. PALLARES:  Form. | 03:34 |
| 19 | MR. LEVINE:  Form.  Levine. | 03:34 |
| 20 | THE WITNESS:  I see it. | 03:34 |
| 21 | BY MS. LENZE: | 03:34 |
| 22 | Q.  Have you -- your testimony is that you've | 03:34 |
| 23 | never seen this memo, correct? | 03:34 |
| 24 | A.  Correct. | 03:34 |
| 25 | Q.  Did anyone talk to you around this time of | 03:35 |

Page 212

Devin Safford
March 21, 2025

| | | |
|---|---|---|
| 1 | A.   I do. | 03:46 |
| 2 | Q.   You say here on this first bubble on | 03:46 |
| 3 | October 13th of 2020, "We are trying to do right by you | 03:46 |
| 4 | given the position we are having to navigate." | 03:46 |
| 5 | Do you see that? | 03:46 |
| 6 | A.   I do. | 03:46 |
| 7 | Q.   What do you mean "do right by him"? | 03:46 |
| 8 | A.   Well, if he is in fact innocent of what he is | 03:46 |
| 9 | claiming to be innocent of, then we want to make sure | 03:46 |
| 10 | that we are doing the things that would preserve that, | 03:46 |
| 11 | and if he's not, then, obviously, that's a different | 03:46 |
| 12 | scenario. | 03:46 |
| 13 | But again, this is an empathetic conversation | 03:46 |
| 14 | between me and Michael Bjorkman.  It's not a -- we're | 03:46 |
| 15 | not negotiating anything or having any -- any | 03:46 |
| 16 | conversation other than he is emotionally distraught. | 03:46 |
| 17 | He's reaching out to me and I'm saying, "Hey, you are | 03:47 |
| 18 | going through some tough stuff.  I get it if you're | 03:47 |
| 19 | innocent, then, we'll be here to support you when you | 03:47 |
| 20 | get things worked out." | 03:47 |
| 21 | Q.   Did you have a similar empathetic | 03:47 |
| 22 | conversation -- strike that. | 03:47 |
| 23 | Did you think it would be important as the | 03:47 |
| 24 | head of a company to have a similar empathetic | 03:47 |
| 25 | conversation with women who were sexually assaulted and | 03:47 |

Page 223

| | | |
|---|---|---|
| 1 | it. | 06:10 |
| 2 | BY MR. LEVINE: | 06:10 |
| 3 | Q.  Now -- so if there's an event where, say, a | 06:10 |
| 4 | few of the eXp people get together at night, they have | 06:10 |
| 5 | alcohol and do recreational drugs, that is not | 06:10 |
| 6 | regulated by eXp in terms of the policies and | 06:10 |
| 7 | procedures, true? | 06:10 |
| 8 | MS. LENZE:  Object to form. | 06:10 |
| 9 | THE WITNESS:  Yeah, that's true. | 06:10 |
| 10 | BY MR. LEVINE: | 06:10 |
| 11 | Q.  And even if there's allegations of rape at | 06:10 |
| 12 | that event, that is still not regulated by eXp, true? | 06:11 |
| 13 | MS. LENZE:  Object to form. | 06:11 |
| 14 | THE WITNESS:  Yeah, the -- yeah, the -- | 06:11 |
| 15 | it's not a -- it's not a real estate brokerage | 06:11 |
| 16 | activity.  It does have reputational risk attached to | 06:11 |
| 17 | it, but it is not something that is directly tied to | 06:11 |
| 18 | our supervision responsibilities of an agent. | 06:11 |
| 19 | BY MR. LEVINE: | 06:11 |
| 20 | Q.  So it's their personal business and not | 06:11 |
| 21 | regulated by eXp.  If they decide to go up to their | 06:11 |
| 22 | suite with other eXp people, have a few beers, watch | 06:11 |
| 23 | Super Bowl, and do recreational illegal drugs, that's a | 06:11 |
| 24 | personal matter, and they can't be fired, suspended or | 06:11 |
| 25 | lose revenue share for that; isn't that true? | 06:11 |

Page 323

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT H**

| | | |
|---|---|---|
| 1 | A.    Yes. | 09:17 |
| 2 | Q.    Mr. Haggard, can you please share with the | 09:17 |
| 3 | Ladies and Gentlemen of the Jury what the purpose of | 09:17 |
| 4 | the agent compliance department is. | 09:17 |
| 5 | A.    We're tasked with investigating potential | 09:17 |
| 6 | policy violations and interpreting whether or not agent | 09:17 |
| 7 | misconduct or allegations thereof violate eXp policies | 09:17 |
| 8 | and procedures, as well as educate is another function. | 09:18 |
| 9 | Q.    You help educate eXp's agent base on eXp's | 09:18 |
| 10 | internal policies and procedures; right? | 09:18 |
| 11 | A.    Correct. | 09:18 |
| 12 | Q.    You help enforce eXp's core values; true? | 09:18 |
| 13 | A.    True. | 09:18 |
| 14 | Q.    You help with the enforcement of eXp's | 09:18 |
| 15 | policies and procedures; correct? | 09:18 |
| 16 | A.    Correct. | 09:18 |
| 17 | Q.    And you help correct the behavior if | 09:18 |
| 18 | there's been any violation of eXp's policies and | 09:18 |
| 19 | procedures by its agents; right? | 09:18 |
| 20 | MR. PALLARES:  Objection.  Form. | 09:18 |
| 21 | MR. DEMARCO:  Join. | 09:18 |
| 22 | THE COURT REPORTER:  Who -- | |
| 23 | MR. DEMARCO:  Mr. Demarco. | |
| 24 | MR. PALLARES:  Mr. Demarco, are you on | |
| 25 | camera at all?  Because the court reporter doesn't know | |

Page 11

HAGGARD
5/2/25 Depo

| | | |
|---|---|---|
| 1 | You agree, sir, that one of the purposes of | 09:19 |
| 2 | the agent compliance department at eXp is the | 09:19 |
| 3 | correction of behavior where there has been violations | 09:19 |
| 4 | of the policies and procedures; right? | 09:20 |
| 5 | A.    True. | 09:20 |
| 6 | Q.    You agree with me, sir, that part of the | 09:20 |
| 7 | purpose of the agent compliance department is the | 09:20 |
| 8 | protection of agents; true? | 09:20 |
| 9 | MR. PALLARES:  Objection.  Form. | 09:20 |
| 10 | THE WITNESS:  It's to protect eXp as a | 09:20 |
| 11 | whole, and that includes its agents as well. | 09:20 |
| 12 | BY MS. LENZE: | 09:20 |
| 13 | Q.    You agree with me that part of the purpose | 09:20 |
| 14 | of the agent compliance department at eXp is the | 09:20 |
| 15 | protection of eXp; right? | 09:20 |
| 16 | MR. PALLARES:  Objection.  Form. | 09:20 |
| 17 | THE WITNESS:  Yes. | 09:20 |
| 18 | BY MS. LENZE: | 09:20 |
| 19 | Q.    Now, you are the head of this department | 09:20 |
| 20 | with Mr. Bastian, who you worked with at USANA; | 09:20 |
| 21 | correct? | 09:20 |
| 22 | A.    Technically Mr. Bramble is the head of -- I | 09:20 |
| 23 | report to Mr. Bramble, so you could classify him as the | 09:20 |
| 24 | head of agent compliance, but I am the -- one of the -- | 09:20 |
| 25 | one of the leadership within the department. | 09:21 |

Page 13

```
 1              (Whereupon the record was read by the          09:28

 2     reporter as follows:

 3              QUESTION:  And you would agree with me,

 4     sir, that Exhibit 1, the "Policies and Procedures" from

 5     November 16 of 2018, were the policies and procedures

 6     that were in effect at eXp until January of 2023;

 7     correct?)                                               09:28

 8              MR. PALLARES:  I object as to form.            09:28

 9              Okay.  Go ahead.                               09:28

10              THE WITNESS:  Yes.                             09:28

11     BY MS. LENZE:                                           09:28

12        Q.    Now, this November 2018 policy and            09:28

13     procedure that we're looking at here on Exhibit 1 has a 09:28

14     policy on harassment; true?                            09:28

15        A.    (Witness reviews document.)                   09:28

16              MR. PALLARES:  Are you asking him if that's    09:28

17     just generally true or do you want him to find the     09:28

18     provision?                                             09:28

19              MS. LENZE:  He's welcome to do either.        09:28

20              MR. PALLARES:  Okay.  Well, what's the        09:28

21     question?                                              09:28

22              Answer the question if you can.               09:28

23              THE WITNESS:  Yes, there is a policy          09:28

24     regarding harassment.                                  09:28

25     BY MS. LENZE:                                          09:28
```

Page 20

| | | |
|---|---|---|
| 1 | Q.    You agree with me, sir, that this | 09:28 |
| 2 | November 16, 2018, policies and procedures has a policy | 09:28 |
| 3 | on harassment located on page 21; correct? | 09:29 |
| 4 | A.    Yes.  This document has a harassment | 09:29 |
| 5 | policy. | 09:29 |
| 6 | Q.    You agree with me, sir, that the policy of | 09:29 |
| 7 | eXp that you were charged with enforcing related to | 09:29 |
| 8 | harassment was the following:  "The Company takes all | 09:29 |
| 9 | forms of harassment seriously"; right? | 09:29 |
| 10 | MR. PALLARES:  Objection.  Form.  Out of | 09:29 |
| 11 | context. | 09:29 |
| 12 | Go ahead. | 09:29 |
| 13 | THE WITNESS:  Yes. | 09:29 |
| 14 | BY MS. LENZE: | 09:29 |
| 15 | Q.    You agree with me that when you joined eXp | 09:29 |
| 16 | in August of 2019, the policy of eXp related to | 09:29 |
| 17 | harassment was to take all forms of harassment | 09:29 |
| 18 | seriously; right? | 09:29 |
| 19 | A.    Yes. | 09:29 |
| 20 | Q.    This included but was not limited to | 09:29 |
| 21 | verbal, physical or sexual harassment; correct? | 09:30 |
| 22 | A.    Correct. | 09:30 |
| 23 | Q.    You agree with me that it was the policy | 09:30 |
| 24 | and procedure of eXp, as of the time you joined in | 09:30 |
| 25 | August of 2019, and as of November 16 of 2018, when | 09:30 |

Page 21

```
 1    this policy and procedure went into effect, that all          09:30

 2    reported or suspected occurrences of harassment will be       09:30

 3    promptly and thoroughly investigated; right?                  09:30

 4         A.    Yes, that's what this document says.                09:30

 5         Q.    Is that, sir, what the policy and procedure         09:30

 6    of eXp was at the time you joined in August of 2018?          09:30

 7         A.    Yes.                                                09:30

 8         Q.    "Any Agent that is found to have harassed          09:30

 9    another agent, employee, client, customer or any member      09:30

10    of the public shall be immediately, and without              09:31

11    warning, released from the Company at the Company's          09:31

12    sole discretion."                                             09:31

13              You agree with me that that was the policy          09:31

14    in effect at eXp as of August of 2019, when you joined       09:31

15    the company; correct?                                         09:31

16         A.    Correct.                                           09:31

17         Q.    "If an Agent felt {sic} that they had been        09:31

18    harassed in any way, the agent should {sic} notify the       09:31

19    state broker(s) or a member of the corporate team            09:31

20    immediately."                                                 09:31

21              Do you agree that was the policy and                09:31

22    procedure in effect as of the time you joined?               09:31

23         A.    Yes.                                               09:31

24         Q.    Do you agree with me, sir, that, "The             09:31

25    Company would not permit or condone any acts of              09:31
```

Page 22

| | | |
|---|---|---|
| 1 | retaliation against anyone who files a harassment | 09:31 |
| 2 | complaint or cooperates in the investigation of the | 09:32 |
| 3 | same"? | 09:32 |
| 4 | Do you agree with me that that was the | 09:32 |
| 5 | policy and procedure in effect at the time you joined? | 09:32 |
| 6 | A.    Yes. | 09:32 |
| 7 | Q.    Now, your role, as you testified earlier, | 09:32 |
| 8 | as both a director of agent compliance, and ultimately | 09:32 |
| 9 | as vice-president of agent compliance, was to uphold | 09:32 |
| 10 | the Code of Conduct of eXp set forth in the policies | 09:32 |
| 11 | and procedures; correct? | 09:32 |
| 12 | A.    That's correct. | 09:32 |
| 13 | Q.    And that Code of Conduct is set forth in | 09:32 |
| 14 | the policies and procedures of November 16, 2018; on | 09:32 |
| 15 | page 4; true? | 09:32 |
| 16 | A.    Yes.  In this document on page 4 is the | 09:32 |
| 17 | Code of Conduct. | 09:33 |
| 18 | Q.    You agree with me, sir, that, "All agents | 09:33 |
| 19 | should conduct their business in alignment with the | 09:33 |
| 20 | Company's core values, the National Association of | 09:33 |
| 21 | Realtors Code of Ethics, and in accordance with the | 09:33 |
| 22 | applicable federal and state laws" as of the time of | 09:33 |
| 23 | this document; correct? | 09:33 |
| 24 | MR. LEVINE:  I object to the form.  Levine. | 09:33 |
| 25 | BY MS. LENZE: | 09:33 |

Page 23

| | | |
|---|---|---|
| 1 | Q.    Go ahead. | 09:33 |
| 2 | A.    Restate the question, please. | 09:33 |
| 3 | Q.    Sure. | 09:33 |
| 4 | You agree with me it was the policy and | 09:33 |
| 5 | procedure of eXp, as of the time you joined in August | 09:33 |
| 6 | of 2019, that, "All agents should conduct their | 09:33 |
| 7 | business in alignment with the Company's core values, | 09:33 |
| 8 | the National Association of Realtors Code of Ethics, | 09:33 |
| 9 | and in accordance with the applicable federal and state | 09:33 |
| 10 | laws"; right? | 09:33 |
| 11 | MR. LEVINE:  I object to the form.  Levine. | 09:33 |
| 12 | THE WITNESS:  Yes. | 09:33 |
| 13 | BY MS. LENZE: | 09:33 |
| 14 | Q.    You agree with me, sir, that the policies | 09:33 |
| 15 | and procedures, as of the time you joined, were that, | 09:33 |
| 16 | "Agents should conduct themselves in an appropriate | 09:34 |
| 17 | business-like manner in all activities and relations | 09:34 |
| 18 | with fellow agents, clients, potential customers and | 09:34 |
| 19 | Company staff"; true? | 09:34 |
| 20 | A.    Yes. | 09:34 |
| 21 | Q.    You agree with me that the policy and | 09:34 |
| 22 | procedure you were tasked with enforcing, as of August | 09:34 |
| 23 | of 2019, included that, "Any agent whose conduct, | 09:34 |
| 24 | actions or performance violated or conflicted with the | 09:34 |
| 25 | COMPANY'S policies herein or the Company's core values | 09:34 |

Page 24

| | | |
|---|---|---|
| 1 | may be released from the Company immediately and | 09:34 |
| 2 | without warning"; right? | 09:34 |
| 3 | A.    Yes.    That's what the policy says. | 09:34 |
| 4 | Q.    Is that what the company's policy was? | 09:34 |
| 5 | A.    Yes. | 09:34 |
| 6 | Q.    You agree with me, sir, that the policy you | 09:34 |
| 7 | were tasked with enforcing was that, "It is the | 09:35 |
| 8 | commitment of the Company to ensure the brokerage is | 09:35 |
| 9 | free from negative, aggressive and inappropriate | 09:35 |
| 10 | behaviors, and that the environment is aimed at | 09:35 |
| 11 | providing an atmosphere upholding our core values"; | 09:35 |
| 12 | true? | 09:35 |
| 13 | A.    True. | 09:35 |
| 14 | Q.    We'll come back to those core values, sir. | 09:35 |
| 15 | But you also agree with me that, "All | 09:35 |
| 16 | agents and employees of the Company have the right to | 09:35 |
| 17 | be treated with dignity and respect"; correct? | 09:35 |
| 18 | A.    Yes. | 09:35 |
| 19 | Q.    You were tasked with enforcing that; true? | 09:35 |
| 20 | A.    True. | 09:35 |
| 21 | Q.    "All complaints of negative and | 09:35 |
| 22 | inappropriate behaviors would be taken seriously and | 09:35 |
| 23 | followed through to resolution"; right? | 09:35 |
| 24 | A.    Yes. | 09:35 |
| 25 | Q.    You agree with me, sir, that as both | 09:35 |

Page 25

| | | |
|---|---|---|
| 1 | director and ultimately vice-president of agent | 09:36 |
| 2 | compliance, you were tasked with making sure that "all | 09:36 |
| 3 | complaints of negative and inappropriate behavior would | 09:36 |
| 4 | be taken seriously and followed through to resolution"; | 09:36 |
| 5 | right? | 09:36 |
| 6 | A.    Yes. | 09:36 |
| 7 | Q.    You agree with me that, "Agents or | 09:36 |
| 8 | employees of the Company who file complaints will not | 09:36 |
| 9 | be victimized for 'whistle blowing' or reporting others | 09:36 |
| 10 | for their inappropriate behavior"; right? | 09:36 |
| 11 | MR. PALLARES:  Objection.  Form. | 09:36 |
| 12 | THE WITNESS:  Can you restate the question? | 09:36 |
| 13 | BY MS. LENZE: | 09:36 |
| 14 | Q.    Sure. | 09:36 |
| 15 | You agree with me that the policy, as of | 09:36 |
| 16 | the time you joined in August of 2019, was that, | 09:36 |
| 17 | "Agents or employees of the Company who file complaints | 09:36 |
| 18 | will not be victimized for 'whistle-blowing' or | 09:36 |
| 19 | reporting others for their inappropriate behavior"; | 09:36 |
| 20 | right? | 09:36 |
| 21 | A.    Right. | 09:37 |
| 22 | Q.    Agents were required as members of NAR to | 09:37 |
| 23 | maintain their required ethics training; true? | 09:37 |
| 24 | A.    True. | 09:37 |
| 25 | Q.    And you agree with me, sir, that as part of | 09:37 |

Page 26

```
 1    your enforcement of the Code of Conduct under the        09:37

 2    policies and procedures in effect at the time you        09:37

 3    joined, was that, "Agents should not disparage the       09:37

 4    conduct, reputation or character of another agent or     09:37

 5    the Company, whether the agent is with the Company or    09:37

 6    another office"; correct?                                09:37

 7        A.    Correct.                                       09:37

 8        Q.    And you agree with me that the, "Agents are    09:37

 9    subject to immediate termination for violation of the    09:37

10    Code of Conduct"; right?                                 09:37

11        A.    Correct.                                       09:37

12        Q.    Now, when you joined in August of 2019, did    09:37

13    you, yourself, sir, have any specific training on how    09:38

14    to enforce these policies and procedures?                09:38

15        A.    My experience working at USANA for six         09:38

16    years was my introduction into the compliance world and 09:38

17    enforcing independent contractor agreements and         09:38

18    internal company policy.                                 09:38

19        Q.    Did you, yourself, sir, have any training      09:38

20    at eXp on the enforcement of policies and procedures     09:38

21    within eXp?                                              09:38

22        A.    Can you be more specific on what you mean      09:38

23    by --                                                    09:38

24        Q.    Sure.                                          09:38

25              Did anybody provide you with training about    09:38
```

Page 27

1     Q.     The standard operating procedure included     09:50

2     the procedures for conducting investigations of     09:50

3     complaints by agents; right?     09:50

4     A.     That's correct.     09:50

5     Q.     Now, is Exhibit 2 the standard operating     09:50

6     procedures that you helped create for the agent     09:50

7     compliance department at eXp?     09:50

8     A.     Yes.     09:50

9     Q.     If you could turn to page 2926 of that.     09:51

10     MS. LENZE:     And for the record -- I     09:51

11     apologize, we have folks on Zoom.  For the record,     09:51

12     Exhibit 2 is Bates 2eXp_002923 through 2eXp_002939.     09:51

13     All right.     09:51

14     BY MS. LENZE:     09:51

15     Q.     Now, sir, if you could turn to page 2926 of     09:51

16     that document, if you would.     09:51

17     A.     Yes, I'm there.     09:51

18     Q.     Now, this title of the standard operating     09:51

19     procedure states "Standard Operating Procedures for     09:51

20     investigating and processing 'serious,'" in quotes,     09:51

21     "policy violations."     09:51

22     Do you see that?     09:51

23     A.     Yes.     09:51

24     Q.     Did you help create this section of the     09:51

25     standard operating procedures for agent compliance at     09:51

Page 32

```
 1   eXp?                                               09:51

 2        A.    I did.                                  09:51

 3        Q.    And serious policies -- strike that.    09:51

 4              Serious policy violations include       09:52

 5   violations of the Code of Conduct; right?          09:52

 6        A.    Yes, they can.                           09:52

 7        Q.    Serious policy violations at eXp can    09:52

 8   include violations of the core values; true?       09:52

 9        A.    That is true.                            09:52

10        Q.    Serious policy violations as set forth in  09:52

11   this -- strike that.                                09:52

12              Serious policy violations, investigations  09:52

13   and processing include, or can include, anything that  09:52

14   puts agents at risk; right?                         09:52

15              MR. DEMARCO:  Just sort of object to the  09:52

16   form.  These call for incomplete hypotheticals.  This  09:52

17   is Robert Demarco.                                  09:52

18   BY MS. LENZE:                                       09:52

19        Q.    Go ahead.                                09:52

20        A.    Please restate your question.            09:52

21        Q.    Sure.  No problem.                       09:52

22              Serious policy violations as contemplated  09:52

23   by page 2926 of this document can include serious   09:52

24   policy violations that put agents at risk; right?   09:53

25        A.    Yes, that's accurate.                    09:53
```

                                              Page 33

```
 1        Q.    Serious policy violations could include any      09:53

 2   violation that puts eXp at risk; right?                     09:53

 3        A.    Yes.                                             09:53

 4        Q.    Serious policy violations include                09:53

 5   violations of the harassment policy; correct?               09:53

 6        A.    It definitely could fall under a serious         09:53

 7   policy violation.                                           09:53

 8        Q.    Complaints of sexual assault fall under          09:53

 9   serious policy violations; true?                            09:53

10           MR. PALLARES:  Objection.  Form.                    09:53

11           THE WITNESS:  Yes, I would categorize -- I          09:53

12   believe you said sexual assault -- as a very serious        09:53

13   issue.                                                      09:53

14   BY MS. LENZE:                                               09:53

15        Q.    Would you categorize it as a very serious        09:53

16   policy violation falling under the standard operating       09:53

17   procedures as set forth in 2926?                            09:54

18        A.    Yes, I would.                                    09:54

19        Q.    Would you agree with me, sir, that serious       09:54

20   policy violations could include issues related to the       09:54

21   drugging of agents?                                         09:54

22           MR. LEVINE:  Object to the form.  Levine.           09:54

23           MR. DEMARCO:  Join.                                 09:54

24           And I just want to be clear.  I know we             09:54

25   stated it, but there is an agreement and stipulation        09:54
```

Page 34

| | | |
|---|---|---|
| 1 | that if one defense lawyer objects, that all defendants | 09:54 |
| 2 | join.  I just want to make sure that's clear; correct? | 09:54 |
| 3 | MS. LENZE:  Yes, it is clear and it has | 09:54 |
| 4 | been stipulated to. | 09:54 |
| 5 | MR. DEMARCO:  Okay.  Just double-checking | 09:54 |
| 6 | again.  Thank you. | 09:54 |
| 7 | MS. LENZE:  No problem. | 09:54 |
| 8 | MR. PALLARES:  So is there a question | 09:54 |
| 9 | pending? | 09:54 |
| 10 | MS. LENZE:  I can ask a new one. | 09:54 |
| 11 | MR. PALLARES:  Yeah. | 09:54 |
| 12 | MS. LENZE:  Okay. | 09:54 |
| 13 | BY MS. LENZE: | 09:54 |
| 14 | Q.    Serious policy violations, sir, can include | 09:55 |
| 15 | issues of agents being drugged by other agents; | 09:55 |
| 16 | correct? | 09:55 |
| 17 | MR. LEVINE:  I object to the form. | 09:55 |
| 18 | Incomplete hypothetical. | 09:55 |
| 19 | THE WITNESS:  Yes.  If somebody were to | 09:55 |
| 20 | drug another individual within eXp, that would be | 09:55 |
| 21 | serious for sure. | 09:55 |
| 22 | BY MS. LENZE: | 09:55 |
| 23 | Q.    Now, based on this standard operating | 09:55 |
| 24 | procedure, your department, following the receipt of a | 09:55 |
| 25 | complaint, is to perform the highlighted steps.  Do you | 09:55 |

Page 35

```
 1    see the steps listed on Bates 2eXp_002926 through 2927,      09:55
 2    sir?                                                         09:55
 3         A.    (Witness reviews document.)  Yes.                 09:55
 4         Q.    You agree with me that the first step             09:55
 5    following a complaint of a serious policy violation is       09:56
 6    to, Step 1, open a case file; right?                         09:56
 7         A.    Correct.                                          09:56
 8         Q.    Step 2 includes that, "The compliance             09:56
 9    officer investigates the complaints under close             09:56
10    supervision from the director of agent compliance.           09:56
11    This investigation should include an interview of the        09:56
12    complainant, any witnesses, and the alleged offending        09:56
13    agent.  Witnesses and others interviewed should provide      09:56
14    written statements where possible.  Copies of other          09:56
15    evidentiary documents should be collected and attached       09:56
16    to the CSC case file."                                       09:56
17              That's all part of Step 2; correct?                09:56
18         A.    Yes, that's correct.                              09:56
19         Q.    Further, as part of Step 2, "When a serious       09:57
20    policy complaint has been made, the chairman of the          09:57
21    compliance committee" -- that's you, right, sir?             09:57
22         A.    Correct.  Yes.                                    09:57
23         Q.    "The chairman of the Compliance Committee         09:57
24    will update appropriate members of management that an        09:57
25    investigation is being conducted, if the violator is an      09:57
```

Page 36

| | | |
|---|---|---|
| 1 | influencer and/or ICON agent and/or a significant | 09:57 |
| 2 | producer"; correct? | 09:57 |
| 3 | A.    That is correct. | 09:57 |
| 4 | Q.    Can you tell the Ladies and Gentlemen of | 09:57 |
| 5 | the Jury, sir, what a compliance committee is? | 09:57 |
| 6 | A.    So we set up the compliance committee to be | 09:57 |
| 7 | more so an independent body comprised of multiple | 09:57 |
| 8 | members of management, from the executive team director | 09:57 |
| 9 | above type level, that can be a body to review my | 09:58 |
| 10 | department's investigation work and make a | 09:58 |
| 11 | determination as how to come to a resolution. | 09:58 |
| 12 | Q.    Do you provide any training to the members | 09:58 |
| 13 | of the compliance committee? | 09:58 |
| 14 | A.    When we call members of the compliance | 09:58 |
| 15 | committee, typically I will have a discussion with | 09:58 |
| 16 | them, let me them know generally how the meetings work, | 09:58 |
| 17 | show them an example of -- | 09:58 |
| 18 | MR. PALLARES:  Keep going, please. | 09:58 |
| 19 | THE WITNESS:  -- an agenda that we would | 09:58 |
| 20 | present, talk to them generally about topics that we | 09:58 |
| 21 | might review. | 09:58 |
| 22 | BY MS. LENZE: | 09:58 |
| 23 | Q.    Was the -- strike that. | 09:58 |
| 24 | Was the formation of the compliance | 09:58 |
| 25 | committee your idea? | 09:58 |

Page 37

```
 1        A.    It was in conjunction with me and Mr.         09:58

 2   Bramble.                                                 09:58

 3        Q.    Did you select all of the members of the      09:58

 4   compliance committee since its inception?                09:59

 5        A.    That was also a joint selection process       09:59

 6   with me and Mr. Bramble.                                 09:59

 7        Q.    Were you the only two individuals involved    09:59

 8   in the selection of individuals for the compliance       09:59

 9   committee?                                               09:59

10        A.    My recollection is there were times where I   09:59

11   may consult the standing members, just to get their      09:59

12   opinions.                                                09:59

13             MR. LEVINE:  We're running out of milks.       09:59

14             MR. PALLARES:  Okay.  Who's ever talking in    09:59

15   the background, you need to put it on your mute.         09:59

16             MR. LEVINE:  I apologize.  That was Levine.    09:59

17   BY MS. LENZE:                                            09:59

18        Q.    I'm sorry, sir.                               09:59

19             You would consult other members of the        09:59

20   compliance committee in additional selection?           09:59

21        A.    Occasionally, yes.                            09:59

22        Q.    And you served as the chairman -- chairman    09:59

23   of the compliance committee; correct?                   09:59

24        A.    That's correct.                               09:59

25        Q.    When did the compliance committee at eXp      09:59
```

Page 38

| | | |
|---|---|---|
| 1 | to seven.  We don't have a set standard number.  But | 10:01 |
| 2 | current standing I believe is seven members. | 10:01 |
| 3 | Q.    Now, turning back to Exhibit 2, if you | 10:01 |
| 4 | would, sir, on 2926, sticking with Step 2, it says, | 10:01 |
| 5 | "You would update appropriate members of management | 10:01 |
| 6 | that an investigation is being conducted, if the | 10:01 |
| 7 | violator is an influencer, an ICON agent and/or a | 10:01 |
| 8 | significant producer." | 10:01 |
| 9 | Do you see that, sir? | 10:01 |
| 10 | A.    Yes.  That is what this document says. | 10:01 |
| 11 | Q.    And significant producers were just known | 10:01 |
| 12 | at eXp; right? | 10:02 |
| 13 | MR. PALLARES:  Objection.  Form. | 10:02 |
| 14 | THE WITNESS:  That's pretty general.  There | 10:02 |
| 15 | is some subjectivity in terms of evaluation on my team | 10:02 |
| 16 | on who is a producer.  Typically, we would look at | 10:02 |
| 17 | things like how long they had been at eXp, how many | 10:02 |
| 18 | transactions they're closing on any given year, revenue | 10:02 |
| 19 | share group size, anybody that has significant impact | 10:02 |
| 20 | to the business function of eXp. | 10:02 |
| 21 | BY MS. LENZE: | 10:02 |
| 22 | Q.    For those individuals, when there is being | 10:02 |
| 23 | an investigation conducted of them, you would notify | 10:02 |
| 24 | somebody in management or update appropriate -- strike | 10:02 |
| 25 | that. | 10:02 |

Page 40

| | | |
|---|---|---|
| 1 | THE WITNESS:  Can you please repeat that? | 10:03 |
| 2 | BY MS. LENZE: | 10:04 |
| 3 | Q.    Sure. | 10:04 |
| 4 | You agree with me, do you not, sir, that an | 10:04 |
| 5 | investigation of an influencer by the agent compliance | 10:04 |
| 6 | department could potentially have a large impact on the | 10:04 |
| 7 | company itself? | 10:04 |
| 8 | MR. PALLARES:  Objection.  Form. | 10:04 |
| 9 | THE WITNESS:  It's very possible there | 10:04 |
| 10 | could be a disruption to business operations or people, | 10:04 |
| 11 | you know, having opinions on it one way or another.  So | 10:04 |
| 12 | yes to your question. | 10:04 |
| 13 | BY MS. LENZE: | 10:04 |
| 14 | Q.    You agree with me, sir, that ICON agents | 10:04 |
| 15 | have a large financial impact on eXp; correct? | 10:04 |
| 16 | MR. PALLARES:  Objection.  Form. | 10:04 |
| 17 | Foundation. | 10:04 |
| 18 | THE WITNESS:  It's generally true that an | 10:04 |
| 19 | ICON agent is somebody that has hit their respective | 10:04 |
| 20 | cap at eXp, meaning they paid in the full company | 10:04 |
| 21 | dollar per agent, which is typically $16,000.  So you | 10:04 |
| 22 | could say that yes, they could have an impact on the | 10:04 |
| 23 | company financially. | 10:05 |
| 24 | BY MS. LENZE: | 10:05 |
| 25 | Q.    You agree with me, sir, do you not, that | 10:05 |

Page 42

```
 1    process of investigating and processing serious policy        10:06
 2    violations, Step 3 says, "The compliance officer              10:06
 3    reviews the results of the investigation with the             10:06
 4    director of agent compliance and eXp's chief counsel."        10:06
 5            Do you see that, sir?                                  10:06
 6       A.   Yes.  That is in the document, yes.                    10:06
 7       Q.   So Step 3 requires review of the results              10:06
 8    with both you and Jim Bramble; correct?                       10:06
 9       A.   That is correct.                                       10:06
10       Q.   "The director of agent compliance" --                 10:06
11    that's you, right, sir?                                        10:06
12       A.   That's correct.                                        10:06
13       Q.   -- "will work with the compliance officer            10:06
14    to help resolve any outstanding issues in preparation         10:07
15    for the compliance committee."                                10:07
16            Do you see that, sir?                                  10:07
17       A.   Yes.                                                   10:07
18       Q.   And that was part of the standard operating           10:07
19    procedures of agent compliance since August of 2019?          10:07
20       A.   That's correct.                                       10:07
21       Q.   Incidentally, has this standard operating             10:07
22    procedure ever been updated since you joined in August        10:07
23    of 2019?                                                       10:07
24       A.   Yes.  We updated it generally for                     10:07
25    appearance, making it more consistent with current eXp        10:07
```

Page 44

| 1 | the top of the head is TCPA violation, if you're | 10:11 |
| 2 | familiar with that term. | 10:11 |
| 3 | Q.    That's related to telephone calls; correct? | 10:11 |
| 4 | A.    Telephone Consumer Protection, if they're | 10:11 |
| 5 | found in violation, that could be a very serious matter | 10:11 |
| 6 | and we have a correction course.  They could take that. | 10:11 |
| 7 | We have some -- we have a course around | 10:11 |
| 8 | agent attraction or business interference sponsorship. | 10:11 |
| 9 | Interference courses. | 10:11 |
| 10 | Q.    Anything else? | 10:11 |
| 11 | A.    I'd have to look at our full library.  I | 10:11 |
| 12 | don't recall any more directly off the top of my head. | 10:11 |
| 13 | Q.    Do you recall a corrective education | 10:11 |
| 14 | related to sexual misconduct at eXp? | 10:11 |
| 15 | A.    My recollection is we have one for Code of | 10:11 |
| 16 | Conduct, but not one specific to sexual harassment or | 10:11 |
| 17 | sexual assault. | 10:12 |
| 18 | Q.    Going back to Step No. 4, under, | 10:12 |
| 19 | "Discipline for Serious Policy Violations," No. 3 is, | 10:12 |
| 20 | "Suspension of right to sponsor new agents." | 10:12 |
| 21 | Do you see that? | 10:12 |
| 22 | A.    Yes. | 10:12 |
| 23 | Q.    What do you understand that to mean? | 10:12 |
| 24 | A.    The idea behind this was if we find that an | 10:12 |
| 25 | agent is in violation of our attraction policies, | 10:12 |

Page 48

| | | |
|---|---|---|
| 1 | eXp; correct? | 10:38 |
| 2 | A.    Correct. | 10:38 |
| 3 | Q.    In that investigation process, working with | 10:38 |
| 4 | your officers, for example, setting up compliance | 10:38 |
| 5 | committees, did you communicate in that investigation | 10:38 |
| 6 | process through your email? | 10:38 |
| 7 | A.    It's possible I used email and -- a | 10:38 |
| 8 | combination of email and Workplace. | 10:38 |
| 9 | Q.    We've seen a document indicating that you | 10:38 |
| 10 | received a complaint of sexual harassment through your | 10:38 |
| 11 | email. | 10:38 |
| 12 | Do you recall that exhibit? | 10:38 |
| 13 | A.    Yes. | 10:38 |
| 14 | Q.    As you sit here today, do you have a | 10:38 |
| 15 | recollection of receiving complaints of sexual | 10:38 |
| 16 | harassment via your email at eXp? | 10:38 |
| 17 | A.    I don't have specific recollections of | 10:38 |
| 18 | specific instances, no. | 10:38 |
| 19 | Q.    What email do you use at eXp? | 10:38 |
| 20 | A.    I have a company-assigned email address, | 10:38 |
| 21 | which is a combination of my first and last name at | 10:39 |
| 22 | eXprealty.net. | 10:39 |
| 23 | Q.    What is that? | 10:39 |
| 24 | A.    That's my personal work email. | 10:39 |
| 25 | Q.    Can you state your email address? | 10:39 |

Page 68

| | | |
|---|---|---|
| 1 | BY MS. LENZE: | 10:50 |
| 2 | Q.    You, yourself -- | 10:50 |
| 3 | MR. LEVINE:  Move to strike as unresponsive | 10:50 |
| 4 | and lack of foundation. | 10:50 |
| 5 | BY MS. LENZE: | 10:50 |
| 6 | Q.    You, yourself, sir, coming into this | 10:50 |
| 7 | company at eXp in August of 2019, never endeavored to | 10:50 |
| 8 | review prior complaints of any type of sexual | 10:50 |
| 9 | misconduct as eXp before you got there; right? | 10:50 |
| 10 | MR. PALLARES:  Objection.  Argumentative. | 10:50 |
| 11 | Form. | 10:50 |
| 12 | Go ahead and answer. | 10:50 |
| 13 | THE WITNESS:  No, I did not review prior | 10:50 |
| 14 | records. | 10:51 |
| 15 | BY MS. LENZE: | 10:51 |
| 16 | Q.    EXp used a database to monitor complaints | 10:51 |
| 17 | of agents when you came on at eXp; correct? | 10:51 |
| 18 | MR. PALLARES:  Form. | 10:51 |
| 19 | THE WITNESS:  There were several systems | 10:51 |
| 20 | that the company used to monitor the work of agents. | 10:51 |
| 21 | BY MS. LENZE: | 10:51 |
| 22 | Q.    We've talked about those; right? | 10:51 |
| 23 | MR. PALLARES:  Objection.  When?  I mean | 10:51 |
| 24 | what deposition?  The 30(b)(6)?  Because he's here on | 10:51 |
| 25 | his personal capacity. | 10:51 |

Page 78

```
1    So he had to have been onboarded.                    14:01

2    BY MS. LENZE:                                        14:01

3         Q.    She goes on to say, "They knew he was fired  14:01

4    from Re/Max for sexual harassment!"                  14:01

5              Do you see that?                           14:01

6         A.    Yes.                                      14:01

7         Q.    Now, I see two blanks, 12:03:40 from Ms.  14:01

8    Payne and 12:04 from Ms. Payne.                      14:01

9              I think you testified earlier, but do you  14:01

10   have any indication of -- or knowledge about why those  14:01

11   Workplace Chat comments are blank?                   14:01

12        A.    (No audible response.)                    14:01

13        Q.    Is that a no?                             14:01

14        A.    That's a no.                              14:01

15        Q.    Ms. Payne then says she's scheduling a    14:01

16   meeting with ROM.                                    14:01

17             What's that?                               14:01

18        A.    It's acronym for "Regional Operations     14:01

19   Manager."                                            14:02

20        Q.    And Debbie, is that Debbie Penny?         14:02

21        A.    Presumably so, based off the context of   14:02

22   what was said earlier.                               14:02

23        Q.    She says, "I am scheduling a meeting with  14:02

24   ROM and Debbie ASAP to get this handled.  I fear     14:02

25   liability if anything else were to happen here with us  14:02
```

Page 180

| | | |
|---|---|---|
| 1 | knowing all of this.  Debbie said there is a Trello | 14:02 |
| 2 | thread with him in it for his actions and behaviors." | 14:02 |
| 3 | Do you see that? | 14:02 |
| 4 | A.    I do. | 14:02 |
| 5 | Q.    Does that refresh your recollection about | 14:02 |
| 6 | whether there were issues of sexual misconduct within | 14:02 |
| 7 | the Trello database? | 14:02 |
| 8 | A.    Again, as I've stated before, is Trello can | 14:02 |
| 9 | have cards about anything, anything that a broker put | 14:02 |
| 10 | on.  So presumably, if they've created a card regarding | 14:02 |
| 11 | this matter, and it had to deal with that, it would | 14:03 |
| 12 | have that in there I would suspect.  But yeah, I still | 14:03 |
| 13 | don't recall directly what this is about. | 14:03 |
| 14 | Q.    This indicates, on that page 901, that the | 14:03 |
| 15 | Enterprise account mentioned the firing from Re/Max for | 14:03 |
| 16 | sexual harassment. | 14:03 |
| 17 | My question to you, sir, is:  Does | 14:03 |
| 18 | Enterprise contain portions where management, or | 14:03 |
| 19 | individuals like yourself in agent compliance, can add | 14:03 |
| 20 | comments? | 14:03 |
| 21 | A.    Yes, you can add notes on an agent's | 14:03 |
| 22 | Enterprise account.  It's very common that various | 14:03 |
| 23 | department, as they perform different tasks for each | 14:03 |
| 24 | agent, will put notes on the account. | 14:03 |
| 25 | Q.    You then ask at 902, "Did she provide the | 14:03 |

Page 181

```
 1    police reports?"                                        14:04

 2             Did you see that?                              14:04

 3        A.   Yes.                                           14:04

 4        Q.   Why did you want police reports, if you       14:04

 5    know?                                                   14:04

 6        A.   Because it sounded that she had indicated      14:04

 7    that she submitted her complaint.  And then we could    14:04

 8    have it for evidence to make a decision regarding this  14:04

 9    agent's standing at the company, or what we needed to   14:04

10    do to just add some validity to her claims.             14:04

11        Q.   Ms. Payne then indicates to you, on 902,       14:04

12    "This guy is huge liability and in 2018 he should have  14:04

13    been let go.  I am sort of scratching my head why the   14:04

14    enterprise account says he needs to be let go but he's  14:04

15    still here.  It's a major issue."                       14:04

16             Do you see that?                               14:04

17        A.   Yes.                                           14:04

18        Q.   Any -- does that refresh your recollection    14:04

19    in any way about this issue?                            14:04

20        A.   I don't have any idea what specifically        14:04

21    we're talking about.                                    14:04

22        Q.   Would you agree with me, based on your         14:04

23    review of this document, that you and Ms. Payne, both   14:04

24    in agent compliance, are handling issues related to     14:05

25    sexual harassment at this point?                        14:05
```

                                                    Page 182

| | | |
|---|---|---|
| 1 | regarding this type of thing. | 14:51 |
| 2 | BY MS. LENZE: | 14:51 |
| 3 | Q.    It says here, "Frank can be reached at," | 14:51 |
| 4 | and then a number. | 14:51 |
| 5 | "Debbie Penny Assistant State | 14:51 |
| 6 | Administrative Broker - California." | 14:51 |
| 7 | That's the same Debbie Penny we've been | 14:51 |
| 8 | talking about; correct? | 14:51 |
| 9 | A.    Correct. | 14:51 |
| 10 | Q.    You agree with me that as of 2018, Debbie | 14:51 |
| 11 | Penny, the assistant state administrator broker of | 14:51 |
| 12 | California, was aware that this agent had been fired | 14:51 |
| 13 | from a previous brokerage for sexually harassing a | 14:51 |
| 14 | woman; correct? | 14:51 |
| 15 | MR. PALLARES:  Objection.  Form. | 14:51 |
| 16 | MR. DEMARCO:  Join. | 14:51 |
| 17 | THE WITNESS:  That's what this document is | 14:51 |
| 18 | stating. | 14:51 |
| 19 | MR. LEVINE:  Move to strike as | 14:51 |
| 20 | nonresponsive. | 14:51 |
| 21 | BY MS. LENZE: | 14:51 |
| 22 | Q.    On page 3317, a little bit farther down, it | 14:51 |
| 23 | says, "I will follow up with Frank and see if that is | 14:51 |
| 24 | an option to look into and get from the other Brokerage | 14:52 |
| 25 | that fired him." | 14:52 |

Page 201

| | | |
|---|---|---|
| 1 | raped by Michael Bjorkman; correct? | 17:33 |
| 2 | MR. DEMARCO:  I'd just object to form. | 17:33 |
| 3 | MR. LEVINE:  And as to his lack of | 17:33 |
| 4 | foundation.  And he's already told you he doesn't | 17:33 |
| 5 | remember the events from back then. | 17:33 |
| 6 | MR. DEMARCO:  It calls for speculation. | 17:33 |
| 7 | Lacks foundation.  Assumes facts not in evidence. | 17:33 |
| 8 | BY MS. LENZE: | 17:33 |
| 9 | Q.    Go ahead. | 17:33 |
| 10 | MR. DEMARCO:  Counsel, this is | 17:33 |
| 11 | regurgitating prior questions. | 17:33 |
| 12 | BY MS. LENZE: | 17:33 |
| 13 | Q.    Go ahead. | 17:33 |
| 14 | A.    What's your exact question right now? | 17:33 |
| 15 | MS. LENZE:  Could you read it back, Rockie. | 17:33 |
| 16 | Thank you. | 17:33 |
| 17 | (Whereupon the record was read by the | 17:33 |
| 18 | reporter as follows: | 17:33 |
| 19 | QUESTION:  But you also have testified here | 17:33 |
| 20 | today that you believed Megan Farrell-Jenson {sic} when | 17:33 |
| 21 | she said she was raped by Michael Bjorkman; correct?) | 17:33 |
| 22 | THE WITNESS:  Yes, I did believe her, her | 17:33 |
| 23 | statement. | 17:33 |
| 24 | BY MS. LENZE: | 17:33 |
| 25 | Q.    Now, Ari -- | 17:33 |

Page 307

| | | |
|---|---|---|
| 1 | conversation with Jim Nuth about that statement by | 17:56 |
| 2 | Debbie Penny? | 17:56 |
| 3 | A.    Aside from this chat, no. | 17:56 |
| 4 | Q.    Have you, yourself, ever talked to Debbie | 17:56 |
| 5 | Penny about previous issues she has knowledge of | 17:56 |
| 6 | regarding claims of sexual harassment and sexual | 17:56 |
| 7 | assault against Michael Bjorkman? | 17:56 |
| 8 | MR. PALLARES:  Objection as to time. | 17:56 |
| 9 | MR. DEMARCO:  Object to form.  Lacks | 17:56 |
| 10 | foundation.  Assumes facts not in evidence. | 17:56 |
| 11 | MR. PALLARES:  Go ahead and answer. | 17:56 |
| 12 | THE WITNESS:  Yes, I have spoken to Debbie | 17:56 |
| 13 | Penny.  I don't recall when, but I know I've had | 17:56 |
| 14 | conversations with her.  And I remember her indicating, | 17:56 |
| 15 | very similar to what Jim Nuth put here, is that she | 17:56 |
| 16 | recalled being in a Keller-Williams office with Michael | 17:56 |
| 17 | Bjorkman, and his wife coming into this office upset, | 17:56 |
| 18 | accusing him of extra marital -- of an extra marital | 17:56 |
| 19 | affair. | 17:56 |
| 20 | BY MS. LENZE: | 17:57 |
| 21 | Q.    Do you also recall Debbie Penny telling you | 17:57 |
| 22 | that there had been prior allegations of sexual | 17:57 |
| 23 | misconduct against Michael Bjorkman at their previous | 17:57 |
| 24 | brokerage? | 17:57 |
| 25 | MR. DEMARCO:  Object to form.  Calls for | 17:57 |

Page 325

EXHIBIT 2
DATE 5.2.25
WITNESS Hregary
ROCKIE DUSTIN, CSR, RPR

REALTY

2eXp_002923



## Complaint

If a compliance investigator or a company representative receives a complaint regarding a violation of the Independent contract agreement, Policies and Procedures, or the Agent Attraction Success Guide (AASG) over the phone, they should instruct the person alleging the violation to send in a written complaint. All complaints and other inquiries from agents should receive a response within 48 working hours (24 hours when possible).

When the Compliance Department receives a written complaint, a member of the Compliance team must perform the following steps:

**Step 1**: Within 48 hours Send confirmation to complainant that their complaint has been received.

**Step 2**: Open a Compliance Case File in CSC

The Compliance Case File should include the following:

- The written complaint summarizing the allegations and facts surrounding the alleged violation. In cases where there is only a verbal complaint but there exists sufficient evidence surrounding the allegation, a memorandum summarizing the facts should be included;
- The alleged offending agent's account information (address, phone, e-mail, ID number);
- Any additional information or evidence regarding the investigation;
- Citation of applicable policy in the ICA, Policies and Procedures or Agent Attraction Success Strategy;
- The applicable fields in CSC should be completely filled out and all evidence uploaded and labeled.



## Standard Operating Procedures for Investigating and Processing "Minor" Policy Violations

When the Compliance Department receives a complaint, alleging a minor policy violation, from an agent or representative of the company, a member of the Compliance team should perform the following steps:

**Step 1**: Open Case File in CSC, fill out all the necessary fields and upload any evidence to the file.

**Step 2**: Compliance officer investigates the complaint under supervision from the director of the compliance department. This investigation should include an interview of the complainant, any witnesses and the alleged offending Agent. Witnesses and others interviewed should provide written statements where possible. Copies of other evidentiary documents should be collected (screenshots, text conversations, videos, etc.).

The compliance officer must prepare a written record of his/her investigation and summary of findings and include the information in the CSC matter File. This also includes transcripts of verbal conversations and any other pertinent evidence surrounding the alleged violation.

**Step 3**: The compliance officer reports the results of the investigation to the director of agent compliance for review. The compliance officer will recommend the appropriate discipline based on the facts and circumstances of each case. A resolution will be decided by the compliance officer and the director of compliance.

Outcomes of **minor policy violations** may include but are not limited to 1) verbal warning and notice to educate the agent regarding the violated policy, 2) written warning or notice to educate agent regarding the violated policy, or 3) Completion of mandatory corrective education courses

**Step 4**: The compliance officer notifies the offending Agent verbally and in writing of the case outcome. The compliance officer should record the resolution including any discipline taken or follow up needed in the CSC Case File.

**Step 5**: The compliance officer will close the case by attaching a closing memo outlining the details of the case, as well as, the resolution; and request the director of agent compliance to review and approve the case for closing.



Effective Education   Equitable Enforcement   Agent Success Obsessed      compliance@exprealty.net

## Standard Operating Procedures for Investigating and Processing "Serious" Policy Violations

When the Compliance Department receives a written complaint, alleging a serious policy violation, from an Agent or representative of the company, a member of the Compliance team should perform the following steps:

**Step 1**: Open Case File (See "Standard Operating Procedures for Opening a Compliance Case File").

**Step 2**: Compliance Officer investigates the complaint under close supervision from the director of agent compliance. This investigation should include an interview of the complainant, any witnesses, and the alleged offending agent. Witnesses and others interviewed should provide written statements where possible. Copies of other evidentiary documents should be collected and attached to the CSC case file.

The chairman of the Compliance Committee will update appropriate members of management that an investigation is being conducted, if the violator is an influencer and/or ICON agent and/or a significant producer.

The compliance officer and the director of compliance will prepare a concise written record of his/her investigation and summary of findings and only include pertinent information needed for the compliance committee to determine an appropriate sanction and resolution.

**Step 3**: The compliance officer reviews the results of the investigation with the director of agent compliance and eXp's Chief Counsel. The director of agent compliance will work with the compliance officer to help resolve any outstanding issues in preparation for the compliance committee.

**Step 4**: The chairman of the compliance committee will present the case to the compliance committee during regularly scheduled meetings and recommend appropriate discipline to the compliance committee based on the facts, circumstances and similar previous cases. In some circumstances the committee may invite the agent to meet with them to discuss the allegations against them.

Discipline for **Serious Policy Violations** may include, but are not limited to 1) Fines, 2) Corrective Education, 3) Suspension of right to sponsor new agents, 4) Disqualification of ICON status, 5) Repayment of damages to company or other agents 5) Termination of contract with eXp





**Step 5**: The compliance committee votes on appropriate action to resolve the matter. The director of agent compliance will work with the compliance officer to notify the agent of the committee's final decision.

\*\*If it is determined that the resolution is the cancellation of the Agents' ICA, the member of the compliance team overseeing the case must perform the following steps: 1) Notify the agent's state Designated Managing Broker (DMB) and regional VP of growth (if necessary) of the cancelation; 2) Prepare cancellation notice (use approved template that includes instructions of appeal process); 3) Notify the agent of the committee's decision via telephone and email (template) 4) Notify the offboarding team to start the cancellation process; 6) Final cancellation of Distributorship after 15 (fifteen) days unless the agent appeals and matter is closed.

\*\*If agent appeals, create an updated summary to include the agent's appeal, review any new pertinent information received by the agent with the Compliance Committee and notify Agent of the committee's final decision.

**Step 6**: The compliance officer will, under supervision of the director of the Compliance department, follow up to ensure sanctions, if there are any, are carried out and the case file is closed in CSC with an attached closing memo. Follow up information will be recorded in the CSC case file by the case owner. The director of agent compliance will also review the CSC matter before the matter is closed.



## Compliance Checklist

This checklist should be used in cases where the company suspects significant violations of the ICA, P&P, or Agent Attraction Pledge have occurred. This checklist should be used as an aid in assisting the agent compliance team in conducting investigations of suspected violations of company policy. The Agent compliance team should not hesitate to seek the legal team's input at any stage of this process. At certain stages as noted in this list, input from counsel is essential.



## Section I - Preparation/Evidence Gathering

At this stage the company has received complaints/evidence of potential violations to the ICA. The compliance team will organize all pertinent evidence and statements surrounding the alleged violation. In addition, a preliminary determination of policies or contractual provisions that may have been breached should be identified. Conclusions as to whether the Agent has violated a policy or contractual provision should not be made. At this point in the investigation, both sides of the story have not yet developed. Every agent should be treated as a valued member of eXp and should be considered innocent unless evidence proves otherwise. In extreme cases, such as where criminal conduct may have occurred, placing an Agent's account on a suspended status during the course of the investigation may be warranted in order to protect the company and the public. However, final disciplinary measures should not be taken until a full investigation is completed.

Written Complaints

- Open a case file in CSC

- Attach all original written complaints

- Attach all documents sent with complaint

Verbal Complaints

- Prepare memo summarizing conversation

    Date of complaint: _____
    Approx. time complaint received: _____
    Complainant Name/Agent ID (If applicable):
    Phone number complainant called from:



2eXp_002928
compliance@exprealty.net

Verbal Complaints

☐ Prepare memo summarizing conversation

Date of complaint: _____
Approx. time complaint received: _____
Complainant Name/Agent ID (If applicable):
Phone number complainant called from:

Address of the complainant:
Request caller to submit complaint in writing: Yes / No (if No, why?)

Preliminary Violation Analysis

☐ Identify policy or contractual provisions allegedly breached:

Policy Title/Page number _____

ICA clause or paragraph/Page number _____

Agent Attraction Pledge provision _____

Determine if immediate suspension is warranted during investigation

Does complaint allege potentially criminal conduct (credit card fraud)? Yes / No

Consider initial strength & reliability of evidence:  First-hand / Hearsay / Documentary

Is there supporting documentation? Yes / No

Identify what the document is, who provided it, and date received:

| Document Summary | Provided By | Date Received |
| --- | --- | --- |
| | | |
| **Document Summary** | **Provided By** | **Date Received** |
| | | |
| **Document Summary** | **Provided By** | **Date Received** |
| | | |



Are there any witnesses corroborate allegations? If so, how many and whom?

_____

Identify Corroborating Witnesses:

_____
Name, Agent ID, and Telephone Number

_____
Name, Agent ID, and Telephone Number

_____
Name, Agent ID, and Telephone Number

Does complaint allege conduct that jeopardizes company's compliance with any regulatory agencies? (confer with counsel and/or state broker on this issue) Yes / No

Unauthorized Earnings Claims?  Yes / No

State Real Estate Law?  Yes / No

Misrepresentation Revenue Share?  Yes / No

Other: _____

Does evidence indicate alleged violator knowingly breached policy? Yes / No



## Section II - Fact Investigation

At this stage, the agent compliance team analyzes the evidence provided by all parties involved. The Strengths and weaknesses of the evidence presented by the complainant and alleged violator will also be evaluated.

Communication with Complainant

- Telephone interview with Complainant
  Date of Interview _____
  Phone number complainant was reached at _____
  Approx. time phone call took place _____

- Review the information provided by the complainant to ensure statements are accurate.

- Determine nature of Complainants evidence

  First-hand knowledge of violation? Yes / No

  Second-had (hearsay) knowledge of violation? Yes / No

  Documentary evidence of violation? Yes / No

- Analysis of Complainant's Potential Biases

  If alleged violator is terminated will complainant benefit?  Yes / No

  Does a personal dispute exist between Complainant & alleged violator? Yes / No / Unknown

  Any other known or suspected biases?

  Will Complainant testify in court if necessary?  Yes / No

  Will Complainant provide a written statement of their allegation?  Yes / No

  Complainant understand that if company is to investigate & take action, the alleged violator may be told that the complainant will be identified as the individual making the complaint? Yes / No



Communication with Alleged Violator

- Call alleged violator

- Advise alleged violator of specific complaints leveled against him

- Request alleged violator to send written response to complaint within 10 days

- Request alleged violator to identify any witnesses who can corroborate his side of the story

- Follow up conversation with letter to alleged violator specifying complaints

- Review credibility & reliability of alleged violator's rebuttal

- Nature of evidence

  First-hand / Hearsay / Documentary

- Prepare Witness Interview Form of conversation and upload form to case file

Communication with Corroborating Witnesses

- Telephone interview all witnesses identified by alleged violator and Complainant

- Prepare Witness Interview Form & submit upload form to case file

- Determine during interview whether witness' evidence is first-hand, hearsay or documentary in nature

- Request alleged violator to identify any witnesses who can corroborate his side of the story

Relevant Document Identification

- Identify and locate potentially relevant documents

  Documents frequently useful:

  - Make sure Signed ICA is in Enterprise (always necessary)
  - Seven levels of upline agents
  - Relevant notes on agents' Enterprise profile
  - Documentation regarding prior policy violations or cases



## Section III - Final Policy/Contract Analysis

At his stage, the company should recognize whether the evidence against alleged violator is sufficient to warrant disciplinary action. The company should carefully scrutinize the precise language of the policies which it believes were violated, or the provisions of the ICA which it believes were breached. The evidence should precisely show that the distributor's conduct violated the policy or contract. **input from counsel throughout this sage is essential and should be discussed before the investigation progress or is closed**.

Review All Documentary Evidence

Does documentary evidence establish that the distributor violated the policy/contract? Yes / No

Identify the specific policy or retract provisions that the evidence indicates were violated.

Policy Title/Page number _____

ICA clause or paragraph/Page number _____

Agent Attraction Pledge provision _____

If the policy violation is based on a policy that has been amended since the date the distributor enrolled, is the company certain it gave proper notice to its distributors that the policy was amended?   Yes / No / Uncertain

Was written notice of amendments provided to all distributors?  Yes / No

If yes, when & how? _____

Review All Complainant & Witness Statements

Is there at least one person willing and able to provide first-hand evidence of the agent's alleged violation or breach of policy? Yes No

Identify all witnesses with first-had evidence who are willing to testify:

_____
Name, Agent ID, and Telephone Number

_____
Name, Agent ID, and Telephone Number

_____
Name, Agent ID, and Telephone Number



Analyze documents & witness statements that the company anticipates the agent may use to prove their case in a lawsuit.

Weight the agent's evidence against the company's evidence. On balance, which is more credible? Company / Agent

Has the legal department given reviewed evidence and provided guidance? Yes / No

## Section IV - Prepare "Court Quality" Evidence

If the evidentiary analysis to this point indicates that the Agent has violated a policy and the conduct is sufficiently culpable to warrant significant disciplinary action (e.g.; termination or revocation of commission), the evidence against the Agent should be in "court quality" format. That is, it should be in a form that is admissible as evidence in a court of law. **Consultation with counsel is essential when a case gets to this stage** to ensure the evidence is in proper form.

Evidence of Violator's Breach of the ICA

### Proof of Liability

☐ Obtain Complainants affidavits detailing alleged allegations.

☐ Affidavits must state first-hand knowledge.

☐ Complainant must review affidavit & make any necessary corrections before signing to ensure it is accurate

### Proof of Damages

Developing damage evidence is not always necessary. If the company anticipates taking disciplinary action against an Agent, but does not intend to bring a lawsuit, damages are unnecessary. If, however, the company wants to sue the distributor for monetary relief damage evidence must be developed. In addition, if the company anticipates the Agent may sue the company, it is often wise to gather damage evidence for purposes of bringing a counterclaim. BEWARE: Proof of monetary damages is the most difficult aspect of a company's case against an Agent. It should only be pursued if the company has strong evidence of a significant financial loss. Otherwise, monetary damages are best left unpursued.

Has the Agent's conduct caused the company to lose revenue? Yes / No

Enrollment of a new agent(s) or cancellation of existing agent? Yes / No



If yes, identify all specific individuals who did not enroll or who cancelled because of the agent's conduct.

_____

Name, Agent ID, and Telephone Number

_____

Name, Agent ID, and Telephone Number

_____

Name, Agent ID, and Telephone Number



## Section V - Disciplinary Measures

Once it is determined that there has a been policy violation or breach of contract, appropriate action must be applied. How eXp handles policy violators is up to the company. However, the company should strive to apply disciplinary sanctions in a fair and even-handed manner. As a guideline, the severity of a disciplinary sanction should be based on the severity of the conduct. Conduct which is clearly criminal for example, warrants the most sever and swiftest sanction, whereas conduct which entails a private dispute between two individual distributors often warrants little action by the company. To make this process fair and objective, severe violations will be submitted to the compliance committee for resolution. The compliance committee will review the case material, and all applicable evidence, submitted by the agent compliance team and make a determination of eXp's course of action.

Categorize the Nature of the Conduct

The categories set forth below are illustrative and not mutually exclusive; there will be some overlap between groupings. For example, unauthorized income claims can lead to regulatory sanctions by the F.T.C.  The same income claim may also expose the company to a civil lawsuit. Similarly, Agent conduct that can harm the company can also injure other Agents. Thus, the company should be careful not to categorize a specific policy violation into a single category for purposes of applying sanctions.

Criminal

Credit Card Fraud

Violation of state laws/regulations

Other: _____

Conduct that can result in regulatory fines being levied on company if unchecked

Unauthorized Income Claims

Misrepresenting the eXp opportunity

Not abiding by federal and state mass solicitation regulations

Violation of state real-estate law (this should be a determination of the state DMB where the agent operates)

Other: _____



**Conduct that can result in a civil action against the company if unchecked**

Defamation of another company

Agent misrepresenting themselves as a corporate representative

Use of unapproved advertising

Other: _____

**Conduct that could damage the company's business**

Solicitation of distributors to another brokerage

Disparagement of the company's systems, revenue share, or employees

Other: _____

**Conduct that can cause damage to other agents**

Soliciting another agent's prospect to change their intended sponsor

Defamation of another agent

Other: _____



Review the Agent's Prior History of Policy Violations or Contract Breaches

Does the agent have a prior history of policy violations or contract breaches? Yes / No

Has the agent received written warnings about prior violations or breaches? Yes / No

Has the agent previously been warned about violations of the policy or provision at issue in the immediate case? Yes / No

Have all prior warning communications been located and added to the CSC matter file? Yes / No

Selection of Disciplinary Action

Do the policies or the ICA permit the company to impose the disciplinary action desired? Yes / No

Identify the policy/provision that specifically allows the desired disciplinary action:

_____

How will the penalty rectify the problem? _____

_____

Does the penalty fit the offence? Yes / No

Advise Agent of Company's Action

☐ Contact the Agent and review the compliance committee's decision, explain the sanction, notify of certified letter/email, explain the appeals process

☐ Draft Letter Notifying Distributor of Disciplinary Action to Be Taken & Give Relevant Counsel Review

☐ Notify Agent of sanction via email and phone call

☐ Carry out sanction and document actions in the matter file



## Appeals Process

An Agent that has received a sanction from the compliance committee has fourteen (14) days to appeal the committee's decision. To submit an appeal, the agent will need to submit an email to the Agent Compliance team explaining the reason why the committee's decision should be overturned. The Agent Compliance team will work with the agent to clarify their statement and prepare a memo outlining the Agent's appeal and submit the memo to the compliance committee.

## Reviewing the Agent's Appeal

☐ Agent submits an appeal, in writing, within fourteen (14) days of being notified of sanction

Does the appeal provide relevant information, that at the time of the committee met, may have caused the committee to decide on a different outcome? Yes / No

What is the new pertinent information/evidence provided?

_____

_____

_____

☐ Agent contacted to review appeal statement

☐ Memo created outlining the Agent's appeal and new information for committee's consideration and submitted to the committee

☐ Agent's appeal and memo attached to the CSC matter file

☐ Contact the agent and let them know the committee's final decision

☐ Carry out sanction and document actions in the matter file



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT H-1

```
 1    BY MS. LENZE:                                        10:20

 2         Q.    And then your testimony is that -- well,  10:20

 3    strike that.                                         10:20

 4               And then you, as vice-president of Agent  10:20

 5    Compliance, took swift action against Michael Bjorkman  10:20

 6    on that day of September 18, 2020; right?            10:20

 7               MR. LEVINE:  Objection.  Form.            10:20

 8               THE WITNESS:  I wouldn't characterize it as  10:20

 9    me in my role as vice-president of Agent Compliance  10:20

10    taking swift action.  The company and management     10:20

11    decided to take swift action.                        10:20

12    BY MS. LENZE:                                        10:20

13         Q.    And then you -- strike that.              10:20

14               And then the company and management of eXp  10:20

15    Realty, LLC, took swift action on September 18, 2020,  10:20

16    against Michael Bjorkman related to those allegations  10:20

17    by Ms. Megan Farrell-Nelson of rape; right?          10:20

18               MR. DEMARCO:  Objection.  Form.           10:21

19               Go ahead.                                 10:21

20               THE WITNESS:  Yes, that's correct.        10:21

21    BY MS. LENZE:                                        10:21

22         Q.    And you, as vice-president of Agent       10:21

23    Compliance, took part in that decisionmaking process to  10:21

24    take swift action against Michael Bjorkman; true?    10:21

25               MR. DEMARCO:  Object to form.             10:21
```

Page 12



HAGGARD
8/20/25 Depo

| | | |
|---|---|---|
| 1 | stock without talking to me.  We are 'suspending him | 10:25 |
| 2 | pending an investigation.'" | 10:25 |
| 3 | Do you see that? | 10:25 |
| 4 | A.    I do. | 10:25 |
| 5 | Q.    Do you have an understanding of what | 10:25 |
| 6 | Mr. Bramble meant by "suspending" there? | 10:25 |
| 7 | MR. PALLARES:  Objection.  Form. | 10:25 |
| 8 | THE WITNESS:  I don't have an understanding | 10:25 |
| 9 | of Jim's choice in words in using the term | 10:25 |
| 10 | "suspension," no. | 10:26 |
| 11 | BY MS. LENZE: | 10:26 |
| 12 | Q.    Do you have an understanding of why | 10:26 |
| 13 | Mr. Bramble didn't use the word "terminate" there? | 10:26 |
| 14 | MR. PALLARES:  Objection.  Form. | 10:26 |
| 15 | THE WITNESS:  I don't know why he chose -- | 10:26 |
| 16 | as I said just barely, I don't know why he used that | 10:26 |
| 17 | word "suspended" versus "termination." | 10:26 |
| 18 | BY MS. LENZE: | 10:26 |
| 19 | Q.    Have you ever seen a circumstance, up and | 10:26 |
| 20 | to this point in September of 2020, where a terminated | 10:26 |
| 21 | agent from eXp that was not vested wouldn't have their | 10:26 |
| 22 | options for unvested stock canceled? | 10:26 |
| 23 | MR. PALLARES:  Objection.  Form. | 10:26 |
| 24 | THE WITNESS:  I don't recall any that I | 10:26 |
| 25 | have personal knowledge of. | 10:26 |

Page 16

```
 1        What actions did you take into an                10:29

 2   investigation against Michael Bjorkman following       10:29

 3   September 18 of 2020?                                   10:29

 4        A.    I recall I spoke to Ms. Farrell regarding   10:29

 5   what had occurred and the allegations after she had    10:29

 6   submitted her statement.                                10:29

 7            Also, I spoke to Ms. Tammy Simms, and also    10:29

 8   Ms. Noelle Nielsen, is my recollection.  There were     10:29

 9   also discussions that I was part of through Workplace   10:30

10   chat and in person with other members of management;    10:30

11   Jim Bramble, Jim Nuth, David Conord, Jason Gesing,     10:30

12   regarding what had been reported and what we found.     10:30

13        Q.    Did Agent Compliance ever reach a           10:30

14   conclusion into their investigation related to the      10:30

15   allegations of rape against Michael Bjorkman?          10:30

16            MR. PALLARES:  Objection.  Form.              10:30

17            THE WITNESS:  I'll say this -- how we          10:30

18   handled this response, it wasn't a typical Agent        10:30

19   Compliance investigation, where a matter is handed to   10:30

20   us and we take the led in the investigation and report  10:31

21   back.  This was eXp doing -- using our best judgment to  10:31

22   handle a very unique situation that had members of the   10:31

23   executive team weighing in, looking into things.  And I  10:31

24   was asked to interview people.  Jim Bramble was also    10:31

25   involved in interviews.                                 10:31
```

Page 19

| | | |
|---|---|---|
| 1 | So in terms of did Agent Compliance reach a | 10:31 |
| 2 | conclusion?  I would categorize it as eXp had come to a | 10:31 |
| 3 | conclusion, based off our interviews with Ms. Farrell, | 10:31 |
| 4 | that we believed her testimony that she had been | 10:31 |
| 5 | assaulted, which is why we made the decision to | 10:31 |
| 6 | offboard Mr. Bjorkman on September 18th. | 10:31 |
| 7 | BY MS. LENZE: | 10:31 |
| 8 | Q.    Understood. | 10:31 |
| 9 | And so that conclusion that eXp reached | 10:31 |
| 10 | was, in fact, on September 18 of 2020; right? | 10:31 |
| 11 | A.    That's correct. | 10:31 |
| 12 | MR. DEMARCO:  Object to the form. | 10:31 |
| 13 | THE WITNESS:  That's correct. | 10:31 |
| 14 | BY MS. LENZE: | 10:31 |
| 15 | Q.    My question was -- thank you. | 10:31 |
| 16 | My question was a little bit different, | 10:31 |
| 17 | Mr. Haggard. | 10:32 |
| 18 | My question was, that looking back at | 10:32 |
| 19 | Exhibit 13, it says here, by Mr. Bramble, "We are | 10:32 |
| 20 | suspending him pending an investigation." | 10:32 |
| 21 | Do you see that? | 10:32 |
| 22 | A.    Yes. | 10:32 |
| 23 | Q.    Your testimony earlier, or so I thought, | 10:32 |
| 24 | please correct me if I'm wrong, was that you had | 10:32 |
| 25 | understood there was going to be an investigation, that | 10:32 |

Page 20

| | | |
|---|---|---|
| 1 | procedures of November 16, 2018, state, "All reported | 10:49 |
| 2 | or suspected occurrences of harassment will be promptly | 10:49 |
| 3 | and thoroughly investigated." | 10:49 |
| 4 | Right? | 10:49 |
| 5 | MR. PALLARES:  Objection.  Form. | 10:49 |
| 6 | THE WITNESS:  Yes.  I believe that is the | 10:50 |
| 7 | policy. | 10:50 |
| 8 | BY MS. LENZE: | 10:50 |
| 9 | Q.    But then when you use the word | 10:50 |
| 10 | "exonerated," Mr. Haggard, you're re- -- you're | 10:50 |
| 11 | referring, excuse me, to a criminal case; correct? | 10:50 |
| 12 | MR. PALLARES:  Objection.  Form. | 10:50 |
| 13 | THE WITNESS:  I recall that that term was | 10:50 |
| 14 | used when making decisions with Mr. Bjorkman.  Because | 10:50 |
| 15 | obviously, with any agent, if they were found that the | 10:50 |
| 16 | accusations were just unequivocally false, whether in a | 10:50 |
| 17 | court of criminal law or otherwise, that we wouldn't | 10:50 |
| 18 | want to hurt somebody that was found to not be guilty, | 10:50 |
| 19 | was exonerated for lack of a better term. | 10:50 |
| 20 | BY MS. LENZE: | 10:51 |
| 21 | Q.    So eXp was believing the conclusion of an | 10:51 |
| 22 | investigation up to whether or not there were criminal | 10:51 |
| 23 | charges brought against Michael Bjorkman for | 10:51 |
| 24 | allegations of drugging and rape? | 10:51 |
| 25 | A.    We would have -- | 10:51 |

Page 33

| | | |
|---|---|---|
| 1 | question. | 10:52 |
| 2 | MR. PALLARES:  It's not a yes-or-no | 10:52 |
| 3 | question.  It's nuance. | 10:52 |
| 4 | MS. LENZE:  "Was a conclusion formed" is a | 10:52 |
| 5 | yes-or-no question -- | 10:52 |
| 6 | MR. DEMARCO:  Object to form.  Foundation. | 10:52 |
| 7 | MS. LENZE:  -- respectively. | 10:52 |
| 8 | BY MS. LENZE: | 10:52 |
| 9 | Q.    Go ahead, sir. | 10:52 |
| 10 | Let me make sure I have a clear record. | 10:52 |
| 11 | Was -- yes or no, was a conclusion formed | 10:52 |
| 12 | by eXp into the findings of the investigation that took | 10:52 |
| 13 | place by eXp, following September 18 of 2020, into the | 10:52 |
| 14 | investigation against Michael Bjorkman related to | 10:52 |
| 15 | allegations of drugging and assault? | 10:53 |
| 16 | MR. PALLARES:  Objection to form. | 10:53 |
| 17 | MR. DEMARCO:  I object to form. | 10:53 |
| 18 | THE WITNESS:  Ms. Lenze, we stood by our | 10:53 |
| 19 | initial decision to keep Mr. Bjorkman unaffiliated, | 10:53 |
| 20 | meaning having his license hung at eXp.  It was a | 10:53 |
| 21 | nuanced decision because, again, we will never know | 10:53 |
| 22 | 100 percent what happened that night. | 10:53 |
| 23 | We were standing by the testimony of | 10:53 |
| 24 | Ms. Farrell and we continued to stand by that after our | 10:53 |
| 25 | initial decision going forward. | 10:53 |

Page 35

```
 1    BY MS. LENZE:                                          10:53

 2        Q.    So is that a yes?                            10:53

 3              MR. PALLARES:  Objection.  Argumentative.    10:53

 4    BY MS. LENZE:                                          10:53

 5        Q.    That the conclusion was formed -- strike     10:53

 6    that.                                                  10:53

 7              You just stated you stood by the decision.   10:53

 8    Are you stating, Mr. Haggard, that the answer to my    10:53

 9    question, on whether a conclusion was formed, is yes   10:53

10    given that you stood by your decision to, in your      10:53

11    words, terminate Michael Bjorkman?                     10:53

12              MR. DEMARCO:  Objection to form.             10:54

13    Argumentative.                                         10:54

14              MR. PALLARES:  Objection to form.            10:54

15              Go ahead and answer.                         10:54

16              THE WITNESS:  Based off the outcome of       10:54

17    leaving Mr. Bjorkman unaffiliated with eXp, I would say 10:54

18    that we came to a conclusion that we felt that the     10:54

19    accusations were credible enough for Ms. Farrell that  10:54

20    we did not allow him back.                             10:54

21              So I would say yes, our conclusion was that  10:54

22    we didn't want him affiliated with us.  We couldn't    10:54

23    prove 100 percent what Ms. Farrell said.  We were      10:54

24    believing her and believing her testimony, and we      10:54

25    couldn't -- I can't say 100 percent certainty that it  10:54
```

Page 36

| | | |
|---|---|---|
| 1 | did happen as it was reported to us.  But I say I | 10:54 |
| 2 | believe Ms. Farrell, that something that night | 10:54 |
| 3 | occurred, something horrific and terrible, and we stood | 10:54 |
| 4 | by our decision to not let him back. | 10:54 |
| 5 | BY MS. LENZE: | 10:54 |
| 6 | Q.    When you say "I can't prove a hundred | 10:54 |
| 7 | percent," would -- oh, strike that. | 10:55 |
| 8 | What do you mean, you can't prove a hundred | 10:55 |
| 9 | percent? | 10:55 |
| 10 | MR. DEMARCO:  Object to the form. | 10:55 |
| 11 | THE WITNESS:  There are two people that | 10:55 |
| 12 | were in that room from my understanding, where the | 10:55 |
| 13 | alleged assault occurred. | 10:55 |
| 14 | BY MS. LENZE: | 10:55 |
| 15 | Q.    And you understand that your standard | 10:55 |
| 16 | operating procedures allows you to do things like get | 10:55 |
| 17 | statements that are verified; correct? | 10:55 |
| 18 | MR. DEMARCO:  Object to form. | 10:55 |
| 19 | THE WITNESS:  Yes, we do ask for statements | 10:55 |
| 20 | from parties involved in potential policy violations. | 10:55 |
| 21 | Yes. | 10:55 |
| 22 | BY MS. LENZE: | 10:55 |
| 23 | Q.    Well, let me be a little more specific. | 10:55 |
| 24 | Your standard operating procedures allow | 10:55 |
| 25 | you to collect evidence that are in the form of | 10:55 |

Page 37

```
1         Q.    And my apologies, but I think you used the        11:02
2    word "exoneration" in the answer again.                      11:02
3              When you had this conversation with Michael         11:02
4    Bjorkman, do you recall him asking what exoneration          11:02
5    meant?                                                       11:02
6              MR. DEMARCO:  Object to form.                       11:02
7              THE WITNESS:  I don't recall.                       11:02
8    BY MS. LENZE:                                                11:02
9         Q.    Do you recall having a discussion that           11:02
10   exoneration was tied to the criminal prosecution of          11:02
11   Michael Bjorkman for allegations of drugging and rape?       11:02
12             MR. DEMARCO:  I object to form.                     11:02
13   Argumentative.  Foundation:                                  11:02
14             THE WITNESS:  I don't recall, Ms. Lenze.           11:03
15   If you have something that can refresh my memory             11:03
16   potentially, but I don't recall.                             11:03
17   BY MS. LENZE:                                                11:03
18        Q.    Did you tell Michael Bjorkman you were not        11:03
19   investigating?                                               11:03
20             MR. DEMARCO:  I object to form.                     11:03
21             THE WITNESS:  I don't remember.                    11:03
22   BY MS. LENZE:                                                11:03
23        Q.    Did you tell Michael Bjorkman eXp was not        11:03
24   investigating?                                               11:03
25        A.    I don't recall.                                   11:03
```

Page 42

| | | |
|---|---|---|
| 1 | individual to be part of eXp. | 11:08 |
| 2 | BY MS. LENZE: | 11:08 |
| 3 | Q.    And you agree with me that all allegations | 11:08 |
| 4 | of sexual assault are not made untrue by the lack of | 11:08 |
| 5 | criminal prosecution; right? | 11:08 |
| 6 | MR. DEMARCO:  Object to form. | 11:08 |
| 7 | Argumentative.  Incomplete hypothetical.  Foundation. | 11:08 |
| 8 | THE WITNESS:  Ms. Lenze, can you please | 11:09 |
| 9 | rephrase that question?  I want to make sure I'm | 11:09 |
| 10 | understanding. | 11:09 |
| 11 | BY MS. LENZE: | 11:09 |
| 12 | Q.    Sure.  Yeah. | 11:09 |
| 13 | Allegations of sexual assault are not | 11:09 |
| 14 | deemed untrue because the alleged rapist is not | 11:09 |
| 15 | criminally prosecuted; right? | 11:09 |
| 16 | MR. DEMARCO:  Object to form.  Foundation. | 11:09 |
| 17 | Incomplete hypothetical.  Argumentative. | 11:09 |
| 18 | THE WITNESS:  Yes, that is a possibility, | 11:09 |
| 19 | that somebody could commit a heinous crime like this | 11:09 |
| 20 | and not be found guilty in a criminal court of law. | 11:09 |
| 21 | Most certainly, that is a reality. | 11:09 |
| 22 | BY MS. LENZE: | 11:09 |
| 23 | Q.    And you agree with me that an allegation of | 11:09 |
| 24 | sexual assault is not untrue because an alleged rapist | 11:09 |
| 25 | is not even prosecuted; right? | 11:10 |

Page 47

| | | |
|---|---|---|
| 1 | MR. DEMARCO:  Object to form.  Incomplete | 11:10 |
| 2 | hypothetical.  Foundation.  Argumentative. | 11:10 |
| 3 | THE WITNESS:  I feel like I just answered | 11:10 |
| 4 | that question, Ms. Lenze. | 11:10 |
| 5 | MR. DEMARCO:  Yeah, Counsel, these are | 11:10 |
| 6 | asked and answered.  I'm going to have a standing | 11:10 |
| 7 | objection to any questions related to Mr. Haggard | 11:10 |
| 8 | commenting on the credibility of alleged victims and | 11:10 |
| 9 | his belief of what is true or not. | 11:10 |
| 10 | MS. LENZE:  Okay. | 11:10 |
| 11 | BY MS. LENZE: | 11:10 |
| 12 | Q.    Now, you -- I appreciate you stating you | 11:10 |
| 13 | just answered that.  And I think my issue was that your | 11:10 |
| 14 | response indicated that they could not be found guilty | 11:10 |
| 15 | in a court of law.  My question was a little different, | 11:10 |
| 16 | that an allegation of rape isn't made untrue just | 11:10 |
| 17 | because it's not actually taken to a criminal court of | 11:11 |
| 18 | law; right? | 11:11 |
| 19 | MR. PALLARES:  Objection. | 11:11 |
| 20 | MR. DEMARCO:  Same objections. | 11:11 |
| 21 | THE WITNESS:  Thank you for clarifying. | 11:11 |
| 22 | Most certainly, there can be a sexual | 11:11 |
| 23 | assault that isn't reported to law enforcement.  Most | 11:11 |
| 24 | certainly, that's a reality. | 11:11 |
| 25 | BY MS. LENZE: | 11:11 |

Page 48

```
 1    our decisionmaking and how we proceed, but it's not        11:12

 2    something that we would solely 100 percent rely on.        11:12

 3              So those examples you gave, Ms. Lenze, are        11:12

 4    situations where people don't report.  There are           11:12

 5    situations where a police investigation leads nowhere.     11:12

 6    We understand that and we have to use our best             11:12

 7    judgment, as I've stated before, as human beings, as       11:12

 8    operators of a company, to wade through these very         11:12

 9    sticky and complex situations.                             11:13

10    BY MS. LENZE:                                              11:13

11         Q.   And you've just said, Mr. Haggard, that a        11:13

12    police investigation helps.  Isn't it true, sir, that      11:13

13    you never saw the Las Vegas Police Department report?      11:13

14              MR. DEMARCO:  I object to form.                  11:13

15              THE WITNESS:  I don't recall seeing the          11:13

16    report.  I recall that the charges were dropped against    11:13

17    Mr. Bjorkman, but I don't recall seeing the actual         11:13

18    report.                                                    11:13

19    BY MS. LENZE:                                              11:13

20         Q.   Do you believe, Mr. Haggard, that eXp            11:13

21    conducted a thorough investigation into allegations of     11:13

22    drugging and rape against Defendant Bjorkman?              11:13

23              MR. DEMARCO:  Object to form.  Foundation.       11:13

24              THE WITNESS:  I feel that based off the          11:13

25    interviews that were conducted and the individuals that    11:13
```

Page 50

| | | |
|---|---|---|
| 1 | through August 30 of 2020? | 11:30 |
| 2 | A.    I don't. | 11:30 |
| 3 | Q.    Do you agree with me, Mr. Haggard, that the | 11:30 |
| 4 | policies and procedures in place at this time, in | 11:30 |
| 5 | September of 2020, indicated that the company will not | 11:30 |
| 6 | permit or condone any acts of retaliation against | 11:30 |
| 7 | anyone who files complaints or who cooperates in the | 11:30 |
| 8 | investigation of the same; right? | 11:30 |
| 9 | A.    Correct. | 11:30 |
| 10 | Q.    Was anything done related to Ms. Megan | 11:30 |
| 11 | Farrell-Nelson's indication to Ms. Onnen that David | 11:30 |
| 12 | Golden was calling her and trying to get her to change | 11:30 |
| 13 | her story? | 11:30 |
| 14 | MR. PALLARES:  Objection.  Form. | 11:30 |
| 15 | THE WITNESS:  I don't recall.  I recall | 11:30 |
| 16 | having a conversation with Ms. Farrell where she | 11:31 |
| 17 | indicated that she had followed up with Mr. Golden | 11:31 |
| 18 | after these events and that he had expressed to her his | 11:31 |
| 19 | views of what had occurred, that he was telling her | 11:31 |
| 20 | that -- I recall that this was a more consensual thing, | 11:31 |
| 21 | that they were hanging out together that day, and | 11:31 |
| 22 | that's what I recall.  I don't recall anything further, | 11:31 |
| 23 | though. | 11:31 |
| 24 | BY MS. LENZE: | 11:31 |
| 25 | Q.    But a statement by Ms. Onnen that an agent | 11:31 |

Page 62

| | | |
|---|---|---|
| 1 | 2020, you had a feeling that, "If David, Rosie, | 14:07 |
| 2 | etcetera, are a cancer the organization, we need to get | 14:07 |
| 3 | them out"; true? | 14:07 |
| 4 | A.    Yes.  If we had found that they were | 14:07 |
| 5 | problematic within the organization, I would be in | 14:07 |
| 6 | favor of removing somebody from the company, yes. | 14:07 |
| 7 | Q.    And you had concerns that if you didn't do | 14:07 |
| 8 | so, you might have more complaints in the future; | 14:07 |
| 9 | right? | 14:07 |
| 10 | A.    That's what I stated here. | 14:08 |
| 11 | Q.    Because as of this date, in October 1st of | 14:08 |
| 12 | 2020, you'd heard of allegations against David Golden; | 14:08 |
| 13 | correct? | 14:08 |
| 14 | A.    Yes.  We'd heard allegations of David's use | 14:08 |
| 15 | of drugs and alcohol at events, and off hours in his | 14:08 |
| 16 | personal time in hotels, etcetera.  So yes, we had | 14:08 |
| 17 | heard things about David, yes. | 14:08 |
| 18 | Q.    And in fact, in one of those statements | 14:08 |
| 19 | we've reviewed, you'd heard of allegations of David | 14:08 |
| 20 | Golden being involved in the assault; correct? | 14:08 |
| 21 | MR. PALLARES:  Objection.  Form. | 14:08 |
| 22 | MR. DEMARCO:  Objection.  Form. | 14:08 |
| 23 | THE WITNESS:  I believe we read some notes | 14:08 |
| 24 | from a call that would indicate that that was something | 14:08 |
| 25 | somebody had said. | 14:09 |

Page 120

| | | |
|---|---|---|
| 1 | said this was a non-eXp sponsored event in August | 15:10 |
| 2 | of 2020, am I correct? | 15:10 |
| 3 | MR. PALLARES:  Objection. | 15:10 |
| 4 | BY MR. LEVINE: | 15:10 |
| 5 | Q.    Please -- | 15:10 |
| 6 | MR. PALLARES:  Objection. | 15:10 |
| 7 | MS. LENZE:  I object to form. | 15:10 |
| 8 | MR. PALLARES:  Objection.  Form. | 15:10 |
| 9 | Go ahead and answer.  Listen to the | 15:10 |
| 10 | question, what he's asking.  Go ahead. | 15:10 |
| 11 | THE WITNESS:  Yes.  Can you please repeat | 15:10 |
| 12 | it one more time, Peter. | 15:10 |
| 13 | BY MR. LEVINE: | 15:10 |
| 14 | Q.    Did you believe Ms. Farrell-Nelson when she | 15:10 |
| 15 | states in her written statement that the Las Vegas | 15:10 |
| 16 | event was an unofficial eXp event? | 15:10 |
| 17 | MS. LENZE:  I object to form. | 15:10 |
| 18 | THE WITNESS:  Yes.  We did -- I did believe | 15:10 |
| 19 | that. | 15:10 |
| 20 | BY MR. LEVINE: | 15:10 |
| 21 | Q.    Thank you. | 15:10 |
| 22 | Now, and you agree that eXp does not | 15:10 |
| 23 | regulate personal recreational behavior of agents in | 15:11 |
| 24 | terms of what they do on their private personal time; | 15:11 |
| 25 | isn't that true? | 15:11 |

Page 151

| | | |
|---|---|---|
| 1 | MR. PALLARES:  Objection.  Form. | 15:11 |
| 2 | MS. LENZE:  Objection.  Form. | 15:11 |
| 3 | MR. PALLARES:  Go ahead. | 15:11 |
| 4 | THE WITNESS:  Yes.  For the most part, | 15:11 |
| 5 | they're independent contractors and we are more -- go | 15:11 |
| 6 | ahead. | 15:11 |
| 7 | MR. PALLARES:  No.  You gotta finish your | 15:11 |
| 8 | -- | 15:11 |
| 9 | (Cross talking between attorneys.) | 15:11 |
| 10 | MR. PALLARES:  You gotta finish -- hold on. | 15:11 |
| 11 | You need to finish your answer, all right? | 15:11 |
| 12 | I can't let you -- don't let him cut you off. | 15:11 |
| 13 | Go ahead. | 15:11 |
| 14 | THE WITNESS:  So your question one more | 15:11 |
| 15 | time, Mr. Levine?  Let's start over. | 15:11 |
| 16 | BY MR. LEVINE: | 15:11 |
| 17 | Q.    My question was, you -- you agree that -- | 15:11 |
| 18 | that eXp does not regulate the personal recreational | 15:11 |
| 19 | behavior of real estate agents in terms of what they do | 15:12 |
| 20 | in their personal non-eXp time.  Is that true? | 15:12 |
| 21 | MS. LENZE:  I object to form. | 15:12 |
| 22 | MR. PALLARES:  Objection.  Form. | 15:12 |
| 23 | THE WITNESS:  Yes, generally speaking, I | 15:12 |
| 24 | would say that's true. | 15:12 |
| 25 | BY MR. LEVINE: | 15:12 |

Page 152

| | | |
|---|---|---|
| 1 | Q.    Is there an exception to that? | 15:12 |
| 2 | A.    I could think of some. | 15:12 |
| 3 | Q.    What?  Because you said, "Generally | 15:12 |
| 4 | speaking, it's true." | 15:12 |
| 5 | A.    I think the allegations of Mr. Bjorkman | 15:12 |
| 6 | assaulting Megan Farrell, that was on personal time. | 15:12 |
| 7 | That's something that is concerning to us as a | 15:12 |
| 8 | corporation. | 15:12 |
| 9 | An agent may post something on social | 15:12 |
| 10 | media, on their personal page, but it reflects poorly | 15:12 |
| 11 | on eXp because they're tied to eXp. | 15:12 |
| 12 | Yes, generally speaking, we don't try to | 15:12 |
| 13 | get into people's personal lives.  I will say that is | 15:12 |
| 14 | true.  There's their business, their real estate | 15:12 |
| 15 | business, their agent attraction, their association | 15:13 |
| 16 | with eXp, and their personal life. | 15:13 |
| 17 | In their personal life, they can have | 15:13 |
| 18 | conduct that may run afoul of somebody we would want to | 15:13 |
| 19 | be in business with or want to associate with the | 15:13 |
| 20 | company. | 15:13 |
| 21 | Q.    Was Mr. Golden terminable at will, as far | 15:13 |
| 22 | as you understood? | 15:13 |
| 23 | MR. PALLARES:  Objection.  Form. | 15:13 |
| 24 | Go ahead and answer. | 15:13 |
| 25 | THE WITNESS:  Meaning? | 15:13 |

Page 153

| | | |
|---|---|---|
| 1 | Q.   Well, you said before you found her | 15:21 |
| 2 | allegations were credible; true? | 15:21 |
| 3 | MR. PALLARES:  Objection.  Argumentative. | 15:21 |
| 4 | Form. | 15:21 |
| 5 | THE WITNESS:  Her allegations that she was | 15:21 |
| 6 | assaulted by Mr. Bjorkman, certainly. | 15:21 |
| 7 | BY MR. LEVINE: | 15:21 |
| 8 | Q.   So is it your testimony today that you | 15:21 |
| 9 | formed no opinion as to the credibility of Megan's | 15:21 |
| 10 | allegations, that Golden was using GHB, as she said to | 15:21 |
| 11 | you in her interview? | 15:21 |
| 12 | A.   I think it's accurate that I -- at the | 15:21 |
| 13 | time, I didn't have a formal conclusion whether or not | 15:21 |
| 14 | he was or was not using GHB recreationally. | 15:22 |
| 15 | Q.   Now, in terms of the next page, 2eXp_00538, | 15:22 |
| 16 | do you see the last bullet at the bottom, "Mike and | 15:22 |
| 17 | David travel with GHB"? | 15:22 |
| 18 | A.   Yes, I see that. | 15:22 |
| 19 | Q.   You were aware of this claim by Megan | 15:22 |
| 20 | Farrell-Nelson back on October 4, 2020, that Bjorkman | 15:22 |
| 21 | and Golden travel with GHB; true? | 15:22 |
| 22 | MR. PALLARES:  Objection.  Form. | 15:22 |
| 23 | Go ahead. | 15:22 |
| 24 | THE WITNESS:  Based off what my notes were | 15:22 |
| 25 | from the conversation, yes, it appears I did. | 15:22 |

Page 160

| | | |
|---|---|---|
| 1 | Are you ready to proceed, Mr. Haggard. | 16:19 |
| 2 | THE WITNESS:  Yes. | 16:19 |
| 3 | FURTHER EXAMINATION | 16:19 |
| 4 | BY MS. LENZE: | 16:19 |
| 5 | Q.    Okay. | 16:19 |
| 6 | As you've had an opportunity to review | 16:19 |
| 7 | Exhibit 19, eXp_HAG_001157 to 1164; correct, sir? | 16:19 |
| 8 | A.    Yes.  I just skimmed through it. | 16:19 |
| 9 | Q.    Do you recall this conversation of October | 16:19 |
| 10 | 20 through October 21st of 2020? | 16:19 |
| 11 | A.    I don't recall the specific discussion, no. | 16:19 |
| 12 | Q.    Okay. | 16:20 |
| 13 | And does this appear to be a conversation, | 16:20 |
| 14 | a Workplace chat conversation, between you and Agent | 16:20 |
| 15 | Compliance? | 16:20 |
| 16 | A.    It looks like it's a conversation with | 16:20 |
| 17 | members of the compliance committee at the time. | 16:20 |
| 18 | Q.    And at this point in time, October 20th of | 16:20 |
| 19 | 2020, you had received three sponsorship change | 16:20 |
| 20 | requests relating to allegations of drugging and | 16:20 |
| 21 | assault with respect to Defendant Bjorkman; correct? | 16:20 |
| 22 | MR. PALLARES:  I'm sorry, what was that? | 16:20 |
| 23 | MS. LENZE:  Sure.  Let me try that question | 16:20 |
| 24 | again. | 16:20 |
| 25 | BY MS. LENZE: | 16:20 |

Page 192

```
 1        Q.    As of this time, in October of 2020, you      16:20
 2   had received three sponsorship change requests related   16:20
 3   to allegations of drugging and assault against           16:20
 4   Defendant Bjorkman; correct?                             16:20
 5              MR. PALLARES:  Objection.  Form.               16:21
 6              Go ahead.                                      16:21
 7              MR. DEMARCO:  Objection.  Form.                16:21
 8              THE WITNESS:  I don't know how many we had     16:21
 9   received at that point.  I don't recall.                 16:21
10   BY MS. LENZE:                                            16:21
11        Q.    Well, you recall receiving a sponsorship      16:21
12   change request from Ms. Megan Farrell-Nelson as of this  16:21
13   time, in October of 2020; right?                         16:21
14        A.    Correct.                                      16:21
15        Q.    And you recall receiving a sponsorship        16:21
16   change request from Noelle Nielsen as of this time;      16:21
17   true?                                                    16:21
18        A.    Correct.                                      16:21
19        Q.    And you recall, based on our review of the    16:21
20   conversation you had with Ms. Tammy Edwards, now known   16:21
21   as Tammy Simms, that she, too, had requested a           16:21
22   sponsorship change in her conversation with you;         16:21
23   correct?                                                 16:21
24        A.    Correct.                                      16:21
25              MR. DEMARCO:  Object to form.                 16:21
```

Page 193

```
 1    Michael Bjorkman early vesting because there was          16:32

 2    pressure by other agents to not take away a substantial   16:32

 3    financial benefit to an agent right before they vested?   16:32

 4              MR. PALLARES:  Objection.  Form.                 16:32

 5              Go ahead.                                        16:32

 6              THE WITNESS:  It wasn't my understanding.        16:32

 7    I wasn't aware of any agents putting pressure on.  It      16:32

 8    was my understanding this came from a discussion          16:32

 9    between Mr. Bramble and Mr. Sanford.  As to what led to    16:32

10    that, I don't know.                                       16:32

11    BY MS. LENZE:                                             16:32

12         Q.    And so do I understand your testimony          16:32

13    correct, that it wasn't actually pressure from other      16:32

14    agents, this discussion came from Mr. Sanford's own       16:32

15    suggestion, that to not vest an agent like Mr. Bjorkman   16:32

16    early upon termination would cause fear in other agents   16:33

17    that eXp was going to take away their revenue share?      16:33

18         A.    Again, I don't know what facilitated that      16:33

19    conversation or what the catalyst was to have this        16:33

20    discussion.  I just know that it was a discussion         16:33

21    between Mr. Bramble and Mr. Sanford and we, in the        16:33

22    committee, discussed it at Jim's request.                 16:33

23         Q.    Do you know at this point -- or strike         16:33

24    that.                                                     16:33

25              Do you know, at the time of his                 16:33
```

Page 201

```
 1   successful recruiting and career at eXp.              17:42

 2        Q.    Okay.                                      17:43

 3              And you also came to learn in your         17:43

 4   investigation that Mr. Bjorkman had experience with,  17:43

 5   for example, speaking at presentations and helping    17:43

 6   other agents, including at eXp; correct?              17:43

 7              MR. PALLARES:  Objection.  Form.           17:43

 8              MS. LENZE:  Objection to form.             17:43

 9              THE WITNESS:  I can't recall of an instance 17:43

10   where I was notified that he was helping agents.  I   17:43

11   know he did his own agent recruiting quite heavily, but 17:43

12   I can't recall off the top of my head that he was     17:43

13   helping other agents do so.                           17:43

14   BY MR. DEMARCO:                                       17:43

15        Q.    You agree that eXp felt pressured to       17:43

16   discipline Michael Bjorkman and David Golden after the 17:43

17   allegations; correct?                                 17:43

18              MR. PALLARES:  Okay, listening to the      17:43

19   question, objection to form.                          17:43

20              Go ahead and answer.                       17:43

21              THE WITNESS:  No, I do not feel that there 17:43

22   was pressure.                                         17:43

23   BY MR. DEMARCO:                                       17:43

24        Q.    You agree there were concerns from a public 17:43

25   relations standpoint against the company; correct?    17:43
```

Page 258

| | | |
|---|---|---|
| 1 | A.    Yes, I think that was a consideration. | 17:44 |
| 2 | Q.    I'm going to show you, or I would like you | 17:44 |
| 3 | to look at Exhibit 16.1.  This is Plaintiff's | 17:44 |
| 4 | Exhibit 61.1 that they identified. | 17:44 |
| 5 | Do you have that one? | 17:44 |
| 6 | A.    I believe so. | 17:44 |
| 7 | Q.    Let me know when you have it. | 17:44 |
| 8 | A.    Yes, I have it. | 17:44 |
| 9 | Q.    Okay. | 17:44 |
| 10 | That document should be Bates stamped in | 17:44 |
| 11 | the bottom right-hand corner of the first | 17:44 |
| 12 | page 2eXp_005536. | 17:45 |
| 13 | Do you see that? | 17:45 |
| 14 | A.    Yes. | 17:45 |
| 15 | Q.    Okay. | 17:45 |
| 16 | There's a note here at the top on the first | 17:45 |
| 17 | page, "August 18, 2020, call to Michael Bjorkman | 17:45 |
| 18 | Cory Haggard and Jim Nuth." | 17:45 |
| 19 | Do you see that? | 17:45 |
| 20 | A.    Yes. | 17:45 |
| 21 | Q.    Who is Jim Nuth? | 17:45 |
| 22 | A.    Jim Nuth was a -- I can't recall his exact | 17:45 |
| 23 | title.  I believe he was at one point a vice-president | 17:45 |
| 24 | of the brokerage operations, if I recall correctly. | 17:45 |
| 25 | Q.    Okay. | 17:45 |

Page 259

| | | |
|---|---|---|
| 1 | option to review that and make the determination if he | 17:57 |
| 2 | could return or not. | 17:57 |
| 3 | BY MR. DEMARCO: | 17:57 |
| 4 | Q.    So you agree there was doubt among this | 17:57 |
| 5 | same committee as to whether Mr. Bjorkman had actually | 17:57 |
| 6 | committed any alleged sexual assault; correct? | 17:57 |
| 7 | MS. LENZE:  Objection to form. | 17:57 |
| 8 | THE WITNESS:  I think only as far as that | 17:57 |
| 9 | we couldn't know 100 percent that it did or did not | 17:57 |
| 10 | occur.  We believed her.  We took action on it, but we | 17:57 |
| 11 | wanted to have the flexibility and the discretion to | 17:57 |
| 12 | make that call if information came to light that showed | 17:58 |
| 13 | that we made the wrong decision. | 17:58 |
| 14 | BY MR. DEMARCO: | 17:58 |
| 15 | Q.    And you agreed the decision that this was, | 17:58 |
| 16 | quote, credible was not based on an examination of all | 17:58 |
| 17 | evidence regarding the allegations; correct? | 17:58 |
| 18 | MR. PALLARES:  Objection.  Form. | 17:58 |
| 19 | MS. LENZE:  Objection.  Form. | 17:58 |
| 20 | MR. PALLARES:  Go ahead. | 17:58 |
| 21 | THE WITNESS:  Due to the severity of the | 17:58 |
| 22 | allegation, that one of our agents was raped by | 17:58 |
| 23 | another, we used our best judgment to act quickly and | 17:58 |
| 24 | efficiently to, in our minds, remove somebody that had | 17:58 |
| 25 | assaulted another individual. | 17:58 |

Page 271

| | | |
|---|---|---|
| 1 | Q.    Okay. | 18:10 |
| 2 | Now you agree, again, as I stated, there's | 18:10 |
| 3 | no finding of guilt or any judgment of guilt against | 18:10 |
| 4 | Mr. Bjorkman; correct? | 18:10 |
| 5 | MS. LENZE:  Objection to form. | 18:10 |
| 6 | THE WITNESS:  Not that I'm aware of. | 18:10 |
| 7 | BY MR. DEMARCO: | 18:10 |
| 8 | Q.    Okay. | 18:10 |
| 9 | And then Jim Bramble responds, "Jason's | 18:10 |
| 10 | opinion is shared by Glenn.  In fact, Glenn has | 18:10 |
| 11 | mistakenly understood that was the normal process | 18:10 |
| 12 | already." | 18:10 |
| 13 | Do you see that? | 18:10 |
| 14 | A.    Yes. | 18:10 |
| 15 | Q.    And then Jim Bramble writes, down at the | 18:10 |
| 16 | bottom of 1203, "I also will support the team decision | 18:11 |
| 17 | but my vote would be different.  I am uneasy with the | 18:11 |
| 18 | idea of someone getting let go for cause being granted | 18:11 |
| 19 | premature vesting." | 18:11 |
| 20 | And then Dave Conord writes, "My thoughts | 18:11 |
| 21 | are that we have removed him for an 'accusation' that, | 18:11 |
| 22 | while seeming plausible, is still only that from what I | 18:11 |
| 23 | understand." | 18:11 |
| 24 | Do you see that? | 18:11 |
| 25 | A.    Yes. | 18:11 |

Page 282

```
 1          Q.    And then he writes down later, "Until we        18:11

 2    can say with certainty that something occurred that        18:11

 3    makes us decide that we absolutely do not want to be in    18:11

 4    business with him and not eligible for rehire, then we     18:11

 5    should keep paying him until such time occurs or he is     18:11

 6    reinstated."                                               18:11

 7               Now, again, as we sit here today, you           18:11

 8    agree, no one can say with certainty that an allegation    18:12

 9    of sexual assault occurred; correct?                       18:12

10               MS. LENZE:  Objection to form.                  18:12

11               THE WITNESS:  No, an allegation of sexual       18:12

12    assault did occur.                                         18:12

13    BY MR. DEMARCO:                                            18:12

14          Q.    No one can say with certainty that the         18:12

15    actual allegation has been proven.                         18:12

16               Do you agree with that?                         18:12

17               MS. LENZE:  Objection to form.                  18:12

18               THE WITNESS:  I would say it hasn't been        18:12

19    proven by law enforcement, no.                             18:12

20    BY MR. DEMARCO:                                            18:12

21          Q.    And you then write, "A concern I have is       18:12

22    the fairness.  How many agents have let go that we have    18:12

23    not paid revenue share to?  Are we treating this           18:12

24    situation differently?"                                    18:12

25               Do you see that?                                18:12
```

Page 283

| | | |
|---|---|---|
| 1 | correct? | 18:41 |
| 2 | A. Correct. | 18:41 |
| 3 | Q. And as you testified in earlier | 18:41 |
| 4 | questioning, you had an understanding that Michael | 18:41 |
| 5 | Bjorkman was not -- strike that. | 18:41 |
| 6 | As you testified earlier, you have an | 18:41 |
| 7 | understanding that that arrest did not result in the | 18:41 |
| 8 | D.A. bringing a case criminally in Las Vegas; correct? | 18:42 |
| 9 | MR. PALLARES: Objection. Form. | 18:42 |
| 10 | Go ahead. | 18:42 |
| 11 | THE WITNESS: It was my understanding that | 18:42 |
| 12 | the police were not pursuing additional charges, or | 18:42 |
| 13 | that they had dropped the case, was my understanding. | 18:42 |
| 14 | BY MS. LENZE: | 18:42 |
| 15 | Q. And you recall, in June of 2021, the | 18:42 |
| 16 | compliance committee meeting based on a request for | 18:42 |
| 17 | Michael Bjorkman -- from Michael Bjorkman to be | 18:42 |
| 18 | reinstated at eXp; correct? | 18:42 |
| 19 | A. Correct. | 18:42 |
| 20 | Q. Now, turning to this Exhibit 24, if you | 18:42 |
| 21 | would, this is a Workplace chat dated July 1st of 2021, | 18:42 |
| 22 | through July 2nd of 2021; correct? | 18:42 |
| 23 | A. Correct. | 18:42 |
| 24 | Q. Do you recall this conversation between | 18:42 |
| 25 | you, Mr. Conord and Mr. Bramble? | 18:43 |

Page 306

| | | |
|---|---|---|
| 1 | THE WITNESS:  All right.  I'm there. | 18:51 |
| 2 | BY MS. LENZE: | 18:51 |
| 3 | Q.   Do you see this journal note that says on | 18:51 |
| 4 | 7/6/21, at approximately 2:15 p.m. MST, "I spoke with | 18:51 |
| 5 | Debbie Penny regarding Mike Bjorkman"? | 18:51 |
| 6 | A.   Yes. | 18:51 |
| 7 | Q.   And it says, "I was following up to a | 18:51 |
| 8 | question the committee had about Mike having previous | 18:51 |
| 9 | allegations of misconduct at Keller Williams." | 18:51 |
| 10 | Do you see that? | 18:51 |
| 11 | A.   Yes. | 18:51 |
| 12 | Q.   Does that in any way refresh your | 18:51 |
| 13 | recollection about this issue of previous allegations | 18:51 |
| 14 | of sexual assault coming from a question the committee | 18:51 |
| 15 | had? | 18:51 |
| 16 | A.   Again, I don't recall specifics as to why | 18:51 |
| 17 | the committee ascertained -- asked me to ascertain that | 18:51 |
| 18 | from Debbie Penny. | 18:51 |
| 19 | Q.   Do you recall who in the committee asked | 18:52 |
| 20 | the question related to Mike Bjorkman's allegations of | 18:52 |
| 21 | previous misconduct at Keller Williams? | 18:52 |
| 22 | A.   I don't remember specifically, no. | 18:52 |
| 23 | Q.   Do you have any understanding of who on the | 18:52 |
| 24 | committee was aware that Michael Bjorkman and Debbie | 18:52 |
| 25 | Penny were colleagues at Keller Williams? | 18:52 |

Page 312

```
 1              MR. PALLARES:  Objection.  Form.              18:52

 2              THE WITNESS:  I don't recall.                 18:52

 3    BY MS. LENZE:                                           18:52

 4         Q.    Hearing in a committee meeting, related to   18:52

 5    allegations of sexual assault and decisionmaking        18:52

 6    specifically related to the accused, Michael Bjorkman,  18:52

 7    in a committee meeting, that hearing a question about   18:52

 8    previous allegations of sexual misconduct was a         18:53

 9    critical occurrence in that meeting?                    18:53

10              MR. DEMARCO:  Object to form.                 18:53

11              MR. PALLARES:  What's the question?           18:53

12    BY MS. LENZE:                                           18:53

13         Q.    Was the asking of that question by a         18:53

14    committee member during that meeting a critical        18:53

15    occurrence in that compliance committee meeting?        18:53

16         A.    I don't know what you mean by "critical      18:53

17    occurrence," Ms. Lenze.                                 18:53

18         Q.    Sure.                                        18:53

19              If you were -- strike that.                   18:53

20              It was your role, as chairman of the          18:53

21    compliance committee, to document the minutes of a      18:53

22    meeting; correct?                                       18:53

23         A.    Correct.                                     18:53

24         Q.    And you, in that critical role as chairman   18:53

25    of the compliance committee, would want to document     18:53
```

                                                    Page 313

| | | |
|---|---|---|
| 1 | A. If you read my note of what I wrote, I | 18:56 |
| 2 | don't say "previous allegations of sexual misconduct." | 18:56 |
| 3 | It says "previous allegations of misconduct." That | 18:56 |
| 4 | could be -- | 18:56 |
| 5 | MR. PALLARES: Just answer the question. | 18:56 |
| 6 | All right? | 18:56 |
| 7 | What's the question? I don't want you | 18:56 |
| 8 | bantering. All right? What's the question now? | 18:56 |
| 9 | BY MS. LENZE: | 18:56 |
| 10 | Q. And you then say, "She said Mike was | 18:56 |
| 11 | accused of rape but the complaint didn't go anywhere. | 18:56 |
| 12 | As far as she knows, there was no formal complaint | 18:56 |
| 13 | submitted to the police." | 18:56 |
| 14 | Do you see that? | 18:56 |
| 15 | A. Yes. | 18:56 |
| 16 | Q. Do you have any understanding of what | 18:56 |
| 17 | Ms. Penny was aware of related to allegations of rape | 18:57 |
| 18 | at Keller Williams? | 18:57 |
| 19 | A. Aside from what's memorialized in these, | 18:57 |
| 20 | no. | 18:57 |
| 21 | MR. PALLARES: In these documents we just | 18:57 |
| 22 | turned to. The time in answering the question. | 18:57 |
| 23 | BY MS. LENZE: | 18:57 |
| 24 | Q. Turning to Exhibit 26 if you could. | 18:57 |
| 25 | MR. PALLARES: Which is Exhibit 26? Is | 18:57 |

Page 316

| | | |
|---|---|---|
| 1 | that 1216? | 18:57 |
| 2 | MS. LENZE:  Yes. | 18:57 |
| 3 | MR. PALLARES:  Okay. | 18:57 |
| 4 | MS. LENZE:  That's correct, through 1232. | 18:57 |
| 5 | MR. PALLARES:  Is it Exhibit 26? | 18:57 |
| 6 | MS. LENZE:  Yes. | 18:57 |
| 7 | MR. PALLARES:  All right. | 18:57 |
| 8 | (Exhibit 26 marked.) | 18:57 |
| 9 | THE WITNESS:  (Witness reviews document.) | 18:57 |
| 10 | BY MS. LENZE: | 18:57 |
| 11 | Q.   I can direct you if that would be in the | 18:57 |
| 12 | interest of time. | 18:57 |
| 13 | A.   Yes, please. | 18:57 |
| 14 | Q.   Now, are you aware of -- before we get to | 18:57 |
| 15 | this document, you are aware that Ms. Fabiola Acevado | 18:58 |
| 16 | requested an investigation in sponsor change into | 18:58 |
| 17 | allegations against Defendant Bjorkman as of March of | 18:58 |
| 18 | 2022; correct? | 18:58 |
| 19 | A.   It's my recollection I remember her | 18:58 |
| 20 | requesting a sponsorship change. | 18:58 |
| 21 | Q.   Was there any investigation into Ms. | 18:58 |
| 22 | Acevado's allegation made related to drugging against | 18:58 |
| 23 | Michael Bjorkman? | 18:58 |
| 24 | MR. DEMARCO:  I object to form. | 18:58 |
| 25 | THE WITNESS:  Again, I don't recall | 18:58 |

Page 317

U.S. Compliance Committee
Date: 1/12/2021
Attention: James Bramble
Privileged and Confidential Prepared at the Request of Counsel

**Exception Request #1 – Sponsorship Change**
Agent Information
**Name:** Tami Edwards
**Agent ID:** 24834
**Market:** California
**Join Date:** 8/17/2018

**Summary:**
Tami alleges she too was a victim of Michael Bjorkman. Tami is requesting the following:

1. Allow Tami to change her sponsor from Michael Bjorkman to Nate Butcher.
2. Allow four agents in Tami and Michael's downline, to change their sponsor from Michael Bjorkman to Tami:
   a. Larry Fleischman – One agent in Larry's downline organization
   b. Tony Bellah – No agent's in Tony's downline organization
   c. Natalie Yanez – Two agents in Natalie's downline organization, also Natalie's sponsor is not Michael, she is in Michael's tier two. However, her sponsor is no longer with eXp.
   d. Julie O'Dell – 60 agents in Julie O'Dell's downline organization

**Agent Compliance Recommendation:** Allow Tami to change her sponsor but deny the request to allow the downline agents to change.

Committee Notes:
Allow Tami to move with a written statement from her or her attorney stating they are filing a police report. Not allow her to take any of their requested agents to move with her.

Jim Bramble – No
Jim Nuth – Yes
David Conord – Yes
Jason Gesing – Yes
Stacy Onnen – Yes
John Tobison - Yes
Courtney Chakarun – Yes

EXHIBIT *16*
DATE *8-20-25*
WITNESS *Hoggard*
ROCKIE DUSTIN, CSR, RPR

2eXp_004245

11/18/2020                              eXp Realty, LLC Mail - Official statement

 Gmail                        **Cory Haggard <cory.haggard@exprealty.net>**

---

## Official statement
1 message

---

**Megan Farrell-Nelson <megan@themeganfarrellteam.com>**          Mon, Nov 9, 2020 at 9:17 AM
To: cory.haggard@exprealty.net
Cc: Brady Nelson <bradytnelson@gmail.com>

Hi Cory,

Please accept my apology on the delay of this document. It has taken a lot out of me to put together. Please feel free to contact me should you have any questions or need additional documentation (ie text messages, names, etc)

Thank you again for all of your hard work.

--

Best regards,
*Megan*



## Megan Farrell / REALTOR®

40 Under 40 Top Business Professionals in Flagler & Volusia Counties, 2016 and 2017

President, Flagler County Association of REALTORS

REALTOR of the Year for Flagler County Association of REALTORS

c: 386-597-3545

EXP Realty, LLC

712 S Ocean Shore Blvd

Flagler Beach, FL 32136

Search the entire Flagler County MLS for free at our website!
www.TheMeganFarrellTeam.com/propertysearch



CONFIDENTIAL                                    2eXp_004266

11/18/2020

eXp Realty, LLC Mail - Official statement

*"Be the change you wish to see in the world."*

ExpWrittenComplaint|MeganFarrell.pages
831K

CONFIDENTIAL

2eXp_004267

2/2

When I first heard about EXP Realty, I had the reaction that a lot of people did; Is this too good to be true? Brady and I had been searching for something to take our business to the next level. We knew we didn't want to open up our own brokerage and take on the liability, but we just couldn't find the right fit. After hearing about it and discussing it with David, Mike, and the rest of the team, we decided we were in.

We switched to EXP for two main reasons; 1 the potential for income/multiple revenue streams and 2. we wanted to be a part of something bigger than us (i.e. our team). We love that we could bring agents on and they would not only have the support from us, but also the people above us for 7 levels. We also loved that we had 7 levels above us to offer support and growth. We absolutely loved our group! It truly felt like a family. We supported each other in business and personally.

We were brought in under the umbrella of love and support. We called each other family, told each other "I love you", and many other non-traditional business relationships. Looking back, I believe that this was the beginning of the grooming process to take advantage of me and other women in the organization. They created an environment that is built on "trust" and "compassion" so that we all let our guard down. I traveled both nationally and internationally to events with these guys without a second thought, not realizing that my friends and colleagues were being drugged/hurt at said events.

**Sponsor- Mike Bjorkman**

I was invited by Mike Bjorkman to go to Las Vegas for the weekend of August 27-30. I knew that this was an unofficial EXP event and many agents who are currently aligned with the company, as well as those that were currently being recruited, were going to be there. We went to Jon Cheplak's personal home and spent the entire day masterminding on Friday, August 28. Brent Grove was also there and gave a 3-4 hour talk on Saturday, August 29. At both events, we discussed EXP, agent attraction, and revenue share. There was also a networking pool party on Saturday afternoon.

I knew that David and Mike had GHB but was told it was for recreational purposes for themselves. Hindsight, this seems extremely unlikely and I feel foolish for thinking that it was so. I never in 1,000,000 years would have thought that my friends/colleagues would give drugs to people, let alone me, unknowingly. I was mistaken.

CONFIDENTIAL

On Sunday, August 30, 2020, I was drugged, and Mike raped me in Las Vegas. I woke up
with his hand in my pants. He then picked me up and guided me to the massage room that was in
the shared living area of David's suite. I tried to wipe my eyes but couldn't bend my fingers.
Once we got into the room, Mike picked me up and put me on the table. He then proceeded to
take off my shorts and rape me. When he was finished, he came over to my head and held me
while I cried.

In the almost 2 months since this occurred, I have personally spoken to 11 additional
women and men who have shared a similar experience with Mike; two of those confirmed rape,
4 were men (2 were with spouses who were also drugged/2 were drugged with no reason why),
and one was hospitalized with a blood-alcohol level of 0.3 and almost did not survive. Several of
those agents are still with EXP, 1 left the company, and 2 are spouses of agents who are with
EXP. The agents with EXP that I personally have spoken to who said they were drugged/raped
are Tami Edwards, Noelle Neilsen (she told me Seth was drugged as well), Julie O'Dell, Craig
Chastain (in LV 8/28), Michael Hentry (in LV 8/28), Brittiny Howard (was with EXP when
drugged- no longer with the company), and Rosie Rodriguez.

Mike has isolated each female in his organization. We were each told negative things
about each other. For example, after I witnessed Julie O'Dell overdose, I reached out to him
knowing he was close to her. I told him I was concerned about her mental health and well-being
and thought we should do something to help. He said he would talk to her. For the next 6 weeks,
I called her consistently and I could not reach her. When I finally got a hold of her, she told me
that Mike had told her I said she was an embarrassment to herself at EXPCon, that she was
sloppy, and had a drug and alcohol problem. He told her she needed to "get her shit together"
and "stop embarrassing herself" at events. That was last October after EXPCon and if you look
back, you will see Julie "disappeared" soon after this. I was trying to help Julie, but Mike was/is
abusing her. She is one of several in his front line whom I know he has abused. He caused these
divides between many women in his organizations.

When Mike and David came to Florida in March 2020 to present at a recruiting event we
hosted, Mike constantly tried to pin me and David against each other by saying he didn't care
about the event. While he was here, he also told me that he was having an extramarital affair
with Julie O'Dell. David brought another woman with him around our entire team, even though
they knew he was dating someone else. He also asked one of the agents in my downline to

provide him with cocaine prior to the event because he "didn't want to fly with it". During this trip, David offered Brady GHB in our home- with my son and mother in the next room.

I was also warned by Mike not to travel with David because he will "drug and rape" me. David also said the same thing about Mike multiple times. It's like they were pinning the blame on each other so no one would get caught.

David's girlfriend, Emily Keenan, also confided in me that she and David had had sex in front of Mike in the past and that Mike had masturbated in front of her. He even shared with her where he ejaculated. Even his "best friend's" girlfriend isn't safe from him. On top of that, David knew that this had happened and still remained "best friends" with Mike. This just shows their lack of respect for women, especially in conference settings.

I have heard Mike say extremely hateful things about other people in our organization in front of other people in our organization... A small amount of the things said...
David Golden- Told me not to travel with David or he'll drug and rape me, he's lazy, he only cares about David "It's David's World- You either in it on his terms or not"
Rosie Rodriguez- Called her a "Fat Mexican" (in front of David)
Noelle Nielsen- A crazy bitch (in front of David)
Julie O'Dell- A psycho, drug addict, whore (In front of David and a plethora of people)
Stevie Hahn-My very good friend and fellow REALTOR- "A dumbass who is just smart enough to dress like a slut sometimes so she gets a lot of followers (on social media)" (He put that in writing)

I have multiple text messages with Mike with inappropriate comments about women such as him telling me he's going to "fuck 20 strippers" at conferences as well as warning me not to go out to Vegas because it will be "trouble".

### Line 2 David Golden

Let me start by saying, David has been one of Brady and my dearest friends since we have joined this company. When I reflect back, I am embarrassed, hurt, and ashamed that I let my guard down with people who could cause so much pain for so many people.

At EXPCon 2019 was the first time that I witnessed David with GHB. He offered it to me and several other EXP agents in the room. I also witnessed exorbitant amounts of cocaine in the suite he shared with Rosie Rodriguez and Brannon Lee Chavez.

I have also heard from many people that they have witnessed David and Mike "tag-teaming" women, who are/were EXP Agents in our organizations, during conferences, and in their EXP Suite. I understand that this is not illegal, but due to the pattern of behavior, I think it's important to note.

Mike and David came and helped with a recruiting event for our group in March 2020. As mentioned above, David asked one of my agents to get him cocaine, so he didn't have to fly with it. They did not, but he still ended up with it while he was here.

My parents were also in town this weekend as it was my son's first birthday. These guys have met my parents and spent my son's birthday with my family. I want you to understand that these people infiltrated our family and tore it down.

When I was in Puerto Villarta in February for EXP Freedom Summit with Brent Gove, I witnessed David and Emily bring another EXP Agent, A.R., back to their room for sex. Emily told me the next day that she was "so proud of herself" because she had "pulled a girl". I came to find out that this is something that is expected of her when they travel, and they travel often with EXP. This relationship with this woman, A.R., continued afterward, with David bringing her with him when he came to help with our event on March 11. He also brought her to my house on March 13, 2020. She drank 2-3 drinks and had disappeared into the bathroom with David several times. She became extremely belligerent, so much so that we had to try to convince her not to drive. She fought each of us and got into her car. David and Mike left her at my house and went to the airport to catch their flight. Thankfully, Brady, my mother, and I were able to convince her to stay for a few hours, feed her and provide her with water so she could sober up to make the 2-hour drive home safely.

The drugs and lack of respect for women is a pattern of behavior with Mike and David. It has occurred each time that I have been around the two of them in the last 12 months. There are countless stories from people around the industry, including EXP agents, saying they have witnessed or experienced this with them.

*Line 3 Rosie Rodriguez*

The first time I met Rosie in person was at EXPCon 2019 in Las Vegas. She was there when I witnessed Julie O'Dell overdose. It stood out to me that while Julie was convulsing on the floor, Rosie just sat in her chair without concern as though she had possibly witnessed this before. The second alarming thing was when I called Rosie to inform her that David had asked one of our agents if he could get him cocaine, Rosie basically responded with "you have to take the good with the bad". I have had many candid conversations with Rosie about both Mike and David's behavior and basically each time I was pacified and told that's how they are. After I called her on Tuesday, Sept 15, and told her that Mike assaulted me, she reacted with shock. Her initial response was "Are you sure that he knew you didn't want it?" and "Did you say no or tell him to stop?". I told her that I didn't say anything and that I just froze. She also said in the conversation something similar to, "Sometimes people get fucked up like really fucked up and make mistakes that they wouldn't if they were sober." as well as "And sometimes people get fucked, like really fucked up, and put themselves in situations that they learn from and won't put themselves in again." She did tell me that she understood and shared with me an experience she had with Mike (in confidence) leading me to believe she understood the situation and had been there before. She also proceeded to ask me if I knew how she knew about me and then told me that it was because of Mike's Facebook video (Mike went live on Facebook soon after I made the switch to EXP expressing his disappointment in how I was treated by my previous company and also discussing my business.) Rosie talked with me about the video, saying that he obviously cares a lot about me if he's going to do something like that. She also said how he reached out to her and asked her to call me to welcome me and reiterated that Mike clearly cares about me and would never hurt me on purpose. That was the 2nd to last time I spoke to Rosie. The final time I spoke to her was when she told me that she was just going to stay out of it and not take sides. (No one asked her to pick sides, however, staying neutral is not an option when it comes to sexual assault)

On this most recent trip to Las Vegas, Emily said to Rosie "I can't hear you with your top on" and Rosie proceeded to take her top off and walk around without a shirt on.

I personally think that Rosie is complicit in this behavior and pacifies people who bring it to her attention due to the income she is making from them both.

CONFIDENTIAL    2eXp_004272

*Line 4 Rick Geha*

In November of 2019, Rick Geha visited our association and taught a business planning class. After the class was over, he immediately followed Brady and me to our home and came inside. Brady's sister was there and was making dinner. Rick proceeded to tell her how beautiful she is and repeated several times that his son would love her. He asked her if she would be interested in dating his son and repeated how great of a fit, she would be for him. We laughed it off, but it definitely made her uncomfortable. Brady and Rick started a separate conversation and she and I proceeded to have a conversation about pictures at my baby shower. Out of nowhere Rick bursts out with, "You have pictures together in the shower?" She was so uncomfortable that she walked out to her car on the spot. (She was 27 years old; Rick was in his 60's) We had plans for dinner, so we all walked out to the cars together. I proceeded to ask Rick if he wanted to ride with us. He responded that he was going to take his own car in case he wanted to pick someone up at the bar and bring her back and laughed. This made me feel uncomfortable as I knew he was married. We met one of my teammates at the restaurant. Rick sat at the head of the table, I sat to his right, Mike Andrews (an exp agent in our group) sat to his left, and Brady sat beside Mike. During dinner, Rick put his hand on my thigh and rubbed around. I immediately picked up my chair and moved away. I will say that I did address that situation with Rick the following day. I told him I did not appreciate that he put his hand on my leg and he acted shocked, apologized and we moved on. I think it is worth noting that he changed his behavior, however, I do not think any of the behavior is acceptable, especially for someone who is traveling to help my business.

In addition to the experiences I have had with the people "above" me at EXP, there is also retaliatory behavior occurring after Mike was released from the company, including but not limited to: 1. The text from Scott Marlow calling me a liar with the satanic music video attached, 2. Julie O'Dell calling other agents in our organization and telling them that I am lying about the situation with Mike. 3. Multiple people reaching out to me to tell me I'm "confused" or that I am remembering incorrectly or that I need to "make it stop" and "fix it" because Mike called them.

David and his girlfriend recently took Scott Marlow golfing and sent Julie Allen, also an EXP agent and my roommate from Las Vegas trip, flowers for no reason, but to "send her sunshine".

The thing that is most concerning to me is that this behavior is consistently occurring at EXP events. (EXPCon, Puerto Villarta, 2 EXP recruiting events we have hosted, and unofficial

2eXp_004273

recruiting trip in August 2020) Not only have I been hurt, but I have also witnessed other people participating in behavior which is not only illegal but destructive and unsafe. I have witnessed women be taken advantage of, copious amounts of drugs and alcohol consumed, and violations of EXP recruiting policies.

I 100% would not feel safe attending future events, knowing Mike or David be in attendance. The pattern of behavior that I have witnessed over the last 13 months has been not only illegal, but also destructive, and quite frankly, disgusting.  It is a poison in the company, which has seeped into my life and the lives of many others.

Thank you for your time and allowing for us to remove ourselves from this group.  Brady and I have a long road toward healing, however, now that we are not surrounded by these people, we can begin that process.

I hope that you would take the same consideration to others in a similar situation. These people have caused severe damage to a lot of people's lives.


Thank you again,
Megan Farrell

CONFIDENTIAL

2eXp_004274

Noelle Nielsen – Confidential – eXp Realty

To:      eXp – Dave Conord, Jason Gesing, Cory Haggard
From:    Noelle Nielsen
Date:    October 6, 2020
Re:      Bjorkman/Golden Investigation

---

I want to begin this "written statement" by saying, this may be one of the more difficult things I've ever written. Characterizing people based upon their actions (as opposed to the potential they have within them) is something that is outside of the scope of my comfort zone. Mike, David, Rosie and Rick all have/had amazing potential within them to be good humans. And many times, they actually were. They were friends. They at times demonstrated warm hearts, generous natures, and true kindness. However, that cannot overshadow the other behaviors that were exhibited that bring them outside of the scope of what's professionally expected and acceptable within a brokerage, a company, or a leadership position.

I have tried as best I can to limit this statement to first-hand knowledge. But there are some elements that came from others. I use that knowledge to share it with you, as I know many of these individuals are too afraid to come forward. They've been threatened. They have the same feelings that I described above about these individuals. The lines are blurry. And it's hard to stand up and say when and where the gray matter turns to black.
OVERVIEW of "fire-worthy" offenses... or at a VERY minimum, switching my sponsorship line and allowing the others in my position to do the same:

Mike Bjorkman:
Rape, Sexual Harassment, Illegal Drug Use, Mental Manipulation, Coercion, Abuse of Position.... and... if none of that matters... hiring a recruiting company.

David Golden:
Knowledge of Mike's Behavior, Participation in Mike's Behavior, Sexual Harassment, Illegal Drug Use, Mental Manipulation, Coercion, Abuse of Position... and... if none of that matters... hiring a recruiting company.

Rosie Rodriguez:
Knowledge of Mike and David's Behavior, Participation in Mike's Behavior, Illegal Drug Use, Mental Manipulation, Complacency, Abuse of Position.... and... if none of that matters... hiring a recruiting company.

Rick Geha:
Sexual Harassment, Knowledge of Mike and David's Behavior, Complacency, Abuse of Position

CONFIDENTIAL                    2eXp_004344

Noelle Nielsen – Confidential – eXp Realty

In early April of 2019, I attended an event in La Jolla (at the invitation of Jesse Zagorsky) at which I met Mike Bjorkman, David Golden, and Rosie Rodriguez. At this time, I was running my own successful brokerage, Bright Birch Real Estate, and had never even considered joining eXp. At this event David and Mike quickly "zoned in" on me, and I became their next unwitting "target" for recruiting. They both knew who I was from the real estate videos I was known for making. But this was my first time hearing of them. At the time, I did not actually recognize that this was what was going on. I just thought they were very interested in speaking with me about my videos, etc., as I had grown a following in the industry at this point. At this event, which was called "FOMO", they rented a large house on the beach and many of them, and the attendees, stayed at the house. Not knowing anyone very well at this event, I had booked a hotel, and rented a car, and stayed off-site. (As time has passed, I have learned that this is how they recruit... by renting large homes or suites, and getting people to "let loose" through drinking and drug use... hoping they will convince people to sign up, while they are intoxicated, or get them to do things that are hard to take back and embarrassing and use that against them in order to coerce them to join... there is no "off the clock" for these people). During this event, I did notice that there was quite a bit of drinking, potentially some drug use, and Mike and David both offered me, made, and tried to get me to drink some mixed drinks. I set each of those drinks aside and continued to drink my own sodas I had brought (as I'd gotten in the habit of no longer drinking, especially when I was unaccompanied by my husband, Seth). During this event, there were also rumors of "hookers and blow" being offered in one of the rooms. I laughed and thought it was a joke at the time. I hadn't actually thought about it until recently, when another colleague brought this back up when discussing everything that has been revealed. As someone that hasn't ever participated in activity like that, and doesn't tend to hang out late into the evenings, I guess I was naive and didn't realize this was actually a "thing" in some of these circles. At this event Mike also made many incredibly lewd comments to me. Not knowing him well at the time, and seeing him surrounded with his "buddies", I didn't know what to make of it... and initially I had decided I did not like him. He made the comment that I had the kind of face he could stare at while "fucking", among other things. I decided to ignore him and tried to avoid him for the rest of the event. David and Rosie were both also at this event, both drinking... and in fact, Rosie had so much to drink (or perhaps it was drug use) that the second day when I arrived in the morning, she had ordered an "IV detox" truck to come to the house to assist her in feeling better. I thought this was bizarre and hadn't ever seen anything like it before.

That following week in April of 2019, I drove up the coast to attend a mastermind in Beverly Hills, with my husband, called Closing Table. This was my second "time" meeting Mike Bjorkman, and my husband's first. Before my husband arrived at this event, Mike said he was mad at me for having a husband, and that I could come up to his room quick, before my husband got there. I ignored him, and once again, tried to get away from him. However, after my husband arrived, he turned his behavior around, and became incredibly professional and presented himself as a leader in the industry and as a coach. His beautiful business partner, Tami Edwards, was also at this event. She seemed classy and sweet, and I wondered if I had mis-judged Mike. (Unbeknownst to me, this event was also the downfall of Tami's partnership with Mike and it would also be one of the last times I would see or speak with her). The

2eXp_004345

Noelle Nielsen – Confidential – eXp Realty

behavior, and lewd comments I had experienced at the previous weekend's event disappeared from my sight and I never saw much more of that for several months until after I joined eXp. In fact, I nearly forgot about most of what I had witnessed in La Jolla. Many well-known people and friends in the industry seemed to be friends with Mike. It also became very well known to Mike, and to David, that I was very strong in my faith as a Christian, and not the partying type. After finding this out, Mike then told me he was a Christian too, and even prayed over a group meal we had when we went out to dinner at this Mastermind.

After Closing Table, Mike and David convinced me to download the app, Marco Polo, which they used to communicate and recruit. We stayed in touch in this manner. But from that point on, until I joined, the conversations were mainly professional and about growth and giving up the stress of running a brokerage. We had many conversations back and forth about whether or not this would be a good company for us to join. (After we joined eXp, the Marco Polos started becoming more and more odd, many times with them without shirts on, or even occasionally from their beds, and I actually even have some from them with their girlfriends or with other women naked).

The next time I saw Mike and David (and Rosie) in person, was mid-June of 2019 at the Lab Coat Agents Live event. Mike and David came into town for the event, and immediately invited Seth and I to hang out. Seth and I went to an early lunch with Mike, at which I decided to have a glass of wine, as I felt comfortable, being with a "known" friend and my husband. One glass turned into two and then after we were done with the lunch, around noon, Mike invited us up to his private suite in Coronado to discuss the idea of us moving our brokerage over to eXp. David and Brannon Lee were also in the suite. In this suite, they mixed a drink for Seth and I. I did not watch how, or what, they were making it with. At that point, I remember having some of the drink and then I don't remember much after that. However, I have many friends (Sam Khorramian and Oliver Graf from Big Block, who also run Closing Table) and all of the agents from my brokerage, who were witness to the fact that Seth and I were "wasted" after we left their suite by 1:30/2pm and we ended up making our way back to our room, passing out, and waking up the next morning being incredibly ill, not remembering what had happened the previous day. I was beyond mortified by "my actions" and that I had let myself get "so drunk" that I didn't want to discuss what had happened with anyone. (Later I would discover that Mike was texting Tami Edwards about this, and making fun of us for "getting wasted" in their suite, which was their typical MO… to shame people so no one would reveal the nature of what happened and match their stories. It's also come to my attention that during this same event, they had many drugs with them, and were using that with other potential recruits (Sevin Murdock being one of them)). I was the MC for the LCA Live event that day with Borino, as well as a large-group presenter, and it was really difficult to make it through the day. Everyone made fun of us for what had happened (since it is SO out of character with how we are). We really never discussed it again, until, I got the call from another agent and friend, Aimee Freeman with KW in NC, earlier this month, to tell me, she believed she had been drugged by Mike at her Club Wealth event in Maui in March/April of 2019, after she found out that another girl (Christy Lundy) had been drugged at the more recent event in Vegas in August 2020, and had "gone public" with her accusation. This instantly brought back the memory of LCA and

3

CONFIDENTIAL

Noelle Nielsen – Confidential – eXp Realty

what had happened... and although I will never have proof, it seems that I may have been one of the statistics from the behavior Mike and David are accused of exhibiting.

After the drinking incident at LCA, Mike invited his wife, Ann-Marie to come down to LCA/Coronado, and the two of them took Seth and I out for dinner and to spend a day in Old Town. They raved about their sons, and from all appearances, were the normal, all-American family.

Our conversations about joining eXp continued throughout the summer, and Mike and David were crucial in connecting us with many people that ended up influencing our decision to join, including Dave Conord and Kevin Cottrell. On the flip-side, I also received calls from several people who knew I was considering this option (one of them being Michael Hellickson who runs Club Wealth), begging me not to partner with people like Mike and David and warning me about who they were. At the time, I did not understand the gravity of what they were trying to tell me, because no one just came out and said what it was that was the problem. I recently heard from others that Mike had had an affair with Michael Hellickson's assistant several years ago. Whether that is true or not, I do not know.

The ultimate piece of the decision for our agreement to leave, was a separate arrangement that we came to outside of the eXp agreement, where both Mike and David were separately responsible to make monthly payments to us in order to help us cover our brokerage expenses, lease, etc. as our rev share was just beginning, and would not cover the immediate losses that we realized when we gave up our fees. These payments began shortly after we signed on in September of 2019.  With some reminding, they made the payments for a few months. Then both of them breached their agreement, and stopped making the payments altogether. (I share this only to give context to the break-down of my relationship with them).

The day we announced we were switching over our licenses to eXp, late August of 2019, we flew to Brent Gove's event at Red Rock, with our two biggest producing agents. The day started with a pool-side party, and it quickly became apparent that this was part of the culture that we had just joined. I suppose in that moment, I should have backed out... but we literally had just gone national with our announcement that morning, via video. At this event, the first sign that something was really off, was when David missed his stage appearance on the main stage (it later would come to be revealed that he was too high and too drunk to come up on stage). At this event, we spent much of it, trying to convince our (at the time) reluctant teammates to trust us... and not enough time focusing on the mass chaos we had just entered into. We did not participate in any of the suite events or any of the late-night partying. (It was brought to my knowledge that it was also at this event that Julie O'Dell, one of Mike's other sponsees, overdosed on some combination of cocaine and ghb.  Rosie was present for this, and discouraged them from sending Julie to the hospital. Rosie was very aware of the drugs the "boys" brought with them and engaged in with their agents, and many times participated as well. She was also very aware that the "boys" (men in their late 40s and 50s) were having sex with many of the younger women in their groups, sometimes together, sometimes alone, sometimes by choice, and it sounds like, sometimes by force.)

4

CONFIDENTIAL

**2eXp_004347**

Noelle Nielsen – Confidential – eXp Realty

At this event, it was also my first time meeting Rick Geha. He immediately started complimenting me on my "eyes" and my eye color and my physical appearance. Not long after this, I would start to receive Marco Polos from Rick as well, that had a consistent I like how you "fucking look" theme. I have a montage of these videos I can provide.

(Also not long after this, I received a private facebook message from Jay Kinder, of a video of a guy opening a white claw drink, pouring it into a glass, and then a dildo dropping into the glass. I wasn't sure how to respond to this, and said "that is exactly why I don't drink that crap. Diet cokes all day." Jay Kinder wrote back "What? You don't like dick?"... I'm sharing this... because I believe this to be a part of a culture that eXp has enabled and allowed to thrive within its "structure", that I so desperately want to see changed.)

Fast forward a few months, Mike, David, Rosie and Rick all came to town for an event we hosted in Minnesota. Prior to the day of the event, we went to dinner with a few of our local recruits. After the dinner was over, I went to take Mike, David and Rosie home. (Rick stayed at one of his, now recruit's, homes that night... and Mike and David insisted on how this woman was Rick's partner outside of his marriage and that he had an open relationship... this was the first time I started hearing about this lifestyle/culture). On the way home, the 3 of them tried to pressure me to stop at a well-known strip club in Minneapolis, Deja Vu. The three of them had been drinking, and I had not, and am not easily swayed. I said no, and explained to them my feelings about strip joints. They got upset, called me a fun-killer, but I drove them back to their hotel anyway. The next morning I came back to the hotel to pick them up, and Rosie was too hung over to actually make it to the morning of the event. We went through the event day like normal, and out to dinner that night where many of our recruits and agents joined. Rick also had several of his own recruits at this event and dinner. At this dinner, it later turned out that Mike had a very public, loud and very "dirty" conversation with one of our agents, who he claimed told him she wanted to leave and "sleep with him". I questioned this conversation as it was not within the parameter of who I knew her to be. He was very vocal about it. That following week, this agent quit our group without talking to anyone. As I was preparing to bring Mike and David back to the hotel, they started yelling at my young assistant to come back to their room with them. Thankfully, I convinced her that she should get a ride home, and not follow their requests. The following morning I returned back to pick them up. David got in the car, but did not know where Mike was. Mike had apparently not returned to his room for the night. This was the first time I became aware of the fact that it was not out of the ordinary for Mike to be unfaithful to his wife, and it was not a "big deal." I brought David back to our office to prepare for the eXp explained we had planned for that morning, and it was at this time that David also discussed with me that he did not believe in monogamous relationships, and that he was a "swinger." He discussed multiple things with me and I told him that I didn't agree with his statements or his lifestyle, and that I thought God had a different idea of things. This was the first time David and I ever had a discussion about this. It was also at this point that David began accusing me of "judging" him.

2eXp_004348

Noelle Nielsen – Confidential – eXp Realty

A few weeks later, in November 2019, I saw Mike again at another Closing Table mastermind in Napa. When I arrived, Mike was already fairly intoxicated, but as the day went on, he became much worse. By the end of the day, as a group of us was heading out to a restaurant, Mike grabbed onto me and tried to kiss me. I pushed him away and told him to leave me alone. He kept telling me he loved me so much. Two of our friends (Sam and Oliver, who are mentioned above), told Mike to back off and leave me alone. Mike was not in a good state, and for the rest of the weekend, I tried to avoid him. This was particularly embarrassing as, at this point, Mike was now my "business partner" through eXp, and many of the attendees and witnesses of his behavior were potential future "recruits" for us. The next day, when confronted about his behavior, he denied it and accused me of making it up. When everyone else highlighted his behavior, he shrugged it off. (This was also the first Closing Table that Tami was not present for, as it turned out, she left her partnership with Mike, and fled to the other side of the country, to Florida, to get away from him.)

The following month, I was invited by Mike, David and Rosie to go visit Gene Frederick in Puerto Rico. Of course, I was excited to go on the trip and meet Gene, and felt comfortable since Rosie would be there. We rented a 3 bedroom VRBO in PR. On my way (already on the plane), Rosie informed me that she would not be able to attend as she was ill. During this trip, I was on a heightened awareness that I was with these two men and in a vulnerable spot, but nothing out of the ordinary happened, besides further uncomfortable discussions. Kevin Cottrell and his wife Meg were also visiting at this time and Mike and David were on good behavior. While they did mix drinks on this trip, and offered me some, I did not drink them. David during this trip, had told me that there was no drug on the planet he had not tried. One evening, the two of them told me they had some questions to ask me and they wanted to know how/why I could stand to be in a single marriage, and how my "sex relationship" worked. I told them I didn't want to talk about that with them. At this point, David started getting upset and very mad at me, as I discussed with them once again, my feelings on both of the lifestyles that they were leading. David told me that he liked to be with more than one girl at a time, and that the girls he was used to being with, also liked it. Then Mike started talking about porn, and his use of it. He wanted to know if I had ever watched porn, and if my husband and I watch porn together. I removed myself from the conversation and went and locked myself in my room. It was uncomfortable to say the least. The next morning, I had Gene come and pick me up and he took me to the airport. He didn't know why I wanted to go to the airport so early, but I was thankful to be out of the situation. From that time on, I spent much less time with Mike and David, and only tried to hang out with them in professional settings.

In early February 2020, Brent Gove had his Cabo trip. This was really when our relationship started to unravel. I had already informed the guys that at this point, I no longer wanted to travel without my husband, Seth. Rosie was also aware of this. David was having a very hard time with the fact that I was refusing to come. The next thing I knew, I got a call from both David and Rosie, telling me that they had invited two of my recruits that I had been working on, and they had been helping me talk to, to Mexico. And because they invited them, I HAD to come. I refused to go, and was really upset at this happening. David told me that if either of the recruits decided to sign up, while on the trip, that they would have to sponsor to David, since

2eXp_004349

Noelle Nielsen – Confidential – eXp Realty

he was paying for their rooms. (It turns out that right before going on this trip, one of these girl's spouse, received a call from Mike's former sponsee, Tami Edwards, and it was a strange call, warning him to warn his wife (Sandy Stites), not to drink any drinks made by Mike and David on the trip. It also turns out, that while in Mexico, David tried to get Sandy to come back to his room with him and his girlfriend and propositioned her. She refused, and felt extremely uncomfortable). The other girl, Sevin Murdock, actually canceled on them last minute and did not go on the trip, using the excuse of "covid".

At this point, I was really starting to question my decision to join eXp, and to join Mike and David, because, really, they were eXp for me. A few weeks later, in late February, we had another event in Minnesota, for which Mike, David, and Rosie flew out again. They came each time, because as an incentive for them to come, I would create a few videos for them to use for their own recruiting efforts, in return they would help me with my conferences.

During the Minnesota trip, there was an evening when we went to go to dinner with one of our real estate colleagues who runs a local, large brokerage of 500 agents, Mike Bernier with Realty Group. At this dinner, a comment was made that Bernier should consider switching his brokerage over to eXp. Bernier said that was never going to happen. At this point, David said, "well, then we'll just take all of your agents." Bernier, who had also had too much to drink asked David to take it back, and David refused. The altercation heated up really quickly and both men stood up. I begged David to stop and just take it back. David refused. Mike Bjorkman just stood there laughing. The bar manager came and asked them to stop, but David refused and started getting mad back, yelling at Bernier. Bernier then threw a stool (this is the nicest restaurant in the Mall of America). The cops had to show up and break up the fight, and at this point, I left and decided I really did not want to talk to these two much anymore. So, I stopped responding to their non-stop, crazy texts and emails begging me to forgive them. The next day, we had another recruiting meeting with some of the agents from my team and a large team leader, so I went, but was still not speaking with Mike and David. At one point during this lunch, I made a statement to the agent about why I like eXp. I was sitting across the table from Mike at the very end of the table, and Mike leaned over and whispered to me, "Oh God, I am so turned on right now."

From that point on, my conversations and discussions with Mike and David were had out of necessity. I was basically done with them, except that the structure of eXp required a continued relationship in some capacity. In March, my lead teammate decided he was ready to leave my team and go out on his own to be with another agent he had recruited in. When I asked him why, he said it was in part because they knew how I felt about "recruiting" and that Mike and David had convinced them that they should partner together and hire the same recruiter that Mike and David had been using, with Rosie's help (CityBlast). I had tried to explain that this wasn't within the eXp guidelines, but no one really cared what I had to say on the topic. Because of this, I became so incredibly frustrated with the loss of income that I was left with when my teammate left, and I began feeling extremely isolated. I also had a separate conversation with Sam Rodriguez at this point and asked him what the rules were. He verified I was correct, and asked if I would "name names," because it was a fireable offense. But... with

2eXp_004350

Noelle Nielsen – Confidential – eXp Realty

the way that the eXp structure works, this would then leave me without a "functional" organization above me, and put me in a tough spot to "compete" against other well-known lineages at a national level, and made me feel like I didn't want to "turn anyone in."

It was around this same time that it came to my attention, via Megan Farrell-Nelson, that they had also requested her, and then one of her teammates to "score them some cocaine" for when they visited Florida for one of her events. She called me and asked my advice. I asked her if she would be ok with me calling Rosie about this. She said it was fine. So, I called Rosie, and Rosie basically said to me, "oh well, boys will be boys". She never would take a position when they "misbehaved." In that same conversation, she also offered to pay for a free month of recruiting for me ($1000 worth). I again said I had no interest in that. Next, I called Rick Geha. Rick didn't really want to discuss their behavior either, but instead wanted to "coach me" on team growth, which at the time was not at all what I needed or wanted. I also talked to Rick about the recruiting situation, but he did nothing about it, to my knowledge. And then, finally, I called Brent Gove. Brent listened, but offered no solutions or help, and was in fact "late for a tee time" and didn't have very much time to talk through the issues I was experiencing with my "upline".

During all of this time, Mike and David also kept the women in their group from talking with one another. They would say things on phone calls and in Marco Polos that would cause the women to believe they did not care for one another. They definitely did this between Megan, Julie O'Dell, Tami Edwards, and I. I now believe it was because they did not want us to speak with each other or compare the stories of their manipulation and honestly, mental (and physical) abuse.

However, many of us started talking as Casey Geha started running a women's group, on Rick's behalf, because they were starting to have serious turnover of women within the organization. On one of these calls, before I knew about the events of the Vegas weekend, Casey had asked what our problems with growth were... and I had responded "My Sponsors". At this point, Casey got mad, and grilled me in front of the group, and essentially told me that I was my own problem and that that was my problem with growth, and that I needed to get out of my own way. (She basically "network marketed" me. It's a term I refer to, when I pick up on her strategic lines she's learned. She has done this over and over, and since with Megan on her "situation". I refuse to pick up her calls anymore... and haven't since I stopped using her Nuskin line and she harassed me about it, and wouldn't take no for an answer). Rick oddly, never participated in any of these calls, and really, I haven't heard from Rick since I stopped returning his Marco Polos.

One week later, I received a call from a friend (Aimee Freeman, who I mentioned earlier) saying that she had been alerted by another friend that someone (Christy Lundy) in Vegas had been "drugged"... and then Megan called me to tell me her story of what happened, and then Tami Edwards called me, and slowly all of these bits and pieces started coming together.** Over the next two weeks, I would receive countless calls from people around the country (leaders in the industry) asking what was going on with Mike, David and the crew... asking if I had been hurt,

Noelle Nielsen – Confidential – eXp Realty

and a wide variety of other things. Ironically, I never heard from Mike or David. Rosie attempted to call me, but after hearing that she had told Megan that Megan had "made a mistake while drinking", and basically gave Megan the same type of response that she had been giving me all along, I decided it would not be helpful to have any conversations with her and I would not trust her to keep my conversations confidential and from Mike and David... or to lead anyone in my group. I also see that Rosie to this day is still commenting on both Mike and David's posts, and I don't believe she thinks any wrong has been done.

During these many discussions, it was also revealed that Rick physically touched several of the women I have named in this statement ((groping them under the table at a meal... same story with each one of them) although, he never was physically that close to me...). I would never join Rick or Casey within the eXp community, nor would I feel comfortable recruiting to their leadership.

Note** I understand from the Vegas event from August of 2020, based on the descriptions from others (not from my own personal experience) that the following occurred: Mike (and David) are alleged to have drugged many (Megan, Christy Lundy, Mike Henry, and others) on the first evening with "alcohol powder." That they also had other illegal drugs at this event (Cocaine, ecstasy, ghb, etc.). (I also am aware that eXp's position was initially that some illusive hour the event turned into "off-hours"... but when you are recruiting, at an event, in the name of eXp... at what exact hour on the clock does it become personal time/off hours... when the event takes place in a suite and continues in a suite, with people who are subordinate to you, in your organization, and their recruits... where is the line?) Rosie also participated in the behavior happening in the suite, taking drugs and "running around with her shirt off." While hanging out in the suite, during the early morning of that Sunday, Mike pushed Megan into the "massage room" in the suite (while she was so drugged and intoxicated she could not functionally communicate) and he raped her. It's also my knowledge that David brought in a "paid friend" to be a part of the evening activities named "Bounce-house"... who he had call Megan following the weekend's event, to try to convince her about her behavior during the weekend, and try to talk her out of "crying rape" and telling Megan that Megan "gave Mike a blow job the previous evening." Megan received a call from David's girlfriend, who was also at the event, Emily (and who has been a friend to Megan for awhile), telling Megan, that if she told eXp about Mike, or anyone else, it could have a future impact on David's income, and then they would no longer get to go and party and rent suites and travel like they have been. Megan also received a text from Julie O'Dell, that was a screenshot of a conversation she had had with David, saying that David and Megan and David's girlfriend had all previously had sex on a prior occasion. Megan also tried calling Rosie after this happened and Rosie's initial response to her was, "sometimes people make mistakes when they drink... are you sure you didn't just make a mistake?".

It is my belief, that this type of behavior is not an isolated event, but is in fact, by far the opposite, and that in reality, my experience with these people has been the one that was isolated... I believe, I am the lucky one who didn't get raped, or mentally manipulated to participate in some type of orgy or other disgusting behavior. It is their MO to travel together in

9

CONFIDENTIAL

2eXp_004352

Noelle Nielsen – Confidential – eXp Realty

a pack. To get people so intoxicated that they can hardly function, to rent a suite or a house, and to take advantage of them. To video them. To follow up with statements of "you're a whore", "you asked for it", "you drank too much", "you made a mistake", "you know I would never do something like that to you", "you liked it", etc. It is a CLASSIC case of a narcissistic sociopath. I believe both Mike and David fall into this category. They are both clever, witty, cunning, charming, good at getting forgiveness, and able to deflect, redirect, and twist a story to have the desired outcome. I am not sure why Rosie assists with it, except for the fact that they in large part have been her meal ticket with eXp, and she was responsible for bringing in David...and had one-one calls with him every, single day.

My friend Aimee has texts, and I believe Megan does too, from Mike saying "you know I would never do that do you, right?".

I have also heard, that Craig Chastain had accidentally entered a suite (or was asked to leave a suite) in which both Mike and David were having sex with Julie O'Dell (in Vegas). Julie at this stage, has been so mentally manipulated by Mike and David, that she will refuse to talk. No one wants to name her or talk about her, because they are worried she will attempt to make Mike and David "look good." She believes that if she defends Mike, he will leave Ann-Marie and go back to her. It is my understanding that after Julie joined eXp, she quickly had close to 100 agents under her. That she was bright, articulate and bubbly... and since then has become a shell of who she once was. I share this information, because I'm not sure if anyone else will share it with you all. I also want you to understand that it is the structure of the "no switching of sponsors" that puts a woman in this very, very vulnerable position. "Do I tell, and then be forced to stay with the group?" "These people say that they love me, despite how they treat me." "eXp is my family." "If they take my sponsor away from me, then who will I have." "eXp is a culture, a lifestyle." "Everyone loves them, no one will believe me." "Maybe I was too drunk?" "Maybe it was my fault that I was at the event." (I literally have texts from Megan saying this to me.)

The reality for me is... I'm stronger than that. I was fine before eXp... and if I choose it, I can be fine without it. I don't care enough about what these people think they "might do to me" or the loss of their fake friendships, the loss of my own income from eXp, to not tell the truth and share what I know to be true. It really benefits me nothing to share all of this with you all. I seriously could walk away and start something new at this point. In fact over the last few weeks, I have gotten many calls and offers to do just that from the same brokers that wanted to partner with me before this all started. I could run, and just get out of this situation. It's uncomfortable and awkward, and honestly, I'm sure it makes me in some way, look like a fool for joining them, initially believing them, and for staying with them as long as I have. But taking the easy way out, while appealing to me, will leave many woman in vulnerable positions within the eXp's sponsorship structure, susceptible to exploitation. As much as I would like to believe that Mike and David's behavior is unique, I am sure there are others currently with eXp doing the same thing, and I am sure there will be others in the future and discover that the structure permits and fosters exploitation of others.

10
CONFIDENTIAL

2eXp_004353

Noelle Nielsen – Confidential – eXp Realty

It is incredibly noteworthy that I just yesterday learned that Mike Bjorkman called one of my potential recruits (Sevin Murdock out of Colorado) and asked her to write a "letter of good standing" for him, stating that she was "never raped" by him. This is a girl who he had only hung out with once in person (also way back at LCA Live in 2019), and they hardly even knew each other. I am completely appalled at his behavior, and am totally flabbergasted that if he actually was innocent... if they all were innocent... why not reach out to me? Why would none of these people reach out in a more effective manner? It's because they know... that I know.

I hope this brief overview of the last year and a half of basic hell, will give you a better understanding of why I BEG to let my organizational unit be switched. Rape or no rape, these actions are entirely unprofessional and are not acceptable for a respectable brokerage, especially one that is publicly traded. I again, will reiterate... but I will put it more bluntly this time, if I am not allowed to switch, I will effectively be forced to quit. As a shareholder, this obviously puts me in a challenging position. But it is important that if the system is not fixed, that I vocally share the risks of the eXp model in its current form to hopefully prevent others from falling victim as many of my friends have. Unfortunately for eXp, between my various platforms (LCA, Viral Video, etc.) and given the following of my videos online, my leaving eXp after just a year and my reasons for leaving, will not go unnoticed.

As I understand it, the concern with allowing me and others in situations like this to change sponsorship lines is that it would be unfair to others higher up in the structure because they would lose money. Of course, they will also lose money if I leave and if the flaws of the current structure are brought to light. While I can understand the concern to some extent, I would hope that the company would prioritize ensuring healthy agent relationships with their sponsors over the pocketbooks of those highest up in the company. As shareholders, we are all entitled to fair treatment. The expectation should be set that if one of your sponsees goes off the rails or is asked to leave the company, you may lose the entire organization under that sponsee.

eXp has the potential to be amazing and I would love to play a role in helping it reach its potential. But as long as agent-leadership is in a position to abuse their power, with no remedy for those underneath them, it will never be able to excel to a position of respectability within the real estate world. There will always be Mike Bjorkmans and David Goldens who want to party and take advantage of the people below them. There will always be Rosie Rodriguez's who won't say boo, because they care too much about their pocketbooks and keeping the people underneath them going, and/or quiet. And it will be for those "people" who don't have a voice, that I will speak up about why the "structure" cannot work. Do the right thing here. Stop the abuse of power within the system and create a playing field where, if penalties are earned, they are actually served.

CONFIDENTIAL

2eXp_004354

Noelle Nielsen – Confidential – eXp Realty

Just a few of the eXp people who have a story, who should be included in the investigation:

Megan Farrell-Nelson – has the bulk of the knowledge of what has happened at many of the events.

Jesse Zagorsky – has witnessed dark things with his own eyes (including Mike and David with women and illicit drug use)

Mike Henry – drugged in Vegas and has seen things.

Craig Chastain

Tami Edwards – has first-hand knowledge of these behaviors (and left eXp because of them)

And Julie O'Dell. Reach out to Julie O'Dell.

12

CONFIDENTIAL

2eXp_004355

When three female real estate agents who use our services first approached our leadership team to describe horrific details of sexual assault by another independent real estate agent, to which leadership was previously completely unaware, we immediately investigated, separated from our contractual relationship with the alleged abuser, and worked to accommodate the real estate agents' requests, which included moving them to different teams within our organization. eXp immediately terminated our contract with the alleged abuser based on the allegations. The allegations presented serious, credible, and extreme violations of the policies, values, and mission of the company and its leadership. The claims in this case stem from alleged assaults by independent real estate agents who were never eXp employees—which we handled with speed, seriousness, and deep respect as soon as the accusers brought it to our attention, in line with our values and with the law. eXp's investigation into new claims led to eXp taking corrective action against another male agent.

eXp hopes and trusts the court will give a full and fair hearing to the plaintiffs as they pursue claims against the individuals who allegedly assaulted them. However, the claims against eXp and its leadership have no basis in fact or law, and to which eXp vehemently denies. The court has dismissed some claims and we are prepared to present and defend our position on the others.

Separately, an eXp agent notified the company about another agent who had been allegedly assaulted in May 2023. The alleged assaulter was not an eXp agent or employee and the assault did not occur at the eXp event location. eXp took immediate action, flying the agent's family in to be with her, covering her expenses, and banning the alleged assaulter from any eXp event.

We recently learned of new allegations of alleged assaults that were brought forth by another female agent and have begun an investigation into the claims.

The experiences these women shared are abhorrent and unacceptable. We have no tolerance for this behavior, and in each case we took swift and appropriate action to provide support and protection.

2eXp_LACERS_000687

**STATE OF NEVADA**
**DEPARTMENT OF BUSINESS AND INDUSTRY**
**REAL ESTATE DIVISION**
3300 W. Sahara Ave., Suite 350, Las Vegas, Nevada 89102
(702) 486-4033 / realest@red.nv.gov / http://red.nv.gov/



## REAL ESTATE TERMINATION FORM

**All sections must be completed by broker or authorized signer except for item 4.**
**Form will be voided and returned to the broker if all sections are not completed.**

### 1. LICENSEE INFORMATION:

Termination Date: 05/10/2023

First Name: David          Middle Name: _____          Last Name: Golden

License Number: S.0057742.LLC

Residence Address: 2700 Las Vegas Blvd S 1110

City: LAS VEGAS          State: NEVADA          Zip: 89109

Phone Number: (702) 469-3402

### 2. REASON FOR TERMINATION OF EMPLOYMENT:

☑ CIRCUMSTANCES:

Terminated from eXp for being out of compliance with the MLS

☐ DECEASED: Date of decease required: _____

Also attach a copy of an obituary or the certificate of death.

### 3. SIGNATURE OF BROKER, DEVELOPER OR AUTHORIZED SALESMANAGER:

Name of Business: eXp Realty LLC          License Number: B.0144881

First Name: Spencer          Middle Name: _____          Last Name: Walden

Signature: _S. W.ll_

### 4. SIGNATURE OF LICENSED SALESPERSON OR BROKER SALESPERSON:

Signature of Licensee Named in Section 1: _____          Date: _____

### 5. HAND DELIVERY PERMISSION:

_____ has permission to hand carry license to the Real Estate Division.

Signature (Broker Authorized Broker-Salesperson): _____

Revised 6/18/2021          Page 2 of 2          505







Termination Date: 05/10/2023
License Number: S.0057742.LLC
Address: 2700 Las Vegas Blvd S 1110, Las Vegas, NV 89109

David Golden,

The Division requires this letter to be sent to notify you have been terminated from eXp Realty and your license is/has been returned to the Division.

You must continue to cease any and all real estate activities under eXp. These activities include, but are not limited to, showing properties, conversing with current or prospective clients, and hosting open houses. Any active listings and/or open contracts shall be immediately assigned to another agent.

The State Department of Licensing deems it a serious offense to practice real estate without an active license. eXp Realty LLC is hereby held harmless against any actions taken by you in the future.

Sincerely,

Spencer Walden

Designated Managing Broker
License # B.0144881 LLC
EXP Realty LLC

# REAL ESTATE LICENSE

## STATE OF NEVADA DEPARTMENT OF BUSINESS AND INDUSTRY

NOT TRANSFERABLE                   **REAL ESTATE DIVISION**                   NOT TRANSFERABLE

This is to Certify That: DAVID S GOLDEN                    License Number: S.0057742.LLC

Is duly authorized to act as a real estate  SALESPERSON
from the issue date to the expiration date at the business address stated here in, unless license is sooner revoked, cancelled, withdrawn, or invalidated.

Issue Date: November 15, 2022                    Expire Date: September 30, 2024

In Witness Whereof, THE DEPARTMENT OF BUSINESS AND INDUSTRY REAL ESTATE DIVISION, by virtue of the authority vested in Chapter 645 of the Nevada Revised Statues, has caused the license to be issued with its Seal printed thereon. This license must be conspicuously displayed in place of business

FOR:  EXP REALTY LLC                    REAL ESTATE DIVISION
      10845 GRIFFITH PEAK DR #2
      LAS VEGAS, NV  89135

                    SHARATH CHANDRA
                    *Administrator*

## EXHIBIT I

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1      Q    How about -- well, let me ask you, what is

2      your role as a broker in the oversight of an agent,

3      if anything?

4      A    Agents are independent contractors.  My

5      role is -- has to do with the regulatory end of

6      things.

7      Q    Is it your testimony, Ms. Penny, that as a

8      broker, your only oversight over an agent is

9      related to the regulatory issues regarding an

10     agent?

11              MR. PALLARES:  Objection.  Form.

12              Go ahead.

13              THE WITNESS:  Yes, that's what I deal with

14     on a day-to-day basis.

15     BY MS. LENZE:

16     Q    Your testimony, Ms. Penny, is that as a

17     broker in California, your oversight includes

18     making certain that the California real estate laws

19     and business and profession codes are upheld, true?

20              MR. PALLARES:  Objection.  Form.

21     Misstates.

22              THE WITNESS:  True.

23     BY MS. LENZE:

24     Q    Your role, Ms. Penny, as a California

25     broker is to oversee transactions between a real

Page 34

```
1        estate agent and a client, correct?

2            A    Correct.

3            Q    And your role as a broker in California is

4        to oversee compliance with transaction, correct?

5                MR. PALLARES:  Objection.  Form.

6                Go ahead.

7                THE WITNESS:  Correct.

8        BY MS. LENZE:

9            Q    It's your testimony, Ms. Penny, that as a

10       broker, you have no obligations to oversee agents

11       in any other capacity, true?

12               MR. PALLARES:  Objection.  Form.

13               THE WITNESS:  Correct.

14       BY MS. LENZE:

15           Q    What made you interested in -- in becoming

16       not just a real estate agent but transitioning into

17       a broker?

18           A    That's an interesting question.  I knew

19       that I didn't want to sell homes forever, and I

20       like the management end.  I like delving into the

21       transactions themselves and helping agents with

22       those.

23           Q    Did becoming a broker place more

24       responsibility on your shoulders than as a real

25       estate agent?
```

Page 35

1      narrative from the complainant?

2           A     That if we ever had an issue of a personal

3      nature as opposed to a transactional.

4           Q     It was your understanding, Ms. Penny, that

5      Mr. Marquez trained you that if there were ever

6      issues of a personal nature of an agent, to ask for

7      a written narrative?

8           A     To ask for a written narrative, yes.

9           Q     Besides forwarding that narrative to at

10     the time the designated broker or if you were the

11     designated broker to the regional director yourself

12     or Agent Compliance, did you do anything else with

13     that written narrative?

14          A     No.

15          Q     Did you receive any training into how to

16     ask for that written narrative?

17                MR. PALLARES:  Objection.  Form.

18                THE WITNESS:  It would have been very cut

19     and dry, "Ask them for written detailed narrative

20     and forward it on."

21     BY MS. LENZE:

22          Q     Did you have phone conversations with the

23     agent who was complaining about reports of sexual

24     misconduct, let's say?

25                MR. PALLARES:  Objection.  Form.

                                              Page 70

1            THE WITNESS:  If an agent called in or

2       e-mailed or sent something Workplace Chat, I deal

3       with standard protocol, "Please put this in writing

4       and get it -- get it to me.  I will get it to the

5       proper departments."

6       BY MS. LENZE:

7            Q    Did you make any determinations, following

8       the receipt of a narrative, related to the

9       allegations?

10           MR. PALLARES:  Objection.  Form.

11           THE WITNESS:  It -- I don't have that

12      authority.

13      BY MS. LENZE:

14           Q    Did you at any point as managing broker or

15      designated broker have authority to instruct an

16      agent complaining about sexual misconduct by

17      another agent to require them to go make a police

18      report?

19           A    That would be standard as well.

20           Q    So standard procedure for you as both

21      managing broker and designated broker at eXp Realty

22      of California, Inc. was to ask for a written

23      narrative and tell the person complaining of sexual

24      misconduct by another agent to go make a police

25      report?

                                                    Page 71

```
 1                  MR. PALLARES:  Objection.  Form.
 2                  THE WITNESS:  Every year they put out
 3      information and they have an agent safety month,
 4      and during that time we make sure that we add in
 5      that information to our meetings as a reminder to
 6      agents, because sometimes you get so used to doing
 7      what you do on a daily basis and you might become a
 8      little complacent.
 9      BY MS. LENZE:
10           Q    Ms. Penny, it's your testimony that you
11      added in information related to sexual harassment,
12      sexual misconduct training from NAR and CAR into
13      your agent safety month?
14           A    That is not --
15                  MR. PALLARES:  Objection --
16                  THE WITNESS:  Oh, sorry.
17                  MR. PALLARES:  Objection.  Form.
18                  Go ahead.
19                  THE WITNESS:  That is not correct.  Agent
20      safety in general.
21      BY MS. LENZE:
22           Q    Did that agent safety month -- strike
23      that.
24                  In that agent safety month, did you
25      yourself ever include any information related to
```

Page 78

```
 1        sexual harassment or sexual misconduct training to

 2        your agents?

 3                 MR. PALLARES:  Objection.  Form.

 4                 THE WITNESS:  That's outside my realm.

 5        BY MS. LENZE:

 6            Q    Is that a "no"?

 7            A    That is correct, that is a "no."

 8            Q    So just so I'm clear, Ms. Penny, you

 9        yourself as an employee received training in terms

10        of sexual harassment training through a module,

11        correct?

12            A    Correct.

13            Q    You yourself in your role as a broker

14        received training related to the reports of sexual

15        harassment or sexual misconduct from Ray Marquez,

16        correct?

17                 MR. PALLARES:  Objection.  Form.

18                 THE WITNESS:  Correct.

19        BY MS. LENZE:

20            Q    And Ray Marquez taught you that with

21        report -- with any reports of a personal nature,

22        including sexual harassment or sexual misconduct

23        between agents, you were to ask for a narrative and

24        ask for the complainant to file a police report,

25        correct?
```

Page 79

1          And then they take it from there.  That is

2     outside our realm because, as I said earlier, our

3     role as brokers is for transactional and regulatory

4     compliance.

5          Q    Do you as a broker have any responsibility

6     over the agents underneath you with respect to

7     ethics training?

8          A    They're independent contractors and they

9     are required by the State of California to receive

10    ethics training once every three years.  Ethics

11    training is also part of a license renewal.  That's

12    one of the classes.  That's how they get that

13    training.

14         Q    Do you as a broker overseeing those agents

15    have any obligations to make certain that the

16    agents underneath you receive that training?

17              MR. PALLARES:  Objection.  Form.

18              THE WITNESS:  If they don't take their

19    code of ethics training, we are alerted by the

20    Association of Realtors, and if they don't -- don't

21    get their training in, they might be severed.  The

22    State would require -- California Association would

23    require that we sever them if they don't renew that

24    training.

25    BY MS. LENZE:

Page 81

```
 1          and -- and speak.  It would have different

 2          speakers.

 3               Q    Did anybody speak at that meeting about

 4          the brokers receiving complaints of sexual

 5          misconduct, sexual harassment?

 6               A    I don't recall.

 7               Q    Did Ms. Onnen attend those meetings?

 8               A    Yes.

 9               Q    How often, if you recall?

10               A    She was more than likely in all of them

11          for a while.

12               Q    Did you work closely with Ms. Onnen?

13               A    No.  Different -- different area.

14               Q    Do you know Glenn Sanford?

15               A    Personally, no.

16               Q    Okay.  Have you had any discussions with

17          Mr. Sanford about the facts and circumstances that

18          we're here about today?

19               A    No.

20               Q    Have you had any discussions with

21          Ms. Onnen about the facts and circumstances we're

22          here about today?

23               A    No.

24               Q    Now, this broker's book, as you sit here

25          today can you provide any estimate whatsoever about
```

Page 89

```
 1              THE WITNESS:  Code of ethics, code of
 2      conduct, they're -- we -- we uphold the code of
 3      ethics, yes, because we are all -- what makes us
 4      realtors is being a member of National Association
 5      of Realtors, and as such, we agree to uphold the
 6      code of ethics.
 7      BY MS. LENZE:
 8          Q    Do those code of ethics set forth anything
 9      about realtors' conduct towards one another?
10          A    Yes.  Could I name chapter and verse?  No.
11          Q    Okay.  You agree -- turning to paragraph 3
12      under that section, Code of Conduct, that "eXp has
13      a commitment to ensure the brokerage is free from
14      negative, aggressive and inappropriate behaviors,
15      and that the environment is aimed at providing an
16      atmosphere upholding our core values"?  Do you see
17      that?
18          A    Yes.
19          Q    Did you review that upon joining -- well,
20      strike that.
21              Did you come to learn that upon reviewing
22      these November 2018 policies and procedures?
23          A    I've always known that there's a code of
24      conduct that we should adhere to.
25          Q    And in fact, if you turn to page 3,
```

Page 91

1    limit- -- strike that.

2            You understood that this included but was

3    not limited to verbal, physical or sexual, correct?

4        A    Correct.

5        Q    And you understood that all reported or

6    suspected occurrences of harassment would be

7    promptly and thoroughly investigated, true?

8        A    True.

9        Q    And you understood that any agent that was

10   found to have harassed another agent, employee,

11   client, customer or any member of the public shall

12   be immediately and without warning released from

13   the company at the company's sole discretion,

14   correct?

15       A    Correct.

16       Q    And you as a broker could make a

17   recommendation of such, true?

18       A    I can get -- voice my opinion.

19       Q    And you understood, at least as of

20   November 2018, that if an agent felt that they had

21   been harassed in any way, the agent was to notify

22   the state broker, parentheses brokers, or a member

23   of the corporate team immediately, true?

24       A    True.

25       Q    You understood that the company would not

Page 93

```
 1          permit or condone any acts of retaliation against

 2          anyone who filed harassment complaints or

 3          cooperates in the investigation of the same,

 4          correct?

 5               A    True.

 6               Q    You understood at least as of November

 7          2018 that agents who felt they had been harassed

 8          were supposed to come to the state broker and

 9          report, correct?

10               A    Correct.

11                    MR. PALLARES:  Objection.  Objection to

12          form.

13          BY MS. LENZE:

14               Q    And your testimony as we sit here today is

15          that the training you received in -- in -- in

16          receiving those reports was that you were to ask

17          for a personal narrative and advise that they

18          report to the police department, correct?

19               A    If an agent came to me with -- with a

20          complaint of that nature and they felt threatened,

21          file a police report, and provide us with your

22          written detailed narrative so that we can get it to

23          the correct department.

24               Q    Turning to page 24, if you could, please,

25          Ms. Penny.  It says Contacting The State Brokers.
```

                                                    Page 94

```
 1                    "Did you have any role as either a

 2                     managing broker or a state designated

 3                     broker in informing agents related to

 4                     this specific sexual harassment

 5                     policy located in Exhibit 3?")

 6               MR. PALLARES:  Do you understand the

 7      question?

 8               THE WITNESS:  No, I don't.

 9      BY MS. LENZE:

10          Q    Okay.  Did you in your role as a managing

11      broker or designated broker --

12          A    Uh-huh.

13          Q    -- train agents related to the harassment

14      policy in Exhibit 3?

15          A    I would not personally do the training of

16      such a thing.

17          Q    Do you know if anyone at eXp did?

18          A    I don't know.  I do know that if -- as I

19      said before, if someone came forward with an issue,

20      then we would definitely make sure that they knew

21      the steps to take.

22          Q    If somebody had already come to you, true?

23          A    If someone came to us, yes.

24          Q    Do you have any knowledge about agents

25      being informed about the requirement to take
```

Page 97

1    harassment complaints to their state brokers?

2        A    When an agent onboards with eXp, they are

3    given a copy of the policies and procedures, and by

4    signing, they're stating that they have received

5    them and acknowledge that they have read them or

6    will read them.  So they are provided with them,

7    and as independent contractors it is their

8    responsibility to follow through to read.

9        Q    I understand what you're saying,

10   Ms. Penny, that as part of signing on, an agent is

11   given the policies and procedures and signs on that

12   they have acknowledged and read them, true?

13       A    True.

14       Q    Are you as you sit here today, as the

15   designated broker of California, aware of any

16   specific training that eXp provides to their agents

17   regarding the reporting of sexual harassment and

18   sexual misconduct?

19            MR. PALLARES:  Objection to form.

20            THE WITNESS:  I am not.

21   BY MS. LENZE:

22       Q    Turning to -- well, let me ask this before

23   we move on:  What is your understanding of your

24   role, whether as managing broker or designated

25   broker for California, in the vetting of new agents

Page 98

1    coming on to eXp?

2        A    As far as vetting agents, in the

3    onboarding process, the onboarding team pulls their

4    DRE license information.  They're checking to make

5    sure that they are licensed, first of all; that

6    that license is valid, that it has not expired; and

7    if there's any kind of restriction on that license

8    or -- it wouldn't even have to show as restricted.

9    If there's anything that shows up in the Comments

10   section, they would flag it and reach out to the

11   designated broker so the designated broker would

12   have the opportunity to take a look at that.

13        Sometimes there is a hyperlink for a

14   complaint that was filed, the decision reached.

15   And so at that point the designated broker does

16   have the opportunity to reach out to the agent to

17   get more information and potentially to say "We're

18   going to pass.  We're not going to bring you

19   onboard."

20        Q    When you say a hyperlink for a complaint

21   that was filed, do you mean with the DRE?

22        A    Yes, because the DRE requires Live Scan,

23   fingerprints.  They do background checks.

24        Q    Is there any part of the vetting process

25   that you're involved in that goes beyond checking a

Page 99

```
 1          Q    And all of those things you're describing
 2     would show up from a review of the DRE website,
 3     correct?
 4          A    Correct, their license on the DRE website.
 5          Q    Is there any other process that you're
 6     involved in as a state broker in the vetting of
 7     potential new agents to eXp?
 8          A    No.
 9          Q    Are there any actions you would take as a
10     state broker of California, whether managing broker
11     or designated broker, if a potential new agent's
12     name came across your desk, came into your
13     knowledge, and you knew that agent was a risk to
14     other agents that you supervise, would action then
15     be required on your part?
16               MR. PALLARES:  Objection.  Form.
17     Incomplete hypothetical.
18               THE WITNESS:  If there is nothing on their
19     license, anything else would be possible rumor.  I
20     can't prove anything.
21     BY MS. LENZE:
22          Q    Anything else would be rumor, correct?
23          A    Correct.
24               MR. PALLARES:  Objection.  Form.
25               THE WITNESS:  Or -- I'm sorry -- something
```

Page 101

1          that I can't -- I don't have proof of.

2          BY MS. LENZE:

3              Q    What do you mean when you say "proof"?

4              A    I have nothing in writing in front of me

5          showing that there was any kind of a conviction,

6          complaint, that the DRE is flagging that would

7          cause them to be a concern with regard to the

8          issuance of a license or to be brought onboard.

9              Q    But how about a scenario where there were

10         complaints of let's say sexual misconduct of a

11         potential new agent and -- and you as a broker

12         understood that there were these complaints related

13         to sexual misconduct against that potential eXp

14         agent, does the vetting process, in your role as a

15         broker in the vetting process, require you to do

16         anything in that instance?

17             MR. PALLARES:  Objection.  Form.

18         Incomplete hypothetical.

19             THE WITNESS:  I have to look at what's in

20         front of me in writing.

21         BY MS. LENZE:

22             Q    What if there was a complaint of sexual

23         misconduct --

24             A    Then show it to me in writing.

25             Q    Let me finish my question.

Page 102

1          Are those training classes what we were

2     discussing earlier today?

3          A     Those training classes will be on various

4     topics, such as listing strategies, working with

5     buyers.  In I believe it's October there will be a

6     class on agent safety, to review what CAR and NAR

7     put out.  And we will have various speakers come in

8     to those classes.  Sometimes it's a class to teach

9     SkySlope, which is our online transaction platform.

10    Things along those -- of that nature.

11         Q     And I believe it was your testimony

12    earlier, Ms. Penny, that the agent safety classes

13    that CAR and NAR puts out that are taught via those

14    trainings do not relate to sexual harassment and

15    sexual misconduct, correct?

16         A     To my memory, no.

17         Q     And as you sit here today, you are not

18    aware of any training that's been provided while

19    you were a managing broker or a designated broker,

20    you're not aware of any training to agents related

21    to sexual harassment or sexual misconduct, correct?

22         A     Correct.  We cannot mandate any classes to

23    an agent because they are independent contractors.

24         Q     Let me ask a different question then.  As

25    you sit here today, you're not aware of eXp even

Page 118

1        A    We made -- we -- brokers as part of

2    oversight with regard to regulatory have an

3    obligation to teach certain classes to make sure

4    the agents are trained in contracts, disclosures,

5    things of that nature.  So the Department of Real

6    Estate has that expectation as part of our

7    oversight.  So for those, it's say -- it's an

8    expectation from the Department of Real Estate.

9        Q    Now, at this time, in January of 2020, the

10    policies and procedures that agents were given with

11    their ICA required if an agent was the recipient of

12    unwanted sexual harassment in the forms we read in

13    the policies and procedures, they were to report

14    that to the state broker or leadership.  Do you

15    recall reading that in the policy and procedures?

16            MR. PALLARES:  Objection.  Form.

17            Go ahead and answer if you understand the

18    question.

19            THE WITNESS:  Yes.

20    BY MS. LENZE:

21        Q    Would it have been something the

22    California brokers' office could do to offer

23    classes similar to those offered in the regulatory

24    context to agents related to sexual harassment and

25    the reporting of sexual harassment and sexual

Page 159

```
 1        misconduct?
 2                    MR. PALLARES:  Objection to form.
 3        Incomplete hypothetical.
 4                    Go ahead and answer if you can.
 5                    THE WITNESS:  That would have been outside
 6        our realm.
 7        BY MS. LENZE:
 8            Q    Understood, Ms. Penny.  And I'm asking I
 9        think a question that's a little bit different.
10                    Would it have been possible?
11                    MR. LEVINE:  This is Levine.  Object to
12        the form of the question.
13                    MR. PALLARES:  So you're thinking -- I
14        thought you were going to continue.  I'm going to
15        object to the form of the question.  Calls for some
16        speculation.
17                    THE WITNESS:  I don't know.
18        BY MS. LENZE:
19            Q    Okay.
20            A    I mean, I...
21            Q    Now -- you can put that one in the pile,
22        Ms. Penny.  I'm going to show you a series of
23        exhibits quickly, but feel free to take your time
24        if you want to take --
25                    THE WITNESS:  Do you want it?
```

Page 160

```
 1                Do you see that?

 2        A     Yes.

 3        Q     And you respond at 4:03:39, "Agents do not

 4   have to complete the sexual harassment courses

 5   because they are not employees."

 6                Do you see that?

 7        A     Correct.

 8        Q     Did you respond "Take that, it's good

 9   information"?

10                MR. PALLARES:  Okay.  You had --

11   objection.  Argumentative.

12                THE WITNESS:  I don't recall.

13   BY MS. LENZE:

14        Q     Well, do you see that response on this

15   document that was --

16        A     I see --

17                MR. PALLARES:  The question is:  Did you

18   respond?

19                And I think she answered it.  She doesn't

20   recall.  So you -- are you asking her to --

21                MS. LENZE:  I --

22                MR. PALLARES:  -- read the document and

23   tell you what the document says?

24                MS. LENZE:  Let me -- let me back up a

25   little bit.
```

Page 169

1          Q    I think we need to unwind that.

2               You testified earlier that if agents had

3     come to you and asked you about taking this

4     CAR-mandated sexual harassment, you would tell them

5     "Take that, that's good information," right?

6          A    I would have said that "You can definitely

7     take it, it's great information to have."

8          Q    Did you respond in that manner to Diem

9     Tryon?

10              MR. PALLARES:  Objection.  Best evidence

11    rule.  Form.

12              Go ahead.

13              THE WITNESS:  Obviously not.

14    BY MS. LENZE:

15         Q    Now, are you aware of California

16    Association of Realtors' position regarding sexual

17    harassment training even for independent

18    contractors?

19              MR. PALLARES:  I'm sorry, objection to

20    form.

21              THE WITNESS:  Ask me the question again,

22    please.

23    BY MS. LENZE:

24         Q    Sure.

25              You've testified that you're aware of

                                              Page 170

1      CAR's position on sexual harassment training for

2      employees, true?

3          A    True.

4          Q    And for teams of agents with five or more,

5      correct?

6          A    True.

7          Q    My question is:  Are you aware of

8      California Association of Realtors' position on

9      that sexual harassment training for independent

10     contractors?

11         A    I am not aware of their stand on that.

12         Q    Are you aware of the National Association

13     of Realtors' position on sexual harassment training

14     even for independent contractors?

15         A    No.

16         Q    We talked a little bit about your

17     disciplinary authority over agents wherein I

18     believe your testimony was that you could offer

19     recommendations, correct?

20         A    I can offer my opinion.

21         Q    And has that ability to offer -- simply

22     offer an opinion related to disciplinary actions

23     against an agent ever changed since June of 2018

24     until today?

25         A    No.

Page 171

```
 1              A     Just, you know, in a social setting to say
 2        "Hi, how are things?"
 3              Q     You said that he at some point in time,
 4        and you don't recall exactly when, you came to
 5        understand that he was very social, correct?
 6              A     Correct.
 7              Q     And you understood very social -- or
 8        strike that.
 9                    Your meaning of very social was that he
10        attended a lot of realtor community gatherings,
11        correct?   "Yes"?
12              A     Yes.
13              Q     Did you understand Michael Bjorkman at
14        that time to drink excessively?
15              A     I became aware that he was a drinker.
16              Q     Do you recall approximately when you
17        became aware of that?
18              A     No.
19              Q     And when you say "he was a drinker," what
20        do you mean by that?
21              A     He would have more than one or two drinks
22        at social events.
23              Q     Prior to let's say 2010, do you ever
24        recall him -- strike that.
25                    Prior to 2010, at these realtor community
```

Page 190

```
 1        A    No.

 2              MR. SCHONFELD:  Same -- same objection.

 3     BY MS. LENZE:

 4        Q    During that time period where Michael

 5     Bjorkman was at Keller Williams and you were the

 6     broker over that Valencia office, did you come to

 7     have an understanding of whether or not there were

 8     any extramarital affairs that occurred?

 9              MR. SCHONFELD:  Form.  Foundation.

10     Relevance.  Lack of admissibility.

11              Go ahead.

12              THE WITNESS:  Yes.

13     BY MS. LENZE:

14        Q    And how did you come to have that

15     understanding?

16              MR. SCHONFELD:  Same objection.

17              THE WITNESS:  I was not in the office when

18     this occurred, but I was told about it from the

19     office manager, that Mike's wife came to the office

20     and they had a shouting argument regarding his

21     extracurricular affair.

22     BY MS. LENZE:

23        Q    Do you know who that was with?

24        A    I don't.

25              MR. SCHONFELD:  Same objection.
```

Page 200

```
 1    end of Media Unit 5.  The time is 4:42 p.m.  We're

 2    off the record.

 3              (Recess taken.)

 4              THE VIDEOGRAPHER:  This marks the

 5    beginning of Media Unit 6.  The time is 5:11 p.m.

 6    We are on the record.

 7    BY MS. LENZE:

 8         Q    Ms. Penny, are you ready to proceed?

 9         A    Yes.

10         Q    Okay.  Before the break, we were talking

11    about a conversation Ms. House had with you about

12    her allegations of rape or potential attempted rape

13    by Michael Bjorkman.  Do you recall that testimony?

14         A    I do.

15         Q    Do you recall ever asking Ms. House to

16    reduce that allegation to writing, to put that in

17    writing?

18         A    What I do know is that I was made aware of

19    the situation, it was something in the past, it

20    wasn't anything that happened during the time that

21    they were with a brokerage that I was broker of,

22    and so that's -- I mean, that's all I can recall.

23         Q    Okay.  And you as you sit here today don't

24    recall -- strike that.

25              You never had any conversations with
```

                                              Page 214

1    the first time you recall being made aware of

2    allegations of sexual misconduct by Michael

3    Bjorkman at eXp?

4          MR. PALLARES:  Same objection.

5          THE WITNESS:  I don't even know how to

6    answer that the way -- the way it's given, so -- I

7    don't know that I found out at eXp.  If we're

8    referring to -- if we're referring to Tamar House.

9    Is that what you're referring to?

10   BY MS. LENZE:

11         Q    That's a great distinction.  And are you

12   making that distinction because of your testimony

13   earlier that you might have found out about -- or

14   strike that.

15         You might have heard from Ms. House at a

16   brokerage prior to joining eXp about her

17   allegations of rape or attempted rape by Michael

18   Bjorkman, true?

19         MR. PALLARES:  Objection.  Form.

20         THE WITNESS:  Because I don't know when I

21   heard that from her.

22   BY MS. LENZE:

23         Q    I want to ask you another question, and I

24   appreciate that clarification and that distinction.

25         Ms. Penny, I'm asking about -- well,

                                                Page 246

FILED

AUG 09 2022

DEPT. OF REAL ESTATE

By _____

1    DIANE LEE, Counsel (SBN 247222)
     Department of Real Estate
2    320 West 4th Street, Suite 350
3    Los Angeles, California 90013

4    Telephone:      (213) 576-6982
     (Direct)        (213) 576-6907
5

6

7

8                BEFORE THE DEPARTMENT OF REAL ESTATE

9                        STATE OF CALIFORNIA

10                              * * *

11   In the Matter of the Accusation of          )    No. H-05279 SD
                                                  )
12       EXP REALTY OF CALIFORNIA, INC.;          )
                                                  )
13                                                )
         DEBORAH LYNN PENNY, individually and as  )
14       designated officer of eXp Realty of California, )
         Inc.;                                    )
15                                                )
         PETER T. MIDDLETON;                      )    FIRST AMENDED
16                                                )
         JOSE SAMANO;                             )    ACCUSATION
17                                                )
         ABE IVAN CAZAREZ;                        )
18                                                )
         CAMILO ANDRES SALDARRIAGA                )
19       ARCHILA; and                             )
20                                                )
         CHRISTINE KFOURY,                        )
21                                                )
22                        Respondents.            )

23        This First Amended Accusation amends the Accusation filed on or about

24   February 23, 2022.  The Complainant, Veronica Kilpatrick, a Supervising Special Investigator

25   of the State of California, for cause of Accusation against Respondents EXP REALTY OF

26   CALIFORNIA, INC. ("EROCI"); DEBORAH LYNN PENNY ("PENNY"), individually and

27

                                    – 1 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

1    as designated officer of eXp Realty of California, Inc.; PETER T. MIDDLETON

2    ("MIDDLETON"); JOSE SAMANO ('SAMANO"); ABE IVAN CAZAREZ ("CAZAREZ");

3    JOSE SAMANO ("SAMANO"); CAMILO ANDRES SALDARRIAGA ARCHILA

4    ("SALDARRIAGA ARCHILA"); and CHRISTINE KFOURY ("KFOURY") (collectively

5    "Respondents"), is informed and alleges as follows:

6                                              1.

7            The Complainant, Veronica Kilpatrick, a Supervising Special Investigator of the

8    State of California, makes this Accusation in her official capacity.

9                                              2.

10           All references to the "Code" are to the California Business and Professions

11   Code, and all references to "Regulations" are to Title 10, Chapter 6, California Code of

12   Regulations, unless otherwise specified.

13

14                        (RESPONDENTS' LICENSE HISTORY)

15                                             3.

16   *EXP REALTY OF CALIFORNIA:*

17           A.      Respondent EROCI is presently licensed and/or has license rights issued

18   by the Department of Real Estate as a real estate corporate broker (license no. 01878277).

19   EROCI was originally licensed as a corporate real estate broker on February 16, 2010.  From

20   on or about February 16, 2010 to November.8, 2015, EROCI was licensed as eXp Realty of

21   Washington, Inc.  EROCI currently has approximately 104 fictitious business names registered

22   with the Department of Real Estate.  Each and every one of these fictitious business names

23   began on or about October 1, 2018 through August 24, 2021.  EROCI currently has

24   approximately 173 branch offices.  EROCI currently has approximately 787 broker associates

25   and 8,326 salespersons.  From on or about December 20, 2018 to the present, PENNY has been

26

27

                                              – 2 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17-2

1    the designated officer of EROCI. EROCI's mailing address has been in San Ramon, California

2    from on or about June 25, 2019 through the present.

3          B.      On or about March 20, 2019, a First Amended Accusation in case no. H-

4    6686 SAC was filed against EROCI and Ramey Joseph Marquez ("Marquez"), a broker and

5    then-designated officer of EROCI (license no. 01800314), as well as Natasha Dee Carlena

6    Davis, a salesperson (license no. 01426736). As more fully set forth in the First Amended

7    Accusation, EROCI was in violation of Code sections 10159.6 (team name and responsible

8    broker's identity) on at least six (6) websites and 10163 (failure to register branch office) for at

9    least seventeen (17) branch offices, and Regulations section 2731 (fictitious business name) on

10   at least twenty-six (26) websites. Also, EROCI failed to notify the Department of Real Estate it

11   had hired five (5) of its licensees. As a result, there was cause to discipline EROCI's license

12   pursuant to Code sections 10177(d) (willful disregard of the Real Estate Law and/or

13   Regulations), 10177(g) (negligence), and 10177(h) (broker supervision). On or about March

14   16, 2020, a Stipulation and Agreement in Settlement and Order was filed for EROCI wherein

15   EROCI's license was suspended with suspension stayed pursuant to certain terms and

16   conditions.

17                                    4.

18         *DEBORAH LYNN PENNY*: Respondent PENNY is presently licensed and/or

19   has license rights issued by the Department of Real Estate as a real estate broker (license no.

20   01022642). PENNY was originally licensed as a real estate broker on June 9, 1992, and has

21   been so licensed since then. From on or about April 13, 1989 to June 8, 1992, PENNY had a

22   salesperson license. At no time has PENNY had a fictitious business name registered with the

23   Department of Real Estate. From on or about December 20, 2018 through the present, PENNY

24   has been the designated officer of EROCI. PENNY's mailing address has been in Orcutt,

25   California from on or about August 21, 2018 through the present.

26                                    5.

27

– 3 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17-3

1    *PETER T. MIDDLETON*: Respondent MIDDLETON is presently licensed

2    and/or has license rights issued by the Department of Real Estate as a real estate broker (license

3    no. 01224842).   On or about April 22, 2005, MIDDLETON was originally licensed as a real

4    estate broker, and has been so licensed since then.   From on or about July 18, 1997 to April 21,

5    2005, MIDDLETON had a salesperson license.   From on or about April 20, 2010 through the

6    present, MIDDLETON has had the fictitious business name of "Middleton and Associates Real

7    Estate."   At no time has MIDDLETON has any other fictitious business name registered with

8    the Department of Real Estate.   From on or about September 17, 2019 through the present,

9    MIDDLETON has been a broker associate with EROCI.   MIDDLETON's mailing address has

10   been in La Jolla, California from on or about May 25, 2010 through the present.

11                                              6.

12   *JOSE SAMANO*: Respondent SAMANO is presently licensed and/or has license

13   rights issued by the Department of Real Estate as a real estate broker (license no. 01745615).

14   On or about April 5, 2011, SAMANO was originally licensed as a real estate broker, and has

15   been so licensed since then.   SAMANO had a conditional salesperson license from on or about

16   June 3, 2006 to December 3, 2007, and then a salesperson license from on or about May 23,

17   2008 to June 22, 2010.   At no time has SAMANO had a fictitious business name registered

18   with the Department of Real Estate.   From on or about December 18, 2020 through the present,

19   SAMANO has been a broker associate of EROCI.   SAMANO's mailing address has been in

20   Anaheim, California from on or about February 24, 2021 through the present; it was in Santa

21   Ana, California from on or about June 3, 2006 to February 23, 2021.

22                                              7.

23   *ABE IVAN CAZAREZ*: Respondent CAZAREZ is presently licensed and/or has

24   license rights issued by the Department of Real Estate as a real estate salesperson (license no.

25   01886832).   CAZAREZ was originally licensed as a real estate salesperson on or about August

26   24, 2010.   At no time has CAZAREZ had a fictitious business name registered with the

27

– 4 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17-4

1   Department of Real Estate. CAZAREZ's sponsoring broker has been EROCI from October 20,

2   2020 through the present. CAZAREZ's mailing address has been in Escondido, California

3   from August 24, 2010 through the present.

                                         8.

5       *CAMILO ANDRES SALDARRIAGA ARCHILA*: Respondent SALDARRIAGA

6   ARCHILA is presently licensed and/or has license rights issued by the Department of Real

7   Estate as a real estate salesperson (license no. 02005935). SALDARRIAGA ARCHILA was

8   originally licensed as a real estate salesperson on or about September 2, 2016. At no time has

9   SALDARRIAGA ARCHILA had a fictitious business name registered with the Department of

10  Real Estate. SALDARRIAGA ARCHILA sponsoring broker has been EROCI from October 2,

11  2020 through the present. SALDARRIAGA ARCHILA's mailing address has been in San

12  Diego, California from on or about June 17, 2020 through the present.

                                         9.

14      *CHRISTINE KFOURY*: Respondent KFOURY is presently licensed and/or has

15  license rights issued by the Department of Real Estate as a real estate salesperson (license no.

16  02091458). KFOURY was originally licensed as a real estate salesperson on or about July 10,

17  2019. At no time has KFOURY had a fictitious business name registered with the Department

18  of Real Estate. KFOURY's sponsoring broker has been EROCI from March 9, 2021 through

19  the present. KFOURY's mailing address has been in Santa Ana, California from on or about

20  December 16, 2019 through the present.

21

22                          (RESPONDENTS' ATTRIBUTED ACTIONS)

23                                       10.

24      Whenever acts referred to below are attributed to EROCI, those acts are alleged

25  to have been done by PENNY, acting by themselves, or by and/or through one or more agents,

26  associates, affiliates, and/or co-conspirators.

27

                                       – 5 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17-5

11.

Whenever acts referred to below are attributed to MIDDLETON, those acts are alleged to have been done by EROCI and/or PENNY, acting by themselves, or by and/or through one or more agents, associates, affiliates, and/or co-conspirators.

12.

Whenever acts referred to below are attributed to SAMANO, those acts are alleged to have been done by EROCI and/or PENNY, acting by themselves, or by and/or through one or more agents, associates, affiliates, and/or co-conspirators.

13.

Whenever acts referred to below are attributed to CAZAREZ, those acts are alleged to have been done by EROCI and/or PENNY, acting by themselves, or by and/or through one or more agents, associates, affiliates, and/or co-conspirators.

14.

Whenever acts referred to below are attributed to SALDARRIAGA ARCHILA, those acts are alleged to have been done by EROCI and/or PENNY, acting by themselves, or by and/or through one or more agents, associates, affiliates, and/or co-conspirators.

15.

Whenever acts referred to below are attributed to KFOURY, those acts are alleged to have been done by EROCI, PENNY, and/or SAMANO, acting by themselves, or by and/or through one or more agents, associates, affiliates, and/or co-conspirators.

///
///
///
///
///
///

– 6 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton, Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17-6

<u>(VIOLATIONS RE: DISCLOSURE, FICTITIOUS BUSINESS NAMES, ETC.)</u>

16.

Incorporated herein are Paragraphs 3 through 15, above.

*MIDDLETON*

17.

From an unknown time to at least May 2021, MIDDLETON's website, www.peteknowsrealestate.com, MIDDLETON used the unregistered fictitious business name of "Pete Knows Real Estate," and failed to provide the real estate license numbers of some of his team members.

18.

From at least March 2021 to today's date, MIDDLETON advertised his real estate services on a large banner on the building at 2949 Garnet Ave., San Diego, CA 92109 visible from the 5 Freeway in a manner that violated Real Estate Law and Regulations. These violations include, but are not limited to the use of the unregistered fictitious business name of "Pete Knows Real Estate," not identifying the team member's name, and his real estate license number was not conspicuous or prominent.

19.

On or about May 7, 2021, Corrective Actions Letters were mailed to MIDDLETON and EROCI. Although some issues were corrected prior to the filing of the original Accusation herein on or about February 23, 2022, the banner described above remained up until on or about March 7, 2022.

20.

From on or about June 10, 2022 through the present, MIDDLETON has used another large banner to advertise his real estate services at the same place as the prior banner described above. This second banner fails to use the full name of at least one of the licensed

– 7 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton, Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

J 7-7

1  members of the team, and MIDDLETON's real estate license number is not displayed in a

2  conspicuous and prominent manner,

3                                                    21.

4           The conduct, acts, and/or omissions of Respondent MIDDLETON as described

5  in Paragraphs 16 to 20, above, are violations of Code sections 10140.6 (disclosure of licensed

6  status (i.e., name and license number) in advertising), 10159.5 (file fictitious business name

7  with county clerk), and 10159.6 (team name requirements), and Regulations sections 2731

8  (shall not use unregistered fictitious business name) and 2773 (license number on solicitation

9  materials), and are cause for the suspension or revocation of all real estate licenses and license

10 rights of Respondent under the provisions of Code sections 10176(a) (substantial

11 misrepresentation), 10177(d) (willful disregard of Real Estate Law and Regulations), 10177(h)

12 (broker supervision), and 10177(g) (negligence/incompetence).

13

14 *SAMANO and KFOURY*

15                                                    22.

16          From an unknown date to at least August 11, 2021, Respondents SAMANO and

17 KFOURY advertised on the website, pwregroup.com, and business cards that had various

18 violations of the Real Estate Law and Regulations.  These violations include, but are not

19 limited to, failing to identify SAMANO and KFOURY's license numbers and employing

20 broker, EROCI, and identifying as a part of "Power Real Estate Group," which is supervised

21 and run by SAMANO, but no one on its team roster has the surname of Power and "Power Real

22 Estate Group" is not a registered fictitious business name under EROCI's license.  Power Real

23 Estate Group is supervised and run by SAMANO.

24                                                    23.

25          The conduct, acts, and/or omissions of Respondents SAMANO and KFOURY

26 as described in Paragraphs 16 and 22, above, are violations of Code sections 10140.6

27

                                                    – 8 –
First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17~8

1  (disclosure of licensed status), 10159.5 (file fictitious business name with county clerk), and

2  10159.7 (fictitious and team names) and Regulations sections 2731 (shall not use unregistered

3  fictitious business name) and 2773 (license number on solicitation materials), and are cause for

4  the suspension or revocation of all real estate licenses and license rights of Respondents

5  SAMANO and KFOURY under the provisions of Code sections 10176(a) (substantial

6  misrepresentation), 10177(d) (willful disregard of Real Estate Law and Regulations), and

7  10177(g) (negligence/incompetence).

8

9  *CAZAREZ*

10                                    24.

11          In at least June 2021, CAZAREZ advertised on his website, thetimeteam.net,

12  which has various violations of the Real Estate Law and Regulations.  These violations include,

13  but are not limited to, using but failing to register the fictitious business name of "The Time

14  Team" with his current broker, EROCI, despite being employed under EROCI from on or about

15  October 20, 2020 through the present.

16                                    25.

17          The conduct, acts, and/or omissions of Respondent CAZAREZ as described in

18  Paragraphs 16 and 24, above, are violations of Code section 10159.5 (file fictitious business

19  name with county clerk) and Regulations section 2731 (shall not use unregistered fictitious

20  business name), and are cause for the suspension or revocation of all real estate licenses and

21  license rights of Respondent under the provisions of Code sections 10176(a) (substantial

22  misrepresentation), 10177(d) (willful disregard of Real Estate Law and Regulations), and

23  10177(g) (negligence/incompetence).

24  ///

25  ///

26  ///

27

– 9 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17-9

1 | *SALDARRIAGA ARCHILA*

2 | 26.

3 | From an unknown time to at least December 2021, *SALDARRIAGA ARCHILA*

4 | advertised on his Instagram page "Camclose52," which had various violations of the Real

5 | Estate Law and Regulations.  These violations include, but are not limited to, failing to disclose

6 | his real estate license number and identify his employing broker, EROCI.

7 | 27.

8 | From an unknown time to at least December 2021, *SALDARRIAGA ARCHILA*

9 | advertised on Facebook page, www.facebook.com/camcloses, which had various violations of

10 | the Real Estate Law and Regulations.  These violations include, but are not limited to, failing to

11 | identify his employing broker, EROCI.

12 | 28.

13 | From an unknown time to at least December 2021, *SALDARRIAGA ARCHILA*

14 | advertised on his website, camestates.com, which had various violations of the Real Estate Law

15 | and Regulations.  These violations include, but are not limited to, failing to disclose his real

16 | estate license number.

17 | 29.

18 | The conduct, acts, and/or omissions of Respondent *SALDARRIAGA ARCHILA*

19 | as described in Paragraphs 16 and 26 to 28, above, are violations of Code section 10159.5 (file

20 | fictitious business name with county clerk) and Regulations section 2731 (shall not use

21 | unregistered fictitious business name), and are cause for the suspension or revocation of all real

22 | estate licenses and license rights of Respondent under the provisions of Code sections 10176(a)

23 | (substantial misrepresentation), 10177(d) (willful disregard of Real Estate Law and

24 | Regulations), and 10177(g) (negligence/incompetence).

25 | ///

26 | ///

27 |

– 10 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17-10

*IN AGGRAVATION*

30.

After the Accusation in case no. H-6686 SAC, as described in Paragraph 3, above, was filed on or about May 15, 2018, the Department of Real Estate found at least three (3) of EROCI's licensees had various compliance violations, including, but not limited to, using unregistered fictitious business names, sending unsolicited text messages without license numbers, and advertising unlicensed branch offices. These licensees include, but are not limited to, broker and EROCI branch manager Aaron Klapper (license no. 01409532), salesperson Michael David Bridges (license no. 01917698), and salesperson Michael Adam Turnquist (license no. 01351911).

31.

Compliance letters regarding the violations described in Paragraph 30, above, were sent to EROCI and the pertinent licensees, and the cases were closed once compliance was met.

(BROKER SUPERVISION AND MISREPRESENTATION: EROCI AND PENNY)

32.

Incorporated herein are Paragraphs 3 through 31, above.

33.

EROCI has had previous license discipline in DRE case nos. H-6686 SAC, in part, on its failure to supervise.

34

Based on the above facts, EROCI did not exercise reasonable control and supervision over the activities conducted by its employees and/or licensees, including, but not limited to, MIDDLETON, SAMANO, CAZAREZ, SALDARRIAGA ARCHILA, and KFOURY, as necessary to secure full compliance with real estate laws, which constitutes a

– 11 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton, Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

*17-11*

1   breach of fiduciary duty with respect to its real estate consumers and clientele, and that EROCI

2   demonstrates a continued and flagrant course of misrepresentation and/or making of false

3   promises through its licensees.  EROCI's conduct and violations are cause for the suspension or

4   revocation of its real estate license and license rights pursuant to Code sections 10176(c),

5   10176(g), and 10177(h) and Regulations section 2725.

6                                              35.

7          Based on the above facts, PENNY did not exercise reasonable control and

8   supervision over the activities conducted by its employees and/or licensees, including, but not

9   limited to, MIDDLETON, SAMANO, CAZAREZ, SALDARRIAGA ARCHILA, and

10  KFOURY, as necessary to secure full compliance with real estate laws, which constitutes a

11  breach of fiduciary duty with respect to its real estate consumers and clientele, and that PENNY

12  demonstrates a continued and flagrant course of misrepresentation and/or making of false

13  promises through its licensees.  PENNY's conduct and violations are cause for the suspension

14  or revocation of his real estate license and license rights pursuant to Code sections 10176(c),

15  10176(g), and 10177(h) and Regulations section 2725.

16

17                                          <u>COSTS</u>

18                                             36.

19         Code section 10106 provides, in pertinent part, that in any order issued in

20  resolution of a disciplinary proceeding before the bureau, the Commissioner may request the

21  administrative law judge to direct a licensee found to have committed a violation of this part to

22  pay a sum not to exceed the reasonable costs of investigation and enforcement of the case.

23  ///

24  ///

25  ///

26  ///

27

– 12 –

First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

17-12

1    WHEREFORE, Complainant prays that a hearing be conducted on the

2    allegations of this Accusation and that upon proof thereof, a decision be rendered imposing

3    disciplinary action against all licenses and/or license rights under the Real Estate Law (Part 1 of

4    Division 4 of the California Business and Professions Code) of Respondents EXP REALTY

5    OF CALIFORNIA, INC.; DEBORAH LYNN PENNY, individually and as designated officer

6    of eXp Realty of California, Inc.; PETER T. MIDDLETON; JOSE SAMANO; ABE IVAN

7    CAZAREZ; JOSE SAMANO; CAMILO ANDRES SALDARRIAGA ARCHILA; and

8    CHRISTINE KFOURY for the cost of investigation and enforcement as permitted by law, and

9    for such other and further relief as may be proper under applicable provisions of law.

10           Dated at San Diego, California: August 8, 2022                              .

11

12                                          *Veronica Kilpatrick*

13                                          Veronica Kilpatrick
                                            Supervising Special Investigator
14

15

16

17

18

19

20    cc:    eXp Realty of California, Inc.
             Deborah Lynn Penny
21           Peter T. Middleton
             Jose Samano
22           Abe Cazarez
             Camilo Andres Saldarriaga Archila
23           Christine Kfoury
             Veronica Kilpatrick
24           Sacto.

25

26

27

                              – 13 –                                        17-13
First Amended Accusation re: eXp Realty of California, Inc., Deborah Lynn Penny, Peter T. Middleton,
Jose Samano, Abe Cazarez, Camilo Andres Saldarriaga Archila, and Christine Kfoury (H-05279 SD)

**EXHIBIT J**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# U.S. Policies and Procedures Manual

**eXp Realty reserves the right to make updates to its policies. When/if updates are made, they will be communicated through Workplace, the eXp News (weekly newsletter) and/or the weekly company meeting. Agent shall have seven days from notice to review changes and seek clarification. At the completion of the seven days, the changes will be deemed accepted.**

## TABLE OF CONTENTS

CORE VALUES..........................................................................................................3
POLICY.................................................................................................................3
PROCEDURES.........................................................................................................3
STATE ADDENDA...................................................................................................4
CODE OF CONDUCT...............................................................................................4
DUTIES AS AN AGENT.............................................................................................5
  Fiduciary.............................................................................................................5
  Cooperation and Compensation.............................................................................5
  License Renewal and State Department of Licensing Rules.........................................5
  Representation.....................................................................................................6
  Forms.................................................................................................................6
  Transaction Files..................................................................................................6
  Earnest Money.....................................................................................................6
  Late Paperwork Submissions..................................................................................6
  Agent-owned Properties........................................................................................7
  Commercial Property.............................................................................................8
  Unauthorized Activities.........................................................................................8
ACCOUNTING AND COMMISSIONS.........................................................................9
  1099.................................................................................................................9
  Commissions and Other Fees From Clients.............................................................10
  Commission Advances..........................................................................................10
  Actions for Unpaid Commissions or Procuring Cause Claims.....................................11
  Referrals Payments and Relocation Companies.......................................................11
ADVERTISING AND MARKETING.............................................................................11
  Listing and Property-related Advertising.................................................................11
  General (non-property related) Advertising.............................................................12
  Signs...............................................................................................................12
  Logo or Company Name.......................................................................................12
  Using Name or Letters eXp in Social Media or Other Online Venues..........................12
  Job Postings......................................................................................................13
  Media Relations..................................................................................................14
  Blogging and Other Social Media Postings.............................................................15
  Social Media Networking......................................................................................15
  Video...............................................................................................................16
REPRESENTATION ON REALTOR ASSOCIATION AND MLS BOARDS...........................16



EXHIBIT 9
WIT: Sanford
DATE: 5/21/25
Judy Bonicelli, RPR, CCR 2322

 **U.S. Policies and Procedures Manual**

Associations of Realtors ..............................................................................16
Multiple Listing Services .............................................................................17
**AGENT ATTRACTION**................................................................................**17**
Agent Attraction Universal Pledge & Certification Course .........................17
Sponsorship Requests from Vendors.........................................................18
Avoiding Stock Solicitations........................................................................18
**COMPANY INFORMATION AND TOOLS** ..................................................**19**
Company Communication / Training Platform ............................................19
Email Facilities............................................................................................19
**EXPAND MENTORING PROGRAM**............................................................**19**
**LEGAL, INSURANCE and LAW COMPLIANCE** .........................................**19**
Antitrust......................................................................................................19
Conflicts of Interest....................................................................................19
Cyber Liability Insurance ............................................................................20
Data Security and Client Privacy ................................................................20
Do Not Call Rules .......................................................................................20
Drones ........................................................................................................20
Drug and Alcohol Use.................................................................................20
Errors & Omissions Insurance ...................................................................21
Harassment.................................................................................................21
Intellectual Property Rights ........................................................................21
Judgments ..................................................................................................21
Non-solicitation ..........................................................................................21
Reporting Problems....................................................................................22
**OFFICE POLICIES**....................................................................................**22**
Agent Business Expenses ..........................................................................22
Assistants - Unlicensed..............................................................................22
Assistants - Licensed..................................................................................23
Associations and Board Memberships .......................................................23
Contact Information ....................................................................................24
Contacting the State Broker(s)...................................................................24
ICON Agent Award .....................................................................................24
Open Houses ..............................................................................................25
Out of Town or Unavailable ........................................................................25
Physical Office Space .................................................................................25
Teams .........................................................................................................25
**OMISSIONS FROM POLICY MANUAL** .....................................................**26**
**POLICY AND PROCEDURE UPDATE AND REVIEW**...................................**26**
**TERMINATION** .........................................................................................**27**

 | **U.S. Policies and Procedures Manual**

## CORE VALUES

eXp Realty is a global community designed and powered by our agents and partners, transforming the real estate experience. At the heart of eXp Realty lies our core values. Created together with agents and staff, our nine core values are beliefs that support our vision and shape our culture — both professionally and personally. We use these core values every day to stay aligned.



## POLICY

It is the policy of the Company to participate in a real estate activity only when it is legal, honest, fair and beneficial to us and others. In pursuit of compensation for ourselves, we will never ignore the benefit of our community. Therefore, we will conduct our business in a manner to follow all the laws and rules of our profession. We pledge to exercise the highest standard of ethics, honesty, fairness and professionalism in all our real estate activities.

## PROCEDURES

As an independent contractor and agent with the Company, agent is are expected to adhere to and abide by the Policies and Procedures set forth herein. Failure to adhere to the Policies and Procedures could result in legal and regulatory liability for the agent and Company. Therefore, agent agrees that if they depart from the Policies and Procedures, they will defend, indemnify and hold the Company, and its principals and affiliates harmless against any and all claims, complaints or actions that may arise from such a departure. In addition, failure to comply with

 | **U.S. Policies and Procedures Manual**

this Policy is grounds for the immediate release of agent's license and removal from the Company.

This manual provides detailed guidelines for the Company's policies and procedures; however, there may be some circumstances or issues that are not addressed. In those instances, decisions and actions taken will reflect our core values.

This Policies and Procedures Manual is incorporated into and is made a part of each of the Independent Contractor Agreement that agent entered into as part of the process of associating with the Company. As well, agent's right to be compensated for their work, activities on behalf of the Company, revenue share and stock may be adversely affected by any failure on agent's part to carry out, adhere to and otherwise support and fulfill the provisions of those agreements or these Policies and Procedures.

## STATE ADDENDA

This Manual is designed to address nationwide policies and procedures applicable to all agents in all states in which the Company does business. It is impracticable to address the peculiarities of state and local requirements in the body of this Manual, particularly the responsibilities of agents to principals and the public. While it is each agent's obligation to be fully familiar with and fully comply with state and local law pertaining to the providing of real estate brokerage services, the Company offers additional state addenda where necessary, to address many, but not all, state and local requirements. The state addendum, if applicable, will be a critical part of this Manual and, to the extent, it is inconsistent with this Manual, it supersedes it.

## CODE OF CONDUCT

All agents shall conduct their business in alignment with the Company's core values, the National Association of Realtors® Code of Ethics, and in accordance with applicable federal and state laws. Agents should conduct themselves in an appropriate business-like manner in all activities and relations with fellow agents, clients, potential customers and Company staff.

Any agent whose conduct, actions or performance violates or conflicts with the Company's policies herein or the Company's core values may be released from the Company immediately and without warning.

It is the commitment of the Company to ensure the brokerage is free from negative, aggressive and inappropriate behaviors, and that the environment is aimed at providing an atmosphere upholding our core values. All agents and employees of the Company have the right to be treated with dignity and respect. All complaints of negative and inappropriate behaviors will be taken seriously and followed through to resolution. Agents or employees of the Company who file complaints will not be victimized for "whistle-blowing" or reporting others for their inappropriate behavior.

Agents, as members of the National Association of Realtors®, are required to maintain their required ethics training. Failure to complete the course will result in suspension or termination of membership and removal from the Company.

**U.S. Policies and Procedures Manual**

Agents are expected to become familiar with and adhere to the National Association of Realtors® Pathways to Professionalism found on their website.

Also, agents shall not disparage the conduct, reputation or character of another agent or the Company, whether that agent is with this company or another office.

Agents are subject to immediate termination for violation of the Code of Conduct.

# DUTIES AS AN AGENT

### Fiduciary

The agent and all licensed assistants shall abide by their fiduciary responsibilities when acting as an agent for a client. The agent owes the client the fiduciary duties of obedience, loyalty, disclosure, confidentiality, accounting, reasonable skill and care. Agents shall also deal fairly with all parties to a transaction.

The agency relationship with any party with whom agent is working must be established in writing on a form acceptable to the state broker(s) before an offer on a property is written. The failure to establish and disclose the type of relationship one has by the time of contract is unacceptable. The contract is to serve only as a confirmation of an election made by the buyer/lessee or seller/lessor in separate written agreement before the contract is written.

### Cooperation and Compensation

As a matter of policy, the Company does not offer cooperation or compensation to sub-agents.

An agent exclusively representing a buyer shall not, under any circumstances contact a seller directly without first obtaining the express consent by the listing broker and state broker(s). The exception to this policy being for sale by owner properties.

All agents shall offer compensation to cooperating real estate professionals in their MLS who work with potential buyers of the Company's listed properties and such compensation shall be offered equally and without discrimination.

### License Renewal and State Department of Licensing Rules

Agent agrees to maintain an active real estate license with the State Department of Licensing. It is the agent's sole responsibility to fulfill all continuing education requirements and file their renewal promptly and be aware of their licensing status with the State Department of Licensing. The Company may, at its sole option, sever the agent's license with the Company if the agent's license is not renewed on time.  Failure to renew can have severe financial impacts on the agent. Commissions are subject to forfeiture for any unlicensed real estate activities after expiration/revocation of agent's license.

Agents agree to adhere to all state and federal licensing rules and regulations. It shall be the agent's responsibility to be knowledgeable about the rules set forth by their State Department of Licensing. Should a complaint be filed against an agent, agent agrees to immediately notify the Company via their state broker, respond promptly to the complaint, and cooperate fully with the State Department of Licensing.

 | **U.S. Policies and Procedures Manual**

### Representation

Agents are not authorized to bind or obligate the Company to any agreement, promise or representation other than a witness to normal business practice in real estate such as listings, purchase contracts, amendments, addendums or any other form pertaining to a transaction which is processed and subject to the approval of the Company.

### Forms

Agent must use the forms which are customary to the MLS or REALTOR® Board of which the agent is a member. These forms are normally provided via some sort of MLS or Board intranet. Documents created for a special situation must be reviewed and approved by their state broker(s) prior to execution. Many Company forms will be found within the transaction management system currently used.

## Transaction Files

### Executed Real Estate Agreements

The state broker(s) has a supervisory responsibility by law and must comply with the State Licensing Department's rules. All purchase and sale agreements, listings, referrals and any other transactional documents must be uploaded into the transaction management system within two business days of execution. Please refer to the transaction checklists provided in each state.

Transaction files should include all documents related to the transaction and any and all correspondence, notes, email communications, text messages, etc. Agents are encouraged to make copies of their files. The Company reserves the right to maintain digital files in storage for the statutory period as required by the State licensing departments. Unauthorized removal of any file from the transaction management system may lead to termination.

Agents are expected to transact ALL real estate business through the Company. Transactions that are processed outside of the Company shall be grounds for immediate termination.

### Earnest Money

Earnest money shall be handled as described in state-specific policies and procedures addendum. The agent will be subject to immediate termination if it has been determined that there has been any improper handling of earnest money.

All files must contain an accounting for disbursement of funds including earnest money and final settlement statements.

Once a customer or client has signed a document, they are entitled to and shall, therefore, receive a copy of the document upon its execution. You are encouraged to send follow-up copies to them even if agent has already physically delivered the document to them.

### Late Paperwork Submissions

Completing and uploading documents file(s) outside company timelines is a violation of company policy and subject to an escalating fine and removal from the Company at the discretion of the state broker(s) as outlined below.

# U.S. Policies and Procedures Manual

A fine of $150 shall be assessed for documents uploaded later than 10 calendar days after execution.

Any files with documents uploaded after 30 days of escrow closing are subject to a fee totaling 25% of the gross commission.

Any files with documents uploaded after 60 days of escrow closing are subject to a fee totaling 50% of the gross commission.

Any files with documents uploaded after 90 days of escrow closing shall have the entire gross commission forfeited.

Any files that did not close and reached termination through expiration, cancellation, withdrawal or anything of the type that are not closed out in SkySlope with all state broker required documentation will result in commissions being held on any new closings until the old files are cleared up. Late fees as outlined above still apply.

Any investigation and discovery made by the state broker(s) for compliance with laws because of agent negligence will be reason for an additional charge by Company at Company's sole discretion.

Files uploaded at any time other than outlined above is not acceptable and will result in either a delay of commission processing or a fine, or both.

## Agent-owned Properties

Agent shall execute the Owner/Agent Disclosure of Personal Interest form with each agent-owned property.

Agents shall never act as a principal in a transaction without the full written consent of all parties.

A single agent may not represent both sides of a sales transaction if the agent or a family member of the agent is a principal or party to the transaction.

Agents shall not enter into a contract to sell or flip a property until the agent holds title to the subject property after a conventional closing thereon. Agent agrees that agent shall never act as a "middleman" in a real estate transaction.

The property must receive a professional home inspection that is delivered to the buyer.

The agent must provide the buyer with a standard home warranty, from a company of buyer's choice, at the expense of the agent.

All seller disclosures must be made regarding any property defects or material information.

The parties must use standard forms and sales contracts.

Any work completed on the property that requires a permit shall be done by a licensed bonded and insured contractor. Agents shall not complete any major repairs on a property they own and sell.

 | **U.S. Policies and Procedures Manual**

## Commercial Property

Prior to listing commercial and income properties, agent must have approval from their state broker(s). Agents may not act outside their area of expertise.

Agent is aware that the Company Errors & Omissions policy limits are not sufficient to conduct many commercial activities.

For any commercial and income properties with a listing price above our current Errors & Omissions insurance limits, agent is required to obtain individual Errors & Omissions coverage in an amount equal to or greater than the transaction amount as primary coverage for the file with the Company named as additional insured and supply such to their state broker(s). The Company Errors and Omissions shall serve as an excess policy only on such transactions. Failure to obtain appropriate coverage may be grounds for immediate release from the Company, and the agent shall bear the full financial responsibility for the defense of the Company.

## Unauthorized Activities

No business will be conducted in the Company name that does not pertain directly to the duties of an agent as directed by federal, state and local laws/regulations as well as Company Policies, referenced herein.

Agents shall not open any brick and mortar offices in Company's name or bind Company to any agreements without the written consent of eXp Realty Brokerage Operations.

Agents shall not conduct property management services through Company. Property management includes, but is not limited to, collecting rents, performing inspections, setting up repairs and maintenance, posting notices, and running a background check. Agents shall not make or assist with tenant selection for the landlord.

Agents shall not sell or list to sell business opportunities.

Agents shall not conduct a final walk-through inspection on behalf of their client.

Agents shall not perform work or do repairs on properties where agent is representing a buyer or seller.

A single agent shall not represent both sides of a sales transaction if the agent or a family member of the agent is a principal or party to the transaction. Agent is aware that failure to follow this policy can result in loss of errors and omissions coverage and agent shall be responsible for all defense costs.

Agents shall not represent both sides of a transaction without full written consent from all parties executed prior to contract. Agent is aware that failure to follow this policy can result in loss of errors and omissions coverage and agent shall be responsible for all defense costs.

Agents shall not engage in the act of wholesaling properties in which they, or a family member, has a financial interest.  In this instance, real estate wholesaling occurs when the agent contracts with a home seller to purchase their property, markets the home to potential buyers and then sells and assigns the contract to another buyer. The agent makes a profit, which is the difference between the contracted price with the seller and the amount paid by the buyer.

# U.S. Policies and Procedures Manual

Agents shall not engage in activities that involve loan wraps.

Agents shall not take limited service listing agreements, limited service buyer agency, or any transaction that does not result in a fiduciary relationship between agent and buyer/seller. Agents may only work with an unrepresented party if the agent represents a party in the transaction (i.e., helping a buyer client purchase from a for sale by owner, helping an unrepresented buyer purchase their listing where they represent the seller). MLS-only listings are not allowed.

Agents shall not act outside of their area of expertise, either in knowledge base or geographic area. At the option of the state broker(s), another agent may be assigned to work with agent or to personally assist the agent in such a transaction. If compensation to the agent is affected, the state broker(s) shall negotiate a reasonable compensation agreement on that transaction.

Agent shall not open any offices, contract for any services, or bind Company in any way without written consent of the Company.

Agents shall not render legal, appraisal or tax advice to any person on behalf of the agent, the state broker(s) or the Company. Under no circumstances is an agent to deny, or in any way discourage, client from seeking the advice of an attorney of client's choice. Rather, such activity should be encouraged.

Agents shall never agree to act as an "attorney in fact" under a power of attorney on behalf of a client or customer of the Company.

If the agent conducts real estate brokering and/or mortgage origination activities pursuant to a license from any state agency, agent may not conduct mortgage representation activities for any real estate transactions in which they are directly involved as an agent, principal or in any other way. Further, they shall not perform mortgage activities on any transaction in which they have a financial interest through revenue share. In addition, agent may not engage the services of a mortgage lender with a familial relationship to the agent on any transactions the agent is involved in or has a financial interest in through revenue share.

If the agent conducts real estate appraisal activities pursuant to a license from any state agency, agent may not conduct real estate appraisal activities for any real estate transactions in which they are directly involved. Further, they shall not perform appraisal activities on any transaction in which they have a financial interest through revenue share.

Agents shall not recommend third party services with a familial relationship to the agent in any transactions the agent is directly involved in or has a financial interest through revenue share.

Agents shall not enroll or participate in auction websites without state broker(s) and Company approval.

## ACCOUNTING AND COMMISSIONS

### 1099

Agents will receive Form 1099 on or before January 31 of the year following their earnings in compliance with requirements published by the Internal Revenue Service. Total earnings

 | **U.S. Policies and Procedures Manual**

reported to agents will include agent commissions earned, revenue share earned, and stock issuances (ICON, stock awards, etc.). All information reported to the Internal Revenue Service is reported on a cash basis. Thus all commissions reported are based on the year in which the agent was paid. For example, if a home closed for a client on December 30, but eXp Realty did not receive final paperwork until January 2, and the agent was paid on January 3, that transaction will be included on the next year's Form 1099. Please consult a tax advisor for proper reporting of taxable income and deductions.

## Commissions and Other Fees From Clients

The agent's commission shall be made payable to the name or entity on file with the State Department of Licensing and the current W-9 on file with the Company. The name on file with the Department and the name on the W-9 must match in order for payment to be rendered by Company to agent. If the agent elects to be paid as a PC or PLLC, LLC or Corporation/Company name, as allowed by state and federal law, agent must amend his/her W-9 to reflect the proper name and tax identification number of the entity and advise Company of the same. Agent shall not be paid in the name of a PC or PLLC, LLC or Corporation/Company name without complying with all State Department of Licensing rules and regulations as well as federal and state law.

All commissions must be payable to the Company including but not limited to retainers, rental commissions, administrative fees, document storage fees, broker price opinions, and any additional fees charged to the consumer by the agent. At no time, shall the agent accept client checks made payable to themselves directly. All commissions and fees are subject to the Company commission splits.

Any agreement to share commissions between agents within Company shall be done so in writing. All agreements shall be uploaded and stored in the transaction management platform. In the absence of a written agreement between agents, the Company shall pay the entire agent share of the commission to the agent(s) whose name(s) appear on the transactional document between the principals (to be divided equally between those agents if more than one and not otherwise specified.) The Company will make the final determination regarding commission disputes between agents licensed with Company.

Any sales incentive, gift, and/or bonus received shall be paid to eXp Realty. eXp Realty treats bonuses, gifts and incentives as any other commissions and will pay the agent based on the agent's current split.

## Commission Advances

Commission advances are not offered by eXp Realty directly but may be obtained in accordance with the following procedures.

1. All commission advances must be approved in writing by the state broker(s) in advance.
2. Prior to signing the commission advance agreement, the agent must have the listing file (with an accepted contract) or the transaction file in SkySlope, and it must have passed the approval process.
3. Agent may not have more than one open commission advance at any given time, regardless of whether it is a listing advance or sales transaction advance.
4. Agent may only receive up to 70% of the net commission due to the agent.

 | **U.S. Policies and Procedures Manual**

5. Advances shall only be approved for transactions that are under contract and pending close.

## Actions for Unpaid Commissions or Procuring Cause Claims

A decision to proceed with legal action, mediation or arbitration against a party owing a commission to the Company will be made solely at the discretion of the Company. The Company shall not have any monetary obligations to the agent or any other party, resulting from brokerage fees and/or commissions that are uncollected. Agents may obtain independent counsel as desired to pursue and/or defend their position during mediation or arbitration. Company shall not supply counsel to pursue these items.

Should the agent be named in a mediation or arbitration as the respondent, the Company reserves the right to require the total amount of the disputed commission is held by the Company until the mediation or arbitration results are received. Should the Company and the agent not prevail, the agent agrees to pay all commissions amounts immediately to Company.

An agent does not have the authority to reduce, defer or replace any portion of the Company's splits or fees without the written consent of the state broker(s) or the Company.

## Referrals Payments and Relocation Companies

Referrals shall only be paid to licensed agents in conjunction with all State Department of Licensing rules and regulations.

All third-party referrals are subject to the Company split and the Company cap rules.

Outbound referral fees are taken off the top of a transaction and directed to the referral/relocation companies.

Agent shall not do ongoing outbound referrals as a method of effectively reducing the company dollar percentage. If an agent is referring a large percentage (in the opinion of the Company) of his or her business to another firm, the Company may require that agent provide documentation showing equitable work being completed by the other agent and firm to the transactions in question. If in the opinion of the Company equitable work is not being completed by the other firm or agent, the Company will withhold the company dollar percentage and/or transaction fee on the entire transaction before paying the outbound referral.

# ADVERTISING AND MARKETING

## Listing and Property-related Advertising

- **Online and Print Advertising**
  - All advertising must be reviewed and approved by the state broker(s) in advance.
  - The agent is responsible for ensuring that all ads are HUD and RESPA compliant and comply with all other state, local and federal legal requirements and with the rules of the MLS or Boards, as applicable.

 **U.S. Policies and Procedures Manual**

## General (non-property related) Advertising

The Company's agents and brokers may, from time to time, desire to run general advertising campaigns to induce consumers to engage their services or attract talent to their organization or team. The Company reserves the right to require any agent or broker to provide a copy of a proposed ad for Company review prior to publication and also reserves the right to compel any agent or broker to remove an advertisement if the Company determines, in its sole discretion, that an advertisement is false, misleading, in poor taste, against the Agent Attraction Universal Pledge, or reflects poorly on the Company or its agents, brokers or staff.

Any general advertisement must contain the following disclaimer:

*"The statements and opinions contained in this advertisement are solely those of the individual author and do not necessarily reflect the positions or opinions of eXp Realty, LLC, or its subsidiaries or affiliates (the "Company"). The Company does not assume any responsibility for, nor does it warrant the accuracy, completeness or quality of the information provided."*

## Signs

1. No signs will be placed in front of a listing until the Company has the executed listing agreement.
2. Signs must comply with all local, state and federal requirements.
3. Signs used must be the signs designed or expressly approved in writing by the Company.
4. Custom sign designs need to be submitted to and approved by eXp Realty Marketing (marketing@exprealty.com) for brand and the state broker(s) for state requirements.
5. Agent may only use approved sign riders, directionals, solds and others signs as needed to support the listing as well as the business of the agent and the Company.
6. Most MLSs prohibit putting up a "For Sale" sign before entering the listing in the MLS. A listing must be reported when it is taken and when it is sold within certain limitations. Agents must follow the MLS rules and comply. Any fine due to the violation will be paid by the agent and not the state broker(s) or Company.

## Logo or Company Name

1. Agents must read and comply with the eXp Realty brand guidelines.
2. Use of the company logo and name are considered advertising and must be approved in advance. Please send to marketing@exprealty.com for approval.

## Using Name or Letters eXp in Social Media or Other Online Venues

Use of the letters eXp in a domain name, YouTube channel name, Facebook page, Twitter handle or other social media is prohibited and must be approved by the Company in advance or risk being required to be removed from the respective places online and or turned over to the Company for additional consideration.

 **U.S. Policies and Procedures Manual**

1. Websites
    a. Websites must have prominent above the fold branding for the Company.
    b. Agent-created real estate websites, including real estate-related blogs, will have a link back to http://www.exprealty.com with the anchor text being "eXp Realty" with coding to hide the company links from the search engines is prohibited
2. Domain Names
    a. Names used in real estate or relating to the Company's business may not use the trademark eXp in the domain name. The Company has spent considerable money and effort to develop and maintain the brand for everyone's benefit.
3. Business Cards
    a. Unless agent has the express permission on a design different than those provided by the Company, agent will use a Company-approved design.
    b. Business cards will have the following identifying information on the cards:
        i. Brokerage name
        ii. Agent's name as licensed
        iii. Agent's title
            1. Agents cannot use a title that would reasonably lead someone to believe that the agent is an employee of eXp Realty or representing himself as an employee of eXp Realty. Examples would include Recruiter, Recruiting Manager, Vice President of Agent Attraction, Growth Leader, or any other such term/title that may cause confusion as to the Agent's position with eXp Realty.
            2. Titles may include any of the following, where allowed:
                a. REALTOR®
                b. Real Estate Professional
                c. Buyer's Agent
                d. Listing Agent
            3. Title may also list a professional designation as recognized by the National Association of REALTORS®
                a. CRS, ABR, ePro, etc.
    c. Additional items which may be included on the front of business cards
        i. Company provided email address
        ii. Agent's direct phone number
        iii. Company website or agent's careers site
        iv. Social media accounts such as LinkedIn, Facebook and/or Twitter
        v. Personal business website or blog

## Job Postings

1. Agents shall not advertise under false pretenses and/or offer in advertising or posts what appear to be positions of employment with eXp Realty, and/or advertising which is otherwise misleading.
2. Agents are prohibited from advertising on job placement or posting websites, other than for the purposes of building their direct real estate team of agents or

 | **U.S. Policies and Procedures Manual**

transactional staff. The solicitation or recruitment of potential licensed real estate professionals by current licensed real estate professionals of eXp Realty by way of job postings on third-party internet employment sites (e.g., Indeed, Monster, Glassdoor, LinkedIn, etc.) shall not contain any reference to eXp Realty.

3. Current licensed real estate professionals of eXp Realty are prohibited from using third-party employment websites to solicit or recruit human resources for unlicensed positions.

4. Agents are prohibited from using in any professional profiles, whether online or otherwise, titles which would reasonably lead someone to believe that agent is an employee of eXp Realty or representing herself/himself as an employee of eXp Realty.

5. Agents are prohibited from using the eXp Realty branding, official images, logos or other intellectual property without approval from eXp Realty's marketing department or using the name "eXp" in any public website domain or social media page.

## Media Relations

1. Read "How to Do PR with eXp Realty" before engaging with the media:
http://files.exprealty.com/PDF/How_to_Do_PR_with_eXp_Realty.pdf

2. **Press releases:** All press releases mentioning eXp Realty must be pre-approved prior to distribution and include the following language:

*[insert name] is an independent contractor of eXp Realty and this is not an official press release of eXp Realty, its parent company eXp World Holdings, Inc. or any related subsidiary.*

Once approved, the press release cannot be modified without additional approval for the modifications. Send questions and/or the completed press release to pressreleases@exprealty.com. The team will respond with questions or approval within two business days.

3. **Quotes from eXp Realty staff:** The company typically does not provide quotes for press releases. All staff quote requests must be sent to pressreleases@exprealty.com for consideration. The team will respond with questions or approval within two business days.

4. **Media interviews:** If agent receives a media request to talk about eXp Realty – the company, the company's products and services, data, stock price, etc., please refer the reporter to pressreleases@exprealty.com. All media requests about the agent's opinion on the local market are acceptable, but anything about eXp Realty or speculation on the stock price could be problematic or seen as insider trading as we are a public company. We discourage agent from discussing national industry issues or local/national competitors. If agent isn't sure, they can reach out to pressreleases@exprealty.com.

 | **U.S. Policies and Procedures Manual**

### Blogging and Other Social Media Postings

1. Agents are responsible for ensuring blogs and all online content are accurate.
2. If the blog is to be hosted on another site other than the agent's, approval should be obtained through marketing@exprealty.com. The team will respond with questions or approval within two business days.
3. Upon publication and distribution, agents should monitor channels daily for the first week, then weekly thereafter for any false or defamatory comments, and remove said comments that are false or misleading.
4. Agents must comply with the standards of the REALTOR® Code of Ethics and all real estate laws, including local, state and federal laws (e.g. fair housing, antitrust, license, copyright, etc.).
5. Agents are prohibited from activity which violates any law, rule or regulation, including but not limited to, the terms of service of any social networks; Federal Trade Commission ("FTC") rules; real estate license law; Securities and Exchange Commission ("SEC") laws and rules; and Do-Not-Call and anti-SPAM laws.
6. Agents must abide by the terms of service of any social networks or online advertising platforms.
7. Agents must identify themselves correctly, not impersonate another person and include this disclaimer on social media: "Opinions are my own and not the views of eXp Realty."

### Social Media Networking

Since agents are the face of the Company, agents will be professional in their appearance and their interaction on social media by adhering to the following guidelines:

1. Agents are to avoid arguments and aggressive language on social media that could leave a negative view of the Company and/or impact the agent's business.
2. Agents are expected to respect the privacy of other eXp Realty agents, staff, clients, and potential clients and agents, and may not use social media to make defamatory comments about the Company or other persons affiliated with the Company (e.g. staff, customers, vendors, contractors, service providers, etc.), or to attack or harass any person on the basis of race, gender, religion, age, physical or mental disability, marital status or civil partnership/union status, national origin, veteran status, ancestral medical condition, genetic characteristics, sexual orientation, gender identity or expression, or any other basis prohibited by applicable federal, state or local law.
3. Dishonorable content such as racial, age, ethnic, sexual, religious, physical disability and attacks on political-stances will not be tolerated.
4. Agents may not use social media to compete with the Company or engage in conduct that could create a conflict of interest.
5. Agents on social media are expected to respect all applicable laws, including copyright, privacy, trademark and financial disclosure requirements.
6. Using social media to contact people directly without their consent is prohibited.
7. Content found within the Company's internal networks (e.g. Workplace and Company email updates) is not to be shared publicly on social media. Shareable social media

 **| U.S. Policies and Procedures Manual**

content can be found at expmarketingcenter.com and on its respective social media channels, including:

   a. Facebook: U.S. & Canada
   b. Twitter: U.S. & Canada; eXp World Holdings
   c. LinkedIn: U.S. & Canada

8. See something, say something. If an agent sees something on social media that requires an official Company response or violates the policies and procedures, ICA or agent attraction universal pledge, she/he is encouraged to contact social@exprealty.com. The team will respond within two business days.

9. Agents are prohibited from posting inaccurate or misleading content (e.g., title, misleading attraction efforts).

10. Using the eXp Realty branding, official images, logos or other intellectual property without approval from eXp Realty's marketing department or using the name "eXp" in any public website domain or social media page is prohibited. To obtain approval, agents should email marketing@exprealty.com. The team will respond with questions or approvals within two business days.

### Video

1. eXp Realty agents may not share any recorded video (e.g., sessions in eXp World, sessions from The eXp Shareholder Summit, etc.) that is intended for internal use without receiving written approval. This includes distribution on websites and social media (e.g., Facebook, LinkedIn, YouTube, etc.). eXp Realty reserves the right to limit the use of any video content to the extent eXp Realty determines in its sole discretion that the video content does contain accurate information about eXp Realty or does not accurately represent eXp Realty's desired image or brand.

2. When hosting a session in eXp World, agent may record the session but only with the consent of the attendees.

# REPRESENTATION ON REALTOR ASSOCIATION AND MULTIPLE LISTING SERVICE BOARDS OF DIRECTORS

## Associations of Realtors

Being elected to serve on a Board of Directors of a Realtor Association is both an honor and a privilege that also carries responsibilities. Agent's role on the Board of Directors, while earned by personal excellence, reflects upon eXp Realty as their brokerage.

In general, eXp Realty leaves local Association business decisions in agent's capable hands, however there are areas where eXp Realty requests that the agent considers the welfare of the brokerage as being the deciding factor in the vote. Specifically, if there are opportunities for either physical or data consolidation, eXp Realty asks that the agent strongly supports them as being beneficial to the industry and to eXp Realty as a national brokerage.

 | **U.S. Policies and Procedures Manual**

From time to time, eXp Realty will publish guidance as to our position on issues specific to the National Association of Realtors or at the state or local levels. Please consider that guidance as being a recommended course of action when voting. If agent has any questions, please do not hesitate to contact the SVP of Brokerage Operations.

### Multiple Listing Services

Agent access to the MLS is always via the broker participant; agents cannot join an MLS without the broker first becoming a participant of the service.

When serving on the Board of Directors of an MLS, eXp Realty agents and regional brokers will bear in mind that because we are a brokerage, not a franchise model, access to the MLS is conditional upon Company's approval. As a result, policy and business decisions regarding MLS on the national, state and local levels will conform precisely to stated eXp Realty policies and positions. If the absence of a stated position, elected volunteers cannot go far wrong by choosing consumer-friendly policies that enhance data collaboration, consolidation and the freedom of the broker to use MLS data in ways conforming to generally accepted practices on the internet.

# AGENT ATTRACTION

### Agent Attraction Universal Pledge & Certification Course

The Company has established best practices, standards and guidelines concerning methods, messaging and approaches to attracting real estate professionals to eXp Realty. All agents shall make themselves familiar with and adhere to the Agent Attraction Universal Pledge. The Pledge includes a certification course and quiz that shall be taken by all agents of the Company prior to any agent attraction efforts. Practices that are lacking in integrity and quality can discredit and/or harm the reputation of the Company and, in certain cases, can result in personal liability to the agents and brokers of eXp Realty. Agents who have not taken the course and quiz and/or act in a manner inconsistent with the pledge are subject to removal from the Company.

eXp Realty agents may use the services of not more than one assistant to schedule meetings and telephone calls with prospective eXp Realty agents and handle other administrative tasks related to agent attraction. To qualify as an agent's assistant for purposes of this policy, the person must be a full or part-time employee of the agent (not an independent contractor or third party service) and subject to the control and supervision of the agent in all matters dealing with agent attraction. Agent attraction assistants shall not engage in substantive conversations with any potential eXp Realty agent including, without limitation, describing the specific benefits of eXp Realty. Except as allowed above, eXp Realty agents may not use the services of any other person or firm to engage in any contact with potential eXp Realty agents on behalf of the agent attraction agent.

Use of any non-company materials for attraction purposes must have been pre-approved by the Attraction Compliance division of the Company (email attractioncompliance@exprealty.com). Any deviation from these policies will be subject to penalties as described in the attraction best practices pledge.

**U.S. Policies and Procedures Manual**

## Sponsorship Requests from Vendors

From time to time opportunities may arise for vendors to sponsor local events for eXp Realty and non-eXp Realty agents to attend. When this opportunity arises, the agent will submit a sponsorship request to their state broker(s) at least two weeks prior to the event. Broker(s) will speak to the vendor and verify the amount being paid, expectations of the vendor and process for sharing agent information collected at the event. At NO time is the agent to handle the funds without written approval from Brokerage Operations.

## Avoiding Stock Solicitations

As a company with publicly traded common stock, the Company is subject to requirements relating to the substance and manner of public communications. Also, federal securities laws generally require that, in the absence of an exemption, offers to buy stock, and solicitations regarding stock, need to be preceded by a filed registration statement relating to the offer. All agents of the Company shall follow these guidelines (see the insider trading policy in the ICA for further details), for the protection of the Company and those affiliated with it:

- Only an executive officer or director of the Company can solicit interest in, or encourage others to buy the Company's stock, or promote the Company's stock as the basis for encouraging others to join the Company.
- Only executive officers and directors who are authorized to speak on behalf of the Company should discuss the agent equity program or similar stock incentives in any detail. Agents, whether on social media or in agent attraction efforts, should merely point out that such a program or incentives exist, and direct potential agents to Company approved resources or publicly available information.
- Both in public and private conversations, including all social media platforms, agents shall not comment on the potential or projected growth of the Company or it's stock or encourage people to buy the stock or join the Company based on the stock's growth.
- All directors, officers, employees and agents are subject to SEC Insider Trading regulations, which include the obligation not to disseminate confidential information of the Company.
- Failure to adhere to these guidelines will result in immediate release from the Company.
- Do not make or post income claims, including any income claims pertaining to revenue share and/or posting copies of revenue share checks or screenshots from eXp Enterprise on social media. The FTC has very specific rules and guidelines for making income claims. Agents should never make any income claims during presentations. Hypothetical income examples which may be contained in Company-approved and Company-issued marketing materials and which are used to explain the Revenue Sharing Program, and which are not misleading or exaggerated, may be presented to prospective agents, provided such earnings examples are clearly and conspicuously identified as hypothetical.

 **U.S. Policies and Procedures Manual**

# COMPANY INFORMATION AND TOOLS

### Company Communication / Training Platform

Through Workplace, eXp Enterprise and eXp World, the company provides best practices in different parts of the business. It is the responsibility of the agent to stay up to date on the latest Policies as well as the latest best practices relative to working with any tools and services the company has deployed or is being recommended for agents to use. Agent shall not give out usernames or passwords or any other access to any internal system.

### Email Facilities

The Company provides email addresses to all associates for purposes of conducting eXp Realty business. Email may be delivered by various providers from time-to-time as requirements and costs dictate. Company email may be forwarded to other email addresses and systems, provided that the system provides a secure log-in with a minimum of two-factor authentication. Agents and staff will use company provided email accounts to communicate with other agents and staff as well as with clients. Company provided email will be the official email used to communicate all company communication. We strongly encourage agents to check email regularly for important communication from the company and/or the state broker.

# EXPAND MENTORING PROGRAM

All new agents (licensed for a period less than 12 months) or those who have not completed three transactions within the previous twelve-month period shall be required to participate in the eXpand Mentoring Program upon transfer of license to eXp Realty.

If agent would otherwise meet those requirements, but are obtaining a license in a new state it is at the Company's discretion whether agent will be required to participate in the mentor program in the new state.

# LEGAL, INSURANCE and LAW COMPLIANCE

### Antitrust

Commission rates of the Company are based on the value of the services provided and competitive market conditions. Commission rates are determined solely by agreement with the listing party. Agents shall not participate in any discussions with individuals affiliated with any other company concerning the commission rates charged by the Company or any other real estate company. When soliciting a listing or negotiating any agreement, agents shall not make any reference to a "prevailing" or "standard" commission rates in the market or any other words that suggest that the commission rates are uniform, standard or non-negotiable.

### Conflicts of Interest

Agents shall avoid engaging in activities that would result in a question of business ethics or a compromise in the agent's loyalty to the Company or clients. Questions regarding potential

 **U.S. Policies and Procedures Manual**

conflicts must be directed to state broker(s). When purchasing a Company listing it must be disclosed, in the contract, that the associate is a member of the Company. Additionally, no associate shall be involved in any form of settlement service or receive income or benefits "for value" directly from a settlement service company while actively licensed with the Company.

## Cyber Liability Insurance

Agent is aware that the Company's cyber liability insurance does not include any agent as an insured under this policy. In other words, the Company's cyber liability insurance does not extend to, or cover, any loss or damage related to any security/data breach or wire/ financial fraud that may result in connection with any licensed activity of the agent. Further, the Company's cyber liability insurance does not cover any loss or damage that may be sustained by any parties to a real estate transaction handled by the agent. Therefore, the Company urges agent to obtain cyber liability insurance covering his or her own real estate business. The Company advises agent that cyber risk is a serious threat to their business and the consequences of data breaches and wire fraud can be financially disastrous.

## Data Security and Client Privacy

Agent will come in contact with personal and confidential information in the day-to-day course of their business. All agents of the Company are expected to become familiar with and follow a course of action with all personal and confidential interest that is in alignment with all local, state and federal laws regarding data security and client privacy. Please review the National Association of Realtors® Data Security and Privacy Toolkit found here. If agent fails to secure their client's data and confidential information, agent will defend, indemnify and hold the Company, and its principals and affiliates harmless against any and all claims, complaints or actions that may arise from such a departure. In addition, failure to comply with this Policy is grounds for the immediate release of agent's license and removal from the Company.

## Do Not Call Rules

Agent must stay up-to-date on rules relating to the National No Not Call Registry:  See: http://www.ftc.gov/donotcall

Cold calling must be done in compliance with applicable state and national laws. Any fines that result from any violation of the "do not call" law or any other solicitation will be paid for by the agent who broke the said rule.

## Drones

Agents who desire to use drones in their Company business agree they shall become familiar with and follow all Federal Aviation Administration (FAA) small drone rules.

## Drug and Alcohol Use

Drug and alcohol use is strictly prohibited while engaged in real estate brokerage services. Accordingly, agents are prohibited from possessing, selling, consuming alcohol or drugs; smelling of alcohol or being under any influence of any drug (except as authorized by a physician) or engaging in the consumption of alcohol while they are engaged in real estate brokerage services and any work for Company.

 | **U.S. Policies and Procedures Manual**

Agent should also discourage the use of drugs or alcohol by any party during a transaction. Upon discovering that a party is under the influence of either drugs or alcohol, agent should take appropriate action to terminate that day's activity and suggest that they discuss or complete the transaction another time.

## Errors & Omissions Insurance

Agent is aware and understands all dual agency transactions must contain a fully executed consent for dual/limited representation form, completed prior to purchase/sale contract execution, in order to preserve the right to errors and omissions insurance coverage on the file. Agent is aware that if they fail to obtain such written consent, the file may be excluded from coverage and agent shall be responsible for the full amount of the damages, attorneys' fees, and costs incurred by and/or recovered against Company.

## Harassment

The Company takes all forms of harassment seriously. This includes but is not limited to verbal, physical or sexual. All reported or suspected occurrences of harassment will be promptly and thoroughly investigated. Any agent that is found to have harassed another agent, employee, client, customer or any member of the public shall be immediately, and without warning, released from the Company at the Company's sole discretion.

If agent feels they have been harassed in any way, agent shall notify the state broker(s) or a member of the corporate team immediately.

The Company will not permit or condone any acts of retaliation against anyone who files harassment complaints or cooperates in the investigation of same.

## Intellectual Property Rights

Agents shall become familiar with and adhere to all laws, rules and regulations regarding intellectual property rights and their real estate business. "Intellectual property" refers to all major forms of legal protection of intangible rights protected by the law, including copyright, trademark, patent, trade secrets, design rights and the like. Agents shall acquire, use and deal in only licensed copies of copyright protected material, and genuine articles of trademark and patent protected products, in carrying out the agent's and Company's business.

## Judgments

Agents must notify the state broker(s) and Company immediately and in writing of any legal judgment, order or decision against them, including, but not limited to, DUIs, felonies, bankruptcies, foreclosures, UCC filings and tax liens.

## Non-solicitation

The Agent agrees not to solicit, recruit, employ, or entice (either for him/herself or another) Company partners, affiliates, salespersons, agents and/or employees to leave Company during the agent's association with Company. This obligation shall continue for a period of two years after the termination of association of agent with Company.

 | **U.S. Policies and Procedures Manual**

### Reporting Problems

It is understood that agents, though operating as independent contractors, act as agents of the Company and must, therefore, keep the Company informed of their activities. Agents shall immediately bring any of the following situations to their state broker's attention, and shall immediately provide the Company with copies of any correspondence or legal process in connection with such situations. Failure to timely notify the state broker(s) and the Company shall result in termination from the Company.

- Any substantive complaint involving a real estate transaction or the providing of real estate brokerage services, whether brought by a client, the state real estate licensing authority or a third party.
- Any disclosure, or potential disclosure, of confidential client information.
- Any accident or injury that occurs while providing real estate brokerage services.
- Any criminal charge against an agent other than a traffic infraction.
- Any civil suit, subpoena, or other legal document concerning real estate activity of agent.
- Any contact by or with the state real estate licensing authority.
- Any threat of any legal or administrative action against agent or Company resulting from agent's real estate brokerage services.
- Any act of discrimination.
- Any unresolved dispute with another agent or a real estate professional affiliated with another brokerage firm.
- Any foreseeable dispute or problem relating to the payment or collection of a commission.
- Any other situation involving professional real estate activity that could lead to liability on the part of the Company or anyone associated with the Company.
- Any notification received from the state real estate licensing authority regarding the status of agent's real estate license.

# OFFICE POLICIES

### Agent Business Expenses

Company shall not be responsible for any expense incurred by agent in the performance of their business duties unless approved in advance and in writing by the state broker(s). No inducements, including inspections or other services associated with real estate brokerage services customarily paid by customers or clients, shall be offered or paid by agent without advance approval by the state broker(s), and then shall be at agent's sole expense. Agents shall not charge any undisclosed commission or profit on expenditures made for their principals.

### Assistants - Unlicensed

The Company fully supports the use of licensed and unlicensed assistants by the agents. By delegating tasks that may be performed by those other than the agent, the agent's time can be spent more efficiently on tasks directly related to maximizing earning potential. The Company advises all agents using assistants to seek legal counsel regarding employment laws and obligations within their state.

## U.S. Policies and Procedures Manual

Agents must have a written contract with their assistants. Said contract must be submitted to the state broker(s) within 10 working days of joining the Company or entering into an agreement for these services. Copies of the contract are to be filed in the agent's personnel file.

Agents are responsible for training assistants, making sure they are familiar with and abide by all office policies and procedures and are familiar with and abide by all state regulations. The agent must go over the policy and procedures manual with the assistant and have the assistant sign a form acknowledging that they have read and are familiar with the manual.

An unlicensed assistant may not:

- Host an open house.
- Solicit sellers or buyers in any manner.
- Provide advice or guidance to a consumer with regards to a listing contract or a contract of purchase and sale.
- Meet with owners to obtain or renew listing agreements.
- Present or negotiate an offer.
- Communicate with consumers about real estate transactions.
- Be paid from the commission at closing or be paid commission in any way, regardless of timing.
- Open listings for clients or prospective clients.

An unlicensed assistant may:

- Perform office filing.
- Fill out a document at the instruction of the agent.
- Place or remove signs.
- Witness signatures.
- Perform agent's bookkeeping.
- Draft correspondence for approval by the agent.
- Draft forms for review by the agent.
- Make and deliver copies of any public records.

### Assistants - Licensed

Licensed Assistants are bound by the same licensing requirements as an agent including, but not limited to, executing an ICA and fully associating themselves with the Company. They shall pay all fees associated with and follow all policies and procedures of the Company. Licensed assistants may only assist other Company agents and may not work for or with any agents outside of the Company. Any licensed assistants or transaction coordinators must have their license affiliated with Company.

### Associations and Board Memberships

All agents of the Company must maintain a current membership with the National Association of Realtors® and any required state and local boards and associations. Any state that requires the Company to pay the agent's portion of the dues will be handled accordingly. The agent portion of these dues will be billed back to the agent immediately and the agent will reimburse the

 **U.S. Policies and Procedures Manual**

company within 10 days of billing. Agents who fail to reimburse the Company will be subject to removal from the Company.

Agents who are billed directly by the Association and MLS are expected to pay those bills in a timely manner as directed by the Association and MLS. The Company will not pay late dues on behalf of the agent and the agent will be subject to removal from the Company.

### Contact Information

Agents MUST use their legal name as it appears on their real estate license in all advertising, on contracts and in all real estate correspondence. Agents using any name other than their full legal name may only do so if allowable within their state and must have their state broker(s) approval.

Agent's business address is the main office of eXp Realty in the state which agent's license is registered at the state. Agent must use this address in all activities if an address is required by the State Licensing Department. All business correspondence related to transactions must be sent to this address, not to the agent's home. No personal mail may come to the office. Any mail coming to the office will be considered official business and subject to being opened by the state broker(s) or admin team. Agent agrees to make arrangements to pick up any parcels that are delivered to the office by vendors and will work to properly inform all vendors that parcel deliveries are to be scheduled directly with the agent. All unclaimed parcels are subject to disposal within 7 days of delivery.

Escrow companies, title companies and other closing agencies must send all communications pertaining to a transaction to our company address. Agent may receive a duplicate copy of escrow documents for the file.

Immediately notify the state broker(s) and admin staff of any changes in address, phone numbers and third-party email address that are on file with the company.

### Contacting the State Broker(s)

Each state has a different state broker(s), and as a result, please review any state specifics with regard to broker communication.

Each administrative state broker(s) will make themselves available inside of eXp World for general communication and discussions.

Consult state broker(s) public calendar for their availability online.

If agent has a specific urgent need for the state broker(s) to address outside of business hours, please call or email the state broker(s) directly.

### ICON Agent Award

The ICON Agent Award is aimed at attracting and incentivizing top agents into the company.

The Award provides each qualified "ICON" with publicly traded eXp World Holdings, Inc. common stock upon the achievement of certain production and cultural goals within an agent's anniversary year. The ICON Agent Award Program is subject to approval by the Board of

 **U.S. Policies and Procedures Manual**

# TERMINATION

Upon termination of the agent's affiliation with the Company, any pending escrows shall be closed by Company and compensation therefrom, minus company splits, fees/expenses (including but not limited to a reassignment fee as determined by Company and a transaction coordination fee at then current rates, per transaction) shall be deducted from agent's commission.

Any current listings are to be forwarded to the transferred brokerage in a reasonable time if the agent leaves in good standing, pays all outstanding fees in full, and the client(s) executes necessary paperwork to transfer the files to the new brokerage. Agent shall forfeit all proceeds and listings if a replacement brokerage is not established within three business day of termination, or if he/she leaves the business.

Listings and pending transaction files shall be released at the sole discretion of Company.

As used herein, "good standing" means that the agent is not in breach of any term, covenant, condition, obligation or duty set forth in the Agreement, has no pending legal claims or disputes, and his/her license with the State Department of Licensing has not been restricted, suspended or revoked. Company reserves the right to withhold commissions and assign another agent to close out any pending transactions.

Agent's agreement shall also immediately, and automatically terminate, without prior notice, if for any reason, agent breaches his or her obligations hereunder, or if agent's license expires, is restricted, suspended or is revoked.

In the event, agent leaves Company their termination date will be determined by the date the notice was given by either party as referenced in the Independent Contractor Agreement. Agent billing shall continue unless written notice to offboard was delivered to Company by agent or agent was terminated by Company. Any prepaid fees, dues or other billable items are non-refundable.

Upon termination or separation from the Company, agent will lose access to all Company tools, emails, files, and company provided third party sites. The Company strongly encourages agent to backup any files they desire access to prior to requesting offboarding.

If within 12 months from termination date, agent wishes to rejoin eXp Realty the agent must have left in good standing and they will rejoin under their original sponsor.

**eXp Realty reserves the right to make updates to its policies. When/if updates are made, they will be communicated through Workplace, the eXp News (weekly newsletter) and/or the weekly company meeting. Agent shall have seven days from notice to review changes and seek clarification. At the completion of the seven days, the changes will be deemed accepted.**

## **EXHIBIT J-1**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# General Company Policies

**Policy:**

It is the policy of eXp Realty to participate in a real estate activity only when it is legal, honest, fair and beneficial to us and others. In pursuit of compensation for ourselves we will never ignore the benefit of our community. Therefore, we will conduct our business in a manner to follow all the laws and rules of our profession. We pledge to exercise the highest standard of ethics, honesty, fairness and professionalism in all our real estate activities.

**Procedures:**

We ask all our associates to follow these procedures in addition to the rules and regulations established by laws, real estate boards, professional organizations and our independent contractor agreement.

## Table of Contents:

1. Disclosure:
2. Forms
3. Reporting
   - Executed Purchase and Sale Agreements:
   - Listings:
   - Adding Additional Files to Existing folders:
4. Contact Information
5. Advertising:
   - Print Advertising
   - Online Advertising:
   - Signs:
   - Logo or Company name:
   - Websites:
   - Domain Names
   - Business Cards
6. Continuing Education:
7. Advising your clients beyond the subject of Real Estate:
8. Property Management
9. Commercial Property
10. Commissions:



EXHIBIT _10_
WIT: _Santori_
DATE _2/21/25_
Judy Bonicelli, RPR, CCR 2322

**2eXp_000214**

- Commission Disbursements:
- Minimum Listing Commission:
- Inbound Referrals Payments
- Outbound Referral Fees to Referral / Relocation Companies

11. Email Facilities
12. Transaction Log
13. Mentor Program:
14. Income Reporting:
15. Referrals
16. Supra / eKey / MLS Keybox Key
17. Do Not Call Rules:
18. Out of Town or Unavailable:
19. Contacting Your Broker
20. Company Communication / Training Platform:
21. Physical Office Space:
22. Personal Transactions:
23. Professional Practices:
    - Dress
    - Automobile
    - Presentation Materials
    - Laptop
24. Using Online Company Resources:
25. Home Office:
    - Hardware, Software & Internet Connectivity:
26. Company Lead Program
27. Blogging
28. Social Networking
29. Agent Recruiting
30. Avoiding Stock Solicitations
31. Use of Internet Employment Websites
32. Agent Recruiting and Attraction Websites and Video
33. Recruiting Assistants
34. Policy and Procedure Updates and Review:

1. **Disclosure:**
   1. In a real estate transaction you must disclose imperative information required by law to all parties involved regardless of your agency relationship.
2. **Forms**
   1. You must use the forms which are customary to the MLS or REALTOR Board of which you are a member. These forms are normally provided via some sort of MLS or Board intranet. Documents created for a special situation must be reviewed and approved by your broker.
3. **Reporting**
   1. **Executed Purchase and Sale Agreements:**
      1. All Purchase and Sale Agreements must be reported to the broker with 2 business days of execution by uploading a complete purchase and sale agreement.
         1. For Washington State
            1. email wa.pendings@exprealty.com the following in pdf format:
               1. A copy of the Mutually Accepted Purchase and Sale Agreement
               2. All other documents that you have at Mutual Acceptance
      2. In addition to all documents required by the State Broker, the initial file must contain

the complete purchase and sale agreement including all addenda for the transaction.

3. Earnest Money Receipt for Transaction File
    1. Earnest money deposits MUST be made payable to escrow, NOT eXp Realty.
    2. A copy of any check or deposit related to a transaction needs to be added to the appropriate Transaction folder.
    3. Earnest Money Checks must be deposited within 2 business days of mutual acceptance and a copy of the Earnest Money receipt included in the original email or added to the folder for the transaction within 3 days of mutual acceptance.
4. Consult State Specific Manuals for the exact documents required to be included in a Pending File.
5. Completing and uploading a file(s) to complete a particular transaction after the close of escrow is a violation of company policy and subject to a $150 penalty. You have the responsibility to keep brokers informed in every transaction right from the beginning. We request that you upload all necessary documents for review and complete your file as it progresses. Broker has supervisory responsibility by law and must comply with the Department of Real Estate rules. Any investigation and discovery made by the brokers for compliance with laws because of your negligence will be reason for additional charge by Broker. Please do not surprise us by uploading files the last minute and expect the file to be processed immediately.

2. **Listings:**
    1. Within 24 hours of having a listing agreement signed by the seller all paperwork relating to that listing must be uploaded to Skyslope.
        1. Once the administrative staff receives your listing a listing folder will be created and shared with you with the initial listing paperwork submitted in the originating email.
            1. Inside of the folder created above upload all additional required listing materials.
            2. Please consult your state specific eXp Manual for the specific documents required by your state and broker.
3. **Adding Additional Files to Existing folders:**
    1. When adding a file to a folder on Box.net please be sure to add a comment to the file added for broker and/or admin review.
    2. Always use the **.pdf** format when adding files or documents

4. **Contact Information**
    1. Agents MUST use their legal name as it appears on their real estate license in all advertising, on contracts and on real estate correspondence.
    2. Your business address is the main office of eXp Realty in the state which you work and by law you must use this address in all your activities. All business correspondence related to transactions must be sent to this address, not to the agent's home. No personal mail may come to the office. Any mail coming to the office will be considered official business and subject to being opened by the broker or admin team.
    3. Escrow Company must send all communications pertaining to a transaction to our company address. You as an agent may receive a duplicate copy of escrow for your file.
    4. Immediately notify the broker and admin staff of any changes in your address, phone numbers and third party email address that you have on file with the company.

# Advertising

## I. Listing and Property Related Advertising

### 1. Print Advertising

- All print (magazine / newspaper, etc.) non-changing advertising must be reviewed and approved by Brokers in advance of publication and must be subsequently uploaded into the property file in paperless pipeline within 48 hours of publication.
- Agent is responsible for ensuring that all ads are HUD and RESPA compliant and comply with all other state, local and federal legal requirements and with the rules of the MLS or Boards, as applicable.

## 2. Online Advertising

- State managing brokers may, in their discretion, require that online advertising be reviewed and approved by broker in advance of publication.
- Agent is responsible for ensuring that all online ads are HUD and RESPA compliant and comply with all other state, local and federal legal requirements and with the rules of the MLS or Boards, as applicable.
- Immediately (within 1 hour) of placing an ad online agent will put a copy of that ad in the appropriate listing or property file within paperless pipeline.

# II. General (non property-related) Advertising

The Company's agents and brokers may, from time to time, desire to run general advertising campaigns in an effort to attract talent to their organization or team. The Company reserves the right to require any agent or broker to provide a copy of a proposed ad for Company review prior to publication and also reserves the right to compel any agent or broker to remove an advertisement if the Company determines, in its sole discretion, that an advertisement is false, misleading, in poor taste, or reflects poorly on the Company or its agents, brokers or staff.

Any general advertisement must contain the following disclaimer:

*"The statements and opinions contained in this advertisement are solely those of the individual author and do not necessarily reflect the positions or opinions of EXP REALTY INTERNATIONAL, INC. or its subsidiaries or affiliates (the "Company"). The Company does not assume any responsibility for, nor does it warrant the accuracy, completeness or quality of the information provided."*

## III. Signs:

1. No signs will be placed in front of a listing until we have the complete listing agreement uploaded to the New Listings folder.
2. Within 72 hours of having a sign installed on a property, a photograph of the sign in front of the property be added to the listing folder
3. Signs used must be the signs designed or expressly approved in writing by the company.
4. Custom sign designs need to be submitted to marketing@exprealty.com for approval.
5. Agent may only use approved sign riders, directionals, solds and others signs as needed to support the listing as well as the business of the agent and the company.
6. Most MLS's prohibit putting up a "For Sale" sign before entering listing in the MLS. A listing must be reported when it is taken and when it is sold within certain limitations. Please follow the MLS rules and comply. Any fine due to the violation will be paid by the Sales Associate and not the Broker.

## IV. Logo or Company name:

1. Use of the company logo is considered advertising and must be approved in advance.
2. Use of the eXp company name is considered advertising and must be approved in

2eXp_000217

advance. i.e. on any social media etc.

## V.    Using Name or letter eXp in Social Media or other online venues

1. Use of the letters eXp in a Domain name, YouTube Channel Name, Facebook page or other Social Media site is prohibited and must be approved by the company in advance or risk being required to be removed from the respective places online and or turned over to the company for no additional consideration.

2. **Websites:**
   1. Websites must have prominent above the fold branding for the company.
   2. Agent owned real estates including real estate related blogs will have a link back to http://www.exprealty.com/ with the Anchor Text being "eXp Realty" and in the case of a website owned by the company in the local market a link to that website with the name of the city the website serves followed by the term "real estate" as the anchor text.
      1. eg. <a href="http://www.scottsdaleparadise.com/">Scottsdale Real Estate</a>
      2. Coding to hide the company links from the search engines is prohibited

3. **Domain Names**
   1. Domain Names used in real estate or relating to our business may not use the trademark exp in the domain name. The company has spent considerable money and effort to develop and maintain our brand for everyone's benefit.

4. **Business Cards**
   1. Unless Agent has express permission on a design different than those provided by the Company, Agent will use a Company approved design as listed in the Company Wiki.
   2. Business Cards will have the following identifying information on the Cards
      1. Agent's Name as Licensed
      2. Agent's Title
         1. Titles may include any of the following:
            1. REALTOR
            2. Real Estate Professional
            3. Buyer's Agent
            4. Listing Agent
         2. Title may also list a professional designation as recognized by the National Association of REALTORS
            1. CRS, ABR, ePro, etc.
      3. Company Provided email address
         1. This email address may be either an exprealty.com email address or a locally based email address such as someone@seattlepowersearch.com
      4. Agent's Direct Phone Number
         1. Direct Cell or Other Line which connects directly to Agent
      5. Company Provided 800# with extension
      6. Company Provided Fax#
      7. Company Web Address which may be either http://www.exprealty.com or a locally based Company owned website such as http://www.SeattlePowerSearch.com/
   3. Additional Items which may be included on front of business cards
      1. Twitter ID
      2. Personal Business Website or Blog

## 6.    Continuing Education:

1. Though eXp Realty provides ongoing classes on all areas of the business, Training and getting education is your responsibility. You must proactively seek out educational opportunities inside and outside of eXp Realty to make you more effective as a real estate professional.
   1. Knowledge is important to protect the interest of your client in a real estate transaction. You must educate yourself in every possible way available to you.
   2. If you are not certain about a situation, consult your broker and/or staff.

**2eXp_000218**

3. Do not act based on your instinct without proper information.
4. Consult your Broker(s) and staff at eXp Realty are your support team.

2. Continuing Education is also required to keep your license current with the state.
   1. Please add any forms relating to classes you have taken which fulfill your Continuing Education into your Legal Compliance Folder

## 7. Advising your clients beyond the subject of Real Estate:

1. Do not give advice on legal, tax, construction and other advice which are outside of the scope of your license.

## 8. Property Management

1. Property management, business opportunities and prepayment rental activities are not allowed.

## 9. Commercial Property

1. Listing of commercial and income properties must be reviewed and approved by the Broker in advance.  Listing residential properties priced one million dollars or more must also be approved by the Broker.

## 10. Commissions:

1. **Commission Disbursements:**
   1. Commission disbursements to licensees will not take place until the company has a completed file.
   2. Commissions are paid from the Company via Direct Deposit.  While the company is building out its Direct Deposit platform, the Company may direct Escrow to pay agent directly from Escrow, however the direction of how commissions are dispersed to agents is from the company only.
2. **Minimum Listing Commission:**
   1. Agent will charge a Listing Commission of no less then $2500 / Listing. In the event that Listing Commission is less then $2500 then Company dollar or the Company split would be $500 going to the company on which Revenue Share would be calculated with the balance going to the agent.  As with all other transactions agent would also be responsible for the Broker Review fee or E&O fees.
3. **Inbound Referrals Payments**
   1. All 3rd Party Referrals are subject to the company split and company cap rules.
   2. If the Inbound Referral Payment was a result of a company generated lead then an additional referral fee of 25 – 35% would apply.
4. **Outbound Referral Fees to Referral / Relocation Companies**
   1. Outbound Referral Fees are taken off the top of a transaction and directed to the Referral / Relocation Companies.
   2. If lead was also a Company Generated lead then lead is also subject to the company generated lead program internal referral fee as well as the company split and cap rules.
   3. Agent shall not do ongoing outbound referrals as a method of effectively reducing the company dollar percentage.  In the event that Agent is referring a large percentage (in the opinion of eXp Realty) of his or her business to another firm, the Company may require that Agent provide documentation showing equitable work being completed by the other agent and firm to the transactions in question.  If in the opinion of the Company equitable work is not being completed by the other firm or agent, eXp Realty will withhold the company dollar percentage and/or transaction fee on the entire transaction before paying the outbound referral.

## 11. Email Facilities

1. The company provides email addresses to all associates and staff.  These email address are provided via Google Apps which is an enterprise level email facility provided by Google.
2. Agents and Staff will use company provided email accounts to communicate with other agents and staff as well as with clients originally generated through company advertising or company owned websites.
3. Agents may use personal email addresses with clients not related to lead generation done through company owned websites.

2eXp_000219

12. **Transaction Log**
   1. Keep a transaction log of all appointments, telephone conversations, emails and other communication related to your real estate practice both for tax purposes as well as for any potential legal matters in the future. As much as is possible use the company provided facilities, RealFutureCRM, Box.net, and Google Apps to keep track of all the above information. These systems have large amounts of online storage so you are able to keep conversations, emails and documents inexpensively and virtually indefinitely.

13. **Mentor Program:**
   1. New agents and agents who have completed less then 6 completed transactions in the prior 36 months must work with an experienced mentor on their first five transactions with eXp Realty. The first five transactions are subject to an additional 10% of Gross Commission income mentor fee which will be paid directly out of a closed escrow to the mentor for working with the New Agent.

14. **Income Reporting:**
   1. A 1099 will be mailed to you in January for income earned the previous year. Please review it and let the know about any discrepancies as soon as you receive it. Correction after the final report to the IRS is a difficult task as our CPA must make those changes.

15. **Referrals**
   1. Outside referral payments must have supporting referral agreements included in the file.

16. **Supra / eKey / MLS Keybox Key**
   1. Do not give your Supra key or MLS login information to any unauthorized person. You will be responsible for damages caused by such a violation.

17. **Do Not Call Rules:**
   1. Agents must stay up to date on rules relating to the Do-not-call rules:
      See: http://www.ftc.gov/donotcall
   2. Cold calling must be done in compliance with applicable state and national laws. Any fines that result from any violation of the "do not call" law or any other solicitation will be paid for by the sales person who broke said rule.

18. **Out of Town or Unavailable:**
   1. When you have listings and/or open escrows and you are out of town, or otherwise unable to provide services to your clients, you are requried to notify the admin staff so they know who is covering your business. Do not leave your business unattended.
      1. How? - Specific System for notification and updates?

19. **Contacting Your Broker**
   1. Each State has a different broker and as a result please review any state specifics with regard to your broker communication.
   2. Each Broker will make themselves available inside of eXp Virtual for general communication and discussions.
      1. Consult your Broker's public calendar for their availability online
   3. If you have a specific urgent need for the broker to address outside of business hours please call or email your broker directly.
   4. Each Broker for each state keeps different online office hours.
      1. Please consult the Broker Google calendar to know when he or she is available.

20. **Company Communication / Training Platform:**
   1. Through the Intranet and eXp World the company provides Best Practices on different parts of the business. It is the responsibility of the agent / sales associate to stay up to date on the latest Policies as well as the latest Best Practices relative to working inside of the company intranet, virtual office, CRM, and/or any other tools that the company has deployed or is being recommended for agents to use.

21. **Physical Office Space:**
   1. eXp Realty runs almost entirely virtually and as such does not invest in physical bricks and mortar infrastructure. Agents are encouraged to contact their local affiliates, Title and Escrow Companies, Lenders, Banks, and other organizations whom they work with if they need physical space to meet clients.
   2. The company encourages agents to have a AT&T wireless hotspot account or similar

account in the city where they live to provide them access to high speed internet when not at their home office.

3. Where allowed by law and MLS rules agents who have achieved the level of associate broker and have agreed to policies relating to the opening of an eXp Realty office may at the company's discretion given permission to have a branded eXp Realty office.

   1. Any branded eXp Office will be paid for by the agent or agents who have agreed to open that office and no obligation relating to that office will transfer to the company. Any financial obligation with regard to opening and/or maintaining office will be at the expense of those benefited by such office.

## 22. Personal Transactions:

1. Personal Transactions will carry a $250 / closing transaction fee + Broker Review Fee & E&O.
2. Personal Transactions do not pay out upline Revenue Share.
3. Contractor may exempt 3 personal transactions per anniversary year.
4. Contractor must be in good standing with the company (current on invoices)
5. Contractors, contractors business or person of lineal relationship must be on the title

## 23. Professional Practices:

1. In addition sales associate will keep his automobile clean and organized.  It is recommended that the sales associate wash his/her car not less then once per week as an active agent and more if necessary.

2. **Dress**
   1. When showing property, sales associate must maintain a clean and presentable appearance. It is highly encouraged that agent dress in business casual at a minimum when first meeting a client and to maintain a wardrobe which is consistent with being a trusted professional.

3. **Automobile**
   1. Clean
      1. Wash car no less than once a week when actively involved in listing and showing property.
   2. Organized
      1. Use of Document Organizers in the back of automobile encouraged
   3. Newer (2008 on)
   4. Good Condition
      1. Dent Free
      2. No noticeable cracks in windows
      3. Interior in good condition
         1. no holes in the carpets, seats or roof
   5. 4 Doors
   6. 4 Passenger Seating Minimum

4. **Presentation Materials**
   1. eXp Realty Folders to hold materials for clients

5. **Laptop**
   1. See New Agent Toolkit.

24. Using Online Company Resources:
The company pays for many online resources to support the business of the agent.  Please do not abuse any of these facilities.  The services provided are being provided as a service to you as an agent and to make the business smoother for all agents and staff involved.
Resources Provided Include:
   1. eXp World
   2. Google Apps
   3. kvCore

## 25. Home Office:

1. **Hardware, Software & Internet Connectivity:**

2eXp_000221

1. See: New Agent Toolkit.

## 26. Company Lead Program

The Company Generates leads through the IDX's on the top ranked websites the company owns and manages. These leads ultimately generate the income necessary for the company to be able to launch new websites as well as increasing the functionality and visibility of existing websites. The revenues from these sites help everyone earn more by providing a way for agents to supplement their database of clients back to themselves.

Agent's participating in the Company Lead Program will execute a separate addendum making them part of the Company Lead Conversion Program.

Company Generated Leads come in in a number of forms:1 - Relocation Requests
2 - Specific Area Requests
3 - Specific Property Type Requests Company generated leads continue to be property of the company and can be reassigned if necessary to maximize revenue to the company.

1. IDX - New Website Users, New Saved Searches, Property Information Requests, and Inbound Phone Calls from the Websites themselves
2. Form Leads - Forms on the Website that result into a lead. These could include:
   1. Relocation Package Requests
   2. Specific Area Requests
   3. Specific Property Type Requests

## 27. Blogging

1. Local Rules / Fines

## 28. Social Networking

1. Since Agents are the face of the Company Agents will be professional in the appearance and their interaction in the Social Media.

## 29. Agent Recruiting

1. Agents are encouraged to recruit other agents to eXp Realty however in order to make sure that Agents, Brokers and Leadership are working together as a team the following recruiting policies have been put in place.
   1. Prior to doing recruiting via Craigslist, email marketing and/or other lead generation outside of ones current sphere of agents or agents whom recruiter has association with agent will need to meet the following requirements.
      1. Have personally recruited 1 agent from sphere or local MLS area prior to each outside market area agent or broker would be running direct marketing efforts using services like Craigslist ads or doing direct mail campaigns.
         1. In additional Ads must be approved by:
            1. Local Ads - Your State Broker
            2. Existing States other than local State - State Broker for that State
            3. New Market Ads - Corporate (Glenn Sanford)
      2. Be proficient at doing the eXp eXplained Presentation and be doing these presentations for his/her personal recruits.
      3. When Recruiting in any market area Recruiter should understand the local rules and regulations and to some common practices in the market one is recruiting in.
   2. Recruiter must establish a meaningful relationship with prospective recruit such that the recruit will feel comfortable in naming the recruiting agent as the person most responsible for getting that recruit to join eXp.
      1. Recruiter and Recruit need to continue active dialog throughout the process.
         1. Similar to Procuring Cause: It's an unbroken chain of events that leads to the recruit signing up with eXp.
            1. Recruiter can't alienate (personality or otherwise) Recruit and still expect that Recruit to be in their Rev Share group.
            2. Recruiter can't abandon Recruit and still expect recruit to be in his/her revenue share group.
   3. As a point of reference in the event of a dispute between recruiters the company will

2eXp_000222

be using the NAR policy on Procuring Cause as the basis for making decisions.

    1. If necessary a Mediation Panel of Fellow Agents outside the market area will be pulled together to determine a binding outcome of who was the Procuring Cause for said Recruit.

4. Recruiter will notify and bring Regional Overseeing Broker into the conversation with potential Recruit at the point in time where Recruit has indicated a significant interest in joining eXp.

    1. For Interview to see if Broker agrees that potential recruit would be a good fit for eXp Realty.

    2. Broker may pass on any agent who he/she doesn't believe will be a good agent and/or provide a good impression of eXp Realty in general.

    3. Broker may also pass on an agent if the infrastructure is not yet in place to support the agent as in the case of expanding into new MLS market areas in the state when the company isn't already operating there.

## 30. Avoiding Stock Solicitations

eXp World Holdings, Inc. (the "Company"), as a company with publicly traded common stock, is subject to requirements relating to the substance and manner of public communications. In addition, federal securities laws generally require that, in the absence of an exemption, offers to buy stock, and solicitations regarding stock, need to be preceded by a filed registration statement relating to the offer. Accordingly, as outside corporate counsel to the Company, we recommend that all employees and agents of the Company follow the following guidelines, for the protection of both the Company and those affiliated with it:

- Only an Executive Officer or Director of the Company can solicit interest in, or encourage others to buy the Company's stock, or promote the Company's stock as the basis for encouraging others to join the Company.
- Only Executive Officers and Directors who are authorized to speak on behalf of the Company should discuss the agent equity program or similar stock incentives in any detail. Employees and agents, whether on social media or in recruiting efforts, should merely point out that such a program or incentives exist, and direct potential agents to Company approved resources or publicly available information.
- Both in public and private conversations, including all social media platforms, employees and agents should not comment on the potential or projected growth of the Company's stock, or encourage people to buy the stock or join the Company based on the stock's growth.
- All directors, officers, employees and agents are subject to SEC Insider Trading regulations, which include the obligation not to disseminate confidential information of the Company.

## 31. Use of Internet Employment Websites

The solicitation or recruitment of potential licensed real estate professionals by current licensed real estate professionals of eXp by way of job postings on third party internet employment sites (e.g. Indeed, Monster, Glassdoor, LinkedIn, etc.) is prohibited. Any use of third party employment websites by current licensed real estate professionals of eXp to solicit or recruit human resource for unlicensed positions shall not contain any reference to eXp Realty.

## 32. Agent Recruiting and Attraction Websites and Video

1. Except for URLs owned by eXp agents that re-direct the user to eXp's official agent attraction website located at join.exprealty.com (or such other URL that eXp may designate from time to time), eXp agents who wish to use a personal website primarily intended for agent recruiting/attraction purposes shall notify and obtain approval from eXp for such website prior to the website being generally accessible via the Internet. eXp reserves the right to limit the use of any personal website to the extent eXp determines in its sole discretion that the website does contain accurate information about eXp or does not accurately represent eXp's desired image or brand. For purposes of this policy, a "website" includes a webpage or webpages accessible via an Internet URL or a designated page on a social media site (e.g. a Facebook Page).

**2eXp_000223**

2. eXp agents may not publish via the Internet (e.g. websites, Facebook, Linkedin, YouTube, etc.) or distribute via other means any recorded video content that is primarily intended for agent recruiting/attraction without receiving written approval from eXp prior to such publishing or distribution. eXp reserves the right to limit the use any video content to the extent eXp determines in its sole discretion that the video content does contain accurate information about eXp or does not accurately represent eXp's desired image or brand.

3. For clarity, except as limited above, this policy does not prohibit an eXp agent from using Facebook and other social media sites to engage in agent/recruiting activities as otherwise allowed by eXp.

4. eXp agents wishing approval for websites or videos should submit website links or web/video content to marketing@exprealty.com.

## 33. Recruiting Assistants

eXp agents may use the services of not more than one assistant to schedule meetings and telephone calls with prospective eXp agents and handle other administrative tasks related to recruiting. To qualify as an agent's assistant for purposes of this policy, the person must be a full or part-time employee of the agent (not an independent contractor or third party service) and subject to the control and supervision of the agent in all matters dealing with recruiting. Recruiting assistants shall not engage in substantive conversations with any potential eXp agent including, without limitation, describing the specific benefits of eXp. Except as allowed above, eXp agents may not use the services of any other person or firm to engage in any contact with potential eXp agents on behalf of the recruiting agent.

## 34. Policy and Procedure Updates and Review:

1. Sales Associate will review these Policy and Procedures a minimum of once a quarter to monitor any changes to the document. In addition email updates on changes to this document are considered constructive notice about modified Policy and Procedures.

**EXHIBIT K**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**8/18/2020 Call to Michael Bjorkman with Cory Haggard and Jim Nuth**

We have received comments

He is aware of it

We are returning your license in the interim

He is the last guy to do something like this

We are not accusing we aren't saying anything

If you are exonerated, we will return you to your spot

We are not investigating, the police will be conducting this

The state broker will work with you on any deals you have.
We will not charge the 20% to your deals

If you're exonerated, you will be put back in your spot


**Call with Jason Gesing and Noelle Nielsen 10/1/2020 approx. 12:00 pm MST**

- Thanked her for his message
  - We acted quickly in one respect, but we've taken a bit longer considering your request
- The challenge for us is the negative impact to the people above in your org


- They are both attorneys and she was in human resources
- She would not have stepped into a position without a sponsor to provide coaching
  - Mike said he would provide this, and this is why she chose to leave her own brokerage to join eXp
- She will never reach out to David Golden, ever, she has blocked him
  - He is trying to change the narrative
- She doesn't want eXp to come out in a negative light, so she went to Kevin Cottrell
- She is hearing things from other potential victims of Mike and maybe David
- There is no one she is comfortable going to in her upline anymore, she doesn't think Brent can fulfil help to her team.
- She doesn't feel good about people making money off her and her team's efforts.
- David and Rosie know about Mike's behavior. In Feb it came to her attention that they asked
- At least three women in eXp, one has left eXp in a weird fashion, and she said she will never come forward to speak about what Mike did to her
- David is aware and has been part of what Mike has done

EXHIBIT 5
WIT: _Bjorkman_
DATE: _8/6/25_
JILL E. SHEPHERD, RPR, CSR

**CONFIDENTIAL**                    2eXp_005536

Noelle Nielsen ~ Confidential ~ eXp Realty

To:      eXp ~ Dave Conord, Jason Gesing, Cory Haggard
From:   Noelle Nielsen
Date:   October 6, 2020
Re:      Bjorkman/Golden Investigation

---

I want to begin this "written statement" by saying, this may be one of the more difficult things I've ever written. Characterizing people based upon their actions (as opposed to the potential they have within them) is something that is outside of the scope of my comfort zone. Mike, David, Rosie and Rick all have/had amazing potential within them to be good humans. And many times, they actually were. They were friends. They at times demonstrated warm hearts, generous natures, and true kindness. However, that cannot overshadow the other behaviors that were exhibited that bring them outside of the scope of what's professionally expected and acceptable within a brokerage, a company, or a leadership position.

I have tried as best I can to limit this statement to first-hand knowledge. But there are some elements that came from others. I use that knowledge to share it with you, as I know many of these individuals are too afraid to come forward. They've been threatened. They have the same feelings that I described above about these individuals. The lines are blurry. And it's hard to stand up and say when and where the gray matter turns to black.
OVERVIEW of "fire-worthy" offenses… or at a VERY minimum, switching my sponsorship line and allowing the others in my position to do the same:

Mike Bjorkman:
Rape, Sexual Harassment, Illegal Drug Use, Mental Manipulation, Coercion, Abuse of Position…. and… if none of that matters… hiring a recruiting company.

David Golden:
Knowledge of Mike's Behavior, Participation in Mike's Behavior, Sexual Harassment, Illegal Drug Use, Mental Manipulation, Coercion, Abuse of Position… and… if none of that matters… hiring a recruiting company.

Rosie Rodriguez:
Knowledge of Mike and David's Behavior, Participation in Mike's Behavior, Illegal Drug Use, Mental Manipulation, Complacency, Abuse of Position…. and… if none of that matters… hiring a recruiting company.

Rick Geha:
Sexual Harassment, Knowledge of Mike and David's Behavior, Complacency, Abuse of Position



EXHIBIT 15
WIT: Sanford
DATE: 3/21/25
Judy Bonicelli, RPR, CCR 2322

NIELSEN - 000008

Noelle Nielsen – Confidential – eXp Realty

In early April of 2019, I attended an event in La Jolla (at the invitation of Jesse Zagorsky) at which I met Mike Bjorkman, David Golden, and Rosie Rodriguez. At this time, I was running my own successful brokerage, Bright Birch Real Estate, and had never even considered joining eXp. At this event David and Mike quickly "zoned in" on me, and I became their next unwitting "target" for recruiting. They both knew who I was from the real estate videos I was known for making. But this was my first time hearing of them. At the time, I did not actually recognize that this was what was going on. I just thought they were very interested in speaking with me about my videos, etc., as I had grown a following in the industry at this point. At this event, which was called "FOMO", they rented a large house on the beach and many of them, and the attendees, stayed at the house. Not knowing anyone very well at this event, I had booked a hotel, and rented a car, and stayed off-site. (As time has passed, I have learned that this is how they recruit… by renting large homes or suites, and getting people to "let loose" through drinking and drug use… hoping they will convince people to sign up, while they are intoxicated, or get them to do things that are hard to take back and embarrassing and use that against them in order to coerce them to join… there is no "off the clock" for these people). During this event, I did notice that there was quite a bit of drinking, potentially some drug use, and Mike and David both offered me, made, and tried to get me to drink some mixed drinks. I set each of those drinks aside and continued to drink my own sodas I had brought (as I'd gotten in the habit of no longer drinking, especially when I was unaccompanied by my husband, Seth). During this event, there were also rumors of "hookers and blow" being offered in one of the rooms. I laughed and thought it was a joke at the time. I hadn't actually thought about it until recently, when another colleague brought this back up when discussing everything that has been revealed. As someone that hasn't ever participated in activity like that, and doesn't tend to hang out late into the evenings, I guess I was naive and didn't realize this was actually a "thing" in some of these circles. At this event Mike also made many incredibly lewd comments to me. Not knowing him well at the time, and seeing him surrounded with his "buddies", I didn't know what to make of it… and initially I had decided I did not like him. He made the comment that I had the kind of face he could stare at while "fucking", among other things. I decided to ignore him and tried to avoid him for the rest of the event. David and Rosie were both also at this event, both drinking… and in fact, Rosie had so much to drink (or perhaps it was drug use) that the second day when I arrived in the morning, she had ordered an "IV detox" truck to come to the house to assist her in feeling better. I thought this was bizarre and hadn't ever seen anything like it before.

That following week in April of 2019, I drove up the coast to attend a mastermind in Beverly Hills, with my husband, called Closing Table. This was my second "time" meeting Mike Bjorkman, and my husband's first. Before my husband arrived at this event, Mike said he was mad at me for having a husband, and that I could come up to his room quick, before my husband got there. I ignored him, and once again, tried to get away from him. However, after my husband arrived, he turned his behavior around, and became incredibly professional and presented himself as a leader in the industry and as a coach. His beautiful business partner, Tami Edwards, was also at this event. She seemed classy and sweet, and I wondered if I had mis-judged Mike. (Unbeknownst to me, this event was also the downfall of Tami's partnership with Mike and it would also be one of the last times I would see or speak with her). The

2

Noelle Nielsen – Confidential – eXp Realty

behavior, and lewd comments I had experienced at the previous weekend's event disappeared from my sight and I never saw much more of that for several months until after I joined eXp. In fact, I nearly forgot about most of what I had witnessed in La Jolla. Many well-known people and friends in the industry seemed to be friends with Mike. It also became very well known to Mike, and to David, that I was very strong in my faith as a Christian, and not the partying type. After finding this out, Mike then told me he was a Christian too, and even prayed over a group meal we had when we went out to dinner at this Mastermind.

After Closing Table, Mike and David convinced me to download the app, Marco Polo, which they used to communicate and recruit. We stayed in touch in this manner. But from that point on, until I joined, the conversations were mainly professional and about growth and giving up the stress of running a brokerage. We had many conversations back and forth about whether or not this would be a good company for us to join. (After we joined eXp, the Marco Polos started becoming more and more odd, many times with them without shirts on, or even occasionally from their beds, and I actually even have some from them with their girlfriends or with other women naked).

The next time I saw Mike and David (and Rosie) in person, was mid-June of 2019 at the Lab Coat Agents Live event. Mike and David came into town for the event, and immediately invited Seth and I to hang out. Seth and I went to an early lunch with Mike, at which I decided to have a glass of wine, as I felt comfortable, being with a "known" friend and my husband. One glass turned into two and then after we were done with the lunch, around noon, Mike invited us up to his private suite in Coronado to discuss the idea of us moving our brokerage over to eXp. David and Brannon Lee were also in the suite. In this suite, they mixed a drink for Seth and I. I did not watch how, or what, they were making it with. At that point, I remember having some of the drink and then I don't remember much after that. However, I have many friends (Sam Khorramian and Oliver Graf from Big Block, who also run Closing Table) and all of the agents from my brokerage, who were witness to the fact that Seth and I were "wasted" after we left their suite by 1:30/2pm and we ended up making our way back to our room, passing out, and waking up the next morning being incredibly ill, not remembering what had happened the previous day. I was beyond mortified by "my actions" and that I had let myself get "so drunk" that I didn't want to discuss what had happened with anyone. (Later I would discover that Mike was texting Tami Edwards about this, and making fun of us for "getting wasted" in their suite, which was their typical MO... to shame people so no one would reveal the nature of what happened and match their stories. It's also come to my attention that during this same event, they had many drugs with them, and were using that with other potential recruits (Sevin Murdock being one of them)). I was the MC for the LCA Live event that day with Borino, as well as a large-group presenter, and it was really difficult to make it through the day. Everyone made fun of us for what had happened (since it is SO out of character with how we are). We really never discussed it again, until, I got the call from another agent and friend, Aimee Freeman with KW in NC, earlier this month, to tell me, she believed she had been drugged by Mike at her Club Wealth event in Maui in March/April of 2019, after she found out that another girl (Christy Lundy) had been drugged at the more recent event in Vegas in August 2020, and had "gone public" with her accusation. This instantly brought back the memory of LCA and

3

Noelle Nielsen – Confidential – eXp Realty

what had happened... and although I will never have proof, it seems that I may have been one of the statistics from the behavior Mike and David are accused of exhibiting.

After the drinking incident at LCA, Mike invited his wife, Ann-Marie to come down to LCA/Coronado, and the two of them took Seth and I out for dinner and to spend a day in Old Town. They raved about their sons, and from all appearances, were the normal, all-American family.

Our conversations about joining eXp continued throughout the summer, and Mike and David were crucial in connecting us with many people that ended up influencing our decision to join, including Dave Conord and Kevin Cottrell. On the flip-side, I also received calls from several people who knew I was considering this option (one of them being Michael Hellickson who runs Club Wealth), begging me not to partner with people like Mike and David and warning me about who they were. At the time, I did not understand the gravity of what they were trying to tell me, because no one just came out and said what it was that was the problem. I recently heard from others that Mike had had an affair with Michael Hellickson's assistant several years ago. Whether that is true or not, I do not know.

The ultimate piece of the decision for our agreement to leave, was a separate arrangement that we came to outside of the eXp agreement, where both Mike and David were separately responsible to make monthly payments to us in order to help us cover our brokerage expenses, lease, etc. as our rev share was just beginning, and would not cover the immediate losses that we realized when we gave up our fees. These payments began shortly after we signed on in September of 2019. With some reminding, they made the payments for a few months. Then both of them breached their agreement, and stopped making the payments altogether. (I share this only to give context to the break-down of my relationship with them).

The day we announced we were switching over our licenses to eXp, late August of 2019, we flew to Brent Gove's event at Red Rock, with our two biggest producing agents. The day started with a pool-side party, and it quickly became apparent that this was part of the culture that we had just joined. I suppose in that moment, I should have backed out... but we literally had just gone national with our announcement that morning, via video. At this event, the first sign that something was really off, was when David missed his stage appearance on the main stage (it later would come to be revealed that he was too high and too drunk to come up on stage). At this event, we spent much of it, trying to convince our (at the time) reluctant teammates to trust us... and not enough time focusing on the mass chaos we had just entered into. We did not participate in any of the suite events or any of the late-night partying. (It was brought to my knowledge that it was also at this event that Julie O'Dell, one of Mike's other sponsees, overdosed on some combination of cocaine and ghb.  Rosie was present for this, and discouraged them from sending Julie to the hospital. Rosie was very aware of the drugs the "boys" brought with them and engaged in with their agents, and many times participated as well. She was also very aware that the "boys" (men in their late 40s and 50s) were having sex with many of the younger women in their groups, sometimes together, sometimes alone, sometimes by choice, and it sounds like, sometimes by force.)

NIELSEN - 000011

Noelle Nielsen – Confidential – eXp Realty

At this event, it was also my first time meeting Rick Geha. He immediately started complimenting me on my "eyes" and my eye color and my physical appearance. Not long after this, I would start to receive Marco Polos from Rick as well, that had a consistent I like how you "fucking look" theme. I have a montage of these videos I can provide.

(Also not long after this, I received a private facebook message from Jay Kinder, of a video of a guy opening a white claw drink, pouring it into a glass, and then a dildo dropping into the glass. I wasn't sure how to respond to this, and said "that is exactly why I don't drink that crap. Diet cokes all day." Jay Kinder wrote back "What? You don't like dick?"... I'm sharing this... because I believe this to be a part of a culture that eXp has enabled and allowed to thrive within its "structure", that I so desperately want to see changed.)

Fast forward a few months, Mike, David, Rosie and Rick all came to town for an event we hosted in Minnesota. Prior to the day of the event, we went to dinner with a few of our local recruits. After the dinner was over, I went to take Mike, David and Rosie home. (Rick stayed at one of his, now recruit's, homes that night... and Mike and David insisted on how this woman was Rick's partner outside of his marriage and that he had an open relationship... this was the first time I started hearing about this lifestyle/culture). On the way home, the 3 of them tried to pressure me to stop at a well-known strip club in Minneapolis, Deja Vu. The three of them had been drinking, and I had not, and am not easily swayed. I said no, and explained to them my feelings about strip joints. They got upset, called me a fun-killer, but I drove them back to their hotel anyway. The next morning I came back to the hotel to pick them up, and Rosie was too hung over to actually make it to the morning of the event. We went through the event day like normal, and out to dinner that night where many of our recruits and agents joined. Rick also had several of his own recruits at this event and dinner. At this dinner, it later turned out that Mike had a very public, loud and very "dirty" conversation with one of our agents, who claimed told him she wanted to leave and "sleep with him". I questioned this conversation as it was not within the parameter of who I knew her to be. He was very vocal about it. That following week, this agent quit our group without talking to anyone. As I was preparing to bring Mike and David back to the hotel, they started yelling at my young assistant to come back to their room with them. Thankfully, I convinced her that she should get a ride home, and not follow their requests. The following morning I returned back to pick them up. David got in the car, but did not know where Mike was. Mike had apparently not returned to his room for the night. This was the first time I became aware of the fact that it was not out of the ordinary for Mike to be unfaithful to his wife, and it was not a "big deal." I brought David back to our office to prepare for the eXp explained we had planned for that morning, and it was at this time that David also discussed with me that he did not believe in monogamous relationships, and that he was a "swinger." He discussed multiple things with me and I told him that I didn't agree with his statements or his lifestyle, and that I thought God had a different idea of things. This was the first time David and I ever had a discussion about this. It was also at this point that David began accusing me of "judging" him.

NIELSEN - 000012

Noelle Nielsen – Confidential – eXp Realty

A few weeks later, in November 2019, I saw Mike again at another Closing Table mastermind in Napa. When I arrived, Mike was already fairly intoxicated, but as the day went on, he became much worse. By the end of the day, as a group of us was heading out to a restaurant, Mike grabbed onto me and tried to kiss me. I pushed him away and told him to leave me alone. He kept telling me he loved me so much. Two of our friends (Sam and Oliver, who are mentioned above), told Mike to back off and leave me alone. Mike was not in a good state, and for the rest of the weekend, I tried to avoid him. This was particularly embarrassing as, at this point, Mike was now my "business partner" through eXp, and many of the attendees and witnesses of his behavior were potential future "recruits" for us. The next day, when confronted about his behavior, he denied it and accused me of making it up. When everyone else highlighted his behavior, he shrugged it off. (This was also the first Closing Table that Tami was not present for, as it turned out, she left her partnership with Mike, and fled to the other side of the country, to Florida, to get away from him.)

The following month, I was invited by Mike, David and Rosie to go visit Gene Frederick in Puerto Rico. Of course, I was excited to go on the trip and meet Gene, and felt comfortable since Rosie would be there. We rented a 3 bedroom VRBO in PR. On my way (already on the plane), Rosie informed me that she would not be able to attend as she was ill. During this trip, I was on a heightened awareness that I was with these two men and in a vulnerable spot, but nothing out of the ordinary happened, besides further uncomfortable discussions. Kevin Cottrell and his wife Meg were also visiting at this time and Mike and David were on good behavior. While they did mix drinks on this trip, and offered me some, I did not drink them. David during this trip, had told me that there was no drug on the planet he had not tried. One evening, the two of them told me they had some questions to ask me and they wanted to know how/why I could stand to be in a single marriage, and how my "sex relationship" worked. I told them I didn't want to talk about that with them. At this point, David started getting upset and very mad at me, as I discussed with them once again, my feelings on both of the lifestyles that they were leading. David told me that he liked to be with more than one girl at a time, and that the girls he was used to being with, also liked it. Then Mike started talking about porn, and his use of it. He wanted to know if I had ever watched porn, and if my husband and I watch porn together. I removed myself from the conversation and went and locked myself in my room. It was uncomfortable to say the least. The next morning, I had Gene come and pick me up and he took me to the airport. He didn't know why I wanted to go to the airport so early, but I was thankful to be out of the situation. From that time on, I spent much less time with Mike and David, and only tried to hang out with them in professional settings.

In early February 2020, Brent Gove had his Cabo trip. This was really when our relationship started to unravel. I had already informed the guys that at this point, I no longer wanted to travel without my husband, Seth. Rosie was also aware of this. David was having a very hard time with the fact that I was refusing to come. The next thing I knew, I got a call from both David and Rosie, telling me that they had invited two of my recruits that I had been working on, and they had been helping me talk to, to Mexico. And because they invited them, I HAD to come. I refused to go, and was really upset at this happening. David told me that if either of the recruits decided to sign up, while on the trip, that they would have to sponsor to David, since

6

Noelle Nielsen – Confidential – eXp Realty

he was paying for their rooms. (It turns out that right before going on this trip, one of these girl's spouse, received a call from Mike's former sponsee, Tami Edwards, and it was a strange call, warning him to warn his wife (Sandy Stites), not to drink any drinks made by Mike and David on the trip. It also turns out, that while in Mexico, David tried to get Sandy to come back to his room with him and his girlfriend and propositioned her. She refused, and felt extremely uncomfortable). The other girl, Sevin Murdock, actually canceled on them last minute and did not go on the trip, using the excuse of "covid".

At this point, I was really starting to question my decision to join eXp, and to join Mike and David, because, really, they were eXp for me. A few weeks later, in late February, we had another event in Minnesota, for which Mike, David, and Rosie flew out again. They came each time, because as an incentive for them to come, I would create a few videos for them to use for their own recruiting efforts, in return they would help me with my conferences.

During the Minnesota trip, there was an evening when we went to go to dinner with one of our real estate colleagues who runs a local, large brokerage of 500 agents, Mike Bernier with Realty Group. At this dinner, a comment was made that Bernier should consider switching his brokerage over to eXp. Bernier said that was never going to happen. At this point, David said, "well, then we'll just take all of your agents." Bernier, who had also had too much to drink asked David to take it back, and David refused. The altercation heated up really quickly and both men stood up. I begged David to stop and just take it back. David refused. Mike Bjorkman just stood there laughing. The bar manager came and asked them to stop, but David refused and started getting mad back, yelling at Bernier. Bernier then threw a stool (this is the nicest restaurant in the Mall of America). The cops had to show up and break up the fight, and at this point, I left and decided I really did not want to talk to these two much anymore. So, I stopped responding to their non-stop, crazy texts and emails begging me to forgive them. The next day, we had another recruiting meeting with some of the agents from my team and a large team leader, so I went, but was still not speaking with Mike and David. At one point during that lunch, I made a statement to the agent about why I like eXp. I was sitting across the table from Mike at the very end of the table, and Mike leaned over and whispered to me, "Oh God, I am so turned on right now."

From that point on, my conversations and discussions with Mike and David were had out of necessity. I was basically done with them, except that the structure of eXp required a continued relationship in some capacity. In March, my lead teammate decided he was ready to leave my team and go out on his own to be with another agent he had recruited in. When I asked him why, he said it was in part because they knew how I felt about "recruiting" and that Mike and David had convinced them that they should partner together and hire the same recruiter that Mike and David had been using, with Rosie's help (CityBlast). I had tried to explain that this wasn't within the eXp guidelines, but no one really cared what I had to say on the topic. Because of this, I became so incredibly frustrated with the loss of income that I was left with when my teammate left, and I began feeling extremely isolated. I also had a separate conversation with Sam Rodriguez at this point and asked him what the rules were. He verified I was correct, and asked if I would "name names," because it was a fireable offense. But… with

7

Noelle Nielsen – Confidential – eXp Realty

the way that the eXp structure works, this would then leave me without a "functional" organization above me, and put me in a tough spot to "compete" against other well-known lineages at a national level, and made me feel like I didn't want to "turn anyone in."

It was around this same time that it came to my attention, via Megan Farrell-Nelson, that they had also requested her, and then one of her teammates to "score them some cocaine" for when they visited Florida for one of her events. She called me and asked my advice. I asked her if she would be ok with me calling Rosie about this. She said it was fine. So, I called Rosie, and Rosie basically said to me, "oh well, boys will be boys". She never would take a position when they "misbehaved." In that same conversation, she also offered to pay for a free month of recruiting for me ($1000 worth). I again said I had no interest in that. Next, I called Rick Geha. Rick didn't really want to discuss their behavior either, but instead wanted to "coach me" on team growth, which at the time was not at all what I needed or wanted. I also talked to Rick about the recruiting situation, but he did nothing about it, to my knowledge. And then, finally, I called Brent Gove. Brent listened, but offered no solutions or help, and was in fact "late for a tee time" and didn't have very much time to talk through the issues I was experiencing with my "upline".

During all of this time, Mike and David also kept the women in their group from talking with one another. They would say things on phone calls and in Marco Polos that would cause the women to believe they did not care for one another. They definitely did this between Megan, Julie O'Dell, Tami Edwards, and I. I now believe it was because they did not want us to speak with each other or compare the stories of their manipulation and honestly, mental (and physical) abuse.

However, many of us started talking as Casey Geha started running a women's group, on Rick's behalf, because they were starting to have serious turnover of women within the organization. On one of these calls, before I knew about the events of the Vegas weekend, Casey had asked what our problems with growth were… and I had responded "My Sponsors". At this point, Casey got mad, and grilled me in front of the group, and essentially told me that I was my own problem and that was my problem with growth, and that I needed to get out of my own way. (She basically "network marketed" me. It's a term I refer to, when I pick up on her strategic lines she's learned. She has done this over and over, and since with Megan on her "situation". I refuse to pick up her calls anymore… and haven't since I stopped using her Nuskin line and she harassed me about it, and wouldn't take no for an answer). Rick oddly, never participated in any of these calls, and really, I haven't heard from Rick since I stopped returning his Marco Polos.

One week later, I received a call from a friend (Aimee Freeman, who I mentioned earlier) saying that she had been alerted by another friend that someone (Christy Lundy) in Vegas had been "drugged"… and then Megan called me to tell me her story of what happened, and then Tami Edwards called me, and slowly all of these bits and pieces started coming together.** Over the next two weeks, I would receive countless calls from people around the country (leaders in the industry) asking what was going on with Mike, David and the crew… asking if I had been hurt,

8

Noelie Nielsen – Confidential – eXp Realty

and a wide variety of other things. Ironically, I never heard from Mike or David. Rosie attempted to call me, but after hearing that she had told Megan that Megan had "made a mistake while drinking", and basically gave Megan the same type of response that she had been giving me all along, I decided it would not be helpful to have any conversations with her and I would not trust her to keep my conversations confidential and from Mike and David... or to lead anyone in my group. I also see that Rosie to this day is still commenting on both Mike and David's posts, and I don't believe she thinks any wrong has been done.

During these many discussions, it was also revealed that Rick physically touched several of the women I have named in this statement ((groping them under the table at a meal... same story with each one of them) although, he never was physically that close to me...). I would never join Rick or Casey within the eXp community, nor would I feel comfortable recruiting to their leadership.

Note** I understand from the Vegas event from August of 2020, based on the descriptions from others (not from my own personal experience) that the following occurred: Mike (and David) are alleged to have drugged many (Megan, Christy Lundy, Mike Henry, and others) on the first evening with "alcohol powder." That they also had other illegal drugs at this event (Cocaine, ecstasy, ghb, etc.). (I also am aware that eXp's position was initially that at some illusive hour the event turned into "off-hours"... but when you are recruiting, at an event, in the name of eXp... at what exact hour on the clock does it become personal time/off hours... when the event takes place in a suite and continues in a suite, with people who are subordinate to you, in your organization, and their recruits... where is the line?) Rosie also participated in the behavior happening in the suite, taking drugs and "running around with her shirt off." While hanging out in the suite, during the early morning of that Sunday, Mike pushed Megan into the "massage room" in the suite (while she was so drugged and intoxicated she could not functionally communicate) and he raped her. It's also my knowledge that David brought in a "paid friend" to be a part of the evening activities named "Bounce-house"... who he had call Megan following the weekend's event, to try to convince her about her behavior during the weekend, and try to talk her out of "crying rape" and telling Megan that Megan "gave Mike a blow job the previous evening." Megan received a call from David's girlfriend, who was also at the event, Emily (and who has been a friend to Megan for awhile), telling Megan, that if she told eXp about Mike, or anyone else, it could have a future impact on David's income, and then they would no longer get to go and party and rent suites and travel like they have been. Megan also received a text from Julie O'Dell, that was a screenshot of a conversation she had had with David, saying that David and Megan and David's girlfriend had all previously had sex on a prior occasion. Megan also tried calling Rosie after this happened and Rosie's initial response to her was, "sometimes people make mistakes when they drink... are you sure you didn't just make a mistake?".

It is my belief, that this type of behavior is not an isolated event, but is in fact, by far the opposite, and that in reality, my experience with these people has been the one that was isolated... I believe, I am the lucky one who didn't get raped, or mentally manipulated to participate in some type of orgy or other disgusting behavior. It is their MO to travel together in

9

NIELSEN - 000016

Noelle Nielsen – Confidential – eXp Realty

a pack. To get people so intoxicated that they can hardly function, to rent a suite or a house, and to take advantage of them. To video them. To follow up with statements of "you're a whore", "you asked for it", "you drank too much", "you made a mistake", "you know I would never do something like that to you", "you liked it",  etc. It is a CLASSIC case of a narcissistic sociopath. I believe both Mike and David fall into this category. They are both clever, witty, cunning, charming, good at getting forgiveness, and able to deflect, redirect, and twist a story to have the desired outcome. I am not sure why Rosie assists with it, except for the fact that they in large part have been her meal ticket with eXp, and she was responsible for bringing in David...and had one-one calls with him every, single day.

My friend Aimee has texts, and I believe Megan does too, from Mike saying "you know I would never do that do you, right?".

I have also heard, that Craig Chastain had accidentally entered a suite (or was asked to leave a suite) in which both Mike and David were having sex with Julie O'Dell (in Vegas). Julie at this stage, has been so mentally manipulated by Mike and David, that she will refuse to talk. No one wants to name her or talk about her, because they are worried she will attempt to make Mike and David "look good." She believes that if she defends Mike, he will leave Ann-Marie and go back to her. It is my understanding that after Julie joined eXp, she quickly had close to 100 agents under her. That she was bright, articulate and bubbly... and since then has become a shell of who she once was. I share this information, because I'm not sure if anyone else will share it with you all. I also want you to understand that it is the structure of the "no switching of sponsors" that puts a woman in this very, very vulnerable position. "Do I tell, and then be forced to stay with the group?" "These people say that they love me, despite how they treat me." "eXp is my family." "If they take my sponsor away from me, then who will I have." "eXp is a culture, a lifestyle." "Everyone loves them, no one will believe me." "Maybe I was too drunk?"

"Maybe it was my fault that I was at the event." (I literally have texts from Megan saying this to me.)

The reality for me is... I'm stronger than that. I was fine before eXp... and if I choose it, I can be fine without it. I don't care enough about what these people think they "might do to me" or the loss of their fake friendships, the loss of my own income from eXp, to not tell the truth and share what I know to be true. It really benefits me nothing to share all of this with you all. I seriously could walk away and start something new at this point. In fact over the last few weeks, I have gotten many calls and offers to do just that from the same brokers that wanted to partner with me before this all started. I could run, and just get out of this situation. It's uncomfortable and awkward, and honestly, I'm sure it makes me in some way, look like a fool for joining them, initially believing them, and for staying with them as long as I have. But taking the easy way out, while appealing to me, will leave many woman in vulnerable positions within the eXp's sponsorship structure, susceptible to exploitation. As much as I would like to believe that Mike and David's behavior is unique, I am sure there are others currently with eXp doing the same thing, and I am sure there will be others in the future and discover that the structure permits and fosters exploitation of others.

NIELSEN - 000017

Noelle Nielsen – Confidential – eXp Realty

It is incredibly noteworthy that I just yesterday learned that Mike Bjorkman called one of my potential recruits (Sevin Murdock out of Colorado) and asked her to write a "letter of good standing" for him, stating that she was "never raped" by him. This is a girl who he had only hung out with once in person (also way back at LCA Live in 2019), and they hardly even knew each other. I am completely appalled at his behavior, and am totally flabbergasted that if he actually was innocent... if they all were innocent... why not reach out to me? Why would none of these people reach out in a more effective manner? It's because they know... that I know.

I hope this brief overview of the last year and a half of basic hell, will give you a better understanding of why I BEG to let my organizational unit be switched. Rape or no rape, these actions are entirely unprofessional and are not acceptable for a respectable brokerage, especially one that is publicly traded. I again, will reiterate... but I will put it more bluntly this time, if I am not allowed to switch, I will effectively be forced to quit. As a shareholder, this obviously puts me in a challenging position. But it is important that if the system is not fixed, that I vocally share the risks of the eXp model in its current form to hopefully prevent others from falling victim as many of my friends have. Unfortunately for eXp, between my various platforms (LCA, Viral Video, etc.) and given the following of my videos online, my leaving eXp after just a year and my reasons for leaving, will not go unnoticed.

As I understand it, the concern with allowing me and others in situations like this to change sponsorship lines is that it would be unfair to others higher up in the structure because they would lose money. Of course, they will also lose money if I leave and if the flaws of the current structure are brought to light. While I can understand the concern to some extent, I would hope that the company would prioritize ensuring healthy agent relationships with their sponsors over the pocketbooks of those highest up in the company. As shareholders, we are all entitled to fair treatment. The expectation should be set that if one of your sponsees goes off the rails or is asked to leave the company, you may lose the entire organization under that sponsee.

eXp has the potential to be amazing and I would love to play a role in helping it reach its potential. But as long as agent-leadership is in a position to abuse their power, with no remedy for those underneath them, it will never be able to excel to a position of respectability within the real estate world. There will always be Mike Bjorkmans and David Goldens who want to party and take advantage of the people below them. There will always be Rosie Rodriguez's who won't say boo, because they care too much about their pocketbooks and keeping the people underneath them going, and/or quiet. And it will be for those "people" who don't have a voice, that I will speak up about why the "structure" cannot work. Do the right thing here. Stop the abuse of power within the system and create a playing field where, if penalties are earned, they are actually served.

NIELSEN - 000018

Noelle Nielsen – Confidential – eXp Realty

Just a few of the eXp people who have a story, who should be included in the investigation:

Megan Farrell-Nelson – has the bulk of the knowledge of what has happened at many of the events.
Jesse Zagorsky – has witnessed dark things with his own eyes (including Mike and David with women and illicit drug use)
Mike Henry – drugged in Vegas and has seen things.
Craig Chastain
Tami Edwards – has first-hand knowledge of these behaviors (and left eXp because of them)
And Julie O'Dell. Reach out to Julie O'Dell.

NIELSEN - 000019



**Cory Haggard 03:07:35 PM**

He seemed to know there was an issue floating around. He knew there were allegations but he didn't know there have been formal complaints to the police yet. Jim and I kept it very high level and let him know if he is found not guilty we would look at his standing with eXp. he was okay, professional, but denies any claim that he did anything wrong.



**Jim Nuth 03:07:48 PM**

I spoke with the CA Broker, and she was his Broker at KW where they had to part ways for issues... I asked, "What kind of issues"???



**Jim Nuth 03:09:09 PM**

According to our Broker, Mike liked to drink at the time, and his wife had come into the office (possibly more than once) so they could scream and fight when she found out about his "Side friends"...



**Courtney Keating 03:10:20 PM**

I only edits the first 3 sentences. This is well written



**Courtney Keating 03:10:22 PM**

eXp has recently been informed of allegations of sexual assault made by one of its agents against another of its agents. The incident took place at a real estate event. This was not an event that was hosted or sponsored by eXp.



**Courtney Keating 03:10:31 PM**

B20200918DRAFTeXpSexualAssaultStatement_2614680098847572.docx
14 6 KB

NFIDENTIAL

- They get a suite, bring in a daytime event, they have people and start grooming these women, get drinks with them, convince them to take drugs or drug them, Rape them, she has heard they have video's and have black mailed people with these videos
- The most recent victim has called her almost daily, She has an attorney and is filing charges against Mike. She doesn't know if Dave will be implicated or not.
- She doesn't know if Dave or Mike know about this.
- Dave called her and tried to convince her to change her story and tried to convince her it was consensual
- Rosie also called her and tried to convince her that she just got drugged.
- KC came out of the woodwork on behalf of Richard Geha.
- In Feb she heard about a cocaine incident, mike told her to ignore it. Rosie said boys will be boys, Rick wanted to just ignore it and wanted to coach her.
- She called Brent and he was too busy to listen.
- She started to back away from them in Feb when this happened.
- KC called Meagan and tried to convince her that she should move on and not think about it.
- Rosie was doing drugs and Rosie was in the room without her shirt on
- She asked the people that have first hand knowledge and they are too scared to come forward
- She doesn't Blame Brent for this. She doesn't think he is involved.
- About a 100 people in her downline that would need to move
- Meghan has not filed yet because Las Vegas PD are inundated with cases
- Tammy Edwards is one of the victims that left eXp but she has not come out and will not reveal her story She called Meagan

**Call with Megan Farrell 10/04/2020 Approx. 1:15 pm MST**

Event took place August 27th - 30th

Sunday the 30th when the assault took place
At Concourse suits

- She had a hard time believing that David had anything to do with her getting hurt
- She named several eXp agents as potentially having information or themselves being drugged at David and Michael events:
  - David Golden being mentioned as who had the room
  - **Michael Henry** may have also been drugged, talked to him about talking to the police. He is really struggling with this issue.
  - **Craig Chastain** - Craig asked if he could go to the police, in the suite and had a drink and said they felt funny after one drink
  - **Don Malory** - in the suite and had a drink and said they felt funny after one drink
  - **Noelle Nielsen** - asked for the PD number to report a previous issue
  - **Julie Odelle** - May have had issues with Mike assaulted but is also in love with Mike. She is bashing character.
- Megan knew they were taking GHB, but didn't think they were using the drugs to drug women

- **Christi Lundy** called and told Megan she thought she had been drugged. Megan asked Mike if she drugged a girl and Mike said no, she was drinking vodka, and was wasted. "Plus I wouldn't waste my drugs on her." He went on to tell her that if he did she would taste it and he would have to stir it so she wouldn't notice it (paraphrased).
- Mike allegedly asked one of Megan's downline for cocaine before he came out to an event to help them. When Meagan asked Rosie Rodriguez about this, Rosie told her that "boys will be boys."
- Rosie told her "you know some people get fucked up and they don't know they are hurting people. "Did you tell him No?" The call was initiated by Megan to try and get some help and guidance from Rosie
  - Sometimes people get Fucked up and they put themselves in places they don't want to be
  - She talked to Rosie since and Rosie told her she's not getting involved. Meagan takes this as Rosie taking Mike's side.
- Meagan doesn't feel safe with her current upline
- Meagan has blocked her sponsor and her upline
- Meagan hasn't told anyone, except for eXp and few friends, that she has gone to the police
- David called Megan A week ago Thursday to talk about the issue:
  - David is a close friend
  - She asked David if she was left alone with Mike. David said, no.
  - He was very concerned about losing eXp and what he has built
  - Mike was calling people telling people that she was, "fucking everyone"
  - A girl that Mike and David flew in, Alexandra, who later called Megan and said that Megan was giving Mike a Blow Job and that Megan liked it. This seems to be in an effort to discredit Megan's story.
  - David said he was in the other room with a girl, Emily, and this girl was in the bathroom with Mike and Megan.
  - The story seems to change
    - This is from a different night from the night in question. Megan thinks she may have been assaulted multiple times.
  - David did not openly tell her to change her story,  but he said, "there were not drugs in his room." He was adamant there were not drugs in his room. She took this as a "your story should be there was no drugs in his suite."
  - David said it will look bad that you were hooking up with him on Friday and then you're claiming on Sunday it was rape. Megan said **she never had a** consensual sexual relationship with Mike.
- There was no point where there was a consensual or sexual relationship she wanted with Mike.
- She saw David and Michael do drugs and she was given ecstasy. David gave it to her.
- David told Megan that she would be fired for taking drugs, if eXp found out.
- She had planned to stay in the suit with these people. She thought they were her friends.
  - "I was so naïve, I thought I could trust these people."
- Mike has always been disgusting, but not David.
- Megan called Casey Geha
  - She does not think they were involved at all
- Mike and David travel with GHB. She knows they use it recreationally, but she didn't think they used it to drug women.

- She found out they travelled with GHB at eXp con and David and Michael told her they use it for recovery and to take recreationally.
- She has seen Mike and David take GHB and other drugs.
- She has watched Mike and David get worse and worse with drugs. Before the assault, she was planning on talking to them about getting into rehab.
- Emily Kenan and Alexandra (the person that David Michael flew in)
  - She was in bed with Alexandra and Mike started assaulting her and took her to another room.
  - The drugs were so strong she couldn't react and stop the assault.
- She feels so ashamed and foolish about taking ecstasy, that's so not me. She was very concerned eXp would fire her for this.
- She has heard over 20 women have come forward to bring accusations against Mike.
- Mike and Julie Odelle are having an affair - Julie has called eXp agents and has slandered Megan's name
  - She allegedly said that she was sleeping with everyone all weekend And that she was doing drugs
  - Julie also allegedly told people that Megan didn't file a police report so the allegations must not be true.
- Tammy Edwards is the one that told Megan Julie was calling people and disparaging her - **Does not want anyone to know that Tammy told her this.**
- Julie Odelle wasn't at the event, but in a relationship with Mike Bjorkman.
- Megan asked me to talk to her Husband Brady.
- She is not leaving eXp, "Mike can't take my business from me too."


**Brady Farrell call on 10/4/2020 approx. 3:00 pm MST**
- 517-303-1414

- He doesn't know what happened in Vegas, besides what Megan has told him.
- In March David Golden and Mike came to Florida for an event on a Wednesday through the weekend.
- On the following day they came to Brady's house and were driven there by another eXp agent, Onya Roberts
- They had some cocktails, David pulled out an energy drink bottle, filled with GHB, and asked if he wanted some GHB. He told him no thanks and walked off.
- Everyone had 2-3 drinks, but Onya seemed really intoxicated. More than what a few drinks would cause.
- Onya was planning on driving David and Mike to the airport and they wouldn't let her because she was too intoxicated to drive.
- He doesn't know if they had cocktails before coming to their house.
- His entire demeanor has changed since the allegations have come out against Mike. David has become more defensive when speaking with them.
- He has heard other reports of women being drugged and targeted by David and Michael
  - One example Noelle Nielson

**Call with Tami Edwards 10/06/2020 12:30 PM MST**

**CONFIDENTIAL**

2eXp_005539

- She feels that anything criminally that happened between her and Mike she doesn't want to bring eXp into it
- She was business partners with Mike for six years
  - Everything 50/50 bills, splits, etc.
- When they joined eXp she noticed a huge change in Mike - all about recruiting
  - She didn't like how he was recruiting
- Six years ago, before eXp, she was at a seminar in Vegas and she got a call from Mike and he said, "my friend David Golden is at that event, stay away from him, he will drug you and rape you."
  - Then they join eXp and he wants to partner with David Golden
  - The cost to do business for traveling with David got too high. She claims it was for drinking, drugs, and prostitutes
  - They were very close like brother and sister
  - it was an excuse for him to party - attracting with David that is
  - Their partnership started to sour due to his spending habits
- This has been financially devastating to her and personally
- She had a situation with him that she won't divulge to eXp. Because of it she moved and left the business
- She claims that when she met with Rick Geha for the first time, he reached under the table and started rubbing her thigh
  - She grabbed his hand and she said don't touch me
  - He then started touching Julie Odelle who was on the other side of him
- Because of her issue with Mike, she walked away. "it was bad."
- Mike still owes her money for stock she walked away from; it was all put into Mike's name.
- April 2019, she had a "come to Jesus" meeting with him and let him know that she would not be part of it and would not go down with him.
- She never saw them putting stuff in drinks, it was the initial comments from Mike about David that led her to never want to go to recruiting events.
- She didn't know who was involved in the drugging and drugs. So, she just walked away.
- Tami and Mike started having friction because they didn't agree on how to do attraction/retention
- No police report against Mike. She illuded to the fact the issue was similar to what happened to other people.
- Debbie Penny told someone on team Bjorkman he will be coming back
  - Still using team Bjorkman.
- There was an instance where Mike berated Tami's daughter and called her a "fat ass" in front of 25 people. Tami's daughter has an eating disorder.
  - "All you ever do is think about fucking food you fucking fat ass."
- Mike owes her approx. $20,000 of stock purchases
- She wants her sponsor to be moved away from David Golden. She won't pay a dime to Mike or David
- She still believes in eXp. She loves the company
  - She wants to take these "battered women" and wants to help them
- "David is a devil"
- She believes there is a fine line between business and personal life
  - She knows some things, but she thinks there is personal and private life
- Not so much evil things, but dirt bag things

**CONFIDENTIAL**                    2eXp_005540

- She has been shown videos of David where she saw him completely naked performing sex acts with women
  - Mike showed her these videos
- She feels they've made a mockery of eXp.
- They told her to keep quiet and that their party tactic was to get people to eXp
- She feels eXp gave them the vehicle and excuse to travel around and party under the guise of eXp
- She just thought it was alcohol, not drugs. She knew they would get women wasted drunk and then sleep with them and act like it was okay.
- She saw them take aderole and he knew that Mike kept GHB in his five hour energy drink bottles
- She is coming to me because people are upset that she was associated with them and that she wasn't making the right thing by not coming forward.
- A club wealth event in Hawaii in February 2019 they held an event they were all drinking and Amy Freeman, Amy got really sick and she was more intoxicated than Alcohol can do.
  - They called paramedics and they took her to the hospital
  - Mike Bjorkaman said that the owner of club wealth "can't know about this because they'll blame Mike."
  - Mike then went on to say, Amy was too wasted, she wanted it, she was so into me
  - Mike was trying to recruit her
  - David was not at this event. David was banned at a lot of club wealth events for his reputation
- They always told Tami she made things not fun. Mike tried to hide things from her
- After the allegations came out, he has not reached out to Tami. She hasn't heard from her. He hasn't told.
- Tami walked away from all their rev share because it's dirty money
- Mike is planning on going to i-Real (possibly REAL)
  - Allegedly Mike is poaching our people
- Approx. 7-10 people have reached out to Tami and they want their sponsor changed to Tami from Mike.
- She wants eXp to take a chance on her and let her support this Mike Team and continue to grow it
- She wants to take over where Mike has taken off
  - She doesn't want David to earn from this team.
  - If David has to stay she is okay with that.
- She was not happy with payments to Noelle, the verbal abuse of her daughter, so she left, then whatever happened that she wouldn't disclose.
- She has corporation paperwork where it shows 50/50 with Mike and her. They never filed with eXp.
- They are currently dissolving the partnership.
- She has heard there have been at least 4 police reports and 11 women (she has no evidence of this)
- She believes that Mike feels he has done nothing wrong. He seems to think it's always consensual and they wanted it.
- She has heard he has an attorney and is coming after eXp for wrongful termination.
- They would get people drunk and get them to sign to join eXp

- They hired recruiters to get people to join eXp. She was gone at that point but she heard they were doing this when she was leaving.

**Call with Noelle and her Husband, Seth 10/12/2020 approx. 3:45 PM**

- Noelle and her husband didn't want to send the videos because of the terms of services of Marco Pollo
- They used Marco pollo for recruiting communications in the group.
- On Friday Scott Marllow sent a video about Satan and being a liar to Megan
  - Megan is supposed to send these to me, but she hasn't yet
- She claims they deleted a bunch of videos (Michael and David)

Video #1 - Michael and David
- Marcos with their shirts off. Noelle asked them to put on a shirt and they wouldn't, they thought it was funny.
- Group video between Mike, David, and Noelle
  - David showed his girlfriend in bed with him. She flashed the camera, exposing her breasts several times
  - David said is that a shadow nipple?
  - She said sleep well, and David said they were drunk
- She would tell him don't send these again and they would think it was funny
- David with a women and Michael the women was kissing Michael
- David in bed with half naked women in bed with him
- Michael with his shirt off in almost every video she shared with Noelle
- Talking about eXp in bed without a shirt on. Talking about rev share

Video #2 - Rick Ghia
- Rick always wanted to facetime her
- "Hi gorgeous", your family is beautiful
- He would provide coaching, but he constantly came back to her physical appearance
- You're fucking gorgeous with or without makeup
- You look gorgeous today, your makeup looks intense today
- Love that shirt you have on, that's so you.
- Your lip gloss is bright but you can pull it off
- You are so fucking adorable
- That color blue looks very nice on you
- I missed the Fuck out of you
- You look good in African garb
- You're married to an attorney, should I not do that?
- I tell you you're beautiful because you're an attractive person and your beautiful on the inside
  - I don't call you beautiful lightly
- She gave Rick a necklace he asked about as a thank you for coming to an event for her
- He showed her that he put on the necklace and thanked her for it. Said his wife liked it.
- Love you bunches, you're an amazing woman
- I miss you I'd love to hear from you
- I miss your face and facetiming you

- We have to facetime instead of calls so I can see your face
- I adorn you, I can't wait to spend time with you
- **I'm here to help take care of Michael and David if they get out of hand - Noelle didn't know what exactly he was referring to.** Rick says he knows that Mike and David can be frustrating to a lot of people. I'm sure you know how to handle them, but I'm here to help if they get out of line with you.
- Noelle started feeling uncomfortable, so she started to distance herself from Rick and stopped responding
    - She didn't know how to handle it so she just went silent and stopped responding to him
- My you looked great in your last Marco
- **I'll tell you something, lets say I learned a lesson. It was an accidental lesson that wasn't intended. -** Noelle says she thinks this was the issue that happened with Meagan.
- Tell you how special you are to me. How blessed and grateful I am to have you in my life and in my business.
- Hey sweetheart lets kick some fucking ass in 2020
- Hey gorgeous....
- Love you, baby see ya later

- Noelle said she wouldn't have sent this over if it wasn't for the current situation
- She doesn't want Rick fired, but she wants to be out from under Rick. She can't work with him going forward
- Rick has not reached out to her at all since March.
- Mike, David, Rick have not reached out to Noelle since the issues that have come out.

**Call with Megan and Brady Ferrell 10/13/2020**
- Brandon Chavez, he called Megan and seemed like he was fishing
    - She hung up on him
- Julie Odelle
    - She has reached out fishing information about eXp
    - Calling Megan, a slut and saying she drugged herself and spreading mis info about Megan
    - Scott Marllow - She saw they were not friends on Facebook anymore
        - Sent her a video with rock music saying she is a liar
        - They called him and he didn't answer
        - They told his sponsor and he said it was supposed to go to a different Nielson
- She doesn't feel safe.
- She's worried about who is going to pop up and message or say something horrible
- Julie Odelle overdosed on drugs at eXpcon and Rosie and David just watched as Megan tried to help her
- They felt they were groomed to be closer and closer and then set them up to be assaulted
- They don't know how they can in good conscience talk to agents and get them to come to eXp

What would you want eXp to do, what is your ideal outcome:
- She wants a sponsor change

- ○ She can't be associated with David and these people
- She doesn't want to be associated with anyone in this group

- Megan played a recording of David telling Megan. She told David she didn't know what happened on Friday. David told her she was having the time of your life. David was trying to convince her that she was enjoying and willingly participating in what occurred.
- Mike flew Alexandrea out to have sex with them all weekend and she told Megan that Megan was giving Mike a blow job in the shower. Megan says she has no memory of this.
- Mike said she would have to talk to Emily to find out what happened.
- David said he is worried about himself and losing eXp.
- She doesn't have a second interview with the detective yet.
- She has heard over 20-30 women have come forward against Mike and David
- Megan told me Michael Andrews, a member of her team, was asked by David if he could get him Cocaine for an event. She asked me not to contact Michael yet.

**Call with Noelle Nielsen 11/10/2020 4:20 pm MST**

She will be having him give eXp a call as her attorney.
She is not going to settle with this answer. She wants to be very clear on this.
She is going to go public on this.
She feels that she has gone through hell and back and many people.
There are 0 people in her organization that want to stay in this group.
The way this has been handled has been so bad.
There is no way that he is going to be able to support her organization.

Jim mentioned that what she is asking that we punish other people by moving her team

She said she has lost her temper and she has nothing further to say.

If eXp can't find a loophole to move her, eXp is broken as a system.

If she goes the way she thinks this is going to go with hurt everyone at eXp.

As long as David is at the company, she will not be

How you have handled this, this is disgusting

This could be the downfall of eXp

She has a friend at Remax that is watching this, and it will go national

Call with Rosie Rodriguez 11/18/2020 at approx.

- She is not getting involved in the Megan and Mike issue that is between them, not me.
- She is unclear on a couple things around Noelle
- She asked what the relationship between members having disagreements and why does that allow a group to be moved.
- I explained there was a lot of facts Rosie didn't know.

- This was an exception not the norm
- I explained the risk these alleged behavior brough to eXp.
- Rosie said she has never talked to Noelle about this situation.
- Rosie spent a lot of time with Noelle and this is very surprising to her. She doesn't know what occurred, but she's surprised she moved.
- Rosie feels this was done to stop further risk to appease the complainant and stop a potential lawsuit.
- Personal acts of an individual and how that impacts the line and sponsorship.
- I let Rosie know I wasn't trying to persuade her to see things the way the company does, but the management team felt, due to the totality of the situation, an exception could be granted.
- Rosie said she would take what I said and think about it, but she is still not seeing the connection.

**CONFIDENTIAL**                    **2eXp_005545**

11/18/2020                                  eXp Realty, LLC Mail - Official statement

# M Gmail

Cory Haggard <cory.haggard@exprealty.net>

---

## Official statement
1 message

---

**Megan Farrell-Nelson** <megan@themeganfarrellteam.com>                    Mon, Nov 9, 2020 at 9:17 AM
To: cory.haggard@exprealty.net
Cc: Brady Nelson <bradytnelson@gmail.com>

Hi Cory,

Please accept my apology on the delay of this document. It has taken a lot out of me to put together. Please feel free to contact me should you have any questions or need additional documentation (ie text messages, names, etc)

Thank you again for all of your hard work.

--

Best regards,
*Megan*



## Megan **Farrell** / REALTOR®

40 Under 40 Top Business Professionals in Flagler & Volusia Counties, 2016 and 2017

President, Flagler County Association of REALTORS

REALTOR of the Year for Flagler County Association of REALTORS

c: 386-597-3545

**EXP Realty, LLC**

712 S Ocean Shore Blvd

Flagler Beach, FL 32136

## Search the entire Flagler County MLS for free at our website!
## www.TheMeganFarrellTeam.com/propertysearch





EXHIBIT
WIT:
DATE: 3/21/2
Judy Bonicelli, RPR, CCR 2322

CONFIDENTIAL

**2eXp_004266**

11/18/2020                               eXp Realty, LLC Mail - Official statement

*"Be the change you wish to see in the world."*

---

📄 **ExpWrittenComplaint|MeganFarrell.pages**
     831K

CONFIDENTIAL

2eXp_004267

When I first heard about EXP Realty, I had the reaction that a lot of people did; Is this too good to be true? Brady and I had been searching for something to take our business to the next level. We knew we didn't want to open up our own brokerage and take on the liability, but we just couldn't find the right fit. After hearing about it and discussing it with David, Mike, and the rest of the team, we decided we were in.

We switched to EXP for two main reasons; 1 the potential for income/multiple revenue streams and 2. we wanted to be a part of something bigger than us (i.e. our team). We love that we could bring agents on and they would not only have the support from us, but also the people above us for 7 levels. We also loved that we had 7 levels above us to offer support and growth. We absolutely loved our group! It truly felt like a family. We supported each other in business and personally.

We were brought in under the umbrella of love and support. We called each other family, told each other "I love you", and many other non-traditional business relationships. Looking back, I believe that this was the beginning of the grooming process to take advantage of me and other women in the organization. They created an environment that is built on "trust" and "compassion" so that we all let our guard down. I traveled both nationally and internationally to events with these guys without a second thought, not realizing that my friends and colleagues were being drugged/hurt at said events.

**Sponsor- Mike Bjorkman**

I was invited by Mike Bjorkman to go to Las Vegas for the weekend of August 27-30. I knew that this was an unofficial EXP event and many agents who are currently aligned with the company, as well as those that were currently being recruited, were going to be there. We went to Jon Cheplak's personal home and spent the entire day masterminding on Friday, August 28. Brent Grove was also there and gave a 3-4 hour talk on Saturday, August 29. At both events, we discussed EXP, agent attraction, and revenue share. There was also a networking pool party on Saturday afternoon.

I knew that David and Mike had GHB but was told it was for recreational purposes for themselves. Hindsight, this seems extremely unlikely and I feel foolish for thinking that it was so. I never in 1,000,000 years would have thought that my friends/colleagues would give drugs to people, let alone me, unknowingly. I was mistaken.

On Sunday, August 30, 2020, I was drugged, and Mike raped me in Las Vegas. I woke up with his hand in my pants. He then picked me up and guided me to the massage room that was in the shared living area of David's suite. I tried to wipe my eyes but couldn't bend my fingers. Once we got into the room, Mike picked me up and put me on the table. He then proceeded to take off my shorts and rape me. When he was finished, he came over to my head and held me while I cried.

In the almost 2 months since this occurred, I have personally spoken to 11 additional women and men who have shared a similar experience with Mike; two of those confirmed rape, 4 were men (2 were with spouses who were also drugged/2 were drugged with no reason why), and one was hospitalized with a blood-alcohol level of 0.3 and almost did not survive. Several of those agents are still with EXP, 1 left the company, and 2 are spouses of agents who are with EXP. The agents with EXP that I personally have spoken to who said they were drugged/raped are Tami Edwards, Noelle Neilsen (she told me Seth was drugged as well), Julie O'Dell, Craig Chastain (in LV 8/28), Michael Hentry (in LV 8/28), Brittiny Howard (was with EXP when drugged- no longer with the company), and Rosie Rodriguez.

Mike has isolated each female in his organization. We were each told negative things about each other. For example, after I witnessed Julie O'Dell overdose, I reached out to him knowing he was close to her. I told him I was concerned about her mental health and well-being and thought we should do something to help. He said he would talk to her. For the next 6 weeks, I called her consistently and I could not reach her. When I finally got a hold of her, she told me that Mike had told her I said she was an embarrassment to herself at EXPCon, that she was sloppy, and had a drug and alcohol problem. He told her she needed to "get her shit together" and "stop embarrassing herself" at events. That was last October after EXPCon and if you look back, you will see Julie "disappeared" soon after this. I was trying to help Julie, but Mike was/is abusing her. She is one of several in his front line whom I know he has abused. He caused these divides between many women in his organizations.

When Mike and David came to Florida in March 2020 to present at a recruiting event we hosted, Mike constantly tried to pin me and David against each other by saying he didn't care about the event. While he was here, he also told me that he was having an extramarital affair with Julie O'Dell. David brought another woman with him around our entire team, even though they knew he was dating someone else. He also asked one of the agents in my downline to

provide him with cocaine prior to the event because he "didn't want to fly with it". During this trip, David offered Brady GHB in our home- with my son and mother in the next room.

I was also warned by Mike not to travel with David because he will "drug and rape" me. David also said the same thing about Mike multiple times. It's like they were pinning the blame on each other so no one would get caught.

David's girlfriend, Emily Keenan, also confided in me that she and David had had sex in front of Mike in the past and that Mike had masturbated in front of her. He even shared with her where he ejaculated. Even his "best friend's" girlfriend isn't safe from him. On top of that, David knew that this had happened and still remained "best friends" with Mike. This just shows their lack of respect for women, especially in conference settings.

I have heard Mike say extremely hateful things about other people in our organization in front of other people in our organization… A small amount of the things said…
David Golden- Told me not to travel with David or he'll drug and rape me, he's lazy, he only cares about David "It's David's World- You either in it on his terms or not"
Rosie Rodriguez- Called her a "Fat Mexican" (in front of David)
Noelle Nielsen- A crazy bitch (in front of David)
Julie O'Dell- A psycho, drug addict, whore (In front of David and a plethora of people)
Stevie Hahn-My very good friend and fellow REALTOR- "A dumbass who is just smart enough to dress like a slut sometimes so she gets a lot of followers (on social media)" (He put that in writing)

I have multiple text messages with Mike with inappropriate comments about women such as him telling me he's going to "fuck 20 strippers" at conferences as well as warning me not to go out to Vegas because it will be "trouble".

### *Line 2 David Golden*
Let me start by saying, David has been one of Brady and my dearest friends since we have joined this company. When I reflect back, I am embarrassed, hurt, and ashamed that I let my guard down with people who could cause so much pain for so many people.

At EXPCon 2019 was the first time that I witnessed David with GHB. He offered it to me and several other EXP agents in the room. I also witnessed exorbitant amounts of cocaine in the suite he shared with Rosie Rodriguez and Brannon Lee Chavez.

I have also heard from many people that they have witnessed David and Mike "tag-teaming" women, who are/were EXP Agents in our organizations, during conferences, and in their EXP Suite. I understand that this is not illegal, but due to the pattern of behavior, I think it's important to note.

Mike and David came and helped with a recruiting event for our group in March 2020. As mentioned above, David asked one of my agents to get him cocaine, so he didn't have to fly with it. They did not, but he still ended up with it while he was here.

My parents were also in town this weekend as it was my son's first birthday. These guys have met my parents and spent my son's birthday with my family. I want you to understand that these people infiltrated our family and tore it down.

When I was in Puerto Villarta in February for EXP Freedom Summit with Brent Gove, I witnessed David and Emily bring another EXP Agent, A.R., back to their room for sex. Emily told me the next day that she was "so proud of herself " because she had "pulled a girl". I came to find out that this is something that is expected of her when they travel, and they travel often with EXP. This relationship with this woman, A.R., continued afterward, with David bringing her with him when he came to help with our event on March 11. He also brought her to my house on March 13, 2020. She drank 2-3 drinks and had disappeared into the bathroom with David several times. She became extremely belligerent, so much so that we had to try to convince her not to drive. She fought each of us and got into her car. David and Mike left her at my house and went to the airport to catch their flight. Thankfully, Brady, my mother, and I were able to convince her to stay for a few hours, feed her and provide her with water so she could sober up to make the 2-hour drive home safely.

The drugs and lack of respect for women is a pattern of behavior with Mike and David. It has occurred each time that I have been around the two of them in the last 12 months. There are countless stories from people around the industry, including EXP agents, saying they have witnessed or experienced this with them.

*Line 3 Rosie Rodriguez*

The first time I met Rosie in person was at EXPCon 2019 in Las Vegas. She was there when I witnessed Julie O'Dell overdose. It stood out to me that while Julie was convulsing on the floor, Rosie just sat in her chair without concern as though she had possibly witnessed this before. The second alarming thing was when I called Rosie to inform her that David had asked one of our agents if he could get him cocaine, Rosie basically responded with "you have to take the good with the bad". I have had many candid conversations with Rosie about both Mike and David's behavior and basically each time I was pacified and told that's how they are. After I called her on Tuesday, Sept 15, and told her that Mike assaulted me, she reacted with shock. Her initial response was "Are you sure that he knew you didn't want it?" and "Did you say no or tell him to stop?". I told her that I didn't say anything and that I just froze. She also said in the conversation something similar to, "Sometimes people get fucked up like really fucked up and make mistakes that they wouldn't if they were sober." as well as "And sometimes people get fucked, like really fucked up, and put themselves in situations that they learn from and won't put themselves in again." She did tell me that she understood and shared with me an experience she had with Mike (in confidence) leading me to believe she understood the situation and had been there before. She also proceeded to ask me if I knew how she knew about me and then told me that it was because of Mike's Facebook video (Mike went live on Facebook soon after I made the switch to EXP expressing his disappointment in how I was treated by my previous company and also discussing my business.) Rosie talked with me about the video, saying that he obviously cares a lot about me if he's going to do something like that. She also said how he reached out to her and asked her to call me to welcome me and reiterated that Mike clearly cares about me and would never hurt me on purpose. That was the 2nd to last time I spoke to Rosie. The final time I spoke to her was when she told me that she was just going to stay out of it and not take sides. (No one asked her to pick sides, however, staying neutral is not an option when it comes to sexual assault)

On this most recent trip to Las Vegas, Emily said to Rosie "I can't hear you with your top on" and Rosie proceeded to take her top off and walk around without a shirt on.

I personally think that Rosie is complicit in this behavior and pacifies people who bring it to her attention due to the income she is making from them both.

*Line 4 Rick Geha*

In November of 2019, Rick Geha visited our association and taught a business planning class. After the class was over, he immediately followed Brady and me to our home and came inside. Brady's sister was there and was making dinner. Rick proceeded to tell her how beautiful she is and repeated several times that his son would love her. He asked her if she would be interested in dating his son and repeated how great of a fit, she would be for him. We laughed it off, but it definitely made her uncomfortable. Brady and Rick started a separate conversation and she and I proceeded to have a conversation about pictures at my baby shower. Out of nowhere Rick bursts out with, "You have pictures together in the shower?" She was so uncomfortable that she walked out to her car on the spot. (She was 27 years old; Rick was in his 60's) We had plans for dinner, so we all walked out to the cars together. I proceeded to ask Rick if he wanted to ride with us. He responded that he was going to take his own car in case he wanted to pick someone up at the bar and bring her back and laughed. This made me feel uncomfortable as I knew he was married. We met one of my teammates at the restaurant. Rick sat at the head of the table, I sat to his right, Mike Andrews (an exp agent in our group) sat to his left, and Brady sat beside Mike. During dinner, Rick put his hand on my thigh and rubbed around. I immediately picked up my chair and moved away. I will say that I did address that situation with Rick the following day. I told him I did not appreciate that he put his hand on my leg and he acted shocked, apologized and we moved on. I think it is worth noting that he changed his behavior, however, I do not think any of the behavior is acceptable, especially for someone who is traveling to help my business.

In addition to the experiences I have had with the people "above" me at EXP, there is also retaliatory behavior occurring after Mike was released from the company, including but not limited to: 1. The text from Scott Marlow calling me a liar with the satanic music video attached, 2. Julie O'Dell calling other agents in our organization and telling them that I am lying about the situation with Mike. 3. Multiple people reaching out to me to tell me I'm "confused" or that I am remembering incorrectly or that I need to "make it stop" and "fix it" because Mike called them.

David and his girlfriend recently took Scott Marlow golfing and sent Julie Allen, also an EXP agent and my roommate from Las Vegas trip, flowers for no reason, but to "send her sunshine".

The thing that is most concerning to me is that this behavior is consistently occurring at EXP events. (EXPCon, Puerto Villarta, 2 EXP recruiting events we have hosted, and unofficial

recruiting trip in August 2020) Not only have I been hurt, but I have also witnessed other people participating in behavior which is not only illegal but destructive and unsafe. I have witnessed women be taken advantage of, copious amounts of drugs and alcohol consumed, and violations of EXP recruiting policies.

I 100% would not feel safe attending future events, knowing Mike or David be in attendance. The pattern of behavior that I have witnessed over the last 13 months has been not only illegal, but also destructive, and quite frankly, disgusting. It is a poison in the company, which has seeped into my life and the lives of many others.

Thank you for your time and allowing for us to remove ourselves from this group. Brady and I have a long road toward healing, however, now that we are not surrounded by these people, we can begin that process.

I hope that you would take the same consideration to others in a similar situation. These people have caused severe damage to a lot of people's lives.


Thank you again,

Megan Farrell

 **Jim Bramble 01:56:59 PM**
I don't know. But I think we have been put on notice
with the interview she had with the broker. If this
were an employee, if a police officer were accused,
he or she would be suspended pending an
investigation. I think we could make it clear that he is
welcome to come back if he is exonerated.
Brokerage ops decision but just my opinion

 **Jim Nuth 01:57:55 PM**
I agree as well, and I would say if he is found
innocent and wants to return we should pop him back
into his spot...

 **Jim Bramble 01:58:55 PM**
Maybe not even officially taking him out of the spots.
Just on hold I, inactive, pending outcome

 **Cory Haggard 01:59:44 PM**
I think that's a smart move. How do we want to
handle letting him know?

 **Ari Kasper 02:01:29 PM**
I also think Parker should reach out to the victim
once Mike has been offboarded/inactive (assuming
that is the decision BO makes), to let her know while
this is all being investigated he is not an active agent
with us, and to ask if there's anything else she can
assist with or that she (the victim) thinks we should
know/wants to tell us. I have no doubt a number of us
could have that conversation, but I really think it
should be Parker because of her experience ,
Andrew mentioning her, etc. I also think the
statement should either come from Courtney, or
some combination of individuals including her or
Stacey. There is obvious significance in ensuring that

CONFIDENTIAL

**Call with Tami Edwards 10/06/2020 12:30 PM MST**

- She feels that anything criminally that happened between her and Mike she doesn't want to bring eXp into it
- She was business partners with Mike for six years
  - Everything 50/50 bills, splits, etc.
- When they joined eXp she noticed a huge change in Mike - all about recruiting
  - She didn't like how he was recruiting
- Six years ago, before eXp, she was at a seminar in Vegas and she got a call from Mike and he said, "my friend David Golden is at that event, stay away from him, he will drug you and rape you."
  - Then they join eXp and he wants to partner with David Golden
  - The cost to do business for traveling with David got too high. She claims it was for drinking, drugs, and prostitutes
  - They were very close like brother and sister
  - It was an excuse for him to party - attracting with David that is
  - Their partnership started to sour due to his spending habits
- This has been financially devastating to her and personally
- She had a situation with him that she won't divulge to eXp. Because of it she moved and left the business
- She claims that when she met with Rick Geha for the first time, he reached under the table and started rubbing her thigh
  - She grabbed his hand and she said don't touch me
  - He then started touching Julie Odelle who was on the other side of him
- Because of her issue with Mike, she walked away. "it was bad."
- Mike still owes her money for stock she walked away from; it was all put into Mike's name.
- April 2019, she had a "come to Jesus" meeting with him and let him know that she would not be part of it and would not go down with him.
- She never saw them putting stuff in drinks, it was the initial comments from Mike about David that led her to never want to go to recruiting events.
- She didn't know who was involved in the drugging and drugs. So, she just walked away.
- Tami and Mike started having friction because they didn't agree on how to do attraction/retention
- No police report against Mike. She illuded to the fact the issue was similar to what happened to other people.
- Debbie Penny told someone on team Bjorkman he will be coming back
  - Still using team Bjorkman.
- There was an instance where Mike berated Tami's daughter and called her a "fat ass" in front of 25 people. Tami's daughter has an eating disorder.
  - "all you ever do is think about fucking food you fucking fat ass."
- Mike owes her approx. $20,000 of stock purchases
- She wants her sponsor to be moved away from David Golden. She won't pay a dime to Mike or David
- She still believes in eXp. She loves the company
  - She wants to take these "battered women" and wants to help them
- "David is a devil"
- She believes there is a fine line between business and personal life

EXHIBIT 14
WIT: Sanford
DATE: 3/2/26
Judy Bonicelli, RPR, CCR 2322

**2eXp_005141**

- - She knows some things, but she thinks there is personal and private life
- Not so much evil things, but dirt bag things
- She has been shown videos of David where she saw him completely naked performing sex acts with women
  - Mike showed her these videos
- She feels they've made a mockery of eXp.
- They told her to keep quiet and that their party tactic was to get people to eXp
- She feels eXp gave them the vehicle and excuse to travel around and party under the guise of eXp
- She just thought it was alcohol, not drugs. She knew they would get women wasted drunk and then sleep with them and act like it was okay.
- She saw them take Adderall and he knew that Mike kept GHB in his five-hour energy drink bottles
- She is coming to me because people are upset that she was associated with them and that she wasn't making the right thing by not coming forward.
- A club wealth event in Hawaii in February 2019 they held an event they were all drinking and Amy Freeman, Amy got really sick and she was more intoxicated than Alcohol can do.
  - They called paramedics and they took her to the hospital
  - Mike Bjorkaman said that the owner of club wealth "can't know about this because they'll blame Mike."
  - Mike then went on to say, Amy was too wasted, she wanted it, she was so into me
  - Mike was trying to recruit her
  - David was not at this event. David was banned at a lot of club wealth events for his reputation
- They always told Tami she made things not fun. Mike tried to hide things from her
- After the allegations came out, he has not reached out to Tami. She hasn't heard from her. He hasn't told.
- Tami walked away from all their rev share because it's dirty money
- Mike is planning on going to i-Real (possibly REAL)
  - Allegedly Mike is poaching our people
- Approx. 7-10 people have reached out to Tami and they want their sponsor changed to Tami from Mike.
- She wants eXp to take a chance on her and let her support this Mike Team and continue to grow it
- She wants to take over where Mike has taken off
  - She doesn't want David to earn from this team.
  - If David has to stay, she is okay with that.
- She was not happy with payments to Noelle, the verbal abuse of her daughter, so she left, then whatever happened that she wouldn't disclose.
- She has corporation paperwork where it shows 50/50 with Mike and her. They never filed with eXp.
- They are currently dissolving the partnership.
- She has heard there have been at least 4 police reports and 11 women (she has no evidence of this)
- She believes that Mike feels he has done nothing wrong. He seems to think it's always consensual and they wanted it.
- She has heard he has an attorney and is coming after eXp for wrongful termination.

- They would get people drunk and get them to sign to join eXp
- They hired recruiters to get people to join eXp. She was gone at that point, but she heard they were doing this when she was leaving.

# **EXHIBIT L**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      Q    How about -- well, let me ask you, what is

2    your role as a broker in the oversight of an agent,

3    if anything?

4      A    Agents are independent contractors.  My

5    role is -- has to do with the regulatory end of

6    things.

7      Q    Is it your testimony, Ms. Penny, that as a

8    broker, your only oversight over an agent is

9    related to the regulatory issues regarding an

10    agent?

11            MR. PALLARES:  Objection.  Form.

12            Go ahead.

13            THE WITNESS:  Yes, that's what I deal with

14    on a day-to-day basis.

15    BY MS. LENZE:

16      Q    Your testimony, Ms. Penny, is that as a

17    broker in California, your oversight includes

18    making certain that the California real estate laws

19    and business and profession codes are upheld, true?

20            MR. PALLARES:  Objection.  Form.

21    Misstates.

22            THE WITNESS:  True.

23    BY MS. LENZE:

24      Q    Your role, Ms. Penny, as a California

25    broker is to oversee transactions between a real

Page 34

```
 1        estate agent and a client, correct?
 2            A     Correct.
 3            Q     And your role as a broker in California is
 4        to oversee compliance with transaction, correct?
 5                  MR. PALLARES:  Objection.  Form.
 6                  Go ahead.
 7                  THE WITNESS:  Correct.
 8        BY MS. LENZE:
 9            Q     It's your testimony, Ms. Penny, that as a
10        broker, you have no obligations to oversee agents
11        in any other capacity, true?
12                  MR. PALLARES:  Objection.  Form.
13                  THE WITNESS:  Correct.
14        BY MS. LENZE:
15            Q     What made you interested in -- in becoming
16        not just a real estate agent but transitioning into
17        a broker?
18            A     That's an interesting question.  I knew
19        that I didn't want to sell homes forever, and I
20        like the management end.  I like delving into the
21        transactions themselves and helping agents with
22        those.
23            Q     Did becoming a broker place more
24        responsibility on your shoulders than as a real
25        estate agent?
```

Page 35