# FILED UNDER SEAL

## EXHIBIT "B"

## Deposition of Debbie Penny

## May 29, 2025

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FABIOLA ACEVEDO, JANE DOE 1, JANE DOE 2, JANE DOE 3, AND JOHN DOE 1, PLAINTIFFS, | CASE NO. 2:23-CV-01304 AB-AGR |
| VS. | |
| EXP REALTY, LLC, EXP WORLD HOLDINGS, INC., MICHAEL L. BJORKMAN; DAVIS S. GOLDEN; GLENN SANFORD; BRENT GOVE; AND DOES 1-10, DEFENDANTS. | VOLUME I |

-----------------------------------

VIDEOTAPED DEPOSITION OF DEBBIE PENNY
THURSDAY, MAY 29, 2025

FILE NO. 7392997
REPORTED BY: MONICA T. CORLEY, CSR NO. 8803

still?
A Only for about, let's see, a couple of months after joining eXp, and then we moved to the Central Coast.
Q Do you have an under- -- well, strike that.
Is Mr. Crandall located in that Valencia area as well?
A No.
Q Where is he located?
A Sacramento.
Q Okay. How often did you communicate with Mr. Crandall back in, let's say, 2018?
MR. PALLARES: Objection. Form.
BY MS. LENZE:
Q Well, let me back up a little bit?
Did you communicate with Mr. Crandall in 2018?
A Yes.
Q Did you communicate with him via phone?
A Yes.
Q Did you communicate with him via text?
A I don't recall.
Q Okay. Did you see Mr. Crandall in person in 2018?

Page 46

A I don't believe so.
Q Okay. How often would you communicate with Mr. Crandall via phone let's say in 2018?
A At that time I was considering joining eXp Realty, and so I spoke with him several times with questions that I might have. And then once I joined eXp, just getting settled in, checked in periodically.
Q When you say "periodically," can you give me an estimate?
A Three or four times.
Q That was throughout the remainder of 2018 into 2019, correct?
A Correct.
Q Okay. Now, you said earlier eXp is considered a brokerage, correct?
A eXp Realty of California is a brokerage, yes.
Q Is eXp Realty, LLC a brokerage?
A I'm not quite sure how to answer that.
Q Why?
A Because in California, an LLC is not recognized as a brokerage. We're a corporation in California.
Q So eXp Realty of California, Inc. --

Page 47

A Inc.
Q -- is a brokerage in California, correct?
A Yes. Correct.
Q And as you understand it, eXp World Holdings is the parent company of eXp California?
MR. PALLARES: Objection. Form.
THE WITNESS: Yes.
BY MS. LENZE:
Q And I think I got that name wrong. Let me try that again.
As you sit here today, you have an understanding that eXp World Holdings, Inc. is the parent company of eXp Realty of California, Inc., correct?
MR. PALLARES: Objection. Form.
THE WITNESS: I'm not sure if it's Inc., LLC. I...
BY MS. LENZE:
Q Okay. And as you sit here today, do you have an understanding of whether the parent company is eXp World Holdings or eXp Realty, LLC?
MR. PALLARES: Same objections.
BY MS. LENZE:
Q If you know?
A I don't.

Page 48

Q Okay. But nonetheless, you do know, Ms. Penny, that eXp Realty of California, Inc. is a brokerage in California, correct?
A Correct.
Q And when you were hired, you were hired on as a managing broker of California, correct?
A Correct.
Q And that was in June of 2018, true?
A True.
Q Can you please describe your roles and responsibilities as the California state broker -- managing broker for eXp Realty of California, Inc. in 2018?
MR. PALLARES: Objection. Form.
THE WITNESS: My role was different because I was not the designated broker for California. There was a designated broker. So my role as a managing broker was to support the designated broker in the day-to-day transactional questions that agents have, review transaction files, teach the contracts class.
BY MS. LENZE:
Q Who was the designated broker back then?
A Ray Marquez.
Q Did you know Ray Marquez prior to joining

