Jennifer A. Lenze, Esq., CA Bar No. 246858
LENZE LAWYERS, PLC
999 Corporate Drive, Suite 100
Ladera Ranch, CA 91765
T: (310) 322-8800
F: (310) 322-8811
jlenze@lenzelawyers.com

Brooke Cohen, Esq., TX Bar No. 24007019 PHV admitted
Andrea Hirsch, Esq. GA Bar No. 666557 PHV admitted
COHEN HIRSCH, LP
5256 Peachtree Road, Suite 195-E
Atlanta, GA 30341
T: (678) 268-4683
brooke@cohenhirsch.com
andrea@cohenhirsch.com

*Attorneys for PLAINTIFFS*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANYA ROBERTS,** | **CASE NO. 2:23-cv-10492-AB-AGR** |
| **Plaintiffs,** | |
| v. | **PLAINTIFF'S OPPOSITION TO DEFENDANT EXP WORLD HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| **EXP REALTY, LLC, EXP WORLD HOLDINGS, INC., MICHAEL L. BJORKMAN; DAVID S. GOLDEN; BRENT GOVE, GLENN SANFORD, and DOES 1-10,** | Date: June 5, 2026 |
| | Time: 10:00 a.m. |
| **Defendants.** | Courtroom: 7B |
| | Judge: Hon. André Birotte |

i

**TO THE HONORABLE COURT AND COUNSEL OF RECORD**:

Plaintiff Anya Roberts hereby submits this Opposition to Defendant eXp World Holdings, Inc.'s Motion for Summary Judgment and incorporates by reference all prior pleadings in this matter, documents submitted concurrently herewith, including Declaration of Jennifer A. Lenze, Declaration of Anya Roberts, Plaintiffs Statement of Genuine Disputes of Material Fact;  and any oral argument by the Court permits.

DATED: April 10, 2026                By: /s/ Jennifer A. Lenze

Jennifer A. Lenze (CA No 246858)
LENZE LAWYERS, PLC
999 Corporate Drive, Suite 100
Ladera Ranch, California 92694
Telephone (310) 322-8800
jlenze@lenzelawyers.com

Brooke F. Cohen TX 24007019 PHV Adm
Andrea S. Hirsch, GA 666557 PHV Adm
COHEN HIRSCH, LP
5256 Peachtree Road, Suite 195-E
Atlanta, Georgia 30341
Tel: (678) 268-4683
brooke@cohenhirsch.com
andrea@cohenhirsch.com

ii

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................ 1

II. STATEMENT OF ADDITIONAL FACTS............................ 2

   1. Corporate Structure and Oversight ............................... 2

   2. Overlapping Leadership and Compliance Authority ................. 3

   3. Knowledge and Handling of Allegations............................ 4

   4. Litigation Hold and Spoliation.................................... 4

   5. Expert Evidence ................................................. 5

   6. Financial Benefit ............................................... 6

   7. Golden and Bjorkman Facts………………………………………………6

   8. Puerto Vallarta Inducement ..................................... 7

   9. Florida Recruitment ............................................ 7

   10. GHB, Incapacitation, Loss of Memory.......................... 8

   11. Bjorkman Knowledge, Participation, and Conduct ............... 8

12. Corroborating Evidence .......................................... 8

13. eXp's Policies and Procedures.................................... 9

III. LEGAL STANDARD.............................................. 9

IV. ARGUMENT...................................................... 9

   A. TVPRA........................................................ 9

iii

1. Threshold Argument (FAC)........................................................ 9

2. Predicate § 1591 Violations .................................................. 10

3. Venture Definition ................................................................ 12

4. Participation Standard........................................................... 14

5. Benefit to World Holdings..................................................... 15

6. Knowledge ........................................................................... 18

B. Agency / Vicarious Liability ....................................................... 20

C. Evidentiary Gaps / Spoliation .................................................... 22

V. CONCLUSION ............................................................................. 23

PLAINTIFF'S OPPOSITION TO DEFENDANT EXP WORLD HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

*Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740 (C.D. Cal. 2024) ............... 11

*A.G. v. Northbrook Indus., Inc.,* Nos. 25-10816, 25-10829, 24-13294, 2026 U.S. App. LEXIS 9155 (11th Cir. Mar. 30, 2026) ........................................................13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...............................................9

*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021).....................................13

*Ramsbottom v. Ashton*, 2024 WL 4993391 (M.D. Tenn. Dec. 4, 2024) ...................20

*Ratha v. Rubicon Resources, LLC*, 2026 U.S. App. LEXIS 5103 (9th Cir. Feb. 2026),14

*Tolan v. Cotton*, 572 U.S. 650 (2014) ...........................................................9

*Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989 (9th Cir. 2006) ..............10

**Statutes**

18 U.S.C. § 1591............................................................................... 1, 10, 11, 12

18 U.S.C. § 1595.................................................................................1, 12,13

Fed. R. Civ. P. 56.................................................................................9

PLAINTIFF'S OPPOSITION TO DEFENDANT EXP WORLD HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT

# I. INTRODUCTION

eXp World Holdings' motion begins in the tone and tenor that permeates the pleading and causes it to fail. What is "typical" of a sex trafficking victim and whether "most" workplace sexual harassment and sexual assaults constitute sex trafficking is both irrelevant and invades the sacred province of the jury to determine whether if the elements of 18 U.S.C. § 1595 have been met.

