**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANYA ROBERTS,<br>Plaintiff,<br>v.<br>eXp REALTY LLC, et al.,<br>Defendants. | Case No. 2:23-cv-10492-AB (CTSx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO SEVER [DKT. NOS. 162 & 191, 151, 153, 165, 148]** |

Before the Court are Motions for Summary Judgment by Defendant eXp World Holding ("World Holdings MSJ," Dkt. Nos. 162 & 191), eXp Realty LLC ("eXp Realty MSJ," Dkt. No. 151), Glenn Sanford ("Sanford MSJ," Dkt. No. 153), Michael Bjorkman ("Bjorkman MSJ," Dkt. No. 142), and David Golden ("Golden MSJ," Dkt. No. 165), as well as a Motion to Sever ("MTS," Dkt. No. 148). Plaintiff filed timely Oppositions to all motions. Bjorkman MSJ Opp'n, Dkt. No. 219; eXp Realty MSJ Opp'n, Dkt. No. 223; World Holdings MSJ Opp'n, Dkt. No. 229; Golden MSJ Opp'n, Dkt. No. 221; Sanford MSJ Opp'n, Dkt. No. 225; MTS Opp'n, Dkt. No. 215. Defendants filed timely replies. Bjorkman MSJ Reply, Dkt. No. 262; eXp Realty MSJ Reply, Dkt. No. 259; World Holdings MSJ Reply, Dkt. No. 266; Golden MSJ Reply, Dkt. No. 272; Sanford MSJ Reply, Dkt. No. 260; MTS Reply, Dkt. No. 261.

/ / /

The Court had a hearing on the matter on June 26, 2026. For the following reasons, the Motions are **GRANTED IN PART AND DENIED IN PART.**

## I. BACKGROUND

### A. Factual Background

#### 1. eXp Realty LLC and eXp World Holdings

Defendant eXp World Holdings Inc. ("World Holdings") is a publicly traded Delaware corporation headquartered in Washington. Defendants eXp Realty, LLC, eXp World Holdings, and Glenn Sanford's Statement of Uncontroverted Facts ("eXp Corporate Defendants SUF"), ¶¶ 1 & 3, Dkt. No. 168. Defendant eXp Realty, LLC ("eXp Realty") is a limited liability corporation and wholly-owned subsidiary of eXp World Holdings. eXp World Holdings 2020 10-K at 2, Decl. of Lenze, Ex. VV. World Holdings serves as a parent corporation that observes all corporate formalities with respect to its subsidiary eXp Realty. eXp Corporate Defendants SUF ¶ 4.[1] World Holdings and eXp Realty have their own management teams, manage their own books/records, bank accounts, and personnel, though some individuals serve in leadership roles at both companies. *Id.* ¶ 5.

Per its 2020 Annual Report, World Holdings "owns and operates a cloud-based real estate brokerage and technology platform business." eXp World Holdings 2020 10-K at 2. eXp Realty is "leading, rapidly growing, cloud-based international real estate brokerage." *Id.* Real estate agents affiliate with eXp Realty as independent contractors, signing independent contractor agreements ("ICAs") upon joining and are classified as independent contractors under Section 3508 of the Internal Revenue Code. eXp

[1] Plaintiff tries to dispute this fact by alleging joint membership on both boards by several individuals. Plaintiff Statement of Genuine Disputes of Material Fact ("Plaintiff SGF") ¶ 5. However, it is an accepted legal proposition that individuals may properly serve on two different boards and that these directors may "change hats." *United States v. Bestfoods*, 524 U.S. 51, 70 (1998) (observing the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). Accordingly, Plaintiff has failed to meaningfully dispute this fact by Defendants.

Corporate Defendants SUF ¶12.[2] Accordingly, a real estate agent is free to devote whatever amount of their time, energy, effort, and skill to their real estate business as they see fit. eXp Corporate Defendants SUF ¶ 14. eXp Realty does not require real estate agents to keep definite office hours, attend sales meetings, or adhere to sale quotas. *Id*. ¶ 15. eXp Realty does not mandate its real estate agents undergo specific training or utilize specific means of communication. *Id.* ¶ 16.

As relevant to this action, the eXp Realty business model includes two revenue streams: the brokerage ("Brokerage") and the revenue sharing program ("Revenue Share Plan"). The Brokerage program is the business based on the real-estate transaction services provided by real estate agents. eXp World Holdings 2020 10-K at 47. In the Brokerage business, each real estate agent retains at least 80% of the commission on each real estate transaction they close. The remaining 20% is received by eXp Realty as a "Company Dollar." Glenn Sanford Deposition ("Sanford Depo."), 77:21-23, Wang Decl. Ex. 2; 12/15/2025 Bramble Depo. ("12/15/2025 Bramble Depo."), 41:16-22, 42:4-6, 19-23; 91:11-13, Wang Decl. Ex. 3.

Of these Company Dollars, eXp Realty allocates approximately half into the Revenue Share Plan, or the program that allocates payments to qualifying agents. Sanford Depo. 77:18-20. An agent's payment under the Revenue Share Plan is determined by the sales productivity of the agents he or she has directly recruited into eXp Realty as well as agents recruited downstream by those agents. Williams Depo., Ex. 7 at 36, Wang Decl., Ex. 7. In short, the Revenue Sharing Program is built on a

[2] Plaintiff does not dispute that the agents are labeled as independent contractors but maintains that conclusion, as a matter of law, is inaccurate. The Court declines to reach the conclusion as to whether the relationship between eXp Realty and its agents are that of an employer and independent contractor based on the eXp Corporate Defendants statement in the eXp Corporate Defendants Statement of Undisputed Facts. However, in support of its dispute of material fact, Plaintiff points the Court to over 400 pages of exhibits to support the broad proposition that "eXp exercises control over its agents." The Court is not obligated to find a genuine dispute of material fact by digging through the volume of exhibits that Plaintiff cites to with little direction. *See Grigoryan v. Experian Info. Sols., Inc.*, 84 F. Supp. 3d 1044, 1062 (C.D. Cal. 2014)

tiered structure, where an agent's position in the tiered structure is determined by the "sponsor agent" they designate at the time they sign the ICA. Mabery Depo., 173:10-12, Wang Decl., Ex. 1. Thus, Tier 1 consists of the group of real estate agents a particular agent has sponsored, Tier 2 consists of the group of real estate agents sponsoring those in Tier 1, and so on through Tier 7.

Roughly 90% of real estate agents affiliated with eXp Realty at any given time do not receive any payments under the Revenue Share Plan. eXp Corporate Defendants SUF ¶ 70. The primary purpose of the Revenue Share Plan is to incentivize real estate agents to refer new agents to eXp Realty. 12/15/2025 Bramble Depo., 70:20-25, 71:2-7. Moreover, to ensure that agents do not "poach" agents from other agent's downstream, eXp Realty has a general written policy prohibiting changes in designated sponsors. eXp Corporate Defendants SUF ¶ 74.

**B. Plaintiff Anya Robert's Allegations Against Defendants David Golden and Michael Bjorkman**

Plaintiff Anya Roberts ("Plaintiff" or "Roberts") affiliated with eXp Realty on November 18, 2018. Her claims stem from recruiting incidents that allegedly occurred between February and March 2020.

**1. The Puerto Vallarta Event**

Roberts first met Defendant David Golden ("Golden") in Puerto Vallarta, Mexico in February 2020 (the "Puerto Vallarta Event"). eXp Defendants SUF ¶ 31. She alleges she traveled to Puerto Vallarta with her business partner, Holly Madden, to attend the "Freedom Summit," an eXp event where she believed top earning eXp agents who possessed "special trade secrets" that made them successful at recruiting would be in attendance. Golden Reply to Statement of Genuine Disputes of Material Fact ("Golden Reply SGDF") ¶1, Dkt. No. 271. Defendant Golden was held out as one of the top recruiters and considered a model of success. *Id.* ¶ 2.

On the evening of February 7, 2020, Roberts and Madden attended a sunset cruise to attend a private networking event. *Id.* ¶ 3. Roberts claims Golden's girlfriend, Emily

Keenan ("Keenan"), gave her a pill described as "like a coffee" or "Adderall." *Id.* ¶¶ 5-7. Keenan then introduced Roberts and Golden. *Id.* ¶ 10.

