# Exhibit 1

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXPERT DECLARATION OF DR. CHITRA RAGHAVAN

## Table of Contents

**SECTION 1: CREDENTIALS AND EXPERTISE** .......... 2
SECTION 2: SUMMARY OF OPINION .......... 4
**SECTION 3: SCOPE OF EVALUATION** .......... 8
**SECTION 4: RESEARCH OVERVIEW OF DRUG FACILITATED SEXUAL ASSAULT** .......... 9
**SECTION 5: MR. GOLDEN'S RELEVANT BACKGROUND AND MODUS OPERANDI** .......... 12
**SECTION 6: MR. BJORKMAN'S RELEVANT BACKGROUND AND MODUS OPERANDI** .......... 14
**SECTION 7: BRIEF BACKGROUND FOR ANYA ROBERTS** .......... 18
**SECTION 8: MEETING MS. KEENAN AND MR. GOLDEN IN PUERTO VALLARTA (FEBRUARY 8th and 9th 2020)** .......... 20
**SECTION 9: MEETING MR. GOLDEN IN LAS VEGAS (FEBRUARY 11th 2020 and February 21)** .......... 23
**SECTION 10: MEETING MR. GOLDEN IN FLAGER/DAYTONA BEACH (MARCH 10-12, 2020)** .......... 24
**SECTION 11: CONSENT and DFSA ANALYSIS** .......... 27
**SECTION 12: DIAGNOSTIC DETAILS** .......... 29
**SECTION 13: OVERVIEW AND ANALYSIS OF COERCIVE CONTROL (AFTER FEBRUARY 8TH 2020 UNTIL MARCH 2020)** .......... 34
**SECTION 14: ANALYSIS OF DETAILS OF COERCIVE CONTROL (AFTER FEBRUARY 8TH 2020 UNTIL MARCH 2020)** .......... 38
**SECTION 15: METHODOLOGY FOR CLINICAL INTERVIEWING AND TESTING** .......... 43
**SECTION 16: SHORT TERM AND LONG-TERM EFFECTS OF THE ABUSE INCIDENT** .......... 44
**SECTION 17: ALTERNATE EXPLANATIONS/RULE OUT OTHER TRAUMA AND MALINGERING** .......... 45
**CONCLUSION** .......... 47
**INSERT APPENDIX A** .......... 48
**APPENDIX B** .......... 58



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

## SECTION 1: CREDENTIALS AND EXPERTISE

1. I am a licensed clinical psychologist with more than twenty years of experience in the field of clinical psychology including research, teaching, and being qualified as an expert witness[1] in sexual coercion, coercive control, and trauma bonding.

2. I am a tenured and full Professor of Psychology, Director of the Forensic Mental Health Counseling Program, and Coordinator of Victimology Studies in Forensic Psychology at John Jay College of Criminal Justice (City University of New York). My post-high school education includes obtaining a B.A. in French Language and Literature and Psychology from Smith College in 1992; a Doctorate in Community and Clinical Psychology from the University of Illinois in Urbana-Champaign in 1998; a Postdoctoral Fellowship at Yale University School of Medicine in 2000; and working as a Research Scientist at the National Center on Addiction and Substance Abuse (CASA) at Columbia University in 2002.

3. I received my license to practice psychology in New York in 2005 and am in good standing.

4. A complete record of my academic and professional background is detailed in my Curriculum Vitae, attached as part of **Appendix A**. Included are also a list of publications and cases in which I have testified in the last ten years.

5. Among my specialties are coercive control and sexual coercion/assault across different interpersonal contexts and how these forms of abuse engender psychological distress. My academic achievements in the related fields of coercive control, sexual assault and traumatic outcomes are reflected in the widespread utilization of my work in the field; for example, my publications have been read approximately 46,000 times by members of the community (Research Gate). My work in trauma bonding has also made case law in New York State. Smith College (my alma mater) selected me as one of the top contributing alumnae psychologists in the past 100 years in the history of psychology.

6. In the context of sexual abuse and sex trafficking or other interpersonally exploitative situations, I study the pathways of coercive control tactics that abusers use to maintain control over their victims and to ensure control over their victims including the use of love bombing and predatory helpfulness. Coercive control can manifest early via fraud, deception, and practices such as love bombing, grooming and or predatory helpfulness. My research on these subjects is considered groundbreaking in understanding the use of non-violent coercive tactics to entrap victims for exploitation.

---

[1] *People v. Abdur-Razzaq*, 60 Misc. 3d 631 (N.Y. Sup. Ct. 2018) (Slip Op.) (Barrett, J.) ("All three of the People's experts testified credibly; however, the Court found that the testimony of Dr. Raghavan was the most essential and relevant exposition of the scientific analysis that underlies the psychological theory here presented. Dr. Raghavan not only demonstrated scholarship and in-depth knowledge and experience in the field of trauma bonding and the use of coercive control as applied in the area of sex trafficking, but her testimony was free of bias and she was extremely articulate, answering often complex and sometimes convoluted questions with aplomb and in a clear and understandable way. She demonstrated conclusively the validity of the established applications of the theories of trauma bonding and coercive control …

7. Relevant to this evaluation, is my work on how to identify and assess sexual coercion and sexual assault in forensic settings. My sexual coercion measure is currently being translated into French and Hungarian[2]. Core elements of this work include how sex offenders, abusers, and predators, typically men use different deceptive non-forceful tactics to obtain sex without consent from victims.

8. I also examine the traumatic outcomes of coercive abuse including posttraumatic stress disorders such as PTSD and Complex-PTSD, dissociative disorders such as trauma bonding, and mood disorders such as depression and persistent depression. **Trauma bonding**, a form of mental illness, is a pathological dependency and loyalty to an abuser, including unquestioning obedience from a combination of terror of being punished and loss of agency from the abuse, which results from coercive control and abuse[3].

9. In one matter, I testified on behalf of the prosecution in a *Frye* hearing[4], resulting in a published decision that established new law in New York State, holding that theories of trauma bonding and coercive control are well established in both the psychological and legal communities. *People v. Abdur-Razzaq*, 77 N.Y.S.3d 842 (N.Y. Sup. Ct. 2018) (admitting my testimony about coercive control where "the typical juror may question why C.Y. stayed with defendant although she was not physically restrained during the entire period she remained at the location where she was being held").

10. I have made over two hundred conference presentations on these topics. I have also published over sixty peer-reviewed publications and edited two books, including *Domestic Violence: Methodologies in Dialogue*, *Northeastern Series on Gender, Crime, and Law,* Northeastern University Press, 2013. A third book on the assessment of coercive control is under contract with Oxford University Press (2026 publication date).

11. Furthermore, I have qualified as an expert witness and provided testimony in several cases related to sexual coercion and sexual assault, coercive control at the workplace, in domestic violence, sex trafficking, and cult contexts. Documentation of my prior expert testimony is

---

[2] Raghavan, C., Cohen, S., & Tamborra, T. (2015). Development and preliminary validation of The Multidimensional Sexual Coercion Questionnaire (MSCQ). *Journal of Sexual Aggression*, *21*(3), 271–289. https://doi.org/10.1080/13552600.2014.917341

[3] Trauma-coerced bonds" or "trauma bonds" (sometimes also known as Stockholm Syndrome in the media and indexed as Other Dissociative Disorder in the DSM-5) are a pathological dependency and loyalty to the abuser, including unquestioning obedience from a combination of terror of being punished and loss of agency from the abuse. Trauma-coerced bonds result from coercive control and abuse and are an extreme form of traumatic stress that should be viewed as a form of mental illness. Trauma-coerced bonds, while rare in the general population, are not uncommon in victims of intimate partner violence, sex trafficking, and cults.

[4] *People v. Abdur-Razzaq*, 60 Misc. 3d 631 (N.Y. Sup. Ct. 2018) (Slip Op.) (Barrett, J.) ("All three of the People's experts testified credibly; however, the Court found that the testimony of Dr. Raghavan was the most essential and relevant exposition of the scientific analysis that underlies the psychological theory here presented. Dr. Raghavan not only demonstrated scholarship and in-depth knowledge and experience in the field of trauma bonding and the use of coercive control as applied in the area of sex trafficking, but her testimony was free of bias and she was extremely articulate, answering often complex and sometimes convoluted questions with aplomb and in a clear and understandable way. She demonstrated conclusively the validity of the established applications of the theories of trauma bonding and coercive control …



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

attached in **Appendix A**. I have also evaluated plaintiffs and victims on the use of and being the target of sexual assault and coercive control in the above areas in civil cases. In addition to civil cases, I have worked with public prosecutors and public defenders in New York State Supreme Court in New York County, Kings County, Nassau County, Suffolk County, Ulster County, and the Bronx, and at the federal level in the Southern District of New York, the Eastern District of Michigan, New Mexico, Minnesota, and Washington, D.C., as well as in Hague Proceedings in the Eastern District of New York.

12. I have trained lawyers, judges, and mental health professionals with respect to sexual coercion, predatory helpfulness, trauma bonding and coercive control. I have taught classes on trauma and victimization locally and internationally. For example, I conducted a training on "Science of Trauma and PTSD" for the New York State Parole Board in the Incarcerated Gender Violence Survivors Initiative, Meeting of Parole Board Committee, on April 18, 2018. In October 2020, I was the keynote speaker on "Coercive Control and Trauma-Coerced Attachment in Domestic Violence" during a New York Office of Court Administration training series on domestic violence for New York State Supreme Court judges and legal personnel. In 2023, I gave a multi-day training on coercive control and predatory helpfulness to New York State Supreme Court judges in a conference organized by the Office of Court Administration. In 2025, I gave a training on sexual coercion at the Brooklyn Sexual Assault Task Force Meeting. In April 2026, under my leadership, I will co-chair the International Coercive Control Conference at the John Jay College of Criminal Justice. ICCC is the leading conference on this subject globally, gathering top scholars and practitioners biennially.

## SECTION 2: SUMMARY OF OPINION

1. I am Dr. Chitra Raghavan, a licensed clinical psychologist. I have been retained by Plaintiff's counsel as a potential testifying expert witness in this matter on behalf of the Plaintiff Anya Roberts.

2. This declaration sets forth: (1) my evaluation of Ms. Anya Roberts (DOB:10-31-1983); (2) my professional opinions; and (3) the methodology upon which these opinions are based; and (4) the psychological science relevant to this case.

3. My evaluation methodology and conclusions are grounded in established psychological science regarding coercive control, sexual assault, sexual coercion, and drug-facilitated sexual assault. This scientific literature provides the theoretical framework, empirical data, and normative baseline against which forensic evaluations in cases of this nature must be conducted and assessed. My opinions reflect the application of these scientifically validated principles to the specific facts of this case, and I provide an overview of such relevant principles throughout.

4. The objectives of my evaluation were fourfold:



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

i. First, to determine whether Ms. Roberts suffered psychological distress as she alleges and whether this distress is consistent with the totality of clinical data, collateral information, and assessment findings obtained during my evaluation.

ii. Second, to assess whether Ms. Roberts's reported psychological distress is likely associated with her allegations that she was in a coercively controlling and sexually coercive relationship with Mr. Golden and Ms. Keenan,[5] and whether the temporal onset, nature, and severity of her psychological symptoms are consistent with patterns observed in documented cases of such abuse.

[redacted]

iv. Fourth, to determine whether the abuse/exploitation period and its related incidents have disrupted any areas of Ms. Roberts's life.

5. Ms. Roberts alleges that Mr. David Golden and his girlfriend Ms. Emily Keenan were primarily responsible for, incapacitating her involuntarily via drugs and alcohol, and emotionally and sexually exploiting her before, during, and after such incapacitation. At the time of incident, Ms. Roberts worked in a different downline at a real estate company known as eXp and Mr. Golden was actively recruiting her to move her team to his team at eXp where he was a lead broker and sponsor[6]. Ms. Roberts also noted that she believes Mr. Bjorkman was involved with some aspect of her drugging and or sexual assault in Daytona Beach (around March 10-12, 2020); however, because of memory loss she does not recall what that role might be but observed that he was present and involved in obtaining drugs[7].

---

[5] Because this alleged period of deception, abuse, and coercive and sexual control lasted approximately six weeks, it will be referred to as "the abuse/exploitation period."

[6] Exhibit 1: See Roberts First Amended Complaint for Mr. Golden's status in eXp. See also Third Amended Complaint (Exhibit 2) for details of eXp and Mr. Bjorkman's role in this organization until his termination in 2020. See also Exhibit 8 detailing Mr. Bjorkman's influential role in eXp.

[7] Exhibit 3: At the time of the incident, Mr. Golden was a senior agent with eXp and worked closely with Mr. Bjorkman including sharing hotel suites regularly with his girlfriend Emily Keenan and Mr. Bjorkman (pp. 56, 82-83, 726-727, 881-882). See Mr. Golden's testimony that Mr. Bjorkman consumed GHB with Ms. Roberts during one of alleged drugging incidents in Daytona Beach/Flagler Beach. See also Exhibit 26-Golden. Mr. Golden and Mr. Bjorkman discuss a two-bedroom hotel suite Mr. Golden has booked in Las



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

6. My analysis examined whether the constellation of Ms. Roberts's reported symptoms, their chronological development, and their clinical presentation align with established psychological sequelae associated with a coercively controlling and exploitative sexual relationship marked by drug-facilitated and alcohol-facilitated incapacitation and the available evidentiary record in this matter.

7. Based on my evaluation of case data—including witness, plaintiff, and defendant depositions and associated exhibits such as text messages, emails, and police reports—as well as my research and clinical experience, it is my professional opinion, to a reasonable degree of psychological certainty, [redacted]

[redacted]

10. Based on the information provided, Ms. Roberts's presentation is **consistent with** severe trauma associated with the alleged coercive controlling abuse, sexual exploitation, and incapacitation via the involuntary ingestion of substances. Much of Ms. Roberts's extensive symptomatology is consistent with an individual who has sustained significant psychological trauma of a sexual nature (See Diagnostic Details).

11. While Ms. Roberts does not always recall details of what she may have ingested Mr. Golden readily admits that he or Ms. Keenan provided Ms. Roberts with GHB and Adderall across different incidents. Ms. Roberts's lack of memory regarding both the ingestion of GHB or other substances and any sexual activity raises serious questions about her capacity to consent. From a psychological perspective, an individual who is incapacitated by drugs—particularly a substance like GHB, which is known to cause memory loss and impair cognitive function—cannot provide meaningful consent to

---

Vegas, Nevada on August 27th, 2020 (This exhibit was offered in Mr. Golden's deposition The numbering format references that Exhibit 26 was produced as an exhibit during Mr. Golden's deposition).



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

sexual activity. Mr. Golden's assertion that the sex was consensual is undermined by the very nature of the drug he admitted administering: if Ms. Roberts cannot recall taking the drug, agreeing to take it, and or engaging in sexual activity, she was likely too impaired to consent at the time these events occurred.

[redacted]

13. Ms. Roberts' inability to cognitively recall the sexual assaults but yet experiences significant damage post assault is consistent with a body of research on sexual trauma and DFSA.

14. The traumatic injury in this case is multifaceted, encompassing several distinct violations of Ms. Robert's autonomy and safety The traumatic injury in this case as related to the abuse period encompasses: (a) the violation of bodily autonomy through involuntary incapacitation; (a) the violation of bodily autonomy through sexual assault when unable to consent potentially to at least one recalled assailant (Ms. Keenan); (c) the loss of consciousness and cognitive control; (d) the experience of having periodic awareness without memory of intervening events; (e) learning about aversive aspects of the sexual trauma after it happened via photographs and testimony of others and (e) the subsequent realization of her vulnerability during the period of incapacitation. These elements constitute a profound breach of personal integrity and safety, representing a threat of serious harm to self that forms the foundation of her trauma responses[9] [10].

---

[8] Clinically, Ms. Roberts likely experienced blackouts—periods of impaired awareness rather than unconsciousness—a hallmark of substance use. During these episodes, she maintained functional capacity (e.g., air travel, workplace interactions), indicating preserved procedural functioning. However, concurrent substance ingestion likely disrupted the consolidation of short-term memory into long-term storage. Consequently, Ms. Roberts lacks recall for statements and behaviors occurring during these periods, with memory gaps becoming apparent hours to days later.

[9] For example, these issues are explored in this seminal article; Gauntlett-Gilbert, J., Keegan, A., & Petrak, J. (2004). DRUG-FACILITATED SEXUAL ASSAULT: COGNITIVE APPROACHES TO TREATING THE TRAUMA. *Behavioural and Cognitive Psychotherapy*, *32*(2), 215–223. https://doi.org/10.1017/S1352465804001481.

[10] Since this seminal article, other research has noted that DFSA survivors typically have impaired trauma memory. See, for example, Fields, L., Young, D. A., Patel, A. R., Munroe, C., Shumway, M., Bell, S., & Richer, L. A. (2022). Drug-facilitated sexual assault, impaired trauma memory, and implications for mental

[redacted]

16. All available test data is consistent with a pattern suggesting that Ms. Roberts is not malingering her mental health symptoms and related psychological distress.

17. I do not make any definitive conclusions around legal causation of harm, past or present, do not opine on whether the alleged abuse occurred, but rather opine on psychological probability of harm arising from that alleged abuse incident. If new data arise, I reserve the right to amend any part of the report including my opinions.

**SECTION 3: SCOPE OF EVALUATION**

1. The objectives of the evaluation were provided in paragraph 4.

2. I examined Anya Roberts for a total of 13 hours and reviewed the IME recording by Dr. Cohen (about 8 hours) for a total of 21 clinical hours. I also consulted numerous documents including the First Amended Complaint, plaintiff, defendant and witness depositions and associated exhibitions including texts and email messages, and other relevant documents provided by the attorneys (see Appendix B for list) as well relevant scientific articles for a total file review and clinical interviewing of about 85 hours.

3. I met with Ms. Roberts over four Zoom sessions (12/6/25, 12/7/25, 12/15/25, and 12/16/25), and, if given the opportunity at a hearing or trial, I will describe the following conclusions I have made in detail.
4. My opinions are based on my analysis of Ms. Roberts's narrative, my review of other case materials for this matter; my studies and research regarding sexual assault, trauma, and victimology; and my decades of experience evaluating, treating, and interviewing victims of sexual coercion and other forms of abuse.

---

health treatment. *European journal of psychotraumatology*, *13*(1), 2057165. https://doi.org/10.1080/20008198.2022.2057165



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

## SECTION 4: RESEARCH OVERVIEW OF DRUG FACILITATED SEXUAL ASSAULT

In the following section, I provide scientific psychological understanding and definitions of a particular type of sexual coercion: drug-facilitated sexual assault, or DFSA.

1. Sexual coercion refers to forcing an unwilling partner to comply with nonconsensual sexual acts without direct physical violence prior to or during the act. Nonconsent encompasses the unwilling partner's absence of consent, resistance, or compliance under duress[11]. Drug-facilitated sexual assault constitutes a distinct type of sexual coercion compared to non-drug-facilitated sexual assault.

2. Drug-facilitated sexual assault (DFSA) involves using alcohol, pharmaceutical substances (commonly known as "date rape drugs" or DFSA drugs), or both to involuntarily incapacitate a victim. *Proactive* DFSA occurs when the perpetrator intentionally incapacitates a target rather than exploiting an existing opportunity to commit assault.

3. From a perpetrator's point of view, DFSA is effective because particular kinds of DFSA drugs can (1) cause sedation and reduced ability to resist, (2) impair memory through anterograde amnesia, (3) be difficult to detect as they may be colorless, odorless, and tasteless, and (4) leave the body quickly, making detection challenging even with prompt medical evaluation.

4. Research on DFSA suggests that the prevalence of such sexual assaults are underestimated because most substances are metabolized rapidly and eliminated from the system, and because victims often do not report to law enforcement. For example, detection of GHB and flunitrazepam (commonly known as "roofies" or by the brand name Rohypnol) is difficult because these drugs metabolize rapidly and are not detectable after as little as 10–12 hours in the bloodstream[12]. Thus, both public records and medical toxicology reports of DFSA are likely underestimates. Data from treatment centers note the opposite; many clients seeking treatment report being victims of DFSA, suggesting that even if these cases do not make it to law enforcement, drug-facilitated sexual assault survivors identify as such and seek help at disproportionate rates compared to reporting rates[13].

5. DFSA victims rarely retain clear, linear memories of the assault. Instead, they typically recall only fragments and flashes surrounding the event, with the severity and duration of

[11] Mitchell, J., & Raghavan, C. (2019). The impact of coercive control on use of specific sexual coercion tactics. Violence Against Women. 1077801219884127.

[12] For example, see: Busardò, F. P., Varì, M. R., di Trana, A., Malaca, S., Carlier, J., & di Luca, N. M. (2019). Drug-facilitated sexual assaults (DFSA): A serious underestimated issue. European Review for Medical and Pharmacological Sciences, 23(24), 10577–10587. https://doi.org/10.26355/eurrev_201912_19753; See also Berretta, P., & Varì, M. R. (2020). The overwhelming issue of drug-facilitated sexual assaults (DFSA): The case of GHB. La Clinica Terapeutica, 170(1), e44–e45. https://doi.org/10.7417/CT.2020.2187

[13] Fields et al., (2022).



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

memory impairment depending on the dosage and substance used. Memory gaps are commonly referred to as 'blackouts (anterograde amnesia). Although blackouts are used in popular or lay literature to reference loss of consciousness or awareness, clinically, blackouts represent a failure to transfer information from short-term to long-term memory storage, and not necessarily a complete loss of consciousness.

a. High doses of alcohol are well documented to cause blackouts (anterograde amnesia), where individuals remain conscious and active but later cannot recall events. These blackouts may be fragmentary (partial recall with cues) or en bloc (complete memory gaps). Alcohol impairs the consolidation of new memories, particularly when blood alcohol concentration rises rapidly, as occurs during binge drinking. Alcohol disrupts hippocampal function, which is critical for forming new memories[14].

b. Combining alcohol with stimulants (such as cocaine, amphetamines, and Adderall) is associated with increased alcohol consumption (masking hypothesis in which the individual does not feel intoxicated as a result of stimulant effects and thus, consumes more alcohol) which may elevate risk of blackouts.

c. GHB (gamma-hydroxybutyrate) is a potent central nervous system depressant that can cause profound anterograde amnesia, blackouts, and impaired memory consolidation, even at doses commonly used recreationally[15][16]. When combined with alcohol, these effects are magnified due to overlapping mechanisms of action, increasing the risk of partial or complete blackouts.