Page 49

eXp?
A No, I did not.
Q Incidentally, you mentioned you knew Mr. Crandall. Did you know anyone else at eXp when you joined in 2018?
A I don't believe so.
Q Did you know Glenn Sanford?
A No.
Q Who did you interview with to become the managing broker?
A I interviewed with Jason Gesing.
Q Anyone else?
A I -- let's see. Jason Gesing. Ray Marquez had the opportunity to meet with me.
Q Did he?
A Yes. Virtually.
Q Did you meet with Mr. Gesing virtually as well?
A No.
Q What was Mr. Gesing's role in 2018, if you recall?
A I do not recall.
Q Where did you meet?
A San Diego.
Q What did Mr. Gesing say about eXp with



respect to roles and responsibility you would take on as a managing broker?
A We really didn't get into the details. It was an overview of the company and of my qualifications.
Q Did he discuss any issues that the designated broker was having in California at that time?
A No.
Q Did Mr. Gesing talk at all with you during that meeting or thereafter about the growth of eXp?
A Yes.
Q And what did Mr. Gesing say?
A That it was growing at a steady and quick rate.
Q Did he give you any numbers?
A I don't recall.
Q Did he discuss -- well, strike that.
What kind of team existed for the state of California back in June of 2018 in the -- underneath the designated broker?
A There was -- before I came on board, there was one other managing broker.
Q So there was a designated broker, Mr. Marquez, true?



A True.
Q Yourself as a managing broker, correct?
A Well, that is bef- -- I'm talking about before I came on. There was one other -- there was one managing broker and Ray Marquez.
Q Okay. And did you join that other managing broker?
A Yes.
Q Okay. So after you joined, there was Mr. Marquez as the designated broker, yourself as a managing broker, and who was the other managing broker?
A James Guido.
Q Okay. And in terms of your roles and responsibilities, you mentioned it was to support the designated broker, true?
A True.
Q As a broker with a broker's license, did you still carry the obligations that you discussed earlier related to the regulatory actions of agents underneath you?
MR. PALLARES: Objection. Form.
Go ahead.
THE WITNESS: As far as the State of California is concerned, the designated broker, the



broker of record, has the ultimate responsibility for the transactional regulatory. My role as a managing broker was to assist in those day-to-day questions that agents brought in regarding their transactions, issues in transactions, contract questions, teaching the contract class, those kinds of things. Because as we grew, we needed the extra assistance.
BY MS. LENZE:
Q When did you become a designated broker of California for eXp Realty of California, Inc.?
A I found out about it -- it was officially posted with the Department of Real Estate in February of 2019, but the paperwork had been submitted and so the date was around December 26 of '18.
Q When did you have an understanding that you were going to take on that role?
A November of 2018. At that point, though, it was as an interim.
Q From approximately November of 2018 until February of 2019, you were the interim designated broker?
A Correct.
Q Okay. Now, we talked a little bit about

BY MS. LENZE:
Q Sure.
Prior to 2011 and 2012 when Michael Bjorkman joined Keller Williams, did you have an understanding of whether Michael Bjorkman engaged in extramarital affairs?
A No.
MR. SCHONFELD: Same -- same objection.
BY MS. LENZE:
Q Now, how often during that time period, from the '90s when you were engaged in real estate in the Santa Clarita Valley up until 2011/2012 when Michael Bjorkman joined Keller Williams, how often would you have occasion to see Michael Bjorkman at these gatherings?
A Not often.
Q Did you know anyone else that worked with him at Re/Max?
A Yes.
Q Who is that?
A [redacted] worked with him at Re/Max.
Q Anyone else?
A I can't think of anyone.
Q Prior to 2011 or 2012, had you heard of any allegations of rape by [redacted] against



Michael Bjorkman?
A I don't recall hearing anything along those lines.
Q And are you talking about prior to 2011 or 2012 that was your understanding?
A That was my understanding.
Q Then, correct?
A Correct.
Q Now, I want to switch to the time period when Michael Bjorkman joined Keller Williams. All right?
A Uh-huh.
Q "Yes"?
A Yes.
Q Now, you testified earlier that during that time period at Keller Williams, you worked at a Valencia office, true?
A Correct.
Q And did Michael Bjorkman, when he joined Keller Williams, also work out of that Valencia office?
A Yes.
Q And how often would you have an occasion to see him at that Valencia office?
A I was in every day, and if he came in to



the office, I would see him there.
Q How often, let's say in a month, would you have an opportunity to see Michael Bjorkman?
A Agents as independent contractors are in and out, and I -- I don't know how often.
Q What is the time frame -- well, strike that.
You were the designated broker of California for that Valencia office in 2011, correct?
A Correct.
Q And were you the only broker at that time?
A Yes.
Q And your -- strike that.
You -- at that point in time did you -- did your relationship with Michael Bjorkman change in any way?
MR. PALLARES: Objection. Form.
MS. LENZE: Let me ask a better question.
Q Once Michael Bjorkman signed on to Keller Williams, did you become friends?
A We never socialized.
Q Did you go out to events, collegial events, with your Valencia office?
A Occasionally.