The record in the instant matter demonstrates eXp World Holdings ("World Holdings") as much more than a remote, purely passive holding company with no operational relationship to eXp Realty. As discussed more fully *infra*, the World Holdings Board of Directors had authority over the revenue-share structure and regularly received financial information concerning that program. The Revenue Share Program was part of the engine that grew eXp Realty, which ultimately benefited World Holdings stock-price growth.

World Holdings leadership was also embedded in the compliance apparatus: Ms. Keating, Chief Marketing Officer for World Holdings, a C-suite executive, served as a voting member of the Agent Compliance Committee of eXp Realty[1]; Mr. Bramble, General Counsel for World Holdings and World Holdings Board Secretary, likewise served on that committee; Mr. Gesing, World Holdings Board Member, occupied overlapping roles in complaint handling, compliance, and the World Holdings board, and Mr. Sanford served as both World Holdings CEO and Chairman of the Board and at times CEO of eXp Realty.

Despite, eXp World Holdings misconstruing the law on TVPRA, the law and the record support, a venture—the Revenue Share Model, implemented and

---

[11] Agent Compliance was a Department in eXp legal that had a Compliance Committee to formally vote following the finding of a policy violation by an agent. SGD ¶¶ 2, 179.

1

approved by eXp World Holdings, Inc. and that Plaintiff was recruited (and/or enticed) by force, fraud and coercion to engage in a sexual act where a thing of value was exchanged. The framing of Ms. Roberts relationship with Defendant Golden does not obviate those facts, nor is it accurate. As Plaintiff's expert clearly sets forth, and a jury could accept, suffers from a pattern of abuse marked by coercive control and sexual exploitation, and incapacitation SGD ¶ 32. Put simply, eXp World Holdings, Inc. benefited and/*or potentially* from these acts.

This motion is built on narrow characterizations of the pleadings, narrow characterizations of the venture, and narrow characterizations of the parent-subsidiary record. Rule 56 requires the opposite approach. The Court must view the evidence as a whole and draw reasonable inferences in Plaintiff's favor. When that is done, the record supports triable issues as to whether World Holdings exercised parent-level oversight over eXp Realty, participated in and benefited from the revenue-share enterprise, embedded its leadership within the compliance structure, had knowledge or reason to know of the underlying misconduct, and can be held liable under Plaintiff's TVPRA and negligence theories. For those reasons, and for the reasons set forth below, World Holdings is not entitled to summary judgment.[2]

## II.    STATEMENT OF ADDITIONAL FACTS

### 1.    Corporate Structure and Oversight by eXp World Holdings

eXp World Holdings is the parent company of eXp Realty and exercised oversight over its subsidiaries, including responsibilities related to the Revenue

---

[2] In the interest of narrowing the issues for decision, Plaintiff does not address Defendant's arguments as to the negligence claims against eXp World Holdings *only*. Plaintiff otherwise opposes the Motion and maintains that triable issues of fact preclude summary judgment on the remaining claims.

Share Program. SGD ¶ 173. The World Holdings board was responsible for appointing management for World Holdings and, through that corporate chain, for eXp Realty. SGD ¶ 174.

The board regularly received updates regarding the company's financial condition, including compensation paid through the Revenue Share Program. SGD ¶ 58. World Holdings also maintained authority over the Revenue Share Plan itself. SGD ¶ 81. The plan's stated payout structure could be modified to allow eXp to "better compete, attract and retain agents," and its "terms and conditions" were expressly "subject to modification as determined by the Executive Management of eXp and/or the Board of Directors of eXp World Holdings, Inc." SGD ¶ 81.

Golden's Independent Contractor Agreement similarly tied the Revenue Share Program to company growth and specified that the plan was funded from the percentage of gross commissions retained by the company on closed transactions. The agreement further provided that the plan's terms and conditions were subject to modification by the board. SGD ¶ 70.

**2.      Overlapping Leadership and Compliance Authority**

Senior executives associated with eXp World Holdings exercised direct involvement in compliance and complaint-handling functions at eXp Realty.

- **Courtney Keating**, a member of the eXp World Holdings C-suite serving as Chief Marketing Officer, worked across multiple businesses owned by the holding company, including eXp Realty. At the request of Jim Bramble, she served as a voting member of the Agent Compliance Committee. OPP SUF ¶ 4.

- **Jim Bramble**, while acting as legal counsel to eXp, also served as a voting member of the Agent Compliance Committee. OPP SUF ¶ 4.

PLAINTIFF'S OPPOSITION TO DEFENDANT EXP WORLD HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT

- **Jason Gesing** participated in complaint handling, served on the Agent Compliance Committee, and simultaneously held positions as CEO of eXp Realty and a member of the eXp World Holdings Board of Directors. OPP SUF ¶ 4.