After this point, the Parties dispute what occurred. Roberts claims that she remembers little else after the boat ride. She alleges that she was later told she was seen publicly "making out" with Keenan. Plaintiff Statement of Genuine Disputes of Material Fact in Opposition to Golden's MSJ ("Plaintiff SGDF Re Golden MSJ") ¶ 13, Dkt. No. 221-1. She also claims she regained her memory while in a hotel room with Golden and Keenan, unable to recall how she got there, while engaging in sexual activity. *Id.* ¶ 18. Afterwards, she claims Golden took her aside, promising her access to eXp decisionmakers, ways around eXp's policies, and promised to help her get to the top at eXp.[3] *Id.* ¶¶ 21-24. She also alleges that Golden also retained photographs of her during that trip, including images of her nude body, and that Keenan stole her credit card as "collateral." *Id.* ¶¶ 26-27

**2. Las Vegas, Nevada Trip One**

Shortly after the Puerto Vallarta Event, Roberts claims that Golden invited her and her business partner, Holly Madden, to Las Vegas, Nevada between February 11-13, 2020 ("Vegas Trip One"). *Id.* ¶ 32. The Parties dispute the purpose of this trip, with Roberts claiming it was to discuss sponsorship-changes at eXp Realty and Golden claiming it was to develop a personal relationship. *Id.* ¶¶ 32-33; Golden Reply SGDF ¶¶ 32-33. It is undisputed that Roberts and Golden drank alcohol and used other recreational drugs on this trip, however, Roberts contests the nature of the drug use. Plaintiff SGDF Re Golden MSJ ¶¶ 35, 37, 38; Golden Reply SGDF ¶¶ 35, 37, 38. She also states, after taking GHB, she had a fragmented memory of the trip. Plaintiff SGDF Re Golden MSJ ¶ 35. After returning from the trip, Plaintiff told Madden that she and Golden had sex while they were in Las Vegas but she has since lost memory of the

[3] The Court notes that Plaintiff often conflates eXp Realty and eXp World Holdings under the banner of "eXp." It is not clear whether she is referencing eXp Realty or eXp World Holdings here.

encounter. Plaintiff SGDF Re Golden MSJ ¶ 39-40.

### 3. Las Vegas, Nevada Trip Two

After Vegas Trip One, Roberts and Golden began exchanging sexual text messages. Plaintiff SGDF Re Golden MSJ ¶¶ 41. Roberts claims she cannot remember sending the texts but that she recalls him directing her to speak to him in a sexualized way. *Id.* She also alleges that, after Vegas Trip One, Golden began pressuring her to drink more alcohol, obtain an Adderall prescription, control the way she behaved and express his desire to have a sexual relationship. *Id.* ¶¶42-43. Madden also described Roberts' behavior and appearance changing during this time. *Id.* ¶ 46. Golden disputes all these allegations.

From February 21 – 24, 2020, Roberts attended a second event in Las Vegas, Nevada at Golden's invitation to allegedly discuss sponsor-changes and attend a business event ("Vegas Trip Two"). *Id.* ¶ 48. Roberts claims to have few memories of this trip. *Id.* ¶ 49.

### 4. Daytona Beach, Florida Trip

After Vegas Trip Two, Roberts claims Golden invited her and Madden to an eXp recruiting event in Flagler Beach/Daytona Beach, Florida from March 10-12, 2020 ("Daytona Beach Trip"), where he was helping Defendant Michael Bjorkman ("Bjorkman") with a recruiting event. *Id.* ¶¶ 55-56. She alleges that Golden invited her and Madden to show them how he and Bjorkman ran these kinds of events. *Id*. ¶ 56.

Roberts claims that, a few days prior to the event, Golden arranged to have the drug GHB shipped to the Hard Rock Hotel in Daytona Beach, Florida, where she would be staying. *Id.* ¶ 61. When she arrived at Daytona Beach, Roberts claims she expected to be staying in a room alone with Golden, only to find out upon arrival that Bjorkman would also be staying in the same room. *Id.* ¶ 59. Roberts alleges that she had no recollection of taking drugs that first night in Florida or having any sexual encounters. *Id.* ¶ 61. However, Golden told her that they did have sexual relations that night. *Id.*

/ / /

At some point during the trip, the GHB package arrived at the hotel. *Id.* ¶ 69. Roberts, who believed she had never used GHB, was allegedly told by Golden that GHB was common in the fitness world. *Id.* ¶ 70. She agreed to take the GHB because she believed it to be a workout recovery supplement. *Id.* ¶ 73. Roberts claims to have no memory of the rest of the night. *Id.* ¶ 74.

The following day, or the morning of March 12, while Roberts was in the shower, Bjorkman allegedly walked into the bathroom naked. Bjorkman Reply to Plaintiff Statement of Genuine Disputed Facts ("Bjorkman Reply SGDF") ¶ 9, Dkt. No. 263. When she objected, he allegedly responded, "Oh you weren't a prude last night." *Id.* ¶¶ 9, 26.[4] Although she has no memories of the night of March 11, based on this interaction and subsequent text messages, she believes that she and Bjorkman engaged in sexual activity. *Id.* ¶¶ 26, 27.

### C. Subsequent Actions and Reporting at eXp Realty, eXp World Holdings, and by CEO Glenn Sanford

eXp Realty claims that it was first alerted to reports of sexual assaults committed by Defendant Bjorkman in September 2020 after another agent reported being sexually assaulted. eXp Corporate Defendants SUF ¶ 47. Within three hours of receiving this report, eXp Realty released Bjorkman's license. *Id.* ¶ 48.

Plaintiff alleges that, despite his termination, leadership at eXp Realty made active efforts to ensure that Bjorkman received his payments from the Revenue Share Plan ahead of the written policy and kept Bjorkman appraised of developments that occurred during the eXp internal investigation. Plaintiff Statement of Genuine Disputed Facts in Opposition to eXp Corporate Defendants ("Plaintiff SGDF Re eXp Corporate Defendants") ¶¶ 96-101, Dkt. No. 224. Notably, Roberts claims that Defendant Glenn Sanford ("Sanford"), or CEO of World Holdings, personally intervened to Defendant Bjorkman's benefit to ensure that his share of the Revenue Share Program would vest.

---

[4] Plaintiff testified that she believed he said "Oh, now you're shy?" while Bjorkman says he said, "Oh you weren't a prude last night."

Sanford allegedly made the decision to accelerate Bjorkman's vesting, departing from eXp Realty's three-year written vesting policy.[5] *Id.* ¶ 94, 106, 108. Sanford allegedly attended eXp Realty's Compliance Committee meetings for the first time to intervene on behalf of Bjorkman, telling the Compliance Committee that they should not act as "judge, jury, and executioner." *Id.* Following this meeting, Sanford allegedly personally told Bjorkman that he has been "lobbying in the background." *Id.* Roberts also claims that Sanford prevented other members of the World Holdings' Board from engaging an outside law firm to investigate the incident. *Id.* ¶ 117.

eXp Realty claims to have been unaware of any sexual assault allegations against Golden until the complaint was filed in a parallel suit *Acevedo v. eXp Realty et al.*, in February 2023. eXp Corporate Defendants SUF ¶ 58. Promptly after the *Acevedo* complaint was filed, eXp Realty suspended Golden. *Id.* ¶ 59.

Roberts herself never filed a formal complaint of sexual assault with eXp Realty or World Holdings. *Id.* ¶ 84. However, Madden began connecting the dots of Roberts own experience upon reading the *Acevedo* complaint, at which point she concluded she could "be the next Jane Doe." Plaintiff SGDF Re Golden MSJ ¶ 93.

### D. Procedural History

At the conclusion of discovery, all Defendants have moved for summary judgment on the Plaintiffs claims.

Plaintiff has filed timely oppositions to all motions and Defendants have filed Reply briefs. The Court now reviews each of these motions.

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

---

[5] Sanford disputes Plaintiff's characterization, noting that an accelerated vestment had occurred on six prior occasions. eXp Corporate Defendants SUF ¶ 53.

matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party has the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id*. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

## III. DISCUSSION

The operative complaint, FAC, Dkt. No. 84, sets out seven total claims: (1) Claim One against Defendant Golden for violations of 18 U.S.C. § 1591; (2) Claim Two against Defendant Bjorkman for violations of 18 U.S.C. § 1591; (3) Claim Three against Defendants eXp Realty, World Holdings, and Sanford for violations of 18 U.S.C. § 1595; (4) Claim Four against Defendants Bjorkman and Golden for Sexual Battery; (5) Claim Five against Defendants Bjorkman and Golden for Civil Battery; (6) Claim Six against Defendants Bjorkman and Golden for Intentional Infliction of Emotional Distress; and (7) Claim Seven Against Defendant eXp Realty, World Holdings and Sanford for Negligent Hiring, Retention, and Supervision.

Defendants have all moved for summary judgment on these claims.

### A. TVPRA Direct Liability

Defendants Golden and Bjorkman filed motions for summary judgment on Counts One and Two of the FAC, alleging direct perpetrator liability under the Trafficking Victims Protection Reauthorization Act.

#### 1. TVPRA Background

Congress first enacted the Trafficking Victims Protection Act ("TVPA") of 2000 to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Ditullio v. Boehm*, 662 F.3d 1091, 1094 (9th

Cir. 2011) (quoting Pub. L. No. 106-386, 114 Stat. 1464 (Oct. 28, 2000)). The legislation was "intended to more comprehensively and effectively combat human trafficking." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022) (citations omitted).