6. In the absence of toxicology or witness corroborations, a cautious and conservative observation of reported symptoms derived from both the alleged victim and witnesses is a best practice in psychological evaluation. Key differences between alcohol intoxication alone and alcohol combined with substance ingestion include:

a. The onset of action and effects can be as rapid as 20 minutes, and the effects are magnified if alcohol is also used, whereas alcohol intoxication alone takes longer and requires a higher level of ingestion (usually an hour or more and multiple drinks).

b. Central nervous system depressants such as GHB[17] and flunitrazepam result in symptoms such as lightheadedness after consuming very little alcohol, sudden dizziness, blurred vision, disorientation, nausea, and vomiting. While confusion, vomiting, and disorientation also occur with alcohol intoxication, these symptoms

---

[14] White, A. M. (2003). What happened? Alcohol, memory blackouts, and the brain. *Alcohol Research & Health, 27*(2), 186–196

[15] Busardò, F. P., & Jones, A. W. (2015). GHB pharmacology and toxicology: Acute intoxication, concentrations in blood and urine in forensic cases and treatment of the withdrawal syndrome. *Current Neuropharmacology, 13*(1), 47–70

[16] Amsterdam, J. G., et al. (2022). Cognitive impairment following clinical or recreational use of gammahydroxybutyric acid (GHB): A systematic review. *Current Neuropharmacology*, 20(4), 809-821

[17] https://www.unsw.edu.au/research/ndarc/resources/ghb-fact-sheet-2025



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

typically occur after cessation, as withdrawal effects, and not **during** the intoxication period.

c. Alternating effects of sedation (sleepiness, drowsiness) and agitation (hyperactive behavior and presentation) are also present, along with seizure-like movements (myoclonus), also described as robotic movements or difficulty moving despite effort. The cycling of sedation and agitation is unique to GHB, whereas with alcohol there is a dose-response worsening or increase of sedation without cycling.

d. Despite observations or experiences of being highly intoxicated, there is typically minimal hangover if substance is taken without alcohol, and waking is abrupt with significant anterograde amnesia (little to no memory of what transpired after the first drink). Memory loss can continue for up to 24 hours, depending on dosage.

7. Proactive DFSA requires planning and sophistication, particularly when targeting victims with social standing and resources, as opposed to individuals from marginalized populations (such as those experiencing homelessness, undocumented persons, sex workers, or others with limited access to institutional support).

8. To execute proactive DFSA, perpetrators must: know where to obtain the drug; establish an effective dosage for individual or different victims, which requires knowledge or experimentation; gain access to the victim to administer the incapacitating substance; and secure sexual access to the victim once the drug takes effect.

9. Post-assault, the perpetrator must avoid detection and arrest. When known to the victim, the perpetrator must also deny the crime and implement additional evasion strategies.

10. Forensic toxicology evidence is rarely available in DFSA cases because victims seldom report immediately after the assault. The drug-induced confusion and memory loss typically delay reporting until the victim has had time to process what occurred and, when possible, speak with witnesses or bystanders who may help clarify events. This delay proves critical: most drugging substances remain detectable in the body for only 24 hours or less. By the time victims report, these substances have typically been metabolized and can no longer be detected through testing.

11. While most rapes go unreported (roughly two-thirds or more never reach law enforcement, with further attrition before prosecution), DFSA reporting rates are even lower due to memory impairment, evidentiary challenges, and delayed comprehension.

12. In addition to treatment and clinical case studies, sound evidence of serial DFSA using GHB and other substances exists based on litigated cases[18]. Such cases provide

---

[18] Greater Manchester Police. (2020, January 6). A serial rapist who filmed himself attacking his victims after drugging them at his home in Manchester has been jailed. https://www.gmp.police.uk/news/greater-



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

documented evidence that perpetrators targeted multiple victims, that most victims remained unconscious during lengthy rapes, and that victims had fragmented or no memory of the assault. For example, in one case, the perpetrator Mr. Sinaga sexually assaulted over a hundred men. Of his victims, only one returned to consciousness during the sexual assault, leading to Mr. Sinaga's arrest. Few of his victims recalled what may have happened to them (although some suspected sexual assault) and only became aware when contacted by the police. This statistic (0.6% of victims awakened during the assault) corroborates that victims who are successfully drugged can remain ignorant of what happened to them until informed otherwise. This and other DFSA cases[19][20][21] also provide additional evidence of memory loss and perpetrator methodology (i.e., when drugs were used, perpetrators were known to victim or typically approached victims in a friendly manner rather than used force.)

## SECTION 5: MR. GOLDEN'S RELEVANT BACKGROUND AND MODUS OPERANDI

1. It is standard practice in forensic and clinical psychology to consider a perpetrator's modus operandi to understand how the same perpetrators target multiple victims—otherwise known as serial predation[22][23]. Modus operandi is also important to understand psychological distress, a key matter in this case. Mr. Golden's modus operandi appears to have consistency across other alleged victims (some of which are not plaintiffs in this lawsuit), indicating that his targeting Ms. Roberts in the manner that he did was not an

---

manchester/news/news/2020/january/a-serial-rapist-who-filmed-himself-attacking-his-victims-after-drugging-them-at-his-home-in-manchester-has-been-jailed/

[19] See, for example, DSD and NBV v. The Parole Board of England and Wales & Ors, [2018] EWHC 694 (Admin) (High Ct. March 28, 2018). https://www.judiciary.uk/wp-content/uploads/2018/03/dsd-nbv-v-parole-board-and-ors.pdf

[20] See, for example, Doe v. Luster, No. B228288 (Cal. Ct. App. 2011). https://caselaw.findlaw.com/court/ca-court-of-appeal/1564559.html; People v. Luster, No. B248247, 2015 WL 3618042 (Cal. Ct. App. June 8, 2015) (unpublished). Andrew Luster's victims, who were likely drugged with GHB, had near-total amnesia around the event, and videotaping of the sexual assaults was used as evidence.

[21] See, for example, People v. Bohannon, 82 Cal. App. 4th 798 (2000). The defendants used GHB to drug and sexually assault multiple victims, many of whom had near-total amnesia around and after the event.

[22] FBI and other research on cold cases have found that serial sex offending proves much more common than identified—approximately a third to a quarter of over 200,000 subjects identified as part of these research initiatives were serial offenders. Results also indicated that offenders moved between victim types including known victims (ex-spouse, close colleague) and lesser-known targets (strangers, acquaintances). Lovell, R. E., Williamson, A., Dover, T. J., Keel, T. G., & Flannery, D. J. (2020, May). Identifying serial sexual offenders through cold cases. *FBI Law Enforcement Bulletin*. Retrieved from https://leb.fbi.gov/articles/featured-articles/identifying-serial-sexual-offenders-through-cold-cases

[23] Campbell, R., Feeney, H., Goodman-Williams, R., Sharma, D. B., & Pierce, S. J. (2019). Connecting the dots: Identifying suspected serial sexual offenders through forensic DNA evidence. *Psychology of Violence, 10*(4), 399–409. https://doi.org/10.1037/vio0000243



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

exception to the rule[24][25]. A pattern that emerges is as follows:, women were invited into a hotel suite that Mr. Golden shared with his colleague Mr. Bjorkman, voluntarily or involuntarily ingested a substance, lost their memory, and were embarrassed and confused later by what they perceived as their own inexplicable conduct.

2. Mr. Golden was viewed as important and influential in eXp[26]and describes himself as a "top recruiter" for eXp[27].
3. The position and power that Mr. Golden occupied provides context for sexual relationships within an organizational hierarchy, As a self-described "top recruiter" and influential "alpha agent" within eXp, Mr. Golden occupied a position of authority over more junior agents.
4. Mr. Golden appears to have integrated heavy alcohol use with professional meetings and did so openly[28]. Witnesses attested to Mr. Golden using substances[29]. Mr. Golden by his own admission throughout his deposition appeared to routinely use GHB and other drugs such as molly, ecstasy, and cocaine during professional events with other colleagues or friends. In a text thread on 10/10/18 between [redacted] (a sex partner of Mr. Golden) and Mr. Golden[30], [redacted]yen asks if Mr. Golden still uses liquid GHB during professional events "U still doing that shit at those functions" Mr. Golden replies, "I can handle myself" (p.7). Mr. Golden also appeared to have aided other colleagues to obtain drugs during professional meetings[31].
5. Mr. Golden appears to be familiar with properties of GHB. Texts between [redacted]n drawn from Mr. Golden's phone and included in Detective LaFreniere's report (Exhibit

---

[24] Exhibit 5: Sworn Deposition of [redacted] (pp. 153-159). In April 2019, at a FOMO event in La Jolla, David Golden gave [redacted] a drink after which she blacked out and regained consciousness while dancing on a coffee. [redacted]mero testified that she only considered the possibility of being drugged after Mr. Bjorkman was terminated from eXp.

[25] Exhibit 6: [redacted] in her sworn deposition notes that she believed that this was Mr. Golden and Mr. Bjorkman's strategy to sexually exploit women (p.286)

[26] For example, in Ms. Madden's sworn deposition (Exhibit 7), she notes that she understands an "alpha agent" is an agent who has more than 1000 people in their downline and a certain number of people in their Level 1 (p. 299) and that Mr. Golden was such an agent. See Also First Amended Complaint for more information on alpha agents.

[27] Exhibit 3: Mr. Golden's sworn deposition (p. 751).

[28] Exhibit 8: Las Vegas Metropolitan Police Department Officer LaFreniere's Report (3-10-2021). Officer LaFreniere notes that hotel management noted that guests (Mr. Bjorkman and Mr. Golden) attempted to bring two carts of alcohol and a bag of "MJ" to their shared room. Hotel management did not allow the full amount of alcohol to be brought in, and guests agreed to take a lesser amount into the room and removed the marijuana from hotel premises (p. 24).

[29] Exhibit 12: In her sworn deposition, [redacted] noted that she had known Mr. Golden for eight years and had seen him use GHB and Ecstasy on more than one occasion (p. 21-23).

[30] Exhibit 35-Golden: Detective LaFreniere's Report Based on David Golden's cellphone (different from Exhibit 8).

[31] Exhibits 7-Golden to Exhibit11-Golden include texts around obtaining various substances using code names such as "Water" which Mr. Golden clarifies is GHB in his deposition (Exhibit 3, p. 130). He also names drugs such as coke and molly (Exhibit 8-Golden). In a text thread dated 5/10/2019, [redacted] asks Mr. Golden if she can obtain some "blow" and in a text thread dated 5/24/2019, [redacted] asks Mr. Golden if he can help her obtain ecstasy or GHB.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Golden-35) indicate directly that Mr. Golden knows that GHB is not traceable, "It's not traceable," "You don't need to worry about that" (p.6).

6. Mr. Golden also texts about drugging colleagues involuntarily. On December 12, 2019, Mr. Golden (who was in Puerto Rico) texts a senior eXp colleague Rosie Rodriguez the following. "We slipped [redacted] a roofie[32]." Mr. Golden responded in his deposition that he was joking (Exhibit 3: p.328). He also texted that he discussed porn with [redacted] and that she "didn't like it." For context, [redacted] indicated in her deposition that Mr. Golden's behavior in Puerto Rico made her feel so unsafe that she left the island early; she also indicated that Mr. Bjorkman and Mr. Golden had left a 5-hour energy drink on her pillow for her birthday. The significance of the 5-hour energy drink left on Ms. [redacted] pillow becomes clearer in light of Ms. Roberts's later account (see subsequent sections) of being given GHB from a 5-hour energy bottle. This parallel suggests that Mr. Golden and Mr. Bjorkman engaged in a pattern of unprofessional behavior that left colleagues feeling unsafe or suspecting they may have been drugged.

7. In a different text thread (Exhibit 35-Golden, p. 7) between [redacted] asked Mr. Golden if another agent, [redacted] does the "fun drugs." Mr. Golden, as quoted by the recording officer, said "No idea", "I don't remember", "I think so", "Yeah!", and "I gave him a cap lol".

8. Mr. Golden also noted doing drugs such as Adderall and GHB on numerous occasions with others including Mr. Bjorkman (see following section for particulars).

9. In summary, the documentary evidence and witness accounts I reviewed describe a pattern of conduct attributed to Mr. Golden: knowledge of GHB's undetectable properties, routine distribution of controlled substances at professional events, communications referencing the non-consensual administration of substances to colleagues, and parallel accounts from multiple individuals involving similar methods of delivery. I have not evaluated Mr. Golden and therefore offer no opinion on his psychological functioning, nor is it my role to determine whether specific acts occurred. However, from a trauma-informed perspective, exposure to the type of conduct alleged here—or later learning information suggesting one may have been targeted by such conduct—would reasonably be expected to cause significant psychological distress. This framework helps explain the nature and origin of the symptoms Ms. Roberts reported.

## SECTION 6: MR. BJORKMAN'S RELEVANT BACKGROUND AND MODUS OPERANDI

1. Mr. Bjorkman was present during one of the alleged drugging instances because he and Mr. Golden shared a hotel room at the Hard Rock Café Hotel, in Daytona Beach.

[32] Exhibit 2-Golden.

2. This pattern has been previously noted. For example, [redacted] noted that Mr. Golden was present at most events where Mr. Bjorkman attended[33]. In another instance, similar to the Daytona Beach arrangement, Mr. Golden and Bjorkman shared a hotel suite [34].

3. Witnesses narrated that they had met Mr. Bjorkman in professional settings including 1) coaching meetings, recruitment events, and conferences organized by or with eXp presence; and 2) multiple social events at these professional meetings[35].

4. In terms of power and status, Mr. Golden agreed that Mr. Bjorkman was viewed as a leader in his organization and an alpha agent which he defined as being a top recruiter.[36]

5. Further, multiple individuals described Mr. Bjorkman as influential, a leader in the organization, and supportive of their careers. Witnesses further noted that senior colleagues in their field liked and respected Mr. Bjorkman lending further credence to his standing and that access to him would enhance their careers[37][38][39][40].

---

[33] Exhibit 6: Sworn Deposition of [redacted] (P. 49).

[34] Exhibit 26-Golden: Mr. Golden and Mr. Bjorkman discuss a two-bedroom hotel suite Mr. Golden has booked in Las Vegas, Nevada on August 27th, 2020.

[35] For example, as drawn from various depositions and the Third Amended Complaint (Exhibit 2), participants attended meetings at various hotels and venues across the United States between 2007 and 2020 not limited to locations spanning Colorado (Denver), Hawaii (Maui), Louisiana (New Orleans), Texas (San Antonio), California (Coronado, Beverly Hills, Anaheim), Puerto Rico, Minnesota, and Nevada (Las Vegas/Henderson). Events took place in hotels such as the Coronado Inn on Coronado Island in California, Pelican Hill Hotel in California, Montage Hotel in Beverly Hills, Wynn Hotel and Encore Hotel & Casino in Las Vegas, and the Sheraton in Anaheim. These events were organized by entities such as eXp Realty, The Closing Table, Club Wealth, and Lab Coats Agents Live.

[36] Exhibit 3: David Golden's sworn deposition (pp. 303-304).

[37] Exhibit 9: Cheri Benjamin's sworn deposition. Ms. Benjamin described Mr. Bjorkman as "one of the main people" and that "he was very influential (p.18) and "very supportive" (p. 20). She also noted that her senior colleague and founder of Club Wealth Michael Hellickson had "always spoken highly of him" (p.18).

[38] Exhibit 6: [redacted] sworn deposition. [redacted] described Mr. Bjorkman as influential, knowledgeable, respected and helpful (p.133). [redacted] witnessed him in roles such as an expert with Closing Table, a moderator with Lab Coats Agents Live and as a head coach with Club Wealth described this "Everywhere I looked everybody was highlighting this man to be good" (pp. 96-97). She noted that Brent Gove, one of the most senior executives at eXp "spoke amazingly and highly about Mike (p. 134). She further noted that Mr. Bjorkman's corporate connections were a factor in moving to eXp and having him as her team's sponsor (p. 134).

[39] Exhibit 3: David Golden's sworn deposition. When asked why Mr. Bjorkman was referenced as General Mike Bjorkman in Mr. Golden's communications, Mr. Golden noted that the term indicated that the individual was a leader in the organization and further that Mr. Bjorkman was "recruiting at a high level that was influential" (p. 39).

[40] Exhibit 2: Third Amended Complaint. See paragraph 40 (p.11) for further reference.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

6. Third, Mr. Bjorkman appears to have integrated partying with alcohol in his professional life.[41][42] Witnesses not included in this lawsuit reported witnessing Mr. Bjorkman partying and drinking during professional gatherings including being publicly intoxicated.[43] Socializing occurred as gatherings in Mr. Bjorkman's hotel suite[44], in hotel bars, and restaurants. Mr. Bjorkman's own sworn deposition contains multiple references to using alcohol and/or other substances.[45]

7. Fourth, multiple private texts reference that Mr. Bjorkman had conversations about making a substance, potentially GHB[46] and used other substances including Adderall[47] and an unidentified substance described as orange pills[48]. [redacted] alleges that Mr. Bjorkman also told her that he enjoyed consuming drugs[49]. Mr. Golden, in his sworn deposition noted that he had consumed GHB with Mr. Bjorkman on more than occasion.

8. Police investigation of Mr. Bjorkman documents a pattern of alleged drugging and sexual assault spanning from 2000 to 2020 across multiple U.S. locations some of which includes the ones described earlier.[50] Witnesses reported that after consuming between

---

[41]Exhibit 6: [redacted] references that Mr. Bjorkman "loved mixing drinks," did so across different events, and in one instance left a five-hour energy bottle on her pillow during the Puerto Rico event for her birthday (p.322). She notes that Mr. Bjorkman was intoxicated at an event in La Jolla, California (p.57).

[42] Exhibit 4: Sworn Deposition of Brittiny Howard (p. 31). [redacted] notes that Mr. Bjorkman was "Miking it, if that—if that makes sense. He—he would always buy drinks. He's, I don't know, a cool frat guy, almost."

[43]Exhibit 5: Sworn Deposition of [redacted], (p. 177). [redacted] at Big Block Realty and helped organize Closing Table Mastermind events (2013–2018). Ms. Romero stated that she met Michael Bjorkman and David Golden through these real estate networking events and described Mr. Bjorkman as the "fun guy," noting: "wherever Mike was, there was fun. There was a party. We were up late, music, drinking. Whatever it was, you know, Mike provided that for the group."

[44] Exhibit 8: Officer LaFreniere's Report. Officer LaFreniere notes that hotel management noted that guests (Mr. Bjorkman and Mr. Golden) attempted to bring two carts of alcohol and a bag of "MJ" to their shared room. Hotel management did not allow the full amount to be brought in, and guests agreed to take a lesser amount into the room and removed the marijuana (p. 24).

[45]Exhibit 4: Sworn Deposition of Mr. Bjorkman regarding alcohol and drug use. See also Mr. Golden's deposition testimony (Exhibit 3).

[46] Exhibit 8: Officer LaFreniere's Report. Officer LaFreniere's report notes that there are thousands of messages between Mr. Bjorkman and Mr. Golden and that many of them mention GHB (p.4). On 7/31/2019, in a text thread between [redacted] and Mr. Bjorkman, they discuss making "G" using pool supplies. [redacted] calls herself "Mr. Magic and JayHB." Mr. Bjorkman says, "Try making some so we don't have to" and "Practice over and over" (pp. 5-6).

[47] Exhibit 12-Golden (referenced as Exhibit 12 in Mr. Golden's deposition (6-23-25). Further, Mr. Golden in his sworn deposition of 6-23-25 notes that he did Adderall on more than one occasion with Mr. Bjorkman (p. 164) and consumed GHB with Mr. Bjorkman (p. 64) (Exhibit 12; Mr. Golden's sworn deposition).

[48] Exhibit 14-Golden (referenced as Exhibit 14 in Mr. Golden's deposition (6-23-25). A text thread between Mr. Golden and Mr. Bjorkman references orange pills he found in Mr. Golden's cigarette box. Mr. Golden eventually "Glad you have them! Let's party."

[49] Exhibit 6: [redacted] noted that Mr. Bjorkman said that he loved doing drugs and that there "wasn't a drug on the planet that he hadn't tried" (p. 322).

[5050]Exhibit 8:. Officer LaFreniere's report summarizes interviews with alleged victims and witnesses. The incidents described indicate that some of the victims who were interviewed are not plaintiffs in this lawsuit. The report corroborates a pattern of drugging and sexual assault over a twenty-year period.

less than one to two alcoholic drinks, they felt dizzy, cognitively impaired, sedated, physically unable to move, blacking out, behaving in uncharacteristically disinhibited ways, throwing up, and having fragmented memory of the events. Some witnesses recalled being sexually assaulted; others did not. Female witnesses narrated waking up unclothed in their own bed or in Mr. Bjorkman's or Mr. Golden's hotel room with partial to no memory of how they ended up there.

9. In addition to and aligning with the police report to witnesses in depositions describe their experiences of what they believe to be drugging which occurred during professional meetings[51][52][53]. In addition to drugging, [redacted] described sexualized remarks, a sexual assault, and feeling unsafe around Mr. Bjorkman across different events.[54]

---

[51]Exhibit 5: Sworn Deposition of [redacted] (pp. 84, 105–111, 121, 146–159). [redacted] initially declined to respond to plaintiff's counsel, agreeing to testify only after being subpoenaed (pp. 146–152). She provided testimony against her own interest, including disclosing a sexual relationship with Mr. Bjorkman while married and declining to pursue her own legal action against him (p. 84). [redacted] testified that she believed she was drugged at a Closing Table Event in San Francisco in February 2018. After consuming a single vodka soda at a hotel bar with Mr. Bjorkman, she experienced memory loss and awoke in his hotel room with no recollection of how she arrived there (pp. 105–111). Mr. Bjorkman allegedly told her she had acted like a "party girl" and claimed to have filmed her masturbating (p. 121). In April 2019, at a FOMO event in La Jolla, David Golden gave [redacted] a drink after which she blacked out and regained consciousness while dancing on a coffee table (pp. 153–159). [redacted] testified that she only considered the possibility of being drugged after Mr. Bjorkman was terminated from eXp.