Q And did Michael Bjorkman attend those?
A I don't recall.
Q Do you have an understanding of when Michael Bjorkman left Keller Williams?
A Probably around 2013 or so.
Q And do you have an understanding of what -- where he went in 2013?
A I believe he opened a HomeSmart franchise.
Q How did you know the woman you mentioned earlier, [redacted]?
A She was an agent in the Valley who later came to Keller Williams.
Q What -- were you her broker at Keller Williams?
A Yes.
Q And what years did she come to Keller Williams?
A She was with Keller Williams twice. I don't recall the years the first time, and then the second time, I believe it was 2014 or so.
THE VIDEOGRAPHER: One second. Counsel, do you mind lowering your mic a little bit?
MR. PALLARES: Why? Can you hear me breathing?
THE VIDEOGRAPHER: Yeah.

MR. PALLARES: Which is it? Do you want it up or down?

THE VIDEOGRAPHER: I prefer up, but I have no choice.

MR. PALLARES: I move to strike. Nonresponsive.

MS. LENZE: Let's all play it back. Let's hear it.

Q Okay. So, Ms. Penny, when you say [redacted] was there twice, were you the broker over [redacted] both of those times she was at Keller Williams?

A As I recall, I believe she was there before I joined and then left sometime after I joined and then came back for a period of time later.

Q During that time period from about 2011 or '12 to 2013 when Michael Bjorkman was at Keller Williams, did you form any opinions related to his drinking?

MR. SCHONFELD: Form and foundation.

THE WITNESS: I mean, he liked to -- I knew he liked to party.

BY MS. LENZE:

Q What was your -- when you say you knew he



liked to party, during that time period he was at Keller Williams, what's your basis for that, for knowing he liked to party during that time period?

A Reputation.

Q When you say "reputation," what do you mean?

A From other agents.

Q And what did you hear from other agents?

MR. SCHONFELD: I'm going to object to form. Foundation. Hearsay.

Go ahead.

THE WITNESS: That he -- he liked to have a good time at a -- at the events.

BY MS. LENZE:

Q Did you hear of him being intoxicated at those events?

MR. SCHONFELD: Same objection.

THE WITNESS: I don't recall. I don't.

BY MS. LENZE:

Q During that time period from -- well, strike that.

During that time period when Michael Bjorkman was at Keller Williams, did you come to have any understanding of whether or not Michael Bjorkman used drugs?



A No.

MR. SCHONFELD: Same -- same objection.

BY MS. LENZE:

Q During that time period where Michael Bjorkman was at Keller Williams and you were the broker over that Valencia office, did you come to have an understanding of whether or not there were any extramarital affairs that occurred?

MR. SCHONFELD: Form. Foundation. Relevance. Lack of admissibility.

Go ahead.

THE WITNESS: Yes.

BY MS. LENZE:

Q And how did you come to have that understanding?

MR. SCHONFELD: Same objection.

THE WITNESS: I was not in the office when this occurred, but I was told about it from the office manager, that Mike's wife came to the office and they had a shouting argument regarding his extracurricular affair.

BY MS. LENZE:

Q Do you know who that was with?

A I don't.

MR. SCHONFELD: Same objection.



BY MS. LENZE:

Q Who was your manager at the time, the office manager you just mentioned?

A Her name is Jenny, and I'm trying to think of the last name. Or it would have been Judy Fiddler.

MR. PALLARES: I'm sorry, what's that?

THE WITNESS: Judy Fiddler.

MR. PALLARES: Can you spell Fiddler.

THE WITNESS: F-i-d-d-l-e-r.

Jenny would have been the receptionist.

BY MS. LENZE:

Q Julie Fiddler was your --

A Judy.

Q Judy, excuse me, Fiddler was your office manager that told you what had happened with Mr. Bjorkman's wife?

A Yes.