This overlap between corporate leadership and compliance functions demonstrates the parent company's direct involvement in operational and disciplinary decision-making.

### 3. Knowledge and Handling of Sexual Assault Allegations

When another eXp Realty Agent, Fabiola Acevedo, disclosed that she believed she had been drugged and sexually assaulted, the information was escalated to Bramble, Gesing, and Fee Gentry, a member of the World Holdings board. Internally, the matter was framed as involving Acevedo, Mike Bjorkman, and whether Nicole Russo would receive a free FLQA, while the company simultaneously took the position that the event was not a company event and that there was nothing it could do. SGD ¶ 183.

Sexual-assault allegations were also discussed during eXp World Holdings board meetings. Board member Felicia Gentry advocated for an independent investigation; however, these discussions were not reflected in the board minutes, and no independent investigation was undertaken. SGD ¶¶ 109–117.

### 4. Litigation Hold and Spoliation of Workplace Evidence

Within day of learning of the rape allegations lodged against Bjorkman, members of eXp World Holdings C-Suite recognized the likelihood of future litigation. SGD ¶ 197. Less than two years later, World Holdings received a formal preservation notice on August 11, 2022.  SGD ¶ 29. Jim Bramble acknowledged internally that eXp had received notice to safeguard and not destroy documents. SGD ¶ 29.

PLAINTIFF'S OPPOSITION TO DEFENDANT EXP WORLD HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT

But even after that notice, eXp's own Rule 30(b)(6) witness could not identify a Workplace-specific litigation-hold process, did not know what steps were taken to preserve Workplace chats, and admitted that eXp did not preserve the rolling 90-day security logs needed to explain deletions of Workplace messages. SGD ¶ 30; Tollefson 30(b)(6) Dep. 149:3–23. No Workplace-specific litigation-hold policy was identified, and the steps taken to preserve Workplace chats could not be explained. SGD ¶ 30.

After eXp was on notice to preserve, Workplace material that should have existed was missing. Stacey Onnen's Workplace chats were not recoverable, her Workplace account had been deleted, and the company could not determine who deleted the account or why. SGD ¶ 30; Onnen Dep. 176:1–11. Multiple produced Workplace chat records also contained blank message entries. SGD ¶ 31. Witnesses could not explain those blank message entries, and no legitimate reason for a genuine Workplace message to appear blank was identified. Id. Correspondence from Plaintiff's counsel documented these preservation deficiencies. *See* Hirsch Decl.

### 5.    Expert Evidence Regarding Drug-Facilitated Sexual Assault

Dr. Chitra Raghavan opined that Roberts's account and clinical presentation are consistent with involuntary intoxication or the ingestion of substances without informed awareness of their nature or quantity. She further concluded that Roberts's reported amnesia is consistent with a level of impairment that would have precluded meaningful, informed consent at the time the sexual activity occurred. SGD ¶ 32.

5

**6.      Financial Benefit to World Holdings from the Revenue Share Program**

The Revenue Share Program functioned as a central driver of eXp Realty's growth. Building large recruiting organizations through this program contributed directly to the company's expansion and, in turn, to increases in the stock price of eXp World Holdings. SGD ¶ 185.

**7.      Golden and Bjorkman Facts[3]**

Plaintiff Anya Roberts ("Plaintiff" or "Plaintiff Roberts") affiliated with eXp and participated in its recruiting culture, including attending company-related events to learn from top recruiters. SGD 120.  Defendant Golden was presented as a top eXp recruiter and insider, including speaking at events and offering access to "trade secrets" of recruiting success. SGD 121. Golden used that status to cultivate leverage with Ms. Roberts  through promises tied directly to eXp's sponsor-line system, including sponsor-switch assistance, access to elite agents and decisionmakers, recruiting strategies, salary, and advancement within eXp. SGD 140-141.  Defendant Bjorkman was part of that same structure. SGD 154-157. Golden recruited Bjorkman to eXp, described him as his business partner, and the two operated together within the same recruiting network and downline relationships. SGD 154-157.

---

[3] Plaintiff incorporates by reference her Oppositions to Defendants Golden and Bjorkman's Motions for Summary Judgment as well as the Statements of Genuine Disputes filed therewith.

6

PLAINTIFF'S OPPOSITION TO DEFENDANT EXP WORLD HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT

**8.    Puerto Vallarta: Inducement Through Business Opportunity and Incapacitation**

In February 2020, Plaintiff attended the Freedom Summit in Puerto Vallarta to learn recruiting strategies from top eXp agents. SGD 120. During that trip, Golden and his girlfriend, Emily Keenan, sought out Plaintiff whom they'd never met before. SGD 123, 127. Keenan gave Plaintiff a pill described as "like a coffee" or "Adderall," which Plaintiff ingested and thereafter, introduced her to Golden who had been on stage earlier that day. SGD 125-127. Plaintiff's memory then became fragmented. SGD 130.  Disoriented, she later regained awareness in a hotel room with Keenan and Golden, unable to recall how she got there. SGD 130-137.