Congress then reauthorized the TVPA in 2003 and 2008 through the Trafficking Victims Protection and Reauthorization Act ("TVPRA"), expanding its protections and remedies with each reauthorization. *Id.* Notably, the 2003 reauthorization created a private civil remedy against traffickers while the 2008 reauthorization extended liability to those that benefit from what they should have known was a trafficking venture. *Id.* Thus, the TVPRA created two theories of civil liability: direct liability and beneficiary liability.

18 U.S.C. § 1591(a)(1) addresses the substantive offense of sex trafficking, while § 1591(a)(2) addresses liability for knowingly benefiting from participation in a venture engaged in conduct described in § 1591(a)(1). Section 1591(a) states, in relevant part:

> (a)Whoever knowingly—
>
> > (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person;
> >
> > (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Section 1595 in turn provides a civil cause of action, stating:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. 1595(a). In sum, § 1595 provides trafficking victims with a private right of action to pursue claims against those perpetrators of trafficking *and* those that knowingly financially benefit from a trafficking venture. *See Acevedo v. eXp Realty LLC*, 713 F. Supp. 3d 740, 764 (C.D. Cal. 2024).

Finally, remedial statutes, like the TVPRA, that "employ broad, expansive language" should be interpreted broadly, consistent with the canon of construction for remedial statutes. *Id.* at 765-766 (collecting cases and noting Congress' intent that the TVPRA be interpreted broadly). The "TVPRA covers allegations of coercive sexual assault where the defendant uses force and/or fraud to entice the plaintiff to engage in a 'commercial sex act,' even if the defendant has not 'trafficked' the plaintiff within the ordinary or traditional meaning of that word." *Id.* (quoting *David v. Weinstein Co., LLC*, 431 F. Supp. 3d 290, 299 (S.D.N.Y. 2019)). So, while this action "might not be the 'archetypal sex trafficking action," as this Court previously noted, "the TVPRA extends to allegations such as those described" by Roberts. *Id.*

**2. Defendant Golden's Motion for Summary Judgment on Count One - TVPRA Direct Liability**

Defendant Golden's argues summary judgment is appropriate on this claim because the evidence shows an "admitted consensual relationship between Roberts and Golden." Golden MSJ at 9. Defendant Golden further argues that there is no TVPRA liability because there is no "overt act[] in support of a venture," "no sex trade," "no money chang[ing] hands," "no passive benefit to anyone," "no common undertaking,"

no "*quid pro quo,*" or any "'venture' engaged in commercial sex trafficking." Golden MSJ at 8-9. In short, Golden contends that Roberts' claim cannot survive because she "does not show that Golden used force, fraud, or coercion to cause Roberts to engage in a commercial sex transaction." *Id.* at 9.

As an initial matter, Defendant Golden misstates the standard for direct liability under the TVPRA. A claim for direct liability under § 1591(a)(1) requires showing that Defendant Golden (1) knowingly and in interstate commerce; (2) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person (3) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion or any combination of such means will be used; (4) to cause the person to engage in a commercial sex act. *Acevedo*, 713 F. Supp. 3d at 765. A "venture" is not an element of direct perpetrator liability under § 1591(a)(1), and instead appears in § 1591(a)(2)'s beneficiary-liability provision. 18 U.S.C. § 1591(a). Moreover, as this Court has previously held, direct liability does not require proof of a "common undertaking," or "quid pro quo," for direct liability under the TVPRA, as Golden contends. *See Acevedo*, 713 F. Supp. 3d at 772-73 (rejecting the argument that a quid pro quo is required to state a claim under the TVPRA).

Moreover, Defendant Golden's MSJ does not clearly articulate which elements of the TVPRA claim he believes are deficient under the undisputed facts. Instead, his argument appears to rest on the conclusory assertion that a consensual relationship necessarily precludes liability under the TVPRA. Defendant Golden cites no authority supporting this sweeping proposition. Construing his argument liberally, however, the Court understands him to contend that the third and fourth elements of Plaintiff's TVPRA claim cannot be satisfied because his relationship with Plaintiff was consensual. The Court addresses each of these arguments in turn.

/ / /

/ / /

/ / /

**a. Knowing, or in Reckless Disregard of the Fact, That Means of Force, Threats of Force, Fraud, Coercion or Any Combination of Such Means Will Be Used**

To prove a TVPRA claim, Roberts must show that "if things go as [Golden] planned, force, fraud, or coercion will be used to cause his victim to engage in a commercial sex transaction." *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010). Golden does not dispute the law; rather, he appears to argue that there is no factual basis to support this element.

Golden argues there is no evidence of knowledge that "force, threats of force or any combination of such means will be used" because Roberts was engaged in a consensual relationship with Defendant Golden. Golden MSJ at 8-9. Defendant points to several explicit text messages between Defendant Golden and Plaintiff, Roberts' testimony describing their relationship, and her own independent actions which led her to the events in Las Vegas, Puerta Vallarta, and Daytona Beach. *Id.* at 9.

Golden, however, offers only one interpretation of the facts. Roberts has proffered evidence indicating that Golden provided her drugs on several occasions, causing her to lose memory of subsequent sexual encounters, eliminating her ability to provide meaningful consent. Plaintiff SGDF Re Golden MSJ ¶¶ 11, 14, 16, 18, 26-27, 31, 35, 40, 49, 70-71, 74. She testified that he misrepresented to her the nature of these drugs, and that she took them in reliance of those representations, as she herself had no experience with them. *Id.* ¶¶ 70-71. She further testified that he proactively ordered and planned to use those drugs to induce Plaintiff into engaging in a sex act. *Id.* With respect to the text messages, Plaintiff provides evidence indicating that they were the product of "grooming, coercive control, and trauma bonding." Plaintiff SGDF Re Golden MSJ ¶¶ 98-100.[6]

---

[6] The statements referenced in this portion of the Plaintiff's Statement of Genuine Disputes of Material Fact come from the expert report of Dr. Chitra Raghavan. The Court notes that several Defendants have lodged objections to consideration of Dr.

In short, Roberts has proffered evidence from which a reasonable jury could find that Golden used fraud and coercion, including through the alleged administration and misrepresentation of drugs and psychological manipulation, to cause Roberts to engage in sex acts. Golden attempts to highlight "inconsisten[cies]" in the evidence to support his motion summary judgment. Golden MSJ at 2. However, it is well established that the Court "may not weigh the evidence or assess its credibility" on summary judgment. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir.1999) (citations omitted). The assessment Golden asks the Court to undertake is the evidentiary assessment that is precisely within the purview of the jury. At this juncture, the Court's responsibility is to determine whether there exists a genuine dispute of material fact and to determine whether a reasonable jury could find for Roberts.

Viewing the evidence in the light most favorable to the non-moving party, a genuine dispute of material fact exists as to whether Golden knowingly used fraud or coercion to cause Plaintiff to engage in a commercial sex act.

**b. To Engage in a Commercial Sex Act**

A commercial sex act is defined as "any sex act on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Defendant Golden argues that the evidence does not show "sex in exchange for a thing of value;" rather, it "shows an admitted consensual sexual relationship between Roberts and Golden." Golden MSJ at 9. He argues that Plaintiff has "identife[d] no exchange of value to Golden tied to any sexual activity." Golden Reply at 3. However, Defendant has not

---

Raghavan's expert report for lack of sworn signature. *See* Dkt. No. 256. While Defendants are correct that "it is well established that unsworn expert reports are inadmissible and cannot be used to create a triable issue of fact for purposes of summary judgment," an expert report "accompanied by deposition testimony" may be properly considered by the Court on Summary Judgment. *Martinez-Montello v. Target Corp.*, 2023 WL 6621424, at * 3 (D. Nev. Oct. 11, 2023) (collecting cases and declining to consider opinions from an unsworn expert report unaccompanied by either an affidavit or declaration). Dr. Raghavan's report, while not sworn, is signed and accompanied by a deposition transcript. The Court considers it in its assessment of the summary judgment motions.

articulated the correct legal standard.

As this Court has previously observed, a commercial sex act "does not require a bargained for exchange. The coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act." *Acevedo*, 713 F. Supp. 3d at 772. Rather, the statutory phrase "on account of" requires a causal connection between the sex act and the thing of value but does not require a formal quid pro quo or bargained-for exchange. *Id.* Thus, the relevant inquiry is whether a reasonable jury could find the requisite causal connection between a sex act and a thing of value—not whether the parties expressly bargained to exchange one for the other. *Id.*

Roberts testified that Defendant Golden used promises of career advancement, recruiting insights, and access to exclusive business networking and training events to induce her to attend the Las Vegas Trips and Daytona Beach Trip. Plaintiff SGDF Re Golden MSJ ¶¶ 2, 4, 7. She alleges that it was on account of these promises that she attended the events. *Id.* It was at these events that Plaintiff claims she was induced to engage in sex acts with Defendant Golden. *Id.* Thus, according to Roberts, Golden used those opportunities, together with the alleged fraud and coercion described above, to cause her to engage in sex acts

Again, Defendant Golden asks this Court to make the factual determination that Plaintiff's evidence is not credible. The Court reviews these facts in the light most favorable to the Plaintiff and concludes that a reasonable jury could find the coexistence of a thing of value, or promises of career advancement, advice, and opportunities, with the sex act.