[52] Exhibit 10: Sworn Deposition of "[redacted] is not a party to this lawsuit. In 2018, at a real estate conference in Denver run by Club Wealth, [redacted] described how she felt dizzy after consuming a glass or two of wine at a hotel bar. When she stumbled she was intercepted by Mr. Bjorkman who told her that she had been drugged and that he would protect her. Ms. Howard described feeling dizzy, feeling unwell, sensorial memories of walking and having only flashes of memory with large gaps. Initially Ms. Howard believed that Mr. Bjorkman had saved her but later changed her mind and now believes that he drugged her.

[53] Exhibit 6: In her sworn deposition, [redacted] (p.182) believed she may have been drugged at a Lab Coat Agent Event in Coronado, California in April 2019 because of how unwell "I was physically ill" (p. 185) she felt following a drink in Mr. Bjorkman's suite and the following day. [redacted] estimates that she had 2 glasses of wine at brunch around 11 am that morning and a third drink in Mr. Bjorkman's suite (around 12 or 12:30) but does not recall if she finished the drink. She also believes her husband [redacted] was drugged (pp. 104, 106, 108).

[54]Exhibit 6: Sworn Deposition of [redacted]. According to [redacted], Mr. Bjorkman said to her that (she) "I had a face he would like to fuck," at a FOMO event in La Jolla, CA (p. 47) and grabbed her and tried to kiss her at a Closing Table event in Napa Valley in November 2019 (p. 172). [redacted] described attending a professional event in December 2019 in Puerto Rico where Mr. Bjorkman and Mr. Golden were drinking while she was not (pp. 217–220). The two men attempted to enter her Airbnb hotel room. [redacted]. [redacted] reported feeling "very nervous and scared" (p. 217), locked the door, and called her husband while they asked to come into her room and attempted to open the door. Following this incident, [redacted] refused to attend another conference in Puerto Vallarta because she felt "super uncomfortable" (p. 220) and did not want to associate with Mr. Bjorkman or Mr. Golden unless required. In a separate series of texts referenced earlier, Mr. Golden tell [redacted] that he "roofied" [redacted], corroborating her fears that Mr. Golden's behaviors were predatory.

Following the alleged drugging, victims noted feeling puzzled and embarrassed by their uncharacteristic behavior.[55][56]

10. In sum, multiple women (and men) who are not parties to the current lawsuit reported or described believing that they were drugged by Mr. Bjorkman and some believed they were sexually assaulted; multiple witnesses attested to Mr. Bjorkman's unprofessional behavior including heavy drinking, taking substances, and sexualized behavior at professional events.

11. I have not evaluated Mr. Bjorkman and therefore offer no opinion on his psychological functioning, nor is it my role to determine whether specific acts occurred. However, from a trauma-informed perspective, exposure to the type of conduct alleged here—or later learning information suggesting one may have been targeted by such conduct—would reasonably be expected to cause significant psychological distress. This framework helps explain the nature and origin of the symptoms Ms. Roberts reported.

## SECTION 7: BRIEF BACKGROUND FOR ANYA ROBERTS

[redacted]

55 Ibid: [redacted] noted that she believed that she was drugged after one drink in Mr. Bjorkman's suite and that the next day she felt ashamed that she had exhibited such severe intoxication at a professional event which was atypical for her. [redacted] (Exhibit 5) testified that she believed she was drugged at a Closing Table Event in San Francisco in February 2018 following a drink in the hotel lobby. She woke up in Mr. Bjorkman's hotel room. Mr. Bjorkman allegedly told her she had acted like a "party girl" and claimed to have filmed her masturbating (p. 121).

56 Exhibit 5: In her deposition, [redacted] notes that she did not believe Mr. Bjorkman's claims of her behavior, "To be specific, so you understand what I was laughing off, was his boisterous claim of me taking a phone, putting pornograph- -- porn on and masturbating… -- that I would ever do something like that" (p. 121).



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

[redacted]

7. While Ms. Roberts was successful, she also felt overwhelmed. A knee injury from running made touring real estate painful; but she also feared that slowing down would threaten her financial security.

8. Ms. Roberts met Mr. Brent Gove during an eXp con meeting in New Orleans in 2018. Brent Gove who was at that time a senior eXp executive recruited her during a period of work overload, encouraging her to focus on listing agents rather than houses to improve efficiency and work-life balance. Ms. Roberts recalled that he emphasized the negative impact of her schedule on her availability for her son and she was impressed by the possibility of a higher quality of life.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

9. Ms. Roberts and her business partner Ms. Holly Madden moved their team to work for Christian Bear in eXp but were soon frustrated[57]. Unable to expand her business as she believed she had been promised, Ms. Roberts began to seek other mentorship and was encouraged to attend a conference in Puerto Vallarta.

## SECTION 8: MEETING MS. KEENAN AND MR. GOLDEN IN PUERTO VALLARTA (FEBRUARY 8th and 9th 2020)

1. On February 4th, Ms. Roberts and her business partner Ms. Madden arrived, in Puerto Vallarta, Mexico to further develop their business.

2. On February 8, Ms. Roberts attended an expensive sunset cruise and dinner excursion ($250 per head) on a private island. After dinner and a show, she boarded the boat to return to the hotel with her business partner Ms. Madden and two other associates. Ms. Roberts recalled being frustrated that the entire trip had been a waste of time and money and that she had not met or networked in any significantly helpful way with any senior executives[58].

3. On the boat ride back, Ms. Roberts went to the back of the boat alone, where she met Emily Keenan, Mr. Golden's girlfriend. Ms. Roberts recalled liking Ms. Keenan because she seemed friendly, safe, and relatable. After about 15 minutes of casual conversation about motherhood, yoga, and plants, Ms. Keenan placed a pill intrusively near Ms. Roberts's lips when Ms. Roberts mentioned she was tired. Ms. Keenan described the pill as being "like coffee". Startled by the odd gesture (invading her body space, insisting on the pill) but trusting that this was a professional event and that Ms. Keenan was a friendly young woman who was a mother, Ms. Roberts swallowed the pill, which Ms. Keenan further identified as Adderall[59]. Ms. Roberts noted that she did not really know what Adderall was. Ms. Roberts does not recall what she was drinking or whether it was alcohol but recalled swallowing the pill with a drink.

4. Shortly after, Ms. Keenan introduced Ms. Roberts to David Golden, telling her that she (Ms. Keenan) was there with one of the event speakers[60]. Ms. Roberts recognized Mr.

---

[57] Exhibit 3-Golden and Exhibit4-Golden (offered as Exhibits 3 and 4 in Vol 1 of David Golden's deposition). In a text thread, Ms. Roberts expresses frustration and Mr. Bear encourages her to go to Mexico and "get in front" of senior eXp colleagues. He also gives her Brent Gove's cellphone number.

[58] See also Ms. Roberts' deposition (Exhibit 11).

[59] Exhibit 3: In David Golden's sworn deposition (Vol 3; 10-27-25), Mr. Golden corroborates that Ms. Keenan gave Ms. Roberts an Adderall during a work event. He further opines this was because Ms. Roberts was getting very drunk and it was to help her (p. 757). Please see paragraphs 5b? in the DFSA section describing potential combined effects of Adderall and alcohol and the masking hypothesis and paragraph 5c on effects of alcohol and GHB

[60] Exhibit 3: In David Golden's sworn deposition (Vol 3; 10-27-25), he agrees with Ms. Roberts deposition testimony and her interview with this evaluator, that they met on the cruise in Puerto Vallarta through Ms. Keenan (p. 751).



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Golden's name from the event's marketing materials as a speaker and was impressed. They then sat at the back of the boat and had introductory conversation about business.

5. Ms. Roberts believes that at some point early in the conversation/meeting in Puerto Vallarta she told Ms. Keenan and perhaps Mr. Golden that she was married but planning an amicable divorce. Certainly, by the time she returned to Florida after Puerto Vallarta, she knew Mr. Golden was aware of her sexual inexperience because he would reference it regularly.

6. Ms. Roberts recalls the following after ingesting the pill.
    a. She has flashes of conversation with Mr. Golden, including Mr. Golden telling her that Mr. Gove was his best friend which created an immediate sense of connection. She recalled feeling pleased that she was finally meeting someone important after multiple attempts and expense to do so.
    b. She recollects using the bathroom and leaving her drink behind, outside next to Ms. Keenan and Mr. Golden.
    c. Her last memory is being at the bar and recalls that Ms. Keenan was trying to take her phone out of her pocket and that Ms. Madden was annoyed by Ms. Keenan at the familiarity because they had just met.

7. Ms. Roberts learned of the following incidents from others but could not recall it independently:
    d. She learned that she kissed Ms. Keenan on the boat. This information continues to shame and confuse her because Ms. Roberts because this was a professional event and the thought of a sexual encounter with Ms. Keenan let alone in public had not even crossed her mind.
    e. She learned from Ms. Madden that she was missing after the boat landed and did not return to the room that she shared with Ms. Madden.
    f. She knew that she had her credit card with her at the end of trip in Puerto Vallarta; she learned from a series of texts that she had left this card in Ms. Keenan's and Mr. Golden's room, suggesting that she had been in their hotel room[61].
    g. Ms. Farrell-Nelson who is also a party to a parallel lawsuit told Ms. Roberts that she saw her in Mr. Golden's room although Ms. Roberts herself does not remember this.

---

[61] Exhibit 46-Golden (Exhibit offered during Golden's Deposition on 10-27-25); In this text thread, which starts on Saturday February 8th at 9:26 am, Ms. Keenan holds up a credit card under Anya Roberts and says, "Collateral." Mr. Golden responds, "Hot."

h. Ms. Roberts saw a picture of herself unclothed with Ms. Keenan lying unclothed on her in a photograph on her way back from Costa Rica in June 2025 which shocked and traumatized her and continues to intrude in her memories daily.

i. Ms. Robert read a group chat in which [redacted] (a sex partner for Mr. Golden and others) and Mr. Bjorkman wrote that Ms. Roberts talked too much during sex. Ms. Roberts does not recall having sex with either of these individuals.

8. Ms. Roberts' next memory in Puerto Vallarta is as follows:
   a. She reports awakening to a highly distressing and disorienting situation, describing regaining consciousness with Ms. Keenan, positioned on top of her and engaging in non-consensual digital penetration. She recalled that the awakening was abrupt, she gasped and immediately tried to dress and leave the environment.
   b. Ms. Roberts describes significant confusion, repeatedly apologizing, and an inability to comprehend the circumstances, attributing her confusion to a possible excessive alcohol intake. She reports no prior sexual interest in women, and the incident was particularly shocking given her religious background, which intensified her distress and confusion.
   c. Upon awakening, Ms. Roberts recalls observing Mr. Golden, who was masturbating and made a dismissive comment indicating Ms. Keenan was leaving. Ms. Keenan then exited the scene abruptly.

9. Ms. Roberts recalls that Mr. Golden had a complete turnaround and redirected the conversation to a purported business discussion, inviting her to the porch and making statements about her professional potential, including promises of financial security and a new role as an "alpha agent," suggesting she leave her current real estate position. He also—to her confusion—noted that they were divinely ordained to meet and connect romantically and that their Jewish heritage made them uniquely compatible. Ms. Roberts recalled struggling with understanding what was happening but began to feel that she was connecting to Mr. Golden rapidly, adding further to her confusion.

10. Ms. Roberts' next memory is of herself in a state of panic, frantically packing her belongings, crying hysterically, and contacting her husband to reassure him that she would be financially secure, despite her emotional turmoil. She describes her effect as alternating between crying and laughing, consistent with a state of acute emotional dysregulation—a pattern associated more with drug than alcohol ingestion alone.

11. Ms. Roberts reports significant gaps in her memory following the incident and is unsure of the chronology of events. She recalls a subsequent conversation regarding a change in sponsorship to Mr. Golden's downline, during which Ms. Madden expressed anger



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

toward her. Ms. Roberts describes her own behavior as uncharacteristic and "strange," noting a sense of detachment and dissociation, as if observing herself from outside her body. She is unable to recall the process of traveling to the airport, boarding the plane, or returning home, and is uncertain about the timing of her next coherent memory. These recollections are also more associated with drug ingestion than alcohol ingestion alone.

**SECTION 9: MEETING MR. GOLDEN IN LAS VEGAS (FEBRUARY 11th, 2020, and February 21)**

1. Ms. Roberts visited Vegas twice, about a week apart roughly two days after she returned from Puerto Vallarta. Ms. Roberts recalled being in Las Vegas at Mr. Golden's request to discuss changing sponsorship from Mr. Bear's to Mr. Golden's downline. She recalls very little during that first trip and noted that details of the two Vegas trips have bled into each other. However, after that first Vegas trip, she recalled with more certainty that Mr. Golden's texts, demands, and behaviors became very sexual and controlling[62].

2. Specifically, Mr. Golden expressed a desire for sexualized communication and involving his girlfriend Ms. Keenan and other women to enhance his fantasies. Ms. Roberts reported feeling uncomfortable with his requests, which included calling him "daddy[63]" and sending sexually explicit messages. The level of control intensified (see following section) until the relationship ended abruptly in March at Flagler Beach/Daytona, Florida.

3. On February 21, 2020, Ms. Roberts attended a real estate event that Mr. Gove had invited her to during which she hoped to change sponsorship.

4. Ms. Roberts reported significant memory gaps from the trip. Fragments she recalls include:

    a. Mr. Golden seemed to be attempting to isolate her from Ms. Madden.

    b. She recalled being at the Grand Cardone event (important speaker) and witnessing Mr. Gove's substantial revenue share.

    c. She recalled taking a pill prior to dinner provided by Mr. Golden leading to further memory loss. Ms. Roberts recalls that Mr. Golden told her to take the pill and that she did not know how to refuse, fearing that he would disfavor her as he had begun to threaten (see coercive control section).

---

[6262] Ms. Roberts has no memory of having sex with Mr. Golden in that first Vegas trip but learned that she likely did because she told Ms. Madden who remembers the conversation (and Mr. Golden notes that they did have sex on the first trip during his deposition).

[63] Ms. Roberts confided in Ms. Madden who alludes to knowledge of these controlling demands throughout her sworn deposition (Exhibit 7: pp. 141-142)

5. Subsequent memories included a recruitment dinner where she was pressured to wear a revealing outfit chosen by Mr. Golden, despite her initial professional attire. Similarly, Ms. Roberts described being unable to resist, possibly because of substance use and or the combined effect of substance use and fear of displeasing Mr. Golden. She recalled that she felt out of place and was instructed to remain silent while others engaged in recruitment activities which included drinking games. She recalled feeling objectified and disgusted when Mr. Golden slapped her leg sexually and joked publicly about how eXp was a fun place to work.

6. Ms. Roberts has no further recollection of events following the dinner but believes that she was sexually exploited. Her belief is based on how she began to feel differently in her and about her body although at the time, she could not place what was happening to her.

**SECTION 10: MEETING MR. GOLDEN IN FLAGER/DAYTONA BEACH (MARCH 10-12, 2020)**

1. At Mr. Golden's invitation[64], Ms. Roberts attended a real estate event in Daytona/Flagler Beach, Florida where Mr. Golden, Ms. Keenan, and Mr. Bjorkman were present. In his deposition, Mr. Golden admitted that he was "mixing business with pleasure" (p. 781). Ms. Roberts noted that at this point, everything in their brief relationship felt confusing and oppressive and she was constantly trying to please him but seemed to fail no matter how hard she tried.

2. Ms. Roberts recalled that both Mr. Bjorkman and Mr. Golden were anxious and awaiting a delivery of GHB[65]. When the package arrived, it was in a 5-hour energy bottle[66]. She recalled that Mr. Golden offered it to her and told her that it was GHB. Ms. Roberts recalled that when Ms. Roberts responded that she wasn't familiar with GHB, Mr. Golden was condescending, told her that everyone else used it, and made her feel stupid for not knowing what it was[67]. Ms. Roberts believed that this was the first time she had tried GHB; however, she noted that she was shocked to learn that she had tried it previously in Las Vegas, as narrated by Mr. Golden during his deposition.

---

[64] Exhibit 3: In Mr. Golden's deposition (Vol: III; 10-27-25), he notes that he invited Ms. Roberts to this conference to aid her career (p. 780-781).

65 See Exhibit 7-Golden (produced at deposition taken on 6-23-25). In a text thread at 3 am in the morning of March 9th between Mr. Golden places an order of an unidentified substance in a bottle for 4 oz to be sent to Hard Rock Hotel, Daytona Beach.

[66] Exhibit 3: In his deposition (Vol III) Mr. Golden responded to counsel's question that Ms. Roberts poured the GHB in a little 5-hour energy cap and took the capful (p. 795). He also responded that she may have taken 1 or 2 capfuls. He also noted that the bottle containing the GHB was sitting on a table or tray in the hotel room (p. 796) which he shared with Mr. Bjorkman and Ms. Roberts.

[67] Exhibit 3: In his deposition (Vol III) Mr. Golden admits to giving Ms. Roberts GHB in Daytona/Flagler Beach but insists that it was at her request (p. 784). He also noted that she wanted more GHB because they had taken GHB together a few weeks before in Las Vegas (p. 785). Ms. Roberts notes that she has no memory of ever taking GHB prior to Daytona Beach/Flagler Beach and did not know what GHB was. Mr. Golden also noted that Mr. Bjorkman and he also took GHB, but that Ms. Keenan was not present.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

3. Mr. Bjorkman was present at some point during these interactions because he was sharing the room with Mr. Golden. Mr. Bjorkman noted that at the time that he met Ms. Roberts and Mr. Golden, he had assumed that they had taken ecstasy or molly[68] and was surprised to later learn that they had actually taken GHB. Mr. Bjorkman also noted that he was upset that there was GHB present. However, Mr. Golden noted in his deposition that Mr. Bjorkman ingested GHB (please also see Mr. Bjorkman's Modus Operandi which details familiarity with GHB), presenting a contradiction in his sworn depositions.

4. Ms. Roberts last memory that evening was that Mr. Golden gave her some GHB. Her next memory was her head spinning and going in and out of consciousness, which she believes now was an overdose because of how scary it felt. Mr. Golden was rubbing her head and whispering softly to her. Ms. Roberts recalled that he was romantic and his words were validating, beautiful, and intense. For example, he said things such as they would be together forever and that they would grow old together.

5. Ms. Roberts noted that she felt pressured to ingest whatever drugs Mr. Golden claimed would make her more attractive to him including GHB. She felt pressured because shortly after meeting him, she believed that he could save her or destroy her and that disobedience would destroy her. This narrative is consistent with the classic core elements of a trauma bond where the traumatized victim is "brainwashed" to believe that she cannot exist without the abuser and all her actions become survival oriented. In addition to fear, Ms. Roberts ingested drugs handed to her believing that Mr. Golden's claims that it was a simple workout drug[69] and that she would feel good. Had she known that she would lose consciousness and control of her body, Ms. Roberts is adamant that she would not have agreed—describing her previously athletic, healthy eating, drug free, and low alcohol use as her dominant lifestyle the past eleven years or so. As such, she believes consumed the drug under fraudulent pretenses.

6. The morning after taking the GHB, when Ms. Roberts was in the shower Mr. Bjorkman allegedly walked in and exposed himself to her fully unclothed. When Ms. Roberts protested, he allegedly responded "Oh, now you're shy."

7. Ms. Roberts narrated that his actions (intentionally walking into the shower when she clearly was in there) and his undressed state suggested to her that she had been sexually assaulted while unconscious the night before, though she has no memory of any sexual encounter.

---

[68] Exhibit 4:(Mr. Bjorkman's deposition 10-29-25; (p. 63).

[69] Ibid: Mr. Golden agrees that he told Ms. Roberts that GHB was a workout drug (p. 792) and also agreed that he would have recommended less than a capful to an inexperienced user (p. 793) but later responded that Ms. Roberts may have taken one or two capfuls.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

8. Ms. Roberts believes that she may have ingested more than GHB although she does not recall details. While the timeline is not clear, while in Daytona Beach, Ms. Madden found Ms. Roberts at the bar with Mr. Golden and Mr. Bjorkman. Ms. Madden described that she was upset at how dysregulated Ms. Roberts was and believed that she was on drugs[70]. Ms. Madden's description of Ms. Roberts behaviors are more consistent with stimulants.

9. Sometime between March 10 and 12th, likely later during the trip, Ms. Madden informed Mr. Golden that she and Ms. Roberts would not be moving to Mr. Golden's downline. During breakfast, Mr. Golden told Ms. Madden he was "done" with Ms. Roberts, characterizing her as negative and implying she partied excessively. For Ms. Roberts, this abrupt shift stood in stark contrast to his affectionate statements from the previous night when he had told her such things as the would grow old together.

10. Later, at Megan Farrell-Nelson's house (who is a plaintiff in a parallel lawsuit), Ms. Roberts recalled that Mr. Golden delivered a cold and impersonal farewell to Ms. Roberts. The sudden change from the previous night left her confused, devastated, and desperate for an explanation[71]. According to Mr. Golden, Ms. Roberts asked for more GHB, which he supplied. Ms. Roberts does not recall asking for more GHB or taking more GHB but does recall feeling shocked and lost and drinking to cope with her feelings.

11. Ms. Roberts began to be aware of severe psychological distress (see subsequent section) almost immediately after the Daytona Beach/Flagler Beach trip; however, she described many distress symptoms beginning immediately after Puerto Vallarta although at the time, she did not label her emotional reactions as such.

12. From being a high functioning and effective real estate agent, Ms. Roberts progressively deteriorated until she was barely functioning[72].

13. The distress has waxed and waned depending on circumstance; for example, during another real estate event in Cabo San Luca, Ms. Roberts was sexually assaulted by Mr. Sherrard, some of which was witnessed by Ms. Madden who was seated at the same

---

[70] Exhibit 7: In Ms. Madden's sworn deposition, she notes that Ms. Roberts "seemed like she was on something" (p. 207), "Anya was not acting like herself. Her jaw was going left and right. She did not appear facially to be like herself. And I was upset" (p.291). Ms. Madden describes bruxism, which is associated with taking stimulants, particularly MDMA (ecstasy) but also (although less common) with Adderall and cocaine. Bruxism does not occur with GHB.