Q Did you ever have a conversation with Michael Bjorkman about that incident?

A No.

Q Do you recall approximately when that occurred?

A I don't.

Q Did you hear any more details about that

incident?
A No.
Q Did you ever come to learn of any -- well, strike that.
During the time he was an agent at Keller Williams, was [redacted] also an agent at Keller Williams?
A I -- I don't know if the two overlapped.
Q Did you ever have any conversations with [redacted] about Michael Bjorkman?
A I don't recall.
Q Do you ever recall having an understanding that [redacted] alleges Michael Bjorkman raped her?
A Yes.
MR. SCHONFELD: Form. Foundation.
THE WITNESS: Yes.
BY MS. LENZE:
Q When did you come to have that understanding?
A That I do not recall.
Q Was it while you were a broker at Keller Williams?
A I don't recall.
Q Was it while Michael Bjorkman was still an

Page 202

agent at Keller Williams?
A I don't recall.
Q Was it while [redacted] was an agent the first time at Keller Williams?
A I don't recall.
Q Was it while [redacted] was an agent at Keller Williams the second time?
A I don't recall.
Q Do you recall whether you had knowledge of [redacted] indicating that that rape occurred while they were agents at Re/Max together?
A I don't.
MR. SCHONFELD: Form. Foundation.
THE WITNESS: I don't.
BY MS. LENZE:
Q Do you recall having conversations with anyone else about the allegations [redacted] had about Michael Bjorkman raping her?
MR. SCHONFELD: Form. Foundation.
THE WITNESS: Ask the question again.
BY MS. LENZE:
Q Sure.
Do you recall if you had conversations with anyone else regarding [redacted] allegations that Michael Bjorkman raped her?

Page 203

MR. PALLARES: Objection. Form.
MR. SCHONFELD: Same objection. Same objection.
THE WITNESS: I don't -- I don't recall.
BY MS. LENZE:
Q Do you have any memory, Ms. Penny, on how you came to learn that [redacted] alleged that Michael Bjorkman raped her?
MR. SCHONFELD: Form. Foundation.
THE WITNESS: I know I heard it. I believe she said it. I have absolutely no recollection of when.
BY MS. LENZE:
Q When was the last time you spoke with [redacted]?
A It's been years.
Q Do you have an estimation?
A No.
Q Would it have been the last time she was an agent under you as a broker at Keller Williams?
A Well, that could be. I know I spoke with her at Keller Williams.
Q Do you have any recollection of speaking with [redacted] after she left Keller Williams?
A It's possible, but I do not remember any

Page 204

details.
Q To the best of your recollection, do you believe that conversation happened with [redacted] while she was an agent at Keller Williams?
A I don't remember.
Q Is there anything that would help refresh your memory about the timing of when [redacted] told you that Michael Bjorkman raped her?
A I have searched my memory. I do not.
Q Do you recall anything about what [redacted] said occurred with Michael Bjorkman?
A No.
Q Do you recall any detail [redacted] gave you about what Michael Bjorkman did?
A No.
MR. SCHONFELD: Form. Foundation.
BY MS. LENZE:
Q Do you have any knowledge of anything -- strike that.
Do you have any knowledge of any California police reports being made related to Michael Bjorkman?
MR. PALLARES: Objection. Form.
THE WITNESS: No.
BY MS. LENZE:

Page 205

Q Now, you testified Michael Bjorkman left Keller Williams in 2013, correct?
A That's approximate.
Q Did you ever come to have a friendship with his wife?
A No.
Q Did you -- when he left Keller Williams to join HomeSmart, did you maintain a professional relationship with Mr. Bjorkman?
A Yes.
Q Did you continue to see him in real estate events in the Santa Clarita Valley?
A Yes.
Q Did you have an understanding that he ultimately had a partner, a 50/50 partner in HomeSmart, named Tami Sims?
A I recognize the name but not about the partnership.
Q Did you know Tami Sims from the Santa Clarita Valley?
A I know the name.
Q Did you continue to communicate with Michael Bjorkman in any way while he was at HomeSmart?
A Yes.