Golden redirected Plaintiff after she regained consciousness by discussing eXp sponsor changes, access to Brent Gove and other leadership, as well as opportunities for advancement within eXp. Golden promised to help Plaintiff "get to the top" at eXp, provide salary, and share recruiting "secrets," all tied to her joining his organization. SGD 138-144. Golden also retained photographs of Plaintiff from that trip, including images depicting her nude and appearing unconscious. SGD 145-146.

**9.    Florida Trip: Recruiting Event and Coordinated Conduct**

In March 2020, Plaintiff traveled to Florida at Golden's invitation to observe how Golden and Bjorkman conducted recruiting events for agents in their downline. SGD 10. The trip itself involved recruiting for Megan Farrell-Nelson, an agent in Golden and Bjorkman's downline. SGD 11. Bjorkman joined Golden in Florida, showing up in the hotel room claiming he always stayed with Golden and did not have his own room. SGD 14.

7

### 10.    GHB, Incapacitation, and Loss of Memory

Before the trip, Golden arranged to have GHB shipped to the hotel. SGD 17. Golden and Bjorkman discussed the substance with Plaintiff before it arrived. SGD 18. Golden described GHB as a safe, performance-enhancing workout drug, represented that he knew how to administer it, and encouraged Plaintiff to take it. SGD 18. Plaintiff had never heard of GHB before that conversation. SGD 158. Plaintiff consumed the substance while both Golden and Bjorkman were present. SGD 19.  Following ingestion, Plaintiff experienced "huge gaps" in memory and lost recall of significant portions of the evening. SGD 20.

### 11.    Bjorkman's Knowledge, Participation, and Conduct

Bjorkman admitted knowledge about and prior use of GHB. SGD 159. During the period Plaintiff does not remember, Bjorkman described her as "very flirty," "trying to make out," and "grabby." SGD 160. The next morning, Plaintiff recalled being in the shower when Bjorkman entered nude and remarked, "Oh now you are shy?" or "You weren't a prude last night." SGD 20-21. Plaintiff testified Bjorkman acted with an unexplained sense of familiarity she found disturbing given her lack of memory. SGD 161.

### 12.    Corroborating Evidence of Drug Use and Pattern Conduct

Third-party witnesses confirmed the presence and use of GHB. Farrell-Nelson testified that Golden identified the substance as GHB while consuming it. SGD 162.

8

PLAINTIFF'S OPPOSITION TO DEFENDANT EXP WORLD HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT

### 13.  eXp's Policies and Procedures

eXp only implemented a policy and procedure for reporting sexual harassment in November of 2018. SGD 165.eXp never trained their agents on the reporting policies and procedures even when they were implemented. SGD 166. Prior to the assault of Ms. Roberts eXp had received numerous reports of sexual harassment and sexual assault. SGD 175.

## III.  LEGAL STANDARD

Summary judgment may be granted only where the movant shows there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to Plaintiff, draw all justifiable inferences in her favor, and may not weigh credibility or resolve competing inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Because World Holdings seeks summary judgment, it bears the burden of showing an absence of evidence supporting Plaintiff's claims or otherwise negating an essential element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant does not address an independent theory of liability, summary judgment must be denied as to that theory.

## IV.  ARGUMENT

### A.  TVPRA

#### 1.  World Holdings' threshold argument-that the FAC does not plead parent-specific conduct-fails under Rule 56.

World Holdings opens with the argument that the FAC contains no allegations specific to World Holdings and improperly groups World Holdings

with eXp Realty. Defendant World Holdings Mot. 19. That is not a proper Rule 56 argument. This case is far past the pleading stage. The question now is whether the summary-judgment record contains evidence from which a reasonable jury could find World Holdings liable. *See generally Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

Once the motion is analyzed under the actual record, World Holdings' threshold premise collapses. The record permits a finding that Defendant Sanford oversaw eXp Realty as World Holdings' CEO; that Bramble testified World Holdings had oversight over eXp Realty and the revenue-share program; that World Holdings executives and board members were integrated into the compliance and escalation chain; and that board-level discussions about sexual-assault allegations occurred but were omitted from the minutes. SGD ¶ 109-117, 180, 186, 187, 189. World Holdings cannot use Rule 56 as a disguised motion to reargue the FAC while ignoring the evidentiary record.

### a. The predicate section 1591 acts are supported by record evidence and remain triable.

Sanford first argues that Plaintiff's claim under 18 U.S.C. § 1595 fails because Plaintiff cannot establish underlying violations of 18 U.S.C. § 1591 by David Golden or Michael Bjorkman. Plaintiff fully addresses those arguments in her oppositions to Golden's and Bjorkman's motions for summary judgment and incorporates those sections here by reference to avoid unnecessary duplication. *See* Pl.'s Opp'n to Golden MSJ at Pages 13-18; Pl.'s Opp'n to Bjorkman MSJ at Pages 7-14. The record, however, independently demonstrates triable issues of fact as to both perpetrators.