For these reasons, the Court **DENIES** Defendant Golden's Motion for Summary Judgment on Claim One.

/ / /

/ / /

/ / /

### 3. Defendant Bjorkman's Motion for Summary Judgment on Claim Two – TVPRA Direct Liability

Defendant Bjorkman moved for summary judgment on the TVPRA claim, arguing that there is no evidence to support the existence of a (1) "sex act" that was (2) "commercial" or that (3) Defendant Bjorkman "enticed" or "recruited" Plaintiff. In short, Defendant argues that there is no factual evidence to support a finding that Defendant Bjorkman violated the TVPRA. The Court reviews each of these elements in turn.

#### a. The "Sex Act"

As this Court has previously observed, the term "sex act" is not defined in § 1591. *Acevedo*, 713 F. Supp. at 770. Based on the plain and ordinary meaning of the phrase, the Court defined a "sex act" as "an act performed with another for sexual gratification." *Id*. Defendant Bjorkman does not dispute this legal standard. Rather, he argues that there is no evidence that a "sex act" ever occurred. Bjorkman argues that Roberts only factual allegation against him is the statement he made on the morning of March 12, which she claims implied sexual contact. According to Defendant Bjorkman "[n]othing in that allegation, even if deemed true for present purposes, alleges any sort of "sex act" committed by Mr. Bjorkman *against* Plaintiff." Bjorkman MSJ at 16.

Defendant Bjorkman's argument, however, is unconvincing. Roberts has proffered that she had been induced by Golden and Bjorkman to take GHB, noting that Bjorkman appeared to act in concert with Golden. Plaintiff SGDF Re Bjorkman MSJ ¶ 13. The GHB, in turn, caused her to suffer severe memory loss that night. *Id.* ¶ 21. Roberts then testified that Bjorkman came into the bathroom the following morning naked and made a highly suggestive statement to her. *Id.* ¶¶ 25-27. While she had no memory of any sexual contact, a reasonable inference could be made that Defendant Bjorkman had sexual contact with her the previous evening based on these facts.

Because a reasonable jury could find the existence of a "sex act" based on the evidence provided, the Court declines to grant summary judgment on this ground.

**b. Commercial in Nature**

As the Court noted above, a "sex act" is commercial in nature is "any sex act on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Defendant Bjorkman argues that Plaintiff has no evidence to show a "commercial" sex act because "(1) Plaintiff did not agree to switch to Defendant Golden as her sponsor; and (2) there was no conversation whatsoever with Defendant Golden or Bjorkman regarding Defendant Bjorkman being involved in Plaintiff's career in any for or fashion." Bjorkman MSJ at 12. As a result, Plaintiff cannot demonstrate anything "commercial" about any sex act as there was no "quid pro quo or bargained-for exchange." *Id.*

As the Court has already discussed, there is no requirement of a quid pro quo or bargained for exchange in order for a violation of the TVPRA to exist. The "coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act." *Acevedo*, 713 F. Supp. 3d at 772. "Put another way, when a victim is enticed with a fraudulent career opportunity for the purpose of causing a sex act, that sex act is commercial in nature." *Id*. Roberts claims that Golden invited her to Daytona Beach to observe how *both* he and Bjorkman ran recruiting events. Plaintiff SGDF Re Bjorkman MSJ ¶ 1. Plaintiff also claims that Golden and Bjorkman worked together to "routinely manipulate[]" the placement of their recruits, indicating a partnership and relationship between the two. Plaintiff SGDF Re Bjorkman MSJ ¶ 7. She further alleges that Bjorkman had planned to stay in the same room as her and Defendant Golden, a routine practice. Plaintiff SGDF Re Bjorkman MSJ ¶¶ 7, 10.

Viewed in the light most favorable to Plaintiff, the evidence would permit a reasonable jury to find that Plaintiff was enticed to attend the Daytona Beach event to obtain insight into Defendant Bjorkman's recruiting practices. Thus, a reasonable jury could find that there exists a "commercial" sex act based on this evidence.

Defendant Bjorkman's reliance on *Kolbeck v. Twenty First Century Holiness Tabernacle Church, Inc.*, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013), is also

misplaced. *Kolbeck* arose from allegations that Defendant Tony Alamo, the leader of a religious ministry, sexually abused minors affiliated with the ministry. *Id.* at *1. A subset of the *Kolbeck* plaintiffs included minors who were sexually abused while on out-of-state trips with Alamo. *Id.* at *16. Those plaintiffs there claimed the abuse was "commercial" because their "living expenses were paid for with money provided by the ministry's businesses." *Id.* The *Kolbeck* court determined that there was no "commercial" sex act because there was no evidence showing that the "Defendants were compensated 'on account of' the sex acts." *Id.*

This case presents materially different facts. There is no claim of a commercial transaction separate from the sex act; rather, the Plaintiff has provided evidence that the "thing of value," or promise of career advice and advancement, was the item that induced her to come to Daytona Beach for the purpose of having her engage in a "sex act." This constitutes a direct relationship and causal connection between the alleged thing of value and sex act that was absent from *Kolbeck*.

Accordingly, the Court concludes a genuine dispute of material fact exists as to whether the sex act was "commercial."

**c. Entice or Recruit**

Finally, Defendant Bjorkman argues that Plaintiff has presented no evidence that he enticed or recruited her. Bjorkman MSJ at 16-17. Enticement, while not defined by the TVPRA, is construed in accord with its "ordinary and natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). To entice is "to attract artfully or adroitly or by arousing hope or desire." *Acevedo*, 713 F. Supp. 3d at 766; *Noble*, 335 F. Supp. 3d at 517. Defendant Bjorkman argues that "Plaintiff has not established an effort to entice or recruit her." Bjorkman MSJ at 17.

However, a reasonable jury could find Defendant Bjorkman was part of an effort to entice Plaintiff to attend the Daytona Beach Event for the purpose of administering GHB. Plaintiff has testified that Golden and Bjorkman worked together as business partners and that the event in question was to see how they both conducted a recruiting

event. Plaintiff SGDF Re Bjorkman MSJ ¶¶ 1, 5, 7. Plaintiff argues that there existed a "broader mechanism" to draw Plaintiff to Daytona Beach, a mechanism where Defendant Bjorkman was a key part. Bjorkman Opp'n at 12. Plaintiff also asserts that Defendant Bjorkman was not merely used by Defendant Golden as a means to bring her to Daytona Beach; rather, he played a central role in the plan. He arrived to stay in the same hotel room, appeared excited when the GHB arrived, suggesting knowledge of its future use, and was part of the effort to convince Plaintiff to take GHB. Plaintiff SGDF Re Bjorkman MSJ ¶¶ 10, 12, 13.

In short, Defendant Bjorkman's argument is a purely factual one. As noted above, the Court cannot weigh the credibility of evidence, only determine whether there exists a dispute. Plaintiff has provided sufficient evidence at this juncture to find that there exists a genuine dispute of material fact as to whether Defendant Bjorkman recruited and enticed Plaintiff.

The Court **DENIES** Defendant Bjorkman's Motion for Summary Judgment on Claim Two.

### B. TVPRA Beneficiary Liability

As discussed above, the TVPRA creates two theories of civil liability: one for direct perpetrators and one for beneficiaries. Plaintiff's third claim against Defendants eXp Realty, eXp World Holdings, and Sanford is for beneficiary liability under the TVPRA. "The requirements for beneficiary liability under the TVPRA can be stated as follows: (1) the person or entity must 'knowingly benefit[], financially or by receiving anything of value,' (2) from participating in a venture, (3) that the 'person knew or should have known has engaged in an act in violation of [the TVPRA]." *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F.Supp. 3d 959, 964 (S.D. Ohio) (citing 18 U.S.C. § 1595(a)).

Each of Defendants eXp Realty, eXp World Holdings, and Sanford (collectively, "eXp Corporate Defendants") has moved for summary judgment on the issue of beneficiary liability under the TVPRA. For the reasons stated below, the Court

**DENIES** eXp Realty's and Sanford's Motions and **GRANTS** World Holdings' Motion with respect to the TVPRA claim.

**1. Underlying Direct Perpetrator TVPRA Offense**

The eXp Corporate Defendants have argued that there can be no beneficiary liability as a matter of law because Plaintiff has failed to create a genuine dispute of material fact for the predicate direct liability offense. As discussed above, the Court concludes that there exists a genuine dispute of material fact as it relates to the elements of direct liability and **DENIES** the eXp Corporate Defendants motions for summary judgment on that basis.