[71] Exhibit 3: (Mr. Golden's deposition, Vol 3). Mr. Golden agrees that Ms. Roberts was trying to get back with him (p. 791) and that he supplied her with more GHB at her request (p. 797).

[72] Exhibit 7: Ms. Madden noted that "For a young woman that completely dissolved in front of me and he's now gone, and she's a mess, and I am trying to cover in a business…" (p. 241).



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

table[73]. Ms. Roberts also ran into Mr. Golden and Ms. Keenan. Both of these events triggered an upsurge of symptoms. At other times, symptoms would relent for brief but not clinically significant periods of time. For example, Ms. Roberts fled to Costa Rica to try to avoid memories of the abuse; this attempt worked in small doses, but she relapsed without proper care.

14. Ms. Roberts tried to understand what had happened to her post Flagler Beach/Daytona beach visit but could not make sense of her dramatic deterioration. When Ms. Madden suggested to her that she might have been drugged and sexually assaulted when the lawsuit became public, Ms. Roberts began to piece together her experiences and more personally relevant to her, why she was doing so poorly.

15. Despite numerous failed attempts to start therapy and current self-help efforts (exercise, trauma workbooks, fleeing to Costa Rica), Ms. Roberts' trauma has appeared to worsen over time.

16. Ms. Roberts confusion is in part due to the gaps in her memory of the period of time Mr. Golden was pursuing her romantically. Some of her blackouts are consistent with the alleged intoxicants and others may be more related to trauma.

## SECTION 11: CONSENT and DFSA ANALYSIS

1. Mr. Golden admitted that Ms. Roberts consumed Adderall that Ms. Keenan gave her and that he had given her GHB that he had acquired for her on multiple occasions. As such, there is no reason to doubt Ms. Roberts' belief that she had consumed substances. The issue then is whether she consented to consume such substances and consented to subsequent sexual activity.

2. First, elements of Ms. Roberts's recall and presentation is clinically consistent with central nervous system depressant drug intoxication, including but not limited to GHB, rather than alcohol alone, based on multiple indicators: (1) **Intoxication disproportionate to reported consumption**—Ms. Roberts exhibited severe amnesia and incapacitation in Puerto Vallarta after ingesting a pill identified as Adderall and consuming drinks, yet she has almost no memory of the return boat ride, kissing Ms. Keenan in public, or going to Mr. Golden's hotel room, a pattern recognized as a key clinical indicator of possible drug-facilitated sexual assault;[74] (2) **Abrupt onset of**

---

[73] Exhibit 7: Ms. Madden noted that she witnessed Mr. Sherrard put his hand on Ms. Roberts' legs. Ms. Roberts asked him to stop, he persisted and the two of them left the table (pp. 234-235).

[74] New York State Department of Health. (2017, May). *Drug facilitated sexual assault alert sheet*. https://www.health.ny.gov/professionals/safe/docs/dfsa_alert_sheet.pdf; Du Mont, J., Macdonald, S., Rotbard, N., Bainbridge, D., Asllani, E., Smith, N., & Cohen, M. M. (2010). Drug-facilitated sexual assault in Ontario, Canada: Toxicological and DNA findings. *Journal of Forensic and Legal Medicine, 17*(6), 333–338. https://doi.org/10.1016/j.jflm.2010.04.008



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**amnesia**—Ms. Roberts's memory became fragmentary shortly after ingesting the pill and leaving her drink unattended, consistent with GHB's (or some other substance) rapid onset of 5–15 minutes; This also happened during a second visit to Las Vegas and in Flagler Beach/Daytona Beach (Thai et al., 2006) rather than alcohol's gradual correlation with consumption; (3) **Apparent alertness despite amnesia**—Ms. Madden observed her interacting (albeit awkwardly) in public, Ms. Farrell-Nelson recalls that she was in Mr. Golden's suite in Puerto Vallarta, photographs suggest sexualized contact with Ms. Keenan yet she recalls almost none of this, a hallmark of GHB intoxication where victims appear functional while experiencing complete memory blackouts; (4) **Marked hypersexuality and disinhibition**—Ms. Roberts engaged in public sexual behavior with Ms. Keenan, a woman she had just met, despite having no prior sexual interest in women and attending a professional event, consistent with GHB's documented effects of disinhibition" occurring within 15 minutes of ingestion(StatPearls, 2023); Ms. Roberts also cannot recall sex with Mr. Golden despite evidence (texts, photographs) suggesting sexual relationships and Mr. Golden's admission that they had sex ; (5) **Prolonged impairment and dissociative state**—Ms. Roberts's amnesia extended through multiple days including which may reflect prolonged GHB effects or GHB-alcohol synergy; and (6) **Repeated pattern across incidents**—Ms. Roberts experienced similar severe amnesia and incapacitation during subsequent encounters in Las Vegas and Flagler Beach after ingesting substances provided by Mr. Golden, including GHB from a 5-hour energy bottle, reinforcing that her impairment was not attributable to alcohol alone .[75]

3. Ms. Roberts reports no memory of ingesting GHB (or other substances) until her fourth encounter with Mr. Golden in Daytona Beach (other than Adderall in Puerto Vallarta and an unspecified substance during her second trip in Vegas). As detailed earlier, research on GHB and combined GHB and alcohol use consistently demonstrates that the substances impair cognitive function, judgment, and the ability to form memories at certain doses. Relevant to consent, GHB alone or in tandem with alcohol impairs executive function and judgement during intoxication. To a reasonable degree of psychological certainty, Ms. Roberts's reported amnesia is consistent with a level of impairment that would have precluded her capacity to provide meaningful, informed consent at the time the sexual activity occurred.

4. The question of consent is further complicated by the significant power imbalance between Mr. Golden and Ms. Roberts. As a self-described "top recruiter" and influential "alpha agent" within eXp, Mr. Golden occupied a position of authority over Ms. Roberts, a newer agent. This power difference is relevant because Ms. Roberts narrated that she felt pressured to please Mr. Golden constantly including agreeing to Mr. Golden's

---

[75] Thai, D., Dyer, J. E., Benowitz, N. L., & Haller, C. A. (2006). Gamma-hydroxybutyrate and ethanol effects and interactions in humans. *Journal of Clinical Psychopharmacology, 26*(5), 524–529; Le, J., & Richards, J. R. (2023). Gamma-hydroxybutyrate toxicity. In *StatPearls*. StatPearls Publishing; U.S. Drug Enforcement Administration. (n.d.). *GHB—Gamma-hydroxybutyric acid* [Fact sheet].

requests to ingest drugs. Evidence of Mr. Golden's pattern of conduct described in Section 5 strengthens the inference that Ms. Roberts' capacity to consent was compromised.

5. Separate and apart from the evidence described above, Ms. Roberts exhibits psychological symptoms that are, to a reasonable degree of professional certainty, consistent with trauma arising from non-consensual sexual contact. As set forth in detail in Section 12, her symptom presentation corresponds with empirically validated markers of sexual violence trauma as recognized in the sexual assault and trauma literature. This independent clinical evidence is consistent with and lends further support to the conclusion that the sexual acts in question were not consensual.

## SECTION 12: DIAGNOSTIC DETAILS

[redacted]

## TRAUMA-RELATED DISORDERS

**2. Posttraumatic Stress Disorder, Dissociative Subtype, With Panic Attacks**

(a) To be diagnosed with PTSD, the person must be exposed to actual or threatened death, serious injury, or sexual violence either directly, witnessing it in person, learning about it, or being exposed to aversive details repeatedly. This exposure results in a breakdown of emotional, cognitive, and behavioral adaptation systems. As a result, the victim may experience intense negative emotions such as terror, have repeated difficulties with memories, judgments, and integrating knowledge and experiences, all of which affect his/her ability to coordinate actions and decisions. While only one prong is necessary, Ms. Roberts described multiple including recalling being sexually assaulted by Ms. Keenan and seeing Mr. Golden masturbate in Puerto Vallarta; struggling with consciousness in Daytona/Flagler Beach (which she experienced as fighting to stay alive), learning from others about how she was behaving while incapacitated including kissing Ms. Keenan on the boat which was aversive and unwanted; and repeated exposure to aversive details that she was aware of and that she did not know occurred including nude and sexualized photos of herself in lingerie that did not belong to her, and with Ms. Keenan lying on top of her. Amnesia around the sexual assault does not affect or protect



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

the victim from developing PTSD[76] although DFSA symptoms may differ from non-DFSA symptoms.

(b) Ms. Roberts developed some PTSD symptoms directly after her alleged drugging in Puerto Vallarta around February 8, 2020, and the symptoms have waxed and waned for about five years with some periods being worse than others but largely remaining at clinical levels.

(c) I used the Clinician Administered PTSD Scale (CAPS) for the DSM-5 to assess for current PTSD. Data indicate that Ms. Roberts currently meets the diagnostic threshold and her symptoms currently warrant a diagnosis of Posttraumatic Stress Disorder, Dissociative Subtype, with Panic Attacks as described in the DSM-5-TR.[77]

(d) I explored alternative traumas that may contribute to current symptomatology. Prior to the abuse episode, Ms. Roberts reported no significant trauma. [redacted] However, the trigger, chronology, and type of PTSD symptoms described are directly linked to recalling Mr. Golden's and Ms. Keenan's sexual and other abuse of her and not of other traumas, supporting that Mr. Golden's and Ms. Keenan's abuse is a better candidate for her current PTSD.

(e) As described in the DSM-5-TR, PTSD is a mental illness comprising five different criteria described below. To meet diagnosis, one must endorse Criterion A (in this case, sexual abuse was the dominant trauma). Currently, Ms. Roberts meets criteria for severe PTSD. Specifically, she experiences 3/5 symptoms (one required) of Criterion B (intrusive trauma symptoms), 2/2 symptoms of Criterion C (one required) (avoidance of trauma-related activities or thoughts); 6/7 symptoms (two required) of Criterion D (negative alterations in cognitions and mood associated with the traumatic event); 5/6 symptoms of Criterion E (two required) (alterations in arousal and reactivity associated with the traumatic event). The totality of symptoms must also significantly affect interpersonal and/or work functioning and last for at least a month. In Ms. Roberts' case, her symptoms have been present for about five years. Scores on PAI-2 and TSI-2 corroborate her PTSD diagnosis.

**3. Panic Disorder, Current, and Agoraphobic Symptoms (RULED OUT)**

(a) Panic Disorder is characterized by recurrent, unexpected panic attacks—sudden surges of intense fear or discomfort that peak within minutes and include symptoms such as palpitations, sweating, trembling, shortness of breath, chest pain, nausea, dizziness, chills or heat sensations, numbness, derealization or depersonalization, fear of losing control, and fear of dying. At least one attack must be followed by one month or more of persistent concern about additional attacks or their consequences, and/or significant maladaptive behavioral changes related to the attacks. [redacted]

---

[76] Fields, L., Young, D. A., Patel, A. R., Munroe, C., Shumway, M., Bell, S., & Richer, L. A. (2022). Drug-facilitated sexual assault, impaired trauma memory, and implications for mental health treatment. *European journal of psychotraumatology*, *13*(1), 2057165. https://doi.org/10.1080/20008198.2022.2057165

[77] *Am. Psychiatric Ass'n, supra* note 11, at 301–312.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

[redacted]

[78] World Health Organization. (2022). *International Classification of Diseases, Eleventh Revision (ICD-11)*.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

[redacted]

79 Repetition compulsion refers to a pattern in which individuals unconsciously re-enact or recreate traumatic experiences from their past. This can manifest in various ways: seeking out relationships that mirror earlier harmful ones, placing oneself in situations that echo prior trauma, or behaviorally reenacting aspects of unresolved experiences. The compulsion operates largely outside conscious awareness, and the individual is typically not deliberately choosing to repeat the pattern.

80 Möller, A., Bäckström, T., & Söndergaard, H. P. (2021). Female sexual function six months after sexual assault: Post-traumatic stress disorder strongest risk factor for impaired function. *Journal of Sex & Marital Therapy, 47*(8), 801–814. https://doi.org/10.1080/0092623X.2021.1958964

81 For example, see Fontanesi, L., Marchetti, D., Limoncin, E., Rossi, R., Nimbi, F. M., Mollaioli, D., Sansone, A., Colonnello, E., Simonelli, C., Di Lorenzo, G., Jannini, E. A., & Ciocca, G. (2021). Hypersexuality and Trauma: a mediation and moderation model from psychopathology to problematic sexual behavior. *Journal of Affective Disorders*, *281*, 631–637. https://doi.org/10.1016/j.jad.2020.11.100



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

[redacted]

**OTHER RELATED DISORDERS**

[redacted]



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

[redacted]

## SECTION 13: OVERVIEW AND ANALYSIS OF COERCIVE CONTROL (AFTER FEBRUARY 8TH 2020 UNTIL MARCH 2020)

1. Ms. Roberts' narrative and witness accounts that I reviewed describe a pattern of conduct attributed to Mr. Golden that is consistent with a coercive control dynamic. I have not evaluated Mr. Golden and therefore offer no opinion on his psychological functioning, nor is it my role to determine whether specific acts occurred. However, from a trauma-



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

informed perspective, exposure to the type of conduct alleged here—would reasonably be expected to cause significant psychological distress. This framework helps explain the nature and origin of the symptoms Ms. Roberts reported.

2. More specifically, Ms. Roberts' narrative of Mr. Golden's behaviors is consistent with the documented trajectory and strategy of how traffickers and predators' approach and entrap their victims including deception, predatory helpfulness[82] and inducing a trauma bond. Once the bond is formed, coercion control begins and escalates further trapping the target.

3. Coercive control is an ongoing abusive dynamic that seeks to rob a victim of their autonomy using a combination of tactics such as manipulation, intimidation, isolation, surveillance, micro-regulation, and exploitation.

4. As described in a judicial opinion summarizing my testimony and the testimony of two other expert witnesses:

> Coercive control is the use of various tactics by an abuser to strip the abused target of his or her autonomy and liberty, and to create or maintain a power imbalance. Coercive control tactics include intimidation, deprivation, micro-regulation, manipulation, blackmail, degradation, isolation, or perceived isolation and are frequently tailored to the particular vulnerabilities and needs of the victim. . .. The result of the abuser's use of coercive control tactics is that the victim becomes afraid, needy, and dependent on the abuser….. Isolation or perceived isolation of the victim by surrounding the victim with people who are allied with the perpetrator is a particularly important control tactic that helps to form the traumatic bond, as it both prevents the victim from reporting abusive conduct and leads the victim to negotiate with h[is] abuser to end the abuse.
> [A]s a result of the use of these tactics, a cycle begins where the victim, in an attempt to form a human connection with his abuser, seeks to appease the abuser. The abuser then uses intermittent, arbitrary reward and punishment, which causes the victim to submit to the abuser. Over time, the victim's appeasement and submission to the abuser becomes second-nature and internalized. The victim compartmentalizes his thoughts and adopts the worldview of the abuser. Once the abuser has established dominance and the

[82] Predatory helpfulness describes the deceptive tactics traffickers use to recruit victims into sexual exploitation. The framework consists of a two-prong process: a grooming stage that primes victims through seduction and offers of help, followed by a recruitment stage that shifts the relationship into exploitation. Traffickers initially present themselves as caring and supportive—offering emotional connection, or business//financial assistance—before using coercion to trap victims. Research shows traffickers are far more likely to target those in crisis and typically move to exploit them within a brief period of time, as short as one month and rarely more than three to six months. Studies have consistently supported this model, with 58 of 59 participants in a replication study describing experiences matching predatory helpfulness tactics in both stages (Basra et al., 2023; Kenney & Raghavan, 2024).



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

traumatic bond is forged, he can diminish the frequency and severity of his coercive control techniques and use of intermittent reward and punishment. The result of the abuser's use of coercive control tactics is that the victim becomes afraid, needy, and dependent on the abuser. The victim even comes to deify the abuser and see him as omnipotent, better than anyone he has ever been with, and he feels honored to be in the relationship.

These tactics and the resulting traumatic bond with the abuser give rise to paradoxical, incongruous behavior by the victim. The victim may not leave the abusive situation, may return to the abusive situation, or may delay reporting the abuser to law enforcement. The victim also may defend the abuser, downplay the treatment she received, testify on behalf of the abuser, recant, lie to protect the abuser, or provide inconsistent responses over time. *People v. Abdur-Razzaq*, 77 N.Y.S.3d 842, 846–47 (N.Y. Sup. Ct. 2018).[83] [84]

5. By inducing constant fear and anxiety, the victims not only lose their agency and are forced into compliance but also develop traumatic symptoms. Coercive control is particularly powerful because the abuser tailors the control tactics to victim vulnerabilities, as Mr. Golden appeared to have done here, and eventually seeks to convince the victim that she is to blame for his abuse.

6. In addition, Mr. Golden's behaviors as described by Mr. Robert are consistent with predatory helpfulness—a tactic in which traffickers use seemingly benevolent gestures to build trust before exploitation[85]. First, a female accomplice in Puerto Vallarta, Ms. Keenan approached Ms. Roberts and built rapport focusing on being a mother and shared interests. She then allegedly drugged Ms. Roberts by fraudulently presenting her with a

---

[83] The topic of coercive control has been written about extensively by me (see Appendix A and B) and other professionals in the field. *See, e.g.*, *Coercive Control, Physical Violence, and Masculinity*, 4(1) VIOLENCE AND GENDER (2017) (Loveland, J., MA, and Raghavan, C, PhD); EVAN L. STARK, COERCIVE CONTROL: HOW MEN ENTRAP WOMEN IN PERSONAL LIFE (2007); *Relationships Between Shame, Restrictiveness, Authoritativeness, and Coercive Control in Men Mandated to a Domestic Violence Offenders Program*, 33(2) VIOLENCE AND VICTIMS (2018) (Kaplenko, H., MA, Loveland, J., PhD, and Raghavan, C, PhD).

[84] Evan Stark, *Coercive Control: The Entrapment of Women in Personal Life* (Oxford University Press, 2009). Coercive control has been made illegal in several countries and considered a severe form of domestic violence. It has been documented to be widespread in predatory sexual abuse. Jenny E. Mitchell & Chitra Raghavan, *The Impact of Coercive Control on Use of Specific Sexual Coercion Tactics*, 27 Violence Against Women, 187-206 (2019).

85 Basra, I. K., Kenney, T., Forrest-Bank, S., Zottarelli, L. K., & Raghavan, C. (2023). Predatory helpfulness: An empirical framework to identify fraudulent tactics used by pimps to recruit and commercially sexually exploit young girls and women. Journal of Human Trafficking. https://doi.org/10.1080/23322705.2023.2259263

Kenney, T., & Raghavan, C. (2024). Predatory helpfulness: A replication (and expansion) study examining grooming and recruitment tactics in sex trafficking. Journal of Human Trafficking, 1–16. https://doi.org/10.1080/23322705.2024.2327950

"helpful" pill. Once drugged, Ms. Roberts was less likely to perceive danger, further lowering Ms. Roberts's defenses. Ms. Keenan then offered to introduce her to Mr. Golden, leading Ms. Roberts to believe that she was helpful. When Ms. Roberts met Mr. Golden, as recalled by Ms. Roberts, he initially discussed business matters reinforcing the appearance of a legitimate and supportive connection.

7. Ms. Roberts recalls that once she was in Mr. Golden's sphere, he intensified his courtship. She described behaviors that were consistent with love bombing and other coercively entrapping tactics including linking sex, intimacy, and abuse at the same time[86]. Ms. Roberts recalls texts that became intensive (24/7) and she was constantly engaged. Initially, because discussions centered around business matters, Ms. Roberts felt flattered and anxious; she recalled wanting to demonstrate her value in a professional setting and felt that she had a short period of time to prove herself because of how urgent Mr. Golden's texts became.

8. During these initial texts, Ms. Roberts recalls that initially, Mr. Golden's approach was notably professional, characterized by a blend of business-oriented dialogue and strategic compliments. Mr. Golden expressed admiration for her talents, stating things such as, "I have never seen anybody as talented as you," which Ms. Roberts believed was because of how quickly she had evolved in real estate prior to joining eXp.

9. At some point after the first Las Vegas visit, Mr. Golden's texts became simultaneously sexual and controlling. Ms. Roberts was emotionally vulnerable, as her 11-year marriage was ending. [redacted] Mr. Golden exploited this fear directly. He degraded her, criticized her appearance, and suggested she was not attractive enough for a man like himself—echoing insecurities stemming from her failed marriage and sexual inexperience. According to Ms. Roberts, he then offered a (false) solution: she could become worthy of him if she changed herself. This tactic deepened her dependency by simultaneously reinforcing her insecurities and positioning himself as a legitimate arbiter of her worth.

10. My analysis of the coercive controlling tactics employed against Ms. Roberts indicates that these tactics were effective because they attacked her on multiple fronts simultaneously—exploiting her professional ambitions, [redacted]. Mr. Golden—if he used

[86] Exhibit 7. Ms. Madden noted, "I believe that enticing her to come out to Las Vegas and saying that he (Mr. Golden) wanted to help her build a business and he wanted to pay her a salary and he wanted to do all of these things, and then to slowly dismantle every part of who she is and then to tie sex to it, with Emily Keenan, is wrong. And if that is called sex trafficking, that's what it is."



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

such methods--strategically combined love bombing with degradation, creating an emotional rollercoaster where Ms. Roberts constantly chased his approval while feeling she could never be good enough, fostering a trauma bond and desperate dependency[87]. His alleged control over drugs and alcohol impaired her judgment and memory while creating physiological anxiety (when ingesting Adderall) that he then appeared to exploit further by offering more substances as the "solution," trapping her in a vicious cycle of chemical dependency on his terms. Ms. Roberts described microregulation of her appearance, movements, speech, sexual preferences, and communications. This continuous control—if it was present as alleged--systematically dismantled her sense of self and autonomy, while the professional threats ensured she believed her entire career and future depended on his favor. By the end of the four to six-week period, Ms. Roberts was so thoroughly controlled that she no longer recognized herself in her own text messages, had significant gaps in memory, and felt that her life literally depended on pleasing a man[88] she experienced as "god-like"—demonstrating the profound psychological capture these coercive tactics achieved.