Page 206

Q And what was the purpose of those communications?
A Occasionally he would contact me and ask me if I wanted to be his broker at HomeSmart.
Q And what would you respond?
A "No. Thank you." It was flattering, but no.
Q How was Michael Bjorkman as an agent under you as the broker for Keller Williams?
MR. PALLARES: I'm sorry, can I have that question read back.
MS. LENZE: I can say it again.
MR. PALLARES: Yeah.
BY MS. LENZE:
Q How was Michael Bjorkman as an agent under you as a broker at Keller Williams?
MR. PALLARES: Objection. Form.
THE WITNESS: In what context?
BY MS. LENZE:
Q Let me ask you this: Was Michael Bjorkman a high-producing agent while you were a broker at Keller Williams?
A Yes.
Q Was Michael Bjorkman in compliance with the regulatory issues that you testified you

Page 207

oversee agents for, was he in compliance with all of those things while you oversaw him at Keller Williams?
A As I recall, yes.
Q And you heard from your office manager about this incident with his wife, correct?
A Correct.
Q And just so I understand, as you sit here today, is your testimony that you never had a conversation with Michael Bjorkman about that or you don't recall one way or another?
A I didn't have a conversation with him.
Q Understood.
Now, as you sit here today, do you recall if [redacted] told you that Michael Bjorkman had raped her while Michael Bjorkman was an agent under you at Keller Williams?
A I don't recall --
MR. SCHONFELD: Form. Foundation.
THE WITNESS: I don't recall when I found that out.
BY MS. LENZE:
Q If Michael Bjorkman had been an agent under you at Keller Williams and you had knowledge of [redacted] stating to you that one of your agents

Page 208

had raped her, what would you have done?
MR. PALLARES: Objection. Form.
MR. SCHONFELD: Form. Foundation. Improper hypothetical.
MR. LEVINE: Join.
MR. PALLARES: Go ahead.
THE WITNESS: I would have contacted the team leader at that Keller Williams office and contacted the -- what they call the OP, the operating principal, and made them aware of it.
BY MS. LENZE:
Q Who was the team leader at that time?
A I don't remember who the team leader was. After Frank left, there were several that came through, and I don't remember who it was.
Q What years was Frank Crandall there as the team leader?
A I think -- I had been there just a few months when he left.
Q So that would have been in the 2010 time frame?
A Yes.
Q Now, do you have an understanding of whether or not Frank Crandall knew Michael Bjorkman at that time?

Page 209

A I believe he did.
Q Did you ever speak with Frank Crandall about what [redacted] told you Michael Bjorkman had done to her?
A I don't believe so.
Q So as you sit here today, what you do remember is that [redacted] at some point in time told you that Michael Bjorkman had raped her, correct?
MR. SCHONFELD: Form. Foundation.
THE WITNESS: I don't remember that she said he had raped her or if he attempted to rape her. I don't remember when that happened. I don't remember which company we were with when that happened.
BY MS. LENZE:
Q What other company would it have been?
A They were both with eXp at some point.
Q Okay. Is it your testimony that [redacted] might have told you -- well, strike that.
Is it your testimony that [redacted] might have told you that Michael Bjorkman raped her while she was at eXp?
MR. SCHONFELD: Form. Foundation.
THE WITNESS: I may have learned of that



at -- while she was at eXp. I don't remember.
MR. PALLARES: I don't want you guessing.
THE WITNESS: All right.
MR. PALLARES: Okay?
THE WITNESS: All right.
BY MS. LENZE:
Q Up until 2018 when you joined eXp, had you heard of any other women who allege that Michael Bjorkman had raped them?
MR. SCHONFELD: Form. Foundation.
MR. LEVINE: Misstates her testimony. Levine.
BY MS. LENZE:
Q Well, strike that. Let me -- let me start that question over.
Up until that point when you joined eXp in June of 2018, did you hear from any other women like [redacted] who stated that Michael Bjorkman raped or attempted to rape them?
A No.
Q When [redacted] told you this, did you believe her?
MR. SCHONFELD: Form. Foundation.
MR. LEVINE: Calls for speculation.
BY MS. LENZE:



Q Did you believe her, Ms. Penny?
MR. SCHONFELD: Same objection.
MR. LEVINE: Same objection.
THE WITNESS: I knew that both of them did not get along, and I didn't make a judgment call one way or the other.
BY MS. LENZE:
Q You didn't make a judgment call when a woman that was an agent for you came to you as the broker and told you she'd been raped by another agent?
MR. PALLARES: Objection. Form.
MR. LEVINE: Misstates the testimony. She said may have been raped.
MR. SCHONFELD: Form. Foundation. Misstates prior testimony. Argumentative.
MR. PALLARES: Join.
THE WITNESS: I didn't have anything tangible, any -- there was nothing in writing to prove one way or the other.
BY MS. LENZE:
Q When you say "to prove one way or another," were you looking for proof?
A No.
Q Is there -- does there tend to be proof in



allegations of rape, in your experience?
MR. LEVINE: Objection. Form.
MR. SCHONFELD: Form.
MR. LEVINE: Incomplete hypothetical. Argumentative.
MR. SCHONFELD: Form. Foundation.
MR. PALLARES: Join.
THE WITNESS: Would you like to ask that again.
BY MS. LENZE:
Q Sure.
You said there was no proof one way or another, so -- that was your testimony, correct?
A Correct. There was -- there was nothing on Mike Bjorkman's DRE records to show that there was a conviction of any kind for anything.
MR. PALLARES: Can we take a break?
THE VIDEOGRAPHER: Give me a second.
MS. LENZE: Well, just one second.
Q Is that what you were looking for, a conviction to believe [redacted]?
MR. SCHONFELD: Form. Foundation.
THE WITNESS: No.
MS. LENZE: Okay. We can take a break.
THE VIDEOGRAPHER: Okay. This marks the

end of Media Unit 5. The time is 4:42 p.m. We're off the record.
(Recess taken.)
THE VIDEOGRAPHER: This marks the beginning of Media Unit 6. The time is 5:11 p.m. We are on the record.
BY MS. LENZE:
Q Ms. Penny, are you ready to proceed?
A Yes.
Q Okay. Before the break, we were talking about a conversation [redacted] had with you about her allegations of rape or potential attempted rape by Michael Bjorkman. Do you recall that testimony?
A I do.
Q Do you recall ever asking [redacted] to reduce that allegation to writing, to put that in writing?
A What I do know is that I was made aware of the situation, it was something in the past, it wasn't anything that happened during the time that they were with a brokerage that I was broker of, and so that's -- I mean, that's all I can recall.
Q Okay. And you as you sit here today don't recall -- strike that.
You never had any conversations with



Michael Bjorkman about that, true?
A True.
Q Do you recall how many conversations you had with [redacted] related to the allegations of rape?
A To my recollection, it was only the one.
Q And do you have any estimation as you sit here today about the year that conversation with [redacted] occurred?
A No.
Q Do you have any recollection as you sit here today about the brokerage you were at when that conversation with [redacted] occurred?
A No.
Q Now, when was the first time you were made aware that Michael Bjorkman had intention of joining eXp?
A I don't recall.
Q At some point you did come to learn that Michael Bjorkman had joined eXp, correct?
A Correct.
Q Do you recall if it was before or after you joined, if you have a memory?
MR. PALLARES: I'm sorry, one more time. I need the question read back.



MS. LENZE: I can do another question.
MR. PALLARES: Uh-huh.
THE WITNESS: Okay.
BY MS. LENZE:
Q Do you recall if Michael Bjorkman joined eXp before or after you joined in June of 2018?
A He joined after.
Q Do you have a recollection of whether Michael Bjorkman officially joined after in that he signed his ICA after or whether or not prior to June of 2018 he had committed with what's called a letter of intent?
A I have no knowledge of that.
Q Did Michael Bjorkman ever communicate with you directly related to eXp prior to June of 2018?
A Ask me that again.
Q Sure.
Prior to you joining eXp in June of 2018, did Michael Bjorkman communicate with you about his joining a brokerage called eXp?
A No.
Q Now, ultimately at some point you became aware Michael Bjorkman joined eXp, true?
A True.
Q Did you -- once you became aware of that



fact -- well, strike that.
Do you recall exactly when and where you were -- strike that.
Do you recall exactly when you became aware that Michael Bjorkman had joined eXp?
A No.
Q Do you recall how you became aware Michael Bjorkman joined eXp?
A No.
Q Do you recall if you learned that Michael Bjorkman had joined eXp from him?
A No.
Q Do you recall if you learned Michael Bjorkman had joined eXp from another agent?
A I don't recall.
Q Okay. Are you a -- do you use social media, Ms. Penny?
A Very seldomly.
Q Okay. Do you recall if Michael Bjorkman joining eXp was something you learned via social media?
A I don't recall.
Q Okay. All right. Now, ultimately, after June of 2018, you and Michael Bjorkman were agents with eXp, correct?