As to Golden, a reasonable jury could find that he recruited and enticed Plaintiff through promises of professional advancement within eXp's recruiting system—including sponsor-switch opportunities, salary, insider access, and assistance "getting to the top"—while simultaneously using intoxicants, misrepresentation, and coercive manipulation to impair her capacity and obtain sexual access. SGD ¶ 119, 141, 150. The evidence further shows that Golden supplied or encouraged intoxicants—including what was represented as "Adderall" and GHB—and that Plaintiff experienced severe memory impairment consistent with drug-induced incapacity. SGD ¶ 133. Contemporaneous photographs depicting Plaintiff nude, disoriented, or unconscious, as well as Golden's possession of those images, further support an inference of exploitation. SGD ¶ 145. Under controlling law, Plaintiff need not show a formal *quid pro quo*; the coexistence of the sex act and the thing of value is sufficient to create a triable issue. *See Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 783 (C.D. Cal. 2024).

As to Bjorkman, the record likewise supports a finding that he knowingly participated in conduct proscribed by § 1591. The evidence shows Bjorkman was present while Golden discussed and encouraged Plaintiff's use of GHB, understood what GHB was from prior experience, and remained sober while Plaintiff's memory became severely impaired. SGD ¶ 159, 170. Bjorkman himself described Plaintiff as "very flirty," "grabby," and attempting to kiss him during a period when Plaintiff has no memory—conduct a jury could reasonably interpret as occurring while she was incapacitated. SGD ¶ 160. The following morning, Bjorkman entered the shower while Plaintiff was nude and made statements referencing the prior evening, further supporting an inference that sexual conduct occurred during Plaintiff's blackout. SGD ¶ 22. Additional testimony confirms the presence and use of GHB during the trip. SGD ¶ 162.

11

Viewing this evidence as a whole—as Rule 56 requires—a reasonable jury could find that Golden and Bjorkman engaged in conduct actionable under § 1591, including enticement, coercion through intoxicants, and participation in a scheme that rendered Plaintiff incapable of meaningful consent. Because those predicate violations present triable issues of fact, Sanford is not entitled to summary judgment on that threshold ground.

### b.  Beneficiary Liability section 1595

#### 1.  A reasonable jury could find that the revenue-share recruiting enterprise was the relevant venture.

World Holdings' venture argument begins and ends with a conclusory assertion: "The venture must be limited to the activities undertaken by the alleged perpetrators: Golden and Bjorkman." Defendant World Holdings Mot. at 22. But World Holdings cites no authority for the proposition that it gets to redefine Plaintiff's alleged venture by *ipse dixit* at summary judgment.

The starting point is the pleadings. In the FAC, Plaintiff expressly defined the venture. Plaintiff alleged that eXp Realty had "two businesses," one of which was "a multi-level-marketing pyramid scheme which rewards the participants for recruitment of new agents, not for selling real estate," and further alleged that "[t]he venture at issue centers around the recruitment of agents into Defendant eXp REALTY's Revenue Share Program (also referred to as the 'multi-level marketing' or 'pyramid scheme')." FAC ¶¶ 231–232. Plaintiff further alleged that continuous recruitment was essential to that venture. FAC ¶ 233. Plaintiff did not plead that the venture was merely the final assault viewed in isolation. She pleaded

12

from the outset that the relevant venture was the revenue-share recruiting enterprise.

Red Roof confirms that the venture analysis begins with the venture the plaintiff actually pleaded. There, the Eleventh Circuit emphasized that "every single reference to a 'venture' in the complaints refers to a 'sex trafficking venture,'" and it analyzed the case on that basis. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021). The court did not permit defendants to recast the venture; it evaluated the claim as pleaded.

The Eleventh Circuit's recent decision in *A.G. v. Northbrook Industries* reinforces that point and eliminates the narrowing move World Holdings attempts here. The court held that § 1595 does not require the venture itself to be framed as a "sex trafficking venture," but instead asks whether the defendant participated in a venture "which … has engaged in an act in violation" of the TVPRA. *A.G. v. Northbrook Indus., Inc.*, Nos. 25-10816, 25-10829, 24-13294, 2026 U.S. App. LEXIS 9155, at *23 (11th Cir. Mar. 30, 2026). The inquiry therefore turns on the pleaded enterprise—not a defendant's post hoc effort to reduce it to the traffickers' isolated conduct. *Id.* at *21–23.

Here, Plaintiff pleaded the venture as eXp's revenue-share recruiting enterprise. FAC ¶¶ 231–233. Under Red Roof and Northbrook, that definition controls. World Holdings cannot rewrite the case by substituting a narrower venture. Nor has Plaintiff shifted theories—the same enterprise has been alleged from the outset. The venture here is not "Golden and Bjorkman's private misconduct," but the recruitment-based revenue-share system Plaintiff pleaded.

World Holdings therefore is wrong to state, without authority, that the venture "must" be limited to Golden's and Bjorkman's conduct. The relevant venture for purposes of this case is the venture Plaintiff pleaded in the FAC.