**2. Existence of a "Venture"**

The eXp Corporate Defendants argue that summary judgment should be granted as a matter of law because there is no proof of a "venture" in which the eXp Corporate Defendants participated. Plaintiff asserts that the Revenue Share Plan serves as the "venture" for purposes of beneficiary TVPRA liability claim. As an initial matter, the Court acknowledged that it previously acknowledged the Revenue Share Plan could be the basis of a TVPRA beneficiary theory under the TVPRA. *Acevedo*, 713 F. Supp. 3d at 776.

The Ninth Circuit has not adopted a comprehensive definition of "venture" for purposes of § 1595(a). In assessing whether a "venture" exists for beneficiary liability, "courts have consistently pointed to some degree of a formal or more traditional business relationship between the alleged beneficiary and trafficker." *Olive v. Mahboubi-Fardi*, 2025 WL 3638361, at *2 (C.D. Cal. Nov. 13, 2025). Several district courts in this circuit have looked to the Eleventh Circuit's standard, finding a "venture" exists where the alleged beneficiary "took part in a common undertaking or enterprise involving risk and potential profit." *A.G. v. Northbrook Industries, Inc.*, 171 F.4th 1257, 1268 (11th Cir. 2026) (reviewing the circuit split over the definition of a "venture" between the First, Tenth, Seventh, and D.C. Circuits); *see also Olive*, 2025 WL 3638361, at *2 (C.D. Cal. Nov. 13, 2025) (noting the Ninth Circuit has not addressed

the appropriate legal standard and that the appropriate legal standard is the one applied by the Eleventh Circuit); *J.M. v. Choice Hotels Int'l, Inc.*, 2022 WL 10626493, at *4 (E.D. Cal. Oct. 18, 2022); *B.J. v. G6 Hospitality, LLC*, 2023 WL 6120682, at *4 (N.D. Cal. Sep. 18, 2023).[7]

The Court agrees with Plaintiff that there exists a genuine dispute of material fact as to the existence of a "venture." The concept of a "venture" under § 1595(a) is not limited solely to the conduct of the traffickers, as Defendants suggest. *Acevedo*, 713 F. Supp. 3d at 775 ("In other words, § 1595's 'venture' is not limited to a 'sex trafficking venture.'"); *A.G.*, 171 F.4th at 1270 (noting that "nothing in the plain language of § 1595(a) requires that the 'venture' be a 'sex trafficking venture'" and that while a venture "must engage in an act in violation of the TVPRA . . . that requirement does not dictate that the venture must primarily be a sex trafficking venture"). This definition is consistent with the "canon of construction that remedial statutes be construed broadly." *Noble*, 335 F. Supp. 3d at 515.

Reviewing the Revenue Share Plan in light of this background and the relevant standard, the Court cannot find, as a matter of law, that it does *not* qualify as a venture.[8] Plaintiff has proffered evidence from which a reasonable jury could find an element of "risk and potential profit." Plaintiff SGDF Re eXp Corporate Defendants MSJ ¶¶ 65-66. An agent's return under the Revenue Share Plan depends in the recruitment and productivity of downstream agents. *Id.* Plaintiff therefore contends that participating agents risk expending "time, effort, and opportunity costs" without realizing the

---

[7] Several courts often conduct this analysis under the "participation in a venture" element of the TVPRA. Because the eXp Corporate Defendants raise separate arguments related to (1) participation and (2) the existence of a venture, the Court bifurcates the analysis.

[8] The Court recognizes that an overly broad conception of "venture" could potentially sweep ordinary commercial relationships within § 1595(a). That concern, however, is addressed not only by the venture element, but also by the statute's separate requirements of participation, benefit, and actual or constructive knowledge of a TVPRA violation.

anticipated financial return.[9] Opp'n to Sanford MSJ at 11.

The eXp Corporate Defendants' attempts to narrow the scope of a venture are also unavailing. World Holdings points to *Geiss v. Weinstein Co. Holdings LLC* to support the proposition that the Revenue Share Program is not a venture for purposes of the TVPRA. However, their reliance on *Geiss* is misplaced. The *Geiss* court's analysis hinged not on the *existence* of a venture but on whether the defendants had received any *benefit* from their participation, a separate element. 383 F. Supp. 3d 156, 168-69.

eXp Realty and Sanford both argue that there is no venture because there exists no "risk" for the participants. They argue there "is no 'risk' associated with the Revenue Share Plan at all . . . rather, a Real Estate Agent can only fail to earn additional money." Sanford MSJ at 15; eXp Realty MSJ at 15. eXp Realty and Sanford's construe "risk" too narrowly by limiting it to the possibility of monetary loss, yet they identify no authority establishing that "risk" is limited to an out-of-pocket financial loss. Additionally, in light of the statute's remedial purpose, the Court is hesitant to read this requirement into the statute. Plaintiff has proffered evidence that the risk involved is not limited to monetary risk, but to "time, effort, and opportunity cost" that agents may invest and never achieve financial gains. Opp'n to Sanford MSJ at 11. Accordingly, the Court concludes that there exists a genuine dispute of material fact as to the existence of a venture.

**3. Participation in the Venture**

Each of the eXp Corporate Defendants has argued that they cannot be liable under a theory of beneficiary liability because none of them "participated" in the venture. Recently, the Ninth Circuit expressly adopted a broad reading of "participate" under § 1595. *Ratha v. Rubicon*, 168 F.4th 541, 560 (9th Cir. 2026). "Participate" takes its ordinary plain meaning, which is "to take part." *Id.* In establishing this standard, the

---

[9] The Court has considered the eXp Corporate Defendant's objection to Dr. Keep's expert report and overrules the objection as it relates to this summary judgment order.

Ninth Circuit rejected the district court's definition as setting "too high a bar," noting that "one can participate in a venture without operating or managing it." *Id.*

The Court agrees with Plaintiff that there exists a triable issue of material fact as to whether the eXp Realty and Sanford "participated" in the venture. It is undisputed that eXp Realty operates the Revenue Share Plan to help incentivize agents to recruit productive agents and expand the company's agent base. That eXp Realty operates and exercises authority over the Revenue Share Plan is uncontested by eXp Realty, which describes its role in administering the Plan in its own briefing. eXp Realty MSJ at 3.

Sanford's alleged participation in the venture goes beyond routine administration. Plaintiff alleges that Sanford directly intervened in the Revenue Share Plan on behalf of Bjorkman to ensure that Bjorkman's share in the Revenue Share Plan would vest. Plaintiff SGDF Re eXp Corporate Defendants" ¶¶ 94, 106, 108. These actions, if credited, could lead a reasonable jury to conclude that Sanford "took part" in the venture.

World Holdings, however, is a different matter. Plaintiff does not provide evidence from which a jury could reasonably find that World Holdings itself participated in the venture. As an initial matter, the Court observes that Plaintiff has often conflated the various eXp entities during this briefing. However, Plaintiff cannot automatically attribute the activities of a subsidiary company to the parent company. Insofar as Plaintiff seeks to hold World Holdings separately liable, Plaintiff must point to World Holdings-specific participation. Plaintiff's evidence of World Holdings participation is deficient. First, Plaintiff points to individuals who had overlapping roles at World Holdings and eXp Realty in an attempt to tie their activities to World Holdings. But, as this Court discussed previously, it is an accepted legal proposition that individuals may properly serve on two different boards and that these directors may "change hats." *See supra* n. 1. Second, Plaintiff points to the fact the Revenue Share Plan is "subject to board-level authority." Merely because the plan is *subject* to the authority does not indicate that there is actual participation. If anything, the testimony

indicates that World Holdings maintains only the typical, indirect parent relationship with its subsidiaries. Bramble Depo., Ex. F., Dkt. 230.

For this reason, the Court concludes that no reasonable jury could find, based on the evidence presented, that World Holdings participated in the venture. The Court **GRANTS** World Holdings Motion for Summary Judgment on the TVPRA claim.

**4. Knowledge**

To be found liable under a beneficiary theory of the TVPRA, a person must have known or should have known that the venture was engaged in an act in violation of the TVPRA. The "should have known" language "invokes a negligence standard." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022). Negligence is "a less culpable mental state than actual knowledge . . . or recklessness." *Id.* The standard inquiry for negligence is the standard of "a reasonably prudent person under similar circumstances." *Almaraz v. Universal Marine Corp.*, 472 F.2d 123, 124 (9th Cir. 1972).

To satisfy this knowledge requirement, a plaintiff must show "facts establishing that a defendant knew or should have known that the plaintiff was being trafficked or *regarding a specific trafficking enterprise*." *Doe (S.B.C.) v. Six Continents Hotels, Inc.*, 800 F. Supp. 3d 1139, 1144 (W.D. Wash. 2025) (emphasis added). Plaintiff need not necessarily show that Defendants knew that she, herself, was being trafficked. Rather, she only needs to show "that the defendant had constructive knowledge that a venture *generally* has violated" the TVPRA. *G.G. v. Salesforce.com*, 76 F.4th 544, 558 (7th Cir. 2023) (observing that the plain text of the statute does not suggest that knowledge as to a specific victim is required for beneficiary liability); *see also Fleites v. MindGeek S.A.R.L.*, 801 F. Supp. 3d 1045, 1076 (C.D. Cal. 2025).