## SECTION 14: ANALYSIS OF DETAILS OF COERCIVE CONTROL (AFTER FEBRUARY 8TH 2020 UNTIL MARCH 2020)

1. These tactics that Ms. Roberts attributed to Mr. Golden and the patterns that emerged are described in detail below.

**LOVE BOMBING**

2. It is my professional opinion to a reasonable degree of psychological certainty that Mr. Golden's behaviors are consistent with a pattern of love bombing. During the trip to Puerto Vallarta, while on the balcony, Mr. Golden told her they were both Jewish and that their meeting was a "divine appointment" that was meant to be—a setup from the heavens. This resonated deeply with Ms. Roberts because of her religious background, and a feeling of devotion began to build.

3. According to Ms. Roberts, Mr. Golden constantly admired her and paid her attention, while simultaneously creating a sense that she was never good enough. Ms. Roberts found herself desperately chasing approval, feeling frantic about doing everything right.

---

[87] Exhibit 7: In Ms. Madden's disposition, she describes these processes and changes in Ms. Roberts. She says, "She was brainwashed by a guy that she knew for over 30 days who tried to dismantle her piece by piece and she lost her confidence. And she lost herself. And she doesn't know where she's at. And know she's taking Adderall because it is his suggestion." (p. 187). Ms. Madden also noted that Mr. Golden Ms. Roberts to call her "Daddy" (p. 245) and wanted her to take Adderall (p.245) and that "he tried to control women" (p.245).

[88] Ibid: Ms. Madden notes that "Maybe he encouraged her to take the c[redacted]," and that "She felt she needed to participate in the things he was doing in order to be in his world, so to speak." (p. 250).

4. Mr. Golden told her that he loved her and could see a future with her, but she needed to do all the things he asked and needed to change. He promised they would be a "power couple" with a future at eXp.

5. Mr. Golden promised to take care of her, teach her, keep her safe, and make her successful. However, there was always an undercurrent of threat in his tone in case she fell out of favor with him.

**MANIPULATION via DRUGS AND ALCOHOL**

6. It is my professional opinion to a reasonable degree of psychological certainty that Mr. Golden's behaviors are consistent with a pattern of using drugs and alcohol as tools of control. According to Ms. Roberts, Mr. Golden would regularly say things such as "let's party" and "let's get fucked up," pressuring her to drink. He served, ordered, and poured all the drinks—maintaining control over consumption. If she wasn't finished with a drink, he would tell her to finish it, saying "don't be a pussy."

7. Ms. Roberts narrated that she felt pressured by Mr. Golden to "go harder" and get on his pace with drinking. Binge drinking games were common, including races to see who could drink more.

8. According to Ms. Roberts, Mr. Golden continually administered Adderall and had sent her to a doctor to get a prescription. Ms. Roberts believes the Adderall was used to combat the effects of heavy drinking or whatever else they were taking so that she felt somewhat alert.

9. According to Ms. Roberts, Mr. Golden insisted that she continue to drink and take Adderall daily, even and especially when they were not together. He would call/text and ask her when they were apart if she had been drinking and ingesting Adderall. Fairly early on, Ms. Roberts began to feel high anxiety after taking the Adderall which she found unbearable. When Ms. Roberts expressed anxiety, Mr. Golden would tell her to drink more and then give her more Adderall. This cycle made her anxiety worse, compounded by the constant pressure to please him and the feeling of failing. As a result of this pressure, Ms. Roberts began drinking multiple times a day even when she was not physically with Mr. Golden.

**ISOLATION**

10. During the six-week period, Ms. Roberts and Mr. Golden were physically together for about eight days. When not with him, Ms. Roberts noted that he would communicate non-stop—calling, texting, and staying on the phone while she did other things. He had her put her phone on video when she did normal activities or to verify where she was at certain times. They would only get off the phone when they had things to do, spending at least five hours a day on the phone, scattered throughout the day.

**11.** Because of the immense time commitment, Ms. Roberts had little time to socialize with other. Ms. Roberts further recalls that during the February 21 Las Vegas trip, Mr. Golden actively kept her away from Ms. Madden who was becoming suspicious of the way Mr. Golden was treating Ms. Roberts.

**SEXUAL COERCION**

[redacted]

13. Ms. Roberts recalled that after the first Vegas trip, the relationship turned very sexual and there was little attention to mentoring her professionally. Mr. Golden wanted Ms. Roberts to call him "Daddy," which made her very uncomfortable. He wanted sexually explicit messages about oral sex and other acts. He asked her to tell him she could bring girls in to turn him on and would have her practice talking about it on the phone and in text messages. One of the requirements to keep him happy was to talk this way.

14. Ms. Roberts recalled that Mr. Golden told her that in order to be chosen over Ms. Keenan, she had to do things to make him feel like a man. She recalled that he said he would continue his relationship with Emily because she was "trained correctly" and more submissive. He stated frequently that if Ms. Roberts could exhibit the qualities he wanted and become more obedient and feminine, he would eventually discontinue his relationship with Ms. Keenan but in the time being, she needed to placate her. She recalled that he made statements such as this frequently.

15. When Ms. Roberts told him she was not attracted to women[89] and was uncomfortable with this arrangement, Mr. Golden suggested a group sexual experience. She recalled sending a text message asking, "if I don't sleep with Emily, you will leave me?"—this was a continuous theme in their conversations.

16. Ms. Roberts recalled that Mr. Golden began controlling her during work events. During the February 21, 2020, Las Vegas trip, he wanted her to sit in the back of a car and was continually stroking her legs. At a recruitment dinner, Ms. Roberts dressed professionally, but Mr. Golden went through her suitcase, pulled out a clubbing dress, and told her to wear it, saying "no one could say no to you in this dress.". When she arrived at dinner, everyone else was in professional attire while she was in the revealing dress. During dinner, he slapped her leg and said that working at eXp "isn't that bad." Ms. Roberts remembers feeling disgusted and objectified when the other men appreciated the remark.

[89] Exhibit 7: Ms. Madden corroborates that Ms. Roberts had never previously had a sexual relationship with a woman and as far as she knew was never attracted to a woman (p. 264).



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

17. Ms. Roberts has little to no memory after that point although she believes that she did not drink much that evening.

**MICROREGULATION**

18. It is my professional opinion to a reasonable degree of psychological certainty that Mr. Golden's behaviors are consistent with severe microregulation. Ms. Roberts recalled that Mr. Golden controlled her phone calls—dictating who she spoke to and how she said things. After calls, she had to report back on how they went. He would take her phone and send text messages as if he were her, controlling communications.

19. Mr. Golden wanted her to change her physical appearance—to take out her hair extensions, grow out her bangs, and sent her photos of haircuts he wanted her to have[90].

20. Mr. Golden required her to walk a little behind him, never beside or in front. She was not to speak unless he spoke to her first when they were in person.

21. Ms. Roberts had to discuss her outfits with him, and they were subject to his approval. If he didn't like an outfit, he would have her change or pick it out himself.

22. Ms. Roberts noted that Mr. Golden wanted to know where she was and what she was doing at all times. He would ask her to send photos of what she was doing and her location, and this became more and more intense over time. She couldn't do anything without asking him or reporting back—even if she called her father, he wanted to know.

23. Ms. Roberts described that Mr. Golden started to write text messages for her to send to Ms. Keenan and Ms. Madden. Her communication was curated by him. The messages were about love and positivity toward Ms. Keenan, perhaps giving Ms. Keenan the impression that she would consider a relationship with her.

**INTIMIDATION**

24. Ms. Roberts became very intimidated by Mr. Golden. He repeatedly said, "unless you can do exactly what I say, you're out." She felt constant pressure to please him. He would show flashes of coldness, making clear that if she didn't do exactly what he told her, she was out—both personally and professionally.

25. Ms. Roberts noted that if she pushed back on anything, he would threaten to cut her off personally and professionally. When he threatened her, Ms. Roberts noted that she would feel desperate.

26. Ms. Roberts noted that if Mr. Golden disfavored her, her life would fall apart. She felt devoted to him, needed to please him and needed his approval. Ms. Roberts felt like he

[90] Exhibit 7: Ms. Madden recalled that Mr. Golden wanted her to change her appearance. In response to the question by counsel Mr. Levine, "Did you ever witness Golden telling Ms. Roberts how to wear her hair?" Ms. Madden responded…" He didn't like her hair. He didn't like her male energy…." (p. 244).



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

was superior, even "god-like" and very powerful. She believed her life depended on making the relationship work. Indeed, Ms. Roberts experiences are captured by her trauma bond, described elsewhere.

**DEGRADATION**

27. It is my professional opinion to a reasonable degree of psychological certainty that Mr. Golden's behaviors are consistent with a pattern of degradation intended to destroy one's sense of self. As she recalled, Mr. Golden told her she had too much masculine energy. She was ambitious, strong-willed, and a dominant personality—a take-charge person who "wore the pants" and was running her business. Ms. Roberts described that he told her this wasn't attractive to him and that she needed to be silent, compliant, and let him lead if they were to be a successful couple.

28. Ms. Roberts recalled that when he first broached the subject of her masculinity, he talked about this for eight hours continuously and sent her YouTube videos about male and female energy, explaining that dominant females were not attractive. Following this "brainwashing" Ms. Roberts began to doubt her self-presentation and character.

29. When Ms. Roberts protested, Mr. Golden told her that she "too masculine" and that was why she had never been in love. Ms. Roberts recalled that she started to question herself and second-guess her own identity and decisions.

30. In sum, this overall dynamic that Ms. Roberts described is consistent with coercive control in workplace settings: the abuse of hierarchical authority, the implicit or explicit threat to career advancement, and the exploitation of economic vulnerability to override genuine consent.

31. Further, Ms. Roberts' trauma bond (which is clinically associated with the pattern of coercive practices that Ms. Roberts described) created new vulnerabilities that likely made it easier for Mr. Golden to continually exploit her in the guise of a romantic relationship. When Ms. Roberts developed a trauma bond, this traumatic response included believing that Mr. Golden could devastate or help her career. As consistent and indicated by research, the intersection of involuntary substance use, mental illness, and Mr. Golden's coercive power likely increased his control over Ms. Roberts in a trauma loop.

32. In sum, it is my professional opinion to a reasonable degree of psychological certainty that if Mr. Golden gave Ms. Roberts substances and if Mr. Golden engaged in a sexual relationship with her, his behavior is consistent with the exploitation of the inherent power imbalance of their professional relationship—transforming what should be consensual choices into coerced compliance.

## SECTION 15: METHODOLOGY FOR CLINICAL INTERVIEWING AND TESTING

1. I conducted a general clinical interview with Ms. Roberts. Using a mixture of semi-structured questions as well as open-ended queries and a series of tests and assessments summarized shortly, I systematically explored Ms. Roberts's narratives around her childhood, relationships, and her experiences with Mr. Golden covering topics such as how they met, their professional relationship, what Mr. Golden offered, and in-depth interrogations around coercive control, the alleged drugging incidents and alternate explanations for her current alleged distress. The general clinical interview also afforded an opportunity to obtain observational data on how Ms. Roberts responds to questions and addresses or explains ambiguity in her narratives, providing clinical data on narratives that are consistent with credibility of reporting.

2. In addition to a general clinical interview, I used the **Structured Clinical Interview for DSM-5 Disorders—Clinician Version (SCID-V)**[91] to assess for Substance Use Disorders, Anxiety Disorders and Depressive Disorders. I assessed past trauma using the **Clinician Administered PTSD Scale (CAPS)** for the DSM-5[92 93]. I administered the **PAI-2 (Personality Assessment Inventory, 2nd Edition)** to assess current psychopathology, personality disturbances, and behavioral problems as well as to obtain additional evidence as to the veracity of Ms. Roberts's narrative around mental health symptoms.

3. To address the veracity and reliability responses in a more stringent way, I assessed any potential malingering or feigning by using the **Structured Interview of Reported Symptoms, 2nd Edition (SIRS-2)**. The SIRS-2 is a 200-item test of malingering considered to be the gold standard in forensic practice for the past twenty years. Finally, I administered the **Trauma Symptom Inventory-2** (TSI-2) to obtain nuanced evidence on trauma and truthfulness of reporting on mental health symptoms. The TSI is a 136-item measure that assesses trauma broadly and related behaviors comprehensively including depression, dissociation, somatization, impaired self-capacity, and dysfunctional behaviors. **TSI-2** consists of twelve clinical scales and two validity scales.

4. Ms. Roberts's endorsement of symptoms was consistent across numerous assessments (and a different evaluator, Dr. Cohen) and standardized questionnaires that have built-in checkpoints for malingering. Consistent responses across different modalities indicate truthfulness of reporting.

---

[91] Michael B. First, Janet B.W. Williams, et al. *User's guide for the SCID-5-CV Structured Clinical Interview for DSM-5 disorders: Clinical version.* American Psychiatric Publishing, Inc., 2016.

[92] F.W. Weathers, D.D. Schnurr, et al., "The Clinician-Administered PTSD Scale for DSM-5 (CAPS-5)" U.S. Dep't of Veterans Affairs, 2013. https://www.ptsd.va.gov/professional/assessment/adult-int/caps.asp

[93] J.D. Elhai, M.J. Gray, et al., "Which Instruments Are Most Commonly Used to Assess Traumatic Event Exposure and Posttraumatic Effects?: A survey of traumatic stress professionals. *Journal of traumatic stress*, *18*(5), 541–545. https://doi.org/10.1002/jts.20062.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

5. While the PAI-2 indicated higher scores than typically reported, such a profile is not uncommon for trauma survivors. The TSI-2 which specifically measures trauma support that Ms. Roberts was not malingering her trauma symptoms.

6. To increase confidence in these results, I followed up the PAI-2 and the TSI-2 with a stringent assessment of malingering on symptoms using the SIRS-2, which is considered the most accurate assessment currently on detecting malingering. Ms. Roberts's scores are consistent with the SIRS-2 data and validate that her mental health reporting is genuine. Specifically, she has a clear pattern of scores on the Structured Interview of Reported Symptoms, 2nd Edition (SIRS-2) which is strongly characteristic of an individual who is not exaggerating the severity of symptoms, feigning cognitive failure, or disengaging to avoid detection.

7. In sum, the totality of the data about Ms. Roberts is consistent with someone who is reporting their mental health symptoms accurately. Her symptom profile is consistent with other research and other survivors of coercive control, trauma bonding, and sexual assault.

## SECTION 16: SHORT TERM AND LONG-TERM EFFECTS OF THE ABUSE INCIDENT

Consistent with the clinical presentation and corroborating evidence reviewed, Ms. Roberts demonstrates significant functional impairment across psychological, social, and vocational domains. To a reasonable degree of psychological certainty, many of these problems appear to be causally related to the alleged period of drugging.

**(1) Occupational impairment**—Ms. Roberts was previously the #1 real estate agent in her county out of approximately 5,000 agents, [redacted] and completing 50–60 deals per year; [redacted], [redacted]

[redacted]

[redacted], with her functioning worsening significantly during the litigation discovery process;

(3) [redacted]



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

[redacted]

## SECTION 17: ALTERNATE EXPLANATIONS/RULE OUT OTHER TRAUMA AND MALINGERING

I explored alternative explanation for Ms. Roberts's distress including malingering (see elsewhere) and multiple potentially traumatic events preceding the alleged incident including her divorce about the time she met Mr. Golden and two unhealthy romantic relationships after she met Mr. Golden. However, the totality of the data better support that Ms. Roberts's pattern of distress is likely attributed to the abuse incident between February 8 and March 2020 for multiple reasons.

a. [redacted]



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

[redacted]

b. The numerous trauma assessments I completed using the CAPS and other instruments indicate that the symptoms Ms. Roberts described to me are linked to the abuse incident because many of the trauma symptoms encapsulate different elements of the abuse incident.

c. [redacted]

[redacted]

[redacted]

[redacted]



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

[redacted]

[redacted]

**CONCLUSION**

Based on my evaluation of case data and associated exhibits, clinical experience, and relevant research, it is my opinion, to a reasonable degree of psychological certainty that Ms. Roberts' psychological distress was more likely than not associated with a pattern of abuse marked by involuntary incapacitation, coercive control and sexual exploitation.

The summaries, conclusions, and opinions contained in this declaration are based on data that were available to the examiner at the date of this signed report. Information provided to the examiner after that date could result in a modification of this report. Thus, I reserve the right to amend this report including my conclusions and recommendations, upon receipt and review of new data.

Friday, January 9, 2026

Chitra Raghavan, PhD
New York State Psychology License Number: 016466

## APPENDIX A: PUBLICATIONS AND PRIOR TESTIMONY

### A) Peer-Reviewed Journal Articles

Williams, Y. A., & Raghavan, C. (in press). Do prior religious beliefs play a role in cult susceptibility?: A descriptive study. *International Journal of Coercion, Abuse, and Manipulation.*

Khan, Z. K., & Raghavan, C. (2025). Self-concealment as a trauma response: Examining the mediating role of shame and dissociation in the link between PTSD symptoms and self-concealment among women who were sex-trafficked. *Journal of Human Trafficking*, 1–15. https://doi.org/10.1080/23322705.2025.2472319

Raghavan, C., & Doychak, K. (2025). Assessing coercive control in forensic settings: Development, psychometrics, and application of the Brief Interview of Coercive Control (BICC). *Journal of Forensic Psychology Research and Practice*, 1–18. https://doi.org/10.1080/24732850.2025.2551643

Morales, S. P., & Raghavan, C. (2024). An examination of sexual coercion experiences among Latinx female college students. *Journal of Sexual Aggression*, 1–17. https://doi.org/10.1080/13552600.2024.2347223

Kenney, T., & Raghavan, C. (2024). Predatory helpfulness: A replication (and expansion) study examining grooming and recruitment tactics in sex trafficking. *Journal of Human Trafficking*, 1–16. https://doi.org/10.1080/23322705.2024.2327950



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Juraschek, E., Legg, A., & Raghavan, C. (2024). The reconsecration of the self: Qualitative analysis of sex trafficking survivors' experience of the body. *Violence Against Women*, *0*(0). https://doi.org/10.1177/10778012241239948

Basra, I. K., Kenney, T., Forrest-Bank, S., Zottarelli, L. K., & Raghavan, C. (2023). Predatory helpfulness: An empirical framework to identify fraudulent tactics used by pimps to recruit and commercially sexually exploit young girls and women. *Journal of Human Trafficking*. https://doi.org/10.1080/23322705.2023.2259263

Viñas-Racionero, R., Raghavan, C., Soria-Verde, M. A., Scalora, M., Santos-Hermoso, J., González-Alvarez, J. L., & Garrido-Anton, M. J. (2023). Enhancing the assessment of coercive control in Spanish femicide cases: A nationally representative qualitative analysis. *Journal of Family Violence*.

Doychak, K., & Raghavan, C. (2023). Trauma-coerced attachment: Developing DSM-5's "Other Specified Dissociative Disorder." *European Journal of Trauma & Dissociation*.

Unger, L. D., Doychak, K., & Raghavan, C. (2021). Isolation and support dynamics among women in a pimp-based commercial sex ring. *Journal of Human Trafficking*. https://doi.org/10.1080/23322705.2021.1918966

Pomerantz, J., Cohen, S. J., Doychak, K., & Raghavan, C. (2021). Linguistic indicators of coercive control in sex trafficking narratives. *Violence and Gender*. https://doi.org/10.1089/vio.2020.0105



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Pipitone, J. M., & Raghavan, C. (2020). Art as a cultural tool: Deconstructing exotified notions of Balinese society during an American study abroad programme. *Pedagogy, Culture & Society*. https://doi.org/10.1080/14681366.2020.1844788

Legg, A., & Raghavan, C. (2020). Not safe for all: A mixed methods study of violence in men in commercial sex. *Psychology of Sexual Orientation and Gender Diversity*. Advance online publication. https://doi.apa.org/doi/10.1037/sgd0000374

Hagan, E., Raghavan, C., & Doychak, K. (2019). Functional isolation: Understanding isolation in trafficking survivors. *Sexual Abuse*. https://doi.org/10.1177/1079063219889059

Mitchell, J., & Raghavan, C. (2019). The impact of coercive control on use of specific sexual coercion tactics. *Violence Against Women*, 1077801219884127.

Raghavan, C., Beck, C. J. A., Menke, J. M., & Loveland, J. E. (2019). Coercive controlling behaviors in intimate partner violence in male same-sex relationships: A mixed methods study. *Journal of Gay and Lesbian Social Services*. https://doi.org/10.1080/10538720.2019.1616643

Doychak, K., & Raghavan, C. (2018). "No voice or vote": Trauma-coerced attachment in victims of sex trafficking. *Journal of Human Trafficking*. https://doi.org/10.1080/23322705.2018.1518625

Barbaro, L., & Raghavan, C. (2018). Patterns in coercive controlling behaviors among men mandated for batterer treatment: Denial, minimization, and consistency of tactics across relationships. *Partner Abuse*, *9*(3), 270–290.

Kaplenko, H., Loveland, J. E., & Raghavan, C. (2018). Relationships among shame, restrictiveness, authoritativeness, and coercive control in men mandated to batterer treatment. *Violence and Victims*, *33*(2), 296–309.

Kavanagh, A. M., Loveland, J. E., & Raghavan, C. (2017). Male rape in men who have sex with men: Help-seeking and social support responses. *Criminal Justice and Law Enforcement Annual: Global Perspectives*, *7*(2), 75–103.

Pipitone, J. M., & Raghavan, C. (2017). Socio-spatial analysis of study abroad student experiences in/of place in Morocco. *Journal of Experiential Education*, 1053825917709823.

Loveland, J. E., & Raghavan, C. (2017). Coercive control, physical violence, and masculinity. *Violence and Gender*, *4*(1), 1–6.