MR. PALLARES: Let her finish the question. Okay?
THE WITNESS: Okay.
BY MS. LENZE:
Q Do you see down at the bottom of Bates stamp 231 it looks to be an e-mail from Michael Bjorkman on October 5 of 2018 to you, correct?
A Correct.
Q Related to eXp prospecting?
A Correct.
Q And it says -- the e-mail from Michael Bjorkman says "Are we allowed to have cold callers and follow up with e-mails like this," question mark. "It's making a lot of agents here mad and making it hard to work."
Do you see that?
A I do.
Q When he says "making a lot of agents here mad," do you know what he's talking about?
A No.
Q And then you respond "No, this isn't okay, and I have forwarded this to Ray in Attraction Compliance. Thanks for bringing this to our attention."
Do you see that?



A I do.
Q And this is what you were describing where if you understood an agent to be in violation, you would forward it to, at least at that time, your designated broker, correct?
A Correct.
Q Now, do you have any recollection as you sit here today ever around -- well, strike that.
As you sit here today, do you have any recollection, prior to this e-mail of October 2018, of submitting any compliance violations of Michael Bjorkman to Ray Marquez?
A I have no recollection.
Q Okay. Do you -- do you recall submitting any violations of Julie O'Dell to anyone like Ray Marquez?
A I have no recollection.
MR. PALLARES: Objection --
BY MS. LENZE:
Q Do you recall the outcome of this e-mail?
A No, I do not.
Q Who is Gayle Rodriguez?
A She was in Attraction Compliance.
Q Incidentally, your e-mail on this is listed as dpenny01@sbcglobal.net. Do you see that?



A Yes.
Q At this time, in October of 2018, did you have an eXp e-mail?
A I did.
Q Do you have an understanding of why Michael Bjorkman wrote you at debbie.penny@eXprealty.com and then you are sent an e-mail from Gayle Rodriguez to dpenny01@sbcglobal.net?
MR. PALLARES: Same objection. I'm sorry. Form. Objection to form.
THE WITNESS: I have no idea.
BY MS. LENZE:
Q Okay. Did you during that time period use both?
MR. PALLARES: Objection. Form.
THE WITNESS: Not -- not normally, no.
BY MS. LENZE:
Q Was the dpenny01 your personal e-mail?
A Personal.
Q Do you recall when Frank Crandall joined eXp? And I apologize, I think you might have told me earlier, but as you sit here -- strike that.
As you sit here today, do you have a recollection of when Frank Crandall joined eXp?



A I know that it was before me, but I don't know exactly when.
Q Okay. Do you have a recollection of sometime around October of 2018 there being any event called eXp Con in New Orleans?
A Yes.
Q Did you go to that event?
A Yes.
Q Do you recall exactly when it was?
A Sometime in October.
Q Do you recall having a conversation with Frank Crandall following that New Orleans eXp Con related to [redacted]?
A I don't recall.
Q Do you recall receiving a message from [redacted] wanting to talk with you following the New Orleans eXp Con somewhere around October of 2018?
A I don't recall.
Q You testified earlier in the eXp World that if, for example, a microphone of an agent was not working, there was a chat capability. Do you remember that testimony?
A Yes.
Q And that it disappeared once the chat was

STATE OF CALIFORNIA )
COUNTY OF RIVERSIDE ) ss.

I, MONICA T. CORLEY, RMR, CRR, CSR No. 8803, in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript {XX} was { } was not required.

I further certify that I am not interested in the event of the action.

Witness my hand this June 11, 2025.

Monica T. Corley

Certified Shorthand Reporter
for the State of California



WILLIAM E. PALLARES
WILLIAM.PALLARES@LEWISBRISBOIS.COM
June 11, 2025
RE: Acevedo, Fabiola v. EXP Realty, LLC
5/29/2025, Debbie Penny, (#7392997).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

_XX_ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.



__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.



Acevedo, Fabiola v. EXP Realty, LLC
Debbie Penny (#7392997)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE______________________
________________________________________________
REASON__________________________________________

________________________ ______________
(Debbie Penny) Date