13

## 2. World Holdings misstates the legal standard for "participation."

World Holdings argues that a parent company can "participate" in a trafficking venture undertaken through its subsidiary *only if* the parent exercised "significant control" over the venture's day-to-day activities or otherwise directly "take part in" the trafficking conduct itself. Defendant World Holdings Mot. at 26:1-4. More specifically, World Holdings argues it cannot be liable because it did not control eXp Realty's operations generally or the revenue-share program specifically. *Id.* That argument fails because it is built on a legal standard that *Ratha* rejected.

In *Ratha*, the Ninth Circuit held that the district court erred by defining "participate" too narrowly. The *en banc* court explained that "one can participate in a venture without operating or managing it." *Ratha v. Rubicon Res., LLC*, 2026 U.S. App. LEXIS 5103, at *39-*40 (9th Cir. Feb. 20, 2026). The court then held: "Applying the proper definition of participation, and viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Rubicon participated in a human trafficking venture." *Id.* at *40.

That is the opposite of the rule World Holdings advances here. *Ratha* does not require a parent to have significant control over the venture's day-to-day affairs. It does not require proof that the defendant controlled every operational detail of the subsidiary's business. And it does not impose a special parent-company carveout under which ownership-plus-involvement becomes irrelevant unless the parent micromanaged the venture. To the contrary, *Ratha* rejects the premise that "participation" means operational control.

World Holdings therefore cannot win summary judgment merely by asserting that it did not control every operational detail of eXp Realty or the revenue-share program. The question is whether the evidence permits a reasonable

14

inference that World Holdings took part in the structures that sustained the venture. It does and a jury could so find here. The revenue-share plan remained subject to board-level authority; World Holdings, CEO and Boad Chairman Sanford oversaw eXp Realty and accepted responsibility for policy implementation; Keating, Bramble, and Gesing occupied overlapping parent-company and compliance roles; and sexual-assault allegations were escalated to that same leadership structure. SGD ¶ 73, 173, 180, 186.

**3.  A reasonable jury could find that World Holdings benefited from the revenue-share venture and from the proposed sponsor switch.**

World Holdings argues Plaintiff cannot show any benefit to the parent company because the proposed sponsor switch was, at most, a matter between Roberts, Golden, and eXp Realty. That framing is too narrow and ignores how the record describes the business itself. The evidence permits a jury to find that the venture Plaintiff identifies—the revenue-share recruiting enterprise—was not peripheral to the corporate structure. It was one of the mechanisms by which eXp grew, by which the parent tracked performance, and by which parent-level leadership benefited financially.

Start with the structure. World Holdings' own 30(b)(6) witness admitted that World Holdings had responsibilities with respect to the revenue-share program, that the World Holdings board regularly received financial information that included compensation paid through revenue share, and that the terms and conditions of the revenue-share policy were subject to modification by executive management and/or the Board of Directors of eXp World Holdings. SGD ¶ 81. Golden's ICA reflects the same point: the plan was funded from the company's retained commission dollars and remained subject to board-level modification. SGD ¶ 70. A reasonable jury could infer from that evidence that revenue share was

15

not merely a compensation feature affecting individual agents. It was a parent-governed growth mechanism embedded in the enterprise World Holdings owned and oversaw.

The economic evidence reinforces that inference. Dr. Keep testified that eXp's MLM compensation structure was "a particular way to do business," that "the heart of the funding that goes to revenue share" came from real-estate transactions, and that "revenue share is derived from real estate transaction commissions." SGD ¶ 190. He further testified that roughly ten percent of commissions supported company operations and another ten percent went to revenue share. SGD ¶ 191. Most importantly, he testified that building large recruiting organizations was "part of the engine that grew eXp," that Sanford benefited from the resulting rise in stock price, and that Sanford's compensation was benchmarked in part to revenue share. SGD ¶ 185. On this record, a jury could reasonably find that the revenue-share system increased enterprise growth, enterprise value, and parent-level compensation. That is benefit.

World Holdings also argues Plaintiff has not shown how the proposed sponsor switch would have benefited eXp. The record answers that too. Roberts testified that "alpha agents" were the top recruiters in the company—the agents with the largest revenue-share organizations—and that she wanted to become one "very much so" because that was how to "make the most money." SGD ¶ 192. She also testified that at eXp the "sole path to success was not by selling real estate, but attracting more people to join eXp," and that the company's focus was on "recruitment and the money that could be made by recruiting others." SGD ¶ 193. That testimony matters because it ties the proposed sponsor switch to the business result the enterprise valued most: more productive recruiting.

16

Roberts then explained why the switch was being pushed. Under Bear, she lacked mentorship, was not getting systems or processes, and was being competed against for recruits. SGD ¶ 194. She testified that Golden and Gove presented themselves as the solution to that problem and that her understanding was that Golden saw her as an opportunity to increase his and Gove's revenue share. SGD ¶ 195. Madden corroborated that Golden was offering salary, help, "secrets," and advancement if Roberts and Madden moved into his organization. SGD ¶ 196. A jury could infer from that evidence that the sponsor switch was not merely a private relationship dispute. It was an effort to move Roberts into a more productive channel within the very recruiting enterprise that World Holdings governed, tracked, and benefited from.