The negligence standard "is satisfied along a spectrum." *Acevedo*, 713 F.Supp.3d at 780. For instance, courts have declined to find that a defendant "should have known" of a trafficking enterprise when there were only generalized, industry-wide allegations of sex trafficking. *Ratha*, 35 F.4th at 1180 (concluding that "generalized evidence of labor conditions in the Thai shrimp industry" were not sufficient to raise a genuine

dispute of material fact); *Doe (S.B.C.)*, 800 F. Supp. 3d at 1145 (holding "sex trafficking in the hotel industry generally or even at other IHG branded hotels are insufficient to satisfy the knowledge requirement"); *A.B. v Wyndham Hotels & Resorts, Inc.*, 532 F.Supp.3d 1018, 1026 (D. Or. 2021) ("[G]eneral knowledge of commercial sex activity occurring at hotels across the United States is insufficient").

Conversely, "red flags" of a specific sex trafficking venture may support a finding of constructive knowledge of sex trafficking. *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, 798 F.Supp.3d 1082, 1098 (N.D. Cal. 2025) ("[Plaintiff] sufficiently alleges that local hotel staff knew or should have known [she] was a victim of sex trafficking given the red flags that she exhibited"). Moreover, this Court and others have found that "failure to implement policies to combat a known problem in one's operations can rise to the level of willful blindness or negligence." *Acevedo*, 713 F.Supp.3d at 782 (collecting cases).

Against this background, the Court considers whether eXp Realty and Sanford had constructive knowledge of the sex trafficking venture. First, the Parties do not dispute that they became aware of reports of drugging and sexual assaults by Defendant Bjorkman by September 2020. This fact, alone, does not necessarily establish knowledge of a TVPRA violation; however, it is sufficient to create a genuine dispute of material fact as to the requisite knowledge.

The more challenging issue is whether eXp Realty and Sanford *should have known* about the venture before September 2020. The Court agrees that there exists a genuine dispute of material fact as to whether eXp Realty should have known about the venture based on the knowledge possessed by Debby Penny. Debby Penny had worked with Bjorkman at Keller Williams. After Bjorkman joined eXp Realty, she also joined eXp Realty as its California State Broker. While working at eXp Realty, Penny had knowledge of prior sexual assault allegations against Bjorkman, Plaintiff SGDF Re eXp Corporate Defendants ¶ 56, and disclosed that she was aware Keller Williams had previously terminated Defendant Bjorkman for issues related to drinking and fights.

Plaintiff SGDF Re eXp Corporate Defendants ¶ 44.

eXp Realty argues that information Debby Penny learned prior to joining eXp Realty cannot be imputed onto eXp Realty under principles of agency law. eXp Realty correctly observes that "[i]t is settled law that knowledge of the agent is not knowledge of the principal as to matters not within the scope of the agent's authority conferred by the principal . . . the knowledge of the agent is considered and imputed as the knowledge of the principal only when the former acquires it in the course of his agency." *Jefferson Pilot Life Ins. Co. v. Goold*, 2005 WL 5957832, at *1 (C.D. Cal. Nov. 15, 2005) (quoting *Redman v. Walters*, 88 Cal. App. 3d 448, 454 (1979)). However, this general rule is subject to the exception that "[t]he principal is charged with knowledge which his agent acquires before the commencement of the relationship when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal." *O'Riordan v. Fed. Kemper Life Assurance Co.*, 36 Cal. 4th 281, 288 (2005). At this stage, the Court agrees that there exists a factual question, as to whether the allegations against Bjorkman and knowledge of the circumstances of his firing were "present in [her] mind" while working for eXp Realty and whether they could be imputed to eXp Realty.

Additionally, Plaintiff claims that eXp Realty did not have a sexual assault reporting policy until 2018 and did not conduct adequate training with respect to sexual assault investigations. Bramble Depo., Decl. of Lenze, Ex. H at 1. As noted above, this lack of adequate training and where a known problem existed could rise to negligence needed to support the constructive knowledge.

Together, the Court concludes that Debby Penny's knowledge and the lack of adequate training create a genuine dispute of material fact as to whether eXp Realty had constructive knowledge. Admittedly, the factual record is thin; however, it is sufficient to defeat summary judgment. Accordingly, the Court concludes that there exists a genuine dispute of material fact as to whether eXp Realty had constructive knowledge

of the venture.[10]

**5. Benefit**

Finally, TVPRA beneficiary liability requires demonstrating that defendants "knowingly benefit[ted] . . . financially or by receiving anything of value from participation in the alleged venture." 18 U.S.C. 1595(a). As this Court previously concluded, Plaintiff need not show that Bjorkman or Golden transferred a benefit specifically in exchange for facilitating sexual misconduct. *Acevedo*, 713 F. Supp. 3d at 776. She must, however, identify a benefit received from Defendants' participation in the alleged venture.

Additionally, there is no requirement that the benefit be received *while* the trafficking is ongoing. A benefit received after the defendant has acquired actual or constructive knowledge of the venture may satisfy this element; the benefit need not have been received contemporaneously with the underlying trafficking act. *See Ratha*, 35 F.4th at 1177-79 (bifurcating the benefit analysis to before and after the date of undisputed notice and finding a TVPRA violation exists where a benefit could be shown after the date of notice).

The Court agrees with Plaintiff that there exists a genuine dispute of material fact as to whether eXp Realty and Sanford benefited from the Revenue Share Plan after obtaining knowledge. Sanford and eXp Realty make two arguments against the finding of a benefit. First, they argue that "the revenue Roberts generated for eXp Realty from 2018 through 2023 accounts for only 0.0046% of the gross profit [sic] eXp World Holdings Inc. reported during the same time period." To the extent the Defendants argue that a benefit needs to be above a certain threshold to be considered under the TVPRA, that argument is rejected. Indeed, the plain language of the statute belies that conclusion, determining a benefit is "*anything* of value." 18 U.S.C. § 1595(a).

[10] The constructive knowledge allegations here are all specific to eXp Realty, not Defendant Sanford. However, since the Court addressed Sanford's knowledge already, it declines to make a finding regarding his constructive knowledge at this time.

Second, the Defendants argue that there is no "causal connection between Roberts' alleged sex trafficking and that benefit." eXp Realty MSJ at 17-18; Sanford MSJ at 18. However, the Parties cite no binding or persuasive authority that the Court must find a causal connection between the sex trafficking and that benefit. The Court has, moreover, rejected this argument previously. *Acevedo*, 713 F. Supp. 3d at 777. The statute focuses on a benefit derived from participation in the venture, not a benefit derived directly from the trafficking act itself. By its terms, this is more expansive than eXp Realty's and Sanford's interpretation.

For this reason, the Court **DENIES** summary judgment for Defendants on this basis.

**6. Conclusion**

In sum, the Court **GRANTS** summary judgment on beneficiary liability for World Holdings and **DENIES** eXp Realty and Sanford's motions as they relate to beneficiary liability.

**7. Vicarious Liability**

Finally, the eXp Corporate Defendants seek summary judgment on Plaintiff's theory that they are vicariously liable for Defendant Bjorkman and Golden's alleged TVPRA violations. The Court reviews these arguments to each of the eXp Corporate Defendants.

**a. eXp World Holdings**

As an initial matter, the Court observes that Plaintiff presents the vicarious liability theory as a separate claim for the first time at summary judgment. Opp'n World Holdings at 18-21. The operative complaint contains eight causes of action, none of which expressly seek to hold eXp World Holdings liable under a TVPRA direct liability theory through vicarious liability. *See generally* FAC. The only direct liability claims, or Claim One and Claim Two, are against Defendants Golden and Bjorkman respectively. The FAC remains ambiguous as to how Plaintiff intends to bring a claim

against eXp World Holdings.[11] For this reason alone, the Court finds it sufficient to grant summary judgment to the extent Plaintiff intends to hold eXp World Holdings vicariously liable for Defendant Bjorkman and Defendant Golden. *See e.g., Sedell v. Wells Fargo of Cal. Ins. Serv., Inc.*, 2012 WL 3017541, at * 8 (N.D. Cal. July 23, 2012).

Even ignoring this issue, Plaintiff's theory of vicarious liability is legally deficient. Plaintiff argues that a jury could find World Holdings vicariously liable for the venture because (1) World Holdings retained authority over the economic structure through which the venture operated; (2) World Holdings retained authority over the policy and supervisory structures governing the enterprise; and (3) World Holdings embedded itself in the compliance and escalation architecture that governed agent conduct. Opp'n World Holdings at 18-21.