Viñas-Racionero, R., Raghavan, C., Soria-Verde, M. Á., & Prat-Santaolaria, R. (2017). The association between stalking and violence in a sample of Spanish partner violence cases. *International Journal of Offender Therapy and Comparative Criminology*, *61*(5), 561–581.

Raghavan, C., Cohen, S., & Tamborra, T. (2015). Development and preliminary validation of the multidimensional sexual coercion questionnaire (MSCQ). *Journal of Sexual Aggression*, *21*(3), 271–289.

Raghavan, C., & Doychak, K. (2015). Trauma-coerced bonding and victims of sex trafficking: Where do we go from here? *International Journal of Emergency Mental Health and Human Resilience*, *17*(2), 583–587.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Loveland, J. E., & Raghavan, C. (2014). Near-lethal violence in a sample of high-risk men in same-sex relationships. *Psychology of Sexual Orientation and Gender Diversity*, *1*, 51–62.

Johnson, M., Raghavan, C., Citron, K., Kavanagh, A.-M., & Massey, C. (2014). Interrogation expectations: Individual and race/ethnic group variation among an adult sample. *Journal of Ethnicity in Criminal Justice*, 1–14.

**B) Peer-Reviewed Book Chapters and Encyclopedia Articles**

Doychak, K., & Raghavan, C. (2021). Queering forensic psychology: What intimate partner violence and sex trafficking can tell us about inclusivity. In *Queer psychology* (pp. 291–310). Springer.

Loveland, J. E., & Raghavan, C. (2017). Intimate partner violence in same-sex couples. In K. Nadal (Ed.), *The SAGE encyclopedia of psychology and gender*. SAGE Publications. https://doi.org/10.4135/9781483384269.n329

Pipitone, J. M., & Raghavan, C. (2017). Amok. In A. Wenzel (Ed.), *The SAGE encyclopedia of abnormal and clinical psychology* (Vol. 7, p. 161). SAGE Publications. https://doi.org/10.4135/9781483365817.n64

Kerns, J. G., Karcher, N., Raghavan, C., & Berenbaum, H. (2014). Anomalous experiences, peculiarity, and psychopathology.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**TESTIMONY LIST**

March 10–11, 2020: Expert witness in sex trafficking and coercive control in *United States v. Randall*, 19-cr-131 (S.D.N.Y.). Requested by the United States Attorney's Office for the Southern District of New York.

March 4–5, 2020: Expert witness in sex trafficking and coercive control in *United States v. Armstead*, 18-cr-357, 19-cr-369 (D.D.C.). Requested by the United States Attorney's Office for the District of Columbia.

October 19–20, 2020: Expert witness in psychology, coercive control, and multicultural issues in *Francis v. Culley*, No. 20-cv-3326 (E.D.N.Y.). Requested by Davis Polk & Wardwell LLP.

February 2, 2021: Expert witness in domestic violence, coercive control, and PTSD in *People v. Natasha Chopito*, Sentencing Hearing (State of New Mexico). Requested by Law Offices of the Public Defender, New Mexico.

May 7, 2021: Expert witness in forensic psychology in *United States v. Subhannah Wahaj* (Federal District of New Mexico). Requested by Defendant's Attorney Ryan Villa, Federal District Court for the District of New Mexico.

June 7–8, 2021: Expert witness in coercive control, sex trafficking, and trauma in *United States v. Rivera* (S.D.N.Y.). Requested by the United States Attorney's Office for the Southern District of New York.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

July 7–8, 2021: Expert witness in coercive control, domestic violence, and trauma bond in *United States v. Aquilino Torres*. Requested by the United States Attorney's Office for the Southern District of New York.

July 28, 2021: Expert witness in coercive control, domestic violence, and trauma bond in *United States v. Joey Green-Remache* (D.D.C.). Requested by the United States Attorney's Office for the District of Columbia.

October 5, 2021: Expert witness in coercive control, domestic violence, sex trafficking, and trauma bond in *United States v. Darnell Deshawn*. Requested by the United States Attorney's Office for the District of Minnesota.

October 20, 2021: Expert witness in coercive control, domestic violence, and sexual coercion in *The People of the State of New York v. Andre Gilkes* (245-2020). Requested by the Kings County District Attorney's Office.

March 15, 2022: Expert witness in coercive control and domestic violence in *The People of the State of Michigan v. Jessica Simpson* (Michigan). Requested by Law Offices of the Federal Defender, Eastern District of Michigan.

April 14, 2022: Expert witness in coercive control and battered person syndrome in *The People of the State of New Mexico v. William Baca*, Sentencing Hearing. Requested by Law Offices of the Public Defender, New Mexico.

September 24, 2022: Expert witness in coercive control, domestic violence, sexual coercion, and cultural influence in *People v. Uddin Meftaah*, Ind. No. 73667-21 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

January 31, 2023: Expert witness in intimate partner violence, coercive control, and trauma in *People v. Christopher Dantignac*, Ind. No. 73950-21 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

March 29, 2023: Expert witness in intimate partner violence, coercive control, and sexual coercion in *People v. Joshua Nembhard*, Ind. 70686-21 (N.Y. Sup. Ct., Nassau County). Requested by the Nassau County District Attorney's Office.

June 7, 2023: Expert witness in domestic violence, coercive control, and trauma bonds in *People v. Joshua Hemphill*, Ind. 2018CF1015654 (D.C. Sup. Ct., District of Columbia). Requested by the United States Attorney's Office for the District of Columbia.

October 2, 2023: Expert witness in domestic violence and coercive control in *United States v. Rosado* (S.D.N.Y.), 21 Cr. 516 (RMB) 2021R00680. Requested by the United States Attorney's Office for the Southern District of New York.

November 6, 2023: Expert witness in intimate partner violence and coercive control in *United States v. Marvin Lopez*, 2016-CF1-018780 (D.C. Sup. Ct., District of Columbia). Requested by the United States Attorney's Office for the District of Columbia.

December 13, 2023: Expert witness in domestic violence and coercive control in *People v. Ruslan Sadikhov*, IND-73067-21 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

December 13, 2023: Expert witness in domestic violence, cultural issues, and coercive control in *People v. Al-Sodani, Mohammed*, IND-74570-22 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

February 28, 2024: Expert witness in psychology, forensic psychology, sexual victimization, and sexual assault in *People v. Clarke, Carlis*, IND-72441-21 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

March 14, 2024: Expert witness in domestic violence, coercive control, and sexual assault in *People v. Mustafa Aboulissan*, IND-74236-22 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

March 26, 2024: Expert witness in domestic violence and coercive control in *People v. Jonathan Wright*, IND-70998-23 and 71033-22 (N.Y. Sup. Ct., Suffolk County). Requested by the Suffolk County District Attorney's Office.

May 17, 2024: Expert deposition in *Minskoff v. Mendoza*, Case No. 1:23-CV-584 (E.D.N.Y.). Witness for the plaintiff, deposed by defendant counsel, Reed Smith LLP and Constangy Brookes Smith and Prophete, LLP.

May 22, 2024: Expert witness in domestic violence, coercive control, and trauma bonding in *United States v. Quenton Jones*, 2024-DVM-167 (D.C. Sup. Ct., District of Columbia). Requested by the United States Attorney's Office for the District of Columbia.

September 19, 2024: Expert witness in domestic violence, coercive control, and sexual assault in *People v. Ri Zheng*, IND-70572-23 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

October 25, 2024: Expert deposition in *Jane Doe 3 v. Darren Indyke and Richard D. Kahn*, Case No. 1:24-CV-01204-AS (S.D.N.Y.). Witness for the plaintiff, deposed by defendant

counsel, Hughes, Hubbard, & Reed LLP for Indyke and Patterson, Belknap, Webb, & Tyler, LLP for Kahn.

January 7, 2025: Expert witness in domestic violence, coercive control, and PTSD in *United States v. Stacey Yellowhorse*, Sentencing Hearing (State of New Mexico). Witness for the defense counsel Rothstein and Donatelli Law, LLP, New Mexico.

March 11, 2025: Expert witness in domestic violence, coercive control, and trauma in *People v. Juan Rosas Cordero*, IND-70147-23 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

March 17, 2025: Expert deposition in *Dixon v. Reid*, Case No. 1:2023cv09878 (S.D.N.Y.). Witness for the plaintiff, deposed by defendant counsel, Gregory Korn for Kinsella Holley Iser Kump Steinsapir LLP, Los Angeles, and Bobbi C. Sternheim for Law Offices of Bobbi C. Sternheim, New York.

May 6, 2025: Expert witness in sexual assault, coercive control, and traumatic outcomes in *People v. Fabio Abreu-Rojas*, IND-73904-22 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

August 20, 2025: Expert witness in coercive control and traumatic outcomes in *People v. Michael Howell*, IND-70589-24 (N.Y. Sup. Ct., Suffolk County). Requested by the Suffolk County District Attorney's Office.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

UPDATED 05/03/2024

CHITRA RAGHAVAN, Ph.D.
Department of Psychology
John Jay College of Criminal Justice
524 West 59th Street
New York, N.Y. 10019

Office: 10:63:10 NB
Please contact via email
craghavan@jjay.cuny.edu

## EMPLOYMENT

**2002-Current** **John Jay College of Criminal Justice, City University of New York.**
Professor (tenured in January 2007),
Director, Forensic Mental Health Counseling Program (Fall 2020-current)

Program Director, BA/MA Program (appointed Spring 2007-2016)
Deputy Director, Forensic Mental Health Counseling Program (Fall 2015-Summer 2020)
Doctoral Faculty, Program in Criminal Justice
Doctoral Faculty, Program in Forensic Psychology

**2001-2002** **Research Associate**
National Center on Addiction and Substance Abuse at Columbia University.

**1998-1999** **Post-doctoral Fellow**
Yale University School of Medicine, Department of Psychiatry.

## CLINICAL LICENSURE

**2005** License number 016466

## EDUCATION

**Ph.D. 1998** **University of Illinois at Urbana-Champaign**
Major: Clinical and Community Psychology.
Minor: Quantitative methods and Personality/Social Ecology.

**MA 1995** **University of Illinois at Urbana-Champaign**

Major: Clinical and Community Psychology.

**A.B. 1992** **Smith College, Magna cum Laude**
Major: Psychology and French Language and Literature.

**1990-1991** **Université Paris (V).**
Participated in the Smith Junior Year Abroad program

**Statistics** Conversant with advanced statistical techniques including discriminate function analyses, structural equation modeling, factor analysis and cluster analysis.

**Languages** Tamil, English, Malay, French, Basic Portuguese.

**RESEARCH AND CLINICAL EXPERTISE**
**PEER REVIEWED BOOKS AND BOOK CHAPTERS**

Multicultural issues in assessment and treatment of coercive control tactics, partner violence, sexual assault and sex trafficking and the traumatic outcomes including PTSD, dissociative disorders, and trauma bonding. Forensic evaluations and court-qualified expert witness for above areas in civil, criminal, family, and parole settings.

Case law: https://law.justia.com/cases/new-york/other-courts/2018/2018-ny-slip-op-28161.html

## LIFETIME HONOR

**February 2023** Selected as one of 10 Smith College alumna who have contributed to psychology in the U.S. in the past 100 years.
https://www.smith.edu/academics/psychology#chitra-raghavan-%E2%80%9992-4

## SELECTED KEYNOTE ADDRESS, TRAININGS AND CLINICAL-RELATED PROFESSIONAL SERVICES

**April 04 2023** Predatory Helpfulness and Coercive Control Provide the Framework for Understanding Domestic Abuse and Sex

| | |
|---|---|
| | Trafficking: Training Given to judges at National Judicial Network, Peer to Peer |
| 2<br>**March 23 2023** | Using Coercive Control to Close the Gap Between Victim Experience and the Criminal Justice System: Panelist at: Tackling Domestic Violence: Analyzing the situation and finding ways to create healthier communities, Public Policy Exchange |
| **March 17 2023** | Science First: Assessing Predatory Helpfulness and Coercive Control to More Accurately Understand Exploitation and Abuse: Talk Given at King's County District Attorney's Office |
| **Oct 13 2022** | Using Coercive Control To Challenge Disbelieve: Telling it Like It Really Happened Key note speaker at International Coercive Control Conference, 2022. |
| **Oct 13 2022** | Coercive Control: Nuts and Bolts. Invited Panelist at Coercive Control, Lethality and Femicide Panel at Aligning the Law With Today's Concepts of Domestic Violence, Justice for Survivors of Intimate Partner Violence, Family Law Conference. Presentation made to over 600 lawyers in New York State. |
| .<br>**Sep 29 2022** | Predatory Helpfulness to Trauma Bonding: Pimp Strategies to Entrap Women. Training given to HTIC judges during New York State Unified Court System's 2022 Human Trafficking Intervention Court (HTIC) Conference. |
| **June 3 2022** | Panel member at Enlightened Family Court Representation, New York State Bar Education. Presented to over 200 lawyers in New York State. |
| **November 11 2021** | DVSJA and Coercive Control: Making Invisible Visible. Training given at Understanding the DVSJA. Organized by Family Violence Task Force, NYS Unified Court System, Office of Court Administration—Office of Policy and Planning. Training presented to 100+ New York State judges and court personnel. |
| **October 22 2021** | Coercive Control & Domestic Violence: What Is It? How Do You Prove It? Panelist, New York State Bar Association, Committee on Families and the Law, Family Law Section |
| **October 8 2020** | Keynote Speaker on Coercive Control and Trauma-Coerced Attachment in Domestic Violence: The Science and Significance |

| | |
|---|---|
| | for Litigation", in the Domestic Violence Keynote Series, Office of Court Administration, New York. Training for NYS Supreme Court judges and legal personnel. |
| **January 17 2020** | Invited panelist on "*Expert Evidence*" at Innovations in Prosecution Human Trafficking in New York State, NY, NY. |
| **October 24 2019** | Keynote Speaker "*The Mind Body Connection: Attachment Perspectives on Human Trafficking*" at the Sixth See the Girl" Summit, Delores Barr Weaver Policy Center, Jacksonville, Florida. |
| **February 8 2019** | Invited Panelist on "*Expert Witness Considerations in Custody and Visitation Matters Involving Domestic Violence Survivors Domestic Violence 2019*: Skills and Key Considerations in Custody and Visitation Cases, Public Law Institute (PLI) |
| **January 22 2019** | Invited speaker on "*The Mind Body Connection: Medical and Psychological Perspective on Human Trafficking*," NYC Administration for Children Services, Office of Child Trafficking, Prevention, and Policy (OCTPP). |
| **September 13 2018** | Key note speech on "*Science of Trauma: Integrating Mind and Body,* at Not On my Watch: Combatting Human Trafficking and Domestic Violence, Fifth Annual Conference, Brooklyn, NY. |
| **November 11 2018** | Invited Panelist at A Roadmap for the Future: Key Strategies for Child Sex Trafficking Prevention and Intervention, convened by the Manhattan District Attorney's Office and the Administration for Children's Services, NY, NY. |
| **April 26 2018** | Training on "Science of Trauma and PTSD" in Incarcerated Gender Violence Survivors Initiative, Meeting of Parole Board Committee |
| **January 11 2016** | Training on "*Understanding Coercive Control and Pathways to Sex Trafficked Survivors*" for Human Trafficking Intervention Court Judicial Training by Office of Court Administration, Albany, NY. |
| **October 9 2015** | Training on "*Increasing Identification of Survivors of Trafficking: Assessing Coercive Control and Trauma-Coerced Bonding*" for RESTORE, NY, NY. |

**May 5 2015** Training on *"*Coercive Control and Traumatic Bonding in Sex Trafficking Contexts*"* for *NYC Queens Family Justice Center and Human Trafficking Intervention Court, Queens.*

**October 8 2014** Training on "*Coercive control and trauma bonding in sex trafficking contexts"* for the Manhattan District Attorney's Office, Special Victim's Unit.

**October 9 2014** Training on "*Coercive control and implications for parenting and post-separation abuse"* for the Appellate Division, Third Judicial Department and the office of Court Administration, Attorney Child Contracts, Albany

**October 24 2013** Training on "*Coercive control and traumatic bonding in sex trafficking contexts*" at the first Human Trafficking Intervention Court Training in New York State, New York State Unified Court System, Office of Court Administration, to judges and court personnel, Brooklyn, NY.

**2007-2008** Organizing Co-Chair of Femicide Conference in partnership with Urban Resource Institute: Understanding and Preventing the Murder of Women in Intimate Relationships (Nov 7, 2008).

**2003-2006** NYPD (New York Police Department), Psychology Trainer. Jointly ran innovative training programs with police tactical trainers on how to negotiate using safe non-violent procedures with violent and mentally disturbed individuals. Conducted basic trainings for new recruits, and advanced training for Hostage Negotiation Unit, and Emergency Services Unit of the NYPD.

## CLASSES TAUGHT

BA: Psychological Analysis of Criminal Behavior, Global Portraits of Domestic Violence, Gender, Community, and Violence, Multicultural Issues in Forensic Psychology, Culture, Psychopathology, and Healing, Psychology of Gender
MA: Trauma and Dissociation, Psychology of the Victim, Family Violence and Disputes, Advanced Research Methods, Clinical Interviewing
PhD: Cognitive and Affective Aspects of Behavior, Diversity, Psychopathology

Study Abroad**:** Created and led program to Rabat, Morocco (Gender, Islam, and Feminism) in 2008 and Bali, Indonesia, (Culture, Healing, and Psychopathology), 2010. Ongoing.

**INTERNATIONAL WORK**

| | |
|---|---|
| **June 2010** | Chair of International Biennial John Jay Conference: Societies in Transition: Balancing Security, Social Justice, and Tradition. Marrakesh, Morocco. |
| **Jan-February 2009** | Visiting Professor at the Psychiatric Institute, Hospital As Clinicas, Sao Paulo, Brazil. |
| **2007-2010** | External PhD Examiner Avinashilingam University, Coimbatore, India. |

## STUDENTS SUPERVISED

20+ completed MA theses and 4 completed doctoral thesis, 4 ongoing doctoral student supervision, doctoral thesis committee member of multiple students, over 100 non-thesis students supervised at BA and MA levels.

## CREATIVE WORK

Forensic Consultant on *Evil* Pilot and First and Second Seasons, CBS series. (February, 2019-current).

**Raghavan, C** and Foudy, M. S., (Producers), and Foudy, M. S. (Director). (2014 release date). *Children of Zina*. HD/DV Documentary Production, New York City. Women Make Movies Fiscal Sponsorship Program. NYSCA (New York State Council for the Arts)

*Student first author; **student authors

**PEER REVIEWED BOOKS AND BOOK CHAPTERS**

Doychak, K., & **Raghavan, C**. (2021). Queering forensic psychology: What intimate partner violence and sex trafficking can tell us about inclusivity. In *Queer Psychology* (pp. 291-310). Springer, Cham.

Kerns, J. G., Karcher, N., **Raghavan, C**., & Berenbaum, H. (2014). Anomalous experiences, peculiarity, and psychopathology.

**Raghavan C**. & Cohen, S.J. (Eds.) (2013). *Domestic Violence: Methodologies in Dialogue*. Northeastern Series on Gender, Crime, and Law, Northeastern University Press.

*Markus, K., Loveland, J., Ha, D. & **Raghavan, C**. Publication Trends in Intimate Partner Violence: Bridging the Division in Qualitative and Quantitative Methods. In C. Raghavan and S. Cohen (Eds.). (2013). *Domestic Violence: Methodologies in in Dialogue*. Northeastern Series on Gender, Crime, and Law, Northeastern University Press.

**Raghavan, C**. & Levine, J. (Eds.). (2012). *Self-Determination and Women's Rights in the Muslim World*. HBI Series on Gender, Culture Religion, and Law. Boston: Brandeis University Press.

Berenbaum, H., Kerns, J., & **Raghavan, C**. (2000). Anomalous experiences, peculiarities, and psychopathology. In J. Cardena, Lynn, & S. Krippner (Eds.), *The varieties of anomalous experience,* (pp.25-46). Washington, D.C.: American Psychological Association.

Berenbaum, H., **Raghavan, C.**, Le, H.N., Vernon, L., & Gomez, J. (1999). Disturbances in emotion. In D. Kahneman, E. Diener, & N. Schwarz (Eds.), *Well-being: The foundation of hedonic psychology* (pp.267-287). New York: Russell Sage.

## REPORTS & MONOGRAPHS

**Raghavan, C.** & Pipitone, J.M. (2014). *Engaging Students with the Arts through the Teaching of Psychology in Bali: A Teaching Guide and Evaluation Codebook.* Prepared for the Baruch-Rubin Museum of Art Project Faculty Incentive Program for Integrating Arts Across the Curriculum. New York, NY: Baruch College School of Public Affairs (ahead21.org).

## PEER REVIEW ARTICLES

* Student first author

*Juraschek, E., & Legg, A. & **Raghavan, C.** (accepted pending revisions) How sexual coercion manifests in abusive relationships. Violence Against Women.

**Raghavan, C** & Doychak, K. (2025) (in press). Assessing coercive control in forensic

settings: development, psychometrics, and application of the Brief Interview of Coercive Control (BICC). Journal of Forensic Psychology Research and Practice.

*Morales, S. P., & **Raghavan, C.** (2024). An examination of sexual coercion experiences among Latinx female college students. *Journal of Sexual Aggression*, 1–17. https://doi.org/10.1080/13552600.2024.2347223

*Kenney, T., & **Raghavan, C.** (2024). Predatory helpfulness: A replication (and expansion) study examining grooming and recruitment tactics in sex trafficking. *Journal of Human Trafficking*, 1–16. https://doi-org.ez.lib.jjay.cuny.edu/10.1080/23322705.2024.2327950

*Juraschek, E., Legg, A., & **Raghavan, C**. (2024). The Reconsecration of the Self: Qualitative Analysis of Sex Trafficking Survivors' Experience of the Body. Violence Against Women, 0(0). https://doi.org/10.1177/10778012241239948 (authorship is by alphabetical order as all authors contributed equally).