That is enough under section 1595. Plaintiff need not prove that World Holdings received a check labeled "benefit from trafficking." She need only show evidence from which a reasonable jury could find that World Holdings knowingly benefited financially or by receiving anything of value from participation in the venture. Here, the evidence supports a finding that the venture drove enterprise growth, that parent leadership tracked and could modify that system, that Sanford benefited through stock-price growth and compensation metrics tied in part to revenue share, and that Golden's effort to reposition Roberts was designed to increase recruiting output inside that system. Summary judgment should therefore be denied.

17

**4. A reasonable jury could find that World Holdings knew or should have known the venture had engaged in trafficking-related conduct.**

World Holdings' knowledge argument fails because it isolates Roberts from the corporate structure through which complaints were actually escalated. The question is not whether Plaintiff has a parent-level confession. The question is whether the Rule 56 record permits a reasonable jury to find that World Holdings knew or, at minimum, should have known the venture had engaged in trafficking-related conduct. It does.

The record shows more than ordinary parent ownership. It shows parent-level personnel embedded in the very compliance architecture through which sexual-misconduct complaints moved. SGD ¶ 180. Keating was part of the World Holdings C-suite, had no formal CMO role at eXp Realty, but was nevertheless placed on the Agent Compliance Committee as a voting member. SGD ¶ 185. Bramble likewise sat on that committee and had a vote in its determinations. SGD ¶ 187. Gesing, meanwhile, occupied overlapping roles in complaint handling, compliance, and the World Holdings board. SGD ¶ 188. That overlap matters because it makes this a case about routed knowledge, not abstract corporate separateness.

And the record shows that sexual-assault complaints were in fact routed upward through that structure. Keating testified that when Acevedo reported she believed she had been drugged and assaulted, that information was escalated to Bramble, Gesing, and a board member. SGD ¶ 183. Under company policy, complaints of that kind made to HR or a C-suite member were supposed to be transferred to Agent Compliance and/or legal, and serious complaints were to be investigated through witness interviews and reviewed in weekly meetings. SGD ¶

PLAINTIFF'S OPPOSITION TO DEFENDANT EXP WORLD HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT

184. A reasonable jury could infer from that record that parent-level actors were not outside the notice stream. They were part of it.

The board-level evidence strengthens that inference. Gesing testified that Felicia Gentry raised sexual-assault allegations at World Holdings board meetings and advocated for an independent investigation. SGD ¶ 114. Gentry confirmed that sexual-assault allegations were discussed at board meetings, that those discussions were not reflected in the minutes, that the board had a private Workplace channel, and that Bramble had access to it. SGD ¶ 189. She further testified that she sought a second opinion from Jackson Lewis about an independent investigation, that no one at eXp supported or participated in that effort, and that Sanford shut it down. SGD ¶ 109-117. A jury could reasonably infer from that evidence not merely passive awareness of reputational risk, but actual exposure to sexual-assault allegations connected to the same recruiting ecosystem and a conscious decision not to pursue independent scrutiny.

That is enough to satisfy the "knew or should have known" element at summary judgment. Plaintiff is not required to prove that World Holdings knew every detail of Roberts' experience before it happened. The standard is broader. On this record, a jury could find that World Holdings had ample reason to know that the revenue-share recruiting venture in which its executives and directors were embedded had generated sexual-assault and drugging allegations, that those allegations were serious enough to reach parent-level governance channels, and that World Holdings nevertheless failed to ensure an adequate independent response. That is a triable knowledge issue.

A Tennessee district court case, *Ramsbottom v. Ashton*, does not change that conclusion. *Ramsbottom* was a pleading-stage case dismissed because the

19

complaint lacked specific factual allegations connecting the relevant defendants to the plaintiffs' interactions. *Ramsbottom*

*v. Ashton,* 2024 WL 4993391 (M.D. Tenn. Dec. 4, 2024). Here, by contrast, Plaintiff relies on deposition testimony showing actual escalation of assault allegations to World Holdings personnel, actual overlap between the parent and compliance structures, and actual board-level discussion of sexual-assault allegations. This is not a case built on conclusory group pleading. It is a case built on a developed discovery record. For Rule 56 purposes, that is enough.

**B.      Plaintiff's vicarious-liability theory is agency, and the Rule 56 record supports it.**

World Holdings argues Plaintiff's vicarious-liability theory fails because Plaintiff did not plead alter ego. Dkt. 162 at 28–29. That argument misses the theory Plaintiff actually advances. Plaintiff does not seek to disregard corporate separateness or pierce the corporate veil. Plaintiff's theory is that World Holdings may be held responsible under agency principles because the record permits a finding that it retained and exercised authority over the mechanisms through which the recruiting venture operated.

The FAC pleads that theory. It alleges that the eXp Defendants were "vicariously liable" for Golden's and Bjorkman's conduct; that Gove, Sanford, and eXp Realty "instructed, required, and enabled" Golden and Bjorkman in how to entice agents and recruit them into eXp's downline; that they provided "scripts, tools, and training"; that eXp required use of its recruiting guides, policies, branding, systems, forms, and documents; and that Golden and Bjorkman acted as eXp agents. FAC ¶¶ 217–223. It further alleges that Gove, Sanford, and eXp Realty "maintained and controlled" Golden's and Bjorkman's recruitment activities sufficient to establish "vicarious or agency liability under the TVPRA."