All three of Plaintiff's theories appear to be grounded in World Holdings' control and authority over various aspects of eXp Realty's business.[12] Under California law parent companies are generally only liable for the actions of the subsidiary "only if that subsidiary is either the alter ego or the agent of the parent." *Salkin v. United Servs. Auto. Ass'n*, 767 F. Supp. 2d 1062, 1065-66 (C.D. Cal. 2011) (citing *Sonora Diamond Corp. v. Super. Ct.*, 83 Cal. App. 4th 523 (2000)). Plaintiff expressly states that she is not attempting to bring an alter ego theory, only an agency theory. Opp'n World Holdings at 20.

/ / /

---

[11] The FAC also does not meaningfully distinguish between eXp Realty and eXp World Holdings, grouping them together in the allegations. This is despite the fact that eXp World Holdings and eXp Realty are distinct entities, with eXp World Holdings serving as the parent company of eXp Realty. Defendants had assumed the that the theory of vicarious liability for eXp World Holdings would be for the actions of eXp Realty, its subsidiary. However, the Opposition makes clear that Plaintiff intends to hold eXp World Holdings separately liable for the actions of Defendants Bjorkman and Golden. This is not clearly noted in the FAC and for this reason, the Court observes the Opposition as the first time Plaintiffs have extended this theory.

[12] Plaintiff argues that they are not attempting to hold World Holdings liable for the actions of eXp Realty. Yet, in their argument, they argue World Holdings should be vicariously liable based on its control over eXp Realty's business.

To establish a parent-subsidiary agency relationship, a party must demonstrate "the nature and extent of the control exercised over the subsidiary by the parent" is "so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent." *Ruhnke v. SkinMedica, Inc.*, 2014 WL 12577172, at *10 (C.D. Cal. Sep. 5, 2014) (quoting *Sonora Diamond Corp.*, 83 Cal. App. 4th at 541). "The nature of the control exercised by the parent over the subsidiary ... must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence." *Id.* The Court agrees with World Holdings that Plaintiff has provided no facts upon which a jury could reasonably find that eXp World Holdings had the requisite level of control over the venture. At best, Plaintiff has demonstrated that eXp World Holdings maintains a level of supervision and authority typical of a parent company. She has not provided any facts that demonstrate the level of supervision or control upon which a jury could find the required agency relationship.

For these reasons the Court **GRANTS** World Holdings Motion for Summary Judgment on vicarious liability.

**b. Sanford**

Plaintiff seeks to hold Sanford vicariously liable for Bjorkman and Golden's actions under theories of actual authority, apparent authority, and ratification. Roberts' argument fails under every theory, as she has not demonstrated an agency relationship connection Sanford, specifically, to Defendants Golden and Bjorkman.

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01. Plaintiff attempts to import an agency relationship between Sanford and Defendants Bjorkman and Golden because "Sanford controlled the recruiting enterprise through which Golden and Bjorkman operated[.]" Opp'n Sanford MSJ at 18. However, merely because Sanford allegedly had control over

"key features" of the recruiting program and Revenue Share Program, does not suggest that Defendants Golden and Bjorkman were acting on Sanford's behalf.

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Sapan v. Bloom Retirement Holdings, Inc.*, 2025 WL 1718083, at * 5 (C.D. Cal. Apr. 14, 2025) (citing Restatement (Third) of Agency § 2.03). Plaintiff argues that Defendants Bjorkman and Golden acted with apparent authority as agents of Sanford because eXp Realty "held Golden and Bjorkman out as individuals with authority, influence, and power within the organization." Opp'n Sanford MSJ at 18. The only connection to Sanford is the allegation that eXp Realty did this "through the sponsor-line recruiting system" he created. *Id.* In short, Sanford is only tangentially connected to the relationship which Roberts purports creates the agency relationship. Accordingly, Plaintiff has provided no evidence upon which a reasonable jury could conclude that Defendants Golden and Bjorkman were acting under *Sanford's* apparent authority.

Finally, Plaintiff argues that Sanford ratified Defendant Golden and Bjorkman's actions. "Ratification occurs when the principal accepts the benefit of the agent's act either with actual knowledge of the material facts or with knowledge of facts that would have led a reasonable person to investigate further—also known as 'willful ignorance.'" *Brown v. DirecTV LLC*, 562 F. Supp. 3d 590, 610 (C.D. Cal. 2021) (quoting *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073, 75 (9th Cir. 2019)). Moreover "A principal cannot ratify the act of the alleged agent, unless the 'agent' purported to act on behalf of the principal." *In Re Gonda*, 2011 WL 5240154, at *7 (N.D. Cal. 2011) (quoting *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 961-62 (2002)). Roberts has provided no facts to suggest that Defendants Bjorkman and Golden purported to act on behalf of Sanford, as opposed to on behalf of eXp Realty or where Sanford benefited. Thus, a reasonable jury could not find that Sanford ratified Defendant Bjorkman and

Golden's action.

Thus, the Court **GRANTS** Defendant Sanford's Motion for Summary Judgment as it relates to vicarious liability.

**c. eXp Realty LLC**

Finally, Defendant eXp Realty argues that it cannot be vicariously liable for Defendant Bjorkman and Golden's actions because eXp Realty "did not intend that [it] would control Bjorkman or Golden's activities under their respective independent contractor agreements." eXp Realty MSJ at 19. In response, Plaintiff argues that there exists a genuine dispute of material fact as to whether there is an agency relationship between Defendant Bjorkman and Golden and eXp Realty.

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act. Actual authority is limited to actions specifically mentioned to be done in a written or oral communication or consistent with a principal's general statement of what the agent is supposed to do." *Sapan*, 2025 WL 1718083, at *5 (citations omitted). Because there is no evidence to suggest that any of Defendant Bjorkman and Golden's activities were specifically within the scope of what eXp Realty expected them to do, the Court cannot find they acted within the scope of any actual agency authority.

Plaintiff also appears to assert that eXp Realty should be vicariously liable for the activities of Defendant Golden and Bjorkman because eXp Realty had "control over the relevant undertaking." A "control" theory of vicarious liability "invokes the Restatement (Third) of Agency's theory of vicarious liability arising out of an employer-employee relationship." *Jones v. Royal Administration Serv., Inc.*, 887 F.3d 443, 450 (9th Cir. 2018). To determine whether vicarious liability may be imposed in this context, "the extent of control exercised by the principal is the essential ingredient." *Id.* The Ninth Circuit considers ten factors to determine whether an employer is liable for the conduct of its employee: "

> 1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer supplies tools and instrumentalities [and the place of work], 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business."

*Id.* (citations omitted).

At this juncture, the Court concludes that there exists a genuine question of material fact as to whether eXp Realty had "control" over Defendant Golden and Bjorkman. Both Parties agree that eXp Realty's Independent Contractor Agreements state that Golden and Bjorkman "act on eXp Realty's behalf in connection with Real Estate Agent recruiting." Reply at 8, n. 12; *see* also Plaintiff SGDF Re eXp Corporate Defendants ¶ 61. However, the extent of control that eXp Realty retains over its agents is contested. The "existence of an agency relationship is ultimately a question of fact." *Sabadash v. Brevent*, 2024 WL 3841615, at *7 (C.D. Cal. July 8, 2024).

Accordingly, the Court **DENIES** eXp Realty LLC's Motion for Summary Judgment on vicarious liability.

**8. State Law Claims**

Outside of TVPRA liability, Plaintiff has asserted claims for sexual battery and assault, intentional infliction of emotional distress, and negligent hiring against Defendants. Defendants have all moved for Summary Judgment on the respective state law claims. The Court reviews the arguments below.

**a. Sexual Battery, Civil Battery, and Intentional Infliction of Emotional Distress**

Claims Four, Five, and Six bring actions for sexual battery, civil battery, and intentional infliction of emotional distress ("IIED") against Bjorkman and Golden. Golden and Bjorkman moved for summary judgment on each claim. However, their

arguments fail largely for the reasons discussed in connection with Plaintiff's TVPRA claims.

**i. Bjorkman**

Bjorkman argues summary judgment is appropriate on the sexual battery, civil battery, and IIED claims because Plaintiff cannot demonstrate any nonconsensual touching occurred at the Daytona Beach Event. Bjorkman MSJ at 20-26. However, as the Court previously noted, there exists a genuine dispute of material fact as to whether there was any sexual contact between Bjorkman and Plaintiff. *See supra* Section III.A.iii.a. For this reason, the Court **DENIES** Bjorkman's motion for summary judgment on the sexual battery, civil battery, and IIED claims.

**ii. Golden**

Golden moves for summary judgment on the sexual battery, civil battery, and IIED claims. With respect to the sexual battery and civil battery claims, Golden's primary argument is that Plaintiff consented to the relationship and any subsequent activities. Golden advances a similar argument with respect to the IIED claim, arguing that Plaintiff "attempt[s] to retroactively recharacterize a consensual fling based on post-hoc regret." However, as the Court previously observed, there is a genuine dispute as to whether Plaintiff consented to the relationship and conduct at issue. *See supra* III.A.ii. Thus, the Court **DENIES** Golden's motion for summary judgment as it relates to sexual battery, civil battery, and IIED.