*Basra, I.K., Kenney, T., Forrest-Bank, S., Zottarelli, L.K., & **Raghavan, C**. (2023). Predatory helpfulness: An empirical framework to identify fraudulent tactics used by pimps to recruit and commercially sexually exploit young girls and women. Journal of Human Trafficking. DOI: 10.1080/23322705.2023.2259263

Viñas-Racionero, R., **Raghavan, C**., Soria-Verde, M.A., Scalora, M., Santos-Hermoso, J., González-Alvarez, J.L., & Garrido-Anton, M.J. (2023). Enhancing the Assessment of Coercive Control in Spanish Femicide Cases: A Nationally Representative Qualitative Analysis. *Journal of Family Violence.*

*Doychak and **Raghavan, C**. (2023). Trauma-Coerced Attachment: Developing DSM-5's"Other Specified Dissociative Disorder". *European Journal of Trauma & Dissociation.*

*Unger, L. D., Doychak, K., **Raghavan, C.** (2021). Isolation and support dynamics among women in a pimp-based commercial sex ring. *Journal of Human Trafficking*. DOI: 10.1080/23322705.2021.1918966

*Pomerantz, J., Cohen, S.J., Doychak, K., **Raghavan, C**. (2021). Linguistic Indicators of Coercive Control: in Sex Trafficking Narratives. *Violence and Gender.* DOI: 10.1089/vio.2020.0105

*Pipitone, J.M., & **Raghavan, C.** (2020): *Art as a cultural tool: deconstructing exotified notions of Balinese society during an American study abroad programme*, Pedagogy, Culture & Society. https://doi.org/10.1080/14681366.2020.1844788

*Legg, A., & **Raghavan, C.** (2020). *Not Safe for All: A Mixed Methods Study of Violence in Men in Commercial Sex.* Psychology of Sexual Orientation and Gender Diversity. Advance Online Publication. https://doi.apa.org/doi/10.1037/sgd0000374

*Hagan, E., **Raghavan**, C., & Doychak, K. (2019). Functional Isolation: Understanding isolation in trafficking survivors. *Sexual Abuse.* DOI: 10.1177/1079063219889059

*Mitchell, J., & **Raghavan**, C. (2019). *The impact of coercive control on use of specific sexual coercion tactics*. Violence Against Women. 1077801219884127.

**Raghavan, C.,** Beck, C. J. A., Menke, J. M., & Loveland J. E. (2019). Coercive controlling behaviors in intimate partner violence in male same-sex relationships: A mixed methods study. *Journal of Gay and Lesbian Social Services*. DOI: 10.1080/10538720.2019.1616643

*Doychak, K & **Raghavan, C**. (2018). "No voice or cote:" trauma-coerced attachment in victims of sex trafficking. *Journal of Human Trafficking*, DOI: https://doi.org/10.1080/23322705.2018.1518625

*Barbaro, L. & **Raghavan, C**. (2018). Patterns in coercive controlling behaviors among men mandated for batterer treatment: Denial, minimization, and consistency of tactics across relationships. *Partner Abuse*, 9(3), 270-290.

*Kaplenko, H., Loveland, J. E**.**, & **Raghavan, C**. (2018). Relationships among shame, restrictiveness, authoritativeness, and coercive control in men mandated to batterer treatment. *Violence and Victims, 33(2), 296-309*.

*Kavanagh, A. M., Loveland, J. E., & **Raghavan, C**. (2017). Male rape in men who have sex with men: Help-seeking and social support responses. *Criminal Justice and Law Enforcement Annual: Global Perspectives, 7*(2), 75-103.

*Pipitone, J. M. & **Raghavan, C**. (2017). Socio-spatial analysis of study abroad student experiences in/of place in Morocco. *Journal of Experiential Education.* 1053825917709823.

*Loveland, J. E., & **Raghavan, C**. (2017). Coercive control, physical violence, and masculinity. *Violence and Gender, 4*(1), 1-6.

*Viñas-Racionero, R., **Raghavan, C**., Soria-Verde, M. Á., & Prat-Santaolaria, R. (2017). The association between stalking and violence in a sample of Spanish partner violence cases. *International journal of offender therapy and comparative criminology*, 61(5), 561-581.

*__Raghavan, C__., Cohen, S., & Tamborra, T. (2015). Development and preliminary validation of the multidimensional sexual coercion questionnaire (MSCQ). *Journal of Sexual Aggression*, *21*(3), 271-289.

*__Raghavan, C__., & Doychak, K. (2015). Trauma-coerced Bonding and Victims of Sex Trafficking: Where do we go from here? *International Journal of Emergency Mental Health and Human Resilience*, 17(2), 583-587.

*Loveland, J.E., & **Raghavan, C**. (2014). Near-lethal violence in a sample of high-risk men in same-sex relationships. *Psychology of Sexual Orientation and Gender Diversity*, 1, 51-62.

*Johnson, M., **Raghavan, C**., Citron, K., Kavanagh, A-M., and Massey, C. (2014). Interrogation Expectations: Individual and race/ethnic group variation among an adult sample. *Journal of Ethnicity in Criminal Justice, 1-14*

*Dejanova, T. E., & **Raghavan**, C. (2013). Report from the field: evaluating an alternative to incarceration program for "highly probable trafficking victims". *Dialectical Anthropology*, 1-8.

*Jones, C.A. & **Raghavan, C**. (2012). Sexual Orientation, Social Support Networks and Dating Violence in an Ethnically Diverse Group of College Students. *Journal of Gay and Lesbian Social Services*, *24*, 1-22.

Beck, C.J.A., & **Raghavan, C**. (2010). Intimate partner violence screening in custody mediation: The importance of assessing coercive control. *Family Court Review, 48,* 555-565.

Jahn, C. & Raghavan, C. (2020). Partnergewalt neu denken. Eine Einführung in Coercive Control. Trauma & Gewalt, 14 (4), 000 – 000. DOI 10.21706/tg-14-4-00000.

Tanha, M., Beck, C.J.A., & Figueredo, A.J., & **Raghavan, C** (2010). Coercive control as motivational factor for intimate partner violence. *Journal of Interpersonal Violence, 25,* 1836-1854.

****Raghavan, C.**, Rajah, V., & Gentile, K., Collado, L., & Kavanagh, A-M. (2009). Community Violence, social support networks, ethnic group differences, and male perpetration of intimate partner violence. *Journal of Interpersonal Violence,* 24, 1615-1632.

Kingston, S., & **Raghavan, C.** (2009). The relationship of sexual abuse, early initiation of substance use, and adolescent trauma to PTSD. *Journal of Traumatic Stress, 22, 65-68.*

*Allen, C.T., Swan, S.C., **Raghavan, C**. (2009). Gender symmetry, sexism and intimate partner violence. *Journal of Interpersonal Violence, 24,* 1816-1834.

**Raghavan, C.**, & Mennerich, A. (2007). Networks, neighborhoods, and depression: Negative interactions by social support members as mediators of neighborhood characteristics and depressive symptoms in a sample of recovering substance abusing women. *Journal of Social Distress and the Homeless, 16,* 67-87.

**Gentile, K., **Raghavan, C.**, Rajah, V., & Gates, K. (2007). It doesn't happen here: An assessment of eating disorders in ethnically diverse urban sample of male and female college students. *International Journal of Eating Disorders, 15,* 405-425

**Raghavan, C.**, & Berenbaum, H. (2006). A study of values as cross-cultural competencies: A potential source of self-esteem? *Psicologia: Teoria e Practica, 8,* 51-68.

**Raghavan, C.**, Mennerich, A., Sexton, E., & James, S. (2006). Community violence and it's direct, indirect, and mediating effects on intimate partner violence. *Violence Against Women, 12,* 1-18.

**Raghavan, C.**, & Kingston, S. (2006). PTSD in substance abusing women: The role of early drinking and exposure to violence. *Journal of Traumatic Stress, 19, 269-278*.

**Raghavan, C.**, Swan, S., Snow. D., & Mazure, C. (2005). The mediational role of relationship efficacy and resource utilization in the link between physical and psychological abuse and relationship termination. *Violence Against Women, 11, 65-88.*

James, S. E., Johnson, J., **Raghavan, C.**, & Woolis, D. (2004). "I couldn't go anywhere": social networks, violence and drug abuse. *Violence Against Women, 10, 991-1014.*

Berenbaum, H., **Raghavan, C.**, Le, H.N., Vernon, L., & Gomez, J. (2003). A taxonomy of emotional disturbances. *Clinical Psychology: Science and Practice, 10,* 206-226.

Snow, D. L., Swan, S. C., **Raghavan, C.**, Connell, C., & Klein, I. (2003). The effects of work stressors, coping, and social support on psychological symptoms among female secretarial employees. *Work and Stress, 17,* 241-263.

James, S. E., Johnson, J., **Raghavan, C.**, Lemos, T., Smith, M., & Woolis, D. (2003). The violent matrix: a study of structural, interpersonal and intra-personal violence among a sample of poor women. *American Journal of Community Psychology,* 129-141.

Le, H.N., Berenbaum, H., & **Raghavan, C.** (2002). Culture and alexythymia: Mean levels, correlates, and the role of parental socialization of emotions. *Emotion, 2,* 341-360.

**Raghavan, C.** ,Le H.N., & Berenbaum, H. (2002). Predicting depression and hostility using the diathesis-stress model of sociotropy and autonomy in a contextualized stress setting. *Cognitive Therapy and Research, 26*, 231-244.

Mazure, C., **Raghavan, C.**, Maciewiejewski, P., Jacobs, S.C., & Bruce, M.L. (2001). Cognitive personality characteristics as unipolar predictors of major depression. *Cognitive Therapy and Research, 25*, 215-225.

## ENCYCLOPEDIA ARTICLES, BOOK REVIEWS, AND NON-PEER REVIEW ARTICLES

*Loveland, J. E., & **Raghavan, C.** (2017). Intimate partner violence in same-sex couples. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender*. Thousand Oaks, CA: SAGE Publications Ltd. doi: 10.4135/9781483384269.n329

*Pipitone, J. M. & **Raghavan, C.** (2017). Amok. In A. Wenzel (Ed.), *The Sage Encyclopedia of Abnormal and Clinical Psychology* (Vol. 7, p. 161). Thousand Oaks, CA: SAGE Publications Ltd. doi: 10.4135/9781483365817.n64

*Sriken, J., & **Raghavan**, C. (2012). Domestic Violence. In D. Jones-Brown & B.D. Frazier (Eds.), African Americans and the Criminal Justice System: An Encyclopedia. Greenwood Press.

**Raghavan, C.** (2010). Review of the book *Listening to Battered Women. A Survivor-Centered Approach to Advocacy, Mental Health, and Justice* by L. A. Goodman and D. Epstein. Journal of Trauma and Dissociation, 11, 124-126.

*Tuller, A., & **Raghavan**, C. (2010). Dating Violence. In B. Fisher & S. Lab (Eds.), *Encyclopedia of victimology and crime prevention.* Thousand Oaks, CA: Sage.

*Reardon, L., & **Raghavan**, C. (2009). Cyberstalking. In Wilson, J. (Ed.), *Praeger Handbook of Victomology*. (pp. 67-69). Santa Barbara, CA: Praeger.

*Ranjan, S., & **Raghavan,** C. (2010). *The Economic Recession and Intimate Partner Violence.* The Journal of Employee Assistance, 40.

## MANUSCRIPTS

Khan, Z, & **Raghavan, C.** (2024). Self-concealment and PTSD in sex trafficked women. Invited Resubmission to Journal of Human Trafficking.

### SELECTED INVITED TALKS

**Raghavan, C** (2019, September)**.** Invited Panelist on "*Survivors and Mental Health",* at Not On My Watch: Dare to Care, Sixth Annual Conference, NY, NY.

**Raghavan, C.** (2016, May). *Understanding Trauma-Coerced Attachment: Collaborating with Mental Health Professionals When Representing Victims of Intimate Partner Violence*, The Twentieth Annual Fordham Forum on Domestic Violence, NY. NY.

**Raghavan, C.** (2015, February)**.** *Coercive control, gender, and sexual orientation: Furthering our understanding of intimate partner violence across differing context.* Psychology Department Colloquuim Series, University of Vermont, Burlington, VT.

**Raghavan, C.** (2014, March). *Surviving Revictimization: Challenging Social and Institutional Responses to Gender Violence.* Panelist at the 18th Annual Fordham Forum on Domestic Violence, NY, NY.

**Raghavan, C.** (2012, March). *Trauma in the Courtroom*. Talk presented at *the Role of Mental Health Professionals in the Court,* The 16th Annual Fordham Forum on Domestic Violence, NY, NY.

**Raghavan, C.** (2011, March). *The conceptualization of non-violent sexual coercion tactics in young dating couples*. Paper presented at the Vera Institute of Justice, New York, New York.

**Raghavan, C**. (2010, April). *Violence and coercive control in male same sex relationships*. Paper presented at Dickinson College, Carlisle, PA.

**Raghavan, C**. (2008, December,). *Cognitive behavior therapy, gender and violence: A comparison of Indian and US contexts*. Paper presented at the Avinashilingam Women's University.

**Raghavan, C**. (2007, October). *The changing definition of date rape*. Invited panelist on grey rape sponsored by Cosmopolitan and John Jay College of Criminal Justice.

**Raghavan, C**. (2007, October). *The role of community violence and peer affiliation in understanding partner violence*. Invited speaker at the Colloquium Series at the University of Arizona, Tucson.

**Raghavan, C**. (2007,October). *Structural risk factors for perpetration of intimate partner violence*. Invited speaker at the Research to Practice Series, New York City Alliance Against Sexual Assault.

**Raghavan, C.**, Gentile, K., Collado, L., & Rajah, V. (2007, May) *How relationships between young men impact on violence.* Invited Speaker at Moving Our Systems Forward. The Role of Human Service Providers in Ending Violence Against Women, sponsored by John Jay College, Safe Horizon, New York State Office for the Prevention of Domestic Violence, A Call to Men. New York, NY.

**Raghavan, C.** (2005). *Responding to engaging men*. Invited Panelist at Ending Violence Against Women: A Call to Men: Safe Horizon and John Jay College of Criminal Justice, New York City, New York.

**Raghavan, C.** (2003). *Domestic violence prevention & treatment*. Invited speaker at the Rotary Club International, Kuala Lumpur, Malaysia.

**Raghavan, C.** (2002). *Family violence research, prevention & treatment.* Invited talk given at the Graduate Lecture Series, John Jay College of Criminal Justice – The City University of New York.

**POSTERS AND PRESENTATIONS (LAST TEN YEARS)**

**Raghavan, C**., Doychak, K., Juraschek, E., Legg, A., & Feliciano, S. (September, 2023). *Coercive Control and Intimate Partner Violence: Applications in Differing Contexts*. European Conference on Domestic Violence. Reykjavik, Iceland.

Ali, Y., **Raghavan, C**., & Feliciano, S. (2022, August). What Role Does Prior Religious Belief Play in Cult Susceptibility: A Descriptive Study. In E. Juraschek (Chair), *Power and Control in Cults* [Symposium]. American Psychological Association 2022 Annual Convention, Minneapolis, MN, United States.

Ali, Y., **Raghavan, C**., & Feliciano, S. (2021, November). What Role Does Prior Religious Belief Play in Cult Susceptibility: A Descriptive Study. In E. Juraschek (Chair), *A Flexible Framework: Using Coercive Control to Operationalize Abuse in Sex Trafficking and Cults* [Panel]. American Society of Criminology 2021 Annual Convention, Chicago, IL, United States.

Legg, A., **Raghavan, C**., & Morales, S. (2019, November). Not safe for all: Violence against men in commercial sex. Paper presented at the annual meeting of the American Society of Criminology Conference, San Francisco, CA.

Doychak, K., & **Raghavan, C.** (2018, November). No voice or vote: Coercive control

and trauma-coerced attachment in sex-trafficking victims. In J. Pomerantz (Chair), *Coercive Control: Different Contexts, Different Measures, Different Issues.* Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Juraschek, E., & **Raghavan, C.** (2018, November). How sexual coercion manifests in abusive relationships. In E. Juraschek (Chair), *What is Still Unseen in Violent Relationships: Sexual Coercion, Impression Management, and Cultural Definitions.* Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Legg, A., **Raghavan, C.**, & Doychak, K. (2018, November). *Client perpetrated violence against male sex workers*. Poster session presented at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Pomerantz, J., **Raghavan, C**., Doychak, K., & Mitchell, E. (2018, November). Power imbalances within a sex trafficking dynamic: A linguistic analysis of compliance. In J. Pomerantz (Chair), *Coercive Control: Different Contexts, Different Measures, Different Issues.* Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA..

**Raghavan, C**., & Doychak, K. (2018, November). Broadening our understanding of coercive control as a marker of abusive power imbalances. In J. Pomerantz (Chair), *Coercive Control: Different Contexts, Different Measures, Different Issues.* Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Reissman, B., Doychak, K., Crossman, A., & **Raghavan, C.** (2018, November). "I'm the greatest:" Pride, impression management, and denial of coercive control and physical abuse by perpetrators of intimate partner violence. In E. Juraschek (Chair), *What is Still Unseen in Violent Relationships: Sexual Coercion, Impression Management, and Cultural Definitions*. Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA..

Unger, L. D., Doychak, K., Juraschek, E. F., Pomerantz, J., & **Raghavan, C**. (2018, November). Characteristics of isolation and social support among victims of sex trafficking. In L. D. Unger (Chair), *Victimization of Women and Persons of Color*. Session conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Sriken, J. & **Raghavan, C**. (2018). Prevalence and correlates of intimate partner violence among at-risk men who have sex with men. Poster to be presented at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Doychak, K. & **Raghavan, C**. (2018, March). Intermittent reward and punishment: Emotional exploitation in a sex-trafficking context. In K. Doychak (Chair), *Coercive Control: Tactics and Responses in a Sex-Trafficking Context.* Symposium conducted at the meeting of the Eastern Psychological Association, Philadelphia, PA.

Mitchell, J.E., Juraschek, E., & **Raghavan, C.** (2018, march). *The Impact of Coercive Control on Use of Specific Sexual Coercion Tactics.* Poster presented at the Eastern Psychological Association Conference. Philadelphia, PA.

Pomerantz, J., Cohen, S., & **Raghavan, C**. (2018, March). Elaboration as Compliance Tactic: A Linguistic Analysis within Sex Trafficking. In K. Doychak (Chair), *Coercive Control: Tactics and Responses in a Sex-Trafficking Context*. Symposium conducted at the meeting of the Eastern Psychological Association, Philadelphia, PA.

Unger, L. D., Doychak, K., Pomerantz, J., & **Raghavan, C.** (2018, March). Coercive control by proxy in victims of sex trafficking. In K. Doychak (Chair), *Coercive Control: Tactics and Responses in a Sex-Trafficking Context*. Symposium conducted at the Annual Meeting of the Eastern Psychological Association, Philadelphia, PA.

*Mahan, E., Doychak, K., & **Raghavan, C**. (2017, March). *Shrinking Social Space: Understanding Isolation in Trafficking Survivors*. Poster presented at the annual meeting of Eastern Psychological Association, Boston, MA.

*Pomerantz, J., Cohen, S.J., & **Raghavan, C**. (2017, March). *Compliance in the Absence of Proximal Intimidation within Abusive Interpersonal Dynamics.* Poster presented at the annual meeting of Eastern Psychological Association, Boston, MA.

*Pipitone, J.M. & **Raghavan, C**. (2015, September). *Physical Environments of Study Abroad: Student Experiences of Self and Place in Morocco and Indonesia.* **Individual paper** presented on the "Influence of Place and Space on Young People's Mobilities in Urban and Rural Contexts" **Panel Session** at the Royal Geographic Society (RGS) with the Institute of British Geographers (IBG), Exeter, United Kingdom.

*Pipitone, J.M. & **Raghavan, C**. (2015, September). *Integrating the Physical and Psychological: Adolescent Experiences of a Therapeutic Wilderness.* **Individual paper** presented on the "Children and Nature in the Anthropocene: Impacts of children, families, and young people connecting with nature " **Panel Session** at the Royal Geographic Society (RGS) with the Institute of British Geographers (IBG), Exeter, United Kingdom.

*Pipitone, J.M. & **Raghavan, C**. (2015, March). *International Learning Environments: Student Experiences and Experiential Pedagogies in Morocco and Bali.* **Individual paper** presented at the annual meeting of the Eastern Psychological Association, Philadelphia, PA.

***Raghavan, C.,** Loveland, J. E., & Tuller, A. (2014, November). Use of sexual coercion as a control tactic by abusive men. Presentation at the American Society of Criminology's Annual Meeting, San Francisco, CA.

*Crossman, A., **Raghavan, C.**, & Loveland, J. E. (2014, March). Shame, self-deception, and the batterer. Poster presentation at the Eastern Psychological Association Meeting, Boston, MA.

*Kaplenko, H., Loveland, J. E., & **Raghavan, C**. (2014, November). Relationships among shame, restrictiveness, authoritativeness, and coercive control in a sample of men mandated to batterer treatment. Poster Presentation at the American Society of Criminology's Annual Meeting, San Francisco, CA.

*Loveland, J. E., & **Raghavan, C.** (2014, March). The disjuncture between sexual labels and sexual behavior. Poster presentation at the Eastern Psychological Association Meeting, Boston, MA.

*Pipitone, J.M. & **Raghavan, C**. (2014, April). *Assessing Student Engagement with the Arts through the Teaching of Psychology in Bali.* **Individual paper** presented at The Arts & Higher Education: Building Creative Partnerships and Assessing Program Impacts Conference, Baruch College, New York, NY.

*Loveland, J.E., & **Raghavan, C**. (2013, March). *Near Lethal Violence Among Men in Same Sex Relationships.* Poster presentation at the Eastern Psychological Association Meeting, New York, New York.

*Loveland, J.E., & **Raghavan, C**. (2013, March). *Near Lethal Violence Among Women in Same Sex Relationships.* Poster presentation at the American Psychology-Law Society Conference, Portland, Oregon.

*Barbaro, L. M. & **Raghavan, C**. (2012, November). *Resistance to violence*: *Differences between heterosexual, gay and lesbian victims if intimate partner violence*. Paper presented at 68th Annual Meeting of the American Society of Criminology, Chicago, IL.

*Barbaro, L. M. & **Raghavan, C.** (2012, October). *Types of resistance: The effect on fight resolution among LGBT intimate partners*. Paper presented at 12th Annual Diversity Challenge, Boston, MA.