20

FAC ¶ 230. The question at summary judgment is therefore not whether Plaintiff can prove alter ego. It is whether the evidence permits a reasonable jury to find retained authority and actual control sufficient to support agency.

The record permits that finding in at least three ways. First, a reasonable jury could find that World Holdings retained authority over the economic structure through which the venture operated. World Holdings' 30(b)(6) witness admitted that World Holdings had responsibilities with respect to the revenue-share program, that the World Holdings board regularly received financial information that included compensation paid through revenue share, and that the terms and conditions of the revenue-share plan were subject to modification by executive management and/or the Board of Directors of eXp World Holdings, Inc. Bramble 30(b)(6) Dep. 19:7–25, 21:18–25, 22:1–7, 193:13–194:24. Golden's ICA likewise tied the plan to company growth and provided that its terms and conditions remained subject to board-level modification. Golden ICA at GOLDEN 0042, 0045–46; Haggard 30(b)(6) Dep. 248:17–25, 249:1–14, 250:4–5. A jury could infer from that evidence that World Holdings did not merely own eXp Realty at a distance; it retained authority over the incentive system that drove recruiting, sponsorship changes, and downline expansion.

Second, a reasonable jury could find that World Holdings retained authority over the policy and supervisory structures governing that enterprise. Sanford, as CEO of World Holdings, oversaw eXp Realty, accepted responsibility for implementation and training of eXp Realty's policies and procedures, and could require presentations from management and demand policy changes. Sanford Dep. 39:6–25, 40:14–21, 42:6–25. That is evidence of more than passive shareholder status. It is evidence that parent-level leadership retained authority to shape the rules under which the recruiting organization functioned.

21

Third, a reasonable jury could find that World Holdings embedded itself in the compliance and escalation architecture that governed agent conduct. Keating, a World Holdings C-suite executive, served as a voting member of the Agent Compliance Committee. Keating Dep. 18:1–20, 19:16–19, 20:1–8, 35:5–8, 60:9–25, 61:1–24. Bramble likewise served on that committee and had a vote in its determinations. Bramble Oct. 31, 2025 Dep. 362:16–20, 363:1–3, 365:1–4. Gesing simultaneously held complaint-handling and compliance-related responsibilities while also serving on the board of eXp World Holdings. Haggard 30(b)(6) Dep. 86:6–25, 87:1–18; Gesing Dep. 50:21–25, 51:1–9. A jury could reasonably view that overlap as evidence that World Holdings retained and exercised authority over how serious agent-misconduct issues were escalated, reviewed, and handled.

Taken together, that evidence supports a coherent agency theory: World Holdings retained and exercised authority over the economic incentives, policy structures, and compliance mechanisms through which Golden and Bjorkman operated. That is enough to defeat summary judgment. World Holdings cannot obtain judgment by disproving alter ego when alter ego is not Plaintiff's theory. The operative Rule 56 question is whether the record permits a reasonable jury to find agency-based control. On this record, it does.

### C.    World Holdings Cannot Rely On Evidentiary Gaps Created By Exp's Preservation Failures.

Finally, World Holdings repeatedly argues that Plaintiff lacks direct evidence of internal communications, board deliberations, and preservation-era knowledge. But those alleged gaps are not neutral. eXp was on formal preservation notice by August 11, 2022, and Bramble acknowledged the preservation demand internally days later. SGD ¶ 29. Yet eXp's own 30(b)(6) witness could not identify a Workplace-specific hold process, did not know what steps were taken to preserve

Workplace chats, and admitted the company did not preserve the rolling 90-day logs needed to explain deletions. SGD ¶ 30.

That matters here because parent-level notice, internal escalation, and compliance deliberations were communicated through exactly the channels eXp failed to preserve. The deletion of Onnen's account, the missing chats, and the inexplicable blank messages all undermine World Holdings' attempt to portray the evidentiary record as affirmatively exculpatory. SGD ¶ 31. Summary judgment cannot rest on gaps the corporate defendants helped create.

## V.    CONCLUSION

For all of these reasons, Defendant eXp World Holdings, Inc.'s motion for summary judgment should be denied.

Dated April 10, 2026.

By: /s/ Jennifer A. Lenze

Jennifer A. Lenze (CA No 246858)
LENZE LAWYERS, PLC
999 Corporate Drive, Suite 100
Ladera Ranch, California 92694
Telephone (310) 322-8800
jlenze@lenzelawyers.com

Brooke F. Cohen TX 24007019 PHV Adm
Andrea S. Hirsch, GA 666557 PHV Adm
COHEN HIRSCH, LP
5256 Peachtree Road, Suite 195-E
Atlanta, Georgia 30341
Tel: (678) 268-4683
brooke@cohenhirsch.com
andrea@cohenhirsch.com

Attorneys for Plaintiff

23