**b. Negligent Hiring, Supervision, and Retention**

Plaintiff's seventh claim is against World Holdings, Sanford, and eXp Realty for negligent hiring, supervision, and retention. The Court observes that Plaintiff brought this claim against World Holdings but explicitly declined to oppose World Holdings motion for summary judgment on this claim. Opp'n World Holdings at 2 n.2; *see also Jenkins v. Cnty. Of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005). For this reason, the Court considers the claim abandoned and **GRANTS** World Holdings' motion for summary judgment on the negligent hiring, supervision, and retention claim. The Court

now reviews Defendant Sanford's and eXp Realty's motions for summary judgment on the negligent hiring, supervision, and retention.

Sanford and eXp Realty argue that, to the extent that this claim is based on conduct that occurred in Nevada and Mexico, the claim is untimely. The Parties concede, however, that her claims are timely to the extent they are based on the conduct alleged in Florida. Under California law, "[a]n employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit." *Dent v. Nat'l Football League*, 902 F.3d 1109, 1121-22 (9th Cir. 2018). "To establish negligent supervision, a plaintiff must show that a person in a supervisorial position over the actor had prior knowledge of the actor's propensity to do the bad act." *Z.V. v. Cnty of Riverside*, 238 Cal. App. 4th 889, 903 (2015). To establish liability, a "plaintiff must demonstrate the familiar elements of negligence: duty, breach, proximate causation, and damages." *Dent*, 902 F.3d at 1122. In negligent hiring and retention cases, "the existence of an employment relationship and foreseeability of the injury" are also required. *Id.*

In their Motions, eXp Realty and Sanford[13] make three arguments for summary judgment: (1) Roberts cannot show how eXp Realty and Sanford caused her damages; (2) Sanford and eXp Realty breached no duty to Roberts; and (3) Roberts cannot show

[13] In both eXp Realty's Motion for Summary Judgment and Sanford's Motion for Summary Judgment, Defendants argue that summary judgment is appropriate because there was no employment relationship between Roberts and eXp Realty or Sanford. eXp Realty MSJ at 22; Sanford MSJ at 22 (both stating "[t]here is no evidence that [Sanford/eXp Realty] had any employment relationship with Roberts). This is the incorrect standard, as the relevant employment relationship is between the defendant employer and the tortfeasor, not the plaintiff and defendant employer. Sanford's Reply acknowledges the error and characterizes the original argument as a "scrivener's error." Scrivener's errors are typically limited to "obvious clerical or typographical errors." *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Serv., Inc.*, 448 F.3d 1092, 1097 (9th Cir. 2006) (Bybee, J., dissenting) (describing ordinary kinds of scrivener's errors). The Court is not convinced the error is properly characterized as a scrivener's error. Since Plaintiff has not had a meaningful opportunity to respond to the allegedly corrected argument made in the Reply, the Court will disregard this argument for the sake of summary judgment.

a causal connection between eXp Realty and Sanford's alleged breach of duty and her alleged injuries.

The Court starts its analysis with eXp Realty. In the case of a negligent hiring, retention, or supervision claim, an employer is liable if "it knew or should have known of the dangerous propensities of the employee who injured the plaintiff." *C.A. v. Willaim S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 867 (2012). As the Court discussed earlier, there exists a genuine dispute of material fact as to whether eXp Realty should have known about Bjorkman's past allegations and whether that is indicative of a risk for others. *See supra* discussion at Section III.B.iv. If a jury finds that eXp Realty knew or should have known that Bjorkman posed a risk of the type of misconduct alleged here and nevertheless failed to take reasonable steps in hiring, retaining, or supervising him, the jury could also find that eXp Realty's negligence was a proximate cause of Plaintiff's resulting injury.[14] Moreover, the alleged sexual misconduct is also sufficiently related to the risk allegedly revealed by the prior complaints to permit a jury to find the injury foreseeable.. The Court acknowledges that there are factual weaknesses in Roberts' argument. However, weighing these facts is not appropriate for the Court at summary judgment. The Court only determines whether there is a genuine dispute of material fact. Accordingly, the Court **DENIES** eXp Realty's motion for summary judgment on negligent hiring, retention, and supervision.

With respect to Sanford, the Court agrees with Sanford that Plaintiff has failed to meet her burden at summary judgment. Sanford argues that "there is no evidence showing that Sanford knew or had reason to know of Bjorkman or Golden's alleged unfitness at any time relevant" to Roberts' claim. Sanford MSJ at 23. Plaintiff herself acknowledges the timing issue in her negligent hiring, retention, and supervision claim. To support a negligent retention claim, Plaintiff must show that the breach of duty

---

[14] To the extent that Defendants argue that there is no evidence of sexual assault or civil battery, the Court has determined that there exists a genuine dispute of material fact on that issue.

*caused* her injury, which Plaintiff concedes requires showing that Sanford knew or should have known about any alleged unfitness before or at the time of her injury. Opp'n Sanford MSJ at 23.

Plaintiff attempts to create a genuine dispute of material fact by stating that there is a genuine dispute about whether the relevant knowledge within the enterprise and "whether Sanford, as the decisionmaker who controlled retention and compensation issues, may be charged with that knowledge." *Id.* at 23. In short, Plaintiff attempts to create a genuine dispute of material fact by speculating as to what Sanford knew or did not know. She offers no testimony or evidence in support of her proposition. This is not sufficient to defeat a motion for summary judgment. Contrary to Plaintiff's position, "if the non-moving party will bear the burden of proof at trial as to any element essential to its case, that party can withstand a motion for summary judgment *only by* making a showing sufficient to establish a genuine issue of fact regarding that element and a showing that the dispute properly may be resolved only by the fact-finder because it could reasonably be resolved in favor of either party." *Cox v. Depuy Motech, Inc.*, 2000 WL 1160486, at * 2 (S.D. Cal. 2000) (citing *Celotex Corp.*, 477 U.S. at 321) (emphasis added).

The Court finds Plaintiff's unsupported speculation insufficient to create a genuine dispute of material fact. Accordingly, the Court **GRANTS** Sanford's motion as it relates to the negligent hiring, retention, and supervision claim.

## IV. MOTION TO SEVER

Bjorkman has moved to sever the trial between him and the other Defendants. He is joined by Defendant Golden. The Court notes that, while Bjorkman does not clearly articulate the Rule through which he wishes the Court to sever his trial, his Reply brief suggests he seeks severance pursuant to Federal Rules of Civil Procedure 21, and/or 42(b). Both Rules 21 and 42(b) are discretionary. *See* Fed. R. Civ. P. 21 ("The court *may* also sever any claim against a party."); Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court *may* order a separate trial of

one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.").

Bjorkman asserts that certain evidence admissible against eXp Realty and World Holdings will be unduly prejudicial if offered against him in this case. *See generally* Motion to Sever (listing the various kinds of evidence that Bjorkman fears would be admitted and unduly prejudicial against him). Having reviewed and considered the admissible evidence, particularly after the hearings on the motions in limine, the Court agrees with Defendant Bjorkman. The Court believes that several documents and pieces of evidence admissible against the eXp Corporate Defendants would be unduly prejudicial against Defendants Golden and Bjorkman. Indeed, proposed evidence includes messages between eXp Realty and eXp World Holdings board members discussing the allegations against Bjorkman and Golden, including their assessment of the validity of the same, subsequent actions taken by eXp Realty memorialized in internal memoranda using highly prejudicial language, and other documents that reference testimony and allegations from individuals whose testimony would not be admissible against Defendants Golden and Bjorkman.

While the Court agrees that Defendant Bjorkman's trial should be severed from the eXp Corporate Defendants, the Court declines to sever his trial from Defendant Golden. The allegations against Defendant Golden are necessarily intertwined and severing as to Defendants Golden and Bjorkman will likely result in judicial inefficiency, as the allegations are sufficiently intertwined. *See Arteaga v. FCA US LLC*, 2020 WL 2857488, at *3 (C.D. Cal. June 2, 2020) (declining to sever where the claims are "sufficiently intertwined, factually and legally, that severance would be inconvenient and inefficient").

Thus, the Court **GRANTS IN PART** Bjorkman's Motion to Sever.

/ / /

/ / /

/ / /

## V. CONCLUSION

For the forgoing reasons, the Court:

- DENIES Bjorkman's Motion for Summary Judgment
- DENIES Golden's Motion for Summary Judgment
- DENIES eXp Realty's Motion for Summary Judgment
- GRANTS World Holdings Motion for Summary Judgment as it relates the TVPRA beneficiary liability claim (Claim III), vicarious liability, and the negligent hiring, supervision, and retention (Claim VII)
- GRANTS Sanford's Motion for Summary Judgment as it relates to vicarious liability and negligent hiring, supervision, and retention (Claim VII); DENIES as it relates to the TVPRA beneficiary liability claim (Claim III)
- GRANTS IN PART Bjorkman's Motion to Sever

Dated: August 20, 2026

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT JUDGE