*Loveland, J. E., & **Raghavan, C**. (2012, November). *Staying with the Perpetrator: Differences between Heterosexual and Same Sex Victims*. Paper presentation at the American Society of Criminology's Annual Meeting, Chicago, Illinois.

*Loveland, J. E., & **Raghavan, C**. (2012, August). *The complex relationship between women's sexual identity and sexual preference*. Poster presentation at the American Psychological Association Conference, Orlando, Florida.

***Raghavan, C**, Beck, C, Anderson, E.R., & Brewster, K.O. (2011, November). *How are violence tactics gendered? Examination of partner violence behaviors in male same sex relationships*. Paper presented at the annual meeting of the American Society of Criminology, Washington, D.C.

*Viñas-Racionero, R., **Raghavan, C**., Soria-Verde M. A., & Prat-Santaolària, R. (2011, August). *Severity of Intimate Partner Violence Behaviors in Spain: What is the role of stalking?*. Paper presented at the 119th American Psychological Association (APA) Annual Convention, Washington, D.C.

***Raghavan, C**., Cohen, S., & Tamborra, T. (2011, June). *A New Model of Sexual Coercion: Theory and Measure Development*. Paper presented at the meeting of the Society of Community Research and Action, APA Division 45, Chicago, IL. (Portions of this talk were presented at the 6th National Congress of Legal and Forensic Psychology, Palma de Mallorca, Spain and at Vera Institute of Justice, New York, New York).

***Raghavan, C**., Cohen, S., & Tamborra, T. (2011, April). *A New Model of Sexual Coercion: Theory and Measure Development.* Paper presented at the 6th National Congress of Legal and Forensic Psychology, Palma de Mallorca, Spain.

*Viñas-Racionero, R., Soria-Verde M. A., **Raghavan, C.,** & Prat-Santaolària, R. (2011, April). *El incremento del riesgo de las dinámicas de acoso con finalidad romática o vengadora: Pefiles de agresión domestica [The increasing risk of romantic and revenge stalking dynamics: A domestic aggression profile].* Paper presented in the VI Congreso de Psicología Jurídica y Forense, Palma de Mallorca, Spain.

*Soria-Verde M. A., Viñas-Racionero, R., **Raghavan, C**., & Prat-Santaolària, R. (2011, July). *Investigación Prelimiar de los perfiles de las tentativas de homicidio domestico [Preliminary investigation of profiles of domestic homicide attempts*]. Paper presented in the Congreso internacional sobre: manipulación psicológica, grupos sectarios, socioadicciones y sus daños, Barcelona, Spain.

*Viñas-Racionero, R., Soria-Verde M. A., Prat-Santaolària, R., & **Raghavan, C**. (2011, March). *Domestic stalking violence in Spain: Could certain types of stalking*

*behaviors be related with aggressions?* Paper presented at the IV International Congress on Psychology and Law, Miami, FL.

***Raghavan, C**, Tamborra, T, & Cohen, S. (2010, November). *Development of a new gender sensitive sexual coercion scale*. Paper presented at the annual meeting of the American Society of Criminology, San Francisco, CA.

*Decker, M., Tuller, A., **Raghavan, C**. (2010, November). *Resistance to sexual assault: A comparison of male, female & transgender survivors*. Poster presented at the annual meeting of the American Society of Criminology, San Francisco, CA.

*Duro, A.S., Sriken, J. & **Raghavan, C**. (2010, November). *Client Violence during Male Sex Work: Hidden and Unknown Violence among Men Who Have Sex with Men*. Poster presented at the 62nd Annual Meeting of the American Society of Criminology, San Francisco, CA.

*Decker, M. & **Raghavan, C**. (2010, November). *Media's creation of the ineffective bystander*. Paper presented at the 2010 Annual Meeting of the American Society of Criminology, San Francisco, CA.

*Sriken, J. & **Raghavan, C.** (2010, November). *"Wanna get dirrty": The internalization of sexual and racial objectification*. Paper presented at the 2010 Annual Meeting of the American Society of Criminology, San Francisco, CA.

*Simons, K. & **Raghavan, C**. (2010, November). *Make her say aah: The evolution of television media and its impact on society's objectification of Black women.* Paper presented at the 2010 Annual Meeting of the American Society of Criminology, San Francisco, CA.

**Raghavan, C**., and Beck, C. (2010, March). *What About Coercive Control in Same Sex Relationships*? Paper presented at the annual meeting of American Psychological-Law Society conference in Vancouver, Canada.

**Raghavan, C**., and Beck, C. (2010, June). *Coercive Control in Abusive Relationships.* Paper presented at the Ninth Biennial International Conference, John Jay College of Criminal Justice, Marrakesh, Morocco

**Raghavan, C**., and Ranjan, S. (2009, November). *Development of a Community Response to Partner Violence Scale*. Poster presented at the annual meeting of the American Society of Criminology, Philadelphia, PA.

*Sriken, J., **Tuller, A.,** & Raghavan, C. (2009, November). *Risk of intimate partner homicide among marginalized men who have sex with men.* Poster presented at the annual meeting of the American Society of Criminology, Philadelphia, PA.

***Tuller, A.,** & Raghavan, C. (2009, November). *Coercive control in same sex relationships*. Paper presented at the annual meeting of the American Society of Criminology, Philadelphia, PA.

**Raghavan, C**. (2008, March). Chair: *Is cyberstalking stalking? Legal, theoretical, and measurement issues*. Panel presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Jones, C., Reardon, L., & **Raghavan, C**. (2008, March). *The Development of the Cyber Stalking Scale (CSTS)*. Paper presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Tuller, A., Jones, C., & **Raghavan, C**. (2008, March). *Is cyberstalking part of intimate partner violence?* Paper presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Davis, S. M., & **Raghavan, C**. (2008, March). *Stalking and jealousy: Does the relationship hold across gender and culture?* Paper presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Ha, D., Williams, J. F., **Raghavan, C**., Tuller, A., & Schraft, C. (2008, March). *Does the CTS really measure the worst conflict? Evidence from college students suggests not*. Poster presented at the American Psychological-Law Society conference in in Jacksonville, F.L.

*Jones, C., Tuller, A., & **Raghavan, C**. (2008, March). *Intimate partner violence and social support peer networks in gay, lesbian, and straight students*. Poster presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Tuller, A., & **Raghavan, C.** (2008, November). *Shame, Anger, and Violence Among Men Who Have Sex with Men.* Paper presented at the annual meeting of the American Society of Criminology, St. Louis, MO.

**Raghavan, C**. (2007, November). Chair: *Conceptualizing intimate partner violence in a gender and culture-sensitive framework*. Panel presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*DeSimone, L. J., Davis, S. M., & **Raghavan, C**. (2007, November). *Why did we fight and what made it so bad: Narratives of intimate partner conflict*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Davis, S. M., DeSimone, L. J., & **Raghavan, C**. (2007, November). *The role of jealousy in intimate partner violence: Gender and ethnic group differences*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

**Raghavan, C**., Kavanagh, A. M., Rajah, V., Gentile, K., & Collado, L. (2007, November). *Community violence, violence in the social support networks, and male perpetration of intimate partner violence*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

Johnson, M., **Raghavan, C.**, Citron, K., & Kavanagh, A. M. (2007, November). *Examining 'Expectations of police compliance with Miranda protections': Ethnic group differences*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Kassen, M., & **Raghavan, C.** (2007, November). *Exposure to urban violence and contributory factors to posttraumatic stress in a diverse college sample*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Davis, S. M., Jones, C., & **Raghavan, C**. (2007, November). *Peer validation of partner violence*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*DeSimone, L. J., Attoh, A., & **Raghavan, C**. (2007, November). *Abusive childhood experiences: differentiating anger in adulthood*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Hey, A. L., Kassen, M., & **Raghavan, C**. (2007, November). *Methodological or real differences among intimate partner femicide research: a qualitative meta-analysis*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Jenkins, J., Sergenian, S., & **Raghavan, C**. (2007, November). *Dating violence and school performance among college students*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Jones, C., Reardon, L. M., & **Raghavan, C**. (2007, November). *Does social support mediate or moderate the relationship between community violence and intimate partner violence?* Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Kavanagh, A. M. J., & **Raghavan, C**. (2007, November). *Personality traits of males who perpetrate sexual coercion and/or physical abuse in dating relationships*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Reardon, L. M., Davis, S. M., & **Raghavan, C**. (2007, November). *Relationship monitoring or stalking?* Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Tuller, A., Schraft, C. V., & **Raghavan, C**. (2007, November). *The role of shame, isolation and hostility within intimate partner violence*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Williams, J. F., Ha, D., Davis, S. M., & **Raghavan, C**. (2007, November). *Emotions felt after a worst conflict among intimate partners: Initial validation of the ATWC scale*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Davis, S. M., DeSimone, L., & **Raghavan, C**. (2007, May). *Jealousy and intimate partner violence in a culturally diverse college population*. Poster presented at the Association for Psychological Science Convention, Washington, DC.

*DeSimone, L., Kamath, G., & **Raghavan, C**. (2007, May). *Intimate partner violence in a diverse college population: A preliminary test of intersectionality*. Poster presented at the Association for Psychological Science Convention, Washington, DC.

**Raghavan, C**. (2007). Chair, *Victimization; Psychology & Law*. 3rd Annual Forensic Psychology Graduate Research Conference, John Jay College of Criminal Justice, NY, NY.

*DeSimone. L, & **Raghavan, C**. (2007, May). *A test of intersectionality: Intimate partner violence in a culturally diverse lesbian, gay, and heterosexual college population*. Poster presented at the John Jay Graduate Forensic Psychology Research Conference, New York, NY.

*Reardon, L., Jones, C., & **Raghavan, C**. (2007, May). *Community violence and intimate partner violence in an ethnically diverse population: The role of social support*. Poster presented at the John Jay Graduate Forensic Psychology Research Conference, New York, NY.

*Tuller, A., Schraft, C., & **Raghavan, C**. (2007, May). *Emotional consequences of intimate partner conflict: An exploratory investigation of gender differences*. Poster presented at the John Jay Graduate Forensic Psychology Research Conference, New York, NY.

*Williams, J., Ha, D., Davis, S. M., & **Raghavan, C**. (2007, May). *Exploring the factor structure and determining the reliability of the After the Worst Conflict Scale*. Poster presented at the John Jay Graduate Forensic Psychology Research Conference, New York, NY.

*Davis, S. M., DeSimone, L., & **Raghavan, C**. (2007, March). *Ethnic and gender group differences in intimate partner jealousy in a diverse college population*. Paper

presented at the Mid-Hudson Undergraduate Psychology Research Conference, New Paltz, NY.

**Raghavan, C**. (2006, Nov). Session Chair: *Gender, sex, and violence*. Panel presented at the meeting of the American Society of Criminology, Los Angeles, CA.

**Raghavan, C**. (2006, Nov). *A Feminist-community model of intimate partner violence*. In C. Raghavan (Chair), Gender, sex, and violence. Paper presented at the meeting of the American Society of Criminology, Los Angeles, CA.

**Raghavan, C**., Collado, L., & Desimone, L. (2006, November). *Gender differences in dating scripts and IPV*. Poster presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Collado, L. & **Raghavan, C**. (2006, November). *The effects of acculturation on intimate partner violence among Hispanics and Non-Hispanic immigrants*. Poster presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*McHenry, S. P., Gates, K., & **Raghavan, C**. (2006, November). *Sexual coercion and sexual confusion*. Paper presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Jenkins, J, & **Raghavan, C**. (2006, November). *The association of social development/Age on juvenile fear of crime levels In New York City Public Schools*. Paper presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Yazykova, K., **Raghavan, C**., & O'Connor, M. (2006, November). *Categories of stalking tactics and their associations with intimate partner violence*. Paper presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Yazykova, K., **Raghavan, C**., O'Connor, M., & Dernison, A. (2006, November). *Associations between stalking tactics, intimate partner violence, and underlying motivations*. Poster presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Gates, K., **Raghavan, C**., & Kavanagh, A-M. (2006, August). *Predictive factors for men who sexually coerce intimate partners*. Poster presented at the annual meeting of the American Psychology Association, New Orleans, LA.

**Raghavan, C**. ,& Cruz, G. (2006, May). *A test of two models of intimate partner violence*. Poster presented at the annual American Psychological Society Conference, New York, NY.

*Gates, K., McHenry, S., **Raghavan, C**., & Kavanagh, A-M. (2006, May). *Sexual abuse in intimate relationships: Effect on female victims*. Poster presented at the annual meeting of the American Psychology Society, New York, NY.

*Carter, A., R**aghavan, C**., & Kavanagh, A-M. (2006, May). *Is alcohol use a cause or a consequence of dating violence in an urban college sample?* Poster presented at the annual American Psychological Society Conference, New York, NY.

*Kavanagh, A-M., **Raghavan, C**., & Gates, K. (2006, March). *Personality traits of men and women who perpetrate sexual coercion*. Poster presented at the annual American Psychological Society Conference, New York, NY.

*Kavanagh, A-M., **Raghavan, C**., & Gates, K. (2006, March). *The relationship between gender and sexual coercion*. Poster presented at the American Psychological-Law Society conference in Florida, March, 2006.

*Kavanagh, A-M., & **Raghavan, C**., (2006, March). *The influence of social support on intimate partner violence*. Poster presented at the American Psychological-Law Society conference in Florida, March, 2006.

Falkenbach, D., **Raghavan, C**., & Krishnan, S. (2006, March). *Consideration of psychopathic traits in perpetrators of domestic violence*. Poster presented at the annual meeting of the American Psychology-Law Society Conference, St. Petersburg, FL.

*Ranjan, S., **Raghavan, C**., & O'Connor, M. (2005). *Stalking and intimate partner violence victimization in an urban sample of immigrant commuter college students*. Paper presented at the 14th World Congress of Criminology, Philadephia, PA.

**Raghavan, C**. (2005). Session Chair: *Dating violence in an ethnically diverse sample of college students: Correlates and consequences*. Panel conducted at the American Psychology-Law Society Conference, La Jolla, California.

**Raghavan, C**., Kavanagh, A-M., Gentile, K., Rajah, V., & Collado, L. (2005). *Description of dating violence and associated community risk factors in an urban college sample*. Paper presented at the American Psychology-Law Society Conference, La Jolla, California.

Gentile, K., **Raghavan, C**., Kavanagh, A-M., & Rajah, V. (2005). *It doesn't happen here: An assessment of eating disorders in ethnically diverse urban sample of male and female college students*. Paper presented at the American Psychology-Law Society Conference, La Jolla, California.

Rajah, V., **Raghavan, C**., & Gentile, K. (2005). *Gender differences in accounts for dating violence among a low income minority college sample*. Paper presented at the American Psychology-Law Society Biennial Conference, La Jolla, California.

*Carter, A., **Raghavan, C**., Rajah, V., Gentile, K., & Kavanagh, A-M. (2005). *Alcohol use and dating violence in an urban college sample. A dual model of traumatic response*. Paper presented at the American Psychology-Law Society Biennial Conference, La Jolla, California.

*Kavanagh, A-M., & Raghavan, C. (March, 2005). Male peer support and dating violence. Poster presented at the American Psychological-Law Society conference in Arizona, March, 2005.

O'Connor, M., Galietta, M., & **Raghavan, C**. (2005). *Level of exposure to stalking in an urban college sample: implications for policy and services.* Paper presented at the American Psychology-Law Society Conference, La Jolla, California.

**Raghavan, C**. (March, 2004). Chair: *Issues in Domestic Violence*. Panel conducted at the American Psychology-Law Society Conference, Scottsdale, Arizona.

**Raghavan, C**., Mennerich, A., & James, S. (March, 2004). *Domestic violence in a neighborhood context: Links between neighborhood disorder, drug use, criminal activity, and community violence*. In Raghavan, C. (Chair), Issues in domestic violence. Panel conducted at the American Psychology-Law Society Conference, Scottsdale, Arizona.

**Raghavan, C**. (Feb, 2004). Chair: *Collective and individual space: views from the abstract, transnational and local perspectives.* Panel conducted at the Third International Conference on Crime and Criminal Justice in the Caribbean, Kingston, Jamaica.

**Raghavan, C**., Mennerich, A., & James, S. (Feb, 2004). *The influence of public life on private: A study of crime, drugs and domestic violence*. In C. Raghavan (Chair), Collective and individual space: Views from the abstract, transnational and local perspectives. Panel conducted at the Third International Conference on Crime and Criminal Justice in the Caribbean, Kingston, Jamaica.

**FUNDED RESEARCH PROJECTS AT JOHN JAY**

PSC-CUNY Research Grant, John Jay College of Criminal Justice (2020-2022)

PSC-CUNY Research Grant, John Jay College of Criminal Justice (2018-2019)

PSC-CUNY Research Grant, John Jay College of Criminal Justice (2013-2014)

Research Assistant Fund, John Jay College of Criminal Justice (2009-2010)
Title: *An Investigation of Physical and Sexual Violence among Drug using Men who have Sex with Men*
PI: **C. Raghavan**
Amount: $1,000

Research Assistant Fund, John Jay College of Criminal Justice (2008-2009)
Title: *An Investigation of Severe and Near Lethal Violence among Gay Men*
PI: **C. Raghavan**
Amount: $1,000

PSC-CUNY Research Grant, City University of New York (2006-2007)
Title: *Gender symmetry, intimate partner violence, and post-traumatic stress disorder*.
PI: **C. Raghavan**
Amount: $5,940

Faculty Fellowship Publication Program, City University of New York (2006).
Title: *The differential risk hypothesis: a theory predicting minor and severe forms of intimate partner violence.*
PI: **C. Raghavan**
Amount: $3,800

PSC-CUNY Research Grant, City University of New York (2005-2006)
Title: *Why are rates of violence so much higher in this urban college sample?* An in-depth exploration of contributing community factors.
PI: **C. Raghavan**
Amount: $3,800

PSC-CUNY Research Grant, City University of New York (2004-2005)
Title: *Dating violence and academic performance in first year students at John Jay College Of Criminal Justice.*
PI: **C. Raghavan**
Amount: $4,900

Research Assistance Fund, Jay College of Criminal Justice (2004-2005)
Title: *An examination of drinking and violence using the calendar method.*
PI: **C. Raghavan**
Amount: $1000

Forensic Psychology Research Grant, John Jay College of Criminal Justice (2004-05)
Title: *An examination of dating violence in first year students at John Jay College Of Criminal Justice.*
PI: **C. Raghavan**

Co-PI: Katie Gentile and Valli Rajah
Amount: $6,660

PSC-CUNY Research Grant, City University of New York (2003-2004)
Title: *Exposure to community violence as a mediator of individual and neighborhood risk factors for domestic violence.*
PI: **C. Raghavan**
Amount: $4,920

## DOCTORAL DISSERTATION

Title: An investigation of cross-cultural differences and similarities between Asian Americans and European Americans based on a new multidimensional model of esteem.

**University of Illinois at Urbana Champaign, Department of Psychology**
Chair: Howard Berenbaum, Ph.D

### OTHER PROFESSIONAL SERVICES

University Service
Elected to University-Wide Personnel and Budget Committee (P & B) (2010-2011, 2011-2012).
Governance Committee of the MA in International Crime and Justice (2009-current)
Sexual Harassment Awareness Committee (2010-current).
President's Advisory Committee on International Programs (2008-current).
Appointed Director of BA/MA Program (2007-current).
Member of Committee on Graduate Studies (2007-current).
Elected to Department Personnel and Budget Committee (P & B) (2004, 2005, 2006, 2007-2008).
Organizing committee of the proposed M.A. in International Crime and Justice (2006-2009).
Appointed to Affirmative Action Committee (2006-2010).
Member of the Gender Studies Committee (2002-2010)

Ad Hoc Reviewer
Feminist Criminology (September, 2008, April 2010, May 2011, July 2013).
International Journal of Forensic Mental Health (June 2010, December, 2010).
Violence Against Women (March 2004, January 2008, November 2010, March 2011).
International Journal of Offender Therapy and Comparative Criminology (November 2010, March 2011).
Women Studies Quarterly (July, 2010).

Journal of Consulting and Clinical Psychology (August 2008, November, 2009).
Book Review for Journal of Trauma and Dissociation (March, 2009).
Book Review for Oxford University Press (August, 2007).
Violence and Victims (January, 2008).
Journal of Abnormal Psychology (1997).
Journal of Traumatic Stress, (Jan 1998, Apr 1998).
Cognitive Behavior and Therapy (June 2000).
Journal of Substance Abuse Treatment (July 2002)

**PROFESSIONAL AFFILIATIONS**

New York Psychological Association
American Society of Criminology
American Psychological Association

**PAST HONORS AND AWARDS**

| | |
|---|---|
| 2013 | Baruch-Rubin Summer Faculty Fellow |
| 2014 | Baruch-Rubin Faculty Fellow |
| 1992-1993 | University of Illinois Fellowship |
| 1990 | Phi Beta Kappa |
| 1991 | Smith College, Magna cum laude |
| 1988-1992 | Smith College International Student Grant |
| 1988-1992 | Smith College Dean’s List |
| 1988-1992 | Smith College First Group Scholar |

## APPENDIX B

1. Exhibit 1: Roberts First Amended Complaint
2. Exhibit 2: Third Amended Complaint
3. Exhibit 3: Mr. Golden's Sworn Deposition and related exhibits produced during this deposition. These exhibits are noted in the following format: Exhibit3-Golden.
4. Exhibit 4: Mr. Bjorkman's Sworn Deposition
5. Exhibit 5: [redacted]
6. Exhibit 6: [redacted]
7. Exhibit 7: Sworn Deposition of Ms. Holly Madden
8. Exhibit 8: Officer LaFreniere's Report (3-10-2021)
9. Exhibit 9: Sworn Deposition of Cheri Benjamin
10. Exhibit 10: Sworn Deposition of [redacted]
11. Exhibit 11: Sworn Deposition of Anya Roberts
12. Exhibit 12: Sworn Deposition of [redacted]
13. Depositions not cited but reviewed include those of Mr. Hellickson and [redacted] among other potentially relevant documents